BRESSLER, AMERY & ROSS, P.C.
John D. Miller, III
Justin E. Condit
325 Columbia Turnpike
Florham Park, NJ 07932
P: 973.660.4428
F: 973.514.1660
jmiller@bressler.com
jcondit@bressler.com

and

KOLEY JESSEN PC, LLO
Margaret C. Hershiser, Neb. #19545
(*pro hac vice* motion to be filed)
Patrice D. Ott, Neb. #24435
(*pro hac vice* motion to be filed)
One Pacific Place, Suite 800
1125 South 103rd Street
Omaha, NE 68124-1079
(402) 390-9500
(402) 390-9500 (facsimile)

*Attorneys for Plaintiff, Sandhills Global, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SANDHILLS GLOBAL, INC., | Civil Action No. |
| Plaintiff, | |
| v. | **VERIFIED COMPLAINT AND JURY DEMAND** |
| LAWRENCE GARAFOLA, individual, and FACTS TECHNOLOGY LLC, a New Jersey limited liability company, | |
| Defendants. | |

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Sandhills Global, Inc. f/k/a Sandhills Publishing Company ("Sandhills") is a corporation organized under the laws of the State of Nebraska with its principal place of business located in Lincoln, Nebraska.

2.      Defendant Lawrence Garafola, Sr. ("Garafola") is an individual residing in Neshanic Station, New Jersey. Upon information and belief, Garafola is not a minor, incompetent person or a person in the military service so as to be entitled to the benefit of the Service members Civil Relief Act of 2003 (50 U.S.C. § 501 *et seq.*).

3.      Defendant Facts Technology LLC was formed as a New Jersey limited liability company on September 16, 2019.

4.      Jurisdiction is proper in this Court pursuant to 28 U.S. Code § 1331 and the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.*

5.      Subject matter jurisdiction also exists by virtue of diversity of citizenship, pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

6.      This Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S. Code § 1367.

7.      Venue is appropriate because the parties stipulated that this judicial district would be an appropriate venue for any action arising out of the agreements at issue and pursuant to 28 U.S. Code § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## GENERAL FACTUAL ALLEGATIONS

8.      Founded in 1978, Sandhills is a global leader in servicing the trucking, agriculture, construction, heavy machinery, aviation, and related industries with a diverse range of products and services, including print and electronic publication of well-established trade publications, as well as websites and hosted technology services customized to meet the evolving needs of Sandhills' customers.

9.      Sandhills' core print publications and websites lead their industries through calculated distribution channels that leverage both print and digital media. Sandhills supports multiple international publications and connects buyers and sellers of equipment in the trucking, agriculture, construction, heavy machinery, aviation, and related industries. Sandhills' customers benefit from the opportunity to expand their brands through cross-marketing on any number of Sandhills' many well-regarded print and electronic publications.

10.     Sandhills is also engaged in the online auction industry designed to facilitate and carryout interstate commerce.

11.     Sandhills expends considerable time and money to create, maintain, and enhance its goodwill with its customers.  This includes, but is not limited to: Sandhills' brand name and global recognition in the many industries it services for bringing cutting edge auction technology to its customers in an a robust and hassle free manner; its strong customer/bidder/auctioneer base and its related customer/bidder/auctioneer lists and databases containing confidential information about its customers/bidders/auctioneers; its websites and domain names through which it provides services to its customers; copyrights and trademarks; cutting edge, proprietary technology to service the auction needs of its customers/bidders/auctioneers; trade secrets; and Sandhills' overall reputation among its customers/bidders/auctioneers in highly competitive industry.

12.     For over forty (40) years, Sandhills has worked tirelessly to develop goodwill, resulting in Sandhills becoming a global leader in the industries it serves.

13.     Customers and people in the industries served by Sandhills know the Sandhills' name and the Sandhills' family of brands.

The Sandhills Family: the Equipmentfacts Acquisition

14.     From 2001 to 2018, Garafola was the sole owner and Chief Executive Officer of Equipmentfacts, LLC, a New Jersey limited liability company ("Equipmentfacts").

15.     Equipmentfacts was engaged in the business of providing online auction solutions for heavy equipment, truck, agriculture and related action industries. Equipmentfacts provided industry-specific online bidding systems, websites for virtual attendance at auctions, the *Auction Facts Monthly* publication, third-party advertisement services and podcast content (the "Equipmentfacts Business").

16.     On July 16, 2018, Equipmentfacts and Sandhills entered into an Asset Purchase Agreement whereby Sandhills purchased from Equipmentfacts substantially all of the assets of Equipmentfacts, free and clear of all liens and encumbrances, including but not limited to, the following assets:

    a.     Equipmentfacts' Intellectual Property, as defined in the Asset Purchase Agreement, which includes certain email domains, certain web domain names, and databases (including the customer database, bidder database, and auctioneer list);

    b.     Rights to and under customer contracts and purchase orders, whether written or oral;

    c.     "[A]ll books, records, and other documents, including fixed asset records, sale and advertising materials (including all price lists, customer lists, bidder lists, auctioneer lists and any related lists and records), copies of any employer or employee records, technical and research data, books of account and records, ledgers, files, correspondence, specifications, creative materials, studies, reports and other items" to the extent they relate to the Equipmentfacts Business or the Included Assets (as defined in the Asset Purchase Agreement) and certain excluded records that are not relevant to this dispute; and

    d.     The goodwill of Equipmentfacts.

17.     Section 4.3 of the Asset Purchase Agreement requires Garafola to not take any action that "is intended to have the effect of discouraging any lessor, licensor, customer, supplier,

sales representative, dealer, distributor or other business associate of either [Equipmentfacts] or [Garafola] with respect to any aspect of the [Equipmentfacts] Business from maintaining the same business relationship with [Sandhills] after closing as it maintained with [Equipmentfacts] and [Garafola] prior to closing." Pursuant to Section 5.2 of the Asset Purchase Agreement, this covenant survives for twenty-four (24) months after closing, or until July 16, 2020.

18.     Sandhills paid $1,500,000.00 for the purchase of Equipmentfacts.

Garafola's Contractual Obligations to Sandhills

19.     On July 16, 2018, in conjunction with the Asset Purchase Agreement, Sandhills and Garafola entered into an employment agreement by which Garafola was employed by Sandhills (the "Employment Agreement"). Garafola continued to manage the New Jersey office and reported to Sandhill's Director of New Products. A true and correct copy of the Employment Agreement is attached as **Exhibit A** and incorporated by reference.

20.     Pursuant to the Employment Agreement, Garafola agreed to exercise a high degree of professionalism and devote all of his business hours to performing his duties. Garafola also agreed to devote his full-time professional energy, skill, attention and best efforts to Sandhills.

21.     Pursuant to Section 4 of the Employment Agreement, Garafola agreed that he would not engage in any other business or render any commercial or professional services, directly or indirectly to any other person or organization, whether for compensation or otherwise, which would interfere with his employment with Sandhills unless explicitly approved in writing by Sandhills.

22.     At no time did Sandhills provide written approval for Garafola to engage in any other business or render commercial or professional services directly or indirectly to any other

person or organization, whether for compensation or otherwise, that would interfere with his employment with Sandhills.

23.     Pursuant to the Employment Agreement, Garafola was provided access to Sandhills' confidential and proprietary information, including but not limited to Sandhills' customer/bidder/auctioneer lists and/or customer/bidder/auctioneer databases.

24.     In light of the significant purchase price set forth in the Asset Purchase Agreement, the Employment Agreement is reasonable both in time and scope. Garafola acquired special knowledge about Sandhills' business and customers/bidders/auctioneers because of his employment with Sandhills. The confidentiality and other provisions of the Employment Agreement are necessary to protect Sandhills' legitimate business interests.

25.     Also on July 16, 2018, Garafola and Sandhills entered into a Noncompetition, Noninterference and Confidentiality Agreement (the "Restrictive Covenant Agreement"), a true and correct copy of which is attached as **Exhibit B**.

26.     The restrictions set forth in the Restrictive Covenant Agreement are reasonable in time and scope, especially in light of the significant purchase price ($1,500,000.00) paid by Sandhills for Equipmentfacts.

27.     The Restrictive Covenant Agreement includes specific restrictions on Garafola's activities following consummation of the Asset Purchase Agreement, including restrictions on competing (directly or indirectly) with Sandhills; prohibitions on direct or indirect solicitation of business for any other person or entity that competes with Sandhills; restrictions on solicitation of employees, and prohibitions on interfering with Sandhills' business relationships.

28.     The restrictions in the Restrictive Covenant Agreement remain in effect for five (5) years from and after July 16, 2018. Garafola's actions and activities, as described herein, have

taken place just a year after he signed the Restrictive Covenant Agreement.

29.     On July 13, 2018, given Garafola's continued employment with Sandhills, Garafola and Sandhills entered into an Employee Proprietary Information, Inventions and Nonsolicitation Agreement (the "Garafola PMA"). A true and correct copy of the Garafola PMA is attached to this Complaint as **Exhibit C** and is incorporated by this reference.

30.     The Garafola PMA provides, in relevant part, as follows:

1.  **NONDISCLOSURE.**

    **1.1     Recognition of the Company's Rights; Nondisclosure.** At all times during my employment and thereafter, I will hold in strictest confidence and will not discuss, disclose, use or publish any of [Sandhills'] Proprietary Information (defined below), except as such discussion, disclosure, use or publication may be required in connection with my work for [Sandhills], or unless the President of [Sandhills] expressly authorizes such in writing. I will obtain [Sandhills'] written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at [Sandhills] or for its affiliates or subsidiaries and/or incorporates any Proprietary Information.

    **1.2     Proprietary Information.** The term "Proprietary Information" shall mean any and all confidential and/or proprietary knowledge, data or nonpublic information of [Sandhills], its affiliates and subsidiaries. By way of illustration but not limitation, "Proprietary Information" includes (a) trade secrets, inventions, works, ideas, processes, formulas, source and object codes, data, databases, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (hereafter collectively referred to as "Inventions"); and (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and financial statements, licenses, prices and costs, suppliers, customers, customer sales information, customer representatives and customer contact information.
    …

4.  **DUTY OF LOYALTY DURING EMPLOYMENT.** I understand that my employment with [Sandhills] requires my full business time, attention and effort. I agree that during the period of my employment by [Sandhills] I will notify [Sandhills'] human resources department in writing of any and all outside employment or business activity I may have that may, directly or indirectly, interfere with my employment with [Sandhills] and further agree that I shall not, without [Sandhills'] express written consent, engage in any employment or business activity other than for [Sandhills], which is competitive with, or would otherwise conflict with, my employment with [Sandhills]. Likewise, during my employment with [Sandhills], I will not use my knowledge or experience relating to [Sandhills'] industry or business for the benefit of any person or entity other than in connection with my employment with [Sandhills].

5.  **NON-COMPETITION.** I agree that during my employment by [Sandhills] and for eighteen (18) months after the date of my employment with [Sandhills] ends for any or no reason, including, but not limited to, voluntary termination by me or involuntary termination by [Sandhills] (collectively the "Termination Date"), I will not, except in the course of performing my duties on behalf of [Sandhills], directly or through others, be involved as an owner, partner, shareholder, joint venture, director, employee, agent or independent contractor of any business engaged in Restricted Business within the Restricted Area to the extent such involvement would my provision of products or performance of services of the type I conducted, authorized, offered, or provided while working on behalf of [Sandhills] during the twenty-four (24) month period prior to the Termination Date; and, "Restricted Business" means the business of providing online auction platform or online auction services for the purpose of facilitating the sale of equipment or machinery that is used in the agricultural or construction industries in a manner that competes with [Sandhills].

6.  **NO SOLICITATION OF EMPLOYEES OR CUSTOMERS.** I agree that during my employment by [Sandhills] and for eighteen (18) months after the Termination Date, I will not, except in the course of performing my duties on behalf of [Sandhills], either directly or through others, (i) solicit or attempt to solicit any employee of the Company to become an employee, consultant or independent contractor to or for any other person or entity, and/or (ii) solicit, do business with, or accept or aid in the provision of products or services to any customers of [Sandhills], its affiliates and subsidiaries with whom I had personal contact and actually did business with in the course of my employment with [Sandhills] (or in my performance of work for any affiliate or subsidiary of [Sandhills]) during my employment with [Sandhills] at any time during the four (4) year period immediately preceding the termination of my employment with [Sandhills].

8.  **RETURN OF COMPANY PROPERTY.** When I leave the employ of [Sandhills], I will immediately deliver to [Sandhills] any and all drawings, notes, customer information, databases, contact lists, calendars, correspondence, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any [Sandhills] Inventions, Third Party Information or Proprietary Information of [Sandhills], its affiliates or subsidiaries.

The Garafola PMA contains other provisions intended to protect Sandhills' confidential and proprietary information, both during and after employment, and imposes certain other restrictions on Garafola.

31.     The Garafola PMA is reasonable both in time and scope, and Garafola acquired special knowledge about Sandhills' business and customers/bidders/auctioneers because of his employment with Sandhills. The confidentiality and other provisions of the Garafola PMA are

necessary to protect Sandhills' legitimate business interests and are necessary because of the specialized knowledge Garafola obtained during employment with Sandhills.

32.     Upon commencement of his employment with Sandhills, Garafola also received a copy of Sandhills' security policy, which sets forth restrictions on access to Sandhills' confidential and proprietary information. Sandhills has specific security and data protection protocols in place that governs who may access its confidential and proprietary information and materials.

33.     Upon commencement of his employment with Sandhills, Garafola also received a copy of the Employee Handbook, which includes a detailed discussion of the confidential, proprietary, and trade secret information to which employees are provided access and the terms of use of such information. Garafola executed an employee acknowledgement form, acknowledging he read the Employee Handbook, understood the rules, policies, terms and conditions of employment and that he agreed to abide by them.

Garafola's Access to Sandhills' Proprietary Information

34.     As the manager of the New Jersey office of Equipmentfacts, Garafola was given direct access to Sandhills' technical and competitively sensitive information, including Sandhills' pricing schedules, business strategies and other Proprietary Information in exchange for his agreements to keep the information confidential and not to use it contrary to Sandhills' interests.

35.     Garafola had considerable and regular contact with current and prospective customers/bidders/auctioneers and gained intimate knowledge of Sandhills' customer/bidder/auctioneer base, computer files, pricing, profitability, marketing concepts, solicitation methods, techniques and programs, and technical information necessary to provide Sandhills' services and products.

36.     Sandhills at all times deemed and treated its Proprietary Information as highly sensitive, confidential and competitive information. Sandhills made reasonable efforts to preserve the confidentiality of its Proprietary Information.

Garafola violates his agreements with Sandhills, and litigation ensues

37.     In July 2019, Sandhills learned that Garafola, among others, were making plans to unlawfully compete with the Equipmentfacts Business. Garafola was an employee of Sandhills and managed the New Jersey office at the time this scheme was initiated.

38.     Sandhills, upon learning of his activities, sent management to the New Jersey office to investigate, and the results of that investigation resulted in Sandhills' terminating all of the employees in the New Jersey office, including Garafola.

39.     In August 2019, Sandhills filed a lawsuit in this Court against Garafola, among others. See Sandhills Global, Inc. v. Lawrence Garafola, Sr., et al., Civil Action No. 19-17225. This is not the first time that Garafola's unlawful conduct resulted in litigation and ultimately a judgment against Equipmentfacts before Sandhills purchased it. See Yoder & Frey Auctioneers, Inc., v. Equipmentfacts, LLC, 774 F.3d 1065 (6th Cir. 2014) (affirming the judgment entered by the United States District Court for the Northern District of Ohio imposing liability and damages against Equipmentfacts for the unlawful conduct of Larry Garafola, Sr. in a civil suit brought by Yoder & Frey Auctioneers, Inc. involving claims of Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030, common law fraud and trespass to chattels, and breach of contract)..

Sandhills learns that Garafola has been preparing to unlawfully compete.

40.     Sandhills' investigation into Garafola's activities reveals that while Garafola was a Sandhills' employee, he transmitted specific Proprietary Information to his personal Gmail account, including but not limited to, the following documents:

a.      A "Biggest Auctioneers" list that contained specific auctioneer sales and commission figures;

b.      A Top Bidder spreadsheet that contained bidder names with corresponding bidder numbers, bidder rank, and total sales figures;

c.      Equipmentfacts' manuals, documents, templates, welcome emails, and video tutorials on how to manage bidders, set up a remote broadcast, create a timed auction, create invoices, generate reports, upload sale day catalogues, create a live auction;

d.      An Excel spreadsheet entitled "3.0 Distribution Spreadsheet," which contains a list of over forty (40) auction companies; and

e.      A list of Oilfield bidders that contained specific bidder names, contact information, as well as the bidders' Sandhills branded website registration information, including, email addresses and passwords.

41.     Sandhills' investigation into Garafola's activities also reveals that while Garafola was a Sandhills' employee, but shortly before his termination, he accessed a spreadsheet entitled "AllBidpathBiddersExport_4.30_19_revised." Sandhills stopped doing business with Bidpath in April 2019, but Garafola accessed this spreadsheet on July 30, 2019. Prior to his termination from Sandhills, Garafola deleted these documents from his work station.

Garafola forms Facts Technology and begins unlawfully soliciting Sandhills' customers

42.     In September 2019, shortly after Sandhills initiated litigation, Garafola formed Facts Technology.

11

43.     Garafola, while an employee of Sandhills, misappropriated Sandhills' trade secrets and proprietary technology, and used such trade secrets and proprietary technology to launch a competing online auction company, Facts Technology, shortly after his termination from Sandhills and only weeks after Sandhills filed its companion litigation against Garafola.

44.     Sandhills is aware of a number of recent instances in which Garafola, using Sandhills' compilation of business data has contacted Sandhills' customers to solicit their business for Facts Technology's benefit.

45.     During the course of Garafola's employment with Sandhills, he sought to and did intentionally and willfully misappropriate, use and disclose Sandhills' trade secrets and proprietary technology to wrongfully interfere with Sandhills' contractual relations for his and Facts Technology's benefit and to the detriment of Sandhills.

46.     Facts Technology operates OilfieldFacts, branded as the "brainchild of Larry Garafola, Founder of Equipmentfacts."

47.     OilfieldFacts is an "Online Marketplace for Equipment and Trucks."

48.     Garafola's affiliation with OilfieldFacts directly violates his agreements with Sandhills, which prevent him from competing in the Equipmentfacts Business space.

49.     On November 6, 2019, OilfieldFacts held its first auction for Permian International Energy Services.

50.     According to its website (https://vr2.vortexauction.com/oilfieldfacts/upcoming), OilfieldFacts has additional auctions for Permian International Energy Services in December 2019, March 2020, May 2020, July 2020, September 2020, November 2020, and December 2020.

51.     Permian International Energy Services is long-standing Sandhills' customer.

52.     On Friday, November 15, 2019, Facts Technology announced the release of AuctioneerFacts in email solicitations to Sandhills' customers. This announcement and solicitation states that "Larry Garafola, CEO of Facts Technology and the Founder of Equipmentfacts is set out to change the Online Auction Industry by the release of AuctioneerFacts."

53.     Garafola and/or Facts Technology sent the solicitation to Sandhills' customers via email. Such customers did not provide Facts Technology or Garafola with their email addresses absent Garafola's prior connection with Equipmentfacts and employment with Sandhills.

54.     Upon receipt of the email solicitation from Facts Technology/Garafola, a number of Sandhills' customers reached out to their contacts at Sandhills to express their concern and confusion about Facts Technology and Garafola's new venture.

55.     On November 18, 2019, on behalf of Facts Technology and AuctioneerFacts, Garafola directly solicited, via email, Sandhills' customers and provided a copy of the AuctioneerFacts digital magazine. Sandhills became aware of this email marketing solicitation from a number of its customers.

56.     Garafola has branded AuctioneerFacts as an "online broadcaster of live webcast and timed auctions."

57.     The AuctioneerFacts digital magazine states that AuctioneerFacts has "decades" of auction experience and is "led by Larry Garafola, Founder of Equipmentfacts."

58.     Garafola continues to misrepresent an affiliation with Equipmentfacts, leading to confusion in the marketplace.

59.     Garafola continues to reference and use the term "Equipmentfacts" in communications made on Facts Technology's behalf, inevitably causing confusion.

60.     Upon receipt of the November 18, 2019 email from Facts Technology, at least one Sandhills' customer reached out to Sandhills to state that he "knew something was wrong" and that Garafola was and is improperly competing with Sandhills.  This Sandhills' customer thought that it appears that "all Mr. Garafola did was take the Equipmentfacts.com platform, put a new name on it and then tried to get my company to do business with him instead of Sandhills."

61.     Upon receipt of the November 18, 2019 email from Facts Technology a Sandhills', a different Sandhills' customer stated that it "soon became clear to me that Facts Technology was providing auction services nearly identical to the services provided by Sandhills through Equipmentfacts.com," and that he was surprised that Garafola had created a new auction service that competes with Sandhills.

62.     That same Sandhills' customer expressed concern to Sandhills that Garafola had improperly taken his contact information, and possibly other information about his relationship with Sandhills, and was using it to convert his business from Sandhills to Facts Technology.

63.     Garafola knows of his restrictive covenants (as set forth in Exhibits A-C), yet continues to engage in such improper solicitations and activities as set forth herein.

64.     Counsel for Sandhills, upon learning of these activities, attempted to contact counsel for Garafola to discuss his improper business activities and to demand that he immediately cease-and-desist. To date, counsel for Garafola has not responded and Garafola has not agreed, and has not stopped, his improper business activities.

65.     As set forth above, Garafola's actions, on behalf of Facts Technology, show an intentional and willful misappropriation, use, and disclosure of Sandhills' Proprietary Information, including, but not limited to, an intentional and willful use of Sandhills' customer lists/databases

without permission. In doing so, Garafola has wrongfully interfered with Sandhills' contractual relations for his and Facts Technology's benefit and to the detriment of Sandhills.

66.    Since forming Facts Technology, Garafola has solicited and continues to actively solicit Sandhills' customers in violation of his agreements with Sandhills.

67.    Since forming Facts Technology, Garafola continues to solicit Sandhills' customers and continues to use Sandhills' customer lists and/or databases to compete with Sandhills in violation of his agreements with Sandhills.

## CLAIM ONE
### (Breach of Contract/the Asset Purchase Agreement—Garafola)

68.    Sandhills incorporates the allegations set forth above as if fully set forth herein.

69.    The Asset Purchase Agreement is a valid contract that imposes obligations on each party.

70.    Garafola has materially breached Section 4.3 of the Asset Purchase Agreement, which survives for twenty-four months after closing (see Section 5.2 of the Asset Purchase Agreement) by actively soliciting and encouraging customers, dealers, distributors and/or business associates to do business with Facts Technology rather than Sandhills.

71.    As set forth above, Garafola's actions, on behalf of Facts Technology, show that he has breached the Asset Purchase Agreement by targeting Sandhills' customers for business solicitation, which commercially benefits him and Facts Technology, to the detriment of Sandhills.

72.    Since forming Facts Technology, Garafola has solicited and continues to solicit Sandhills' customers and continues to use Sandhills' customer lists and/or databases to compete with Sandhills in violation of the Asset Purchase Agreement.

73.    Garafola's actions have resulted in Sandhills' customers raising their concerns to Sandhills about his use of their contact information and Fact Technology's solicitation of their business.

74.    As a result of his breaches of the Asset Purchase Agreement, Sandhills has been and continues to be damaged, including but not limited to the loss of customers, goodwill, and revenue.  Additionally, Garafola's continued solicitations of Sandhills' customers is interfering with Sandhills' ongoing business operations, leading Sandhills' employees to have to divert significant time, money and substantial resources to address his illegal solicitations.

75.    Sandhills has performed all conditions precedent and substantially performed its duties under the Asset Purchase Agreement, or such conditions precedent and performance have been waived or excused.

WHEREFORE, Sandhills Global, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant Lawrence Garafola in an amount to be proven at trial, plus attorneys' fees and costs and award such other, further, and different relief as to this Court seems just and equitable.

## CLAIM TWO
### (Breach of Contract/the Restrictive Covenant Agreement—Garafola)

76.    Sandhills incorporates the allegations set forth above as if fully set forth herein.

77.    The Restrictive Covenant Agreement, attached as **Exhibit B**, is a valid contract that imposes obligations on each party.

78.    Garafola has materially breached his obligations under the Restrictive Covenant Agreement by (a)  failing to return Sandhills' property, including but not limited to customer lists and/or databases upon termination of employment; and (b) soliciting Sandhills' customers with

whom he had personal contact and actually did business with in the course of his employment with Sandhills, which lasted just one year, for the benefit of himself and Facts Technology.

79.    As set forth above, Garafola's actions, on behalf of Facts Technology, show that he has breached the Asset Purchase Agreement by targeting Sandhills' customers for business solicitation, which commercially benefits him and Facts Technology, to the detriment of Sandhills.

80.    Since forming Facts Technology, Garafola has solicited and continues to solicit Sandhills' customers and continues to use Sandhills' customer lists and/or databases to compete with Sandhills in violation of the Restrictive Covenant Agreement, which he entered into as part of the acquisition of Equipmenfacts (at a significant purchase price) by Sandhills.

81.    Garafola's actions have resulted in Sandhills' customers raising their concerns to Sandhills about his use of their contact information and Fact Technology's solicitation of their business.

82.    As a result of his past and continuing breaches of the Restrictive Covenant Agreement, Sandhills has been and continues to be damaged, including but not limited to the loss of customers, goodwill, and revenue. Additionally, Garafola's continued solicitations of Sandhills' customers is interfering with Sandhills' ongoing business operations, leading Sandhills' employees to have to divert significant time, money and substantial resources to address his illegal solicitations.

83.    Sandhills has performed all conditions precedent and substantially performed its duties under the Restrictive Covenant Agreement, or such conditions precedent and performance have been waived or excused.

WHEREFORE, Sandhills Global, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant Lawrence Garafola in an amount to be proven at trial, plus

attorneys' fees and costs and award such other, further, and different relief as to this Court seems just and equitable.

## CLAIM THREE
### (Breach of Contract/the Garafola PMA)

84.    Sandhills incorporates the allegations set forth above as if fully set forth herein.

85.    The Garafola PMA attached as **Exhibit C**, is a valid contract that imposes obligations on each party.

86.    Garafola has materially breached and actively continues to breach his obligations under the Garafola PMA by (a) failing to return Sandhills' property, including but not limited to customer lists and/or databases upon termination of employment; and (b) soliciting Sandhills' customers with whom he had personal contact and actually did business with in the course of his employment with Sandhills, which lasted just one year, for the benefit of himself and Facts Technology.

87.    As set forth above, Garafola's actions, on behalf of Facts Technology, show that he has breached the Garafola PMA by targeting Sandhills' customers for business solicitation, which commercially benefits him and Facts Technology, to the detriment of Sandhills, and in direct contradiction to the restrictive covenants he agreed to in the Garafola PMA.

88.    Since forming Facts Technology, Garafola has solicited and continues to solicit Sandhills' customers and continues to use Sandhills' customer lists and/or databases to compete with Sandhills in violation of the Garafola PMA, which he entered into as part of the acquisition of Equipmentfacts (at a significant purchase price) by Sandhills.

89.    Garafola's actions have led to Sandhills' customers raising concerns to Sandhills about his use of their contact information and Fact Technology's solicitation of their business.

90.     As a result of his breaches Sandhills has been and continues to be damaged, including but not limited to the loss of customers, goodwill, and revenue. Additionally, Garafola's continued solicitations of Sandhills' customers is interfering with Sandhills' ongoing business operations, leading Sandhills' employees to have to divert significant time, money and substantial resources to address his illegal solicitations.

91.     Sandhills has performed all conditions precedent and substantially performed its duties under the Garafola PMA, or such conditions precedent and performance have been waived or excused.

WHEREFORE, Sandhills Global, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant Lawrence Garafola in an amount to be proven at trial, plus attorneys' fees and costs and award such other, further, and different relief as to this Court seems just and equitable.

## CLAIM FOUR
### (Misappropriation of Trade Secrets—Garafola)

92.     Sandhills incorporates the allegations set forth above as if fully set forth herein.

93.     The Proprietary Information provided to Garafola pursuant to Exhibits A-C was kept confidential by Sandhills, was not available to the general public, and held economic value to those who possessed it.

94.     As part of his duties with Sandhills, Garafola learned information that Sandhills kept confidential, did not make available to the general public, and was of monetary value to those who possessed it. Such information includes, but is not limited to, Sandhills' customer lists and/or databases, marketing strategies, and pricing strategies.

95.     Garafola, by engaging in the conduct described above, has and continues to misappropriate, retain and misuse the Proprietary Information of Sandhills for his personal benefit and, upon information and belief, the benefit of Facts Technology a competitor of Sandhills.

96.     Garafola's conduct was and is willful, intentional and unprivileged and has caused and is causing irreparable harm and monetary damages to Sandhills.

97.     The Proprietary Information derives independent economic value, actual or potential, from not being known to and not being ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

98.     Sandhills has taken reasonable efforts under the circumstances to maintain the secrecy of its Proprietary Information, including but not limited to strict security protocols and policies.

99.     Pursuant to the terms of Exhibits A-C, Garafola is under contractual duties to maintain the secrecy of Sandhills' Proprietary Information.

100.     Garafola's misappropriation of Sandhills' Proprietary Information will cause Sandhills actual damages.

101.     Sandhills is entitled to affirmative action to protect its Proprietary Information including the return of all documentation and information given to and taken by Garafola and the return or destruction of any documents partially or wholly produced with such Proprietary Information.

102.     Against such continued use and threatened use of its Proprietary Information, Sandhills has no adequate remedy at law.

WHEREFORE, pursuant to the New Jersey Trade Secrets Act, N.J.S. § 56:15-1, *et seq.*, Plaintiff Sandhills Global, Inc. requests the Court enter judgment in its favor and against Defendant Lawrence Garafola and enjoin him from improperly and illegally using the Proprietary Information and from producing documents based on such Proprietary Information; ordering Lawrence Garafola to return all such documentation and information constituting Proprietary Information; ordering Lawrence Garafola to return or destroy any partially of fully produced documents based on the Proprietary Information; for general damages to be proved at trial in the amount of the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing Sandhills' actual loss, or, in lieu thereof, in the amount of a reasonable royalty that is equitable under the circumstances; for prejudgment interest from and after the date(s) of violation at the maximum legal rate; for an award of Sandhills' costs and attorneys' fees incurred herein; and for such other, further and different relief Court deems just and equitable.

## CLAIM FIVE
### (Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.*-Garafola)

103.    Sandhills incorporates the allegations set forth above as if fully set forth herein.

104.    During his employment with Sandhills, Garafola had access to the Proprietary Information, which includes Sandhills' confidential information and trade secrets. This information was gathered, created, and prepared at significant expense to Sandhills; is kept confidential by Sandhills; is not available to the general public; and gives Sandhills a competitive advantage over those who do not know the Proprietary Information.

105.    The Proprietary Information is related to products and services used in interstate commerce.

106.    Sandhills takes reasonable steps designed to maintain the confidentiality of its Proprietary Information, including having employees (including Garafola) sign agreements with confidentiality and non-disclosure provisions.

107.    Sandhills derives substantial independent economic value from the Proprietary Information not being generally known to the public.

108.    Sandhills' Proprietary Information constitute a trade secret under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.*

109.    As set forth above Garafola has used, and continues to use, Sandhills' Proprietary Information despite knowledge that such actions and activities are improper.

110.    Upon information and belief, Garafola has possession of Sandhills' Proprietary Information.

111.    As a direct and proximate result of the misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.*, Sandhills has suffered and will continue to suffer immediate and irreparable harm, the exact nature and amount of which is impossible to ascertain at the present time, but which includes, without limitation, lost reputation and goodwill, and lost competitive advantage.

WHEREFORE, pursuant to the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.,* Plaintiff Sandhills Global, Inc. requests the Court enter judgment in its favor and against Defendant Lawrence Garafola enjoining him from improperly and illegally using the Proprietary Information and from producing documents based on such Proprietary Information; ordering Defendant Lawrence Garafola to return all such documentation and information constituting Proprietary Information; ordering Defendant Lawrence Garafola to return or destroy any partially of fully produced documents based on the Proprietary Information; for general damages to be

proved at trial in the amount of the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing Sandhills' actual loss, or, in lieu thereof, in the amount of a reasonable royalty that is equitable under the circumstances; for prejudgment interest from and after the date(s) of violation at the maximum legal rate; for an award of Sandhills' costs and attorneys' fees incurred herein; and for such other, further and different relief Court deems just and equitable.

## CLAIM SIX
### (Breach of Duty of Loyalty—Garafola)

112.   Sandhills incorporates the allegations set forth above as if fully set forth herein.

113.   Throughout his employment with Sandhills, and in his role in running Sandhills' New Jersey office, Garafola discussed and developed business strategies for Sandhills.

114.   Garafola's actions as described herein were a breach of his duty of loyalty to Sandhills.

115.   Garafola's repeated breach of the duties he owed to Sandhills were a direct and proximate cause of damages to Sandhills including, but not limited to, all compensation paid to Garafola in 2019, and loss of corporate opportunities that Garafola has redirected, and continues to redirect, to Facts Technology, including but not limited to the Permian International Energy Services auctions that occurred or are scheduled through OilfieldFacts or AuctioneerFacts.

116.   Still further, upon information and belief, Garafola's acts of diverting his focus and attention to Facts Technology while employed by Sandhills caused him to neglect his duties at Sandhills.

117.   This neglect has cost and will cost Sandhills revenue and customers.

118.   Garafola's interference has been and will continue to be a direct and proximate cause of loss to Sandhills in an amount to be determined at trial.

WHEREFORE, Sandhills Global, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant Lawrence Garafola in an amount to be proven at trial, plus attorneys' fees and costs and award such other, further, and different relief as to this Court seems just and equitable.

## CLAIM SEVEN
### (Interference With A Business Relationship and/or Expectancy—Garafola)

119.    Sandhills incorporates the allegations set forth above as if fully set forth herein.

120.    Sandhills has numerous ongoing contracts, pending quotes, and corporate opportunities for new business that Sandhills strategically planned and sought. Each of these contracts, quotes, and opportunities were contract expectancies of Sandhills.

121.    In his role running Sandhills' New Jersey office, Garafola knew of Sandhills' contracts, quotes, opportunities, and contract expectancies because he was provided this information pursuant to Exhibits A-C, as applicable.

122.    Garafola has and will continue to interfere with Sandhills' contracts, quotes, opportunities, and expectancies through his affiliation with Faets Technology and his active solicitation of customers on Facts Technology's behalf, and using the Proprietary Information and other information obtained from Sandhills pursuant to Exhibits A-C, as applicable.

123.    Garafola's interference is intentional and unjustified because he improperly obtained the Proprietary Information regarding Sandhills' contracts, quotes, opportunities and expectancies pursuant to Exhibits A-C and thereafter solicited and continues to solicit Sandhills' business for Facts Technology for OilfieldFacts and/or AuctioneerFacts. His solicitation of Sandhills' clients began before Facts Technology began operations in September 2019, continues through the date of this filing, and will continue until Sandhills is provided relief from the Court.

124.    Garafola's interference has been and will continue to be a direct and proximate cause of loss to Sandhills in an amount to be determined at trial.

WHEREFORE, Sandhills Global, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant Lawrence Garafola in an amount to be proven at trial, plus attorneys' fees and costs and award such other, further, and different relief as to this Court seems just and equitable.

## CLAIM EIGHT
### (Interference With A Business Relationship and/or Expectancy—Facts Technology)

125.    Sandhills incorporates the allegations set forth above as if fully set forth herein.

126.    Sandhills has numerous ongoing contracts, pending quotes, and corporate opportunities for new business that Sandhills strategically planned and sought. Each of these contracts, quotes, and opportunities were contract expectancies of Sandhills.

127.    Facts Technology knew of Sandhills' contracts, quotes, opportunities, and contract expectancies due to its relationship with Garafola.

128.    Facts Technology has and will continue to interfere with Sandhills' contracts, quotes, opportunities, and expectancies by using the Proprietary Information and other information obtained from Sandhills to divert business and customers from Sandhills to Facts Technology.

129.    In fact, Facts Technology has already diverted business from Permian International Energy Services from Sandhills, as evidenced by the recent and upcoming auctions advertised on the Oilfieldfacts' website.

130.    Facts Technology interference is intentional and unjustified because Facts Technology improperly obtained the Proprietary Information regarding Sandhills' contracts, quotes, opportunities and expectancies and thereafter solicited Sandhills' business. This

solicitation of Sandhills' clients began before Facts Technology began operations, continues through the date of this filing, and will continue until Sandhills is provided relief from the Court.

131.    Facts Technology's interference has been and will continue to be a direct and proximate cause of loss to Sandhills in an amount to be determined at trial.

WHEREFORE, Sandhills Global, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant Facts Technology LLC in an amount to be proven at trial, plus attorneys' fees and costs and award such other, further, and different relief as to this Court seems just and equitable.

## CLAIM NINE
### (Civil Conspiracy against Garafola and Facts Technology)

132.    Sandhills incorporates the allegations set forth above as if fully set forth herein.

133.    Garafola and Facts Technology developed a scheme whereby they accessed Proprietary Information from Garafola's agreements with Sandhills and his experience with Equipmentfacts and later Sandhills.

134.    Garafola and Facts Technology obtained or had access to information that they were legally and contractually prohibited from obtaining, using, and passing off as Fact Technology's own.

135.    This scheme was carried out by the Garafola by virtue of his role at Sandhills, and Garafola wrongfully directed Facts Technology to use such information to wrongfully interfere with Sandhills' business and to wrongfully solicit Equipmentfacts/Sandhills' customers.

136.    Garafola benefited from this scheme by way of compensation from Facts Technology.

137.    As a direct and proximate result, Sandhills has suffered and will continue to suffer immediate and irreparable harm, the exact nature and extent of which may only be known after an

accounting has been ordered and completed, but includes, without limitation, lost business sales, customer accounts, reputation and goodwill, and competitive advantage, and Sandhills has incurred and will incur monetary damages.

WHEREFORE, Sandhills Global, Inc. respectfully requests that the Court enter judgment in its favor and against Defendants Lawrence Garafola, Sr. and Facts Technology LLC, jointly and severally, an amount to be proven at trial, plus attorneys' fees and costs and award such other, further, and different relief as to this Court seems just and equitable.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Sandhills, prays that this Court:

1.      Grant a temporary restraining order until determination of Sandhills' application for a temporary injunction, or other order of the Court, to maintain the status quo and to restrain and enjoin Defendants Lawrence Garafola and Facts Technology LLC from the following:

   a.      Discussing, disclosing, divulging, destroying, or releasing Sandhills' confidential information for any purpose, including soliciting Sandhills' auctioneers, bidders and customers and prospective auctioneers, bidders and customers and competing with Sandhills;

   b.      Utilizing, accessing or otherwise referring to Sandhills' Proprietary for any purpose;

   c.      Calling on or soliciting, or attempting to call or solicit, the business of any of Sandhills' auctioneers, bidders and customers or prospective auctioneers, bidders and customer; or

   d.      Engaging in a business in competition with Sandhills in any capacity.

2.       Grant a temporary restraining order until determination of Sandhills' application for a temporary injunction, or other order of the Court, to maintain the status quo and to require Defendants Lawrence Garafola and Facts Technology LLC, and all those acting in concert with them, to immediately return to Sandhills all originals, copies and derivations of Proprietary Information, including but not limited to the specific documents reference in this Verified Complaint, that Garafola took from Sandhills or that Garafola obtained from any other source, including any and all copies of Sandhills' list of customers/bidders/auctioneers and prospective customers/bidders/auctioneers and associated information;

3.       Find in favor of Sandhills on each of its claims, and award Sandhills its damages in an amount to be determined at trial;

4.       Award Sandhills its costs, interests and attorneys' fees as permitted by law; and

5.       Award Sandhills such other, further and different relief as this Court deems just and proper.

Dated: November 25, 2019.

SANDHILLS GLOBAL, INC., Plaintiff,

By: _s/ John D. Miller, III_____
     John D. Miller
     Justin E. Condit
     BRESSLER, AMERY & ROSS, P.C.
     325 Columbia Turnpike
     Florham Park, NJ 07932
     P: 973.660.4428
     F: 973.514.1660
     JMiller@bressler.com
     Condit@bressler.com
     Attorneys for Plaintiff.

## VERIFICATION

I, Alexander Essay, am in-house counsel of Sandhills Global, Inc., the Plaintiff in this action, and I approve the filing of this Complaint. I have reviewed the allegations contained in this Verified Complaint and state that the matters stated therein about which I have personal knowledge are true and that the other matters stated therein are true and accurate to the best of my knowledge, information, and belief.

Alexander Essay

Subscribed in my presence and sworn to before me on November 25, 2019.

My Commission Expires:

GENERAL NOTARY - State of Nebraska
WENDY SCHELLHORN
My Comm. Exp. April 13, 2021

Notary Public

4834-7288-3885.1

# EXHIBIT A

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into effective as of July 16, 2018 (the "Effective Date"), by and between Sandhills Publishing Company, a Nebraska corporation ("Company") and Lawrence Garafola, an individual residing in New Jersey ("Garafola").

WHEREAS, Garafola is the sole owner and the Chief Executive Officer of Equipmentfacts, LLC, a New Jersey limited liability company ("Equipmentfacts"), where he has functioned continuously in such position since 2001;

WHEREAS, Equipmentfacts and Garafola, as the Sole Member of Equipmentfacts (the "Seller") and Company entered into that certain Asset Purchase Agreement, dated as of July 16, 2018 (the "Asset Purchase Agreement"), whereby Company has agreed to purchase from Equipmentfacts certain assets of Equipmentfacts, free and clear of all liens and encumbrances (the "Transaction"); and

WHEREAS, Company wishes to retain the services of Garafola following the Transaction, and Garafola is willing to provide such services in accordance with the terms and conditions set forth in this Agreement.

NOW THEREFORE, consistent with the foregoing recitals and in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.   _Engagement_.  Company agrees to and hereby employs Garafola and Garafola accepts employment with Company on the terms set forth in this Agreement.

2.   _Term and Termination_.  This Agreement shall commence on the Effective Date and shall continue uninterrupted for a period of two (2) years, unless this Agreement and Garafola's employment are earlier terminated upon the first occurrence of any of the following (the "Termination Date"):

    a.   _Death or Disability_.  Garafola's death or Disability.  For purposes of this Agreement, the term "Disability" shall be defined as a mental or physical impairment that prevents Garafola for thirty (30) consecutive days from performing the essential functions and duties of the Position (as defined below), even with reasonable accommodation in accordance with the Americans with Disabilities Act.

    b.   _For Cause_.  At the election of Company, Garafola may be terminated only for Cause immediately upon written notice by Company to Garafola, including the specific reason for such termination and the alleged basis on which such termination is based.  For purposes of this Agreement, "Cause" for termination shall mean in the event of Garafola's:

        i.   actual violation of any law and/or regulation in the performance of his duties on behalf of Company;

      ii.     being charged with a crime;

      iii.    breach of Garafola's duty of loyalty that is detrimental to Company;

      iv.    breach of this Agreement (including, without limitation, Garafola's failure to satisfactorily perform the duties of Section 3 or his failure to comply with the requirements of Section 4), the Asset Purchase Agreement or the Employee Proprietary Information, Inventions and Nonsolicitation Agreement between Garafola and Company;

      v.     repeated failure or refusal to follow the lawful directives of Company within the framework of Garafola's Position; or

      vi.    insubordination or repeated failure or refusal to adhere to Company's reasonable and customary written guidelines of employment or reasonable written corporate governance guidelines or policies.

      c.     *Business Cessation.*  The cessation of Company's business, Company's BidCaller division, or any business transferred pursuant to the Transaction. In the event Company terminates Garafola's employment under this subsection, notwithstanding anything to the contrary in any agreement between Garafola and Company, any and all restrictive covenants the burden Garafola shall cease and be of no further force or effect.

      d.     *Mutual Agreement.*  At any time upon the mutual written agreement of the parties.

    3.     <u>Duties and Responsibilities</u>.  Garafola shall be employed in the position of Manager of Auction Services (the "Position"), or such other position as mutually agreed on by Garafola and Company.  Garafola shall report to Company's Director of New Products, or his designee, as Garafola is advised in writing.  A job description of the Position is attached hereto as <u>Schedule "A"</u> and made a part hereof.  In addition, Garafola will be expected to perform the duties commensurate to the Position, as determined by Company and as otherwise directed by Company from time to time.  Garafola agrees to exercise a high degree of professionalism and devote all of Garafola's business hours to performing Garafola's duties and to comply with all applicable laws, regulations and ordinances and Company policies in the performance of such duties.

    4.     <u>Full-Time Efforts</u>.  Except for illness, Company holidays, vacations and reasonable leaves of absence, Garafola shall devote Garafola's full-time professional energy, skill, attention and best efforts to Garafola's duties and responsibilities under this Agreement. Garafola will not engage in any other business or render any commercial or professional services, directly or indirectly, to any other person or organization, whether for compensation or otherwise, which would interfere with Garafola's employment with Company unless explicitly approved in writing by Company.  Notwithstanding the foregoing, Garafola (i) may make any passive investment where Garafola is not obligated or required to, and shall not in fact, devote

any day-to-day managerial efforts, and (ii) if approved by Company, may participate in trade or professional organizations.

5.    Compensation and Benefits.  During Garafola's employment with Company and in consideration for Garafola's performance of the Position, Company shall pay to Garafola the following compensation and provide him with the following benefits:

a.    *Base Salary*.  Company shall pay to Garafola an annual gross base salary (the "Base Salary"), less applicable withholdings.  The initial Base Salary shall be an amount equal to $170,000.  The parties agree that the Base Salary amount shall be adjusted on the first and second anniversaries of the Effective Date in accordance with the following:

i.    In the event that BC Revenue (as defined below) exceeds the applicable Baseline Revenue (as defined below), the Base Salary shall be increased by $5,000 for every $250,000 increment that BC Revenue is in excess of the applicable Baseline Revenue; provided, however, at no time shall the Base Salary exceed $220,000.

ii.    In the event that BC Revenue falls below the applicable Baseline Revenue, the Base Salary shall be decreased by $5,000 for every $250,000 increment that BC Revenue is below the Baseline Revenue; provided, however, at no time shall the Base Salary be less than $170,000.

iii.    "BC Revenue" determined as of the first and second anniversaries of the Effective Date shall be the gross revenue for the immediately preceding twelve (12) month period of Company's BidCaller division (which includes the revenue generated from the assets acquired from Equipmentfacts).

iv.    "Baseline Revenue" shall be $1,500,000 for the purpose of determining any applicable Base Salary adjustment on the first anniversary. For the purpose of determining a Base Salary adjustment on the second anniversary, the Baseline Revenue of $1,500,000 shall be increased by $250,000 for each $5,000 increase that was applied to the Base Salary on the first anniversary, if applicable, pursuant to Section 5(a)(i) above. For example, if the Base Salary was increased by $30,000 on the first anniversary, the Baseline Revenue for purposes of the second anniversary Base Salary adjustment would be $3,000,000.

b.    *Benefits*.  Subject to the provisions of each of the respective benefit plans, Company shall provide to Garafola all benefits which other similarly situated employees of Company are currently entitled to receive, in accordance with the terms and conditions of any policies or plans applicable to such benefits. Garafola may likewise participate in any additional benefits as may be established during the term of this Agreement by standard written policy of Company.  Notwithstanding anything herein to the contrary, Company shall not be obligated to institute, maintain, or refrain from changing such

prerequisites, so long as the changes applicable to Garafola are equally applicable to other similarly situated employees of Company.

      c.    *Expenses.*  Garafola shall be entitled to reimbursement of all reasonable business expenses incurred by Garafola in accordance with Company's then-current policies and procedures, which shall include, but not be limited to, the provision of receipts corresponding to the expenses being presented for reimbursement.

      6.    <u>Effect of Termination</u>.  On the termination of Garafola's employment and this Agreement pursuant to Section 2, Company shall provide the following compensation and benefits to Garafola: (i) Base Salary through the Termination Date; (ii) all employee benefits accrued through the Termination Date including, without limitation, those referenced herein, and all benefits provided through Company's insurance plans, pursuant to the terms and conditions of such insurance plans; and (iii) reimbursement of Garafola's unreimbursed, reasonable, and properly substantiated business expenses.

      7.    <u>Confidential Information</u>.

      a.    *Access.*  Garafola's employment with Company will necessarily involve exposure and access to Company's confidential and proprietary information.  Garafola hereby acknowledges that Garafola's entering into this Agreement is a condition to Company's willingness to disclose to Garafola and provide Garafola with exposure to, familiarity with, and the opportunity to learn highly sensitive, confidential and proprietary information of Company, which may include, without limitation, information about Company's products and services, customers and prospective customers, customers' demands, customers' purchasing habits, marketing and promotional materials, sales projections, referral sources, vendors and suppliers, pricing, quoting, billing and collection procedures, proprietary software and the source code thereof, financial and accounting data, data processing and communications, technical data, marketing concepts and strategies, business plans, research and development of new or improved products and services, and general know-how regarding the business of Company and its products and services (collectively referred to herein as "Confidential Information").  Garafola expressly acknowledges and agrees that Confidential Information may include, without limitation, confidential and proprietary information belonging to various third parties, such as Company's affiliates, vendors, agents or customers, but which has been and will be entrusted to Company for use by Company to conduct its business.  The failure to mark or designate information as "confidential" or "proprietary" shall not prevent information that will be accessed by or disclosed to Garafola from being deemed Confidential Information under this Agreement; however, disclosure by Garafola to his attorneys and accountants shall not be deemed to be an unauthorized disclosure. Garafola further acknowledges that the Confidential Information is a valuable, special and unique asset of Company, such that the unauthorized disclosure by Garafola or use by Garafola outside the scope of his employment by Company or use by persons or entities outside Company resulting from an unauthorized disclosure by Garafola would cause irreparable damage to the business of Company.

4848-5698-8773.7

b.    *Confidential Relationship.*  Company considers much of its Confidential Information to constitute trade secrets of Company ("Trade Secrets") which have independent value, provide Company with a competitive advantage over its competitors who do not know the Trade Secrets, and are protected from unauthorized disclosure under applicable law.  However, whether or not the Confidential Information constitutes Trade Secrets, Garafola acknowledges and agrees that the Confidential Information is protected from unauthorized disclosure or use due to Garafola's covenants under this Agreement and Garafola's fiduciary duties as an employee of Company. Notwithstanding the foregoing, in accordance with the Defend Trade Secrets Act of 2016, Garafola will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of Trade Secrets that: (i) is made in confidence to a federal, state or local governmental official, either directly or indirectly, or to any attorney where the disclosure to such official or attorney is for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.  In the event Garafola files a lawsuit for retaliation by Company for reporting a suspected violation of law, Garafola may disclose Company's Trade Secrets to Garafola's attorney and use the Trade Secret information in the court proceeding only if Garafola: (i) files any document containing the Trade Secret under seal; and (ii) does not disclose the Trade Secret except pursuant to court order.

8.    Notices.  All notices and other communications under this Agreement shall be in writing and deemed duly given, if delivered: (a) personally by hand or by a nationally recognized overnight courier service, when delivered at the address specified in this Section; (b) by United States certified or registered first class mail when delivered at the address specified in this Section, on the date appearing on the return receipt therefor; (c) by facsimile transmission, when such facsimile transmission is transmitted to the facsimile transmission number specified in this Section; or (d) by electronic mail when such electronic mail is transmitted to the electronic mail address specified in this Section.  In the event that a party is unable to deliver a notice or other communication due to the inaccuracy of the address, electronic mail address or facsimile transmission number provided by the other party pursuant to this Section, or the other party's failure to notify the party of a change of its address, electronic mail address or facsimile transmission number as specified pursuant to this Section, such notice or other communication shall be deemed to be effective upon confirmation by a nationally recognized overnight courier service of its failure to complete delivery to the other party's address as set forth in this Section (or other address duly given to the party by the other party in accordance with this Section).

Addresses, electronic mail addresses, and facsimile transmission numbers (unless and until written notice is given of any other address, electronic mail address or facsimile transmission number) for purposes of this Section are set forth below:

If to Garafola:                                    With a copy to:

Larry Garafola
6 Brearley Avenue
Neshanic Station, NJ 08853
Email: Garafola.lawrence@gmail.com

4848-5698-8773.7

5

If to Company:

Sandhills Publishing Company
ATTN: Legal
120 West Harvest Drive
Lincoln, NE 68521
Email: legal@sandhills.com

With a copy to:

Koley Jessen P.C., L.L.O.
ATTN: Taylor C. Dieckman
One Pacific Place, Suite 800
1125 South 103rd Street
Omaha, NE 68124
Fax. 402.390.9005
Email: taylor.dieckman@koleyjessen.com

9.   <u>General.</u>

    a.   *Entire Agreement.*  This Agreement, including the initial paragraph and the recitals to this Agreement, each of which is incorporated herein and made part of this Agreement by this reference, and the Employee Proprietary Information, Inventions and Nonsolicitation Agreement, constitutes the entire agreement of the parties with respect to the terms and conditions of Garafola's employment. This Agreement is entered into without reliance upon any promise, warranty or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties, representations or agreements related to the subject matter herein, including any previous letter or term sheet from Company offering Garafola employment with Company. This Agreement is binding upon, and shall inure to the benefit of, the parties hereto and the personal representatives and heirs of Garafola and the successors and permitted assigns of Company. No change or modification of this Agreement shall be valid unless the same shall be in writing and signed by the parties hereto.

    b.   *Assignability.*  This Agreement and the rights, interests and obligations of Company hereunder shall be assignable. This Agreement is not assignable by Garafola.

    c.   *Reformation and Severability.*  The parties intend and agree that if a court of competent jurisdiction applying applicable New Jersey law determines that the scope of any provision of this Agreement is too broad to be enforced as written, the court should reform such provision(s) to such narrower scope as it determines to be enforceable. The parties further agree that if any provision of this Agreement is determined to be unenforceable for any reason, and such provision cannot be reformed by the court as anticipated above, such provisions shall be deemed separate and severable and the unenforceability of any such provision shall not invalidate or render unenforceable any of the remaining provisions hereof.

    d.   *Jurisdiction and Venue.*  This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of New Jersey. Each party agrees that any action by either party to enforce the terms of this Agreement may be brought by the other party in an appropriate state or federal court in New Jersey and waives all objections based upon lack of jurisdiction or improper or inconvenient venue of any such court.

4848-5698-8773.7

6

e.      *Counterparts.* This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic transmission or facsimile of this Agreement shall be deemed an original and shall be admissible as evidence of the document and the signer's execution.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

4848-5698-8773.7

IN WITNESS WHEREOF, the parties have signed this Agreement as of the day and year first written above.

LAWRENCE GARAFOLA

_Lawrence Garafola_

SANDHILLS PUBLISHING COMPANY

By:_____
    Shawn Peed, Executive Vice President

Employment Agreement
Signature Page

IN WITNESS WHEREOF, the parties have signed this Agreement as of the day and year first written above.

LAWRENCE GARAFOLA                    SANDHILLS PUBLISHING COMPANY

                                     By: _____

_____          Shawn Peed, Executive Vice President
Lawrence Garafola

# EXHIBIT B

## NONCOMPETITION, NONINTERFERENCE AND CONFIDENTIALITY AGREEMENT

THIS NONCOMPETITION, NONINTERFERENCE AND CONFIDENTIALITY AGREEMENT (this "Agreement") is made and entered into as of July 16, 2018, by and between Sandhills Publishing Company, LLC, a Nebraska corporation ("Purchaser") and Lawrence Garafola ("Seller's Sole Member").

W I T N E S S E T H:

WHEREAS, Purchaser, Equipmentfacts, LLC, a New Jersey limited liability company (the "Seller"), and Seller's Sole Member are parties to that certain Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), pursuant to which Purchaser will acquire certain assets of the Seller (the "Acquisition");

WHEREAS, the Parties (as defined in Section 1 below) agree that the goodwill of the Seller is an integral component of the assets being acquired pursuant to the Purchase Agreement and without such goodwill the value of the assets of the Seller will be greatly diminished and Purchaser's reasons for entering into the Purchase Agreement and completing the Acquisition will be extinguished;

WHEREAS, it is a condition to Purchaser's, the Seller's, and Seller's Sole Member's obligations to consummate the transactions contemplated by the Purchase Agreement that the Parties enter into this Agreement; and

WHEREAS, the Parties intend this Agreement to evidence their understanding with respect to the restrictions on Seller's Sole Member's activities following consummation of the Acquisition.

NOW, THEREFORE, in consideration of the terms, provisions, covenants and agreements contained in this Agreement, the consideration referred to in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree as follows:

1.      Definitions.  As used in this Agreement the following terms shall have the respective meanings ascribed to them in this Section 1:

   a. "Restrictive Period" means a period of five (5) consecutive years from and after the date of this Agreement;

   b. "Party" or "Parties" means any of Purchaser or Seller's Sole Member, as applicable;

   c. "Territory" means the United States of America; and

   d. all other capitalized terms used in this Agreement, but not otherwise defined in this Agreement, shall have the meanings ascribed to them in the Purchase Agreement.

2.    Noncompetition.  Seller's Sole Member shall not during the Restrictive Period, directly or indirectly, within the Territory:

a.    provide or perform services for the benefit of, manage, operate, or in any way participate in, a business that competes with the Business (as conducted by Purchaser or its Affiliates), either on Seller's Sole Member's own behalf or on behalf of any other Person; or

b.    acquire a financial interest in, own or control any business that competes with the Business, other than ownership of not more than a 1% interest in any publicly traded company that competes with the Business.

3.    Nonsolicitation of Business.  Seller's Sole Member shall not during the Restrictive Period, directly or indirectly solicit for Seller's Sole Member or any other Person, business which is competitive with the Business from any customers, clients or accounts of the Business as conducted by Purchaser or its Affiliates.

4.    Nonsolicitation of Employees.  Seller's Sole Member shall not during the Restrictive Period, directly or indirectly, solicit, employ, retain as a consultant, interfere with or attempt to entice away from the Purchaser or its Affiliates, any employee or former employee of the Purchaser or its Affiliates who was employed by the Seller prior to the Closing Date and who has agreed to be, or has been, employed or retained the Purchaser or its Affiliates within twelve (12) months prior to such solicitation, employment, retention, interference or enticement.

5.    Noninterference.  Seller's Sole Member shall not during the Restrictive Period, directly or indirectly:

a.    encourage, in any way or for any reason, any customer, client or account of the Purchaser or its Affiliates, to sever or alter the relationship of such customer, client or account with the Purchaser or its Affiliates;

b.    discourage, in any way or for any reason, any prospective customers, clients or accounts of the Purchaser or its Affiliates from becoming a customer, client or account of the Purchaser or its Affiliates;

c.    aid any other Person attempting to take customers, clients or accounts in relation to the Business from the Purchaser or its Affiliates;

d.    aid any other Person in discouraging, in any way or for any reason, any prospective customers, clients or accounts of the Purchaser or its Affiliates, from becoming a customer, client or account of the Purchaser or its Affiliates;

e.    defame or disparage the Purchaser or its Affiliates. or any of their respective directors, officers or employees, or engage in any deceptive trade practices toward the Purchaser or its Affiliates.

6.    Intellectual Property. Seller's Sole Member shall not use, appropriate or interfere with, directly or indirectly, any Intellectual Property of the Purchaser or any of its respective

Affiliates, or any combination, abbreviation or derivation thereof, at any time during or after the Restrictive Period.

7.      Consideration.  The execution and delivery of this Agreement by Seller's Sole Member is in partial consideration of the payment by Purchaser to Seller's Sole Member under the Purchase Agreement and Purchaser's consummation and closing of the Acquisition.  Seller's Sole Member also acknowledges that Purchaser would not be prepared to engage in the Acquisition unless Seller's Sole Member agreed to the covenants, agreements, understandings and restrictions contained in this Agreement and that Purchaser is placing its confidence and trust in Seller's Sole Member.  Seller's Sole Member is entering into this Agreement and making the covenants, agreements, understandings and restrictions contained in this Agreement, among other things, to induce Purchaser to engage in the Acquisition.

8.      Enforcement.  Seller's Sole Member acknowledges that the covenants, agreements, understandings and restrictions contained in this Agreement are necessary, fundamental and required for the protection of Purchaser and the goodwill of Seller purchased by Purchaser as part of the Acquisition, and relate to matters which are of a special, unique and extraordinary character that gives each of the covenants, agreements, understandings and restrictions a special, unique and extraordinary value.  Seller's Sole Member also acknowledges that a breach of any covenant or restriction contained in this Agreement will result in irreparable harm and damage to Purchaser.  Accordingly, Seller's Sole Member expressly agrees that, in the event of a breach or threat of a breach of any provision of this Agreement by Seller's Sole Member, the Purchaser's remedies at Law will be inadequate, and in each such event, the Purchaser will be entitled to an injunction or other similar relief to prevent any breach of this Agreement and to enforce specifically the provisions of this Agreement, in addition to money damages sustained by Purchaser resulting from Seller's Sole Member's breach or threatened breach of this Agreement, and in addition to any other remedy to which Purchaser may be entitled at Law or in equity.  If Purchaser institutes legal action to enforce the provisions of this Agreement, in addition to any and all other rights or remedies which Purchaser may obtain in any such litigation, Purchaser shall also be entitled to recover from the Seller's Sole Member its reasonable attorneys' fees and out-of-pocket expenses incurred in such litigation.

In addition, Seller's Sole Member expressly acknowledges that the Purchaser's right to enforce this Agreement or to recover monetary damages for breach or threatened breach of this Agreement shall not be limited or restricted by the failure to designate or allocate a specific portion of the purchase price paid by Purchaser to Seller's Sole Member pursuant to the Purchase Agreement to this Agreement.

9.      Severability.  If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect without regard to the invalid, illegal or unenforceable term or provision.  If the courts of any one or more jurisdictions shall hold all or any part of such term or provision wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the Parties that such determination shall not bar or in any way affect Purchaser's right to relief in the court of any other jurisdiction as to failures to observe such term or provision in such other jurisdictions, the above provisions as they relate to each jurisdiction, being, for this purpose, severable into diverse and independent provisions.

10.   <u>Modification</u>.   Each of the Parties recognizes and acknowledges that the covenants, agreements, understandings and restrictions contained in this Agreement are properly required for the adequate protection of Purchaser and the goodwill of the Seller acquired by Purchaser as part of the Acquisition. Each of the Parties also recognizes and acknowledges that the covenants, agreements, understandings and restrictions contained in this Agreement are an inherent part of the purchase under the Purchase Agreement and are accepted as part of the consideration paid. Consequently, in the event that any covenant, agreement, understanding or restriction contained in this Agreement shall be deemed to be illegal, unenforceable or unreasonable by any court or tribunal of competent jurisdiction with respect to any part of the duration of such covenant, agreement, understanding or restriction or the area covered thereby, the Parties agree that the court or other tribunal making such determination shall have the power to reduce the duration or area of such covenant, agreement, understanding or restriction and in its reduced form said covenant, agreement, understanding or restriction shall then be enforceable

11.   <u>Notice</u>. All notices and other communications under this Agreement shall be in writing and deemed duly given, if delivered: (a) personally by hand or by a nationally recognized overnight courier service, when delivered at the address specified in this Section; (b) by United States certified or registered first class mail when delivered at the address specified in this Section, on the date appearing on the return receipt therefor; (c) by facsimile transmission, when such facsimile transmission is transmitted to the facsimile transmission number specified in this Section; or (d) by electronic mail when such electronic mail is transmitted to the electronic mail address specified in this Section. Addresses, electronic mail addresses, and facsimile transmission numbers (unless and until written notice is given of any other address, electronic mail address or facsimile transmission number) for purposes of this Section are set forth below:

If to Seller's Sole Member, to:

Lawrence Garafola
6 Brearley Lane
Neshanic Station, NJ 08853
E-mail:  Garafola.lawrence@gmail.com

with a copy to:

Lynn Blessing McDougall
Diamond Silver Office Building
24 Arnett Avenue, Suite 116
Fax:  (609) 208-9511
E-mail:  lbmcdougallesq@msn.com

If to Purchaser, to:

Sandhills Publishing Company
120 West Harvest Drive
Lincoln, NE 68521
Attention:  Legal Department
E-mail:  legal@sandhills.com

with a copy to:

Koley Jessen P.C., L.L.O.
One Pacific Place, Suite 800
1125 South 103 Street
Omaha, NE 68124-1079
Attention: Taylor C. Dieckman
Fax: (402) 390-9005
E-mail: taylor.dieckman@koleyjessen.com

12.    Construction.  All references to Law shall be deemed to include all rules and regulations promulgated thereunder (by any Authority or otherwise), and any successor law, unless the context otherwise requires.  "Including" means "including without limitation" and does not limit the preceding words or terms.  The word "or" is used in the inclusive sense of "and/or." The singular shall include the plural and vice versa.  Each word of gender shall mean Sections of this Agreement, unless expressly indicated otherwise. The headings or titles preceding the text of the Sections are inserted solely for convenience of reference and shall not constitute a part of this Agreement.  The Parties have each participated in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

13.    Applicable Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey, without giving effect to conflict of law principles thereof. The Parties hereby agree and consent to the exclusive jurisdiction of any state or federal court sitting in New Jersey with respect to all matters relating to this Agreement, waive all objections based on lack of venue and forum non conveniens, and irrevocably consent to the personal jurisdiction of all such courts. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES HERETO THAT THIS SECTION 13 CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 13 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

14.     Entire Agreement.  This Agreement, including the recitals to this Agreement, constitutes the entire understanding of the Parties, and supersedes any prior agreements or understandings, written or oral, between the Parties with respect to the subject matter of this Agreement.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all of the Parties to this Agreement.

15.     Waiver.  The failure of any Party at any time or times to require performance of any provision of this Agreement shall in no manner affect its right at a later time to enforce the same. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

16.     Counterparts; Exchange by Electronic Transmission.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.  The Parties agree that they may execute this Agreement and exchange on the Closing Date counterparts of this Agreement by means of facsimile transmission or electronic mail, the receipt of such executed counterparts shall be binding on the Parties to this Agreement and such executed counterparts shall be construed as originals.

**[The Remainder of This Page Intentionally Left Blank and Signature Page Follows.]**

IN WITNESS WHEREOF, the Parties to this Agreement have caused this Agreement to be duly executed as of the date first written above.

Sandhills Publishing Company, a Nebraska corporation

By: _____

Shawn Peed, Executive Vice President


_____

Lawrence Garafola

IN WITNESS WHEREOF, the Parties to this Agreement have caused this Agreement to be duly executed as of the date first written above.

Sandhills Publishing Company, a Nebraska corporation

By: _____
Shawn Peed, Executive Vice President

_____
Lawrence Garafola

Noncompetition Agreement
Signature Page

# EXHIBIT C

## EMPLOYEE PROPRIETARY INFORMATION, INVENTIONS AND NONSOLICITATION AGREEMENT

In consideration of my employment and continued employment by Sandhills Publishing Company (the "Company") and the ability to perform work for affiliates and subsidiaries of the Company, and the compensation now and hereafter provided to me by the Company, the sufficiency of which I hereby acknowledge, I hereby agree as follows:

## 1.   NONDISCLOSURE.

**1.1   Recognition of the Company's Rights; Nondisclosure.** At all times during my employment and thereafter, I will hold in strictest confidence and will not discuss, disclose, use or publish any of the Company's Proprietary Information (defined below), except as such discussion, disclosure, use or publication may be required in connection with my work for the Company, or unless the President of the Company expressly authorizes such in writing. Unless covered by the aforesaid sentence, I will obtain the Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at the Company or for its affiliates or subsidiaries and/or incorporates any Proprietary Information. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns. I have been informed and acknowledge that the unauthorized taking or use of the Company's Proprietary Information may subject me to liability, irrespective of whether such Proprietary Information constitutes a "trade secret" pursuant to applicable law.

**1.2   Proprietary Information.** The term "Proprietary Information" shall mean any and all confidential and/or proprietary knowledge, data or nonpublic information of the Company, its affiliates and subsidiaries. By way of illustration but not limitation, "Proprietary Information" includes (a) trade secrets, inventions, works, ideas, processes, formulas, source and object codes, data, databases, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (hereinafter collectively referred to

4846-0663-5622.5

as "Inventions"); and (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and financial statements, licenses, prices and costs, suppliers, customers, customer sales information, customer representatives and customer contact information. Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information which is generally known in the trade or industry, which is not gained as result of a breach of this Agreement or any other contractual obligations I may have, and my own, skill, knowledge, know-how and experience to whatever extent and in whichever way I wish.

**1.3   Third Party Information.** I understand, in addition, that the Company, its affiliates and subsidiaries have received and in the future will receive from third parties confidential or propriety information ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company, its affiliates or subsidiaries) or use, except in connection with my work for the Company, Third Party Information, unless expressly authorized by the President of the Company in writing.

**1.4   No Improper Use of Information of Prior Employers and Others.** During my employment by the Company I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will

not bring onto the premises of the Company, its affiliates or subsidiaries any nonpublic documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person. I will use in the performance of my duties for the Company, its affiliates and subsidiaries only information which is generally known, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company, its affiliates and subsidiaries.

**1.5     Notice of 18 U.S.C. § 1833(b) Immunity.** I understand that I and the Company have the right to disclose in confidence trade secrets to Federal, State, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. I also acknowledge that the Company and I also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).

**2.       ASSIGNMENT OF INVENTIONS.**

**2.1     Proprietary Rights.** The term "Proprietary Rights" shall mean all trade secret, patent, copyright, work and other intellectual property rights or "moral rights" throughout the world. "Moral rights" refers to any rights to claim authorship of an Invention or to object to or prevent the modification of any Invention or to withdraw from circulation or control the publication or distribution of any Invention, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

**2.2     Prior Inventions.** Inventions, if any, patented or unpatented, which I make prior to

4846-0663-5622.5

the commencement and outside the scope of my employment with the Company are excluded from the scope of this Agreement. To avoid any possible uncertainty, I have set forth on *Attachment A* (Previous Inventions) attached hereto a complete list of all Inventions that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement and outside the scope of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively referred to as "Prior Inventions"). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in *Attachment A* but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. A space is provided on *Attachment A* for such purpose. If no such disclosure is attached, I represent that there are no Prior Inventions. If, in the course of my employment with the Company or work for the Company's affiliates or subsidiaries, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with right to sublicense through multiple tiers of sublicenses) to make, have made, modify, use and sell such Prior Inventions in any Company inventions.

**2.3     Assignment of Inventions.** I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice, whether alone or jointly with others, prior to and during the period of my employment with

the Company that in any way relate to the current or prospective business or ventures of the Company or its affiliates or subsidiaries. Inventions to be assigned to the Company, or to a third party as directed by the Company pursuant to this Section, are hereinafter referred to as "Company Inventions."

**2.4    Third Party Assignment.** I also agree to assign all of my right, title and interest in and to any particular Company Invention to a third party as directed by the Company

**2.5    Works for Hire.** I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment for the Company or work for the Company's affiliates or subsidiaries and which are protectable by copyright are "works made for hire" pursuant to United States Copyright Act (17 U.S.C. §101 *et seq.*).

**2.6    Enforcement of Proprietary Rights.** During my employment with the Company and at no cost to me, upon reasonable request by the Company, I will cooperate with and assist the Company to obtain and from time to time enforce, in proper and legal manners, Proprietary Rights relating to Company Inventions.

**3.    RECORDS.** I agree to keep and maintain accurate current records as applicable, appropriate and necessary (in the form of notes, sketches, drawings and in any other form that may be required by the Company, its affiliates or subsidiaries) of all Proprietary Information developed by me and all Inventions made by me and all Inventions made by me during my employment at the Company, which records shall be available to and remain sole property of the Company at all times upon request by the Company.

**4.    DUTY OF LOYALTY DURING EMPLOYMENT.** I understand that my employment with the Company requires my full business time, attention and effort. I agree that during the period of my employment by the Company I will notify the Company's human

resources department in writing of any and all outside employment or business activity I may have that may, directly or indirectly, interfere with my employment with the Company and further agree that I shall not, without the Company's express written consent, engage in any employment or business activity other than for the Company, which is competitive with, or would otherwise conflict with, my employment with the Company. Likewise, during my employment with the Company, I will not use my knowledge or experience relating to the Company's industry or business for the benefit of any person or entity other than in connection with my employment with the Company.

**5.    NON-COMPETITION.** I agree that during my employment by the Company and for eighteen (18) months after the date my employment with the Company ends for any or no reason, including, but not limited to, voluntary termination by me or involuntary termination by the Company (collectively, the "Termination Date"), I will not, except in the course of performing my duties on behalf of the Company, directly or through others, be involved as an owner, partner, shareholder, joint venturer, director, employee, agent, or independent contractor of any business engaged in the Restricted Business within the Restricted Area to the extent such involvement would involve my provision of products or performance of services of the type I conducted, authorized, offered, or provided while working on behalf of Company during the twenty-four (24) month period prior to the Termination Date.    For purposes of this Section, the following definitions apply: "Restricted Area" means each State, within the United States, in which the Company or Equipmentfacts has engaged in the Restricted Business during the twenty-four (24) month period prior to the Termination Date; and, "Restricted Business" means the business of providing an online auction platform or online auction services for the purpose of facilitating the sale of equipment or machinery that is used in the agriculture or construction industries in a manner that competes with the Company.

**6. NO SOLICITATION OF EMPLOYEES OR CUSTOMERS.** I agree that during my employment by the Company and for eighteen (18) months after the Termination Date, I will not, except in the course of performing my duties on behalf of the Company, either directly or through others, (i) solicit or attempt to solicit any employee of the Company to become an employee, consultant or independent contractor to or for any other person or entity, and/or (ii) solicit, do business with, or accept or aid in the provision of products or services to any customers of the Company, its affiliates and subsidiaries with whom I had personal contact and actually did business with in the course of my employment with the Company (or in my performance of work for any affiliate or subsidiary of the Company) during my employment with the Company at any time during the four (4) year period immediately preceding the Termination Date.

**7. NO CONFLICTING AGREEMENT OR OBLIGATION.** I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement or obligation of any kind made prior to my employment by the Company, including agreements or obligations I may have with prior employers or entities for which I have provided services. I have not entered into, and I agree I will not enter into, any agreement or obligation either written or oral in conflict herewith.

**8. RETURN OF COMPANY PROPERTY.** When I leave the employ of the Company, I will immediately deliver to the Company any and all drawings, notes, customer information, databases, contact lists, calendars, correspondence, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company, its affiliates or subsidiaries.

**9. LEGAL AND EQUITABLE REMEDIES.** I recognize that in the course of

employment with the Company, I will have access to Proprietary Information, to Third Party Information, and to employees, consultants, contractors, clients, and customers of the Company, its affiliates or subsidiaries. I also recognize that the services which I will be employed to provide are personal and unique. I understand that because of this the Company may sustain irreparable injury if I violate this Agreement. In order to limit or prevent such irreparable injury, the Company shall have the right to enforce this Agreement and any of its provisions by injunctions, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

**10. NOTICES.** Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

**11. NOTIFICATION; NON-ASSOCIATION.** In the event that I leave the employ of the Company, I authorize the Company to provide notice of my obligations under this Agreement to the customers of the Company, its affiliates and subsidiaries to my subsequent employers and to any other entity or person to whom I provide services. I agree that I shall not publish my name or photograph, or cause or permit such to be published or used in connection with advertising, regardless of the media or format, by or on behalf of any person or entity in competition with the Company, its affiliates or subsidiaries, in which reference is made to my former employment with the Company or work for its affiliates or subsidiaries or to having done business with the customers of the Company or its affiliates or subsidiaries, or which tend to identify me with the Company, its affiliates or subsidiaries.

**12. USE OF VOICE, IMAGE, AND LIKENESS.** I give the Company my

4846-0663-5622.5

permission to use any and all of my voice, image and likeness, with or without using my name, in connection with the products and/or services of the Company, for the purpose of advertising and promoting such products and/or services and/or the Company, and/or for other purposes deemed appropriate by the Company in its reasonable discretion, except to the extent expressly prohibited by law.

**13.    PUBLICATIONS.** I will obtain the Company's written approval before publishing or submitting for publication any material that relates to my work at the Company and/or incorporates any Proprietary Information.

**14.    GENERAL PROVISIONS.**

**14.1    Governing Law; Consent to Personal Jurisdiction.** This agreement will be governed by and construed according to the laws of the State of New Jersey. I hereby expressly consent to the exercise of personal jurisdiction by the state and federal courts located in New Jersey in any lawsuit filed arising from or related to this Agreement.

**14.2    Severability.** In case any one or more of the provisions, subsections, or sentences contained in this Agreement, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable to the extent compatible with the applicable law as it shall then appear.

**14.3    Reasonable Restrictions.** I agree that due to my limited privileged position within the BidCaller division of the Company and my access to the most sensitive Confidential Information, the covenants and agreements set forth in this Agreement are fair and reasonable in scope and content and are necessary for the protection of the legitimate business interests, including, without limitation, the Confidential Information, goodwill, and other proprietary interests of the Company and the Company's affiliates and subsidiaries for whom I perform

work, if any. I further acknowledge and agree that the Company services customers throughout the entirety of the Restricted Area and that such area represents the reasonable geographic territory in which I could leverage the Company's goodwill, including customer relationships, Confidential Information, and other proprietary interests to engage in unfair competition with the Company. In signing this Agreement, I am fully aware of the restrictions this Agreement places upon my future employment with someone other than the Company, and that such restrictions will not unduly burden my opportunity to earn a reasonable living following the termination of employment with the Company.

**14.4    Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. The Company retains the right to assign this Agreement and the Company's rights hereunder to successors and/or assigns, without prior notice to or authorization from me.

**14.5    Survival.** The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

**14.6    Waiver.** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

**14.7    Ample Time to Review.** I acknowledge that I have been given a reasonable period of time to deliberate upon the full implication of this Agreement and freely and voluntarily enter into this Agreement.

**14.8    Entire Agreement.** This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter

4846-0663-5622.5

hereof and supersedes and merges all prior dis-cussions between us. The previous sentence notwithstanding, The previous sentence notwithstanding, I expressly acknowledge I may be subject to earlier agreements with the Company or that inure to the benefit of the Company, including, without limitation, the Employment Agreement, that may restrict my conduct following the termination of my employment with the Company, address intellectual property, trade secrets, and Confidential Information, or require my cooperation with the Company on certain matters, and that such agreements, including the choice of law and venue provisions contained therein, are expressly not superseded herein and shall be used together with this Agreement to protect the Company's interests to the fullest extent allowed by law. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

This Agreement shall be effective as of the date of my employment with the Company.

*I HAVE READ THIS AGREEMENT CAREFULLY, FULLY UNDERSTAND ITS TERMS AND VOLUNTARILY AGREE TO ALL OF ITS TERMS.*

Dated: _____ 7/13 _____, 2018

Signature: _____
Lawrence Garafola