# Exhibit A

1        **UNITED STATES DISTRICT COURT**
                **FOR THE DISTRICT OF NEW JERSEY**
2

3 _____

SANDHILLS GLOBAL, INC.,
4
              Plaintiff,              CIVIL ACTION NUMBER:
5
              -vs-
6                                     **3:19-cv-20669-MAS-TJB**
LAWRENCE GARAFOLA SR., and
7 FACTS TECHNOLOGY LLC              Preliminary Injunction
                                             Hearing
8         Defendants.
_____
9        Clarkson S. Fisher United States Courthouse
         402 East State Street
10       Trenton, New Jersey  08608
         February 6, 2020
11
   **B E F O R E**:        HONORABLE MICHAEL A. SHIPP
12                         UNITED STATES DISTRICT JUDGE

13

14 **A P P E A R A N C E S**:

15 BRESSLER, AMERY & ROSS, P.C.
   BY:  JOHN D. MILLER, III, ESQUIRE
16 On behalf of the Plaintiff.

17 TRINITY & FARSIOU
   BY:  STEVEN D. FARSIOU, ESQUIRE
18 On behalf of the Defendants.

19

20        Cathy J. Ford, Official Court Reporter
                cfordccr@gmail.com
21                 609.367.2777

22 Proceedings recorded by mechanical stenography; transcript
   produced by computer-aided transcription.

23

24

25

1
2
3
4                          I N D E X

5    WITNESS                                          PAGE

6
      EVAN WELCH                                       11
7
      DIRECT EXAMINATION BY MR. MILLER                 12
8     CROSS-EXAMINATION BY MR. FARSIOU                142

9

10                       E X H I B I T S

11   NUMBER                                           IDEN.

12
      Plaintiff's Exhibit P-1 through P-24 for         238
13    identification.
      Defendant's Exhibit D-1 through D-4 for          238
14    identification.

15

16

17

18

19

20

21

22

23

24

25

```
 1              (PROCEEDINGS held in open court before The Honorable

 2  Michael A. Shipp, United States District Judge, at 10:12 a.m.)

 3              THE COURT:  Please be seated.  Good morning.

 4              MR. MILLER:  Good morning, your Honor.

 5              MR. FARSIOU:  Good morning, Judge.

 6              THE COURT:  We're here and we're on the record in the

 7  matter of Sandhills Global v. Garafola, Docket

 8  Number 19-20669.

 9              May I have appearances of counsel, please.

10              MR. MILLER:  For the plaintiff, John Miller from

11  Bressler Amery & Ross.  And with me is representatives from

12  Sandhills, Evan Welch and Alexander Essay, in-house counsel.

13              THE COURT:  Good morning.

14              MR. FARSIOU:  Good morning, Judge.  Steve Farsiou for

15  the law firm of Trinity & Farsiou on behalf of the defendants.

16  And I have Mr. Garafola sitting to my left.

17              THE COURT:  Okay.  And good morning to you as well.

18              Okay.  This matter comes before the Court upon the

19  plaintiff Sandhills Global's motion for a preliminary

20  injunction against defendants Larry Garafola and Facts

21  Technology LLC.  Defendants filed opposition, plaintiffs filed

22  a reply.

23              And by way of background, on December 16, 2019, the

24  Court issued a TRO against Garafola alone on plaintiff's

25  contract claim, which remains in effect pending a preliminary
```

1    injunction hearing.

2            On December 23, 2019, plaintiff informed the Court

3    that Garafola violated the TRO by continuing to solicit

4    plaintiff's customers and requested that the Court amend the

5    TRO to enjoin Facts Technology.  The Court denied plaintiff's

6    request for an amendment to the TRO and for attorney's fees.

7            On January 22, 2020, plaintiff again informed the

8    Court that Mr. Garafola violated the TRO and requested the

9    Court to amend the TRO to restrain Facts Technology and for

10   attorney's fees and costs.

11           Having reviewed the parties' submissions and having

12   held a pre-hearing conference on January 22, 2020, the Court

13   is now prepared today to proceed with the preliminary

14   injunction hearing.  And in that connection, I remind the

15   parties that we're going to proceed.

16           Although officially and on the record, the rules of

17   evidence are relaxed in a preliminary injunction hearing.  So

18   to the extent that there are any objections, you can certainly

19   make them, but again, it's for the Court's benefit to assist

20   the Court in making the ultimate determinations.

21           So you can reserve such and put such in writing, if

22   you need to do that, post.  We're also going to have some post

23   briefing after the hearing.  So there are certain conclusions

24   of law and findings of fact that you'll have to set forth

25   after the conclusion of the hearing.

 1          So, with that, I do want to proceed in a somewhat

 2   informal manner, and if there are other issues that need to be

 3   brought to the Court's attention, certainly you can bring them

 4   to the Court's attention.

 5          And notwithstanding the fact that I do have some of

 6   my interns sitting in the jury box, there is no jury trial.

 7   There is no need for any theatrics, no need for anything that

 8   is for your client's consumption.  I want to be able to make

 9   these determinations, so help me to help you.

10          With that, I'm turning it over to the plaintiff.

11          Mr. Miller, it's your case.

12          MR. MILLER:  Judge, thank you very much.  Very

13   quickly, as a housekeeping matter, while I think there's a

14   contested issue about the intellectual property that we're

15   going to be discussing, I thank your Honor for entering the

16   confidentiality agreement in an order this morning.

17          For purposes of the preliminary injunction hearing,

18   the documents that I'm going to offer the Court for its

19   edification contain some of the confidential intellectual

20   property.

21          And my request is that, at least for this part, that

22   those documents not be made public until we otherwise have the

23   full record in there.  Because if, ultimately, they're made

24   public, then my client, Sandhills, loses that confidential

25   intellectual property.

1          So my request is if those can be remained under seal

2     until the preliminary injunction hearing is concluded.

3          THE COURT:  Any opposition, Mr. Farsiou?

4          MR. FARSIOU:  No, Judge.  And, Judge, do we need to

5     put anything on the record about what we discussed with

6     respect to the documents?

7          THE COURT:  If you want to put them on the record,

8     you can put them on the record.

9          MR. FARSIOU:  Okay.

10          THE COURT:  And, Counsel, your request is granted.

11     We will keep these documents confidential until such time

12     that, you know, you file whatever you need to file, in

13     accordance with the rules, regarding the sealing of the

14     records, the sealing of any document production.

15          MR. MILLER:  Thank you, your Honor.

16          THE COURT:  Okay.

17          Mr. Farsiou?

18          MR. FARSIOU:  So, Judge, just so the record is clear,

19     as I advised your Honor in chambers, at approximately

20     6:29 p.m. last night I received an email from Mr. Miller.

21     Contained 596 documents, the majority of which I had never

22     seen before but had requested previously.  And I had indicated

23     to your Honor that I felt that those documents should not be

24     introduced and should not be permitted.

25          Your Honor indicated that the opportunity to review

1    those documents and reserve any cross-examination with respect

2    to Mr. Welch will be given, so I thank your Honor for that

3    courtesy.

4          But, at the same time, I just want to note that the

5    documents that were provided last night were the same

6    documents that were the subject in the initiation of the first

7    Sandhills case.  Those documents had been requested in that

8    case and a confidentiality order was entered.  Those documents

9    were never produced.

10          We came here on December 11th of 2019 for the TRO

11   hearing, and Mr. Miller stood up and indicated that he had all

12   this evidence about what my client had apparently done

13   improperly.

14          I said that that's news to me, I had never seen the

15   documents, we requested them previously, we never had them.

16   Those documents -- I'm assuming there's no other ones -- the

17   documents that we received last night at 6:29, the 596 pages

18   of documents are those documents that I had been requesting

19   for months.

20          So obviously, you know, your Honor made a ruling with

21   respect to how we're going to proceed, and we're obviously

22   going to abide by that.  I just wanted the record to be clear

23   as to what actually happened so that, you know, my client

24   understands what's going to happen here today and that I'm

25   going to be able to reserve my right to cross-examine

```
 1   Mr. Welch based upon our discussion.

 2           THE COURT:  Okay.

 3           Mr. Miller.

 4           I'm sorry.

 5           MR. FARSIOU:  One other thing, Judge.  I did indicate

 6   previously that -- and I don't think it's going to be an issue

 7   today.  But to the extent that Mr. Miller is going to submit

 8   to your Honor certifications from people who are not here

 9   today, I understand the rules of evidence are relaxed, I just

10   want to note my objection that I believe that the witnesses

11   should be required to get on the stand and be cross-examined

12   as to how those certifications came about.  I think that's

13   very important here.  So I just want to note that.

14           I do have, as your Honor knows, I have a

15   certification from Mr. Dyess from Permian.  I had indicated

16   Mr. Permian (sic) is in Texas and he's not available today,

17   because we talked about not having him.

18           But if the next date comes and you want to hear from

19   Mr. Dyess, I would request that Mr. Dyess be permitted to

20   either testify via FaceTime or some other -- some type of, I

21   guess, social media device that he can testify so that you can

22   actually see him and he can be cross-examined.  I think that's

23   the only fair way to proceed here.  So I just wanted to note

24   that for the record.

25           THE COURT:  Okay.
```

1          Mr. Miller.

2          MR. MILLER:  Very briefly, your Honor.

3          The majority of the documents that are at issue

4  Mr. Farsiou just made clear.  As I explained to your Honor,

5  those are emails or attachments to emails that were sent to

6  Mr. Farsiou -- Garafola's personal email account, the

7  Gmail account.  I just wanted the other side of that equation

8  to be there.

9          And relative to the certification, your Honor has

10  repeatedly said that this is to aid the Court.  And

11  ultimately, I believe, the use of or reliance on the

12  certifications that have already been submitted to your Honor

13  in connection with the application do aid the Court such that

14  if, ultimately, we can present them through Mr. Welch because

15  he otherwise talked or spoke to the clients or

16  representatives, we'd offer them, and we believe that your

17  Honor can actually consider them without calling those

18  witnesses in.  But we'll address that when we get there.

19          THE COURT:  Thank you.

20          Counsel has raised this issue with the Court, and the

21  Court has resolved the dispute by way of simply curing the

22  unfairness.

23          The Court notes that I'm never appreciative of an

24  adversary receiving documents the night before any kind of

25  trial or proceeding.  And to that end and in that connection,

1    I'm going to allow Mr. Farsiou an opportunity to review the

2    documents that he just received as well as have the benefit of

3    the transcript of Mr. Welch's testimony, and then we will have

4    a subsequent hearing, at which time Mr. Farsiou will have an

5    opportunity to cross-examine Mr. Welch with regards to the

6    documents.

7            We are going to proceed in all other aspects today

8    with other remaining claims and other issues that certainly

9    can be put before the Court so as not to waste the time that

10   folks have traveled to get here and waste the time that the

11   Court has set aside to hear this matter.  So we're going to

12   proceed in that fashion.

13           And to the extent that there are certifications that

14   come in, Counsel can make the appropriate request for relief

15   at that time.  We'll look at each certification on a

16   case-by-case basis, and we'll take the testimony as it comes

17   in.  Okay?

18           With that, those are all the preliminary matters that

19   I understand that there are, so I'd like to go ahead get

20   started.

21           Counsel, anything further?

22           MR. MILLER:  Nothing from plaintiff.

23           MR. FARSIOU:  No, Judge.

24           THE COURT:  Okay.

25           Mr. Miller.

*1*          MR. MILLER:  Your Honor, I'd like to call Evan Welch

*2*  to the stand.

*3*          THE COURT:  Mr. Welch.

*4*  EVAN WELCH, PLAINTIFF'S WITNESS, SWORN.

*5*          THE DEPUTY COURT CLERK:  Please state your name for

*6*  the record and spell your last name.

*7*          THE WITNESS:  W-E-L-C-H.

*8*          THE COURT:  Mr. Welch, you can be seated.  And I'm

*9*  just going to give you just a few ground rules just so that we

*10*  keep the record clean.

*11*          There is a court reporter sitting directly in front

*12*  of you.  She's taking down every word that's spoken here.

*13*  It's really important that she's able hear you, so I'm going

*14*  to ask you to keep your voice up; and also that she's able to

*15*  take down an accurate record, so you can't give a nonverbal

*16*  response like a nod of the head or a shrug of the shoulders.

*17*  You have to give a verbal response so she can take it down.

*18*          Secondly, she can't take down two people speaking at

*19*  the same time, so please wait until the attorney fully poses

*20*  the question before you begin to answer.  If not, she'll have

*21*  people speaking on top of one another and we'll have an

*22*  inaccurate record.  Okay?

*23*          If there is an objection at any time, which there

*24*  should not be, please stop speaking and let the Court resolve

*25*  the objection.

1            If counsel needs to be heard at sidebar at any time,

2    certainly, we can have a sidebar.  Okay?  Other than that, I'd

3    like to try and get as much of the testimony in today as we

4    can possibly get covered today.

5            With that, do you have any questions before we begin?

6            THE WITNESS:  No.

7            THE COURT:  Okay.  Mr. Miller, your witness.

8            MR. MILLER:  Thank you, your Honor.

9    (DIRECT EXAMINATION BY MR. MILLER:)

10   Q.   Good morning, Mr. Welch.  How are you?

11   A.   Good.

12   Q.   You traveled from Nebraska to New Jersey for this

13   hearing, correct?

14   A.   Yes.

15   Q.   Well, I appreciate you making the effort.

16        Mr. Welch, by whom are you currently employed?

17   A.   Sandhills Global, Inc.

18   Q.   And what's your current position?

19   A.   Director of new product sales.

20   Q.   With respect to your employment with Sandhills, how long

21   have you been an employee?

22   A.   15 years.

23   Q.   And in your role as the director of new products sales,

24   how long have you been in that role?

25   A.   A little over three years.

WELCH - DIRECT - MILLER

1  Q.   For the Court's benefit, can you give a description of

2  your job responsibilities in that role?

3  A.   Sure.  I deal with the newer products in Sandhills

4  Global, Inc.'s brands.  Some of those include products that

5  are regarding the auction -- the online auction business.

6       I oversee a sales staff of about 22 sales

7  representatives, so I deal with the customers through those

8  sales representatives and three managers that oversee those

9  sales representatives.

10      And as well is I'm also involved in the acquisition of

11 new businesses that Sandhills is acquiring.

12 Q.   Now, Mr. Welch, in terms of Sandhills in the area that

13 you're otherwise employed, and that is as the director of new

14 product sales, can you describe how Sandhills otherwise

15 operates in that space you're employed in?

16 A.   Yes.  So we've got three different divisions within that

17 auction group.  Okay.  So those sales representatives, they

18 work with several different products that are sold to auction

19 companies, primarily.  There's the AuctionTime, which is our

20 timed auction product, "timed auction" meaning online only.

21 There's no live aspect to it whatsoever.

22      Then we've got the product which we acquired from

23 Mr. Garafola, Equipmentfacts, which is our -- what we call our

24 simulcast auction product, meaning that there is an online

25 bidding component that runs alongside a live auction with a

─────WELCH – DIRECT – MILLER─────

 1   live audience.

 2        And then we've got another product called HiBid.  That's

 3   kind of a hybrid of those two but for non-equipment-related

 4   items.

 5   Q.   Now, relative to the online auction component, be it the

 6   timed auction or the simulcast, can you describe for the Court

 7   how it is that you actually conduct that type of business?

 8   A.   Yes.  So the timed auction component, AuctionTime, it's

 9   strictly the bids are being taken by the computer.  So there's

10   bidders from all over the world that are bidding on items that

11   can be spread out all over the world.

12        Equipmentfacts, on the other hand, is in conjunction with

13   a live auction.  So if there's a live auction in New Jersey,

14   there's a hundred people there in the audience that can be

15   bidding on items that are offered up in that auction,

16   Equipmentfacts is the online access for that auction.

17        So Equipmentfacts is sitting there next to the

18   auctioneer, and they're running the bid, the bidding online,

19   and people are bidding from all over the world online on that

20   sale that is taking place in New Jersey.

21   Q.   Mr. Welch, you've described AuctionTime, HiBid, and

22   Equipmentfacts.  Does Sandhills describe those types of

23   functions where those kind of industries in a particular word

24   or a description?

25   A.   Industry-specific brands.

WELCH - DIRECT - MILLER

1   Q.   Brands?

2   A.   Yes.

3   Q.   So, visually, take the Court to, if you were to go to the

4   Sandhills website --

5   A.   Yes.

6   Q.   -- describe what you would see in terms of the brands you

7   just described.

8   A.   You would see a list of all Sandhills Global, Inc.'s

9   brands, which include AuctionTime, Equipmentfacts, HiBid,

10  along with many others.

11  Q.   And the many others, are those others areas in which

12  there's a -- Sandhills is providing, at least through

13  Equipmentfacts, online auction services to different types of

14  brands?

15  A.   Yes.

16  Q.   Prior to the purchase of Equipmentfacts, did Sandhills

17  consider Equipmentfacts a competitor to Sandhills?

18  A.   Yes.

19  Q.   And what brand was it a competitor of?

20  A.   We had a brand called BidCaller that was kind of in its

21  infancy.  It was a simulcast auction service.  It was pretty

22  strong in the farm equipment industry whereas Equipmentfacts

23  was very strong in the construction and truck equipment

24  industry.  So that's why we thought it might be good fit.

25  Q.   And by saying it might be a good fit, is that why you

WELCH - DIRECT - MILLER

 1  targeted the acquisition of Equipmentfacts?

 2  A.   Yes.  Equipmentfacts, and particularly Mr. Garafola, were

 3  kind of pioneers of the industry.  They were one of the first

 4  online providers of simulcast solutions.  So we thought not

 5  only of the Equipmentfacts brand but also the knowledge that

 6  we would get by acquiring the business would be worthwhile.

 7  Q.   And the knowledge, would that include the customer

 8  relationships?

 9  A.   Customer relationships, both buyer and seller; the

10  intellectual property, which would include the website, all

11  the trademarks, all the copyright, like all -- all the

12  intellectual property that came with it.

13  Q.   Now, you've described your experience, or at least

14  knowledge, of Mr. Garafola being a pioneer in the online

15  auction space.  Other than sort of knowing that, did you have

16  any experience with him prior to the acquisition?

17  A.   Knew who he was.  I don't know that I'd ever met him in

18  person before.  I'd seen him at some conventions and trade

19  shows and whatnot, but that was about the extent.

20  Q.   And you've testified, as part of your job

21  responsibilities at Sandhills, that you were involved with

22  business acquisitions, correct?

23  A.   Yes, correct.

24  Q.   Did you have involvement in the acquisition of

25  Equipmentfacts?

WELCH - DIRECT - MILLER

1   A.   Yes.  I was the direct point of contact.

2   Q.   So you were the person negotiating, at least as the face

3   on behalf of Sandhills, for purposes of that acquisition?

4   A.   Yes.

5   Q.   Who was on the other side of that table?  Was

6   Mr. Garafola involved?

7   A.   Yes.  Mr. Garafola was my point of contact.

8   Q.   Did he have any other representatives helping him out

9   through the acquisition?

10  A.   Yes.  He had an attorney.  I think her name was Lynn

11  McDougall.

12  Q.   Now, were there negotiations involved with respect to the

13  acquisition?

14  A.   Yes.

15  Q.   And how long were those negotiations, generally speaking?

16  A.   Our first in-person meeting was July of 2017, which we

17  started negotiations at that time, which they started to pick

18  up significantly in the turn of 2018.  And then, ultimately,

19  we came to a verbal agreement, which ended up consummating to

20  an LOI and ultimately led to the purchase agreement.

21  Q.   For the clarification for the Court's benefit, "LOI"

22  standing for what?

23  A.   Letter of intent.

24  Q.   Thank you.  And is that where the acquisition stopped or

25  there's another additional steps that took place?

———————WELCH - DIRECT - MILLER———————

```
 1  A.   No.  There was a letter of intent in April, and then from

 2  the time -- from April until we ultimately closed in July of

 3  2018, there was due diligence being performed.

 4  Q.   Now, did Sandhills make an initial opening offer in terms

 5  of a price ^ Equipmentfacts?

 6  A.   Yes.

 7  Q.   And what was that offer?

 8  A.   The initial verbal offer was 1.23 million.

 9  Q.   And going forward, you described the letter of intent,

10  that was actually memorialized in a writing?

11  A.   Yes.

12  Q.   And did you have involvement in the creation, or at least

13  the content, of that letter of intent?

14  A.   Yes.

15       MR. MILLER:  Judge, may I approach the witness?  I'd

16  like to offer him.  And, your Honor, for presentation

17  purposes, I have hard copies for you.  I can put it up there

18  or whatever your Honor would like best.

19  Q.   Mr. Welch, please take a minute and review that document

20  and let me know when you've sufficiently reviewed to be able

21  to testify about it.

22  A.   Okay.

23  Q.   Is that the letter of intent you testified about earlier?

24  A.   Yes.

25  Q.   And if you'll flip to the last page, is there a signature
```

─────── WELCH - DIRECT - MILLER ───────

1   there?

2   A.   Yes.

3   Q.   There's -- one of them -- is Mr. Garafola's signature

4   there?

5   A.   Yes, correct.

6   Q.   And there's another signature.  Do you see it?

7   A.   Yes.

8   Q.   And who is that from?

9   A.   Shawn Peed.

10  Q.   If you were the lead on the negotiations, why didn't you

11  sign?

12  A.   Shawn Peed is the owner of the company.

13  Q.   And it's his practice, when there's an acquisition, he's

14  the signatory?

15  A.   Yes.

16  Q.   Going back to the first page, if you will.

17       And for purposes of the record, it's Bates stamped --

18  this document is Bates-stamped Sandhills PI-508 through -515.

19       If you look at paragraph 1 -- I don't want you to read

20  it.  Review it very briefly for yourself because it's actually

21  pretty long.

22       My question to you after you reviewed it is, what is that

23  paragraph reflecting in terms of what's contemplated?

24  A.   A transaction between Sandhills Publishing and

25  Equipmentfacts, a purchase agreement.

WELCH - DIRECT - MILLER

1  Q.  So I'm actually looking paragraph Number 1.  It's towards

2  the bottom?

3  A.  Oh, okay.  I didn't see that.  Sorry.

4  Q.  Sorry.  And for the Court's benefit, what's the title

5  next to Number 1?

6  A.  "Included Assets."

7  Q.  Okay.  Take a minute, just take a real quick look, and

8  let me know when you're done.

9  A.  It's what's included in the purchase price.

10  Q.  And did those items that appear in Number 1 generally

11  carry over to the actual Asset Purchase Agreement?

12  A.  Yes.

13  Q.  And, if you would, going to numbered paragraph 4, which

14  is on the page Bates-stamped 510.  It's at the bottom right.

15     Are you there?

16  A.  Yes.

17  Q.  And that paragraph is purchase price, correct?

18  A.  Correct.

19  Q.  And what's the price there?

20  A.  1.5 million.

21  Q.  You earlier testified that Sandhills made an opening bid

22  of 1.23 million?

23  A.  Yes, correct.

24  Q.  So, obviously, that's an increase, correct?

25  A.  Yes.

—————WELCH - DIRECT - MILLER—————

1   Q.   Did Mr. Garafola negotiate that increase?

2   A.   Yes.

3   Q.   If you go to paragraph -- numbered paragraph number 7.

4   Let me know when you're there.   And that's on Bates stamp 512.

5        Are you there?

6   A.   Yes.

7   Q.   Can you read for the Court the title of that paragraph?

8   A.   Non-competition, Non-Interference, and Confidentiality

9   Agreement.

10  Q.   And, just generally speaking, take a minute to look at

11  it, what does that paragraph convey?

12  A.   That as a part of the purchase agreement, a 5-year

13  non-competition, non-interference, and confidentiality

14  agreement will be signed by the seller.

15  Q.   And that seller being Mr. Garafola?

16  A.   Yes, correct.

17  Q.   And did, in fact, the documents that are referenced

18  there, those agreements, become part of the Asset Purchase

19  Agreement?

20  A.   Yes.

21  Q.   And again, this is in April of 2018?

22  A.   Correct.

23  Q.   And the Asset Purchase Agreement, as you testified,

24  actually occurred a couple months later, in July of 2018?

25  A.   Yes.

WELCH - DIRECT - MILLER

 1   Q.   You testified earlier about an individual that was

 2   assisting Mr. Garafola, a Lynn McDougall?

 3   A.   Yes.

 4   Q.   To your knowledge, was Ms. McDougall -- and she's an

 5   attorney, correct?

 6   A.   Yes, correct.

 7   Q.   To your knowledge, was she involved in the negotiations

 8   of the letter of intent?

 9   A.   Yes.

10   Q.   And again, Mr. Garafola signed it.  And you don't see any

11   notations that he objected to any of the terms, correct?

12   A.   No.

13   Q.   Now, you testified earlier in terms of why you were

14   targeting Equipmentfacts, and you said that it had a stronger

15   or a really strong place in the online auction for agriculture

16   and construction, correct?

17   A.   Construction and truck.

18   Q.   I'm sorry.  Construction and truck.

19   A.   And agricultural as well, but, yes.

20   Q.   And that's what made it attractive for the purchase?

21   A.   Yes.

22   Q.   You touched on, but I'd like you to give a little more

23   detail.  In addition to that, the actual market share,

24   Mr. Garafola, as a potential employee, was attractive to

25   Equipmentfacts and Sandhills as well, correct?

—————————————WELCH - DIRECT - MILLER—————————————

1    A.   Yes.

2    Q.   And can you describe for the Court, in your opinion,

3    having dealt with Mr. Garafola, particularly with the

4    negotiations, what about Mr. Garafola was attractive to bring

5    in as employee?

6    A.   He was very knowledgeable in the industry, had extensive

7    experience with regards to clerking, which, when I say

8    "clerking," I mean running of the online bidding alongside a

9    live auctioneer.  So that experience, we knew, could kind of

10   fast-track us ahead of where we were at that time.

11        He was a good businessman, had built a nice business over

12   the course of working with Equipmentfacts.

13   Q.   And would it be fair to say that you were looking to, as

14   an employee of Sandhills, leverage Mr. Garafola's experience

15   in potential other areas within Sandhills?

16   A.   Yes.

17   Q.   Did, in fact, was Mr. Garafola limited to working just

18   for Equipmentfacts?

19   A.   No.

20   Q.   And did, in fact, Mr. Garafola provide services to other

21   brands for Sandhills?

22   A.   Yes.

23   Q.   Can you give an example or examples?

24   A.   Yeah.  I can give several with his relationships in place

25   with several of our auctioneers.  He actually brought Ryan

─────WELCH – DIRECT – MILLER─────

 1   Auctions into Sandhills to meet and, ultimately, we got them

 2   to use AuctionTime, our timed auctions product.

 3       He had a previous relationship with a company called

 4   Vicari Auctions and was instrumental in creating a classic car

 5   industry-specific portal, where we ran one of those auctions

 6   on that platform.  That's just a couple of examples.

 7   Q.   Great.  Thank you.  Earlier, you were testifying about

 8   your involvement in the negotiations.

 9       Were you actually involved in the actual execution of the

10   Asset Purchase Agreement, which I've referred to as the APA?

11   A.   Yes.

12   Q.   And you understood the terms that were being included in

13   that Asset Purchase Agreement?

14   A.   Yes.

15       MR. MILLER:  Judge, I'd like to approach the witness

16   to give him an exhibit, please.

17       THE COURT:  Sure.

18   BY MR. MILLER:

19   Q.   Mr. Welch, I'm not going to belabor you to go through

20   this whole document, but what I'd like you to do, if you

21   could, generally review the document and, in particular,

22   looking at the last pages.  And when you're there, let me know

23   that you've completed that review, and I have a couple of

24   questions.

25   A.   Yes.

WELCH - DIRECT - MILLER

1   Q.   Mr. Welch, is that the Asset Purchase Agreement about

2   which you testified and had involvement in the negotiations?

3   A.   Yes.

4   Q.   And what I'm going to ask you to do, and this becomes

5   almost a Jenga of exhibits, this document, I'm going to have

6   you, once you're done reviewing it, set it to the side because

7   we're going to refer to it later.

8   A.   Okay.

9   Q.   But for purposes of right now, on the first page, that

10  is, actually numbered page 2, Bates stamp Sandhills PI

11  Number 2, the first whereas clause, do you see that?

12  A.   Yes.

13  Q.   And it ends with, in a parenthetical, "business"?

14  A.   Yes.

15  Q.   You there?

16  A.   Uh-huh.

17  Q.   For your understanding, having been involved in the APA,

18  what's that paragraph doing?  What's the import of that

19  paragraph?

20  A.   It's summarizing what the business is.

21  Q.   And from your involvement in the negotiations and

22  ultimate acquisition, generally speaking, what is your

23  understanding of what the business was or is, according to

24  this document?

25  A.   Online bidding systems, virtual attendance as well as

─────WELCH - DIRECT - MILLER─────

1    timed auctions, for the heavy equipment, truck, agriculture

2    and related auction industries.

3    Q.   And now, if you'll turn to page 25, Bates stamp Sandhills

4    PI-25.  Let me know when you're there.

5    A.   Yes, I'm there.

6    Q.   Now, just for point of reference, if you go one page

7    before, that is, page 24, it's paragraph 6.6, "Notices."  Do

8    you see that?

9    A.   Yes.

10   Q.   And is it accurate that this paragraph is providing the

11   information, contact information, to the extent notices had to

12   be given to the parties?

13   A.   Yes, correct.

14   Q.   And if you turn to page 25.  Let me know, are you there?

15   A.   I'm there.

16   Q.   Lynn McDougall, the attorney, is her name referenced

17   here?

18   A.   Yes.

19   Q.   And is Mr. Garafola's name referenced there?

20   A.   Yes.

21   Q.   Is there an email address for him?

22   A.   Yes.

23   Q.   And is it garafola.lawrence@gmail.com?

24   A.   Yes, that's correct.

25   Q.   And that was known to you as part of -- as early as July

WELCH - DIRECT - MILLER

1   16, 2018, that that was Mr. Garafola's personal email address?

2   A.   Yes.

3   Q.   And just that last page, again, Mr. Garafola has signed?

4   A.   Yes.

5   Q.   Mr. Peed has signed on behalf of Sandhills?

6   A.   Yes, correct.

7   Q.   And in your review of the document, were there any

8   notations on the document from Mr. Garafola or his attorney

9   challenging the terms of this Asset Purchase Agreement?

10  A.   No.

11  Q.   Mr. Welch, you testified earlier in the letter of intent

12  there was a paragraph that talked about non-compete,

13  non-interference, and non-solicitation agreements, correct?

14  A.   Yes.

15  Q.   In addition to the APA that Mr. Garafola executed, did he

16  also execute those same -- or those other documents?

17  A.   Yes.

18  Q.   And was one of them a non-compete, non-interference, and

19  confidentiality agreement?

20  A.   Yes.

21          MR. MILLER:  Judge, may I approach the witness?

22          THE COURT:  Sure.

23  BY MR. MILLER:

24  Q.   Mr. Welch, please take a moment, just peruse that

25  agreement, in particular the signature page, and let me know

WELCH - DIRECT - MILLER

1   when you're done.

2   A.   I'm done.

3   Q.   Is that document -- actually, what's the title of that

4   document for the record?

5   A.   "Non-competition, Non-Interference, and Confidentiality

6   Agreement."

7   Q.   And if you look at that, the first "whereas paragraph,"

8   this document was being executed in conjunction with the Asset

9   Purchase Agreement, correct?

10  A.   Yes.

11  Q.   Without this document having been executed, would the

12  asset purchase have gone through?

13  A.   No.

14  Q.   Now, staying on the first page, which is Bates stamp

15  Sandhills PI-33, do you see a paragraph 1, "Definitions"?

16  A.   Yes.

17  Q.   And you see the restrictive period?

18  A.   Yes.

19  Q.   What's your understanding of the restrictive period

20  that's as part of this agreement?

21  A.   That it's 5 years from the date of the signature.

22  Q.   And you're a math guy.  I'm not.  When would the 5 years

23  expire?

24  A.   July of 2023.

25  Q.   And then do you see a section C, "Territory"?

WELCH - DIRECT - MILLER

1    A.    Yes.

2    Q.    And what's the territory?

3    A.    The United States.

4    Q.    Does Sandhills conduct business throughout the United

5    States?

6    A.    Yes.

7    Q.    In particular, the online auction industry in which you

8    operate?

9    A.    Yes.

10   Q.    If you would, go to page 2, Bates stamp Sandhills PI-34.

11   You see a paragraph 2 there?

12   A.    Yes.

13   Q.    And what's that paragraph?

14   A.    Non-competition.

15   Q.    And without going through it in entirety, what's your

16   understanding of what that non-competition paragraph is

17   providing?

18   A.    That Larry cannot compete with the business that was

19   being sold to Sandhills.

20   Q.    Now, so pulling out from the terms of it your

21   understanding, the person who actually operates within the

22   online auction space at Sandhills, what was it preventing

23   Mr. Garafola from doing in terms of the non-compete?

24   A.    Selling online auction services to Sandhills' customers

25   and its affiliates.

WELCH - DIRECT - MILLER

```
 1   Q.   By "affiliates," what do you mean by that?

 2   A.   Additional brands.

 3   Q.   And we'll get to a presentation with the brands, but

 4   Sandhills has multiple brands, correct?

 5   A.   Yes, correct.

 6   Q.   And do those brands rely on the online auction services

 7   provided by Equipmentfacts?

 8   A.   Yes.

 9   Q.   So ultimately, if I've heard you correctly, Mr. Garafola

10   is not to provide online auction solutions or services in the

11   industries in which Sandhills operates.

12   A.   Yes, correct.

13   Q.   If you go to paragraph 3, what's that paragraph?

14   A.   Non-solicitation of business.

15   Q.   And what's your understanding of that paragraph?

16   A.   That Mr. Garafola would not solicit customers of

17   Sandhills, whether it be directly or indirectly.

18   Q.   And going to paragraph 5, what's the paragraph entitled?

19   A.   "Non-interference."

20   Q.   And I want to focus on two of the subparagraphs, in

21   particular A and C.  Let's start with A.

22        What's your understanding of the non-interference clause?

23   A.   That he would not encourage in any way, for any reason,

24   to alter the relationship that Sandhills has with any of its

25   customers.
```

WELCH - DIRECT - MILLER

```
 1   Q.   Or the customers of its affiliates?

 2   A.   Yes, correct.

 3   Q.   In paragraph C, what's your understanding of what that

 4   paragraph provides?

 5   A.   That he wouldn't aid in taking the customers of Sandhills

 6   and its affiliates, whether it be in -- directly or

 7   indirectly.

 8   Q.   And then finally, Mr. Welch -- not finally -- on this

 9   page, finally, paragraph 6, "Intellectual Property."  Take a

10   minute to review that short paragraph.  It goes from Bates

11   stamp Sandhills PI-34 to -35.

12        When you're done, what is it you understand that

13   paragraph to provide?

14           MR. FARSIOU:  I'm sorry.  What paragraph did you say?

15           MR. MILLER:  Paragraph 6.

16           THE WITNESS:  That Mr. Garafola cannot appropriate or

17   interfere with the intellectual property of Sandhills and its

18   affiliates.

19   BY MR. MILLER:

20   Q.   And is there a time frame in which he's not permitted to

21   do so?

22   A.   At any time during or after this restrictive period, the

23   5 years.

24   Q.   So, ultimately, it's from when it's executed to 2023?

25   A.   Yes, correct.
```

─────────── WELCH - DIRECT - MILLER ───────────

1   Q.   Paragraph 8 on page number 3, what's that paragraph

2   entitled?

3   A.   "Enforcement."

4   Q.   Now, I know it's a long paragraph.  I'm not looking for

5   you to read the whole thing.  I'd like to focus you on a

6   specific section.  If you would, it's one, two, three, four,

7   five -- six lines down, the sentence that begins "seller's

8   sole member."

9        Let me know when you're there, "the seller's sole member

10  also acknowledges."

11  A.   I'm there.

12  Q.   Read from that point -- it's actually quite a long

13  sentence.  Read that sentence to yourself.  I think it's a

14  total of about ten lines.  When you're done reading it, let me

15  know.

16  A.   Okay.

17  Q.   What's your understanding of what this enforcement

18  section is providing in the agreement?

19  A.   That Mr. Garafola understands that and acknowledges that

20  any breach of this would result in irreparable harm and damage

21  to Sandhills, the purchaser.

22  Q.   And then continue from that and go down a little further.

23  Does is it provide anything in addition to what you've just

24  described?

25  A.   That the seller would remedy at -- what does that say?

──────WELCH - DIRECT - MILLER──────

1   The seller would remedy the situation brought on by the

2   breach.

3   Q.   And is there a reference to an injunction there?

4   A.   Yes.

5   Q.   And for clarity -- and for clarity of the record, can you

6   read the section?

7   A.   "The purchaser will be entitled to an injunction or other

8   similar relief to prevent any breach of this agreement and to

9   enforce specifically the provisions of this agreement, in

10  addition to money damages sustained by purchaser resulting

11  from the seller's sole member's breach or threatened breach of

12  this agreement."

13  Q.   Mr. Welch, if you go to the last page of this document,

14  is Mr. Garafola's signature there?

15  A.   Yes.

16  Q.   And then, actually, going backwards into page number 4,

17  "Notice Provision," paragraph 11.

18       Do you see the contact information on that page?

19  A.   Yes.

20  Q.   Do you see Mr. Garafola's contact information there?

21  A.   Yes.

22  Q.   Does it also contain his personal Gmail account?

23  A.   Yes.

24  Q.   So you're familiar with Mr. Garafola's personal Gmail

25  account?

WELCH - DIRECT - MILLER

1   A.   Yes.

2   Q.   Again, this document, is there any notation anywhere on

3   it, other than the signature, reflecting that Mr. Garafola was

4   not agreeing to its provisions?

5   A.   No.

6   Q.   So, ultimately, he signed and agreed to it?

7   A.   Yes.

8   Q.   And again, if he didn't sign this non-competition,

9   non-interference, and confidentiality agreement, would the

10  sale have gone through?

11  A.   Absolutely not.

12  Q.   We have been talking about what Sandhills got for its

13  purchase.  We got the assets, we got everything,

14  Equipmentfacts' copyrights, customers list.  What did

15  Mr. Garafola get?

16  A.   $1.5 million.

17  Q.   And, in addition to that, did he get anything else?

18  A.   Yeah, he became an employee of Sandhills and also then

19  had access to all of our other products and could continue to

20  sell those products and, ultimately, developed Equipmentfacts

21  into a much larger business.

22  Q.   I think you just said Mr. Garafola became an employee of

23  the company, correct?

24  A.   Yes, correct.

25  Q.   How was he paid?

WELCH - DIRECT - MILLER

1    A.    He was salary.

2    Q.    And what was his salary?

3    A.    $170,000 a year.

4    Q.    And during the duration of his employment, did he

5    negotiate it up?

6    A.    Yes, he negotiated an upside based on the performance of

7    Equipmentfacts.

8    Q.    So, ultimately, what then became his salary?

9    A.    His salary was $170,000 a year.  And if revenues

10   increased for Equipmentfacts, it would go up, up to as much as

11   $220,000.

12   Q.    And other than the monetary component -- that is, the

13   1.5 million for the sale, purchase of the company and

14   everything involved -- and the employee benefits -- that is,

15   compensation and benefits -- what additional benefits did

16   Mr. Garafola get?

17   A.    Access to proprietary information, data.  He could then

18   come into our kind of ecosystem and continue to build more

19   products.

20   Q.    And was he given access to customers that he hadn't

21   otherwise had experience with in the past?

22   A.    Yes.

23   Q.    And I think you testified earlier to some of those?

24   A.    Uh-huh.

25   Q.    You've got to say yes.

WELCH - DIRECT - MILLER

1    A.   Yes.  Sorry.

2    Q.   Now, on the flip side, Sandhills pays a lot of money for

3    the acquisition.  It pays a lot of money for Mr. Garafola's

4    employment.  What's it getting in return?

5    A.   We get intellectual property; the knowledge that

6    Mr. Garafola had of the industry; the Equipmentfacts website,

7    trademark; their goodwill; their customer list, both buyer and

8    seller; trademarks.

9    Q.   And did you get anything else other than what was,

10   basically, the asset purchase and what came with it?

11   A.   Just the knowledge and the intellectual property that

12   Mr. Garafola and his ongoing employment with Sandhills would

13   bring.

14   Q.   Did the agreements he signed give any benefits to

15   Sandhills?

16   A.   Yes.

17   Q.   In particular the non-compete that's attached to the APA?

18   A.   Yes.

19   Q.   Did Sandhills get a benefit from that?

20   A.   Yes, absolutely.

21   Q.   What was the benefit, in your words?

22   A.   Is that he would not compete with Sandhills for up to 5

23   years.

24   Q.   And was there anything else other than the non-compete

25   that tied to the asset purchase?

─────WELCH - DIRECT - MILLER─────

1    A.   Non-solicitation.

2    Q.   I think we read earlier, non-interference?

3    A.   Yes, correct.

4    Q.   And then, as an employee, did Sandhills also get a return

5    on his compensation to him?

6    A.   Yes.

7    Q.   And in what form did that take?

8    A.   We had an Employment Agreement.  We also had a

9    non-compete, non-solicitation, duty of loyalty.

10             MR. MILLER:  Judge, may I approach the witness?

11             THE COURT:  Yes.

12             Mr. Miller, I notice you had this item here marked as

13   an exhibit.  Are you going to be moving to have all these

14   admitted or just certain documents?

15             MR. MILLER:  Going to be all.  I can do it at the end

16   or I can do it right now.

17             THE COURT:  No, that's fine.  I just noticed this,

18   some of these are and some of them are not.

19             MR. MILLER:  Oh.  I may have given you the wrong

20   marking.

21             THE COURT:  Okay.  Well, just make sure, at the end

22   that my courtroom deputy, Gina, has all the documents that

23   we're talking about here.

24             MR. FARSIOU:  Judge, can I just have a quick sidebar?

25             (Off the record.)

─────────── WELCH - DIRECT - MILLER ───────────

1   BY MR. MILLER:

2   Q.   Mr. Welch, do you have that document that's been marked

3   P-4?

4   A.   Yes.

5   Q.   Can you read the title of that document?

6   A.   "Employee Proprietary Information Inventions and

7   Non-Solicitation Agreement."

8   Q.   Is that the agreement you were earlier testifying about

9   in terms of what Mr. Garafola had to sign as part of being an

10  employee?

11  A.   Yes.

12  Q.   Now, if you would, can you go to paragraph Number 4?

13  It's on Bates stamp Number Sandhills PI-52.  Let me know when

14  you're there.

15  A.   Yes, I'm there.

16  Q.   What's the title of that paragraph?

17  A.   "Duty of Loyalty During Employment."

18  Q.   Generally speaking, do you have a familiarity of that

19  paragraph?

20  A.   Yes.

21  Q.   What's your general understanding of what it provides?

22  A.   Is that, while employed with Sandhills, he would not

23  interfere with or try to attract business to outside

24  companies.

25  Q.   Now going to paragraph 5.  What's that paragraph titled?

WELCH - DIRECT - MILLER

1    A.   "Non-competition."

2    Q.   And what's your understanding relative to that paragraph?

3    A.   That he could not compete with Sandhills for up to

4    18 months after the termination of an employment.

5    Q.   Yeah.  It asks questions about the negotiations of the

6    various agreements.

7         Do you recall that?

8    A.   Yes.

9    Q.   Did Mr. Garafola negotiate any changes to the terms of

10   this agreement?

11   A.   Yes.

12   Q.   And what were the changes?

13   A.   We initially proposed a 24-month non-competition, and he

14   negotiated it down to 18 months.

15   Q.   Now, relative to the scope of the non-compete, that is,

16   paragraph 5, what is the restrictive period and the restricted

17   business that's contemplated by this paragraph?

18   A.   The period is 18 months following the termination date of

19   employment.

20   Q.   Okay.

21   A.   The restrictive is that he cannot do business with or

22   interfere with the business of Sandhills during that time.

23   Q.   Is there a particular business that it otherwise

24   contemplates?

25   A.   Sandhills and affiliates.

```
                     ┌─WELCH - DIRECT - MILLER─┐
```

 1   Q.   So if you look down towards the bottom, there's a --

 2   A.   Or restrictive business.

 3   Q.   Correct.  Can you read that?

 4   A.   "The business of providing an online auction platform or

 5   online auction services for the" --

 6   Q.   If you could slow down?

 7   A.   Yeah.  Sorry.  "The business of providing an online

 8   auction platform or online auction services for the purpose of

 9   facilitating the sale of equipment or machinery that is used

10   in the agriculture or construction industries in a manner that

11   competes with the company."

12   Q.   Now, if you go to the next page, please.  It's paragraph

13   6 that I want to refer you to, Bates stamp Sandhills PI-53.

14        What's the title of that paragraph?

15   A.   "No Solicitation of Employees Or Customers."

16   Q.   I want you to focus in particular on numerette number ii

17   of that paragraph.  Let me know when you're there.

18   A.   I'm there.

19   Q.   Can you read -- without reading, necessarily, what's your

20   understanding of that provision?

21   A.   That he cannot solicit or do business with or accept

22   aid -- or accept aid in the provision of products or services

23   to any other customer -- any of our customers of the company.

24   Q.   You've got to blame lawyers for all these words.  It's

25   actually "solicit, do business with, or accept or aid in the

─────WELCH - DIRECT - MILLER─────

```
 1  provision of products and services."  Not your fault.  It was

 2  tough for me to read too.

 3       What's your understanding of what that provides?

 4  A.   That he can't do business with Sandhills companies or

 5  customers or affiliates of Sandhills.

 6  Q.   Or aid?

 7  A.   Yeah, or aid.

 8  Q.   Before we go from that document, can you go to paragraph

 9  8, please.  And let me know when you're there.

10  A.   I'm there.

11  Q.   And what's the title of that paragraph?

12  A.   "Return of Company Property."

13  Q.   What's your understanding what that paragraph provides?

14  A.   That any property of Sandhills, whether it be

15  intellectual property or physical property, would be returned

16  to Sandhills.

17  Q.   You can set those aside for right now.

18       Mr. Welch, did there come a point in time that

19  Mr. Garafola's employment was terminated?

20  A.   Yes.

21  Q.   And can you describe for the Court what the catalyst was?

22  What happened?

23  A.   We became aware of Mr. Garafola competing directly with

24  Equipmentfacts.

25  Q.   And how did you become aware of that?
```

─WELCH - DIRECT - MILLER─

1   A.   It started with an email that one of our employees

2   received from Marlene Greene soliciting business for a

3   company, Bidfacts.

4          MR. MILLER:   Judge, may I approach the witness?

5          THE COURT:   Yes.

6   BY MR. MILLER:

7   Q.   Mr. Welch, is that the email that you were just

8   describing that you became aware of?

9   A.   Yes.

10  Q.   And can you help the Court understand exactly what's

11  happening here?   Who's the sender, who's the receiver?

12  A.   The sender, it says payments@permian.   The signature on

13  the email is Marlene.

14  Q.   And who is Marlene?

15  A.   Marlene Greene, a former employee of Equipmentfacts that

16  was with Larry for many years.

17  Q.   What's the date of this email?

18  A.   July 30th.

19  Q.   And Marlene Greene was not an employee of Sandhills at

20  that time?

21  A.   She was no longer an employee at that time.

22  Q.   Did she voluntarily resign?

23  A.   Yes.

24  Q.   Do you recall about when that was?

25  A.   Several weeks before, probably mid to late June.

```
                          ─WELCH - DIRECT - MILLER─
```

 1   Q.   Did you have any concerns -- and who's Colton Rush?

 2   A.   Colton Rush is a representative for Sandhills Global.

 3   Q.   Does he report into you?

 4   A.   Yes.

 5   Q.   Did Colton bring to you this email?

 6   A.   Yes.

 7   Q.   And did you do anything after you received this email?

 8   A.   Yes.

 9   Q.   What did you do?

10   A.   I brought it to our attorneys in ownership and,

11   ultimately, ended up going out to New Jersey to confiscate the

12   hardware that was still out there from Marlene Greene as well

13   as the hardware from Mr. Garafola.

14   Q.   Were those the only two individuals or employees from

15   whom you confiscated the doc -- or the equipment?

16   A.   Yes, at that time.

17   Q.   And Marlene wasn't there.  Was her equipment left behind?

18   A.   No, correct, her equipment was left behind.  And by "her

19   equipment" I mean her computer and her phone, company-issued

20   phone.

21   Q.   And after that confiscation, did you do anything relative

22   to it?

23   A.   Yes, we brought it home and implored a third party, 12

24   Points, to do a forensics IT analysis of the devices.

25   Q.   And did you receive a findings from that analysis?

─────WELCH - DIRECT - MILLER─────

```
 1   A.   Yes.

 2   Q.   And, generally speaking, what were those findings?

 3   A.   That the equipment had been wiped.

 4   Q.   After receiving that email, beyond having retrieved the

 5   equipment, did you take any other steps to investigate?

 6   A.   Yes.

 7   Q.   What did you do?

 8   A.   We knew Ms. Greene's personal email address, so we did a

 9   monitor of our systems to make sure that no other emails had

10   been sent from her personnel email address to our servers, any

11   of our customers or employees that we host email for.

12   Q.   And did you discover any emails?

13   A.   Yes.

14   Q.   And as best you can recall, what is it you found?

15   A.   We found an email between Marlene Greene and Mr. Garafola

16   as well as David Brindley, an employee of Bidpath, which is a

17   competitor, discussing the starting of a new business that

18   would directly compete with Equipmentfacts.

19           MR. MILLER:  Judge, may I approach?

20           THE COURT:  Yes.

21   BY MR. MILLER:

22   Q.   Mr. Welch, is that the email you were just testifying

23   about?

24   A.   Yes.

25   Q.   Now, it reads, obviously, in reverse.  So if you turn to
```

─────────────── WELCH - DIRECT - MILLER ───────────────

1   the second page, which is the initial email in that exchange,

2   correct?

3   A.   Yes.

4   Q.   You don't have to go through the whole thing, but I want

5   you to tell me, are there particular sections or words that

6   are contained in this email that gave you concern?

7   A.   Yes, several.

8   Q.   And what were they?

9   A.   First off, the initial email from Mr. Garafola's personal

10   email address to Ms. Greene's personal email address

11   references that Larry had talked to an attorney and that, at

12   some point, they could, even though they did timed auctions

13   prior to acquisition, they could conduct auctions and compete

14   with AuctionTime, according to his attorney.

15        The second thing that's alarming is Marlene's response,

16   "Great news, Boss."

17   Q.   Why is that a concern?

18   A.   Marlene was no longer employed by Sandhills, so Larry was

19   not -- and Larry was still employed by Sandhills.  So the fact

20   that she was calling him "boss" was alarming.

21   Q.   Anything else within the email exchanges?

22   A.   Yes.  There is the email from David Brindley from

23   Bidpath.  And Bidpath is a previous provider of the software

24   that ran Equipmentfacts prior to acquisition and during

25   acquisition up until April.  And it's referencing trying to

┌─────────────────────────────────────────────────────────────┐
WELCH – DIRECT – MILLER

1   meet up and this meeting not being able to happen because of a

2   delayed flight.

3        And then it goes on, Bidfacts LLC is in place as of July

4   3rd, and it talks about the bank accounts being finalized and

5   tying to QuickBooks.  And then it references a new meeting

6   that they plan to have at NAA.

7   Q.   And what's NAA?

8   A.   NAA is the National Auctioneer Association, which is a

9   convention that is attended by many in the industry, the

10  auction industry.

11  Q.   And did Mr. Garafola attend?

12  A.   Yes.

13  Q.   Did Sandhills pay for his attendance?

14  A.   Yes.

15  Q.   And am I correct that Mr. Garafola, according to this

16  email, was going to meet with Mr. Brindley from Bidpath not on

17  behalf of Equipmentfacts but on behalf of a different

18  business?

19  A.   Yes, Bidfacts LLC.

20  Q.   And so, essentially, Mr. Garafola is setting up a

21  competing business while still employed by Sandhills?

22  A.   Yes.

23  Q.   Other than this email, did you discover any other emails

24  as part of your investigation?

25  A.   Yes.

WELCH - DIRECT - MILLER

1   Q.   And, generally speaking, approximately how many emails

2   that you're aware of were uncovered by this investigation?

3   A.   Dozens, if not hundreds.

4   Q.   And -- but prior to the investigation, you weren't aware

5   that those emails existed, correct?

6   A.   No.

7   Q.   But you did actually review as part of your supervisory

8   functions the results of that investigation, including the

9   emails themselves?

10  A.   Yes.

11  Q.   And, Mr. Welch, you've testified I think now three times

12  that you're familiar with Mr. Garafola's personal email

13  address because they appear in the contract documents,

14  correct?

15  A.   Yes, in both the purchase agreement and the letter of

16  intent.

17          MR. MILLER:  Judge, may I approach?

18          THE COURT:  Yes.

19          MR. FARSIOU:  Judge, I just want to make one note

20  that -- and I should have said it a little earlier.  P-1, and

21  now we're getting into P-7, these are documents that I have

22  not seen before.

23          THE COURT:  Thank you.

24  BY MR. MILLER:

25  Q.   Mr. Welch, is this one of the emails that you became

WELCH - DIRECT - MILLER

1  aware of as part of the investigation?

2  A.   Yes.

3  Q.   And I apologize for the incredibly small font that's

4  involved with the attachment.  We can provide a larger one for

5  the Court.

6      But, Mr. Welch, let's start with the cover page.  Who is

7  the sender, who is the receiver?

8  A.   Lawrence Garafola was the sender and the receiver.

9  Q.   And what's the date of this email exchange or this email?

10 A.   June 11th.

11 Q.   Of what year?

12 A.   2019.

13 Q.   Now, the attachment, if you'll go to that.  And in

14 particular what I'm most focused on is the headers that are on

15 the columns.  I know it's difficult to read, but are you able

16 to tell the Court what the headers are that appear on the

17 spreadsheet?

18 A.   Yes.

19 Q.   Would you please do so?  Start from left to right.

20 A.   Company Name, Bidder Number, Password, Email, First Name,

21 Last Name, Phone Number, Country, State, and Zip Code.

22 Q.   Now, Mr. Welch, are you familiar with what this document

23 actually is?

24 A.   Yes.

25 Q.   And what is it?

──────WELCH - DIRECT - MILLER──────

1   A.   It's a bidder list of bidders that have bid on the oil

2   field equipment.

3   Q.   And these bidders would have logged in or utilized the

4   oil field equipment website, correct?

5   A.   The Equipmentfacts website, yes.

6   Q.   The online auction component of it.

7   A.   Yes.  Yes.

8   Q.   And to access and get use of the Equipmentfacts online

9   functions, they have login credentials?

10  A.   Yes.  They have to register.

11  Q.   And that gives them a user name?

12  A.   Yes, correct.

13  Q.   As well as a password.

14  A.   Yes, correct.

15  Q.   And this document has all of the passwords for -- I

16  haven't counted them, but I'm going to say it's over 100

17  bidders.  Correct?

18  A.   Yes.

19  Q.   And do you as -- on behalf of Sandhills consider this

20  document, including, in particular, the passwords, a

21  confidential proprietary document?

22  A.   Absolutely.

23  Q.   Talking about P-7, that was the bidder document, do you

24  have any concern with the fact that it otherwise existed or

25  was sent from Mr. Garafola's personal email address?

```
                      ┌WELCH - DIRECT - MILLER┐
  1  A.   Yes.

  2  Q.   What's your concern?

  3  A.   This is our lifeblood.  This is really, truly how we make

  4  our money.  The bidders that come to our platform, when they

  5  purchase an item online, we get a percentage of that.  So

  6  having these bidders is the key to the business.

  7  Q.   And if an individual has that bidder list, can they

  8  target or somehow advertise to bidders more focused and more

  9  effectively?

 10  A.   Yes.

 11  Q.   Any reason you can think of why Mr. Garafola has the

 12  bidders' passwords?

 13  A.   No.

 14  Q.   Does that give you concern?

 15  A.   Yes.

 16         MR. MILLER:  Judge, may I approach?

 17         THE COURT:  Yes.

 18  BY MR. MILLER:

 19  Q.   Mr. Welch, is this another email that was uncovered by

 20  the investigation?

 21  A.   Yes.

 22  Q.   Can you tell me in the first -- or the last email

 23  exchange in it who's the sender, who's the receiver?

 24  A.   Larry Garafola is the sender and Larry Garafola's

 25  personal email is the receiver.
```

WELCH - DIRECT - MILLER

1  Q.   Going to the body of this email, you'll see the email

2  between Ms. Greene, that is, Marlene Greene, and Mr. Garafola.

3  Do you see that?

4  A.   Yes.

5  Q.   What date is that exchange?

6  A.   May 23rd.

7  Q.   So Ms. Greene was employed at least as long as May 23rd,

8  2019?

9  A.   Yes.

10  Q.   And then, what, for the Court's benefit, what's being

11  described here?

12  A.   These are all the auctions that were over $40,000 in

13  commission and the size of the overall sale.

14  Q.   And do you consider that information to be confidential

15  and proprietary to Sandhills and Equipmentfacts?

16  A.   Absolutely.

17  Q.   And do you have any concerns that ultimately -- well, let

18  me stop.  The "to/from" that is Larry to Larry, what's the

19  date of that email?

20  A.   June 14th.

21  Q.   What year?

22  A.   2019.

23  Q.   So it's being sent from Equipmentfacts to Mr. Garafola's

24  personal email account, correct?

25  A.   Yes.  Correct.

WELCH - DIRECT - MILLER

1  Q.   Do you have a concern that Mr. Garafola has, as you've

2  described, Sandhills' confidential and proprietary information

3  at his personal account?

4  A.   Yes.

5  Q.   But why?

6  A.   This is our, basically, top list of customers.  Not only

7  is it the top list of customers, it's what they paid us for

8  our services.

9  Q.   And could a person that's going to compete against

10  Sandhills utilize this information?

11  A.   Yeah.  They could undercut our commission.

12  Q.   So they have, basically, your commissions, or, rather,

13  what the commissions were paid.  And if, ultimately, they

14  adjusted their pricing, they could somehow come underneath

15  what Equipmentfacts charges.

16  A.   Yes.

17  Q.   And, just real quick, go to the first email exchange in

18  that.  That's the second page.

19      What's Larry's request to Marlene that generates that

20  list?

21  A.   "Can you come up with the top five auctioneers that had

22  the highest revenue?"

23  Q.   And, ultimately, is that what Marlene provided to him?

24  A.   Yes.

25  Q.   So, basically, it's, at least at this period of time,

───────WELCH - DIRECT - MILLER───────

1   Sandhills Equipmentfacts' top customers.

2   A.   Yes.

3   Q.   Their sales?

4   A.   Yes.

5   Q.   Their commissions?

6   A.   Yes.

7   Q.   And Mr. Garafola now has this in his personal email

8   address.

9   A.   Correct.

10  Q.   Could a competitor use it to undercut Sandhills?

11  A.   Absolutely.

12          MR. MILLER:  Judge, may I approach?

13          THE COURT:  Yes.

14          MR. FARSIOU:  Judge, this would be the same

15  objection.

16  BY MR. MILLER:

17  Q.   Mr. Welch, is this another email that you uncovered as

18  part of the investigation?

19  A.   Yes.

20  Q.   This document is Bates-stamped Sandhills PI-72 through

21  -81.

22       Mr. Welch, first, can you describe for the Court what

23  email exchanges are occurring, starting, in particular, with

24  the earliest one?

25  A.   It's an email from Larry Garafola's Equipmentfacts email

WELCH - DIRECT - MILLER

 1   address to Larry Garafola's personal email address.

 2   Q.   And then there's another email on top of that.

 3        Do you see that?

 4   A.   Yes.

 5   Q.   And without waiving or describing any of attorney-client

 6   communications, what's happening with that email exchange?

 7   A.   I'm forwarding it to my internal counsel.

 8   Q.   And your internal counsel here is referenced as?

 9   A.   Alex Essay.

10   Q.   And Mr. Essay is sitting to my right, to your left?

11   A.   Yes, correct.

12   Q.   Now, there's an attachment to this.  Do you see that?

13   A.   Yes.

14   Q.   And what's the name of that attachment?

15   A.   Top Bidders List.

16   Q.   And go to the actually attachment itself.  Is there a

17   header on that document?

18   A.   Yes.

19   Q.   I know a little bit's cut off, but can you read for the

20   record what that header is?

21   A.   Equipmentfacts LLC Top Bidders 2017 to Present.

22   Q.   Do you see -- excuse me -- the chart that there follows?

23   A.   Yes.

24   Q.   And it's numbered by rankings?

25   A.   Yes.

1   Q.   How many people are ranked or how many customers are

2   ranked, or clients?

3   A.   500.

4   Q.   And this doesn't mean much to me, but can you describe

5   for the Court what it is, whether it's proprietary, and the

6   significance to you?

7   A.   Yes, it's absolutely proprietary.  This is our bidder

8   list.  This is the top five bidders that spent the most money

9   on Equipmentfacts from 2017 to present.

10       That's not anything that can be available to the public.

11  No one could possibly know how much M. Nolan Farms spent

12  through Equipmentfacts.

13  Q.   And what's the time frame of which this bidder ranking

14  covers?

15  A.   2017 to present.

16  Q.   So this is printed out or at least emailed to

17  Mr. Garafola, to himself, July 16, 2019.  So approximately two

18  years' worth?

19  A.   Yes.

20  Q.   Does Sandhills expend money to otherwise not only

21  generate the sales but to account for them and track them?

22  A.   Yes.

23  Q.   And does the -- Sandhills pay its account representatives

24  to otherwise service those accounts to get the information

25  that ultimately rolls up into this kind of chart?

────────── WELCH - DIRECT - MILLER ──────────

1   A.   Yes.

2   Q.   And could any competitor use this information to compete

3   against Sandhills?

4   A.   Yes, absolutely.

5   Q.   And how would they do so?

6   A.   This is a target list of if you were to -- you know who

7   the most active buyers are in the market, and you can market

8   to those buyers.  And that's how you make revenue is based on

9   what they spend on your platform.

10  Q.   And could they take -- you see here there's the sales on

11  it.

12       Do you see that?

13  A.   Yes.

14  Q.   Is there, at least with respect to Sandhills, can you

15  apply a formula or a percentage that would show what the

16  commissions or revenue is off of those sales?

17  A.   Yeah.  We charge 2 percent for the sales, so 2 percent of

18  whatever that person spends is what we make.

19  Q.   And Mr. Garafola, while employed by Sandhills at

20  Equipmentfacts, he was aware of that 2 percent figure,

21  correct?

22  A.   Yes.

23  Q.   So if a person, Mr. Garafola or anyone else, had this

24  information, they could extrapolate out the sales or the

25  commissions based off of it?

─────────WELCH - DIRECT - MILLER─────────

1   A.   Yes.

2   Q.   Could they use it to undercut Sandhills and the business

3   in its targeting effort?

4   A.   Yes.

5   Q.   How would they do so?

6   A.   They can undercut our pricing.

7   Q.   Do you have concern that Mr. Garafola emailed this to

8   himself on July 16th, 2019?

9   A.   Yes, absolutely.

10  Q.   You know, I failed to tie it out before.  Mr. Garafola's

11  employment was terminated, correct?

12  A.   Yes.

13  Q.   Well, we'll get to it.  What date was his employment

14  terminated?

15  A.   August 7th.

16  Q.   So it's a couple weeks after this email he forwarded to

17  himself?

18  A.   Yes.

19          MR. MILLER:  Judge, may I approach?

20          THE COURT:  Yes.

21  BY MR. MILLER:

22  Q.   Mr. Welch, is this another email that you uncovered as

23  part of the investigation?

24  A.   Yes.

25  Q.   Now, look at the -- staying with the first email that

─WELCH - DIRECT - MILLER─

 1  appears on this piece of paper.

 2      Are you there?

 3  A.   Yes.

 4  Q.   Who's the "from" and who's the "to"?

 5  A.   It's from Larry Garafola's Equipmentfacts email address

 6  to his wife, maureenmodridge@earthlink.net's email address.

 7  Q.   And how do you know that that's Mrs. Garafola's email

 8  address?

 9  A.   In our investigation, we saw several emails back and

10  forth between Larry and his wife referencing their

11  relationship.

12  Q.   And that was the email that appeared in those exchanges?

13  A.   Yes.

14  Q.   Now, this document that we're looking at here, the

15  attachment, what's the name of the attachment?

16  A.   Top Bidders.

17  Q.   Now, if you go back real quickly, and I don't want you to

18  necessarily go into it, but go back to P-9 real quick.

19  A.   Okay.

20  Q.   What's the name of that attachment?

21  A.   Top Bidders.

22  Q.   What's the -- the email in which Mr. Garafola sends it to

23  his Gmail, what's the date?

24  A.   July 16th.

25  Q.   And what's the time?

WELCH - DIRECT - MILLER

1  A.   3:18.

2  Q.   In the afternoon?

3  A.   Yes, p.m.

4  Q.   Go to the top of P-10.  What's the date?

5  A.   July 16th.

6  Q.   What's the time?

7  A.   4:16 p.m.

8  Q.   Now, do you know whether there was any translation

9  issues?  Because we're East Coast, Sandhills is Central.

10  Could it have been an hour before or was it the same time it

11  was sent?  Do you have any information about that?

12  A.   These would have both been in the same time zones, so

13  they're correct.

14  Q.   So -- and then, just real quickly, on P-10, the one

15  that's sent to Mrs. Garafola's email address, just look at

16  that chart.  There is actually two attachments.

17  A.   Yes.

18  Q.   Both called bidders -- the Top Bidders, correct?

19  A.   Yes.

20  Q.   One's an XLSX file.  That's an Excel file?

21  A.   Correct.

22  Q.   And the other is a PDF.  Do you see that?

23  A.   Yes.

24  Q.   Any thoughts as to why someone would attach two versions

25  of the same document?  And, oh, let's put it this way.  Would

1  you ever attach an Excel file and a PDF file to an email

2  versus just one or the other?

3  A.   Excel, I would, if I planned to manipulate it and use it

4  in some other form.

5  Q.   And what kind of form could you manipulate or use it?

6  A.   You could turn into a marketing list or import it into a

7  business system or something like that.

8  Q.   So you could almost merge the data that's within it into

9  a mail merge or some kind of other program?

10 A.   Yes.

11 Q.   Now, the time that these were sent, 4:16 and 3:18.

12 Mr. Garafola, according to these two emails, sent himself, or

13 sent to his wife, the very same document on the very same day

14 within an hour of each other, correct?

15 A.   Yes.

16 Q.   You can't get into Mr. Garafola's head, but you testified

17 that this is a significant document.  If, ultimately, you are

18 otherwise wanting to target a document that might be useful

19 for competition, would this be that document?

20 A.   Yes.  This is the lifeblood of our --

21      MR. FARSIOU:  I have to object to this.  I mean, this

22 is -- I mean, he's essentially asking the witness to testify

23 for my client as to what his thoughts were or what he was

24 doing.  Mr. Garafola can testify to that.  This is -- I know

25 we're relaxing the evidence rules, but that's going a little

WELCH - DIRECT - MILLER

```
 1  too far.
 2          THE COURT:  And your objection is so noted for the
 3  record.
 4          The Court will receive the testimony, but it's
 5  limited in scope as to the witness's ability to testify here.
 6          So the objection is so noted for the record.
 7  BY MR. MILLER:
 8  Q.  Mr. Welch, in P-10, other than what you've already
 9  testified to, is there any other information or concerns you
10  have about Mr. Garafola having sent it now not just to himself
11  but to his wife's email account?
12  A.  Yes.  Now it's -- I mean, it's out there to two different
13  people.
14      The other thing that's concerning is that this came from
15  another employee from the New Jersey Equipmentfacts office
16  that was with Larry pre-acquisition, Roselle Denina.
17  Q.  And did she become an employee of Sandhills after the
18  acquisition?
19  A.  Yes.
20  Q.  And you testified earlier Mr. Garafola's employment was
21  terminated.  Were other individuals' employment terminated?
22  A.  Yes.
23  Q.  Was Roselle one of them?
24  A.  Yes.
25  Q.  And was the termination because of her involvement in
```

WELCH - DIRECT - MILLER

1  this?

2  A.   Yes.

3  Q.   Anything else about that document you'd like the Court to

4  be aware of?

5  A.   No.

6          THE COURT:  Mr. Miller.

7          MR. MILLER:  Yes.

8          THE COURT:  By way of time, we're going to take a

9  short restroom break at about 11:30, and we'll take a

10  ten-minute morning break, and we'll try and take a half an

11  hour for lunch at about 1 o'clock.

12          MR. MILLER:  That works perfect.  Thank you.

13          Judge, may I approach?

14          THE COURT:  Yes.

15  BY MR. MILLER:

16  Q.   Mr. Welch, is this another email that you uncovered as

17  part of the investigation?

18  A.   Yes.

19  Q.   Let's start with the cover email, that is, the one at the

20  bottom.  Who is it from and to?

21  A.   From Ryan Jacobi.

22  Q.   And who is Ryan Jacobi?

23  A.   He's an employee of Equipmentfacts in the New Jersey

24  office.

25  Q.   And who is it to?

WELCH - DIRECT - MILLER

1    A.    Larry Garafola.

2    Q.    And to which email account?

3    A.    To his Sandhills Equipmentfacts email address.

4    Q.    And, for the record, can you read what Ryan is telling

5    Mr. Garafola in the initial email?

6    A.    "Attached is a sample of the welcome email in .docs form

7    and accompanying attachments."

8    Q.    Now, there is an attachment line here that has multiple

9    attachments in there.

10         Do you see that?

11   A.    Yes.

12   Q.    Some of them have an att.htm designation.

13         Do you see that?

14   A.    Yes.

15   Q.    Those aren't substantive attachments, are they?

16   A.    No.

17   Q.    Now, but there are descriptions of documents that are

18   attached to that email, correct?

19   A.    Yes.

20   Q.    Can you, going from line to line, just read what the

21   attachment names are called?

22   A.    Equipmentfacts 2 Column Live Sale Template,

23   Equipmentfacts 3 Column Live Sale Template, Equipmentfacts 4

24   Column Live Sales Template, How to Create Invoices,

25   Equipmentfacts 4 Column Live Sales Template.

WELCH - DIRECT - MILLER

1    Q.   How to Create an Invoice Manual?

2         Do you see that one?

3    A.   Yes.

4    Q.   How to Generate Reports Manual?

5         Do you see that one?

6    A.   Yes.

7    Q.   How to Manage Your Bidders Manual?

8         Do you see that?

9    A.   Yes.

10   Q.   How to Upload Your Photographs Manual?

11   A.   Yes.

12   Q.   How to Upload Your Sale Day Catalog Manual?

13   A.   Yes.

14   Q.   How the Auctioneer Pop-Up Projector Functions?  Looks

15   like a PowerPoint presentation?

16   A.   Yes.

17   Q.   And Equipmentfacts 3.0, Creating and Uploading Live

18   Auction Manuals.

19        Do you see that?

20   A.   Yes.

21   Q.   Now, I'm not going to have you go through these in a lot

22   of detail, but ultimately -- and the attachments to this

23   document, this email was sent by Mr. Garafola to whom?

24   A.   To his personal Gmail account.

25   Q.   And what date was it sent on?

WELCH - DIRECT - MILLER

 1    A.    July 18th.

 2    Q.    What year?

 3    A.    2019.

 4    Q.    What time?

 5    A.    7:38 p.m.

 6    Q.    P-10 and -9 were sent on July 16th, correct?

 7    A.    Yes.

 8    Q.    So this is three days later?

 9    A.    Yes.

10    Q.    Now, as to the attachments, generally speaking, do you

11    have concerns with Mr. Garafola having sent these attachments

12    to his home email address?

13    A.    Absolutely.

14    Q.    Why?

15    A.    It's the culmination of all the experience in how to set

16    up an auction and how to conduct an auction.

17    Q.    And that's what you bought for 1.5 million.

18    A.    Yes.

19    Q.    Now, in looking through this, I'd ask you to turn

20    specifically to Sandhills -- this is the Bates stamp number,

21    bottom right corner of the document, Sandhills PI-113.  Let me

22    know when you're there.

23    A.    I'm there.

24    Q.    And that document right there is called "How to Create

25    Invoices"?

─────WELCH – DIRECT – MILLER─────

1   A.   Yes.

2   Q.   Do you see some kind of designation on the bottom above

3   the Bates stamp?

4   A.   Copyright 2018 Equipmentfacts LLC, all rights reserved.

5   Q.   We testified earlier, or you testified earlier, as to

6   what Sandhills was purchasing.

7        Do you remember that?

8   A.   Yes.

9   Q.   And some of it was the copyright information?

10  A.   Yes, correct.

11  Q.   Was this part of that copyright information?

12  A.   Yes.

13  Q.   And did you give Mr. Garafola permission to send this

14  document or any of the other emails with attachments to his

15  home email address?

16  A.   No.

17  Q.   Do you have concern that Mr. Garafola has this document

18  within his email account, his Gmail account?

19  A.   Yes.

20  Q.   Why?

21  A.   Because this is how to -- this is giving you a guide to

22  how to create a competing business, Equipmentfacts 2.0, if you

23  will.

24  Q.   Anything else?  I mean, we can go through each of them.

25  I don't want to belabor the Court's time.  But there's a lot

────WELCH – DIRECT – MILLER────

1   of manuals here; correct?

2   A.   Yes.

3   Q.   It's basically how to build a car and then how to run it.

4   A.   Yes.  Yes.

5   Q.   Is that an accurate description or analogy?

6   A.   Yes.

7        MR. MILLER:  Judge, may I approach?

8   Q.   Mr. Welch, is this another email that was uncovered in

9   the investigation?

10  A.   Yes.

11  Q.   Going down to the first email in the exchange, do you see

12  that?  It's from Ryan?

13  A.   Yes.

14  Q.   And to whom is Ryan sending the email?

15  A.   To Larry Garafola's personal email account.

16  Q.   Is it coming from Ryan's Equipmentfacts account?

17  A.   Yes.

18  Q.   What's the date of that email?

19  A.   July 25th.

20  Q.   What year?

21  A.   2019.

22  Q.   And the P-11 was sent on July 18, 2019, so a couple days

23  later, correct?

24  A.   Yes.

25  Q.   Again, there are several attachments to it, correct?

WELCH - DIRECT - MILLER

1   A.   Yes.

2   Q.   There is a top email that ends this chain.

3        Do you see that?

4   A.   Yes.

5   Q.   And who is the "from" and who is the "to"?

6   A.   From myself to Alex Essay, internal counsel.

7   Q.   In-house counsel?

8   A.   Yes.

9   Q.   And you felt it important enough to send to in-house

10  counsel -- don't get into any of the substance, just answer

11  the question -- this email with the attachments?

12  A.   Yes.

13  Q.   And we'll go into the descriptions or the titles, but why

14  is it that it was important to you as the business person?

15  A.   Because, again, this is the lifeblood of how to create

16  Equipmentfacts 2.0.

17  Q.   And so, for the record, can you read off the titles or

18  the names of the attachments?

19  A.   Auction Flex to Equipmentfacts Manual, Auction Scheduling

20  and Audio Recording Protocol, Bidpath NMI Settings v2, Pause

21  Bidding Checkbox Settings, How to Set Up For a Remote

22  Broadcast Manual, How to Upload Your Photographs, How to

23  Upload Your Sale Day Category Manual, How to Create a Live

24  Auction Manual, How to Create a Timed Auction Manual, How to

25  Create Invoices Manual, How to Generate Reports Manual, and

1  How to Manage Your Bidders Manual.

2  Q.   Going up to -- you mentioned there's an attachment,

3  Bidpath NMI Settings Version -- or v2.  What is Bidpath?

4  A.   Bidpath was the online bidding software that was used at

5  the time of acquisition to run Equipmentfacts.

6  Q.   And you testified earlier as to an email exchange between

7  Marlene, Larry Garafola Sr., and the owner of Bidpath,

8  correct?

9  A.   The president of Bidpath.

10  Q.   The president of Bidpath.

11  A.   Yes.  David Brindley.

12  Q.   And would Mr. Brindley have any use for this Bidpath NMI

13  settings, version 2?

14  A.   I mean, yes, if you were -- if they were creating a new

15  business, yes.

16  Q.   These documents, the attachments that are referenced, you

17  testified earlier the concern was this is essentially how they

18  can create Equipmentfacts 2.0, correct?

19  A.   Yes.

20  Q.   Is that further concern -- is that further concern -- or

21  was that concern furthered by these documents having been

22  transmitted from Ryan Jacobi to Mr. Garafola's personal email

23  account?

24  A.   Yes.

25  Q.   And again, if you could, go to the document Bates stamp

WELCH - DIRECT - MILLER

```
 1  Sandhills PI-163.

 2  A.   Okay.

 3  Q.   Is there a designation at the bottom?

 4  A.   Copyright Equipmentfacts 2018, all rights reserved.

 5  Q.   Sandhills paid 1.5 million for that, correct?

 6  A.   Yes, correct.

 7  Q.   Didn't authorize Mr. Garafola to send it -- or have it

 8  sent to him at his personal email account, correct?

 9  A.   Correct.

10       THE COURT:  Counsel, we're going to go ahead and take

11  our morning break at this time.

12       It's 11:33.  We're going to take a ten-minute break.

13  We'll resume at roughly 11:43 or 11:45.

14       THE DEPUTY COURT CLERK:  All rise.

15       (Short recess is taken.)

16       THE DEPUTY COURT CLERK:  All rise.

17       (Open court begins at 11:44 a.m.)

18       THE COURT:  Please be seated.

19       Folks, again, we're trying to, basically, keep the

20  matter moving.  I'm not going to go through a formality.

21       The witness, during any break, of course, you're

22  still under oath.  I'm reminding you that you're under oath.

23       So we're just going to go ahead and continue and jump

24  right back into it.

25       So, Mr. Miller, you can go ahead and proceed.  It's
```

1    still your witness.

2         MR. MILLER:  Thank you, Judge.

3    Q.   Mr. Welch, you've been testifying as to emails that you

4    discovered as part of the investigation, correct?

5    A.   Yes.

6    Q.   As to one of the emails that sort of triggered this all,

7    can you go back to the email that's marked as P-6?  This is

8    the email between Marlene Greene and David Brindley?

9    A.   Yes.

10   Q.   Can you put that in front of you, please?

11   A.   Yup.

12   Q.   Again, what's the date of that email?

13   A.   July 7th.

14   Q.   And we've been talking about emails that have been

15   exchanged, or at least uncovered, as part of the

16   investigation, sent by Mr. Garafola or others to his Gmail

17   account, correct?

18   A.   Yes.

19   Q.   And several of the emails that you testified about

20   occurred or were sent after this July 7, 2019, email with

21   David Brindley, correct?

22   A.   Yes.  I believe all of them.

23   Q.   Now, I count, and the record will reflect the accurate,

24   but I count approximately six to seven emails with multiple

25   attachments sent by Mr. Garafola or someone on his behalf to

WELCH - DIRECT - MILLER

1  his Gmail account between -- or after the Marlene Greene-David

2  Brindley email and, ultimately, through July 25, 2019.

3      Does that sound about accurate?

4  A.   Yes, correct.

5  Q.   Do you have concerns about that sequence of events, that

6  is, the Brindley email and then, ultimately, there's emails

7  being sent to Mr. Garafola's Gmail account?

8  A.   Yes, absolutely.

9  Q.   And what's your concern?

10  A.   There's the talk of starting the new business,

11  Equipmentfacts 2.0.  And then, in the weeks following, there's

12  the raiding of all of Sandhills' intellectual property and

13  intellectual property of Equipmentfacts.

14  Q.   And as a manager or a supervisor at Sandhills, who

15  purchased for $1.5 million Equipmentfacts, what about that in

16  particular gives you concern?

17  A.   We purchased the intellectual property, the goodwill, and

18  he took all of that to then start a business that would

19  directly compete with Equipmentfacts, the business we paid

20  $1.5 million for.

21  Q.   And remind the Court, at this time, that is, the Brindley

22  email is sent, is Marlene Greene an Equipmentfacts employee?

23  A.   She's no longer an Equipmentfacts employee.

24  Q.   Yet, according to the Brindley email that is P-6, she's

25  otherwise coordinating with Mr. Brindley and Mr. Garafola to

1   create a competing business, correct?

2   A.   Yes.

3   Q.   And Mr. Garafola is then sending what you've described as

4   is essentially the foundation for Equipmentfacts to his

5   personal email account at the very same time or shortly

6   thereafter.

7   A.   Yes, correct.

8   Q.   You can put that one away now.  Thank you.

9        MR. MILLER:  Judge, may I approach?

10       THE COURT:  Sure.

11  BY MR. MILLER:

12  Q.   Mr. Welch, is this another email that was uncovered as

13  part of the investigation?

14  A.   Yes.

15  Q.   And if you go to the bottom of the first page that is

16  Bates-stamped Sandhills PI-178, is that the initial email that

17  starts the exchange?

18  A.   Yes.

19  Q.   And who is the sender, who is the recipient?

20  A.   Ryan Jacobi is the sender.  Larry Garafola's personal

21  Gmail account is the receiver.

22  Q.   And what's the date?

23  A.   July 25th --

24  Q.   Of what year?

25  A.   -- 2019.

WELCH - DIRECT - MILLER

1    Q.   And what time?

2    A.   8:46 a.m.

3    Q.   Now, going further up, there's another email exchange

4    after that, correct?

5    A.   Yes.

6    Q.   And I want, just for purposes of time zone clarification,

7    the first email is 8:46 a.m.

8         Do you see that?

9    A.   Yes.

10   Q.   The one that -- subsequent one is at 7:50 a.m.

11        Do you see that?

12   A.   Yes.

13   Q.   We don't travel back in time, correct?

14   A.   Correct.

15   Q.   Do you believe that that's the result of a time -- the

16   server from which these emails are being sent be on Eastern

17   time or Central?

18   A.   Most likely.

19   Q.   Now, there's the email exchange from Ryan to

20   Mr. Garafola's personal email account July 25, 2019, at

21   7:50 a.m.  Can you read the text of what he's sending to --

22   Ryan is sending to Mr. Garafola?

23   A.   "Here is the link to the download our video tutorials."

24   Q.   Where is it going to?

25   A.   To Dropbox.

WELCH - DIRECT - MILLER

1   Q.   And what's Dropbox?

2   A.   A secure -- a secure third-party platform that could be

3   used to drop or intercept whatever -- any documents that you

4   might want to put in there.

5   Q.   So, essentially, it resides in the cloud, and you could

6   put documents that can be retrieved from another individual?

7   A.   Yes.

8   Q.   Does that reflect there that this is an approved

9   Sandhills or Equipmentfacts Dropbox?

10   A.   No.

11   Q.   Did Mr. Jacobi get authorization from you or anybody in

12   authority at Sandhills or Equipmentfacts to put video

13   tutorials in that Dropbox?

14   A.   No.

15   Q.   Now, going up to the email exchange at the very top,

16   that's your email to Mr. Essay, the in-house counsel, correct?

17   A.   Yes, correct.

18   Q.   And this reflects, in terms of in the attachment line,

19   certain of the documents that were attached to the email.

20   Does it?

21   A.   Yes.

22   Q.   For the record, can you read the names of the attachments

23   that appear in the attachment line?

24   A.   How to Create a Timed Auction Manual, How to Create

25   Invoices Manual, How to Generate Reports Manual, How to Manage

1   Your Bidders Manual, How to Set Up a Remote Broadcast Manual,

2   How to Upload Your Photographs Manual, How to Upload Your Sale

3   Day Catalog Manual, How to Create a Live Auction Manual, and

4   Distribution Spreadsheet.

5   Q.   Mr. Welch, look at the actual attachments.  I don't want

6   you to go into great detail and study them, but are you

7   familiar, as part of this litigation, as to what the

8   attachments are?

9   A.   Yes.

10  Q.   And for the Court's benefit, generally speaking, what is

11  it your impression of the documents that are attached?

12  A.   It's a guide to how to set up and how to create auctions

13  and invoices and uploading catalogs, everything you'd need to

14  put on an auction through an online platform.

15  Q.   Essentially, the user manual how to create an auction

16  business?

17  A.   Yes, correct.

18  Q.   And if you go to the document Bates-stamped Sandhills

19  PI-180?

20  A.   Yes.

21  Q.   And the designation on the bottom of that?

22  A.   Copyright 2018 Equipmentfacts LLC.

23  Q.   And the documents that otherwise have that designation,

24  that's what Sandhills purchased, correct?

25  A.   Correct.

WELCH - DIRECT - MILLER

```
 1  Q.  And you didn't authorize anyone to send these documents
 2  to Mr. Garafola's personal email account, correct?
 3  A.  Correct.
 4         MR. MILLER:  Judge, may I approach?
 5         THE COURT:  Yes.  And, Counsel, you don't have to
 6  keep asking.
 7         MR. MILLER:  Okay.
 8         THE COURT:  You can just keep rolling right through
 9  it.
10         MR. MILLER:  Got you.  Thank you.
11  Q.  Mr. Welch, is this another email that was uncovered as
12  part of the investigation?
13  A.  Yes.
14  Q.  And, for the record, there's an email exchange on
15  July 25th.
16      Do you see that?
17  A.  Yes, correct.
18  Q.  Who's the sender, who's the receiver?
19  A.  Ryan Jacobi is the sender, Larry Garafola's personal
20  Gmail is the receiver.
21  Q.  And again, that date is July what?
22  A.  25th, 2019.
23  Q.  And what time is that?
24  A.  7:52 a.m.
25  Q.  And I'll represent, or if you can go back, P-13 was sent
```

WELCH - DIRECT - MILLER

1  on July 25th, 7:50 a.m.; P-12, was sent on Thursday, July 25,

2  2019, at 7:47 a.m.

3       Is that accurate?

4  A.   7:52 a.m.?  Is that what we're looking at?

5  Q.   Correct, yeah, 7:52.

6  A.   Yes.

7  Q.   Then if you go to P-13?

8  A.   Yes.

9  Q.   What time is that email sent?

10 A.   7:50 a.m.

11 Q.   If you go to P-12?

12 A.   7:47 a.m.

13 Q.   Mr. Welch, and you may have mentioned it before,

14 Mr. Jacobi, was his employment terminated?

15 A.   Yes.

16 Q.   And what was the reason?

17 A.   Again, the emails that were found in here.

18 Q.   Now, Mr. Welch, there is an attachment to this document,

19 correct?

20 A.   Yes.

21 Q.   And can you read what the attachment's name is?

22 A.   PowerPoints 1 and 2.

23 Q.   And what's the file type?

24 A.   A zip file.

25 Q.   For the Court's benefit, what is a zip file?

─────WELCH - DIRECT - MILLER─────

1   A.   It's a file that could be sent, and it's typically used

2   to send larger files.

3   Q.   It compresses them?

4   A.   Yes.

5   Q.   So that it's more easily transmitted over the internet --

6   A.   Correct.

7   Q.   -- or through email?  Now, just peruse briefly, if you

8   will, through these pages.  What is the PowerPoint

9   presentation, the PowerPoint presentation plural, that's

10  represented in the attachment?

11  A.   It's a guide to everything about setting up and running

12  an online auction.

13  Q.   And the PowerPoint presentation begins at Bates stamp

14  Sandhills PI-203 and ends at Sandhills PI-361, correct?

15  A.   Correct.

16  Q.   So we got over 100 pages of PowerPoint presentations.

17  A.   Correct.

18  Q.   And, as you've just described, this is essentially,

19  again, how to set up an online auction business from soup to

20  nuts.

21  A.   Yes, correct.

22  Q.   Mr. Welch, is this another email that you uncovered as

23  part of the investigation?

24  A.   Yes.

25  Q.   And this is sent on what date?  And not from you, you to

─WELCH - DIRECT - MILLER─

1   Alex Essay, but Mr. Jacobi to Mr. Garafola.

2   A.   Thursday, July 25th, 2019.

3   Q.   And at what time?

4   A.   7:58 a.m.

5   Q.   And P-14 was sent at what time?

6   A.   7:52 a.m.

7   Q.   On July 25?

8   A.   Correct.

9   Q.   So a couple minutes later, this was sent?

10  A.   Yes.

11  Q.   That is, P-15 was sent?

12  A.   Yes, correct.

13  Q.   There are attachments to the document, correct?

14  A.   Yes.

15  Q.   And there are -- the names of those attachments appear in

16  the attachments line, correct?

17  A.   Yes.

18  Q.   Without having gone through them all, some of them look

19  familiar.  Is that true?

20  A.   Yes.

21  Q.   Are you aware whether this is a duplicate email or is

22  this a separate email that was sent by Ryan?

23  A.   Looks to be a separate email that was sent, but some of

24  the content may be the same.

25  Q.   And if you'll turn to Bates stamp Sandhills PI-383.

─────────WELCH - DIRECT - MILLER─────────

```
 1   A.   Okay.

 2   Q.   Is there a designation at the bottom?

 3   A.   Yes.

 4   Q.   And what does it say?

 5   A.   Copyright 2018 Equipmentfacts LLC.

 6   Q.   And again --

 7   A.   We --

 8   Q.   -- Sandhills purchased that for $1.5 million, correct?

 9   A.   Yes, correct.

10   Q.   Mr. Welch, is this another email you uncovered as part of

11   the investigation?

12   A.   Yes.

13   Q.   Now, I'm wondering whether this was -- let me go back.

14   Actually, I will strike that.

15        This is a duplicate of P-15.  So P-16 is not -- I can

16   take it back or you guys can keep it, but we're not going to

17   use that one.

18        Mr. Welch, is this another email you discovered as part

19   of the investigation?

20   A.   Yes.

21   Q.   And who is the -- on the first email on the chain, who is

22   the sender, who is the receiver?

23   A.   Ryan Jacobi, and Larry Garafola's personal Gmail account.

24   Q.   And what I'd like you to do is go to the second page of

25   that document, Bates stamp Sandhills PI-426, the first email
```

WELCH - DIRECT - MILLER

1    that appears on that page.

2        Do you see it?

3    A.   Yes.

4    Q.   And you earlier testified as to an email, I believe, that

5    is similar that's referenced here.  Manual 12?

6    A.   Yes.

7    Q.   The subsequent emails are exchanged between Mr. Garafola

8    and Mr. Jacobi, correct?

9    A.   Yes.

10   Q.   And can you tell -- strike that.

11       Going into the email exchange that's dated July 25, 2019,

12   at 9:05 a.m.

13       Do you see that?

14   A.   Yes.

15   Q.   Who's the sender, who's the receiver?

16   A.   Larry Garafola's personal Gmail account is the sender,

17   Ryan Jacobi's Sandhills Equipmentfacts email address is the

18   receiver.

19   Q.   And what's the text that appears there?

20   A.   Mr. Garafola's asking whose Dropbox is this.

21   Q.   And Mr. Jacobi responds how?

22   A.   Info@equipmentfacts.com.

23   Q.   Did Mr. Jacobi have authority to otherwise put the videos

24   in the info@equipmentfacts.com Dropbox?

25   A.   No.

─────────── WELCH - DIRECT - MILLER ───────────

1   Q.   Do you know whether -- strike that.

2       Do you know the purpose for Sandhills or Equipmentfacts

3   to be using that info@equipmentfacts.com Dropbox?

4   A.   Yeah.  To exchange documents.

5   Q.   And again, you didn't authorize Mr. Garafola or

6   Mr. Jacobi to put the videos into that Dropbox, correct?

7   A.   No.

8   Q.   Now, we have Marlene Greene -- and, you know, I've been

9   talking about Marlene Greene in the abstract.  Is Marlene

10  Greene in this courtroom today?

11  A.   Yes.

12  Q.   And where is she?

13  A.   She's sitting back there in the front row.

14  Q.   We have Marlene Greene exchanging emails with Bidpath

15  president Mr. Brindley, correct?

16  A.   Yes, correct.

17  Q.   Mr. Garafola's on that email exchange, correct?

18  A.   Yes, correct.

19  Q.   And the testimony will be what it is, but the summary is

20  they were sort of orchestrating the creation of a new

21  business, correct?

22  A.   Yes.

23  Q.   And Mr. Garafola was currently employed by Sandhills at

24  that time.

25  A.   Yes.

1   Q.   And then, shortly thereafter, there is a flurry of emails

2   being sent either to Mr. Garafola's Gmail account or from it

3   with Equipmentfacts' confidential information.

4   A.   Yes, correct.

5   Q.   And then you get to the point where -- do you recall how,

6   you testified earlier, how it is that, ultimately, the

7   investigation started?

8   A.   It started with the email from Marlene Greene on behalf

9   of Bidfacts to one of our employees.

10  Q.   And do you find the timing of that curious?

11  A.   Yes.

12  Q.   Why?

13  A.   Because it was right around the time that all of this

14  mass -- mass -- this information was being exported and raided

15  from Sandhills.

16  Q.   Do you recall -- and if you don't, that's fine -- within

17  what is quite voluminous attachments and documents and

18  spreadsheets, was Permian's information included in any of

19  those attachments?

20  A.   Well, not Permian's -- oh, yeah.  Permian's information

21  was that they were one of our top customers.

22  Q.   And so Mr. Garafola is sending, among other things, an

23  email with an attachment that has Permian information?

24  A.   Yes.

25  Q.   And then Ms. Marlene Greene is sending an email notifying

WELCH - DIRECT - MILLER

1  of a, I believe it was on behalf of Bidpath, an auction for

2  Permian equipment, correct?

3  A.   Correct.

4  Q.   Permian had been a customer of Sandhills prior to

5  Ms. Greene departing, correct?

6  A.   Yes, correct.

7  Q.   And so do you have any concern that the information that

8  was transmitted outside of Sandhills' systems was used to

9  otherwise get Permian business?

10  A.   Yes, absolutely.

11        MR. FARSIOU:  Judge, I'm going to object to that

12  testimony right there.  Absolutely no evidence.  In fact, as

13  Mr. Miller knows, the evidence is contrary to what the witness

14  just testified to.

15        THE COURT:  Okay.  You can save that and preserve

16  that for cross-examination.

17  BY MR. MILLER:

18  Q.   We've said it repeatedly, but I want to summarize.  The

19  attachments about which you've testified in the multiple

20  emails that were sent to Mr. Garafola's personal email address

21  or his wife's, are those attachments confidential and

22  proprietary information?

23  A.   Yes.

24  Q.   Does Sandhills and Equipmentfacts take measures to

25  protect its confidential and proprietary information,

WELCH - DIRECT - MILLER

 1  including what was attached to the emails?

 2  A.   Yes.

 3  Q.   And what method, what steps are taken?

 4  A.   That it's all user-protected, user names, passwords.

 5  Q.   Okay.  Anything else?

 6  A.   No.

 7  Q.   Well, let me ask you this.  Can you access without

 8  approval the Equipmentfacts drives and their networks and then

 9  any of the information in there?

10  A.   No.

11  Q.   And what do you have to do to get access to it?

12  A.   I have to get approval from our security, cybersecurity

13  team.

14  Q.   So, ultimately, the various brands or business divisions

15  have their own protections in place, correct?

16  A.   Yes.

17  Q.   And the people that are employed there are employed and

18  they're given access credentials?

19  A.   Yes.

20  Q.   And as employees of Sandhills, it's expected that they're

21  not going to do something that's harmful to any of the

22  Sandhills business?

23  A.   Correct.

24  Q.   And, ultimately, if Mr. Essay, and if you don't know,

25  wanted to access your files, he couldn't get access to it,

────────────── WELCH - DIRECT - MILLER ──────────────

1  could he?

2  A.   No.

3  Q.   Any of these documents or emails ever get returned to

4  Sandhills?

5  A.   No.

6  Q.   Do you know whether a request was made?

7  A.   Yes, I believe there was a request made.

8  Q.   And do you know what the response was?

9  A.   That they didn't have it.

10  Q.   And every email we just talked about went to

11  Mr. Garafola's personal Gmail account, correct?

12  A.   Yes, correct.

13  Q.   And you know that how?

14  A.   Because his personal Gmail account was also included in

15  the purchase agreement.

16  Q.   Did Mr. Garafola give back any of the money you paid him?

17  A.   No.

18  Q.   Any of the -- and when I say "money," any of the

19  $1.5 million that was paid for the company?

20  A.   No.

21  Q.   How about any of the compensation he was paid?

22  A.   No.

23  Q.   Now, we've seen and you've testified about the concerns

24  you had about the information being transmitted out of

25  Sandhills to Mr. Garafola's Gmail account, that is, it's

WELCH - DIRECT - MILLER

1    essentially being able to create Equipmentfacts 2.0, correct?

2    A.    Yes, correct.

3    Q.    Is Mr. Garafola competing against Sandhills today?

4    A.    Yes.

5    Q.    And by what entity?

6    A.    Facts Technology LLC.

7    Q.    How did you become aware of Facts Technology?

8    A.    We noticed a former customer of ours, Permian, one of my

9    sales reps brought to my attention that they were now using a

10   new platform, which was OilfieldFacts.  And upon further

11   investigation, OilfieldFacts was a brand of Facts Technology

12   LLC.

13   Q.    And we're going to get to sort of a side-by-side, but

14   you've now just used relative to Facts Technology the word

15   "brand."

16   A.    Yes.

17   Q.    Sandhills existed much longer than Facts Technology, at

18   least as it's currently operated, correct?

19   A.    Yes, correct.

20   Q.    And would you say that the -- is the colloquial use of

21   "brand," is that common throughout the industry or is it

22   unique to Sandhills and now Facts Technology?

23   A.    No, it's used throughout.

24   Q.    Other than the individual that was employed by Sandhills

25   who saw Permian on Facts Technology's brand, did you learn of

1   any other issues relative to the competition by Facts

2   Technology against Sandhills?

3   A.   Shortly thereafter, we started hearing from customers

4   about solicitations from Facts Technology.

5   Q.   And do any come to mind specifically?

6   A.   Yes, several:  J.B. Dimick, Ray Gombiski, Craig Hilpipre,

7   Jeff Martin, McGrew Auctions.  Those are just a few.

8   Q.   Now, I want to go back to the brand conversation.  When

9   you went to go investigate the Permian account or its

10  inventory being auctioned off by Facts Technology, did you

11  actually go visit the website?

12  A.   Yes.

13  Q.   And when you get to the website, is it a static website

14  or does it enable you to go to different web pages?

15  A.   There's different web pages.

16  Q.   And relative to the brands, was there a description of

17  what type of business the brands were otherwise promoting on

18  the website?

19  A.   Yes.

20  Q.   And universally, that is, for every brand that appears,

21  was there something common between them?

22  A.   Online auction services.

23  Q.   And is that what Sandhills is engaged in?

24  A.   Yes.

25          MR. MILLER:  Judge, I have a PowerPoint presentation

─────── WELCH - DIRECT - MILLER ───────

1   that's otherwise -- it's basically just taking the two

2   websites and doing a comparison.  I have a hard copy of it I

3   can present to everyone, and I can put it up there.

4           THE COURT:  Counsel, any objection for the record?

5           MR. FARSIOU:  I mean, I have a lot of objections.  I

6   guess, you know, I haven't seen what this is going to be, but

7   I'll reserve my time, I guess, if it's discussing the new

8   information.

9           THE COURT:  Okay.

10  BY MR. MILLER:

11  Q.   Now, Mr. Welch, as part of this litigation, did you help

12  prepare a PowerPoint presentation comparing the brands of

13  Facts Technology versus Sandhills?

14  A.   Yes.

15  Q.   And did you, in creating that, rely on the publicly

16  available information from Facts Technology as well as from

17  Sandhills?

18  A.   Yes.

19  Q.   And what was the -- and I just said it.  But in your own

20  words, what was the point of that exercise?

21  A.   To view where they were competing with us.

22  Q.   Mr. Welch, what is this representing here?

23  A.   This would be like the two parent companies, Sandhills

24  Global and Facts Technology.

25  Q.   And the narrative, the description that appears there,

─────WELCH - DIRECT - MILLER─────

1   that's taken directly from the websites, correct?

2   A.   Yes.

3   Q.   And, in your opinion, are they different?  I mean,

4   obviously, the words are different, but the import of them?

5   A.   Sandhills is more broad because of our -- all the

6   different verticals we're in.  However, Facts Technology

7   focuses on the online auction services.

8   Q.   And again, Sandhills purchased Equipmentfacts, correct?

9   A.   Yes.

10  Q.   And it was purchasing the business, which was defined as

11  providing online auction services?

12  A.   Yes.

13  Q.   And then the non -- restrictive covenant relative to the

14  APA, the Asset Purchase Agreement, prohibited Mr. Garafola

15  from engaging in online auction services in industries in

16  which Sandhills operated, correct?

17  A.   Correct.

18  Q.   And, right here, it's saying, We know the auction

19  industry -- oh, a question here.

20      It references how long Facts Technology has been in

21  existence, correct?

22  A.   Yes.

23  Q.   Did you become aware of when Facts Technology actually

24  was created?

25  A.   Yes.

WELCH - DIRECT - MILLER

1    Q.   And when was that?

2    A.   September of 2019.

3    Q.   And that's how it currently operates, correct?

4    A.   Yes.

5    Q.   So that statement, at least with respect to how it

6    currently operates, that's not accurate.

7    A.   No.  That says it's been in business for decades.

8    Q.   Now, I know this is difficult to read.  That's why I

9    handed it out.

10        What are we seeing here, Mr. Welch?

11   A.   The brands that -- and how they compete with each other.

12   Q.   So what's on the left-hand side?

13   A.   Sandhills' brands.

14   Q.   And those are the various brands, that is, the industries

15   in which Sandhills operates?

16   A.   Yes.

17   Q.   And what's on the right side?

18   A.   Facts Technology's brands.

19   Q.   And there are circles on the left side that's Sandhills'

20   brands.  Do you see those?

21   A.   Yes.

22   Q.   And what's that meant to designate?

23   A.   The brands that are in direct competition with Facts

24   Technology brands.

25   Q.   Now, before, you said, when looking at the websites, you

────────WELCH - DIRECT - MILLER────────

```
 1  could actually tell by the descriptions provided on the

 2  website that each was providing online auction services,

 3  correct?

 4  A.   Yes.

 5  Q.   Do you see them there?

 6       MR. MILLER:  And you can look there, for the interns,

 7  up there.

 8  Q.   Just peruse these.  And if there is any one that doesn't

 9  provide online auction capabilities, let me know.

10  A.   No.  They all say empowering truck auctioneers with the

11  most advanced online bidding technology and customer support

12  services for each of those industry-specific brands.

13  Q.   So every one of those brands is providing online auction

14  services for whatever it is, Stockyard, ControllerFacts,

15  whatever it might be.

16  A.   Yes, correct.

17  Q.   The top, Mr. Welch, that's part of the restrictive

18  covenant that was executed as part of the Asset Purchase

19  Agreement, correct?

20  A.   Correct.

21  Q.   And again, those are the words from the document.  But

22  what's your understanding, again, what he's restrained from

23  doing for 5 years?

24  A.   He's restrained from competing with Sandhills in any way

25  with regards to online auction services.
```

WELCH - DIRECT - MILLER

1   Q.   And then the term -- the definition of "business" is

2   defined in the Asset Purchase Agreement?

3   A.   Yes.

4   Q.   And you see that phrase "related auction industries"?

5   A.   Yes.

6   Q.   You helped negotiate the agreement, correct?

7   A.   Yes, correct.

8   Q.   So you know the meaning of the terms that apply, correct?

9   A.   Yes.

10  Q.   Was the Asset Purchase Agreement definition of "business"

11  limited to just heavy equipment, truck and agriculture?

12  A.   Absolutely not.

13  Q.   And how do you know that?

14  A.   Larry was instrumental in continuing to expand

15  Equipmentfacts into other verticals.

16  Q.   And those verticals were Sandhills' brands.

17  A.   Yes.

18  Q.   What's this slide designating, or at least representing?

19  A.   Competing brands of Sandhills and Facts Technology.

20  Q.   And, if you could, for the Court's benefit -- and we can

21  go back to the actual descriptions that are contained with

22  each of the brands, for example, Collector Facts (sic).  But

23  can you describe for the Court how CollectibleFacts is

24  competing against HiBid?

25  A.   HiBid is a -- is our online auction website for

1   collectibles.  And many other things, but collectibles being a

2   main focus of it.

3   Q.   So HiBid has collectible inventory that it offers for

4   online auctions?

5   A.   Yes, correct.

6   Q.   And your understanding, having looked at

7   CollectibleFacts, the description, it otherwise is providing

8   online auction services for collectibles, correct?

9   A.   Yes.

10  Q.   And would you do the same for a description in terms of

11  the competition for Machinery Trader and MachineFacts?

12  A.   Yes.  MachineFacts would be the heavy industrial

13  equipment auctions for Facts Technology whereas Machinery

14  Trader is the Sandhills brand for heavy construction

15  equipment.

16  Q.   Now, MachineFacts, does that strike you as familiar?

17  A.   Yes.

18  Q.   Why?

19  A.   Larry wanted to, when we acquired Equipmentfacts, expand

20  into the industrial machine works auction space.  And there

21  was emails with him actually setting that up while employed at

22  Sandhills.

23  Q.   And do you have a recollection whether in fact he uses

24  that very same phrase, "Machinefacts"?

25  A.   He uses that very same phrase, "Machinefacts."

─────WELCH - DIRECT - MILLER─────

 1  Q.   That's while he was employed by Sandhills, correct?

 2  A.   Yes, correct.

 3  Q.   You've referenced before your recollection of

 4  Mr. Garafola using the phrase "Machinefacts" in an email.

 5       Do you recall that?

 6  A.   Yes.

 7  Q.   Is this, that's what's marked as P-18, that email?

 8  A.   Yes.

 9  Q.   Now, I'd like, if you can, to walk the Court through this

10  email exchange, starting first with the initial email exchange

11  that starts on page 2, Bates stamp Sandhills PI-517.

12       You don't have to read it in total.  Take a minute, look

13  at it, and I want you to describe for the Court what's

14  happening here, who's talking to who.

15  A.   Larry is emailing myself and Shawn Peed, the owner of the

16  company, and he states that he was contacted by a head

17  consultant for Barrett-Jackson, Mecum and Vicari Auctions,

18  which those are large collector car auctioneers, and wanted to

19  go about creating CollectorCarFacts in order to get their

20  business.

21  Q.   And then, if you go further up, just above on that second

22  page, there's an email to Larry from Shawn that says, "No,

23  need to tie this into Beech B cars portal."  What does that

24  mean?

25  A.   So we can create brand-specific portals on HiBid, so, for

WELCH - DIRECT - MILLER

1   example, collectorcarfacts.hibid.com.  It's a really easy way

2   for us to create a portal.

3   Q.   And, real quick, it may not be the first time, but HiBid,

4   what's HiBid?  Well --

5   A.   HiBid --

6   Q.   I'm sorry.  Keep going.

7   A.   HiBid is an online auction platform for pretty much

8   anything that's not directly related to the equipment

9   industries.

10  Q.   Got it.  And going to the first page down?

11  A.   Yes.

12  Q.   And there is email exchanges going on between you and

13  various people within Equipmentfacts?

14  A.   Yes.

15  Q.   And within Sandhills itself?

16  A.   Yes, correct.

17  Q.   And then, in particular, I'm interested in the email from

18  Larry, Mr. Garafola, dated Tuesday, April 23, 2019, 3:14 p.m.,

19  to you, and the "re" is collectorcarfacts.com.

20       Do you see that email?

21  A.   Yes.

22  Q.   Can you read that, what Larry sent to you, for the

23  record?

24  A.   "CollectorCarFacts is just like Equipmentfacts, nothing

25  different with the exception of it being powered by HiBid

WELCH - DIRECT - MILLER

1  rather than BidCaller or Bidpath.  The same concept as

2  Machinefacts.com."

3  Q.   Now I'm going to go in reverse order from where I started

4  from.

5       Machinefacts.com, April 23, 2019, who employs Larry at

6  that time?

7  A.   Sandhills.

8  Q.   So, at that point, he's communicating to you he's going

9  to create the Machinefacts.com, and it's otherwise going to

10  provide online auction services for it, or that's what he's

11  anticipating.

12  A.   Correct.

13  Q.   And then, going back into the beginning of that sentence,

14  what strikes you as interesting, if at all, how Mr. Garafola

15  is describing the interplay between Equipmentfacts and what

16  he's describing?

17  A.   He's saying it's no different than Equipmentfacts.  The

18  only thing that's different is the engine that's running it.

19  Q.   And -- I'm sorry.  Keep going.

20  A.   HiBid being the engine that's running CollectorCarFacts

21  and Machinefacts versus BidCaller or Bidpath.

22  Q.   And we keep hearing the same names coming up, BidCaller

23  and Bidpath.  Is that Brindley?

24  A.   Bidpath is Brindley, yes.

25  Q.   So, basically, he's saying while employed that

WELCH - DIRECT - MILLER

1   this either CollectorCarFacts or Machinefacts, a brand, is

2   going to use HiBid, our engine, but you could easily go over

3   to Bidpath, which is just a similar engine but it's run by

4   Mr. Brindley, correct?

5   A.   Yes, correct.

6   Q.   And it's not too far after, it's maybe a month later, I

7   can get it directly, that Mr. Garafola is having email

8   exchanges with Ms. Greene about starting a business with

9   Mr. Brindley, who is from Bidpath.

10  A.   Yes, correct.

11  Q.   MachineFacts, when you clicked on it, was it in

12  competition with Machinery Trader?

13  A.   Yes.

14  Q.   And why?

15  A.   Because it offers industrial equipment.

16  Q.   For what?  For what purpose?

17  A.   For auction.

18  Q.   Online auctions?

19  A.   Yes.

20  Q.   Every one of those is online auction provider, correct?

21  A.   Every one of his is an online auction.

22  Q.   Now, I'm not going to have you necessarily go through

23  each one unless you need to.  Generally speaking, Facts

24  Technology brands, each of them provides an online auction

25  service for a particular industry -- collectibles, machine,

WELCH - DIRECT - MILLER

```
 1  big rigs, whatever they are.  Correct?

 2  A.    Yes.

 3  Q.    Each of those online auction services being provided for

 4  those brands is in competition with the ones that are noted

 5  there for Equipmentfacts -- or Sandhills, correct?

 6  A.    Yes, correct.

 7  Q.    And each one of those is a online auction service -- and

 8  we'll get to how it happens -- online auction service for that

 9  particular industry or brand.

10  A.    Yes.

11  Q.    You described before the engine, how the thing works.

12        Do you recall that?

13  A.    Yes.

14  Q.    I want you to educate the Court about how this works --

15  A.    Okay.

16  Q.    -- the engines, the bodies, how it all works -- and try

17  to make them as apple-is-to-apples comparison.  So please,

18  starting first with the Sandhills model, describe for the

19  Court what that is.

20  A.    Yeah.  Bidpath was the engine of Equipmentfacts at the

21  time of acquisition.  They charged a flat fee for every time

22  we had an auction up that utilized that software.

23        When Larry came on board, we used his knowledge to

24  further develop BidCaller, the software, to a point where we

25  felt comfortable enough to ultimately get Bidpath out of there
```

WELCH - DIRECT - MILLER

 1   and no longer have that expense.  So in April of 2019,

 2   BidCaller replaced Bidpath as the engine that runs

 3   Equipmentfacts.

 4   Q.   And then how does Equipmentfacts otherwise operate with

 5   respect to the various brands that are identified?

 6   A.   Any inventory -- let's take, for example, a bulldozer.

 7   If a bulldozer is on the Equipmentfacts platform and being

 8   offered at auction, you can go to Machinery Trader, find that

 9   dozer, and when you click on it, it will bounce you over to

10   Equipmentfacts, where they can then bid on the item.

11   Q.   So would the converse be true?  Say, for example, if I

12   went to TractorHouse, I saw it had inventory, available was a

13   tractor.  If it was provided for online auction services,

14   simulcast or otherwise, if I clicked on that, would it direct

15   me to Equipmentfacts?

16   A.   Yes, that's correct.

17   Q.   And is that true for each of the brands?  They would

18   otherwise, if online auction services were provided for an

19   inventory, it would go to Equipmentfacts?

20   A.   Yes, correct.

21   Q.   And BidCaller is simply the software, the engine that

22   allows you to conduct the actual online auctions through

23   Equipmentfacts.

24   A.   Yes, correct.

25   Q.   Now, go to the other side, Facts Technology.  It looks

WELCH - DIRECT - MILLER

1  different.  Can you describe what it is in terms of what's

2  being presented here?

3  A.   So they provide strictly only online auction services

4  whereas our brands also have retail inventory listed.

5  Q.   And by that you mean?

6  A.   Meaning an item that's being offered for sale that a

7  buyer would then call the seller and negotiate that price.

8  Whereas the Facts Technology brands are strictly online

9  auctions, so all those brands, the auctions take place on

10  those specific brands.

11  Q.   So, essentially, if I look at this, then for

12  MachineFacts, it already has built into it an Equipmentfacts

13  to it.

14  A.   Yes, it's got an online auctions engine software that's

15  driving it.

16  Q.   And so a difference would be, if you clicked on it, it

17  wouldn't refer you out to the engine, it actually was

18  self-contained within that brand?

19  A.   Yes, correct.

20  Q.   And that's true with CollectibleFacts and all the other

21  ones identified there?

22  A.   Yes, correct.

23  Q.   Now, you have lined up here BidCaller and

24  AuctioneerFacts.

25       Do you see that?

WELCH - DIRECT - MILLER

1    A.   Yes.

2    Q.   Can you describe for the Court what the import of that

3    is?  Why do you have those there?

4    A.   Because AuctioneerFacts is the engine and the software

5    that's running all of his websites whereas BidCaller is the

6    engine and software that's running Equipmentfacts.

7    Q.   Now, we've been talking about brands, and you've got

8    HiBid, you've got MachineFacts as sort of inventory.

9         Does Sandhills actually treat as a brand BidCaller?

10   A.   That's just what we refer to as the software.

11   Q.   Okay.

12   A.   Prior to acquisition, that was the brand.  But upon

13   acquisition, we made Equipmentfacts the overarching brand and

14   then just developed BidCaller to just be the software.

15   Q.   Got you.

16        Based on your having navigated the website that is Facts

17   Technology and the various brands, having seen how, through

18   its description and your understanding of the online auction

19   business, is it your testimony that each of -- Facts

20   Technology is competing against Sandhills in the online

21   auction business for each of the brands identified there?

22   A.   Yes.

23   Q.   And that was contemplated, that is, a prohibition against

24   that kind of competition was expressly contemplated by the

25   Asset Purchase Agreement and the related non-compete, correct?

WELCH - DIRECT - MILLER

 1   A.   Yes.

 2   Q.   Have you, in terms of having reviewed or visited the

 3   Facts Technology website, has it changed since when the

 4   lawsuit, our lawsuit, started to today?

 5   A.   Yes.

 6   Q.   And what's changed?

 7   A.   Bidderfacts was removed.

 8   Q.   And that was a brand that would have appeared on the

 9   right-hand side?

10   A.   Yes.

11   Q.   And you don't know why it was removed, correct?

12   A.   Don't know why.

13   Q.   Was there any change to AuctioneerFacts?

14   A.   It used to have the actual auctions on it.  It no longer

15   does.

16   Q.   If you were to click on AuctioneerFacts, does it bring

17   you to other websites?

18   A.   Yeah.  It brings you to a almost tutorial.

19   Q.   Got you.  I've seen, when it's been clicked on, a

20   reference to a thing called Vortex.

21        Are you familiar with that?

22   A.   Yes.

23   Q.   What's Vortex?

24   A.   Prior to us acquiring Equipmentfacts, Equipmentfacts used

25   several different providers.  Think of Bidpath.  Vortex was

───WELCH - DIRECT - MILLER───

1   one that they used prior to using Bidpath, so it's one that

2   Larry was very familiar with.

3   Q.   And do you have information as to whether AuctioneerFacts

4   relies on Vortex as an engine?

5   A.   Yes, it does.

6   Q.   And Vortex would be competing against BidCaller.

7   A.   Yes, correct.

8   Q.   And so the combination of AuctioneerFacts and Vortex,

9   those two combined would otherwise be a competition to

10  BidCaller.

11  A.   Exactly.

12  Q.   In your opinion, based on having negotiated the Asset

13  Purchase Agreement and the restrictive covenants, is that

14  unlawful competition as specific to the agreements?

15  A.   Yes.

16  Q.   Now, we testified earlier that you learned of the

17  creation of Facts Technology through customers, correct?

18  A.   Yes.

19  Q.   And you mentioned a couple of names.  I didn't hit them

20  at that point, so I'd like to revisit them.  So can you start

21  again?  To your knowledge, what customers raised specific

22  concerns about solicitations they received?

23  A.   J.B. Dimick.

24  Q.   And let's stay with Mr. Dimick right there.  Who is

25  Mr. Dimick?

─────WELCH - DIRECT - MILLER─────

 1   A.   He's a customer of ours, of Sandhills.

 2   Q.   And is he remain a customer of Sandhills?

 3   A.   Yes.

 4   Q.   And how did you become aware of Mr. Dimick's issue?

 5   A.   He received an email from Facts Technology and, in turn,

 6   forwarded that email to one of my sales representatives, Jim

 7   Ryan, and asked is this a part of Sandhills.

 8   Q.   And that was in an email exchange?

 9   A.   Yes.

10   Q.   You've been, probably unfortunately for you, very

11   involved in this litigation, correct?

12   A.   Yes.

13   Q.   Are you familiar with the filings that have occurred?

14   A.   Yes.

15   Q.   Are you familiar with the declarations that have been

16   submitted?

17   A.   Yes.

18   Q.   Did Mr. Dimick submit a declaration?

19   A.   Yes.

20   Q.   Did anything in Mr. Dimick's declaration stand out to you

21   other than the email that we have just testified to?

22   A.   That he was confused as to whether it was a part of

23   Sandhills or not.

24   Q.   And why would that be a problem for you?

25   A.   Because that's -- it's a distraction from our business,

─────WELCH - DIRECT - MILLER─────

1   my sales reps having to explain no, that it's not a part of

2   Sandhills, rather than being focused on continuing to provide

3   our services.  Creates mass confusion in the market.

4        And the other thing that's very concerning is, you know,

5   we heard from J.B. Dimick, but how many out there did we not

6   hear from that also got the same email and came to the same

7   conclusion?

8   Q.  And, in addition to that, did Mr. Dimick make the Court

9   and -- or -- and you aware of an issue about how he received

10  the solicitation?

11  A.  Yeah.  He was curious as to why he got it on the email

12  account that he did, because it was not one that he utilized

13  out publicly and the only people that had it was Sandhills.

14            MR. FARSIOU:  Judge, just note my objection to the

15  certifications since I have no opportunity to cross-examine

16  these individuals.

17            MR. MILLER:  And I'll represent to the Court this is

18  the declaration that was submitted with Sandhills' papers on

19  November 25, 2019, Docket Number 3-2, Mr. Dimick's

20  declaration.

21            MR. FARSIOU:  Just so you note, Mr. Miller, I think

22  this is -- you have a P-19.  You have the other one as P-18.

23  I believe it's P-19, P-20, because it was a duplicate.

24            MR. MILLER:  Oh.  Thank you very much.  I appreciate

25  that.

───────WELCH - DIRECT - MILLER───────

 1           THE COURT:  One second, Counsel.  Let me just take a

 2    quick look.

 3           Okay.  I'm going to allow this to come in.

 4           To the extent that there is anything that remains, at

 5    the conclusion of this examination, that you believe that you

 6    need to call the actual witness for, we'll entertain that at

 7    this time.  But at this time, I'm overruling the objection.

 8    I'm going to allow the declaration to come in.

 9           MR. FARSIOU:  Okay.

10    BY MR. MILLER:

11    Q.   Mr. Welch, you testified to having become aware of the

12    declaration submitted by Mr. Dimick, correct?

13    A.   Yes.

14    Q.   And is this that declaration?

15    A.   Yes.

16    Q.   And attached to the declaration is an email, correct?

17    A.   Yes.

18    Q.   And if you'll turn to it, it's Bates stamp Sandhills

19    PI-438.

20         Are you there?

21    A.   Yes.

22    Q.   And you testified about confusion or your perception of

23    Mr. Dimick being confused.

24         Do you remember that?

25    A.   Yes.

—WELCH - DIRECT - MILLER—

1    Q.   Can you read the first email that appears on that page?

2    A.   J.B. Dimick to Jim Ryan, my sales representative, "Is

3    this part of Sandhills?"

4    Q.   And is that why you had the impression that Mr. Dimick

5    was confused?

6    A.   Yes.

7    Q.   And then, if you go to page 2 of the declaration -- and

8    actually, before you go there, and I don't want you to go into

9    great detail, the attachment, the email that he received, what

10   was it for in terms of what was being advertised?

11   A.   AuctioneerFacts, changed the online auction industry by

12   release of AuctioneerFacts.

13   Q.   And prior to today, had you reviewed AuctioneerFacts'

14   website?

15   A.   Yes.

16   Q.   And what's your understanding, based on the publicly

17   available information, as to what AuctioneerFacts does?

18   A.   Online auction services for the auction industry.

19   Q.   And Mr. Garafola, if you go to that -- or, rather, if you

20   go to Sandhills PI-438, that's an email that's being sent to

21   Mr. Dimick's email address at cascadewood.com, correct?

22   A.   Correct.

23   Q.   Now, if you go to paragraph, in the declaration itself,

24   paragraph 11, Bates stamp Sandhills PI-435.

25        Are you there?

WELCH - DIRECT - MILLER

```
 1   A.   Yes.

 2   Q.   Did Mr. Dimick express any concern about how he received

 3   that solicitation?

 4   A.   Yes.

 5   Q.   And without reading it, did you -- independent of that,

 6   did you have an understanding that Mr. Dimick had that

 7   concern?

 8   A.   Yes.

 9   Q.   And what was his concern?

10   A.   He had only given that email address to a few individuals

11   with whom he does auction business, including Mr. Ryan.

12   Q.   And as a representative of Sandhills, the director of new

13   product sales, do you have concerns about Mr. Dimick having

14   received this solicitation at that email address?

15   A.   Absolutely.

16   Q.   Why?

17   A.   Because the only way that it could have been obtained was

18   through a proprietary information to Sandhills.

19   Q.   And do you have a belief that Mr. Garafola took that?

20   A.   Yes.

21   Q.   We're talking about individuals or customers that raised

22   concerns.  We've just spoken about Mr. Dimick.

23        Are there any others?

24   A.   Yes.

25   Q.   And who else?
```

WELCH - DIRECT - MILLER

```
 1   A.   Craig Hilpipre.

 2   Q.   And do you know what business Mr. Hilpipre operates?

 3   A.   Hilpipre Auctions.

 4   Q.   Without looking at his -- did he submit a declaration?

 5   A.   Yes.

 6   Q.   Did you review the declaration when it was submitted?

 7   A.   Yes.

 8   Q.   And what was the trigger for Mr. -- well, did

 9   Mr. Hilpipre complain?

10   A.   Yes.

11   Q.   To whom did he complain?

12   A.   His sales representative, Michaela Wallace.

13   Q.   A Sandhills Equipmentfacts sales representative?

14   A.   Yes.

15   Q.   And without actually looking at that -- and the complaint

16   was about what?

17   A.   About the email solicitation from Facts Technology.

18   Q.   And without having the benefit of that email solicitation

19   in front of you now, did anything stand out to you about his

20   issues, that is, Mr. Hilpipre's?

21   A.   He was angry.  He referred to Mr. Garafola as a hyena.

22   Q.   And did you form any opinion or impression about how it

23   was that Mr. Hilpipre was expressing his feelings about that?

24   A.   That, I mean, he was angry, and it was because of the

25   email that was -- that he -- and he knew that it was in
```

WELCH - DIRECT - MILLER

```
 1  competition with Sandhills.
 2  Q.   And my first read, that could be beneficial to Sandhills,
 3  couldn't it, if he's thinking about Mr. Garafola as a hyena?
 4  A.   It's a huge distraction to my sales representatives.
 5  Q.   Why?
 6  A.   They're having to battle in the market this perception of
 7  what's going on with Larry Garafola, what's going on with
 8  Equipmentfacts, rather than focus on what their job should be,
 9  and that's selling Sandhills' products.
10  Q.   Did you ever speak to Mr. Hilpipre about his complaint,
11  specifically you and Mr. Hilpipre?
12  A.   No.
13  Q.   Mr. Welch, is that the declaration that you reviewed that
14  was submitted by Mr. Hilpipre?
15  A.   Yes.
16  Q.   If you would go to the email, which is Bates stamped
17  Sandhills PI-466.
18  A.   Yes.
19  Q.   Are you there?
20  A.   Yes.
21  Q.   Again, this email is one being sent on whose behalf at
22  the bottom?
23  A.   AuctioneerFacts.
24  Q.   Is it coming from Facts Technology?
25  A.   Yes.
```

WELCH - DIRECT - MILLER

**1**   Q.   That's Mr. Garafola's company?

**2**   A.   Yes.

**3**   Q.   And Mr. Hilpipre then is forwarding it on -- or at least

**4**   making someone aware.

**5**        You see that exchange at the top?

**6**   A.   Yes.

**7**   Q.   Who is Mr. Hilpipre sending it to?

**8**   A.   Michaela Wallace.

**9**   Q.   And is she a Sandhills' employee?

**10**  A.   Yes.

**11**  Q.   Does she cover that account --

**12**  A.   Yes.

**13**  Q.   -- that is Mr. Hilpipre's account?

**14**  A.   Yes.

**15**  Q.   Can you read, for the record, what Mr. Hilpipre is saying

**16**  to his account representative, Michaela Wallace.

**17**  A.   "In the animal kingdom, he would be considered a hyena,

**18**  living on carcasses, stealing one bit when he can.  If I was

**19**  Sandhills Publishing, I would have the FBI investigate his

**20**  company.  Craig."

**21**  Q.   Did you have the FBI investigate Mr. Garafola's company?

**22**  A.   No.

**23**  Q.   Now, if we go into the actual declaration itself.

**24**       Go to paragraph 5.  Take a minute and review it.  Let me

**25**  know when you've done so.

WELCH - DIRECT - MILLER

1    A.   I'm done.

2    Q.   And in that paragraph it's reciting what you just said in

3    terms of what was contained in the email, correct?

4    A.   Yes.

5    Q.   Can you read the first two sentences up to that quote?

6    A.   "I only know Mr. Larry Garafola from a business

7    perspective.  My last conversation with Mr. Larry Garafola was

8    many years ago.  Based on my past business experience with

9    Mr. Larry Garafola, I can't trust him.  Furthermore, I

10   expressed my opinion in an email to my Sandhills Publishing

11   account representative."

12   Q.   And that's the animal kingdom comment that was made?

13   A.   Yes.

14   Q.   We have Mr. Dimick, Mr. Hilpipre.  Is there anybody else

15   that you recall having raised concerns about solicitations?

16   A.   Ray Gombiski.

17   Q.   And what business did Mr. Glombiski (sic) work for?

18   A.   James G. Murphy Auctions.

19   Q.   Are you aware whether Mr. Glombiski submitted a

20   declaration in connection with this matter?

21   A.   Yes, he did.

22   Q.   Does anything stand out to you -- did you review

23   Mr. Glombiski's declaration and the email solicitation?

24   A.   Yes.

25   Q.   Anything in particular, excuse me, stand out to you?

———WELCH - DIRECT - MILLER———

1   A.   Just, again, the confusion.  Why am I getting contacted?

2   Q.   Mr. Welch, is that Mr. Gombiski's -- I'm sorry.  I'm

3   saying Glombiski.  G-O-M-B-I-S-K-I.

4        Is that Mr. Gombiski's declaration?

5   A.   Yes.

6   Q.   If you would, go down to paragraph 6.

7        Are you there?

8   A.   Yes.

9   Q.   Would you read, for the record, what Mr. Gombiski

10  submitted in his declaration at paragraph 6?

11  A.   "As soon as I read the beginning of the email, I knew

12  something was wrong because Facts Technology" --

13  Q.   Could you slow down --

14  A.   Sorry, yup.

15  Q.   -- for the court reporter.

16  A.   "As soon as I read the beginning of the email, I knew

17  that something was wrong because Facts Technology was clearly

18  competing against Sandhills and Equipmentfacts.  I immediately

19  thought to myself that there had to be some kind of agreement

20  in place that would prevent Mr. Garafola from competing with

21  Sandhills because it purchased equipmentfacts.com from him."

22  Q.   Keep going.

23  A.   "In my opinion, there was a clear conflict of interest in

24  what Mr. Garafola was doing by competing against Sandhills."

25  Q.   And if you go to the second page, go to paragraph 9.

─────WELCH - DIRECT - MILLER─────

1   Can you read out loud what Mr. Gombiski says in paragraph

2   9?

3   A.   "I have never spoken to or communicated with Mr. Garafola

4   or anyone associated with him.  I never provided my company's

5   contact information to Mr. Garafola or anyone associated with

6   him and neither did Mr. Murphy, to my knowledge."

7   Q.   Is the fact that Mr. Gombiski is representing in the

8   sworn declaration that he didn't provide the contact

9   information yet he received a solicitation, is that concerning

10  to you?

11  A.   Yes.

12  Q.   And why is that concerning?

13  A.   Because he probably got it from the intellectual property

14  that he took from Sandhills.

15  Q.   Is there anybody else -- any other customer, a Sandhills'

16  customer, that you were made aware of that received a

17  solicitation?

18  A.   Jeff Martin.

19  Q.   And who is Mr. Martin?

20  A.   He's the owner of Jeff Martin Auctioneers.

21  Q.   And how is it you became aware of Mr. Martin's issue?

22  A.   He called me directly.

23  Q.   And as best you can recall, what did Mr. Martin say to

24  you and what did you say in response?

25  A.   "Things didn't end well with Larry, did they?"

WELCH - DIRECT - MILLER

1  Q.  And that was Mr. Martin to you?

2  A.  Yes.

3  Q.  And how did you respond?

4  A.  "Not exactly.  How did you know?"

5  Q.  And what did Mr. Martin respond in that response?

6  A.  That he had been solicited by Facts Technology.

7  Q.  And was it personally by Mr. Garafola?

8  A.  Yes.

9  Q.  Now, did you enjoy having that conversation?

10 A.  No.

11 Q.  Why?

12 A.  It's embarrassing.

13 Q.  In what respect?

14 A.  It's -- he's wondering what happened between you guys,

15 wanting to know the story.  And just -- he had probably heard

16 one side of the story already.

17 Q.  It's almost having to deal with someone airing out the

18 dirty laundry?

19 A.  Yes, exactly.

20 Q.  Did you secure any new auction business during that call?

21 A.  No.

22 Q.  Are your calls with Mr.  -- what was his name again?

23 A.  Jeff Martin.

24 Q.  "Mr. Martin" -- are those generally an attempt to get new

25 business?

─────────WELCH - DIRECT - MILLER─────────

1   A.   Yes.

2   Q.   Here, you weren't doing that, correct?

3   A.   No.

4   Q.   You were having to answer a question that you should

5   never have to answer?

6   A.   Yes, correct.

7           MR. FARSIOU:  Judge, please, just note my objection

8   here.  We have no certification, and he's talking about

9   thirdhand -- he's talking about a conversation he had with

10  someone who's never going to be on the stand to testify as to

11  whether or not that's accurate, so just note my continuing

12  objection.

13          THE COURT:  This is a hearsay objection?

14          MR. FARSIOU:  Yes.  Absolutely.

15          MR. MILLER:  Judge, if I may respond.  It's not being

16  asserted for the truth of the matter asserted.  It's what

17  did -- how did it impact the state of mind of Mr. Welch when

18  he heard it.  What did I have to do?  How did I feel?  It's --

19          THE COURT:  Counsel, we're not getting into this.

20          I understand your objection is continuing.

21          Again, to the extent that there is anything at the

22  conclusion of his testimony that you want to make an

23  application to have these witnesses come in live, you can make

24  that application, but I'm going to allow the testimony at this

25  time.

WELCH - DIRECT - MILLER

1    Please proceed, Mr. Miller.

2    MR. MILLER:  Thank you.

3  BY MR. MILLER:

4  Q.  So we have Mr. Dimick, Mr. Gombiski, Craig Hilpipre.

5  Who's the gentleman you just described?

6  A.  Jeff Martin.

7  Q.  Jeff Martin.  Anybody else that comes to mind?

8  A.  A representative from McGrew Auctions.

9  Q.  And how did you become aware of that issue?

10  A.  An email was sent to one of my sales representatives.

11  Q.  Mr. Welch, is that the email you were referring to in

12  your testimony just a minute ago?

13  A.  Yes.

14  Q.  And going down to the bottom of the first page, do you

15  see that email exchange that's dated November 20, 2019,

16  9:48 a.m.?

17  A.  Yes.

18  Q.  Who's sending that email?

19  A.  Larry Garafola, larry@factstech.com.

20  Q.  So Mr. Garafola on behalf of factstechnology.com?

21  A.  Yes, correct.

22  Q.  And what is he doing in that email with respect to -- or

23  at least as you can read from it?

24    What are these communications between Mr. Garafola and

25  Mr. -- is it Mr. Knisley?

WELCH - DIRECT - MILLER

 1   A.   Yes.  He's soliciting Mr. Knisley's business.

 2   Q.   And if you go on to the second page, is he doing more

 3   than just a verbal solicitation?  In particular, look at the

 4   last paragraph.

 5   A.   Yes.  He's imploring him to go to the website and learn

 6   more about it with a live demonstration.

 7   Q.   So let's read that last paragraph out loud, for the

 8   record, beginning with "my staff."

 9   A.   "My staff already built a system for you, click on the

10   logo below to see your public online website.  If you have any

11   further interest or would like a live demo of the

12   administrative side of our system, let me know, and I will be

13   more than happy to help with this -- more than happy to set

14   this up."

15   Q.   And then, if you go on to the next page, the next two

16   pages of that email, is that the live demonstration that's

17   otherwise being advertised by Mr. Garafola?

18   A.   Yes.

19   Q.   And it actually looks like -- it's got McGrew's logo

20   already on it?

21   A.   Yes.

22   Q.   It's got -- it looks like there's equipment on there?

23   A.   Yes.

24   Q.   And do you know whether McGrew has -- is McGrew a current

25   customer of Sandhills?

—————WELCH - DIRECT - MILLER—————

1   A.   Yes.

2   Q.   Have they done any business with Facts Technology, to

3   your knowledge?

4   A.   Not to my knowledge.

5   Q.   Other than Mr. Dimick, Gombiski, McGrew, Hilpipre, and

6   Martin, anybody else come to mind that received the

7   solicitation from Facts Technology and Mr. Garafola?

8   A.   Not that I've seen personally but have heard of several

9   more from my sales representatives.

10  Q.   Mr. Welch, at some point in time -- and actually, you

11  heard the judge mention it in his recitation of the history of

12  this case, a TRO was entered, correct?

13  A.   Yes.

14  Q.   And I'll represent that the TRO was entered on

15  December 16, 2019.

16       Does that sound about right?

17  A.   That sounds right.

18  Q.   Did you have a chance, when Judge Shipp issued his TRO or

19  his letter opinion and order, to actually review the opinion

20  and order?

21  A.   Yes.

22  Q.   In that opinion and order, did the judge actually explain

23  what was prohibited by the TRO?

24  A.   Yes.

25            MR. MILLER:  Judge, I don't know if you want me to

──────WELCH - DIRECT - MILLER──────

1   mark this as an exhibit or just refer to it as a docket entry.

2           THE COURT:  You can just refer to it, Counsel.

3           MR. MILLER:  This is Docket Entry 23 filed on

4   December 16, 2019.

5   BY MR. MILLER:

6   Q.   Mr. Welch, is that the letter opinion and order about

7   which you were just testifying?

8   A.   Yes.

9   Q.   And if you would, go to page 9 of that document.

10  A.   Okay.

11  Q.   I'm going to go in reverse order.

12       Go to paragraph 3 of that.  Can you read that out loud,

13  for the record.

14  A.   "Lawrence Garafola shall immediately return Sandhills'

15  and Equipmentfacts' intellectual property, as defined in the

16  Employee Restrictive Covenant, including, but not limited to

17  customer lists and contact lists, bidder lists and contact

18  lists, and auctioneer lists and contact lists."

19  Q.   Mr. Welch, you testified a lot about all the intellectual

20  property that was sent out through his Gmail account, correct?

21  A.   Yes, correct.

22  Q.   Any of this come back to Sandhills as a result of that

23  order?

24  A.   No.

25  Q.   You haven't received anything?

─────WELCH - DIRECT - MILLER─────

1    A.   No.

2    Q.   Now going to paragraph 2, can you read slowly, so the

3    court reporter gets all of it, and I know the judge knows this

4    and the parties know it well, but, for the record, can you

5    read paragraph 2 in terms of what restraints are in place

6    right now or as of December 16th and continuous?

7    A.   "Pending a preliminary injunction hearing, Lawrence

8    Garafola shall be temporarily restrained from directly or

9    indirectly competing with Equipmentfacts's business, as

10   defined in the Asset Purchase Agreement, directly or

11   indirectly soliciting for himself or another business that is

12   competitive with Equipmentfacts's business from any customers,

13   clients or accounts of Equipmentfacts's business, directly or

14   indirectly interfering with any customer, client or account of

15   Equipmentfacts to serve (sic) or alter the relationship of the

16   customer, client or account."

17   Q.   And that -- does that mirror, in sum and substance, what

18   is contained in the APA non-compete as well as the employee

19   non-compete, non-solicitation?

20   A.   Yes.

21   Q.   Are you aware of from December 16th to today whether

22   Mr. Garafola, in your opinion, has violated that TRO?

23   A.   Yes.

24   Q.   What specifically do you have knowledge of?

25   A.   He emailed a customer of Equipmentfacts and Sandhills.

─────────WELCH - DIRECT - MILLER─────────

1  Q.   And what customer is that?

2  A.   Durable Undercarriage.

3  Q.   And did we make the Court aware of that issue, are you

4  familiar?

5  A.   Yes.

6  Q.   And how did you become aware of the email?

7  A.   In our review of continuing to keep an eye on any emails

8  that came in from Marlene's personal Gmail account, as well as

9  Larry's personal Gmail account, we monitored any emails coming

10 from those email addresses into our servers.  As a result of

11 that monitoring, we saw the email to Durable Undercarriage.

12 Q.   Now, in terms of the monitoring that was going on, was it

13 specific to Mr. Garafola's personal email account or did it

14 otherwise touch on other email accounts?

15 A.   It touched on any of the personal email accounts

16 associated with Larry Garafola, Marlene, and Maureen; Larry's

17 wife.

18 Q.   And then going forward, post-TRO, you became aware of an

19 email from Mr. Enos, correct, that is Durable Undercarriage?

20 A.   An email to Mr. Enos, yes, correct.

21 Q.   And that was from -- that email was sent -- or at least

22 you became aware of it because it came into Durable

23 Undercarriage's email account, correct?

24 A.   Yes, correct.

25 Q.   And does Sandhills provide a service to its customers

WELCH - DIRECT - MILLER

1 relative to email hosting?

2 A.   Yes, we host email for lots of customers.

3 Q.   And what services do you provide in that respect?

4 A.   We do -- we cybermonitor so any spam -- we have spam

5 filters in place, any cyberattacks that we need to monitor, we

6 monitor that on their email.  And as a result, if there's a

7 TRO in place or something where we think that something's

8 going against the law, then we monitor that as well.

9 Q.   So you added, in terms of your monitoring functionality,

10 if emails were coming into customers from Mr. Garafola?

11 A.   Yes.

12 Q.   Because ultimately, the TRO specifically said

13 Mr. Garafola cannot solicit Sandhills' customers?

14 A.   Yes, correct.

15 Q.   And that's how you became aware of this email, correct?

16 A.   Yes, correct.

17 Q.   Did you have a chance, after we submitted to the Court --

18 were you aware that Mr. Garafola's attorney submitted an

19 objection to our raising the issue about the Durable

20 Undercarriage email?

21 A.   Yes.

22 Q.   And one of those -- and in my paraphrase it will abide

23 what the document says -- that he had concerns that it was

24 coming from Mr. Garafola's personal email account.

25       Did you read that?

WELCH - DIRECT - MILLER

 1  A.   Yeah.

 2  Q.   Does the email that we're talking about -- and I'll bring

 3  it up to you so that you can see it -- did that deal with

 4  Mr. Garafola's personal email account?

 5  A.   Yeah, it was signed as Larry.

 6  Q.   Well, when I say "personal," I should be clear.  I

 7  apologize.

 8      His Gmail account or his Facts Technology account?

 9  A.   His Facts Technology account.

10  Q.   That's my fault.  I apologize.

11      Now, Mr. Welch, before we get to the email as part of the

12  business relationship you had with Mr. Garafola and

13  Equipmentfacts, did you become familiar with his family

14  members?

15  A.   Yes.

16  Q.   Did you happen to, in person, meet all of them?

17  A.   Not all of them, no.

18  Q.   Do you recognize any of the individuals that are sitting

19  in the gallery today?

20  A.   Yes.

21  Q.   Who do you recognize?

22  A.   Larry Garafola Jr.

23  Q.   Anybody else?

24  A.   No.

25  Q.   Let's focus on the email now.

─────── WELCH - DIRECT - MILLER ───────

1      Start at the second page, Sandhills PI-431.  It's the

2  email that's sent on January 18, 2020.

3      Do you see that?

4  A.   Yes.

5  Q.   Just while it may be academic, at this time, the TRO is

6  in place, correct?

7  A.   Yes, correct.

8  Q.   And, just real quick, if you can pull that -- the letter

9  opinion and order, it was the ninth page.

10      Are you there?

11  A.   Yes.

12  Q.   Going to paragraph 2.

13  A.   Yes.

14  Q.   Read section B out loud, please.

15  A.   "Directly or indirectly soliciting for himself or another

16  business that is competitive with Equipmentfacts's business

17  from any customers, clients or accounts of Equipmentfacts's

18  business."

19  Q.   Keep that framed.  We're going to come back to it.

20      Now, this email exchange that's occurring on January 18,

21  2020, after the TRO is in place that includes subpart B,

22  what's happening?  What's being discussed in this email

23  exchange between Mr. Garafola and Mr. Enos?

24  A.   Larry is soliciting online auction services on behalf of

25  his two sons.

WELCH - DIRECT - MILLER

1   Q.   And is there a focus that his sons are otherwise engaging

2   for purposes of the online auction business?

3   A.   Timed auctions.

4   Q.   And I recall you testifying earlier that Sandhills,

5   through its brands, engages in timed auctions, right?

6   A.   Yes.  Equipmentfacts did timed auctions prior to

7   acquisition.  Upon acquisition, we separated timed auctions

8   out as AuctionTime and Equipmentfacts focused on the

9   simultaneous auction.

10  Q.   AuctionTime is an affiliate -- or one of Sandhills'

11  affiliates, correct?

12  A.   Yes, correct.

13  Q.   That's contemplated by the Restrictive Covenant

14  Agreement, correct?

15  A.   Yes, correct.

16  Q.   Now, how is it -- in the email you were just talking

17  about, how is Mr. Garafola describing his then relationship

18  with Sandhills?

19  A.   That he is no longer involved with Sandhills.

20  Q.   Does he say anything else?

21  A.   Just did not work out how I expected and the company has

22  really changed and the culture did not fit.

23  Q.   Okay.  And from your reading of this -- I know you said

24  it before, but what exactly is Mr. Garafola trying to do on

25  behalf of his sons?

WELCH - DIRECT - MILLER

1   A.   He's trying to get inventory to sell through his online

2   auction -- or his sons' online auction.

3   Q.   Would you view that, just that phrase right there, as you

4   understand the words that are written, that that's directly or

5   indirectly soliciting for another business that is competitive

6   with Equipmentfacts's business from any customers of

7   Equipmentfacts?

8   A.   Yes, absolutely.

9   Q.   And let's just make sure.

10       As of the date of this email, January 18, 2020, Durable

11  Undercarriage was a customer of Sandhills, correct?

12  A.   Yes.

13  Q.   And at that time Mr. Garafola's soliciting a Sandhills'

14  customer on behalf of his sons, correct?

15  A.   Yes, correct.

16  Q.   And his sons are engaged in Timed Auction, correct?

17  A.   Yes, correct.

18  Q.   And that's a business that's competitive to Sandhills'

19  AuctionTime, correct?

20  A.   Yes, correct.

21  Q.   Now, go to the first page of that email.

22       By virtue -- I won't say "by virtue."  Mr. Enos responds

23  to Mr. Garafola's email.

24       Do you see that?

25  A.   Yes.

─────WELCH - DIRECT - MILLER─────

1   Q.   What's your sense -- when you read this, does it give to

2   you an impression of how Mr. Enos is appreciating the

3   relationship, or lack thereof, that Mr. Garafola had with

4   Facts Technology -- with Equipmentfacts?

5   A.   Yes.

6   Q.   What's your impression?

7   A.   He states that he's sorry that -- he's sorry to see you

8   sold Equipmentfacts but I hoped it worked out for you

9   financially.

10  Q.   And does Mr. Garafola respond to that comment in a

11  subsequent email?

12  A.   Yes.

13  Q.   And how does he respond?

14  A.   Financially it was good but if I could do it again, I

15  would have never sold.

16  Q.   So when you received notification of this email being

17  sent after the TRO, did it give you concern?

18  A.   Yes.

19  Q.   What about it?

20  A.   It made me wonder if he was ever going to stop.

21  Q.   Now, it may seem like mental gymnastics but I have a very

22  simple question.

23       Does the entity Facts Technology have knowledge of the

24  customers that were being solicited by Mr. Garafola?

25  A.   Yes, absolutely.

WELCH - DIRECT - MILLER

```
 1   Q.   How?

 2   A.   Facts Technology is Larry Garafola.

 3   Q.   Give me some details around that.  Why do you say that?

 4   A.   You could not create Facts Technology without the

 5   knowledge and the intellectual property that was taken from

 6   Sandhills and the knowledge that Larry Garafola has.

 7   Q.   And relative to Facts Technology's knowledge of the

 8   agreements Mr. Garafola entered into, is it your belief that

 9   Facts Technology knows of those agreements?

10   A.   Yes.

11   Q.   Do you believe that they know the restrictions that are

12   in place?

13   A.   Yes.

14   Q.   Do you know that -- or do you believe that Facts

15   Technology is aware of the customers to which -- or for which

16   Mr. Garafola is not permitted to solicit?

17   A.   Yes.

18   Q.   And you described Mr. -- Jeff Martin, and others, but

19   Jeff Martin.  He received a call directly from Mr. Garafola,

20   correct?

21   A.   Call or email, I'm not sure.

22   Q.   And it was on behalf of Facts Technology?

23   A.   Yes.

24   Q.   So Mr. Garafola was and is Facts Technology?

25   A.   Yes.
```

─────────WELCH - DIRECT - MILLER─────────

 1          THE COURT:  Counsel, it's 1:02.  We're going to take

 2    a half an hour for lunch.

 3          Why don't we go ahead and break here, and we will

 4    resume about 1:35-ish and proceed at that time.

 5          MR. MILLER:  Thank you, Judge.

 6          THE DEPUTY COURT CLERK:  All rise.

 7          (Luncheon recess is taken at 1:02 p.m.)

 8          THE DEPUTY COURT CLERK:  All rise.

 9          (Open court begins at 1:37 p.m.)

10          THE COURT:  Please be seated.  We are back on the

11    record.

12          Mr. Miller, we are continuing with your examination.

13          MR. MILLER:  Thank you, Judge.

14    BY MR. MILLER:

15    Q.   Mr. Welch, if you could refer back to the declaration of

16    Craig Hilpipre.  I believe it's designated as 21.

17          Let me know when you're there?

18    A.   I've got it.

19    Q.   If you go into the email that is attached as an exhibit

20    to that declaration.  Starting at Bates stamp Sandhills

21    PI-446.

22          Let me know when you're there?

23    A.   I'm there.

24    Q.   That's the email from Facts Technology to Mr. Hilpipre,

25    correct?

WELCH - DIRECT - MILLER

1   A.   Yes.

2   Q.   Can you read what is being presented in that solicitation

3   beginning from where it says AuctioneerFacts and beneath that?

4   A.   "Larry Garafola, CEO of Facts Technology and the founder

5   of Equipmentfacts has set out to change the online auction

6   industry by the release of AuctioneerFacts."

7   Q.   So, do you have any reason to understand why

8   Mr. Garafola -- and this is you as a reviewer of the email --

9   is otherwise referring to Equipmentfacts in his solicitation

10  of a Sandhills' customer?

11  A.   No.  It would cause confusion for me as well.

12  Q.   Now, Mr. Welch, you said you negotiated with Mr. Garafola

13  in terms of the purchase of Equipmentfacts, correct?

14  A.   Yes.

15  Q.   And he successfully up bid you in terms of the purchase

16  price?

17  A.   Yes.

18  Q.   And in your experience with Mr. Garafola as an employee

19  of Equipmentfacts, did you form any opinions as to

20  Mr. Garafola in terms of his business acumen, his desire to

21  earn money, or any of those indicia?

22  A.   Yes, he was very money-motivated.

23  Q.   Fast forward to Facts Technology.  Have you seen any of

24  the advertisements or communications to the public from Facts

25  Technology that describes how at least some of its brands are

WELCH - DIRECT - MILLER

1   going to price out the market?

2   A.   Yes.

3   Q.   And speaking of, in particular, AuctioneerFacts, did it

4   have some -- a communication that it was offering up its

5   service for a one-time fee?

6   A.   Yes.

7   Q.   And that there weren't going to be commissions paid in

8   terms of that?

9   A.   Correct.

10  Q.   Do you think Mr. Garafola was going to be receiving

11  compensation as a result of those potential one-time fees?

12  A.   Yes.

13  Q.   Were you aware that Mr. Garafola submitted in this case a

14  letter, an objection to a request to extend the TRO that said,

15  words to the effect, that if the TRO is in place as is or

16  expanded then Mr. Garafola will not be able to continue

17  earning a living.

18       Are you aware of that?

19  A.   Yes.

20  Q.   Does that give to you any belief as to whether

21  Mr. Garafola has business other than Facts Technology?

22  A.   Yeah, he probably doesn't.  This is the way he would make

23  a living.

24  Q.   We've talked about solicitations.  We've talked about

25  competition.  Has Sandhills actually lost customer

WELCH - DIRECT - MILLER

1   relationships?

2   A.   Yes.

3   Q.   Can you tell the Court what relationships you've lost?

4   A.   Permian being one.  Superior Auctions being another.

5   Q.   Permian, in a rolling 12-year lookback -- or 12-month

6   lookback, what was Sandhills' gross revenues from that

7   account?

8   A.   Approximately, a little more than $147,000.

9   Q.   Permian's no longer an account with Sandhills, correct?

10  A.   Correct.

11  Q.   And Permian is an account with Facts Technology, correct?

12  A.   Yes.

13  Q.   Superior was a Sandhills' customer?

14  A.   Yes.

15  Q.   And did Superior leave Sandhills?

16  A.   Yes.

17  Q.   Did they open up an account or relationship with Facts

18  Technology?

19  A.   Yes.

20  Q.   Does Sandhills have any of that relationship, that is,

21  the Superior relationship today?

22  A.   No.

23  Q.   Same analysis, 12-month lookback in terms of gross

24  revenue for Superior, how much was that?

25  A.   A little over $136,000.

WELCH – DIRECT – MILLER

1   Q.   In your experience, doing those historic lookbacks,

2   year-over-year, was the revenue, gross revenue, about the same

3   for those accounts?

4   A.   Looking at it, that was the time that they were in

5   business, was pretty much the one year.

6   Q.   Fair point.  And, you know, let's talk about that.

7        Were you aware of Mr. Enos, in terms of Permian, having

8   submitted a declaration in this case?

9   A.   Mr. Dyess?

10  Q.   I mean, Dyess, rather.  Yes.

11  A.   Yes.

12  Q.   And Mr. Dyess is the owner of Permian?

13  A.   Yes.

14  Q.   And Mr. Dyess took issue with certain statements in your

15  declaration about the length or the duration of the

16  relationship you had?

17  A.   Yes.

18  Q.   Do you recall that?

19  A.   Yes.

20  Q.   Do you have a recollection of what Mr. Dyess said?

21  A.   That he didn't view the term as a lengthy relationship.

22  Q.   And do you disagree with that?

23  A.   Yes.

24  Q.   Why?

25  A.   They have only been in a business for about 18 months and

WELCH - DIRECT - MILLER

1    they started with us, so it was the life of the business.

2    Q.   So you had a relationship since that company existed?

3    A.   Yes.

4    Q.   From its birth to whatever stage it is right now?

5    A.   Yes.

6    Q.   Do you have a recollection of Mr. Dyess having put in his

7    declaration that he did not -- or rather Mr. Garafola did not

8    solicit Permian's business?

9    A.   Yes.

10   Q.   Does that matter to you?

11   A.   No.

12   Q.   Why not?

13   A.   Because according to the Purchase Agreement and the

14   covenants in that, he's not to do business with any of

15   Sandhills' or Equipmentfacts' customers.

16   Q.   And is that related to the Purchase Agreement or the

17   employee non-solicitation?

18   A.   The employee non-solicitation.

19   Q.   Doing business with?

20   A.   Yes.

21   Q.   His declaration concedes that there is a business

22   relationship between Permian and Facts Technology, correct?

23   A.   Yes.

24   Q.   That's doing business "with," in your estimation?

25   A.   Yes.

WELCH - DIRECT - MILLER

1    Q.   Now, other than the monetary loss, which is significant,

2    it's about what, over $300,000 lost gross revenue?

3    A.   Close to 300,000, yes.

4    Q.   Non-monetary harm that you suffered, let's stay specific

5    to Permian and Superior.  Have you lost anything other than

6    the revenue that was generated from those accounts?

7    A.   It's hard to know what all we lost.

8    Q.   And why is that?

9    A.   A lot of our business comes from word of mouth, so the

10   fact that they're no longer doing business with us and we

11   can't use that to leverage with other relationships and

12   potentially build upon, that's concerning.

13   Q.   And tell me this -- stay first with Permian.

14        Was that an account in existence at the time that

15   Sandhills acquired Equipmentfacts?

16   A.   No.

17   Q.   So that became an account after Equipmentfacts was

18   purchased?

19   A.   Yes.

20   Q.   And that was as -- in connection with Mr. Garafola's

21   employment with Equipmentfacts and Sandhills, correct?

22   A.   Yes.

23   Q.   What about Superior, was it an existing client at the

24   time of the purchase?

25   A.   No.

WELCH - DIRECT - MILLER

1    Q.   Did it come with Equipmentfacts?

2    A.   Yes.

3    Q.   And you paid some amount -- amounting in total to

4    $1.5 million for that relationship?

5    A.   Yes.

6    Q.   And you've now lost that relationship?

7    A.   Yes.

8    Q.   Let's talk about -- you said you lost potential referral

9    sources from losing Superior and Permian, correct?

10   A.   Yes.

11   Q.   You've testified about customers that have made

12   complaints or raised issues about the solicitations they

13   received, correct?

14   A.   Yes.

15   Q.   Non-monetarily, in your opinion as a person that's

16   operating the online auction business for Sandhills, have you

17   lost anything as a result of those solicitations and the

18   conversations you and your sales staff had to have with those

19   customers?

20   A.   It has harmed the reputation.

21   Q.   In what respect?

22   A.   People are wondering what's going on.  Some people are

23   wondering whether it's a part of Sandhills.  Some people are

24   wondering what happened between you and Superior.  I mean,

25   there's all kinds of things that are going on.

WELCH - DIRECT - MILLER

1  Q.  And as part of the acquisition of Equipmentfacts, it's

2  specifically referred to in the documents a phrase called

3  "goodwill."  Are you familiar with that term?

4  A.  Yes.

5  Q.  Now, the longstanding relationships that Equipmentfacts

6  and Mr. Garafola had otherwise created at Equipmentfacts, you

7  were buying that relationship, correct?

8  A.  Yes, correct.

9  Q.  And in the contemplation of the purchase and the

10  relationships you were getting with Equipmentfacts, did

11  Equipmentfacts have a reputation in the industry?

12  A.  Yes.

13  Q.  And what kind of reputation did it have?

14  A.  They had a reputation as a pioneer in the online auction

15  business.

16  Q.  And had there been a negative connotation to it, would

17  you have consummated the deal?  That is negative connotation

18  to Equipmentfacts' reputation, would you have gone forward

19  with the deal?

20  A.  No.

21  Q.  So you bought what was an existing -- a positive

22  relationship that now got switched on you by virtue of the

23  solicitations that Facts Technology is creating a conversation

24  with your customer, "what's going on"?

25  A.  Yes.

WELCH - DIRECT - MILLER

```
 1   Q.   And as I think you testified before, as opposed to

 2   getting new business in those discussions, you're having to

 3   try to retain that business?

 4   A.   Yes.

 5   Q.   Explain what happened to you guys at the split up?

 6   A.   Yes, correct.

 7   Q.   My words, but you agreed, that it was having to do with

 8   the aired laundry?

 9   A.   Correct.

10   Q.   Now, it's evident now, by your recall, by the information

11   you'll be able to give, you've been involved with this

12   litigation for a while, correct?

13   A.   Correct.

14   Q.   Acquisitions, you have been involved with approximately

15   how many?  Business acquisitions?

16   A.   About six.

17   Q.   Is this litigation impacting your view as to how you're

18   approaching potential business acquisitions in the future?

19   A.   Yes.

20   Q.   How?

21   A.   I'm concerned that we could be in the same situation

22   again.

23   Q.   And what -- in that regard, what are you looking for?

24   Why are we here today?

25   A.   I just want Larry to abide by the covenants of the
```

1  agreement.  And if those can't be enforced, then it makes me

2  question on going forward with future acquisitions.

3  Q.  And you paid good money for those assurances, those

4  covenants, correct?

5  A.  Yes.

6       MR. MILLER:  Judge, I have no further questions.

7       THE COURT:  Mr. Farsiou.

8       MR. FARSIOU:  Just give me one second, Judge.

9  CROSS-EXAMINATION BY MR. FARSIOU:

10  Q.  Mr. Welch, good afternoon.  We've never met before,

11  correct?

12  A.  Correct.

13  Q.  Now, you said you've been employed with Sandhills since

14  2005?

15  A.  Yes.

16  Q.  Do you have a law degree?

17  A.  No.

18  Q.  You're not a lawyer, right?

19  A.  No.

20  Q.  Now, who's sitting to the right of Mr. Miller?

21  A.  Sandhills' in-house counsel.

22  Q.  He's a lawyer, right?

23  A.  Yes.

24  Q.  But the negotiation of the contract, the language

25  negotiations, everything that had to do with the Asset

WELCH - CROSS - FARSIOU

```
 1  Purchase Agreement, the Employment Agreement, and the various

 2  non-restrictive covenants that we talked about, you

 3  negotiated, correct?

 4  A.   That's not correct.

 5  Q.   That was your testimony earlier, wasn't it?

 6  A.   I was part of the negotiations, but there was also

 7  attorneys involved.

 8  Q.   Okay.  So were you the person who specifically negotiated

 9  the monetary amount?

10  A.   Yes.

11  Q.   Okay.  So Mr. Essay had nothing to do with that?

12  A.   No.

13  Q.   Okay.  Now, with respect to what you just testified,

14  because this is what we're really here for, a preliminary

15  injunction that details what type of losses that you have,

16  damages.

17      Now, I just want to make sure that I'm correct.  You have

18  testified that Permian is a customer that you lost, correct?

19  A.   Yes.

20  Q.   And you believe that you directly lost Permian because of

21  Mr. Garafola, correct?

22  A.   Yes.

23  Q.   And by the way, you testified that you saw Mr. Dyess's

24  certification in this case, right?

25  A.   Yes.
```

─WELCH - CROSS - FARSIOU─

1    Q.   Okay.  He didn't -- do you know what technology he uses

2    for his company?

3    A.   If you got a copy of the document with that, I'd like to

4    see the headings --

5    Q.   It's not in the document.  If I told you that he uses

6    ProxiBid, would that surprise you?

7    A.   No.

8    Q.   ProxiBid is a direct competitor of Sandhills; isn't that

9    right?

10   A.   Yes.

11   Q.   In fact, there's not a very good relationship there, is

12   there?

13   A.   With ProxiBid?

14   Q.   Correct?

15   A.   No, it's fine.

16   Q.   That's your testimony?

17   A.   Yes.

18   Q.   Okay.  So, with respect to Permian, you lost that client,

19   and I believe you said that you believe it would be around

20   $147,000.  Is that what you're saying?

21   A.   Yes.

22   Q.   And Superior -- is it Superior Options?

23   A.   Auctions.

24   Q.   I thought it was Options.  Auctions.  Okay.

25        You're claiming that you lost their business; is that

WELCH - CROSS - FARSIOU

 1  right?

 2  A.   Yes.

 3  Q.   And you believe that Superior is doing business with

 4  Mr. Garafola?

 5  A.   At one time, yes.

 6  Q.   They're not doing business with Mr. Garafola currently,

 7  are they?

 8  A.   I'm not sure on that.

 9  Q.   Okay.  And again, you said that you lost $136,000; is

10  that correct?

11  A.   Yes.

12  Q.   Those are monetary damages, right?

13  A.   Yes.

14  Q.   You're not claiming that in this preliminary injunction,

15  are you?

16  A.   This preliminary injunction is about the covenants and

17  the TRO.

18  Q.   Well, the preliminary injunction's about what irreparable

19  harm Sandhills has suffered.  And one thing that they don't

20  look at is monetary damages.  That's something that you can

21  recoup in a lawsuit, are you aware of that?

22  A.   Yes.

23  Q.   So, can you tell me -- just so I'm clear and so the judge

24  is clear, the monetary amounts that you just brought up, you

25  would agree with me, they would not pertain to a preliminary

WELCH - CROSS - FARSIOU

1    injunction, right?

2    A.    No, I think they pertain to a preliminary injunction.

3    Q.    Why is that?

4    A.    Because it shows what he's -- how he's damaged our

5    company.

6    Q.    Monetarily, correct?

7    A.    And why he shouldn't be contacting our customers.

8    Q.    Monetarily, correct?

9    A.    Yes, monetarily.

10   Q.    Okay.  So, with respect to what you said your irreparable

11   harm is, you said "hard to know," right?

12   A.    Yup.

13   Q.    Okay.  As you sit here today, on February 6th of 2020,

14   you have no idea, no hard concrete evidence as to what

15   non-monetary damages Sandhills has; isn't that correct?

16   A.    Well, I do have -- I saw our whole bidder list go out the

17   door with Mr. Garafola.  That's the lifeblood of our company.

18   Q.    It's interesting that you brought that up.  I obviously

19   didn't see those documents until last night, so I'm not going

20   to ask you questions about that because I'm going to reserve

21   on it.

22        But my question to you is and without -- and I don't

23   think I'm waiving this Judge, he just asked the question about

24   the grid, can I ask him a question about it?

25        Those -- I think you said manuals, right?

WELCH - CROSS - FARSIOU

1    A.   No, I was talking about the bidders.

2    Q.   Okay.  So the bidders were in the -- were in these emails

3    that were provided to me last night, right?

4    A.   Yes, there was the email with the top bidders, and then

5    there was also the email with the oil field bidders.

6    Q.   How long have you had that evidence at your disposal for

7    this case?

8    A.   I can't say I'm sure.

9    Q.   It wasn't last night, was it?

10   A.   Not to my knowledge, no.

11   Q.   Well, you would have had that when you filed the first

12   lawsuit against Mr. Garafola, correct?

13   A.   I'm not sure.  Probably.

14   Q.   Well, are you aware that Sandhills has a lawsuit against

15   Mr. Garafola, Marlene Greene, Bidfacts, and Bidpath?

16   A.   Yes.

17   Q.   Okay.  So those were the documents that you were basing

18   that lawsuit off of it, isn't it?

19   A.   Yes.

20   Q.   So you had.  You had them -- you had them back in July

21   and August, right?

22   A.   August, yeah.

23   Q.   Now -- and that would, by the way, that would go with

24   respect to the entire package that was provided to me last

25   night, correct?

WELCH - CROSS - FARSIOU

1   A.   From what I understand there was a negotiation on whether

2   those would be sealed or not, which is what the holdup was.

3   Q.   That's what you think the holdup was?

4   A.   Yes.

5   Q.   Okay.  Again, you have activity and involvement in both

6   lawsuits, correct?

7   A.   Yes.

8   Q.   In the first lawsuit, there was a confidentiality order

9   that was entered, wasn't there?

10  A.   I believe so.  Not sure but...

11  Q.   Okay.  If there was one, you would have produced the

12  documents, right?  Do you know that or no?

13  A.   I'm not sure on that one.

14  Q.   Okay.  So with respect to what you testified as to

15  non-monetary damage, you said "you don't know," "it's hard to

16  tell," and basically you said you had customer complaints,

17  right?

18  A.   Yes.

19  Q.   Now, you also talked about there was confusion, correct?

20  A.   Yes.

21  Q.   Now, Mr. Garafola had an email address when he was

22  working for Sandhills and running Equipmentfacts, correct?

23  A.   Yes.

24  Q.   What was the email?

25  A.   Larry@equipmentfacts.com.

WELCH - CROSS - FARSIOU

1    Q.   Okay.  And, in fact, all of his company, meaning all of

2    his people that he brought to Sandhills, all of them had the

3    same email address, correct?

4    A.   Yes.

5    Q.   There's not anybody outside of the New Jersey office that

6    had a different email address; is that right?

7    A.   Correct.

8    Q.   So all of those people had an equipmentfacts.com email

9    address?

10   A.   Yes.

11   Q.   Anybody outside of the New Jersey office would not have

12   had that email address?

13   A.   That's not true.  There's employees in Lincoln that would

14   have that email address as well.

15   Q.   Who would they be?

16   A.   Colton Rush.

17   Q.   Who is Colton Rush?

18   A.   He's a sales rep -- or a representative for Sandhills in

19   Lincoln.

20   Q.   Okay.  Was he directly the liaison to Equipmentfacts?

21   A.   No.

22   Q.   What was his role?

23   A.   He was a clerk.  He was underneath Larry.

24   Q.   Okay.  So he was doing Equipmentfacts work?

25   A.   Yes.

WELCH - CROSS - FARSIOU

1   Q.   So, by the way, those email addresses, are they still

2   alive?

3   A.   Not -- there may be a couple that are still forwarded if

4   there's any emails received, but not live as in people sending

5   out emails from them.

6   Q.   If I was to send an email to his -- Mr. Garafola's

7   equipmentfacts.com email address, would it go through?

8   A.   It would go through, yes.

9   Q.   Yeah.  You'd get that, right?

10  A.   Yes.

11  Q.   Now, do you think that's confusing for people who may be

12  customers of Sandhills?

13  A.   No, they're not being responded to.

14  Q.   Okay.  But you're monitoring the emails, right?

15  A.   Yeah.

16  Q.   And these people think that Larry still works there,

17  right?

18  A.   I can't speak to whether -- I can't speak to whether

19  that's what they think or not.

20  Q.   Well, you've testified today about a lot of things about

21  what you think other people thought.

22       So you don't have any opinion today on this question as

23  to whether or not people who send an email to Larry's email

24  address at Equipmentfacts would know that they're sending an

25  email to Larry or that Larry's already gone?  You have no

WELCH - CROSS - FARSIOU

1   opinion on that?

2   A.   I'm not going to speculate on what somebody thinks when

3   the send an email --

4   Q.   Now you're not going to speculate, right?  That's your

5   testimony?

6   A.   Correct.

7   Q.   Okay.  Now, with respect to basically harm to reputation,

8   as you testified, you've indicated two clients that you

9   believe that you lost, and you indicated to the Court what the

10  monetary damages would be, right?

11  A.   Yes.

12  Q.   Okay.  And other than that, there's nothing else, is

13  there?

14  A.   There's more.

15  Q.   Oh, there's more.  Well, I'm just -- your testimony, I

16  wrote down.  Okay.  And you said "hard to know."

17       And, essentially, would you agree with me, that this

18  temporary restraining order was filed out of fear?  You didn't

19  know what type of damage your reputation had incurred, right?

20  A.   Larry was soliciting our customers, that's the reason for

21  the TRO.  We didn't want anymore damages to occur.

22  Q.   Okay.  Mr. Welch, you would agree with me that Sandhills

23  is a billion-dollar company, right?

24  A.   I don't have any clue as to what the financials would

25  look like for Sandhills.

WELCH - CROSS - FARSIOU

1   Q.   Have you seen the papers that have been filed in this

2   case?

3   A.   Yes.

4   Q.   And did you ever see a submission where it was indicated

5   that Sandhills -- and I have to go find it now -- but

6   Sandhills had grossed approximately $2.9 billion in the year

7   2018?

8   A.   Do you have the email?  Could I see it?

9   Q.   Sure.  Give me one second.

10       I want to make sure I am clear.  It's not an email.  It's

11  on your website.  If you go to the website -- let me just ask

12  you this.

13       What is prnnewswire.com/news-releases?  Do you guys put

14  out or publish articles about your company on that site?

15  A.   That would be a press release, yes.

16  Q.   If a press release said that the PR Newswire reported

17  that in 2018 Sandhills had a record-breaking year wherein it

18  exceeded $2.93 billion in gross merchandise value, does that

19  sound familiar?

20  A.   Oh, can I actually see it?

21  Q.   It's just a brief.  I don't have the website on me?

22  A.   What you're referring to, it's not our revenue.

23  Q.   I didn't say that.

24  A.   You just called us 2. -- you said we were a

25  billion-dollar industry or a billion-dollar company.  That's

WELCH - CROSS - FARSIOU

1   not our revenue.  We make a commission fee on what's listed on

2   our sites.  That's not even close to our revenue.

3   Q.   How about this.  Is Sandhills -- it's Sandhills Global,

4   right?

5   A.   Sandhills Global, yes.

6   Q.   What was the name before that?

7   A.   Sandhills Publishing.

8   Q.   And why did you come to Sandhills Global?

9   A.   Why did I come to Sandhills Global?

10  Q.   No.  Are you representing Sandhills?

11  A.   Yes.

12  Q.   How did Sandhills come to Sandhills Global?

13  A.   As a name?

14  Q.   Yes.

15  A.   Because we're doing business internationally.

16  Q.   That's the reason?

17  A.   Yes.

18  Q.   Okay.  And did you get that idea from Marlene Greene?

19  A.   No.

20  Q.   That was something that you guys came up with, right?

21  A.   Yeah.

22  Q.   So, let me ask you this, is Sandhills, is it a

23  multimillion-dollar company?

24  A.   Like I said, I don't want to speculate on our revenue.  I

25  would assume that it is probably a multimillion-dollar

WELCH - CROSS - FARSIOU

```
 1   company.
 2   Q.   You're the big dog on the block, aren't you?
 3   A.   I'm the director of new product sales.  I oversee a
 4   portion of the Sandhills business.
 5   Q.   Would you agree with me that Sandhills, in the auction
 6   industry, is the big dog on the block?
 7        Would you agree with that?
 8   A.   It's got several competitors in the market.  I would
 9   probably argue that Proxibid and Sandhills are the -- are two
10   of the larger ones, as well as Ritchie Bros.  There's several.
11        In fact, Ritchie Bros. is a $5.5 billion company so...
12   Q.   Well, how do you know that?
13   A.   Because it's publicly available on their website.
14   Q.   So you know how much they're worth, but you don't know
15   what Sandhills is worth?
16   A.   They're a publicly traded company.
17   Q.   Okay.  So, as you sit here today, you've worked for
18   Sandhills since 2005.  You have no idea what the company
19   makes?
20   A.   No.  We're a privately held company, family-owned.  So
21   they keep that stuff very close.  So, no, I don't know what
22   we're worth.
23   Q.   You have no idea?
24   A.   No.
25   Q.   Okay.  Now, again, I want to go back to the non-monetary
```

WELCH - CROSS - FARSIOU

1    issues.

2        You said you had complaints, customer complaints.  Those

3    customer complaints were from the previous affidavits that

4    were provided, correct?

5    A.   Yes.

6    Q.   You haven't had any of those, have you, lately?

7    A.   No.

8    Q.   And again, you haven't lost any customers other than what

9    you just testified to?

10   A.   Not that I'm aware of.

11   Q.   Okay.  You don't have any evidence today for the judge to

12   consider as to whether or not you lost any other customers

13   other than the two that you just indicated to?

14   A.   Like -- okay.  There's also the issue of doing business

15   with customers that we're also doing business with.  So, it

16   gets -- it's impossible to put a number figure, a dollar

17   figure on this amount because if Larry and Proxibid and us are

18   all providing online bidding services, we eat out of each

19   other's, so if there's three providers at an auction, each one

20   of the providers is going to get less revenue from him.  So

21   just simply by doing business with auctioneers that we're

22   doing business with, that takes away from us.

23   Q.   You would agree with me that when Mr. Garafola was

24   working for Sandhills, he was dealing with online auctions,

25   correct?

WELCH - CROSS - FARSIOU

1   A.   Yes.

2   Q.   He was dealing with live auctions online, right?

3   A.   Timed auctions, as well.

4   Q.   How many timed auctions did he perform?

5   A.   Nobody performs a timed auction.  It's done by the

6   computer.

7   Q.   How many timed auctions, sir, do you think he was

8   involved in?

9   A.   Well, he was -- he did lots of timed auctions prior to

10  acquisition.  When it got brought internal, Equipmentfacts, we

11  took the timed auctions, put those on the AuctionTime

12  platform, and he was instrumental in getting Ryan Auctions to

13  try AuctionTime.

14  Q.   Mr. Welch, does -- am I correct in that -- well, you know

15  what.  Hold on a second.

16       You were shown a couple documents with respect to the

17  non-competes, the APA, right?

18       Do you remember seeing those?

19  A.   Yes.

20  Q.   There was a document that you weren't shown.  There was

21  an Employment Agreement that was provided to Mr. Garafola,

22  correct?

23  A.   Yes.

24  Q.   And that Employment Agreement, you would agree with me,

25  was part and parcel with the Purchase Agreement, right?

WELCH - CROSS - FARSIOU

1  A.   It was separate from the Purchase Agreement.  It was an

2  Employment Agreement, so it was separate.

3  Q.   Is the Employment Agreement mentioned in the APA?

4  A.   Yes, I believe so.

5  Q.   Okay.  And weren't there discussions with Mr. Garafola as

6  to how this purchase was going to take place, right?

7  A.   Yes.

8  Q.   You remember having those discussions, right?

9  A.   Yes.

10  Q.   Part of the discussion was, what's going to happen,

11  Larry, is you're going to basically -- we're going -- you're

12  going to have an Asset Purchase, but everything is going to

13  stay the same, right, didn't you say that to him?

14  A.   Yes.  With the exception of we would handle the sales

15  side.

16  Q.   Well, you told him that you're going to be an employee.

17  We're going to give you a two-year contract --

18  A.   It was going to be a three-year contract --

19  Q.   Excuse me.

20       THE COURT:  Wait.  Wait.  Wait until the question is

21  fully posed.

22  Q.   We're going to negotiate a base salary, right?  All that

23  stuff, right?

24  A.   Yes, correct.

25  Q.   So, if -- you don't have any idea if Mr. Garafola would

WELCH - CROSS - FARSIOU

1   have sold the business for 1.5 million if he wasn't going to

2   be employed with Sandhills, do you?

3   A.   I don't -- I don't want to speculate on whether he would

4   or wouldn't.

5   Q.   Okay.  So again, that's something you wouldn't speculate

6   on, right?

7   A.   No.

8   Q.   Now, by the way, when you say that Permian left --

9   specifically left Sandhills, you're blaming Mr. Garafola for

10  that, right?

11  A.   Yes.

12  Q.   You did not have any conversations with anybody at

13  Permian about why they left, did you?

14  A.   No.

15  Q.   Okay.  And that is you speculating as to why Permian left

16  Sandhills; isn't that correct?

17  A.   They left and moved over to that platform, which is why

18  we made that assumption.

19  Q.   Okay.  You're speculating, right?

20  A.   We saw them move their business from Equipmentfacts to

21  OilfieldFacts.

22  Q.   What platform are you talking about?

23  A.   OilfieldFacts.

24  Q.   What's that?

25  A.   Well, Bidpath to start with -- Bidfacts to start with,

WELCH - CROSS - FARSIOU

1   and then ultimately OilfieldFacts.

2   Q.   Okay.  You're saying Permian went to Bidfacts?

3   A.   Bidfacts, yes.

4   Q.   Okay.  Now, as you sit here today, do you know whether or

5   not Mr. Garafola ever worked for Bidpath or Bidfacts?

6   A.   All I know is that by the email correspondence, the email

7   said that Larry was setting up a business, Bidfacts, in

8   conjunction with Marlene Greene and Bidpath.

9   Q.   Well, why don't we look at that document that's been

10   discussed.  Let me see if I can -- we killed a lot of trees

11   here today.  Hang on a second.

12       What you're talking about is the -- I believe -- take a

13   look at P-6.

14       Is that the document you're talking about?

15   A.   Yes.

16   Q.   Now, before we get into P-6, BidCaller, what is

17   BidCaller?

18   A.   BidCaller is a software that now runs Equipmentfacts.

19   Q.   But BidCaller was -- well, prior to this purchase of

20   Equipmentfacts, aren't I correct that Sandhills was doing

21   timed auctions and attempting to do live auctions through

22   BidCaller?

23   A.   We weren't doing timed auctions on BidCaller.

24   Q.   I didn't say that.

25   A.   You said timed auctions.  Oh, we were doing simulcast

WELCH - CROSS - FARSIOU

 1   auctions on BidCaller, yes.

 2   Q.   You would agree with me that a timed auction is different

 3   than a live auction?

 4   A.   Ah, yes.

 5   Q.   Okay.  And my question was, Sandhills was doing -- the

 6   majority of their work was timed auctions, correct?

 7   A.   Not necessarily, no.

 8   Q.   Well, you were attempting to do live auctions through

 9   BidCaller, right?

10   A.   Yes.

11   Q.   Okay.  And it wasn't doing very well, was it?

12   A.   No, it was doing pretty well.  Yeah.

13   Q.   So why do you -- if it was doing so well, why did you

14   want to purchase Equipmentfacts from Mr. Garafola?

15   A.   It was a natural fit.  We were stronger in the farm

16   market, they were stronger in the construction and truck

17   market.

18   Q.   Okay.  And Equipmentfacts was only doing business in the

19   truck and heavy machinery industry; isn't that correct?

20   A.   No, that's not true.

21   Q.   That's not true.  Okay.  But that's what you wanted him

22   for, right?

23   A.   That's where they were the strongest, yes.

24   Q.   And so, you needed them -- when they came over, did you

25   use BidCaller?

WELCH - CROSS - FARSIOU

 1    A.    Yes.

 2    Q.    You did?

 3    A.    Eventually, yes.

 4    Q.    No.  No.  I asked you, "when they came over," were you

 5    using BidCaller?

 6    A.    Yes.

 7    Q.    Okay.  At some point you canned BidCaller, didn't you?

 8    A.    No.

 9    Q.    Okay.  You didn't use Bidpath?

10    A.    We also used BidCaller.  We kept the system's different

11    for a time, so BidCaller continued to function as is, as did

12    Equipmentfacts continue to function as is.  During the time

13    from acquisition to ultimately April of 2019, Mr. Garafola was

14    instrumental in developing the BidCaller software to the point

15    where we were comfortable with then taking the brand BidCaller

16    and making it Equipmentfacts and having BidCaller be the

17    engine to run Equipmentfacts as one entity versus the two

18    separate entities ultimately replacing Bidpath.

19    Q.    Let me back up.  When you purchased Equipmentfacts, there

20    was a specific reason why you wanted Equipmentfacts and that

21    was because they were very good in the construction and truck

22    industry, right?

23    A.    That's one of the reasons.  They were also very good at

24    clerking auctions in general, so there was a definite

25    knowledge that we could pull from.

WELCH - CROSS - FARSIOU

1   Q.   When Equipmentfacts came over, did you use -- did

2   Equipmentfacts use BidCaller at that time?

3   A.   Equipmentfacts used Bidpath at that time.

4   Q.   Thank you.  So BidCaller wasn't being used by

5   Equipmentfacts, was it, at that time?

6   A.   It was -- no.

7   Q.   And what you guys -- you also told Mr. Garafola and his

8   people, that you wanted to learn from them as to how they were

9   doing these live auctions and how they were generating the

10  business and doing these auctions, right?

11  A.   We wanted to learn, yes, how they conducted the auctions,

12  correct.

13  Q.   And for months, you guys were learning from Mr. Garafola,

14  right?

15  A.   Yes.

16  Q.   And now, this was -- obviously, the documents indicate it

17  was July 16th of 2018 on the purchase.  You remember that in

18  and around April 29th of 2019, you guys, Sandhills, made the

19  decision that we're getting rid of Bidpath, right?

20  A.   We made the decision long before that.  Larry was a part

21  of that decision.

22  Q.   Larry's not going to testify to that, sir.  Larry's going

23  to testify that you guys came to him and said that you guys

24  didn't want to use Bidpath anymore.  You wanted to use

25  BidCaller, right?

WELCH - CROSS - FARSIOU

1   A.   We, in conjunction with Larry, made the decision long

2   before that, and Larry was instrumental in developing

3   BidCaller to ultimately replace an expense, which is Bidpath.

4   Q.   Sandhills, or you, or someone at Sandhills, pulled the

5   trigger on getting rid of Bidpath in April of 2019, in and

6   around that time?

7   A.   Larry actually gave the okay to do so.

8   Q.   Well, Larry told you that he didn't think the software

9   was ready, didn't he?

10  A.   No.

11  Q.   Okay.  And Ms. Greene didn't --

12  A.   After --

13  Q.   Hold on.  Ms. Greene didn't tell you the same thing?

14  A.   After the fact, they did.  But up to and leading to the

15  point where we switched it out, they thought it was good.

16  Q.   So your testimony is going to be that Mr. Garafola and

17  Ms. Greene told you guys -- or you, or whoever, from

18  Sandhills, in and around April of 2019 that, yup, this is a

19  good idea, let's just get rid of Bidpath?

20  A.   I don't know about Marlene, but Larry, yes, was in

21  support of moving away from Bidpath and on to BidCaller, yes.

22  Q.   Am I correct that during those, let's call it 10 months,

23  that Ms. Greene was helping Sandhills with accounting issues

24  with respect to the Equipmentfacts type of program, right?

25  A.   Her role with Equipmentfacts at the time of acquisition

WELCH - CROSS - FARSIOU

1  was with regards to invoicing customers and accounts

2  receivable in general, yes.

3  Q.  But Sandhills had issues in that area for the live

4  auctions when she came over, isn't that right?

5  A.  BidCaller did not have issues.  Equipmentfacts, we needed

6  to meld that into our processes and automate that process.

7  Q.  Okay.  Let's -- I want to show you --

8       MR. FARSIOU:  And, Judge, I have to see if I have an

9  extra copy.  I thought the document was going to be used but

10  it wasn't.

11       Do you have an extra copy of the Employment

12  Agreement?  I guess we'll have this marked D-1.

13  BY MR. FARSIOU:

14  Q.  Have you seen D-1 before?

15  A.  D-1?

16  Q.  Yes, there's a marking on that document.

17  A.  Okay.

18  Q.  You see there at the bottom, it's marked D-1?

19  A.  Yes.  Yes.

20  Q.  Have you seen that document before?

21  A.  Yes.

22  Q.  Okay.  That document is the Employment Agreement that

23  Mr. Garafola was required to sign when he -- when you guys

24  went to your Purchase Agreement, correct?

25  A.  Yes.

WELCH - CROSS - FARSIOU

1   Q.   Okay.  Because if he doesn't sign this Employment

2   Agreement, the whole transaction doesn't go through, does it?

3   A.   The Employment Agreement was actually Larry that

4   negotiated that.

5   Q.   Sir, my question to you is, if the Employment Agreement

6   wasn't signed, the entire acquisition would not have gone

7   through; is that correct?

8   A.   That's not true.

9   Q.   Oh, so you think that Mr. Garafola would have -- or

10  Sandhills wouldn't have signed or agreed to an agreement, do

11  you think the acquisition would have went through?

12  A.   I can't speculate on whether Larry would have gone

13  through with it or not.

14  Q.   Didn't he tell you, sir, that the Asset Purchase

15  Agreement would not go through unless an Employment Agreement

16  was agreed to?

17  A.   I don't recall if that was said or not.

18  Q.   So you have no recollection of that?

19  A.   No.

20  Q.   So -- and it wasn't Sandhills' requirement to have an

21  Employment Agreement?

22  A.   Sandhills' requirement of an Employment Agreement?  No.

23  Q.   I thought you testified earlier that there were things

24  that were required upon purchase and one of them was an

25  Employment Agreement?

WELCH - CROSS - FARSIOU

1   A.   The covenants of the Purchase Agreement were what was

2   required.

3   Q.   So you wanted Mr. Garafola to enter into an Asset

4   Purchase Agreement with restrictive covenants that applied to

5   his employment and the Purchase Agreement, right?

6   A.   No, applied to the Purchase Agreement.  We also do have

7   restrictive covenants that we put forth in place for all of

8   our employees and not all of your employees have employment

9   agreements.

10  Q.   This really is not that hard of a question.

11      Your attorney, or you, someone, this is your document,

12  isn't it?  Mr. Garafola didn't create this document?

13  A.   No, but he negotiated it.

14  Q.   Sir, just answer the question.  He did not create the

15  document; isn't that correct?

16  A.   No, Larry did not create the document.

17  Q.   Okay.  This is a Sandhills' document?

18  A.   That he negotiated, yes.

19  Q.   And that Sandhills required, right?

20  A.   We did not -- we don't require an Employment Agreement.

21  Q.   Now, let's go to -- well, you would agree with me that

22  Sandhills, Mr. Peed, entered into this Employment Agreement,

23  right?

24  A.   Yes.

25  Q.   And there's obligations on both parties' part, right?

WELCH - CROSS - FARSIOU

1    A.   Yes.

2    Q.   Well, it's not a one-sided agreement, right?

3    A.   Right.

4    Q.   So, if you go to Number 3 on page 2, do you see where it

5    says "duties and responsibilities"?

6    A.   Yes.

7    Q.   Now, this document was going to pertain to Mr. Garafola

8    being an employee at Sandhills, right?

9    A.   Yes.

10   Q.   Okay.  So this says -- am I correct, it says, "Garafola

11   shall be employed in the position of manager of auction

12   services or such other position as mutually agreed on by

13   Garafola and the company."

14        Did I read that correctly?

15   A.   Yes.

16   Q.   So he was the manager of auction services, is what you

17   call it, right?

18   A.   The department manager, yes.

19   Q.   Okay.  And he was going to report to you, right?

20   A.   Yes.

21   Q.   And then it says, "A job description of the position is

22   attached hereto as Schedule A and made a part hereof."

23        Do you see that?

24   A.   Yes.

25   Q.   Where is Schedule A?

WELCH - CROSS - FARSIOU

1  A.   I'm not sure.

2  Q.   Schedule A was never prepared, was it?

3  A.   I don't recall whether it was or wasn't.

4  Q.   You don't recall whether or not Schedule A was prepared?

5  A.   No.

6  Q.   Is there a reason why you don't remember that?

7  A.   I don't.

8  Q.   You don't remember Larry coming to you throughout the

9  year saying, "Where is Schedule A"?

10  A.   Not once.

11  Q.   Okay.  You remember that, though, right?

12  A.   No, he never came to me asking for that, no.

13  Q.   You specifically remember that?

14  A.   Yes.

15  Q.   Now, with respect to Schedule A, Schedule A was supposed

16  to have a job description, right?

17  A.   It looks like -- yes.

18  Q.   Sir, this is not the first time you saw this document,

19  right?

20  A.   Nope.

21  Q.   So Schedule A -- wasn't Schedule A also supposed to

22  include Larry's -- besides the job description.  It was

23  supposed to include a commission and bonus structure, wasn't

24  it?

25  A.   No.

WELCH - CROSS - FARSIOU

1   Q.   When Larry agreed to come on to Sandhills, you didn't

2   promise him a bonus or commission structure?

3   A.   No.   Larry negotiated a clause that if revenues of

4   Equipmentfacts increased that he would get a raise based on

5   those increases, which he received on July 14th.

6   Q.   That was based off of his base salary, right?

7   A.   Yes, correct.

8   Q.   So, if Schedule A was never prepared and his job duties

9   were never provided to him in writing, as per this agreement,

10  that part of the agreement had been breached, correct?

11  A.   No, he knew what his job responsibilities were.   They

12  didn't change from the time he came over from Equipmentfacts

13  to when he was running Equipmentfacts for Sandhills.   And his

14  title stayed the same throughout.   I was never asked for a job

15  description by Larry.

16  Q.   Sir, the contract requires Sandhills to provide a

17  Schedule A, does it not?

18  A.   It requires a description of his job duty which he had.

19  Q.   Where was that?

20  A.   He knew what his job duties were.   They didn't change

21  from Equipmentfacts to now.

22  Q.   See, Mr. Welch, that's the problem with this entire case.

23      You guys are taking the position that Larry can't do

24  anything.   Yet, the most important part of his Employment

25  Agreement was never provided to him, which was supposed to

WELCH - CROSS - FARSIOU

 1   specifically provide his job description, and you're saying in

 2   front of this Court that that wasn't important, right?

 3   A.   He knew what his job description was.

 4   Q.   He also knew when you purchased Equipmentfacts his job

 5   wasn't going to change, he was only going to do

 6   Equipmentfacts, right?

 7   A.   No.  All of our products overlap each other.  So just by

 8   the simple fact that he's talking and working with

 9   auctioneers, there's other products that we also offer to

10   auctioneers that come from that.  Naturally, he's going to get

11   pulled into other conversations on other products.

12   Q.   Well, sir, we don't know that because you didn't provide

13   Schedule A?

14   A.   Well, he did that.  He brought customers to us and sold

15   them on other services, so he must have known that.

16   Q.   Oh, he must have known that.  Okay.

17        But you don't think it's important for Sandhills -- by

18   the way, you want Mr. Garafola to not perform any auction

19   services, right?

20   A.   I want him to abide by the covenants of the agreement.

21   Q.   That's not good enough for this hearing.  We need to

22   know.  You just can't leave it out there like that, sir.

23        You do not want Mr. Garafola to perform any online

24   auction services; isn't that correct?

25   A.   Any online auction services in the businesses that we run

WELCH - CROSS - FARSIOU

1    and our affiliates.

2    Q.   Okay.  So, let me ask you a question.  Sandhills is in

3    the meat business, aren't they?

4    A.   Yes.

5    Q.   Okay.  If Larry Garafola says, you know what, I'm buying

6    a cattle farm tomorrow, and I'm going to sell meat across the

7    country, would that be a violation of his non-compete?

8    A.   I don't want to speculate on what this new business would

9    look like.  I don't know without knowing the details of the

10   business whether or not it would compete with us or not.

11   Q.   Okay.  Let's say it's the exact same meat business that

12   Sandhills is involved in.  Is he in violation of the

13   non-compete?

14   A.   He is providing online auction services?

15   Q.   Sir, answer the question.

16   A.   Without knowing that, I can't answer the question.

17   Q.   So, you have no opinion as to whether or not Mr. Garafola

18   says, you know what, I'm going to go buy a cattle farm

19   tomorrow and I'm going to sell meat just like Sandhills does.

20        Is that a violation?

21   A.   Is he selling it through online auction services?

22   Q.   Is that what you guys do?

23   A.   We don't.

24   Q.   Okay.  So he's not doing that, then.  Is it a violation

25   of his non-compete?

WELCH - CROSS - FARSIOU

1   A.   He's not doing what, sorry?

2   Q.   He's not selling it via online auction?

3   A.   Then, no, that's not a competition.

4   Q.   Okay.  What happens if he's doing it by online auction?

5   A.   Yes.

6   Q.   So him selling meat via auction, would be a violation of

7   his non-compete?

8   A.   Online auction services for Sandhills and all of its

9   affiliates.

10  Q.   Okay.  I want the Court to understand what online auction

11  services means.  That means, you're handling the auction for

12  the auctioneer, correct?

13  A.   Whether it be through a timed or an online simulcast

14  auction, yes.

15  Q.   Okay.  The point is an auction services that Sandhills

16  provides is basically you run the auction for the auctioneer,

17  right?

18  A.   Again, not necessarily.  There's times when the

19  auctioneer runs the online auction software.  There's times

20  when we run it for them.  There's times when there's no one

21  running it because it's timed and it's run by the computer.

22  Q.   Well, you'd agreed with me that an online live auction is

23  not a timed auction, right?

24  A.   Yes.

25  Q.   And so, your testimony is that -- I'm trying to

WELCH - CROSS - FARSIOU

1  understand what you think the non-compete is.

2      So, are you saying that anything that has to do with

3  online auctions -- what I mean by that, Mr. Garafola when he

4  worked for Sandhills was handling online auctions and he was

5  handling them for auctioneers who were clients of Sandhills,

6  correct?

7  A.   Yes.

8  Q.   Okay.  And that was the nuts and bolts of the auction,

9  from A to Z.  Meaning, you're handling the inventory, you're

10 handling the marketing, you're handling the advertising,

11 you're running the software for them, correct?

12 A.   Those are components of it.

13 Q.   And he's getting the bidders, right?

14 A.   Those are components of running the action.

15 Q.   Okay.  That's what he was doing for Sandhills, right?

16 A.   It's part of what he was doing for Sandhills, yes.

17 Q.   Does Sandhills license software?

18 A.   In some capacities, yes.

19 Q.   Does Sandhills license software to third-parties and

20 simply just charge a subscription fee?

21 A.   We do.  We have a product called "Fleet Evaluator" that

22 we license.  We have several products that we do license

23 software.

24 Q.   What was the name of it?

25 A.   Fleet Evaluator.

WELCH - CROSS - FARSIOU

1   Q.   Okay.  And I noticed, by the way, that you had brought up

2   HiBid and AuctionFlex in your -- I think you said AuctionFlex,

3   didn't you?

4   A.   Yes.

5   Q.   Okay.  And you said that those were competing with what

6   Mr. Garafola is doing, correct?

7   A.   I didn't mention anything about AuctionFlex, but HiBid,

8   yes.

9   Q.   Well, AuctionFlex and HiBid, during the relevant time

10  period, which means up until the time you terminated

11  Mr. Garafola, they weren't owned -- those two companies

12  weren't owned by Sandhills?

13  A.   Yes, they were.

14  Q.   They were?

15  A.   Yes.

16  Q.   What's 5 Palms, LLC?

17  A.   That's a subsidiary of Sandhills Publishing.

18  Q.   It's a subsidiary?

19  A.   Yes.

20  Q.   Would that -- do you have anything that would prove that

21  they're a subsidiary of that?

22  A.   I'm not an attorney.  I don't know what the corporate

23  structure was, but that's one of our brands and products.

24  Q.   Okay.  So you're saying that the brand HiBid and

25  AuctionFlex, were they on your website in July of 2019?

WELCH - CROSS - FARSIOU

1  A.   I believe so.

2  Q.   You don't know for a fact?

3  A.   I don't know for a fact.

4  Q.   If I told you that they weren't, would that surprise you?

5  A.   Not necessarily.

6  Q.   Well, this is the relevant time period, so that's why I'm

7  asking.

8       So you have no idea whether or not it was on your

9  website?

10 A.   No.

11 Q.   Now, with respect to Mr. Garafola selling licenses for

12 software packages and that's it, he's not doing anything with

13 the auction.  He's not telling the auctioneer to not work with

14 Sandhills.  He's just selling the license software, is that

15 competing with -- is that a violation of the non-competes?

16 A.   Absolutely.

17 Q.   How so?

18 A.   We could just as easily take BidCaller and charge the way

19 that he's charging for it, we choose not to.  But BidCaller is

20 the exact same thing that he's offering if he's selling a

21 license.  We actually do charge an event fee, that is, a

22 license fee for that auction in addition to the commission

23 structure that we charge for the advertising produced by

24 Equipmentfacts.  It's just one component of what we're

25 selling.

WELCH - CROSS - FARSIOU

1  Q.  Well, let me ask you this:  Do you know what a white

2  label means?

3  A.  Yes.

4  Q.  What does it mean?

5  A.  It means that if you go to somebody's website, you

6  can't -- you don't see branding for the third-party vendor.

7  Q.  Sandhills doesn't provide that, do they?

8  A.  Yes, we do.

9  Q.  So your testimony is Sandhills provides software

10  licensing to third-parties, and you let them brand it as they

11  see fit?

12  A.  You asked me if we provided white label solutions.  Yes,

13  we do.

14  Q.  Is the answer to my question yes or no?  I'm not

15  following you.

16  A.  Yes.

17  Q.  It is?

18  A.  White label solutions, yes.

19  Q.  Okay.  And you've been doing that for how long?

20  A.  Years.

21  Q.  Mr. Garafola wasn't doing that, though, was he?

22  A.  When --

23  Q.  That was not part of his duties at Sandhills, was it?

24  A.  Selling white label solutions?

25  Q.  Yeah.

WELCH - CROSS - FARSIOU

1  A.   Yeah, just by simple -- virtue of him working with

2  auction companies, absolutely, that was a part of the

3  business.

4  Q.   All right.  Sir, none of your papers -- by the way,

5  you've reviewed all the briefs that have been filed?

6  A.   Yes.

7  Q.   None of your briefs ever mentioned that.  Is there a

8  reason why?

9  A.   No.

10 Q.   If Mr. Garafola tomorrow says, you know what, I'm just

11 going to -- I'm going to open up a business that I have a

12 rental facility for an auctioneer, is that a violation of the

13 non-compete?

14 A.   A rental facility for an auctioneer?

15 Q.   Yeah.

16 A.   It's not providing online bidding services or online

17 auction services.

18 Q.   He's providing the venue.

19 A.   Are you talking about just like renting a building?

20 Q.   Sure.

21 A.   No, that's not in competition.

22 Q.   Okay.  So he can do that?

23 A.   Yeah.

24 Q.   Okay.  What is it -- is there anything else he can do

25 according to you?

WELCH - CROSS - FARSIOU

1          MR. MILLER:  Objection.

2          THE COURT:  Basis for your objection, Counsel?

3          MR. MILLER:  "Anything else you can do," he didn't

4    tie it to an actual question or a response.  He's now asking

5    Mr. Welch to otherwise speculate about what could Mr. Garafola

6    do that wouldn't be a violation.

7          MR. FARSIOU:  Judge, this entire case is about what

8    they have been speculating -- he's been speculating all day to

9    begin with.  But, two, no one in this room knows what exactly

10   Mr. Garafola is allowed to do.  So I want to hear from

11   Sandhills' witness that had all the communications and

12   negotiated the contracts -- because no one knows what

13   Mr. Garafola is allowed to do.  So I want to hear it from

14   their witness so that we know what their position is.

15         THE COURT:  If you can answer the question, you can

16   answer it.

17         THE WITNESS:  You want me to speculate on what he

18   could do?

19         THE COURT:  If you can answer the question, you can

20   answer it.

21         THE WITNESS:  I can't.  I don't know what he could

22   do.  I don't.

23   Q.  You understand the question?  Here's the question.  I'll

24   rephrase it.  There was a little bit of a delay.

25         My question to you, sir, is:  What is it that

WELCH - CROSS - FARSIOU

1   Mr. Garafola can do with respect to working within the auction

2   industry that would not violate the non-compete?

3   A.   He could go back to what he was doing prior to forming

4   Equipmentfacts, which was buying and selling equipment at

5   auctions.  I have no problem with that.

6   Q.   Okay.  Well, you had a problem with the emails.  I

7   believe it was AuctioneerFacts, right?  You had a problem with

8   that email about his sons, right?

9   A.   Absolutely.

10  Q.   I'm sorry.  Equipment Auctioneer, right?

11  A.   Yes, absolutely.

12  Q.   Sir, Equipment Auctioneer does exactly what you just

13  said.

14  A.   Not at all.  It doesn't do it at all.

15  Q.   How do you know that?

16  A.   Because they're soliciting for our customer to list there

17  equipment on their auction.  I'm saying prior to the

18  acquisition of Equipmentfacts and prior to the formation of

19  Equipmentfacts, Larry bought and sold equipment of his own,

20  paid for and then resold.  That's what I'm saying he can do.

21  Not what they're doing with Equipment Auctioneer.

22  Q.   Sir, that's exactly what his kids are doing.

23  A.   No, it's not.

24  Q.   Exactly what they're doing.

25  A.   They're buying the equipment?

WELCH - CROSS - FARSIOU

1  Q.   They are selling the equipment to certain people.

2  A.   Is it their equipment?

3  Q.   Some are, some aren't?

4  A.   It's, again, they're trying to get consigned equipment

5  from our customers.

6  Q.   Your customers would then sell the equipment on an

7  auction through your platform, sir; isn't that correct?

8  A.   The equipment that the customer owns.  I don't know if

9  you're following me.

10 Q.   Sir, if they bought the equipment, they own it, right?

11 A.   Mr. Garafola or the customer?

12        MR. FARSIOU:  Oh, my God.  Judge, this guy's got to

13 start answering some questions.

14        MR. MILLER:  Objection, Judge.

15        THE COURT:  Counsel, don't address it like that.

16 Let's just keep the questions narrowly tailored.  If you have

17 an objection, put the objection on the record.

18        MR. FARSIOU:  Judge, I want to see if I have some

19 copies of these certifications.

20 Q.   Mr. Welch, you remember you signed several certifications

21 in this case.  Do you remember that?

22 A.   Yes.

23 Q.   And you indicated that in some of these -- I'm just

24 trying to see if I have extra copies.  I may not.  I don't

25 know, Judge, if you want to take a break.

WELCH - CROSS - FARSIOU

```
 1          THE COURT:  What certifications are you referring to?
 2          MR. FARSIOU:  Well, I have -- Mr. Welch has a
 3   certification November 25th.
 4          THE COURT:  Which ones are you going to be asking
 5   questions about right now?
 6          MR. FARSIOU:  I'd like to ask him questions about all
 7   of them.
 8          THE COURT:  November 25th.
 9          MR. FARSIOU:  November 25th, January 22nd, and
10   there's one more.
11          THE COURT:  Mr. Miller, do you have a copy of it?
12          MR. MILLER:  Unfortunately, I don't.
13          THE COURT:  You don't?
14          MR. MILLER:  I do not.
15          THE COURT:  If you can pass it up, we'll get copies.
16          MR. FARSIOU:  I just want to see one thing.
17          I can't find the other one, Judge.  I know I have it
18   here, but -- I believe there's one more.  Here, it is.  Sorry.
19   It's December 23rd.  Judge, this goes to you.
20   BY MR. FARSIOU:
21   Q.  Mr. Welch, I'm going to show you these three documents
22   that have been marked D-2, D-3, and D-4.
23       Do you recall signing certifications in this case?
24   A.  Yes.
25   Q.  Okay.  And in the certifications, you see that there is a
```

WELCH - CROSS - FARSIOU

1  requirement to tell the truth, right?

2  A.   Yes.

3  Q.   And in your declarations, I want to just show you or turn

4  your attention to December 23rd and the January 22nd

5  certifications.  I believe those would be D-3, D-4.

6  A.   Got it.

7  Q.   And on D-3, you see Number 4, it says that, "On Friday,

8  December 20th, 2019, I became aware of defendants' Lawrence

9  Garafola and Facts Technology sending email solicitations to

10  Sandhills' customers after the Court entered its temporary

11  restraining order on December 16th, 2019," right?

12  A.   Yes.

13  Q.   Okay.  And if you go to D-4, you state the same thing in

14  Number 4 essentially, but, you say, "On Monday, January 20th,

15  2020, I became aware..."  And it goes into other things about

16  sending emails solicitations, right?

17  A.   Where on D-4?

18  Q.   Number 4?

19  A.   Number 4, yes.

20  Q.   Now, you testified earlier that Sandhills provides an

21  email hosting system, right?

22  A.   Yes.

23  Q.   And if I'm correct, the email hosting system is,

24  essentially, you are hosting the system for an auctioneer

25  company; is that correct?

─────────── WELCH - CROSS - FARSIOU ───────────

1   A.   Correct.

2   Q.   And, basically, can you tell the Court, are you -- you

3   are -- how does that work when you're hosting the email

4   system?  What do you do for the client?

5   A.   We have a database -- a datacenter in Lincoln, Nebraska,

6   as well as redundant datacenter in Scottsdale, Arizona where

7   we host the email, as well as provide services, such as,

8   cybersecurity, things of that nature.

9   Q.   Okay.  Well, the point of the -- by the way, how long has

10  Sandhills been in the email hosting business?

11  A.   As long as I've been employed.  So 15-plus years.

12  Q.   Okay.  Part of the email hosting system is to let clients

13  know that their privacy is going to be protected, right?

14  A.   No, I don't think we've ever had that in any sales

15  material.

16  Q.   So when you host someone's email, you're not telling them

17  that their emails are going -- they're going to be

18  protected -- their privacy is going to be protected?

19  A.   No.  In fact, one of the things that they like about it

20  is that if we need to recover emails for them, we're able to

21  do so.

22  Q.   What would that have to do with any privacy issue?

23  A.   Just that we can make -- we can go find emails that they

24  need to find.

25  Q.   Okay.  What does that have to do with privacy issues of

WELCH - CROSS - FARSIOU

1   the client?

2   A.   Nothing.

3   Q.   You're hosting their system so they're giving you access

4   to it, right?

5   A.   Yes.

6   Q.   And you're hosting it for them, for their services, for

7   their benefit, right?

8   A.   Yes.

9   Q.   It's not for the benefit of Sandhills, right?

10  A.   No.

11  Q.   Okay.  So when you say -- what I'm interested to know is

12  that when you say "you became aware in your certifications,"

13  you became aware -- the client didn't contact you and tell you

14  that they got an email from Mr. Garafola, did they?

15  A.   No.

16  Q.   What happened was Sandhills actually put a filter or

17  something to alert them when Mr. Garafola contacted them,

18  correct?

19  A.   As a result of the ongoing investigation, we had filters

20  for any emails being sent from Larry Garafola to any of our

21  databases.

22  Q.   Sir, does your -- do your clients know that?

23  A.   I don't know that they don't know it.  I can't speculate

24  on what they know and what they don't know.

25  Q.   You testified earlier, I believe you said the email

WELCH - CROSS - FARSIOU

1   hosting system, one of the reasons for doing that is for TRO

2   purposes.

3        Do you remember saying that?

4   A.   We keep track of cybersecurity, so if there is any junk

5   mail that's coming through, any security attacks, this was

6   another example of something that we knew was in place and we

7   were monitoring for it.

8   Q.   Sir, did Mr. Garafola pose a cyberthreat to the people

9   that you provided a certification on?

10  A.   No.

11  Q.   So you'd agree with me that Sandhills is filtering their

12  client's email address, email system, so that they, you,

13  Sandhills can be alerted as to whether or not Mr. Garafola or

14  even a competitor contacts them, right?

15  A.   No.  We knew -- we were monitoring for any emails coming

16  from him to anyone on our database.  It wasn't that we were

17  monitoring customer email.

18  Q.   Okay.  But you can't do that, sir, unless you're hosting

19  that person's email address; isn't that correct?

20  A.   Yes, correct.

21  Q.   So, do your clients know that you're accessing that type

22  of information for your own purposes?

23  A.   I can't speculate as to whether they know that or not.

24  Q.   Okay.  Well, you -- Sandhills filed a motion before

25  Judge Shipp saying that, oh, they violated the TRO again by

WELCH - CROSS - FARSIOU

1   contacting Mr. Enos, right?

2   A.   Yes.

3   Q.   And the reason you found that out -- or what you believe

4   to be a violation is because you were filtering your own

5   clients' email addresses, right?

6   A.   We were monitoring all emails sent to our database.

7   Q.   Sir, as you sit here under oath today, does Sandhills

8   have a filter or some type of system in place to alert them

9   when Mr. Garafola sends emails out?

10  A.   We have a monitor when we receive emails from that email

11  address, yes.

12  Q.   Okay.  Your clients don't know that though, do they?

13  A.   I can't speculate as to whether they know that or not.

14  Q.   If I told you that Mr. Enos was appalled by the fact that

15  you had the emails that you submitted to the Court, do you

16  have anything to dispute that?

17  A.   Nope.

18  Q.   Were you aware that Mr. Enos was concerned about the fact

19  that he has his driver's license information, social security

20  information, and other personal information in their email

21  system that they didn't know that you had access to?

22  A.   No.  And again, we were only monitoring it for emails

23  sent from Mr. Garafola to Ms. Marlene Greene.

24  Q.   But that's for Sandhills's own personal benefit, right?

25  A.   It's also -- it's also for the Court's benefit.

WELCH - CROSS - FARSIOU

1  Q.   But it's not for your clients' benefit, is it?

2  A.   I don't know.

3  Q.   You don't know.

4  A.   I can't speculate whether they think that's a benefit or

5  not.

6  Q.   Did anyone tell you that that was legal to do?

7  A.   Again, I'm not an attorney, so, I mean.

8  Q.   We've established that.  Did anyone tell you that that

9  was legal to do?

10  A.   Nobody told me that it was illegal to do.

11  Q.   Okay.  So you think by telling a customer that we're

12  going to host your email address, we're going to provide you

13  with this great security of your emails, that it's okay to use

14  that email hosting system that you've promoted to this client

15  for your own personal -- Sandhills' own personal benefit; is

16  that what you're saying?

17  A.   I think it's not illegal.

18  Q.   Did anyone tell you that?

19  A.   No.

20  Q.   So as you sit here today, you don't have any idea whether

21  or not that's a violation, legal or unlawful or anything,

22  right?

23  A.   No.  Again, I'm not an attorney.

24  Q.   And you want Judge Shipp to consider that evidence that

25  you believe demonstrates a violation, right?

WELCH - CROSS - FARSIOU

 1    A.   Yes.

 2    Q.   Okay.  And by the way, did you reach out to Mr. Enos to

 3    let him know that you're doing this?

 4    A.   We did talk to him after the fact.

 5    Q.   What did Mr. Enos say to you?

 6    A.   He talked to his sales representative so it wasn't to me

 7    directly.

 8    Q.   Well, his son runs the whole IT part of it, right?

 9    A.   I'm not sure on that.

10    Q.   You don't know who Andrew Enos is?

11    A.   No.

12    Q.   Did you have any an conversations with Andrew Enos?

13    A.   Me?  No.

14    Q.   Did anyone from Sandhills have a conversation with

15    Durable Undercarriage to see if it was okay that Sandhills put

16    a filter on their email for your purposes?

17    A.   Not that I'm aware of.

18    Q.   Now, with respect to -- by the way, does Sandhills have

19    the ability to monitor Mr. Garafola's personal email address?

20    A.   His personal email address?

21    Q.   Yeah.

22    A.   If it's sent to our database, we can monitor what's

23    coming from that personal email address but not monitor his

24    personal email address, no.

25    Q.   What about if Mr. -- what about if -- well, we already

WELCH - CROSS - FARSIOU

1  know that -- I'm assuming that Sandhills put a filter on all

2  the email hosting systems that you provide for clients to

3  alert you if Mr. Garafola sends an email out to your client,

4  right?

5  A.   It was on our email database in general, so it was on any

6  emails we would receive.

7  Q.   But that's the filter system, right?

8  A.   Monitoring for emails sent from that address.

9  Q.   Right.  And you're doing that through the hosting systems

10 that you have for your clients, right?

11 A.   We host email, yes.

12 Q.   Right.  What about -- do you have the ability -- here's

13 the question.  Do you have the ability to review

14 Mr. Garafola's email -- personal email if it's not connected

15 to any hosting system that you have for a client?

16 A.   No.

17 Q.   You can't access it through his Staples account?

18 A.   Not that I'm aware of.

19 Q.   Okay.  So as far as you know, the only way you're

20 monitoring his email is by using a filter system for clients

21 that you host their email address for, correct?

22 A.   Yes.

23 Q.   Now, would you agree with me that when you, Sandhills,

24 went to the new software in April of 2019, the BidCaller --

25 and before I ask this question.

WELCH - CROSS - FARSIOU

1    When you changed over to BidCaller, which is what you had

2    before, but Equipmentfacts wasn't using it, eventually what

3    happened was BidCaller was called Equipmentfacts, right?  It

4    was a one-stop shop, right?

5    A.   Eventually, BidCaller was the engine that ran

6    Equipmentfacts.

7    Q.   Right.  But you don't call it BidCaller?

8    A.   We call it Equipmentfacts.

9    Q.   Correct.  Okay.  Now, BidCaller was the system that you

10   had utilized prior to Mr. Garafola, right?

11   A.   Yes.

12   Q.   And when Mr. Garafola came over, you've already testified

13   that he was using Bidpath.  So you guys used Bidpath, right?

14   A.   Yes.

15   Q.   And then you, for 10 months, learned from Mr. Garafola as

16   to how these live online auctions work and then you decided

17   we're going to go to the BidCaller software so that we don't

18   have to pay Bidpath, right?

19   A.   The development started almost from day one on continuing

20   to build BidCaller into the software that we eventually felt

21   comfortable with replacing Bidpath.

22   Q.   The answer to my question is, yeah, that's what happened

23   in April of 2019, we started using -- we went back to

24   BidCaller, right?

25   A.   We went to BidCaller, yes.

WELCH - CROSS - FARSIOU

1    Q.   You went to BidCaller, that's correct.  So, would you

2    agree with me, when you went to BidCaller, that you had

3    received several complaints and issues from clients as to the

4    technology wasn't working for them.  It was confusing.

5         Do you remember that?

6    A.   It was no different than any other rollout.

7    Q.   The question I asked you, sir, was, do you remember

8    receiving and fielding complaints or learning of complaints

9    from other people, such as Mr. Garafola, of clients

10   complaining about the system?

11   A.   Yes.

12   Q.   Okay.  And with respect to that, the manuals that you

13   were talking about -- now I haven't looked at the documents,

14   I'm going to look at them at some point, but the manuals that

15   you were talking about, those manuals were manuals that

16   pertained to the system under Bidpath, right?

17   A.   Those manuals pertained to how to conduct an auction.

18   And a lot of that same knowledge was used in the production of

19   BidCaller.

20   Q.   My question though, sir, is that those manuals were using

21   Bidpath?  It was -- the manuals were made for the Bidpath

22   software technology, right?

23   A.   It had to do with how to work with Bidpath but the same

24   can be used how to work with BidCaller.

25   Q.   Would you agree with me that those manuals that you were

WELCH - CROSS - FARSIOU

1    talking about that were in those emails, were being used by

2    Equipmentfacts using Bidpath's technology for the previous

3    year?

4    A.   Yes, they were.

5    Q.   Okay.  Those manuals were in the possession of Bidpath,

6    were they not?

7    A.   They were a copyright of Equipmentfacts.

8    Q.   Did Bidpath have access to the manuals that you're

9    talking about?

10   A.   I don't know.

11   Q.   So you don't believe -- you just testified that the

12   manuals, as they were set up -- and when we talk about

13   manuals, we're talking about manuals that are discussing how

14   to use the technology for Equipmentfacts, right?

15   A.   How to upload, how to do a lot of things around an

16   auction, yes.

17   Q.   Right.  And when you changed software, it would be

18   different from how Bidfacts -- Bidfacts would have been

19   using -- or Bidpath.  I'm sorry.  Bidpath would be using

20   the -- how Bidpath would interact with Equipmentfacts, right?

21   A.   Repeat the question.

22   Q.   Yeah.  Equipmentfacts, those manuals, okay, pertain to

23   how to -- it says in there, how to do timed auctions, all to

24   do all these other auctions, pursuant to the Bidpath

25   technology, right?

WELCH - CROSS - FARSIOU

```
 1   A.   Yes.

 2   Q.   So Bidpath would have had these manuals because they were

 3   the ones providing the technology for Equipmentfacts?

 4   A.   Again, I don't know that they would or wouldn't have.

 5   Q.   Okay.  Now, at some point you needed to change the

 6   manuals so that it coincided with the BidCaller software,

 7   right?

 8   A.   Not necessarily.

 9   Q.   Well, sir, you testified that there were many problems

10   with the new software.  You don't remember customers saying,

11   hey, this is confusing.  I don't know how to use this?

12   A.   I didn't testify that there was many problems with -- I

13   testified that, yes, we heard -- we received some complaints.

14   Q.   Okay.  Would you agree with me that the BidCaller

15   software, when you went over to it, needed to be fine-tuned

16   and it needed to be corrected at times?

17   A.   Fine-tuned, yes.

18   Q.   Because there were issues with the software, right?

19   A.   Yes.

20   Q.   Okay.  And the Bidpath -- the Bidpath manuals would

21   actually -- they wouldn't even be any good anymore because

22   they would be under the Bidpath technology, right?

23   A.   They actually still would be good.  There is a lot of

24   components of that that we used with regard to BidCaller.

25   Q.   Do you know who Carson Schott is?
```

WELCH - CROSS - FARSIOU

1   A.   Yes.

2   Q.   Who is that?

3   A.   He's a manager.

4   Q.   Okay.  Were you aware as to whether Carson Schott or

5   anybody else from Sandhills had indicated that the manuals had

6   to be changed so it coincided with the BidCaller software?

7   A.   I'm not aware one way or the other.

8   Q.   Let me ask you this, you wouldn't use the manuals that

9   had the Bidpath software if you're using BidCaller software,

10  right, it would be different?

11  A.   Yes.

12  Q.   The manuals would have to be changed, right?

13  A.   Sure.

14  Q.   Okay.  Now, you talked about this email on July 7th of

15  2019.  It's P-6, if you have it.

16       Now, I just want to understand something.

17       This email, is this -- are you saying -- strike that.

18       How did Sandhills get P-6?

19  A.   That email was sent to Larry Garafola's

20  larry@equipmentfacts email address.

21  Q.   Now, in the email, do you see -- you testified earlier

22  that this email was proof positive that Larry had started

23  another company and that he was leaving, right?

24  A.   Proof positive that he was starting another company.  I

25  don't know about leaving or not.

WELCH - CROSS - FARSIOU

1  Q.   Okay.  Well, what did you think he was going to do work

2  for Sandhills and then go work for Bidfacts?

3  A.   Yeah, frankly.

4  Q.   How would he do that, sir?

5  A.   I think his plan was to build up the Bidfacts -- have

6  Marlene and work with Marlene to build up Bidfacts until he

7  was comfortable enough to where it was far enough along that

8  he could move over to it.

9  Q.   Okay.  That's speculation, right?

10  A.   Sure.

11  Q.   Okay.  That you feel comfortable speculating about,

12  right?

13  A.   Given everything I've seen.

14  Q.   Just remember you're under oath, right?

15  A.   Yup.

16  Q.   Okay.  Now, do you see where the email is from -- well,

17  let's look at the first page.  I'll use Mr. Miller's numbers.

18  It looks like Sandhills PI-70.

19       Do you see that that?

20  A.   The first one, yes.

21  Q.   You see where it says in the -- I guess it would be

22  considered the second email of the sheet.  "Marlene, please

23  keep me posted on the feedback from your attorney," right?

24  A.   Yes.

25  Q.   And it says that up here in the paragraph before that, it

WELCH - CROSS - FARSIOU

1   looks like David's talking about meeting with Larry, right?

2   A.   Yes.

3   Q.   Okay.  There's nothing in these emails that says that

4   Larry is onboard, going to Bidfacts, right?

5   A.   Again, I don't -- didn't testify that I thought he was

6   going to leave and go to Bidfacts.

7   Q.   You didn't testify to that, sir?

8   A.   No, I testified that he was starting a new business.

9   Q.   Okay.  So again -- so your testimony is that he was going

10  to just start the new business, stay on with Sandhills and do

11  both?

12  A.   Yes.

13  Q.   And now -- by the way, you never asked him that, did you?

14  A.   I never had the chance to.

15  Q.   Well, let's talk about that.

16       This is July 7th of 2019, right?

17  A.   Yes.

18  Q.   Now, there are no other emails that you have other than

19  P-6 where there's a discussion between Mr. Garafola,

20  Mr. Brindley -- I want to make sure I said his name right,

21  Mr. Brindley or Ms. Greene about going to Bidfacts.  Bidfacts

22  is going to happen, right?

23  A.   Right.

24  Q.   This is your evidence right here, right?

25  A.   This and Marlene's email to our bidder list.

WELCH - CROSS - FARSIOU

1    Q.   Okay.  That email you're talking about, Larry Garafola is

2    not on that email, right?

3    A.   Correct.

4    Q.   Now, -- and, by the way, when you said you picked up the

5    computers, right, remember you said you went to New Jersey,

6    you picked up the computers, you were all concerned because

7    the manuals are being sent, right?

8    A.   Yes.

9    Q.   Okay.  Now, you said that the computers had been wiped,

10   right?

11   A.   Yes.

12   Q.   Okay.  Mr. Garafola's computer wasn't wiped, was it?

13   A.   I don't know a terminology wiped.  He deleted many

14   documents on the computer, yes.

15   Q.   There were other computers that you had that were

16   completely wiped, is that what you're saying?

17   A.   Yes.

18   Q.   Was Mr. Garafola's computer completely wiped?

19   A.   I don't know what you'd say was completely wiped, but

20   there were -- all documents were deleted off of it.

21   Q.   Okay.  Now, you told Mr. Garafola that you were going to

22   be in New Jersey because an electrician was coming to the

23   building, right?

24   A.   That's not true.

25            THE COURT:  Mr. Farsiou, we're going to take a short

WELCH - CROSS - FARSIOU

1   break.  It is 3:01.  We're going to take a 10-minute break.

2   We'll resume about 3:12-ish.  We're only going to go to

3   4 o'clock today, so be mindful.

4         MR. FARSIOU:  Okay.  Thank you.

5         THE DEPUTY COURT CLERK:  All rise.

6         (Court concludes at 3:01 p.m.)

7         THE DEPUTY COURT CLERK:  All rise.

8         (Open court begins at 3:12 p.m.)

9         THE COURT:  Please be seated.

10        Mr. Farsiou.

11        MR. FARSIOU:  I'm ready, Judge.

12  BY MR. FARSIOU:

13  Q.  I just want to backtrack a little bit.

14        You testified that you're utilizing the email hosting

15  systems that you provide to customers to alert Sandhills to

16  any communications from Mr. Garafola.  Does that include his

17  IP address?

18  A.  Not that I'm aware of.

19  Q.  Do you know what I mean by that?

20  A.  Not exactly.

21  Q.  Okay.  IP address means that you can know the physical

22  location of someone.

23        Did you know whether or not if you're monitoring an email

24  or doing an email hosting system for a client, if you can

25  determine the IP address?

WELCH - CROSS - FARSIOU

1   A.   I don't know on that.

2   Q.   Okay.  And when you do the email hosting system, I'm

3   assuming it's the whole system.  Anything that has to do with

4   the emails you're doing, right?

5   A.   Can you be more specific?

6   Q.   Well, you're providing the system for them.  You're doing

7   the cyberthreats for them.  And I'm assuming when you have

8   cyberthreats, you need to know certain IP addresses to see

9   where it's coming from, right, or you don't know?

10  A.   I'm not sure on that.

11  Q.   Okay.  And just to get off of this subject.  The email

12  hosting system is, for example, a client wouldn't use another

13  company for an email hosting system.  They would use

14  Sandhills, if that's who they have a contract with, right?

15  A.   We don't have any contracts.

16  Q.   You have agreements?

17  A.   No.

18  Q.   You have no agreements?

19  A.   Not with regards to email.

20  Q.   So if Durable Undercarriage is having Sandhills use -- or

21  they're using Sandhills' email hosting system, there's no

22  agreement in place?

23  A.   Simply to host their email?

24  Q.   Yeah.

25  A.   No.

WELCH - CROSS - FARSIOU

1   Q.   When you say "simply to host their email," what do you

2   mean by that?

3   A.   We don't have a user email with regards to hosted email.

4   Q.   Okay.  With respect to that, though, you're able to

5   monitor the emails that come in and out and who they come

6   from, right?

7   A.   We are able to -- we are able to see emails that came in

8   from the email addresses that we're monitoring.

9   Q.   Right.  And you're monitoring them for Sandhills'

10  purposes, right?

11  A.   We're monitoring them for many purposes.

12  Q.   Sir, I want to get off this topic, okay, but you're not

13  going to testify under oath here today that you're monitoring

14  Mr. Garafola's email addresses for someone else's benefit,

15  right?

16  A.   No.

17  Q.   Okay.  You're doing it for Sandhills' benefit, right?

18  A.   I don't know -- yeah, sure.

19  Q.   Did Mike Enos say to you, hey, I need to know when Larry

20  is emailing anybody.  Did he say that?

21  A.   No.  No.

22  Q.   Now, we were talking about P-6, okay.

23       And P-6, again, is the only communication that you have

24  that Sandhills has that alerted them that, oh, my God, there's

25  another company that Larry's trying to create, right?

WELCH - CROSS - FARSIOU

1   A.   Yes.

2   Q.   Okay.  Now, by the way, on January -- I'm sorry, July 7th

3   of 2019, this email, that's the date of the email.  Do you

4   remember when you became aware or Sandhills became aware of

5   this email?

6   A.   August 2nd, maybe.

7   Q.   That's when you found this email?

8   A.   Yes.

9   Q.   And did anyone go to Larry and say, hey, Larry, we got to

10  talk.  I want to find out what's going on?

11  A.   No.

12  Q.   And, by the way, Larry, obviously, you paid $1.5 million

13  for Equipmentfacts, right?

14  A.   Yes.

15  Q.   Okay.  And Larry was important to Sandhills, right?

16  A.   Yes.

17  Q.   You wanted to get Equipmentfacts because they were the --

18  I believe you said that Equipmentfacts was the pioneer of

19  online auction services, right?

20  A.   Yes.

21  Q.   Okay.  And you wanted Larry to come onboard because he

22  had the expertise, right?

23  A.   Yes.

24  Q.   Okay.  You didn't want to see him go somewhere else, did

25  you?

WELCH - CROSS - FARSIOU

**1**   A.   No.

**2**   Q.   How come you didn't go to Larry and find out what was

**3**   going on?

**4**   A.   Because at that time I was more concerned about

**5**   protecting our intellectual property.  So if I would have went

**6**   to Larry and alerted him, then I'd be afraid that all of our

**7**   intellectual property would get raided and go out the door.

**8**   Q.   Well, you would have also found out that Larry, a few

**9**   weeks prior, would have told Mr. Brindley that he couldn't do

**10**  business with him, right?

**11**  A.   I would not of, no.

**12**  Q.   Well, you didn't ask him, right?

**13**  A.   No.

**14**  Q.   So, as far as you know, you don't know what Larry was

**15**  doing as of -- in July 8th, 9th, the time after that, all the

**16**  way up to the time that you terminated him on August 7th,

**17**  right?

**18**  A.   I know that I have an email talking about setting up this

**19**  new business, Bidfacts, LLC, and then I know I had a mass

**20**  exodus of all of our intellectual property.

**21**  Q.   Well, again, if Larry would have said to Mr. Brindley, I

**22**  can't do this; I need to focus on my job here; I'm not going

**23**  to be able to do this, he would be doing work for Sandhills,

**24**  wouldn't he?

**25**  A.   You're asking me to speculate on that?

WELCH - CROSS - FARSIOU

1  Q.   I am.

2  A.   I'm not going to speculate on that.

3  Q.   But you're okay speculating with that, he was already

4  gone and he was using this, he was downloading this property

5  of Sandhills for improper purposes, right?  You speculated to

6  that?

7  A.   I'm pretty comfortable in reading this email and the talk

8  of seeing an attorney about setting up a competing business,

9  I'm very confident that, yes, he was, in fact, setting up a

10 competing business.

11 Q.   Well, as of August 2nd, did Larry do any work with

12 Bidfacts?

13 A.   I don't know.

14 Q.   Okay.  You don't have any evidence, right?

15 A.   I have this email.

16 Q.   Okay.  That's the email, right?  By the way, you already

17 testified this email doesn't say that this is a done deal,

18 right?

19 A.   It says Bidfacts, LLC is in place as of July 3rd, so I

20 don't know what you mean by done deal but it looks like an LLC

21 has been formed.

22 Q.   Not by Mr. Garafola?

23 A.   He's certainly involved.

24 Q.   Sir, does this email tell you that Mr. Garafola started

25 and created Bidfacts?

WELCH - CROSS - FARSIOU

1    A.   I feel like it does.

2    Q.   It does.  Where does it say it?  Tell me where it says

3    it?

4    A.   He talks about how he had conversations with his attorney

5    and he's fine to compete with AuctionTime.  Marlene even

6    refers to him as boss.  And then, in turn, they set up a

7    Bidfacts, LLC, David Brindley does.

8    Q.   Okay.  So the answer to my question is David Brindley set

9    up Bidfacts, LLC, right?

10   A.   Yes, it looks like, at the urging of Mr. Garafola.

11   Q.   Where does it say that?

12   A.   It talks about how he saw an attorney and that he's okay

13   to compete with AuctionTime.

14   Q.   Okay.  Well, Mr. Garafola is going to testify that

15   there's a word missing in that sentence, okay.  But do you see

16   anything in here where Mr. Garafola says that, "I am" or "he

17   is a part of the ownership of Bidfacts"?

18   A.   It's certainly insinuated.

19   Q.   Okay.  Well, we don't know because you never talked to

20   Mr. Garafola about it, right?

21   A.   No.

22   Q.   And you don't know that soon thereafter, this email,

23   Mr. Garafola didn't even meet with Mr. Brindley.

24        Are you aware of that?

25   A.   I'm not aware if he did or didn't.

WELCH - CROSS - FARSIOU

1   Q.   Okay.  Well, if I told you that he had didn't meet with

2   Mr. Brindley about Bidfacts, you'd have no evidence, as you

3   sit here today, in front of this Court, on this preliminary

4   injunction hearing, to prove me otherwise, right?

5   A.   Again, I feel like there's ample evidence of the setting

6   up of the business and the raiding of Sandhills' intellectual

7   property.

8   Q.   Again, sir, the intellectual property, the manuals, those

9   manuals had to be changed because you were going to a

10  different software package, right?

11  A.   The manuals is just one tiny aspect of all the data that

12  was exported out of our systems.

13  Q.   Sir, you do realize that -- I'm not going to get into it.

14  You already talked about the issues.

15      Now, do you know, as you sit here today, you have no idea

16  if Mr. Garafola was performing services for Sandhills and not

17  Bidfacts, right?

18  A.   I don't know.

19  Q.   You don't know that because you didn't ask him, right?

20  A.   No.

21  Q.   And by the way, the emails that you provided, I didn't

22  look through them yet.  I see that you just have the

23  forwarding and the attachments.

24      Are you aware -- weren't there emails in between there

25  from Mr. Shot to Mr. Garafola?

WELCH - CROSS - FARSIOU

1  A.   I'm not aware if there were or weren't.

2  Q.   These emails were picked out by who?

3  A.   Which emails are we referring to?

4  Q.   The emails -- well, the 596 pages that were provided to

5  me yesterday, who went through these and said, okay, these are

6  the documents that we're going to provide?

7  A.   I did for most of them, I would say.

8  Q.   Okay.  Are there other emails that relate to the emails

9  that you provided in here?

10  A.   I'm not sure.

11  Q.   So you have no idea -- remember the email you talked

12  about it says the top 500 or whatever, what was the email you

13  talked about?

14  A.   The top bidder list?  The top 500 bidders?

15  Q.   Yes?

16  A.   Yes.

17  Q.   Are you aware as to whether or not Mr. Shot had asked

18  Mr. Garafola to provide him with the list of the top 200?

19  A.   We use that internally, absolutely, as a marketing

20  material.  We would never allow for that to be sent out

21  externally.

22  Q.   Sir, do you know whether or not Mr. Shot had asked

23  Mr. Garafola to provide a list of top 200?

24  A.   I don't know.

25  Q.   Okay.  So you did not -- Sandhills didn't look for emails

WELCH - CROSS - FARSIOU

1    that pertained to the emails that you provided in here, right?

2         MR. MILLER:  Objection.

3         THE COURT:  What's the objection?

4         MR. MILLER:  "You didn't provide emails to the emails

5    that were provided."  It's circular.  Actually, there's no

6    point to the question.

7         THE COURT:  If you can understand the question, you

8    can answer it.

9         THE WITNESS:  I don't know what you mean by that.

10   Q.   Okay.  You understand that these documents were -- they

11   were picked out, right?  You guys decided what emails you were

12   going to provide.  You already testified to that, right?

13   A.   I mean, yeah.

14   Q.   Okay.  And did you look to see if there were other emails

15   in between these dates, before these dates, or after these

16   dates, where Mr. Garafola was asked to provide certain

17   information to certain Sandhills' people?

18   A.   We looked at emails to and from Larry throughout that

19   time period.

20   Q.   Okay.  So the answer to my question is no?

21   A.   I'm not understanding your question.

22   Q.   Did you look for any emails wherein someone from

23   Sandhills requested Mr. Garafola to provide them information,

24   for example, about top bidders?

25   A.   I'm not aware of that.

WELCH - CROSS - FARSIOU

1   Q.   Okay.  Did you look for it?

2   A.   I don't know what reason I would have -- no, I don't -- I

3   don't remember whether we did or didn't.

4   Q.   Okay.  There would be a big reason, sir, because he could

5   have been doing that because he was asked to get that

6   information.  Is that funny?  Is that funny to you, sir?

7   A.   I mean, yeah, frankly.

8   Q.   Okay.  Well, you know what.  I think we can agree.

9   You're right.  This is funny.

10      Now, with respect to Mr. Garafola, again, you are --

11  again, this is the area you like to speculate in.  You're

12  speculating that he was using this information for improper

13  purposes, right?

14  A.   Yes.

15  Q.   Okay.  And again, you never asked him, you never asked

16  him what he was doing with the information?  You never

17  confronted him?  You have no idea if he was doing work for

18  Sandhills, right?

19  A.   Nope.

20  Q.   And you guys just said, we're firing him, right?

21  A.   Upon further investigation, yes.

22  Q.   Well, further investigation of the emails that you talked

23  about, right?

24  A.   Yes.

25  Q.   Okay.  And again, never talked to him about what he was

─WELCH - CROSS - FARSIOU─

1   doing, why he was doing it?  You didn't look for emails that

2   indicated what he was doing either, right?

3   A.   No.

4   Q.   And with respect to that, you, then, Sandhills,

5   terminated Mr. Garafola, right?

6   A.   Yes, for breach of duty of loyalty.

7   Q.   That's your opinion, right?

8   A.   Yes, absolutely.

9   Q.   Sir, I understand that your attorney keeps shaking his

10  head.  You have to answer the question.  You can't follow what

11  your attorney is telling you.

12       MR. MILLER:  Judge, I'm going to object to that

13  insinuation.

14       MR. FARSIOU:  I'm watching him, John.  He's been

15  doing it the whole time.

16       THE COURT:  Okay.  Counsel, it's okay.  You can

17  proceed.

18  BY MR. FARSIOU:

19  Q.   You understand that you guys, Sandhills, fired

20  Mr. Garafola?

21  A.   Yes.

22  Q.   And it was all under the assumption that he had started a

23  new company with Mr. Brindley and Ms. Greene, right?

24  A.   Yes.

25  Q.   But you had no proof that that actually happened other

WELCH - CROSS - FARSIOU

1  than the July 7th email?

2  A.   I feel like there's -- again, I feel like there's ample

3  proof.

4  Q.   Sir, I'll give you the benefit of the doubt.  July 7th

5  email and the other emails that you guys cherry-picked to show

6  that these manuals were being provided or forwarded to an

7  email address, right?

8  A.   Yes.

9  Q.   Anything else?

10  A.   No.

11  Q.   And again, just so I'm clear.  You never asked, you never

12  looked for other emails?  This is your speculation as to what

13  was happening, right?

14  A.   Correct.

15  Q.   And as you testified earlier today, your testimony is

16  that it's hard to know what the reputational damage is, but we

17  lost Permian and we lost -- I'm sorry, the other one was

18  Superior Auctions, right?

19  A.   Yes.

20  Q.   And you are speculating that Superior did business with

21  Mr. Garafola, correct?

22  A.   Yes.

23  Q.   If I told you that Superior never has done business with

24  Mr. Garafola, do you have anything to dispute that?

25  A.   No.

WELCH - CROSS - FARSIOU

1   Q.   Okay.  So then, we're talking about one client, Permian,

2   right?

3   A.   With regards to doing business with?

4        He also did business with several others.

5   Q.   Sir, you testified you lost two clients, right?

6   A.   Yes.

7   Q.   Now, I've told you that one of the clients that you claim

8   you lost because of Mr. Garafola didn't even do business with

9   Mr. Garafola, right?

10            MR. MILLER:  Objection.  He's testifying.

11            MR. FARSIOU:  Judge, please.

12            THE COURT:  Overruled.  I'm giving both sides wide

13   latitude here.  Both sides.  So, please, just be on notice.

14   BY MR. FARSIOU:

15   Q.   Right, you agree with me -- if I told you -- you don't

16   have any evidence that Superior actually did business with

17   Mr. Garafola, right?

18   A.   Superior, no.

19   Q.   And Mr. Dyess, hopefully, will be providing testimony.

20   But your position is that you lost Permian because of him,

21   right?

22   A.   Yes.

23   Q.   Now, is it your testimony that Permian left

24   Equipmentfacts and went directly to Mr. Garafola?

25   A.   No.

WELCH - CROSS - FARSIOU

 1  Q.   Okay.  You're aware that they went to somewhere else,

 2  right?

 3  A.   Yeah.

 4  Q.   Where did they go?

 5  A.   Proxibid as well.

 6  Q.   Okay.  So that wasn't because of Mr. Garafola, was it?

 7  A.   I would argue it was.

 8  Q.   That's you speculating again, right?

 9  A.   Sure.

10  Q.   Well, it's not sure, it's yes, right?

11  A.   Yes.

12  Q.   You didn't have a conversation with Mr. Dyess, right?

13  A.   No.

14  Q.   In fact, when Mr. Dyess provided a certification, either

15  you or someone from Sandhills had been hounding him with phone

16  calls, right?

17  A.   I'm not sure on that.

18  Q.   Did you reach out to him?

19  A.   Yes.

20  Q.   Did you talk to him?

21  A.   Yes.

22  Q.   What did he say to you?

23  A.   That he wasn't happy with Sandhills.

24  Q.   Did he tell you he left Sandhills because of

25  Mr. Garafola?

WELCH - CROSS - FARSIOU

**1**  A.  No.

**2**  Q.  He said that he was unhappy with Sandhills, and he

**3**  thought the technology wasn't good.  Didn't he say that to

**4**  you?

**5**  A.  He didn't say the technology wasn't good.

**6**  Q.  Did he say it was confusing?

**7**  A.  No.

**8**  Q.  You didn't ask him what the problem was?

**9**  A.  That's going back six months.  I don't -- I can't say I

**10**  know exactly how the conversation went word-for-word.

**11**  Q.  I wouldn't want you to speculate on what you think

**12**  happened six months ago.

**13**      You'd agree with me, though, Mr. Dyess at no point told

**14**  you, yeah, we left Sandhills because of Mr. Garafola, right?

**15**  A.  No.

**16**  Q.  So, out of what you testified as to the damages because

**17**  that's what a preliminary injunction is about, it's not about

**18**  money.  It's about harm to the reputation and all of that.

**19**  You have no other evidence to provide to this Court with any

**20**  irreparable harm that you know of, correct?

**21**  A.  It's very difficult to quantify the amount of irreparable

**22**  harm that could have been done.

**23**  Q.  Is Sandhills making money?

**24**  A.  Yes.

**25**  Q.  Okay.  And no one has come to you -- no one has come to

WELCH - CROSS - FARSIOU

1   you, or anybody at Sandhills and said, hey, I don't know

2   what's going on over there but Mr. Garafola said this and I

3   think that you guys stink now, right?  No one said that to

4   you?

5   A.   No.

6   Q.   No one said, hey, Sandhills is a bad company because

7   Mr. Garafola left or said something about Sandhills, right?

8   A.   I can't speculate whether he said that or not.  Nobody

9   has come to me and said that, no.

10  Q.   You have no evidence to support anybody saying to you or

11  telling you that your reputation has been damaged because of

12  Mr. Garafola, correct?

13  A.   Correct.

14  Q.   Do you remember when Permian left Sandhills?

15  A.   No.

16  Q.   If I told you it was June 20, 2019, does that ring a

17  bell?

18  A.   That's probably about right.

19  Q.   Now, Mr. Garafola was still employed with Sandhills,

20  right?

21  A.   Yes.

22  Q.   And again, you don't have -- Mr. Dyess never said to you

23  that they left because was Mr. Garafola, right?

24  A.   No.

25  Q.   Now, with respect to the live auctions that Mr. Garafola

WELCH - CROSS - FARSIOU

 1  was performing for Equipmentfacts, I want to make sure that I

 2  understand what your testimony is.

 3       Are you saying -- and I guess it would be a good point

 4  is -- why don't you pull up or pull out, if you look at P-2,

 5  P-3, and you might as well pull out P-4.

 6       P-2 is what we have been calling the APA or the Asset

 7  Purchase Agreement, right?

 8  A.   Yes.

 9  Q.   Who prepared this document?

10  A.   Our attorneys.

11  Q.   Now, just so it's clear, you had no involvement in the

12  preparation of this document?

13  A.   In what regard?

14  Q.   Well, you said -- I just asked you a question who

15  prepared it?  You said "our attorneys," right?

16  A.   Yes.

17  Q.   You didn't prepare this document in any way, shape, or

18  form?

19  A.   No, I gave feedback.

20  Q.   What feedback did you give with respect to the APA?

21  A.   I can't say I recall a specific point.

22  Q.   Okay.  So, with respect to the APA, you testified that

23  there was a requirement that there that was going to be what I

24  think you called a non-competition, non-interference, and

25  confidentiality agreement, right?

WELCH - CROSS - FARSIOU

1   A.   Non-compete as well, yes.

2   Q.   Well, isn't P-3 -- isn't P-3 labeled non-competition,

3   non-interference, and confidentiality agreement.  Do you have

4   that up there?

5   A.   I got so many.  Just a second.  I'm not finding P-3.

6   Q.   Is it up there?

7   A.   I found it.  We're good.

8   Q.   This is what applies to the Asset Purchase Agreement,

9   right?

10  A.   Yes.

11  Q.   You would agree with me that this provision is different

12  than the Employment Agreement?

13  A.   Yes.

14  Q.   Now, when you -- did you or anybody from Sandhills tell

15  Mr. Garafola that, hey listen, we want you to come to

16  Sandhills.  We want you to run Equipmentfacts.  You're going

17  to stay in the same location.  You're going to keep all your

18  people employed, and you're going to run Equipmentfacts as if

19  it never changed over, right?

20  A.   We -- yeah.  I mean, for the most part, yeah.

21  Q.   They were in New Jersey, right?

22  A.   Yes.

23  Q.   Okay.  They have the same building?

24  A.   Yes.

25  Q.   In fact, Sandhills was paying rent to a company that

WELCH - CROSS - FARSIOU

1  Mr. Garafola owned, right?

2  A.   Correct.

3  Q.   And he kept all his employees, right?

4  A.   Yes.

5  Q.   Okay.  Now -- so the only thing that was going to be

6  different is that Sandhills was going to provide more support,

7  more advertising, more marketing, right?

8  A.   Yeah.  There's always going to be changes, but, yes, that

9  was --

10 Q.   The whole point was that Sandhills needed to get better

11 in the live auction industry and that's why you wanted

12 Equipmentfacts and specifically the Equipmentfacts that

13 Mr. Garafola had created and founded and had run for 19 years,

14 right?

15 A.   Yes, we wanted to improve upon it, but, yes.

16 Q.   Well, you certainly didn't buy Equipmentfacts because you

17 guys were doing so well in the live auction industry, right?

18 A.   No.

19 Q.   Okay.  In fact, there were issues with BidCaller, right?

20 A.   I -- generally, I don't know.  I guess.

21 Q.   Let me ask you this.  Was BidCaller just as good as

22 Equipmentfacts?

23 A.   No.

24 Q.   And Equipmentfacts was using Bidpath, right?

25 A.   Yes.

WELCH - CROSS - FARSIOU

1   Q.   And Bidpath seemed to be doing a pretty good job for

2   Equipmentfacts, right?

3   A.   Yes.

4   Q.   In fact, when they came over, nothing changed?  You guys

5   said, look, we're not going to use BidCaller.  Equipmentfacts

6   will go with Bidpath, right?

7   A.   Yes.

8   Q.   Okay.  Now, that had to do with online auction services,

9   right?

10  A.   What had to do with online?

11  Q.   That's what he was running Equipmentfacts?  That's the

12  business?

13  A.   Yes.

14  Q.   Okay.  Mr. Garafola -- and I want to make sure that I'm

15  clear.  Mr. Garafola wasn't selling software licenses and then

16  saying, hey, go do what you want, right?

17  A.   It's again an online bidding services.

18  Q.   There's a specific difference between someone who sells a

19  license for software packages and tells someone, hey, go do

20  what you need to do.  Tells an auctioneer, hey, here's your

21  software, do whatever you want to do.  You want to take it to

22  Sandhills, take it to Sandhills, right?

23  A.   I don't see the difference other than the way they're

24  charging.

25  Q.   You don't see the difference?

─────WELCH - CROSS - FARSIOU─────

1    A.   No.  They're both providing online bidding services.

2    Q.   No.  So Sandhills was providing online auction services

3    when -- and again, I'm going to say, it's like a one-stop

4    shop.  They use their software.  They get the bidders, right?

5         That's a bid -- you'd agree with me that one of the

6    attractions for auctioneers is for the company -- the online

7    auction company to provide bidders to the auction, right?

8    A.   The online auction company to provide bidders to the

9    company?  I'm not sure I'm following that line of questioning?

10   Q.   Okay.  When Equipmentfacts does an online auction for

11   someone?

12   A.   Yes.

13   Q.   Okay.  Don't they say to them, hey, don't they provide

14   services such as, okay, we're going to get -- we have all

15   these bidders that we know.  We're going to get them.  We're

16   going to advertise this and we're going to get it out to them,

17   and we're going to bring more bidders to your auction, right?

18   A.   We provide -- that's part of the service we provide, yes.

19   Q.   That's the most important aspect of the online auction

20   business, right?

21   A.   I would not agree with that.

22   Q.   So you don't think the bidders who actually buy the

23   product is the most important thing in an online auction?

24   A.   I don't get -- the software is just as important.

25   Q.   Okay.  But Equipmentfacts is running the software,

WELCH - CROSS - FARSIOU

1   getting the bidders, right?  Doing the advertising and doing

2   the marketing, correct?

3   A.   Not always.  In some cases, our customer is running the

4   software.

5   Q.   Okay.  But you're providing the bidders, right?

6   A.   Not -- not -- they're also providing the bidders as well,

7   the customer does as well.

8   Q.   Okay.  Sir, do you see the difference between just

9   providing a software license and walking away?

10  A.   No.  I see one as -- one, what they're doing is just

11  providing a component of what we do.  It's no different.

12  Q.   Mr. Garafola never did that when he was at Sandhills;

13  isn't that correct?

14  A.   Never did what?

15  Q.   He never just provided a software license and walked

16  away, right?

17  A.   No, we chose not to charge that way.

18  Q.   That's not what you hired him to do, right?  You didn't

19  hire Mr. Garafola to license software and then walk away?  You

20  wanted him to run the auctions?

21  A.   We hired him to help sell online auction services.  No

22  different than what he's doing today.

23  Q.   Well, no, you hired him for the heavy truck and machinery

24  equipment, right?

25  A.   And related industries.

WELCH - CROSS - FARSIOU

1    Q.   So I just want to make sure that I'm clear so that the

2    judge understands too.  The related industries is anything to

3    do with online auctions?

4    A.   It's online auction services and related industries.

5    Q.   Sir, do you know what that means?

6    A.   Yes.

7    Q.   Okay.  What tell me what it means?

8    A.   It's industries related to the industries laid out in the

9    agreement.

10   Q.   What's laid out in the agreement, what industries?

11   A.   The construction and truck.

12   Q.   Well, if construction and truck -- well, that's what

13   Equipmentfacts did, right?

14   A.   Part of, yes.

15   Q.   Well, no.  When Larry, Mr. Garafola, was purchased,

16   that's what they did?

17   A.   They'd also done other types of auctions as well.

18   Q.   How do you know that?

19   A.   I kept track of him.  I've been in the business for 15

20   years.  I've seen what he's done.

21   Q.   Okay.  You testified earlier that Sandhills wanted to get

22   better in that area, right?

23   A.   Yes.

24   Q.   Okay.  That's why you purchased Equipmentfacts, right?

25   A.   One of the reasons, yes.

WELCH - CROSS - FARSIOU

1   Q.   Well, you also wanted to learn from Mr. Garafola on how

2   to be better in the live auctions, right?

3   A.   Yes.

4   Q.   And when you learned all of that information from him in

5   and around April or May of 2019, you'd agree with me that you

6   started to strip some of the duties away from him, right?

7   A.   No.

8   Q.   You didn't change his title?

9   A.   No.

10  Q.   Okay.  Well, let me ask you this.  If you did, if you

11  changed his duties or changed his title, you'd agree with me

12  that that would have been a violation of the Employment

13  Agreement, right?

14          MR. MILLER:  Objection, speculation.

15          THE COURT:  Repeat the question, Counsel.

16          MR. FARSIOU:  Sure.

17  Q.   If Sandhills had changed Mr. Garafola -- unilaterally

18  changed Mr. Garafola's title or his duties that would have

19  been a violation of the Employment Agreement, right?

20          THE COURT:  You can answer that question.

21          THE WITNESS:  I'd have to see where that would be --

22  where you're referencing that from?

23  Q.   I believe the document in front of you is -- I want to

24  say D-1.

25  A.   P-3.

—WELCH - CROSS - FARSIOU—

1   Q.   D-1.

2   A.   D-1, I'm sorry.

3   Q.   Now, I got to find mine.  Do you have it in front of you?

4   A.   I have D-1, the Employment Agreement.

5   Q.   Let's go to page 2.

6   A.   Okay.

7   Q.   Do you see where it says "duties and responsibilities,"

8   Number 3?

9   A.   Yes.

10  Q.   Do you see where it says "Garafola shall be employed in

11  the position of manager of auction services," right?

12  A.   Yes.

13  Q.   Now, let's just stop right there real quick.

14      Auction services for Mr. Garafola was running

15  Equipmentfacts as he did prior to coming to Sandhills, right?

16  A.   Yes.  But there's always going to be business changes

17  that happen along the way.

18  Q.   Okay.  But you said that the heavy equipment and

19  machinery -- you said that that's different than the

20  construction and agriculture industry, right?  You said that

21  was different?

22  A.   Wait.  Where did I say that?

23  Q.   Well, you testified earlier that -- let me ask you this.

24  Are you saying -- is it your testimony that the heavy truck

25  and machinery and the construction and agricultural industries

WELCH - CROSS - FARSIOU

1    encompasses everything?

2    A.    In --

3    Q.    In auctions that you're running for Sandhills?

4    A.    I'm not testifying to that, no.

5    Q.    You remember testifying earlier about -- I believe it was

6    Machinery Facts?

7    A.    MachineFacts, yes.

8    Q.    What's the one that Sandhills runs?

9    A.    Oh, Machinery Trader.

10   Q.    Machinery Trader.  Now, MachineFacts was something that

11   Mr. Garafola had brought up to you guys in 2019, right?

12   A.    Yes.

13   Q.    And Sandhills didn't want to do that, did they?

14   A.    That's not correct.

15   Q.    Okay.  Well, you didn't sue Mr. Garafola because he's

16   using MachineFacts, the term "MachineFacts," right?

17   A.    We did among others, yes.

18   Q.    You did?

19   A.    Yeah.

20   Q.    Do you own the domain of MachineFacts?

21   A.    We don't own the domain of MachineFacts.

22   Q.    Well, why didn't you -- if you don't own it, you

23   certainly didn't purchase that from Mr. Garafola, right?

24   A.    I don't know whether we did or didn't.  If that was a

25   pre-acquisition or not.

WELCH - CROSS - FARSIOU

**1** Q.   Well, if you did, and Mr. Garafola was actually doing

**2** that service while he was working for Sandhills, you would

**3** be -- part of your application would have been he can't use

**4** the words or the term "MachineFacts," right?

**5** A.   We put that on there as a competing brand.

**6** Q.   As a competing brand?

**7** A.   Yes.

**8** Q.   But you didn't say the brand was owned by Sandhills,

**9** right?

**10** A.   The brand MachineFacts?

**11** Q.   Yeah.

**12** A.   No, we didn't say that.

**13** Q.   Okay.  Now, let's go to the next part of that sentence.

**14** It says "Or such other position as mutually agreed upon by

**15** Garafola and the company," right?

**16** A.   Yes.

**17** Q.   So my question to you was, if you changed Mr. Garafola's

**18** position unilaterally, that would be a violation of the

**19** Employment Agreement?

**20** A.   I'm not sure if that would or wouldn't.  I guess.  I'm

**21** not an attorney but...

**22** Q.   Do you want to speculate as to whether or not that would

**23** be a violation?

**24** A.   No.

**25** Q.   Okay.  I want to just go back to one last thing about

WELCH - CROSS - FARSIOU

1  this belief that Mr. Garafola was starting this new business

2  in July.  And you said part of the evidence, besides the email

3  of July 7th, was the fact that he had all these manuals being

4  sent to him and the bidder list and things like that, right?

5  A.  Yes.

6  Q.  And again, those materials would have been the materials

7  that would have been utilized by Bidpath for Equipmentfacts,

8  right?

9  A.  It would have been utilized by Equipmentfacts in

10  conjunction with Bidpath.

11  Q.  That's fair.  You'd agree with me that those manuals that

12  were emailed to Mr. Garafola would have already been in the

13  possession of Bidfacts?

14  A.  I'm not sure on that.  They were copyright of

15  Equipmentfacts so I have no evidence that they were in

16  Bidpath's hands.

17  Q.  So you have no idea if the software company that's

18  running Equipmentfacts would be entitled to the manuals that

19  are telling people how to use the software?

20  A.  I have no idea.  Those were created by Equipmentfacts.

21  Q.  Okay.  Do you know whether or not Bidfacts had anything

22  to do with those manuals, in preparation of the manuals?

23  A.  No.

24  Q.  And those were the manuals that I believe you testified

25  from Mr. Miller's questions that -- those are the manuals that

WELCH - CROSS - FARSIOU

 1   were created by Equipmentfacts prior to the purchase?

 2   A.   Yes.

 3   Q.   And with respect to prior to the purchase, again, Bidpath

 4   would have been the software company that Equipmentfacts was

 5   using, right?

 6   A.   Yes, among others.  Yes.

 7   Q.   Now, I want you to go to -- I want you to go back to the

 8   document I believe that has been labeled as P-4.

 9   A.   Is it the employee intellectual property?

10   Q.   Correct?

11   A.   Yes.

12   Q.   Would you agree with me that -- I believe you testified

13   already, but P-4 is the document that would go along with the

14   Employment Agreement, right?

15   A.   Yes.

16   Q.   Okay.  Now, with respect to P-4, if you go to -- I want

17   you to go to page 3.  And that's the -- I want you to go to

18   paragraph -- or Section 5 states, excuse me, non-competition,

19   correct?

20   A.   Yes.

21   Q.   Now, this restricted business is defined here, isn't it?

22   A.   I have to read through it.  Yes.

23   Q.   And if we -- I'd like you to read into the record,

24   slowly, the section that at the very bottom of page 3 in the

25   bottom right column where it starts with quotations

WELCH - CROSS - FARSIOU

1    "restricted area."

2         Could you read that into the record?

3    A.    "Restricted area means each State, within the United

4    States, in which the company or Equipmentfacts has engaged in

5    the restricted business during the 24-month period prior to

6    the termination date.  And restricted business means the

7    business of providing an online auction platform or online

8    auction services for the purpose of facilitating the sale of

9    equipment or machinery that is used in the agriculture or

10   construction industries in a manner that competes with the

11   company."

12   Q.    Okay.  So am I correct that this provision, specifically

13   limits the business being the sale of equipment or machinery

14   that is used in the agriculture or construction industries

15   that competes with the company?

16   A.    With regards to the Employment Agreement?

17   Q.    Yes.

18   A.    Yes.

19   Q.    Okay.  Now, based on this agreement alone, could

20   Mr. Garafola go out and sell a software license for the oil

21   field industry?

22   A.    No.

23   Q.    Okay.  Could Mr. Garafola go out and sell any software

24   license?  And what I mean by that is just simply license the

25   software and not do anything with it?

WELCH - CROSS - FARSIOU

```
 1  A.   Is the software auction software?

 2  Q.   It would be a software package that the auctioneer could

 3  use for auction purposes?

 4  A.   No.

 5  Q.   Okay.  Based on this -- and I know that you're not an

 6  attorney.  Is there anything Mr. Garafola can do in the

 7  auction -- in the auction business?

 8  A.   I'm not going to speculate on what he can or can't do.

 9  Q.   Okay.  So based on this definition, you don't know?

10  You'd have to speculate?

11  A.   Yeah, I'd have to speculate.

12  Q.   All right.  Now, if you go to -- I'm sorry.  Hold on a

13  second.

14       Were there any discussions with Mr. Garafola about the

15  necessity to limit what the restricting business was going to

16  be?

17  A.   I can't recall whether there was or wasn't.

18  Q.   You don't recall Mr. Garafola having a concern that the

19  non-compete being overly broad or outside of areas that he

20  didn't do work in?

21  A.   I don't recall that.

22  Q.   Okay.  And with respect to that, you don't recall that

23  that conversation led to the language that we just spoke

24  about?

25  A.   I don't recall.
```

WELCH - CROSS - FARSIOU

1   Q.   And if you go to the next page, if you look at Number 6.

2   And I know that Mr. Miller asked you some questions about

3   this, but if you look -- Number 6 is no solicitation of

4   employees or customers.  Your issue -- Sandhills' issue is

5   with customers, right?

6   A.   I mean, we would take issue if it was with employees as

7   well, but customers is the issue at hand.

8   Q.   Okay.  What I mean by that is you don't have any evidence

9   to tell this Court that Mr. Garafola was soliciting employees?

10  A.   Not that I'm aware of.

11  Q.   Everybody that worked in New Jersey was fired, right?

12  A.   Yes.

13  Q.   You guys -- I think either you or someone from Sandhills

14  showed up, right?

15  A.   Yes.

16  Q.   And said, hey guys, you're fired?

17  A.   Yes.

18  Q.   Okay.  And no questions asked, just fired everybody?

19  A.   We put them on suspension until further investigation and

20  then ultimately, yes, we dismissed them.

21  Q.   Okay.  When was that?

22  A.   The suspension I believe was on August 5th.  It was a

23  Monday.

24  Q.   And what was the additional investigation that was done?

25  A.   We went out there and retrieved all the hardware from the

WELCH - CROSS - FARSIOU

1  employees.

2  Q.  You took all the laptops, right?

3  A.  Yes.

4  Q.  You took all the cell phones?

5  A.  Yes, correct.

6  Q.  And you took -- the same thing that you took from them,

7  you took from Mr. Garafola?

8  A.  I took from that, from Mr. Garafola, on August 1st.

9  Q.  Earlier, correct?

10  A.  Yes.  Yes.

11  Q.  And then you went back to Nebraska, right?

12  A.  Yes.

13  Q.  And then you provided those laptops and cell phones to

14  who?

15  A.  To 12 Points.

16  Q.  Is that a third-party company?

17  A.  Yes.

18  Q.  And did they -- did you get an investigation report?

19  A.  We didn't get a report.  We got a summary of what they

20  found.

21  Q.  Was it a written summary?

22  A.  I'm not sure if it was written or not.

23  Q.  Okay.  With respect to the summary that you received,

24  were there other employees that were found to have done

25  something improper according to Sandhills?

WELCH - CROSS - FARSIOU

1   A.   Yes.

2   Q.   Okay.  How many?

3   A.   The one that I recall the most is Garafola Jr.  Larry

4   Garafola Jr.

5   Q.   Well, what you learned about Larry Garafola Jr. was

6   that -- it looked like there was certain information that was

7   deleted off his computer, right?

8   A.   No, that was senior.  Garafola Jr., the forensic analysis

9   said that it was completely wiped, meaning the machine went

10  back to what it was at the day it was issued.

11  Q.   Okay.  And there is no written report on that?

12  A.   No, but we could provide one if needed.

13  Q.   Okay.  Well, if you have a written report obviously we're

14  going to request it, but you don't have that, right?

15  A.   Not today, no.

16  Q.   So I just want to make sure I'm clear.

17       You're saying that Mr. Garafola's laptop, there was a

18  report from this third-party company that he had deleted

19  files?

20  A.   There was just no emails left on there.  There was a

21  bunch of things that were put in the deleted folder and

22  ultimately permanently deleted.

23  Q.   That's the first I'm hearing of that, but, okay.

24       Now, with respect to this Number 6, on P-4 -- yeah, P-4.

25  You see where it says -- it talks about the solicitation of

─── WELCH - CROSS - FARSIOU ───

1  employees and customers.  But do you see where it says "With

2  whom I had personal contact and actually did business with in

3  the course of my employment with the company"?

4  A.   Where do you see that?  I'm sorry.

5  Q.   Number 6.

6  A.   Number 6.

7  Q.   If you go to the second bullet point, which is what

8  Mr. Miller asked you to read.

9      Do you remember that?

10  A.   Second bullet point -- okay.  Yes.

11  Q.   Number little two.

12  A.   I got it.

13  Q.   Then it says, when it talks about soliciting -- let me

14  read it.  "Solicit, do business with, or accept or aid in the

15  provision of products or services to any customers of the

16  company, its affiliates, and subsidiaries."  And then it says

17  "With whom I had personal contact and actually did business

18  with in the course of my employment with the company," right?

19  A.   Yes.

20  Q.   So this provision is limited to people that Larry --

21  Mr. Garafola actually did business with while he was working

22  for Sandhills, right?

23  A.   I'm not an attorney, so I don't know how to read that, I

24  guess.

25  Q.   Okay.  Now, this document is comprised of the whole

WELCH - CROSS - FARSIOU

1   non-compete for the employment of Mr. Garafola; is that

2   correct?

3   A.   Yes, for the employment.

4   Q.   Is it your understanding, today, that Facts Technology is

5   doing more than just selling a license -- a software license?

6   A.   They're selling online bidding services.

7   Q.   Is it different than the question that I asked.

8        Is it -- do you know if they're doing anything other than

9   providing a license software package to someone?

10  A.   I don't know.  Anything I say would be speculation there.

11  Q.   Okay.  Would you agree with me that if Mr. Garafola had

12  licensed a software package to an auctioneer company that they

13  could then bring that to Sandhills and say, hey, I want you to

14  run this software and run our auction?

15  A.   No.

16  Q.   Why not?

17  A.   We sell it as a package.  We wouldn't use another

18  service.

19  Q.   Correct.  So, Sandhills would say, no, you have to use

20  our software, and we run the auction, right?

21  A.   Yes.

22  Q.   Okay.  So that would be completely different than what

23  Sandhills does, isn't it?

24  A.   I'm not following, I guess.

25  Q.   Well, you just said -- you just testified Sandhills

WELCH - CROSS - FARSIOU

1   wouldn't use someone's software, right?

2   A.   We have our own software.

3   Q.   Okay.  But you'd be capable of doing it if you needed to,

4   right?

5   A.   Of doing what?

6   Q.   Of using the other software and running the auction for

7   the company?

8   A.   I'm not sure I can even speculate on how that would even

9   work but...

10  Q.   Well, sir, it's pretty simple.  You would -- what you're

11  saying is Sandhills won't run an auction unless that auction

12  is run with their software, right?

13  A.   Yeah, that's part of what we're selling.

14  Q.   Okay.  And so, you're not selling -- you're not selling

15  licensing software to others companies and then having them

16  run their own auction.  That's not what you do?

17  A.   We do allow people to run their own auction.  We're not

18  selling it as a license outright, but we could.

19  Q.   But you're not doing that.  That's not the business

20  you're in, right?

21  A.   We're in the business of online auction services.  No

22  different than what Larry is.

23  Q.   Sir, you are not in the business of selling a license --

24  a software license; isn't that correct?

25  A.   I'm just not seeing the difference.

────WELCH - CROSS - FARSIOU────

1    Q.   It doesn't matter whether you see the difference or not.

2    Just answer the question.

3         Sandhills is not in the business of selling a software

4    license to a third-party, correct?

5    A.   We do sell service licenses.

6    Q.   So, which one is it?

7    A.   Not with Equipmentfacts, not with BidCaller, but we do

8    sell licenses.

9    Q.   Sir, auction services, are you selling a software license

10   to people?

11   A.   It's a component of what we're selling.  The two can't

12   be...  Yeah, it's a component.

13   Q.   You were just about to say, the two can't be separated

14   because when Sandhills runs a auction, they run it with their

15   software, right?

16   A.   Yes.

17   Q.   And part of Sandhills' business does not include selling

18   a software license for auctioneers to run an auction on their

19   own, right?

20   A.   Again, it's selling online bidding services.  It's --

21   they're the same thing.

22   Q.   I just -- you know, it's 4 o'clock now.  I know the judge

23   is going to stop here.  I just want you to answer the question

24   before we leave here today.

25   A.   I did.  I don't see the difference.

 1  Q.   Do you -- it's not whether or not you see the difference.

 2       Does Sandhills sell a software license to third-parties

 3  and not run their auction?

 4  A.   No.

 5            MR. FARSIOU:  Thank you.

 6            Judge, do you want to stop here?

 7            THE COURT:  Yes.

 8            Counsel, first let me get a motion by both sides to

 9  move into the evidence the documents that you have submitted

10  and marked to the Court so that we can at least receive these

11  as part of the record.

12            MR. MILLER:  Judge, on behalf of the plaintiff, I ask

13  that the exhibits that were marked for identification be moved

14  into evidence.

15            THE COURT:  Mr. Farsiou.

16            MR. FARSIOU:  Judge, I would object to any of the

17  certifications of any third-party being moved into evidence at

18  this time, unless they're going to be presented on the stand

19  and be cross-examined based on what -- Mr. Welch basically

20  testified for what these third-parties are going to say.  And

21  I don't think that's fair to Mr. Garafola.  I don't think

22  that's fair to the process for us to really find out what was

23  actually said.  So that's my objection with respect to those

24  declarations.

25            THE COURT:  How about the defense documents?

 1          MR. FARSIOU:  At this point, Judge, I would ask that

 2   the defense documents -- I think it's D-1 through D-4 be moved

 3   into evidence.

 4          THE COURT:  Mr. Miller, any opposition?

 5          MR. MILLER:  No opposition.

 6          THE COURT:  The Court will receive these at this time

 7   pending the completion of the preliminary injunction hearing.

 8   And at that time, we'll make any final determinations as to

 9   the receiving of the documents at all.

10          So, with that, that's where we'll leave it with

11   regards to the documents.

12   (Plaintiff's Exhibit P-1 through P-24 for identification.)

13   (Defendant's Exhibit D-1 through D-4 for identification.)

14          THE COURT:  Where we'll leave it with regard to the

15   schedule is that we need to wrap this up, gentlemen, as

16   quickly as possible.  Apparently, we weren't able to get it

17   done today.  I'm only going to allow one more day of testimony

18   here.  I can't see letting this go into a third or fourth day.

19          So, with that being said, I've given my courtroom

20   deputy four dates, and it's my hope that one of the four dates

21   will work with you.  And I literally had to move my schedule

22   around to make the Court's schedule available on such short

23   notice, but it's important to all that we get this resolved as

24   soon as possible.  And I'm sure you all share my concern with

25   that.

1          So, with that, after I leave the bench, Gina will work

2   with you to try and come up with a date that is satisfactory

3   to both sides.

4          Are there any other outstanding issues that we need to

5   resolve at this time?

6          Of course, the current status quo will remain in place

7   until we finish this injunction hearing, that goes without

8   saying.  That was part of the initial order.

9          Any other items?  From plaintiff counsel?

10          MR. MILLER:  Nothing, your Honor.

11          THE COURT:  Anything from defense counsel?

12          MR. FARSIOU:  Judge, the only thing I would say --

13   and I know you're saying the status quo, but our position is

14   that the selling of the software license is not keeping -- I

15   mean, I think it's outside of what Mr. Garafola can do.

16          THE COURT:  Counsel, that's why we're here.  Isn't

17   that kind of the essence of what the ultimate argument is

18   here?

19          MR. FARSIOU:  Well, I think they've alleged other

20   conduct other than the selling of the license.

21          THE COURT:  What are you asking the Court to do?

22          MR. FARSIOU:  I would like my client to be able to

23   sell software licenses.

24          THE COURT:  That's denied.  Anything else?

25          MR. MILLER:  Not from the plaintiff.

1           MR. FARSIOU:  No, Judge.

2           THE COURT:  That's all we have for today.

3           MR. FARSIOU:  Thank you, Judge.

4           THE DEPUTY COURT CLERK:  All rise.

5           (Court concludes at 4:02 p.m.)

6

7

8           FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

9     - - - - - - - - - - - - - - - - - - - - - - - - - -

10

11

12      I certify that the foregoing is a correct transcript from

13  the record of proceedings in the above-entitled matter.

14

15

16

17

18

19

20  /S/ CATHY J. FORD, CCR, CRR, RPR          February 14, 2020

21      Court Reporter                          Date

22

23

24

25

**$**

**$136,000** [2] - 135:25, 145:9
**$147,000** [2] - 135:8, 144:20
**$170,000** [2] - 35:3, 35:9
**$2.93** [1] - 152:18
**$220,000** [1] - 35:11
**$300,000** [1] - 138:2
**$40,000** [1] - 51:12

**/**

**/S** [1] - 240:20

**0**

**08608** [1] - 1:10

**1**

**1** [7] - 19:19, 20:1, 20:5, 20:10, 28:15, 62:11, 78:22
**1.23** [2] - 18:8, 20:22
**1.5** [12] - 20:20, 34:16, 35:13, 65:17, 70:5, 72:15, 72:20, 81:8, 87:19, 139:4, 158:1, 201:12
**10** [2] - 163:22, 190:15
**10-minute** [1] - 198:1
**100** [2] - 49:16, 79:16
**10:12** [1] - 3:2
**11** [3] - 2:6, 33:17, 109:24
**11:30** [1] - 62:9
**11:33** [1] - 70:12
**11:43** [1] - 70:13
**11:44** [1] - 70:17
**11:45** [1] - 70:13
**11th** [2] - 7:10, 48:10
**12** [4] - 2:7, 43:23, 82:5, 231:15
**12-month** [1] - 135:5, 135:23
**12-year** [1] - 135:5
**14** [1] - 240:20
**142** [1] - 2:8
**14th** [2] - 51:20, 169:5
**15** [2] - 12:22, 221:19
**15-plus** [1] - 183:11
**16** [5] - 3:23, 27:1, 55:17, 121:15, 122:4
**16th** [8] - 57:8, 58:24, 59:5, 65:6, 123:6, 123:21, 162:17, 182:11
**18** [6] - 39:4, 39:14, 39:18, 67:22, 127:2, 127:20, 129:10, 136:25
**18th** [1] - 65:1
**19** [1] - 217:13
**19-20669** [1] - 3:8
**1:02** [1] - 132:1, 132:7
**1:35-ish** [1] - 132:4

**1:37** [1] - 132:9
**1st** [1] - 231:8

**2**

**2** [18] - 25:10, 25:11, 29:10, 29:11, 56:17, 56:20, 63:22, 69:13, 78:22, 96:11, 109:7, 123:2, 123:5, 127:12, 152:24, 167:4, 223:5
**2.0** [5] - 66:22, 68:16, 69:18, 72:11, 88:1
**2.9** [1] - 152:6
**20** [2] - 119:15, 214:16
**200** [2] - 206:18, 206:23
**2005** [2] - 142:14, 154:18
**2017** [4] - 17:16, 54:21, 55:9, 55:15
**2018** [12] - 17:18, 18:3, 21:21, 21:24, 27:1, 66:4, 70:4, 76:22, 81:5, 152:7, 152:17, 162:17
**2019** [42] - 3:23, 4:2, 7:10, 48:12, 51:8, 51:22, 55:17, 57:8, 65:3, 67:21, 67:22, 71:20, 72:2, 73:25, 74:20, 77:22, 78:2, 80:2, 82:11, 92:2, 97:18, 98:5, 101:1, 107:19, 119:15, 121:15, 122:4, 161:13, 162:18, 163:5, 163:18, 174:25, 182:8, 182:11, 189:24, 190:23, 194:15, 196:16, 201:3, 214:16, 222:5, 224:11
**2020** [9] - 1:10, 4:7, 4:12, 127:2, 127:21, 129:10, 146:13, 182:15, 240:20
**2023** [2] - 28:24, 31:24
**20th** [2] - 182:8, 182:14
**21** [1] - 132:16
**22** [3] - 4:7, 4:12, 13:6
**22nd** [2] - 181:9, 182:4
**23** [4] - 4:2, 97:18, 98:5, 122:3
**238** [2] - 2:12, 2:13
**23rd** [4] - 51:6, 51:7, 181:19, 182:4
**24** [1] - 26:7
**24-month** [2] - 39:13, 228:5
**25** [8] - 26:3, 26:14, 72:2, 74:20, 78:1, 80:7, 82:11, 107:19
**25th** [6] - 67:19, 73:23, 77:15, 77:22, 78:1, 80:2, 181:3, 181:8, 181:9
**29th** [1] - 162:18
**2nd** [2] - 201:6, 203:11

**3**

**3** [8] - 30:13, 32:1, 63:23, 122:12, 167:4, 223:8, 227:17, 227:24
**3-2** [1] - 107:19
**3.0** [1] - 64:17
**300,000** [1] - 138:3
**30th** [1] - 42:18
**35** [1] - 31:11
**3:01** [2] - 198:1, 198:6
**3:12** [1] - 198:8
**3:12-ish** [1] - 198:2
**3:14** [1] - 97:18
**3:18** [2] - 59:1, 60:11
**3:19-cv-20669-MAS-TJB** [1] - 1:6
**3rd** [2] - 46:4, 203:19

**4**

**4** [11] - 20:13, 33:16, 38:12, 63:23, 63:25, 182:7, 182:14, 182:18, 182:19, 198:3, 236:22
**402** [1] - 1:9
**4:02** [1] - 240:5
**4:16** [2] - 59:7, 60:11

**5**

**5** [11] - 28:21, 28:22, 30:18, 31:23, 36:22, 38:25, 39:16, 93:23, 113:24, 174:16, 227:18
**5-year** [1] - 21:12
**5.5** [1] - 154:11
**500** [3] - 55:3, 206:12, 206:14
**510** [1] - 20:14
**512** [1] - 21:4
**515** [1] - 19:18
**596** [3] - 6:21, 7:17, 206:4
**5th** [1] - 230:22

**6**

**6** [11] - 1:10, 31:9, 31:15, 40:13, 115:6, 115:10, 230:1, 230:3, 232:24, 233:5, 233:6
**6.6** [1] - 26:7
**609.367.2777** [1] - 1:21
**6:29** [2] - 6:20, 7:17
**6th** [1] - 146:13

**7**

**7** [2] - 21:3, 71:20
**7:38** [1] - 65:5
**7:47** [2] - 78:2, 78:12

**7:50** [4] - 74:10, 74:21, 78:1, 78:10
**7:52** [4] - 77:24, 78:4, 78:5, 80:6
**7:58** [1] - 80:4
**7th** [9] - 57:15, 71:13, 194:14, 196:16, 201:2, 202:16, 210:1, 210:4, 226:3

**8**

**8** [2] - 32:1, 41:9
**81** [1] - 53:21
**8:46** [2] - 74:2, 74:7
**8th** [1] - 202:15

**9**

**9** [4] - 65:6, 115:25, 116:2, 122:9
**9:05** [1] - 82:12
**9:48** [1] - 119:16
**9th** [1] - 202:15

**A**

**a.m** [16] - 3:2, 70:17, 74:2, 74:7, 74:10, 74:21, 77:24, 78:1, 78:2, 78:4, 78:10, 78:12, 80:4, 80:6, 82:12, 119:16
**abide** [4] - 7:22, 125:22, 141:25, 170:20
**ability** [4] - 61:5, 188:19, 189:12, 189:13
**able** [17] - 5:8, 7:25, 11:13, 11:14, 18:20, 46:1, 48:15, 88:1, 134:16, 141:11, 183:20, 200:4, 200:7, 202:23, 238:16, 239:22
**above-entitled** [1] - 240:13
**absolutely** [23] - 34:11, 36:20, 49:22, 51:16, 53:11, 55:7, 56:4, 57:9, 65:13, 72:8, 85:10, 85:12, 94:12, 110:15, 118:14, 129:8, 130:25, 175:16, 177:2, 179:9, 179:11, 206:19, 209:8
**abstract** [1] - 83:9
**academic** [1] - 127:5
**accept** [4] - 40:21, 40:22, 40:25, 233:14
**access** [14] - 14:16, 34:19, 35:17, 35:20, 49:8, 86:7, 86:11, 86:18, 86:25, 184:3, 186:21, 189:17, 192:8
**accessing** [1] - 185:21
**accompanying** [1] - 63:7

**accordance** [1] - 6:13
**according** [8] - 25:23, 45:14, 46:15, 60:12, 72:24, 137:13, 177:25, 231:25
**account** [55] - 9:6, 9:7, 33:22, 33:25, 51:24, 52:3, 55:21, 55:23, 61:11, 63:2, 64:24, 66:18, 67:15, 67:16, 69:23, 70:8, 71:17, 72:1, 72:7, 73:5, 73:21, 74:20, 77:2, 81:23, 82:16, 84:2, 87:11, 87:14, 87:25, 89:9, 107:12, 113:11, 113:13, 113:16, 114:11, 122:20, 123:14, 123:16, 124:8, 124:9, 124:13, 124:23, 125:24, 126:4, 126:8, 126:9, 135:7, 135:9, 135:11, 135:17, 138:14, 138:17, 189:17
**accounting** [1] - 163:23
**accounts** [9] - 46:4, 55:24, 123:13, 124:14, 124:15, 127:17, 136:3, 138:6, 164:1
**accurate** [8] - 11:15, 26:10, 67:5, 71:23, 72:3, 78:3, 92:6, 118:11
**acknowledges** [2] - 32:10, 32:19
**acquired** [3] - 13:22, 95:19, 138:15
**acquiring** [3] - 13:11, 16:6, 104:24
**acquisition** [30] - 13:10, 16:1, 16:16, 16:24, 17:3, 17:9, 17:13, 17:24, 19:13, 25:22, 36:3, 45:13, 45:24, 45:25, 61:16, 61:18, 69:5, 100:21, 103:12, 103:13, 128:7, 140:1, 156:10, 161:13, 163:25, 165:6, 165:11, 179:18, 224:25
**acquisitions** [5] - 16:22, 141:14, 141:15, 141:18, 142:2
**action** [1] - 173:14
**ACTION** [1] - 1:4
**active** [1] - 56:7
**activity** [1] - 148:5
**actual** [10] - 20:11, 22:23, 24:9, 76:5, 94:21, 101:22, 104:14, 108:6, 113:23, 178:4
**acumen** [1] - 133:20
**added** [1] - 125:9
**addition** [7] - 22:23, 27:15, 32:23, 33:10, 34:17, 107:8, 175:22
**additional** [4] - 17:25, 30:2,

35:15, 230:24
**address** [48] - 9:18, 26:21, 27:1, 44:8, 44:10, 45:10, 47:13, 49:25, 53:8, 54:1, 58:5, 58:6, 58:8, 59:15, 63:3, 65:12, 66:15, 82:17, 85:20, 109:21, 110:10, 110:14, 148:21, 149:3, 149:6, 149:9, 149:12, 149:14, 150:7, 150:24, 180:15, 185:12, 185:19, 186:11, 187:12, 188:19, 188:20, 188:23, 188:24, 189:8, 189:21, 194:20, 198:17, 198:21, 198:25, 210:7
**addresses** [6] - 124:10, 150:1, 186:5, 199:8, 200:8, 200:14
**adjusted** [1] - 52:14
**administrative** [1] - 120:12
**admitted** [1] - 37:14
**advanced** [1] - 93:11
**adversary** [1] - 9:24
**advertise** [2] - 50:8, 219:16
**advertised** [2] - 109:10, 120:17
**advertisements** [1] - 133:24
**advertising** [4] - 173:10, 175:23, 217:7, 220:1
**advised** [1] - 6:19
**affidavits** [1] - 155:3
**affiliate** [1] - 128:10
**affiliates** [11] - 29:25, 30:1, 31:1, 31:6, 31:18, 39:25, 41:5, 128:11, 171:1, 172:9, 233:16
**afraid** [1] - 202:6
**afternoon** [2] - 59:2, 142:10
**ago** [3] - 114:8, 119:12, 213:12
**agree** [25] - 145:25, 151:17, 151:22, 154:5, 154:7, 155:23, 156:24, 160:2, 166:21, 185:11, 189:23, 191:2, 191:25, 193:14, 208:8, 211:15, 213:13, 216:11, 219:5, 219:21, 222:5, 222:11, 226:11, 227:12, 234:11
**agreed** [8] - 34:6, 141:7, 165:10, 165:16, 167:12, 169:1, 172:22, 225:14
**agreeing** [1] - 34:4
**agreement** [32] - 5:16, 17:19, 17:20, 19:25, 21:12, 21:14, 27:19, 27:25, 28:20, 32:18, 33:8, 33:9, 33:12, 34:9, 38:8, 39:10, 47:15, 87:15, 94:6, 115:19, 142:1,

165:10, 167:2, 169:9, 169:10, 170:20, 199:22, 215:25, 216:3, 221:9, 221:10, 228:19
**Agreement** [57] - 20:11, 21:9, 21:19, 21:23, 24:10, 24:13, 25:1, 27:9, 28:6, 28:9, 37:8, 38:7, 91:14, 93:19, 94:2, 94:10, 103:25, 105:13, 123:10, 128:14, 137:13, 137:16, 143:1, 156:21, 156:24, 156:25, 157:1, 157:2, 157:3, 164:12, 164:22, 164:24, 165:2, 165:3, 165:5, 165:15, 165:21, 165:22, 165:25, 166:1, 166:4, 166:5, 166:6, 166:20, 166:22, 169:25, 215:7, 216:8, 216:12, 222:13, 222:19, 223:4, 225:19, 227:14, 228:16
**agreements** [11] - 21:18, 27:13, 36:14, 39:6, 105:14, 131:8, 131:9, 166:9, 199:16, 199:18
**agricultural** [2] - 22:19, 223:25
**agriculture** [7] - 22:15, 26:1, 40:10, 94:11, 223:20, 228:9, 228:14
**ahead** [6] - 10:19, 23:10, 70:10, 70:23, 70:25, 132:3
**aid** [9] - 9:10, 9:13, 31:5, 40:22, 40:25, 41:6, 41:7, 233:14
**aided** [1] - 1:22
**aired** [1] - 141:8
**airing** [1] - 117:17
**alarming** [2] - 45:15, 45:20
**alert** [4] - 184:17, 186:8, 189:3, 198:15
**alerted** [3] - 185:13, 200:24, 202:6
**Alex** [3] - 54:9, 68:6, 80:1
**Alexander** [1] - 3:12
**alive** [1] - 150:2
**alleged** [1] - 239:19
**allow** [7] - 10:1, 108:3, 108:8, 118:24, 206:20, 235:17, 238:17
**allowed** [2] - 178:10, 178:13
**allows** [1] - 101:22
**almost** [5] - 25:5, 60:8, 104:18, 117:17, 190:19
**alone** [3] - 3:24, 228:19
**alongside** [2] - 13:25, 23:8
**alter** [2] - 30:24, 123:15
**amend** [2] - 4:4, 4:9
**amendment** [1] - 4:6

**AMERY** [1] - 1:15
**Amery** [1] - 3:11
**amount** [4] - 139:3, 143:9, 155:17, 213:21
**amounting** [1] - 139:3
**amounts** [1] - 145:24
**ample** [2] - 205:5, 210:2
**analogy** [1] - 67:5
**analysis** [4] - 43:24, 43:25, 135:23, 232:8
**Andrew** [2] - 188:10, 188:12
**angry** [2] - 111:21, 111:24
**animal** [2] - 113:17, 114:12
**answer** [20] - 11:20, 68:10, 118:4, 118:5, 166:14, 171:15, 171:16, 176:14, 178:15, 178:16, 178:19, 178:20, 190:22, 204:8, 207:8, 207:20, 209:10, 222:20, 236:2, 236:23
**answering** [1] - 180:13
**anticipating** [1] - 98:11
**APA** [11] - 24:10, 25:17, 27:15, 36:17, 91:14, 123:18, 156:17, 157:3, 215:6, 215:20, 215:22
**apologize** [3] - 48:3, 126:7, 126:10
**appalled** [1] - 186:14
**appear** [5] - 20:10, 47:13, 48:16, 75:23, 80:15
**appearances** [1] - 3:9
**appeared** [2] - 58:12, 104:8
**apple** [1] - 100:17
**apple-is-to-apples** [1] - 100:17
**apples** [1] - 100:17
**application** [4] - 9:13, 118:23, 118:24, 225:3
**applied** [2] - 166:4, 166:6
**applies** [1] - 216:8
**apply** [2] - 56:15, 94:8
**appreciate** [2] - 12:15, 107:24
**appreciating** [1] - 130:2
**appreciative** [1] - 9:23
**approach** [14] - 18:15, 24:15, 27:21, 37:10, 42:4, 44:19, 47:17, 50:16, 53:12, 57:19, 62:13, 67:7, 73:9, 77:4
**approaching** [1] - 141:18
**appropriate** [2] - 10:14, 31:16
**approval** [2] - 86:8, 86:12
**approved** [1] - 75:8
**April** [14] - 18:1, 18:2, 21:21, 45:25, 97:18, 98:5, 101:1, 161:13, 162:18, 163:5, 163:18, 189:24, 190:23, 222:5

**area** [6] - 13:12, 164:3, 208:11, 221:22, 228:1, 228:3
**areas** [3] - 15:11, 23:15, 229:19
**argue** [2] - 154:9, 212:7
**argument** [1] - 239:17
**Arizona** [1] - 183:6
**articles** [1] - 152:14
**aside** [2] - 10:11, 41:17
**aspect** [3] - 13:21, 205:11, 219:19
**aspects** [1] - 10:7
**asserted** [2] - 118:16
**Asset** [21] - 20:11, 21:18, 21:23, 24:10, 24:13, 25:1, 27:9, 28:8, 91:14, 93:18, 94:2, 94:10, 103:25, 105:12, 123:10, 142:25, 157:12, 165:14, 166:3, 215:6, 216:8
**asset** [3] - 28:12, 36:10, 36:25
**assets** [1] - 34:13
**Assets** [1] - 20:6
**assist** [1] - 4:19
**assisting** [1] - 22:2
**associated** [3] - 116:4, 116:5, 124:16
**Association** [1] - 46:8
**assume** [1] - 153:25
**assuming** [4] - 7:16, 189:1, 199:3, 199:7
**assumption** [2] - 158:18, 209:22
**assurances** [1] - 142:3
**att.htm** [1] - 63:12
**attach** [2] - 59:24, 60:1
**attached** [9] - 36:17, 63:6, 63:18, 75:19, 76:11, 86:1, 108:16, 132:19, 167:22
**attachment** [17] - 48:4, 48:13, 54:12, 54:14, 54:16, 58:15, 58:20, 63:8, 63:21, 69:2, 75:18, 75:23, 78:18, 79:10, 84:23, 109:9
**attachment's** [1] - 78:21
**attachments** [25] - 9:5, 59:16, 63:7, 63:9, 63:15, 64:22, 65:10, 65:11, 66:14, 67:25, 68:11, 68:18, 69:16, 71:25, 75:22, 76:5, 76:8, 80:13, 80:15, 80:16, 84:17, 84:19, 85:19, 85:21, 205:23
**attacks** [1] - 185:5
**attempt** [1] - 117:24
**attempting** [2] - 159:21, 160:8
**attend** [1] - 46:11

**attendance** [2] - 25:25, 46:13
**attended** [1] - 46:9
**attention** [4] - 5:3, 5:4, 88:9, 182:4
**attorney** [22] - 11:19, 17:10, 22:5, 26:16, 27:8, 45:11, 45:14, 54:5, 125:18, 166:11, 174:22, 187:7, 187:23, 195:23, 203:8, 204:4, 204:12, 209:9, 209:11, 225:21, 229:6, 233:23
**attorney's** [2] - 4:6, 4:10
**attorney-client** [1] - 54:5
**attorneys** [4] - 43:10, 143:7, 215:10, 215:15
**attract** [1] - 38:23
**attractions** [1] - 219:6
**attractive** [3] - 22:20, 22:24, 23:4
**auction** [149] - 13:5, 13:17, 13:18, 13:20, 13:24, 13:25, 14:5, 14:6, 14:8, 14:13, 14:15, 14:16, 15:13, 15:21, 16:15, 22:15, 26:2, 29:7, 29:22, 29:24, 30:6, 30:10, 40:4, 40:5, 40:8, 46:10, 49:6, 65:16, 68:19, 76:14, 76:15, 79:12, 79:19, 85:1, 89:22, 91:7, 91:11, 91:15, 91:18, 93:2, 93:9, 93:13, 93:25, 94:4, 94:25, 95:8, 95:20, 97:7, 98:10, 99:17, 99:20, 99:21, 99:24, 100:3, 100:7, 100:8, 100:22, 101:8, 101:13, 101:18, 102:3, 103:18, 103:21, 109:11, 109:18, 110:11, 117:20, 127:24, 128:2, 128:9, 129:2, 133:5, 139:16, 140:14, 154:5, 155:19, 156:5, 160:2, 160:3, 167:11, 167:16, 170:18, 170:24, 170:25, 171:14, 171:21, 172:2, 172:4, 172:6, 172:8, 172:10, 172:11, 172:14, 172:15, 172:16, 172:19, 172:22, 172:23, 173:8, 175:13, 175:22, 177:2, 177:17, 179:1, 179:17, 180:7, 191:17, 192:16, 201:19, 217:11, 217:17, 218:8, 219:2, 219:7, 219:8, 219:10, 219:17, 219:19, 219:23, 220:21, 221:4, 223:11, 223:14, 228:7, 228:8, 229:1, 229:3, 229:7, 234:14, 234:20, 235:6, 235:11, 235:16, 235:17,

235:21, 236:9, 236:14, 236:18, 237:3
**Auction** [7] - 64:18, 68:19, 68:24, 75:24, 76:3, 129:16
**auctioned** [1] - 89:10
**Auctioneer** [5] - 46:8, 64:14, 179:10, 179:12, 179:21
**auctioneer** [13] - 14:18, 23:9, 122:18, 172:12, 172:16, 172:19, 175:13, 177:12, 177:14, 182:24, 218:20, 229:2, 234:12
**AuctioneerFacts** [14] - 102:24, 103:4, 104:13, 104:16, 105:3, 105:8, 109:11, 109:12, 109:17, 112:23, 133:3, 133:6, 134:3, 179:7
**AuctioneerFacts'** [1] - 109:13
**auctioneers** [10] - 23:25, 52:21, 93:10, 96:18, 155:21, 170:9, 170:10, 173:5, 219:6, 236:18
**Auctioneers** [1] - 116:20
**AuctionFlex** [5] - 174:2, 174:7, 174:9, 174:25
**Auctions** [1] - 24:1, 24:4, 89:7, 96:17, 111:3, 114:18, 119:8, 135:4, 144:24, 156:12, 210:18
**auctions** [51] - 24:2, 24:5, 26:1, 45:12, 45:13, 51:12, 76:12, 95:4, 95:13, 99:18, 101:22, 102:9, 102:14, 104:14, 128:3, 128:5, 128:6, 128:7, 144:23, 155:24, 156:2, 156:3, 156:4, 156:7, 156:9, 156:11, 159:21, 159:23, 159:25, 160:1, 160:6, 160:8, 161:24, 162:9, 162:10, 162:11, 164:4, 173:3, 173:4, 175:9, 190:16, 192:23, 192:24, 214:25, 220:20, 221:3, 221:17, 222:2, 224:3
**AuctionTime** [13] - 13:19, 14:8, 14:21, 15:9, 24:2, 45:14, 128:8, 128:10, 129:19, 156:11, 156:13, 204:5, 204:13
**audience** [2] - 14:1, 14:14
**Audio** [1] - 68:20
**August** [8] - 57:15, 147:21, 147:22, 201:6, 202:16, 203:11, 230:22, 231:8
**authority** [2] - 75:12, 82:23
**authorization** [1] - 75:11
**authorize** [3] - 70:7, 77:1,

235:21, 236:9, 236:14, 236:18, 237:3

83:5
**automate** [1] - 164:6
**available** [7] - 8:16, 55:10, 90:16, 101:12, 109:17, 154:13, 238:22
**aware** [52] - 41:23, 41:25, 42:8, 47:2, 47:4, 48:1, 56:20, 62:4, 80:21, 88:7, 91:23, 106:4, 107:9, 108:11, 113:4, 114:19, 116:16, 116:21, 119:9, 123:21, 124:3, 124:6, 124:18, 124:22, 125:15, 125:18, 131:15, 134:13, 134:18, 136:7, 145:21, 147:14, 155:10, 182:8, 184:12, 184:13, 186:18, 188:17, 189:18, 194:4, 194:7, 198:18, 201:4, 204:24, 204:25, 205:24, 206:1, 206:17, 207:25, 212:1, 230:10
**aware..** [1] - 182:15

**B**

**background** [1] - 3:23
**backtrack** [1] - 198:13
**backwards** [1] - 33:16
**bad** [1] - 214:6
**bank** [1] - 46:4
**Barrett** [1] - 96:17
**Barrett-Jackson** [1] - 96:17
**base** [2] - 157:22, 169:6
**based** [14] - 8:1, 35:6, 56:8, 56:25, 103:16, 105:12, 109:16, 114:8, 169:4, 169:6, 228:19, 229:5, 229:9, 237:19
**basing** [1] - 147:17
**basis** [2] - 10:16, 178:2
**Bates** [25] - 19:17, 19:18, 20:14, 21:4, 25:10, 26:3, 28:14, 29:10, 31:10, 38:13, 40:13, 53:20, 65:20, 66:3, 69:25, 73:16, 76:18, 79:13, 80:25, 81:25, 96:11, 108:18, 109:24, 112:16, 132:20
**Bates-stamped** [5] - 19:18, 20:14, 53:20, 73:16, 76:18
**battle** [1] - 112:6
**be..** [1] - 236:12
**became** [17] - 34:18, 34:22, 35:8, 41:23, 42:8, 47:25, 116:21, 124:18, 124:22, 125:15, 138:17, 182:8, 182:15, 184:12, 184:13, 201:4
**become** [10] - 21:18, 41:25,

61:17, 88:7, 91:23, 106:4, 108:11, 119:9, 124:6, 126:13
**becomes** [1] - 25:4
**Beech** [1] - 96:23
**begin** [3] - 11:20, 12:5, 178:9
**beginning** [5] - 98:13, 115:11, 115:16, 120:8, 133:3
**begins** [5] - 32:7, 70:17, 79:13, 132:9, 198:8
**behalf** [18] - 1:16, 1:18, 3:15, 17:3, 27:5, 46:17, 49:19, 71:25, 84:8, 85:1, 112:21, 119:20, 127:24, 128:25, 129:14, 131:22, 237:12
**behind** [2] - 43:17, 43:18
**belabor** [2] - 24:19, 66:25
**belief** [4] - 110:19, 131:8, 134:20, 226:1
**bell** [1] - 214:17
**below** [1] - 120:10
**bench** [1] - 239:1
**beneath** [1] - 133:3
**beneficial** [1] - 112:2
**benefit** [22] - 4:19, 10:2, 13:1, 17:21, 20:4, 36:19, 36:21, 51:10, 76:10, 78:25, 94:20, 111:18, 184:7, 184:9, 186:24, 186:25, 187:1, 187:4, 187:15, 200:14, 200:17, 210:4
**benefits** [4] - 35:14, 35:15, 36:14
**best** [3] - 18:18, 44:14, 116:23
**better** [3] - 217:10, 221:22, 222:2
**between** [21] - 19:24, 44:15, 51:2, 58:10, 69:6, 71:8, 72:1, 82:7, 89:21, 97:12, 98:15, 117:14, 119:24, 127:23, 137:22, 139:24, 196:19, 205:24, 207:15, 218:18, 220:8
**beyond** [1] - 44:4
**bid** [6] - 14:18, 20:21, 49:1, 101:10, 133:15, 219:5
**BidCaller** [60] - 15:20, 98:1, 98:21, 98:22, 100:24, 101:2, 101:21, 102:23, 103:5, 103:9, 103:14, 105:6, 105:10, 159:16, 159:17, 159:18, 159:19, 159:22, 159:23, 160:1, 160:9, 160:25, 161:5, 161:7, 161:10, 161:11, 161:14, 161:15, 161:16, 162:2, 162:4, 162:25, 163:3, 163:21, 164:5,

175:18, 175:19, 189:24, 190:1, 190:3, 190:5, 190:7, 190:9, 190:17, 190:20, 190:24, 190:25, 191:1, 191:2, 191:19, 191:24, 193:6, 193:14, 193:24, 194:6, 194:9, 217:19, 217:21, 218:5, 236:7
**Bidder** [1] - 48:20
**bidder** [10] - 49:1, 49:23, 50:7, 55:7, 55:13, 122:17, 146:16, 196:25, 206:14, 226:4
**Bidderfacts** [1] - 104:7
**Bidders** [8] - 54:15, 54:21, 58:16, 58:21, 59:18, 64:7, 69:1, 76:1
**bidders** [25] - 14:10, 49:1, 49:3, 49:17, 50:4, 50:6, 50:8, 55:8, 59:18, 147:1, 147:2, 147:4, 147:5, 173:13, 206:14, 207:24, 219:4, 219:7, 219:8, 219:15, 219:17, 219:22, 220:1, 220:5, 220:6
**bidders'** [1] - 50:12
**Bidding** [1] - 68:21
**bidding** [15] - 13:25, 14:10, 14:15, 14:18, 14:19, 23:8, 25:25, 69:4, 93:11, 155:18, 177:16, 218:17, 219:1, 234:6, 236:20
**Bidfacts** [30] - 42:3, 46:3, 46:19, 84:9, 147:15, 158:25, 159:2, 159:3, 159:5, 159:7, 192:18, 195:2, 195:5, 195:6, 196:4, 196:6, 196:21, 202:19, 203:12, 203:19, 203:25, 204:7, 204:9, 204:17, 205:2, 205:17, 226:13, 226:21
**Bidpath** [63] - 44:16, 45:23, 46:16, 68:20, 69:3, 69:4, 69:7, 69:9, 69:10, 69:12, 83:14, 85:1, 98:1, 98:21, 98:23, 98:24, 99:3, 99:9, 100:20, 100:25, 101:2, 104:25, 105:1, 147:15, 158:25, 159:5, 159:8, 161:9, 161:18, 162:3, 162:19, 162:24, 163:3, 163:5, 163:19, 163:21, 190:13, 190:18, 190:21, 191:16, 191:21, 191:23, 192:5, 192:8, 192:19, 192:20, 192:24, 193:2, 193:20, 193:22, 194:9, 217:24, 218:1, 218:6, 226:7, 226:10, 227:3

**Bidpath's** [2] - 192:2, 226:16
**bids** [1] - 14:9
**big** [4] - 100:1, 154:2, 154:6, 208:4
**billion** [6] - 151:23, 152:6, 152:18, 152:25, 154:11
**billion-dollar** [3] - 151:23, 152:25
**birth** [1] - 137:4
**bit** [3] - 113:18, 178:24, 198:13
**bit's** [1] - 54:19
**blame** [1] - 40:24
**blaming** [1] - 158:9
**block** [2] - 154:2, 154:6
**board** [1] - 100:23
**bodies** [1] - 100:16
**body** [1] - 51:1
**bolts** [1] - 173:8
**bonus** [2] - 168:23, 169:2
**Boss** [1] - 45:16
**boss** [2] - 45:20, 204:6
**bottom** [15] - 20:2, 20:14, 40:1, 62:20, 65:21, 66:2, 70:3, 73:15, 76:21, 81:2, 112:22, 119:14, 164:18, 227:24, 227:25
**bought** [4] - 65:17, 140:21, 179:19, 180:10
**bounce** [1] - 101:9
**box** [1] - 5:6
**brand** [25] - 15:19, 15:20, 16:5, 88:11, 88:15, 88:21, 88:25, 89:8, 89:20, 95:14, 96:25, 99:1, 100:9, 102:18, 103:9, 103:12, 103:13, 104:8, 161:15, 174:24, 176:10, 225:5, 225:6, 225:8, 225:10
**brand-specific** [1] - 96:25
**branding** [1] - 176:6
**brands** [41] - 13:4, 14:25, 15:1, 15:6, 15:9, 15:14, 23:21, 30:2, 30:3, 30:4, 30:6, 86:14, 89:16, 89:17, 90:12, 92:11, 92:13, 92:14, 92:18, 92:20, 92:23, 92:24, 93:12, 93:13, 94:16, 94:19, 94:22, 99:24, 100:4, 101:5, 101:17, 102:4, 102:8, 102:9, 102:10, 103:7, 103:17, 103:21, 128:5, 133:25, 174:23
**breach** [6] - 32:20, 33:2, 33:8, 33:11, 209:6
**breached** [1] - 169:10
**break** [9] - 62:9, 62:10, 70:11, 70:12, 70:21, 132:3, 180:25, 198:1
**breaking** [1] - 152:17

**BRESSLER** [1] - 1:15
**Bressler** [1] - 3:11
**brief** [1] - 152:21
**briefing** [1] - 4:23
**briefly** [3] - 9:2, 19:20, 79:7
**briefs** [2] - 177:5, 177:7
**Brindley** [26] - 44:16, 45:22, 46:16, 69:11, 69:12, 71:8, 71:21, 72:2, 72:6, 72:21, 72:24, 72:25, 83:15, 98:23, 98:24, 99:4, 99:9, 196:20, 196:21, 202:9, 202:21, 204:7, 204:8, 204:23, 205:2, 209:23
**bring** [8] - 5:3, 23:4, 36:13, 43:5, 104:16, 126:2, 219:17, 234:13
**brings** [1] - 104:18
**broad** [2] - 91:5, 229:19
**Broadcast** [2] - 68:22, 76:1
**Bros** [2] - 154:10, 154:11
**brought** [13] - 5:3, 23:25, 33:1, 43:10, 43:23, 88:9, 145:24, 146:18, 149:2, 156:10, 170:14, 174:1, 224:11
**build** [6] - 35:18, 67:3, 138:12, 190:20, 195:5, 195:6
**building** [3] - 177:19, 197:23, 216:23
**built** [3] - 23:11, 102:12, 120:9
**bulldozer** [2] - 101:6, 101:7
**bullet** [2] - 233:7, 233:10
**bunch** [1] - 232:21
**business** [147] - 13:5, 14:7, 16:6, 16:22, 23:11, 25:13, 25:20, 25:23, 29:4, 29:18, 30:14, 34:21, 38:23, 39:17, 39:21, 39:22, 39:23, 40:2, 40:4, 40:7, 40:21, 40:25, 41:4, 42:2, 44:17, 46:18, 46:21, 50:6, 57:2, 60:7, 66:22, 68:14, 69:15, 72:10, 72:18, 72:19, 73:1, 76:16, 79:19, 83:21, 85:9, 86:14, 86:22, 89:17, 91:10, 92:7, 94:1, 94:10, 96:20, 99:8, 103:19, 103:21, 106:25, 110:11, 111:2, 114:6, 114:8, 114:17, 117:20, 117:25, 120:1, 121:2, 123:9, 123:11, 123:12, 123:13, 126:12, 127:16, 127:18, 128:2, 129:5, 129:6, 129:18, 133:20, 134:21, 136:5, 136:25, 137:1, 137:8, 137:14, 137:19, 137:21, 137:24,

138:9, 138:10, 139:16, 140:15, 141:2, 141:3, 141:15, 141:18, 144:25, 145:3, 145:6, 153:15, 154:4, 155:14, 155:15, 155:21, 155:22, 158:1, 158:20, 159:7, 160:18, 162:10, 171:3, 171:8, 171:10, 171:11, 177:3, 177:11, 183:10, 196:8, 196:10, 202:10, 202:19, 203:8, 203:10, 205:6, 210:20, 210:23, 211:3, 211:4, 211:8, 211:16, 218:12, 219:20, 221:19, 223:16, 226:1, 227:21, 228:5, 228:6, 228:7, 228:13, 229:7, 229:15, 233:2, 233:14, 233:17, 233:21, 235:19, 235:21, 235:23, 236:3, 236:17

**businesses** [2] - 13:11, 170:25

**businessman** [1] - 23:11

**but..** [3] - 148:10, 225:21, 235:9

**buy** [3] - 171:18, 217:16, 219:22

**buyer** [3] - 16:9, 36:7, 102:7

**buyers** [2] - 56:7, 56:8

**buying** [4] - 140:7, 171:5, 179:4, 179:25

**BY** [30] - 1:15, 1:17, 2:7, 2:8, 12:9, 24:18, 27:23, 31:19, 38:1, 42:6, 44:21, 47:24, 50:18, 53:16, 57:21, 61:7, 62:15, 73:11, 85:17, 90:10, 108:10, 119:3, 122:5, 132:14, 142:9, 164:13, 181:20, 198:12, 209:18, 211:14

---

**C**

**canned** [1] - 161:7

**cannot** [5] - 29:18, 31:16, 39:21, 40:21, 125:13

**capabilities** [1] - 93:9

**capable** [1] - 235:3

**capacities** [1] - 173:18

**car** [3] - 24:4, 67:3, 96:18

**carcasses** [1] - 113:18

**carry** [1] - 20:11

**cars** [1] - 96:23

**Carson** [2] - 193:25, 194:4

**cascadewood.com** [1] - 109:21

**case** [15] - 5:11, 7:7, 7:8, 10:16, 121:12, 134:13, 136:8, 143:24, 147:7,

152:2, 169:22, 178:7, 180:21, 181:23

**case-by-case** [1] - 10:16

**cases** [1] - 220:3

**Catalog** [2] - 64:12, 76:3

**catalogs** [1] - 76:13

**catalyst** [1] - 41:21

**Category** [1] - 68:23

**CATHY** [1] - 240:20

**Cathy** [1] - 1:20

**cattle** [2] - 171:6, 171:18

**CCR** [1] - 240:20

**cell** [2] - 231:4, 231:13

**Central** [2] - 59:9, 74:17

**CEO** [1] - 133:4

**certain** [9] - 4:23, 37:14, 75:19, 136:14, 180:1, 199:8, 207:16, 207:17, 232:6

**certainly** [8] - 4:18, 5:3, 10:8, 12:2, 203:23, 204:18, 217:16, 224:23

**CERTIFICATE** [1] - 240:8

**certification** [8] - 8:15, 9:9, 10:15, 118:8, 143:24, 181:3, 185:9, 212:14

**certifications** [13] - 8:8, 8:12, 9:12, 10:13, 107:15, 180:19, 180:20, 181:1, 181:23, 181:25, 182:5, 184:12, 237:17

**certify** [1] - 240:12

**cfordccr@gmail.com** [1] - 1:20

**chain** [2] - 68:2, 81:21

**challenging** [1] - 27:9

**chambers** [1] - 6:19

**chance** [3] - 121:18, 125:17, 196:14

**change** [7] - 104:13, 133:5, 169:12, 169:20, 170:5, 193:5, 222:8

**changed** [16] - 104:3, 104:6, 109:11, 128:22, 190:1, 192:17, 194:6, 194:12, 205:9, 216:19, 218:4, 222:11, 222:17, 222:18, 225:17

**changes** [4] - 39:9, 39:12, 217:8, 223:16

**charge** [6] - 56:17, 173:20, 175:18, 175:21, 175:23, 220:17

**charged** [1] - 100:21

**charges** [1] - 52:15

**charging** [2] - 175:19, 218:24

**chart** [3] - 54:22, 55:25, 59:16

**Checkbox** [1] - 68:21

**cherry** [1] - 210:5

**cherry-picked** [1] - 210:5

**choose** [1] - 175:19

**chose** [1] - 220:17

**circles** [1] - 92:19

**circular** [1] - 207:5

**CIVIL** [1] - 1:4

**claim** [2] - 3:25, 211:7

**claiming** [2] - 144:25, 145:14

**claims** [1] - 10:8

**clarification** [2] - 17:21, 74:6

**clarity** [2] - 33:5

**Clarkson** [1] - 1:9

**classic** [1] - 24:4

**clause** [3] - 25:11, 30:22, 169:3

**clean** [1] - 11:10

**clear** [13] - 6:18, 7:22, 9:4, 115:23, 126:6, 145:23, 145:24, 152:10, 210:11, 215:11, 218:15, 221:1, 232:16

**clearly** [1] - 115:17

**clerk** [1] - 149:23

**CLERK** [8] - 11:5, 70:14, 70:16, 132:6, 132:8, 198:5, 198:7, 240:4

**clerking** [3] - 23:7, 23:8, 161:24

**click** [3] - 101:9, 104:16, 120:9

**clicked** [4] - 99:11, 101:14, 102:16, 104:19

**client** [19] - 5:24, 7:12, 7:23, 54:5, 60:23, 123:14, 123:16, 138:23, 144:18, 183:4, 184:1, 184:13, 187:14, 189:3, 189:15, 198:24, 199:12, 211:1, 239:22

**client's** [2] - 5:8, 185:12

**clients** [17] - 9:15, 55:2, 123:13, 127:17, 151:8, 173:5, 183:12, 184:22, 185:21, 186:12, 189:2, 189:10, 189:20, 191:3, 191:9, 211:5, 211:7

**clients'** [2] - 186:5, 187:1

**close** [3] - 138:3, 153:2, 154:21

**closed** [1] - 18:2

**cloud** [1] - 75:5

**clue** [1] - 151:24

**Coast** [1] - 59:9

**Code** [1] - 48:21

**coincided** [2] - 193:6, 194:6

**collectible** [1] - 95:3

**CollectibleFacts** [3] - 94:23, 95:7, 102:20

**collectibles** [4] - 95:1, 95:8,

99:25

**Collector** [1] - 94:22

**collector** [1] - 96:18

**CollectorCarFacts** [4] - 96:19, 97:24, 98:20, 99:1

**collectorcarfacts.com** [1] - 97:19

**collectorcarfacts.hibid. com** [1] - 97:1

**colloquial** [1] - 88:20

**Colton** [5] - 43:1, 43:2, 43:5, 149:16, 149:17

**column** [1] - 227:25

**Column** [4] - 63:22, 63:23, 63:24, 63:25

**columns** [1] - 48:15

**combination** [1] - 105:8

**combined** [1] - 105:9

**comfortable** [6] - 100:25, 161:15, 190:21, 195:7, 195:11, 203:7

**coming** [13] - 67:16, 98:22, 112:24, 124:9, 125:10, 125:24, 168:8, 185:5, 185:15, 188:23, 197:22, 199:9, 223:15

**comment** [2] - 114:12, 130:10

**commission** [6] - 51:13, 52:11, 153:1, 168:23, 169:2, 175:22

**commissions** [6] - 52:12, 52:13, 53:5, 56:16, 56:25, 134:7

**common** [2] - 88:21, 89:21

**communicated** [1] - 116:3

**communicating** [1] - 98:8

**communication** [2] - 134:4, 200:23

**communications** [5] - 54:6, 119:24, 133:24, 178:11, 198:16

**companies** [7] - 13:19, 38:24, 41:4, 90:23, 174:11, 177:2, 235:15

**company** [55] - 19:12, 24:3, 34:23, 35:13, 40:11, 40:23, 42:3, 43:19, 48:20, 87:19, 96:16, 113:1, 113:20, 113:21, 128:21, 137:2, 144:2, 146:5, 146:17, 149:1, 151:23, 152:14, 152:25, 153:23, 154:1, 154:11, 154:16, 154:18, 154:20, 167:13, 182:25, 194:23, 194:24, 199:13, 200:25, 209:23, 214:6, 216:25, 219:6, 219:7, 219:8, 219:9, 225:15, 226:17, 227:4, 228:4,

228:11, 228:15, 231:16, 232:18, 233:3, 233:16, 233:18, 234:12, 235:7
**Company** [1] - 41:12
**company's** [1] - 116:4
**company-issued** [1] - 43:19
**comparing** [1] - 90:12
**comparison** [2] - 90:2, 100:17
**compensation** [4] - 35:15, 37:5, 87:21, 134:11
**compete** [32] - 27:12, 27:18, 29:18, 29:23, 36:17, 36:22, 36:24, 37:9, 39:3, 39:15, 44:18, 45:13, 52:9, 56:2, 72:19, 92:11, 103:25, 123:18, 123:19, 171:7, 171:10, 171:13, 171:25, 172:7, 173:1, 177:13, 179:2, 204:5, 204:13, 216:1, 229:19, 234:1
**competes** [5] - 40:11, 156:17, 175:15, 228:10, 228:15
**competing** [21] - 41:23, 46:21, 66:22, 73:1, 88:3, 90:21, 93:24, 94:19, 94:24, 103:20, 105:6, 115:18, 115:20, 115:24, 123:9, 174:5, 175:15, 203:8, 203:10, 225:5, 225:6
**competition** [24] - 21:8, 21:13, 28:5, 29:14, 29:16, 34:8, 39:1, 39:13, 60:19, 89:1, 92:23, 95:11, 99:12, 100:4, 103:24, 105:9, 105:14, 112:1, 134:25, 172:3, 177:21, 215:24, 216:2, 227:18
**competitive** [4] - 123:12, 127:16, 129:5, 129:18
**competitor** [7] - 15:17, 15:19, 44:17, 53:10, 56:2, 144:8, 185:14
**competitors** [1] - 154:8
**complain** [2] - 111:9, 111:11
**complaining** [1] - 191:10
**complaint** [2] - 111:15, 112:10
**complaints** [9] - 139:12, 148:16, 155:2, 155:3, 191:3, 191:8, 193:13
**completed** [1] - 24:23
**completely** [5] - 197:16, 197:18, 197:19, 232:9, 234:22
**completion** [1] - 238:7
**component** [9] - 13:25, 14:5, 14:8, 35:12, 49:6, 175:24, 220:11, 236:11, 236:12

**components** [3] - 173:12, 173:14, 193:24
**compresses** [1] - 79:3
**comprised** - 233:25
**computer** [9] - 1:22, 14:9, 43:19, 156:6, 172:21, 197:12, 197:14, 197:18, 232:7
**computer-aided** [1] - 1:22
**computers** [4] - 197:5, 197:6, 197:9, 197:15
**concedes** [1] - 137:21
**concept** [1] - 98:1
**concern** [21] - 45:6, 45:17, 49:24, 50:2, 50:14, 52:1, 57:7, 66:17, 69:17, 69:20, 69:21, 72:9, 72:16, 85:7, 110:2, 110:7, 110:9, 130:17, 229:18, 238:24
**concerned** [4] - 141:21, 186:18, 197:6, 202:4
**concerning** [5] - 61:14, 107:4, 116:9, 116:12, 138:12
**concerns** [11] - 43:1, 51:17, 61:9, 65:11, 72:5, 87:23, 105:22, 110:13, 110:22, 114:15, 125:23
**concluded** [1] - 6:2
**concludes** [2] - 198:6, 240:5
**conclusion** [4] - 4:25, 107:7, 108:5, 118:22
**conclusions** [1] - 4:23
**concrete** [1] - 146:14
**conduct** [7] - 14:7, 29:4, 45:13, 65:16, 101:22, 191:17, 239:20
**conducted** [1] - 162:11
**conference** [1] - 4:12
**confident** [1] - 203:9
**confidential** [9] - 5:19, 5:24, 6:11, 49:21, 51:14, 52:2, 84:3, 85:21, 85:25
**Confidentiality** [2] - 21:8, 28:5
**confidentiality** [8] - 5:16, 7:8, 21:13, 27:19, 34:9, 148:8, 215:25, 216:3
**confiscate** [1] - 43:11
**confiscated** [1] - 43:15
**confiscation** [1] - 43:21
**conflict** [1] - 115:23
**confronted** [1] - 208:17
**confused** [3] - 106:22, 108:23, 109:5
**confusing** [4] - 150:11, 191:4, 193:11, 213:6
**confusion** [5] - 107:3, 108:22, 115:1, 133:11, 148:19

**conjunction** [5] - 14:12, 28:8, 159:8, 163:1, 226:10
**connected** [1] - 189:14
**connection** [5] - 4:14, 9:13, 9:25, 114:20, 138:20
**connotation** [2] - 140:16, 140:17
**consider** [6] - 9:17, 15:17, 49:19, 51:14, 155:12, 187:24
**considered** [2] - 113:17, 195:22
**consigned** [1] - 180:4
**construction** [14] - 15:23, 22:16, 22:17, 22:18, 40:10, 95:14, 160:16, 161:21, 221:11, 221:12, 223:20, 223:25, 228:10, 228:14
**consultant** [1] - 96:17
**consummated** [1] - 140:17
**consummating** [1] - 17:19
**consumption** [1] - 5:8
**contact** [13] - 17:1, 17:7, 26:11, 33:18, 33:20, 116:5, 116:8, 122:17, 122:18, 184:13, 233:2, 233:17
**contacted** [3] - 96:16, 115:1, 184:17
**contacting** [2] - 146:7, 186:1
**contacts** [1] - 185:14
**contain** [2] - 5:19, 33:22
**contained** [6] - 6:21, 45:6, 94:21, 102:18, 114:3, 123:18
**contemplated** [5] - 19:23, 39:17, 103:23, 103:24, 128:13
**contemplates** [1] - 39:24
**contemplation** [1] - 140:9
**content** [2] - 18:13, 80:24
**contested** [1] - 5:14
**continue** [6] - 32:22, 34:19, 35:18, 70:23, 134:16, 161:12
**continued** [1] - 161:11
**continuing** [8] - 4:3, 94:14, 107:2, 118:11, 118:20, 124:7, 132:12, 190:19
**continuous** [1] - 123:6
**contract** [7] - 3:25, 47:13, 142:24, 157:17, 157:18, 169:16, 199:14
**contracts** [2] - 178:12, 199:15
**contrary** [1] - 85:13
**ControllerFacts** [1] - 93:14
**convention** [1] - 46:9
**conventions** [1] - 16:18
**conversation** [9] - 89:8, 114:7, 117:9, 118:9,

140:23, 188:14, 212:12, 213:10, 229:23
**conversations** [5] - 139:18, 158:12, 170:11, 188:12, 204:4
**converse** [1] - 101:11
**convey** [1] - 21:11
**coordinating** [1] - 72:25
**copies** [4] - 18:17, 180:19, 180:24, 181:15
**copy** [5] - 90:2, 144:3, 164:9, 164:11, 181:11
**copyright** [9] - 16:11, 66:4, 66:9, 66:11, 70:4, 76:22, 81:5, 192:7, 226:14
**copyrights** [1] - 34:14
**corner** [1] - 65:21
**corporate** [1] - 174:22
**correct** [267] - 12:13, 16:22, 16:23, 19:5, 20:17, 20:18, 20:23, 20:24, 21:16, 21:22, 22:5, 22:6, 22:11, 22:16, 22:25, 26:13, 26:24, 27:6, 27:13, 28:9, 30:4, 30:5, 30:12, 31:2, 31:25, 34:23, 34:24, 37:3, 40:3, 43:18, 45:2, 46:15, 47:5, 47:14, 49:4, 49:12, 49:14, 49:17, 51:24, 51:25, 53:9, 54:11, 56:21, 57:11, 59:13, 59:18, 59:21, 60:14, 63:18, 65:6, 66:10, 67:1, 67:23, 67:25, 69:8, 69:18, 70:5, 70:6, 70:8, 70:9, 71:4, 71:17, 71:21, 72:4, 73:1, 73:7, 74:4, 74:13, 74:14, 75:16, 75:17, 76:17, 76:24, 76:25, 77:2, 77:3, 77:17, 78:5, 78:19, 79:6, 79:14, 79:15, 79:17, 79:21, 80:8, 80:12, 80:13, 80:16, 81:8, 81:9, 82:8, 83:6, 83:15, 83:16, 83:17, 83:18, 83:21, 84:4, 85:2, 85:3, 85:5, 85:6, 86:15, 86:23, 87:11, 87:12, 88:1, 88:2, 88:18, 88:19, 91:1, 91:8, 91:16, 91:17, 91:21, 92:3, 93:3, 93:16, 93:19, 93:20, 94:6, 94:7, 94:8, 95:5, 95:8, 96:1, 96:2, 97:16, 98:12, 99:4, 99:5, 99:10, 99:20, 100:1, 100:5, 100:6, 101:16, 101:20, 101:24, 102:19, 102:22, 103:25, 104:11, 105:7, 105:17, 106:11, 108:12, 108:16, 109:21, 109:22, 114:3, 118:2, 118:6, 119:21, 121:12, 122:20, 122:21, 124:19,

124:20, 124:23, 124:24, 125:14, 125:15, 125:16, 127:6, 127:7, 128:11, 128:12, 128:14, 128:15, 129:11, 129:14, 129:15, 129:16, 129:17, 129:19, 129:20, 131:20, 132:25, 133:13, 134:9, 135:9, 135:10, 135:11, 137:22, 138:21, 139:9, 139:13, 140:7, 140:8, 141:6, 141:9, 141:12, 141:13, 142:4, 142:11, 142:12, 143:3, 143:4, 143:17, 143:18, 143:21, 144:14, 145:10, 146:6, 146:8, 146:15, 147:12, 147:25, 148:6, 148:19, 148:22, 149:3, 149:7, 151:6, 155:4, 155:25, 156:14, 156:22, 157:24, 158:16, 159:20, 160:6, 160:19, 162:12, 163:22, 164:24, 165:7, 166:15, 167:10, 169:7, 169:10, 170:24, 172:12, 173:6, 173:11, 174:6, 180:7, 182:23, 182:25, 183:1, 184:18, 185:19, 185:20, 189:21, 190:9, 191:1, 197:3, 210:14, 210:21, 213:20, 214:12, 214:13, 217:2, 220:2, 220:13, 224:14, 227:10, 227:19, 228:12, 231:5, 231:9, 234:2, 234:19, 235:24, 236:4, 240:12
**corrected** [1] - 193:16
**correctly** [2] - 30:9, 167:14
**correspondence** [1] - 159:6
**costs** [1] - 4:10
**counsel** [16] - 3:9, 3:12, 9:20, 10:21, 12:1, 54:7, 54:8, 68:6, 68:7, 68:10, 75:16, 90:4, 142:21, 237:8, 239:9, 239:11
**Counsel** [13] - 6:10, 10:14, 70:10, 77:5, 108:1, 118:19, 122:2, 132:1, 178:2, 180:15, 209:16, 222:15, 239:16
**count** [2] - 71:23, 71:24
**counted** [1] - 49:16
**country** [1] - 171:7
**Country** [1] - 48:21
**couple** [9] - 21:24, 24:6, 24:23, 57:16, 67:22, 80:9, 105:19, 150:3, 156:16
**course** [5] - 23:12, 70:21, 233:3, 233:18, 239:6
**COURT** [86] - 1:1, 3:3, 3:6,

3:13, 3:17, 6:3, 6:7, 6:10, 6:16, 8:2, 8:25, 9:19, 10:24, 11:3, 11:5, 11:8, 12:7, 24:17, 27:22, 37:11, 37:17, 37:21, 42:5, 44:20, 47:18, 47:23, 50:17, 53:13, 57:20, 61:2, 62:6, 62:8, 62:14, 70:10, 70:14, 70:16, 70:18, 73:10, 77:5, 77:8, 85:15, 90:4, 90:9, 108:1, 118:13, 118:19, 122:2, 132:1, 132:6, 132:8, 132:10, 142:7, 157:20, 178:2, 178:15, 178:19, 180:15, 181:1, 181:4, 181:8, 181:11, 181:13, 181:15, 197:25, 198:5, 198:7, 198:9, 207:3, 207:7, 209:16, 211:12, 222:15, 222:20, 237:7, 237:15, 237:25, 238:4, 238:6, 238:14, 239:11, 239:16, 239:21, 239:24, 240:2, 240:4, 240:8
**Court** [58] - 1:20, 3:18, 3:24, 4:2, 4:4, 4:5, 4:8, 4:9, 4:12, 4:20, 5:18, 9:10, 9:13, 9:20, 9:21, 9:23, 10:9, 10:11, 11:24, 14:6, 15:3, 21:7, 23:2, 41:21, 42:10, 48:5, 48:16, 53:22, 55:5, 61:4, 62:3, 72:21, 94:23, 96:9, 96:13, 100:14, 100:19, 103:2, 107:8, 107:17, 124:3, 125:17, 135:3, 151:9, 170:2, 172:10, 182:10, 183:2, 186:15, 198:6, 205:3, 213:19, 230:9, 237:10, 238:6, 239:21, 240:5, 240:21
**court** [7] - 3:1, 11:11, 70:17, 115:15, 123:3, 132:9, 198:8
**Court's** [13] - 4:19, 5:3, 5:4, 13:1, 17:21, 20:4, 51:10, 66:25, 76:10, 78:25, 94:20, 186:25, 238:22
**courtesy** [1] - 7:3
**Courthouse** [1] - 1:9
**courtroom** [3] - 37:22, 83:10, 238:19
**Covenant** [2] - 122:16, 128:13
**covenant** [2] - 91:13, 93:18
**covenants** [10] - 105:13, 137:14, 141:25, 142:4, 143:2, 145:16, 166:1, 166:4, 166:7, 170:20
**cover** [2] - 48:6, 62:19,

113:11
**covered** [1] - 12:4
**covers** [1] - 55:14
**Craig** [5] - 89:6, 111:1, 113:20, 119:4, 132:16
**create** [15] - 66:22, 68:15, 69:18, 73:1, 76:12, 76:15, 88:1, 96:25, 97:2, 98:9, 131:4, 166:12, 166:14, 166:16, 200:25
**Create** [9] - 63:24, 64:1, 65:24, 68:23, 68:24, 68:25, 75:24, 76:3
**created** [6] - 91:24, 140:6, 203:25, 217:13, 226:20, 227:1
**creates** [1] - 107:3
**creating** [5] - 24:4, 69:14, 90:15, 96:19, 140:23
**Creating** [1] - 64:17
**creation** [3] - 18:12, 83:20, 105:17
**credentials** [2] - 49:9, 86:18
**cross** [8] - 7:1, 7:25, 8:11, 8:22, 10:5, 85:16, 107:15, 237:19
**CROSS** [2] - 2:8, 142:9
**cross-examination** [2] - 7:1, 85:16
**CROSS-EXAMINATION** [2] - 2:8, 142:9
**cross-examine** [3] - 7:5, 10:5, 107:15
**cross-examined** [3] - 8:11, 8:22, 237:19
**CRR** [1] - 240:20
**culmination** [1] - 65:15
**culture** [1] - 128:22
**curing** [1] - 9:21
**curious** [2] - 84:10, 107:11
**current** [3] - 12:18, 120:24, 239:6
**customer** [34] - 16:7, 16:9, 36:7, 40:23, 85:4, 88:8, 93:11, 106:1, 106:2, 116:15, 116:16, 120:25, 122:17, 123:14, 123:16, 123:25, 124:1, 129:11, 129:14, 133:10, 134:25, 135:13, 140:24, 143:18, 148:16, 155:2, 155:3, 179:16, 180:8, 180:11, 185:17, 187:11, 220:3, 220:7
**Customers** [1] - 40:15
**customers** [51] - 4:4, 13:7, 29:24, 30:16, 30:25, 31:1, 31:5, 34:14, 35:20, 40:23, 41:5, 44:11, 52:6, 52:7, 53:1, 55:1, 84:21, 89:3,

105:17, 105:21, 110:21, 123:12, 124:25, 125:2, 125:10, 125:13, 127:17, 129:6, 130:24, 131:15, 137:15, 139:11, 139:19, 146:7, 150:12, 151:20, 155:8, 155:12, 155:15, 164:1, 170:14, 180:5, 180:6, 182:10, 193:10, 198:15, 230:4, 230:5, 230:7, 233:1, 233:15
**cut** [1] - 54:19
**cyberattacks** [1] - 125:5
**cybermonitor** [1] - 125:4
**cybersecurity** [3] - 86:12, 183:8, 185:4
**cyberthreat** [1] - 185:8
**cyberthreats** [2] - 199:7, 199:8

## D

**D-1** [11] - 2:13, 164:12, 164:14, 164:15, 164:18, 222:24, 223:1, 223:2, 223:4, 238:2, 238:13
**D-2** [1] - 181:22
**D-3** [3] - 181:22, 182:5, 182:7
**D-4** [7] - 2:13, 181:22, 182:5, 182:13, 182:17, 238:2, 238:13
**damage** [4] - 32:20, 148:15, 151:19, 210:16
**damaged** [2] - 146:4, 214:11
**damages** [8] - 33:10, 143:16, 145:12, 145:20, 146:15, 151:10, 151:21, 213:16
**data** [3] - 35:17, 60:8, 205:11
**database** [5] - 183:5, 185:16, 186:6, 188:22, 189:5
**databases** [1] - 184:21
**datacenter** [2] - 183:5, 183:6
**date** [20] - 8:18, 28:21, 39:18, 42:17, 48:9, 51:5, 51:19, 57:13, 58:23, 59:4, 64:25, 67:18, 71:12, 73:22, 77:21, 79:25, 129:10, 201:3, 228:6, 239:2
**Date** [1] - 240:21
**dated** [3] - 82:11, 97:18, 119:15
**dates** [5] - 207:15, 207:16, 238:20
**David** [8] - 44:16, 45:22, 69:11, 71:8, 71:21, 72:1, 204:7, 204:8
**David's** [1] - 196:1
**days** [2] - 65:8, 67:22
**deal** [8] - 13:3, 13:7, 117:17, 126:3, 140:17, 140:19,

203:17, 203:20
**dealing** [2] - 155:24, 156:2
**dealt** [1] - 23:3
**decades** [1] - 92:7
**December** [11] - 3:23, 4:2, 7:10, 121:15, 122:4, 123:6, 123:21, 181:19, 182:4, 182:8, 182:11
**decided** [2] - 190:16, 207:11
**decision** [4] - 162:19, 162:20, 162:21, 163:1
**declaration** [25] - 106:18, 106:20, 107:18, 107:20, 108:8, 108:12, 108:14, 108:16, 109:7, 109:23, 111:4, 111:6, 112:13, 113:23, 114:20, 114:23, 115:4, 115:10, 116:8, 132:15, 132:20, 136:8, 136:15, 137:7, 137:21
**declarations** [3] - 106:15, 182:3, 237:24
**Defendant's** [2] - 2:13, 238:13
**Defendants** [2] - 1:8, 1:18
**defendants** [3] - 3:15, 3:20, 3:21
**defendants'** [1] - 182:8
**defense** [3] - 237:25, 238:2, 239:11
**defined** [5] - 91:10, 94:2, 122:15, 123:10, 227:21
**definite** [1] - 161:24
**definition** [3] - 94:1, 94:10, 229:9
**Definitions** [1] - 28:15
**degree** [1] - 142:16
**delay** [1] - 178:24
**delayed** [1] - 46:2
**deleted** [6] - 197:13, 197:20, 232:7, 232:18, 232:21, 232:22
**demo** [1] - 120:11
**demonstrates** [1] - 187:25
**demonstration** [2] - 120:6, 120:16
**denied** [2] - 4:5, 239:24
**Denina** [1] - 61:16
**departing** [1] - 85:5
**department** [1] - 167:18
**DEPUTY** [8] - 11:5, 70:14, 70:16, 132:6, 132:8, 198:5, 198:7, 240:4
**deputy** [2] - 37:22, 238:20
**describe** [13] - 13:14, 14:6, 14:22, 15:6, 23:2, 41:21, 53:22, 55:4, 94:23, 96:13, 100:18, 102:1, 103:2
**described** [12] - 14:21, 15:7, 16:13, 18:9, 32:24, 51:11,

52:2, 73:3, 79:18, 100:11, 119:5, 131:18
**describes** [1] - 133:25
**describing** [5] - 42:8, 54:5, 98:15, 98:16, 128:17
**description** [15] - 13:1, 14:24, 67:5, 89:16, 90:25, 95:7, 95:10, 103:18, 167:21, 168:16, 168:22, 169:15, 169:18, 170:1, 170:3
**descriptions** [4] - 63:17, 68:13, 93:1, 94:21
**designate** [1] - 92:22
**designated** [1] - 132:16
**designating** [1] - 94:18
**designation** [6] - 63:12, 66:2, 70:3, 76:21, 76:23, 81:2
**desire** [1] - 133:20
**detail** [4] - 22:23, 64:22, 76:6, 109:9
**details** [3] - 131:3, 143:15, 171:9
**determinations** [3] - 4:20, 5:9, 238:8
**determine** [1] - 198:25
**develop** [1] - 100:24
**developed** [2] - 34:20, 103:14
**developing** [2] - 161:14, 163:2
**development** [1] - 190:19
**device** [1] - 8:21
**devices** [1] - 43:24
**difference** [9] - 102:16, 218:18, 218:23, 218:25, 220:8, 235:25, 236:1, 236:25, 237:1
**different** [31] - 13:16, 13:18, 15:13, 46:17, 61:12, 89:14, 89:15, 91:3, 91:4, 91:6, 97:25, 98:17, 98:18, 102:1, 104:25, 149:6, 160:2, 161:10, 191:6, 192:18, 194:10, 205:10, 216:11, 217:6, 220:11, 220:22, 223:19, 223:21, 234:7, 234:22, 235:22
**difficult** [3] - 48:15, 92:8, 213:21
**diligence** [1] - 18:3
**Dimick** [18] - 89:6, 105:23, 105:24, 105:25, 106:18, 107:5, 107:8, 108:12, 108:23, 109:2, 109:4, 110:2, 110:6, 110:13, 110:22, 114:14, 119:4, 121:5
**Dimick's** [4] - 106:4, 106:20,

107:19, 109:21
**DIRECT** [2] - 2:7, 12:9
**direct** [4] - 17:1, 92:23, 101:14, 144:8
**directly** [20] - 11:11, 30:17, 31:6, 41:23, 44:18, 72:19, 91:1, 97:8, 99:7, 116:22, 123:8, 123:10, 123:13, 127:15, 129:4, 131:19, 143:20, 149:20, 188:7, 211:24
**director** [5] - 12:19, 12:23, 13:13, 110:12, 154:3
**dirty** [1] - 117:18
**disagree** [1] - 136:22
**discover** [2] - 44:12, 46:23
**discovered** [2] - 71:4, 81:18
**discussed** [3] - 6:5, 127:22, 159:10
**discussing** [4] - 5:15, 44:17, 90:7, 192:13
**discussion** [3] - 8:1, 157:10, 196:19
**discussions** [4] - 141:2, 157:5, 157:8, 229:14
**dismissed** [1] - 230:20
**disposal** [1] - 147:6
**dispute** [3] - 9:21, 186:16, 210:24
**distraction** [2] - 106:25, 112:4
**Distribution** [1] - 76:4
**District** [1] - 3:2
**DISTRICT** [3] - 1:1, 1:1, 1:12
**divisions** [2] - 13:16, 86:14
**doc** [1] - 43:15
**docket** [1] - 122:1
**Docket** [3] - 3:7, 107:19, 122:3
**docs** [1] - 63:6
**document** [68] - 6:14, 18:19, 19:18, 24:20, 24:21, 25:5, 25:24, 27:7, 27:8, 28:3, 28:4, 28:8, 28:11, 33:13, 34:2, 38:2, 38:5, 41:8, 48:22, 49:15, 49:20, 49:21, 49:23, 53:20, 54:17, 58:14, 59:25, 60:13, 60:17, 60:18, 60:19, 62:3, 64:23, 65:21, 65:24, 66:14, 66:17, 69:25, 76:18, 78:18, 80:13, 81:25, 93:21, 122:9, 125:23, 144:3, 144:5, 156:20, 159:9, 159:14, 164:9, 164:16, 164:20, 164:22, 166:11, 166:12, 166:15, 166:16, 166:17, 167:7, 168:18, 215:9, 215:12, 215:17, 222:23, 227:8, 227:13, 233:25

**documents** [55] - 5:18, 5:22, 6:6, 6:11, 6:21, 6:23, 7:1, 7:5, 7:6, 7:7, 7:8, 7:15, 7:16, 7:17, 7:18, 9:3, 9:24, 10:2, 10:6, 21:17, 27:16, 37:14, 37:22, 47:13, 47:21, 63:17, 69:16, 69:21, 75:3, 75:6, 75:19, 76:11, 76:23, 77:1, 83:4, 84:17, 87:3, 140:2, 146:19, 147:17, 148:12, 156:16, 162:16, 181:21, 191:13, 197:14, 197:20, 206:6, 207:10, 237:9, 237:25, 238:2, 238:9, 238:11
**dog** [2] - 154:2, 154:6
**dollar** [6] - 151:23, 152:25, 153:23, 153:25, 155:16
**domain** [2] - 224:20, 224:21
**done** [20] - 7:12, 20:8, 25:6, 28:1, 28:2, 31:12, 32:14, 113:25, 114:1, 121:2, 156:5, 203:17, 203:20, 210:23, 213:22, 221:17, 221:20, 230:24, 231:24, 238:17
**door** [2] - 146:17, 202:7
**doubt** [1] - 210:4
**down** [15] - 11:12, 11:15, 11:17, 11:18, 32:7, 32:22, 39:14, 40:1, 40:6, 67:11, 97:10, 115:6, 115:13, 119:14, 151:16
**download** [1] - 74:23
**downloading** [1] - 203:4
**dozens** [1] - 47:3
**dozer** [1] - 101:9
**driver's** [1] - 186:19
**drives** [1] - 86:8
**driving** [1] - 102:15
**drop** [1] - 75:3
**Dropbox** [8] - 74:25, 75:1, 75:9, 75:13, 82:20, 82:24, 83:3, 83:6
**due** [1] - 18:3
**duplicate** [3] - 80:21, 81:15, 107:23
**Durable** [8] - 124:2, 124:11, 124:19, 124:22, 125:19, 129:10, 188:15, 199:20
**duration** [2] - 35:4, 136:15
**During** [1] - 38:17
**during** [10] - 31:22, 35:4, 39:22, 45:24, 70:21, 117:20, 161:12, 163:22, 174:9, 228:5
**duties** [8] - 167:5, 169:8, 169:20, 176:23, 222:6, 222:11, 222:18, 223:7
**duty** [3] - 37:9, 169:18, 209:6

**Duty** [1] - 38:17
**Dyess** [14] - 8:15, 8:19, 136:9, 136:10, 136:12, 136:14, 136:20, 137:6, 211:19, 212:12, 212:14, 213:13, 214:22
**Dyess's** [1] - 143:23

# E

**earliest** [1] - 53:24
**early** [1] - 26:25
**earn** [1] - 133:21
**earning** [1] - 134:17
**easily** [3] - 79:5, 99:2, 175:18
**East** [2] - 1:9, 59:9
**Eastern** [1] - 74:16
**easy** [1] - 97:1
**eat** [1] - 155:18
**ecosystem** [1] - 35:18
**edification** [1] - 5:19
**educate** [1] - 100:14
**effect** [2] - 3:25, 134:15
**effectively** [1] - 50:9
**effort** [2] - 12:15, 57:3
**either** [6] - 8:20, 84:2, 99:1, 209:2, 212:14, 230:13
**electrician** [1] - 197:22
**Email** [1] - 48:20
**email** [283] - 6:20, 9:6, 26:21, 27:1, 42:1, 42:7, 42:13, 42:17, 43:5, 43:7, 44:4, 44:8, 44:10, 44:11, 44:15, 44:22, 45:1, 45:6, 45:9, 45:10, 45:21, 45:22, 46:16, 46:23, 47:12, 48:9, 49:25, 50:19, 50:22, 50:25, 51:1, 51:19, 51:24, 52:17, 53:7, 53:17, 53:23, 53:25, 54:1, 54:2, 54:6, 57:16, 57:22, 57:25, 58:5, 58:6, 58:7, 58:12, 58:22, 59:15, 60:1, 61:11, 62:16, 62:19, 63:2, 63:3, 63:5, 63:6, 63:18, 64:23, 65:12, 66:15, 66:18, 67:8, 67:11, 67:14, 67:15, 67:18, 68:2, 68:11, 69:6, 69:22, 70:8, 71:7, 71:8, 71:12, 71:20, 72:2, 72:6, 72:22, 72:24, 73:5, 73:12, 73:16, 74:3, 74:7, 74:19, 74:20, 75:15, 75:16, 75:19, 77:2, 77:11, 77:14, 78:9, 79:7, 79:22, 80:21, 80:22, 80:23, 81:10, 81:18, 81:21, 81:25, 82:4, 82:11, 82:17, 83:17, 84:8, 84:23, 84:25, 85:20, 87:10, 96:4, 96:7, 96:10, 96:22, 97:12, 97:17, 97:20, 99:7, 106:5, 106:6, 106:8, 106:21, 107:6, 107:11, 108:16, 109:1, 109:9, 109:20, 109:21, 110:10, 110:14, 111:17, 111:18, 111:25, 112:16, 112:21, 114:3, 114:10, 114:23, 115:11, 115:16, 119:10, 119:11, 119:15, 119:18, 119:22, 120:16, 124:6, 124:10, 124:11, 124:13, 124:14, 124:15, 124:19, 124:20, 124:21, 124:23, 125:1, 125:2, 125:6, 125:15, 125:20, 125:24, 126:2, 126:4, 126:11, 126:25, 127:2, 127:20, 127:22, 128:16, 129:10, 129:21, 129:23, 130:11, 130:16, 131:21, 132:19, 132:24, 133:8, 147:4, 147:5, 148:21, 148:24, 149:3, 149:6, 149:8, 149:12, 149:14, 150:1, 150:6, 150:7, 150:23, 150:25, 151:3, 152:8, 152:10, 159:6, 179:8, 182:9, 182:21, 182:23, 183:3, 183:7, 183:10, 183:12, 183:16, 184:14, 184:25, 185:12, 185:17, 185:19, 186:5, 186:10, 186:20, 187:12, 187:14, 188:16, 188:19, 188:20, 188:23, 188:24, 189:2, 189:3, 189:5, 189:11, 189:14, 189:20, 189:21, 194:14, 194:17, 194:19, 194:20, 194:21, 194:22, 195:16, 195:22, 196:25, 197:1, 197:2, 198:14, 198:23, 198:24, 199:2, 199:11, 199:13, 199:19, 199:21, 199:23, 200:1, 200:3, 200:8, 200:14, 201:3, 201:5, 201:7, 202:18, 203:7, 203:15, 203:16, 203:17, 203:24, 204:22, 206:11, 206:12, 210:1, 210:5, 210:7, 226:2
**emailed** [4] - 55:16, 57:7, 123:25, 226:12
**emailing** [2] - 96:15, 200:20
**emails** [75] - 9:5, 44:9, 44:12, 46:23, 47:1, 47:5, 47:9, 47:25, 58:9, 60:12, 66:14, 71:3, 71:6, 71:14, 71:19, 71:24, 72:6, 74:16, 78:17, 82:7, 83:14, 84:1, 85:20, 86:1, 87:3, 95:21, 124:7, 124:9, 125:10, 147:2,

150:4, 150:5, 150:14, 179:6, 182:16, 183:17, 183:20, 183:23, 184:20, 185:15, 186:6, 186:9, 186:10, 186:15, 186:22, 187:13, 189:6, 189:8, 192:1, 196:3, 196:18, 199:4, 200:5, 200:7, 205:21, 205:24, 206:2, 206:3, 206:4, 206:8, 206:25, 207:1, 207:4, 207:11, 207:14, 207:18, 207:22, 208:22, 209:1, 210:5, 210:12, 232:20
**embarrassing** [1] - 117:12
**employed** [23] - 12:16, 13:13, 13:15, 38:22, 45:18, 45:19, 46:21, 51:7, 56:19, 83:23, 86:17, 88:24, 95:21, 96:1, 98:25, 142:13, 158:2, 167:11, 183:11, 214:19, 216:18, 223:10
**Employee** [2] - 38:6, 122:16
**employee** [26] - 12:21, 22:24, 23:5, 23:14, 34:18, 34:22, 35:14, 37:4, 38:10, 42:15, 42:19, 42:21, 44:16, 61:15, 61:17, 62:23, 72:22, 72:23, 113:9, 123:18, 133:18, 137:17, 137:18, 157:16, 167:8, 227:9
**Employees** [1] - 40:15
**employees** [15] - 42:1, 43:14, 44:11, 84:9, 86:20, 149:13, 166:8, 217:3, 230:4, 230:6, 230:9, 231:1, 231:24, 233:1
**Employment** [26] - 37:8, 38:17, 143:1, 156:21, 156:24, 157:2, 157:3, 164:11, 164:22, 165:1, 165:3, 165:5, 165:15, 165:21, 165:22, 165:25, 166:20, 166:22, 169:24, 216:12, 222:12, 222:19, 223:4, 225:19, 227:14, 228:16
**employment** [19] - 12:20, 35:4, 36:4, 36:12, 39:4, 39:19, 41:19, 57:11, 57:13, 61:20, 61:21, 78:14, 138:21, 166:5, 166:8, 233:3, 233:18, 234:1, 234:3
**employs** [1] - 98:5
**empowering** [1] - 93:10
**enable** [1] - 89:14
**encompasses** [1] - 224:1
**encourage** [1] - 30:23
**end** [4] - 9:25, 37:15, 37:21,

116:25
**ended** [2] - 17:19, 43:11
**ends** [3] - 25:13, 68:2, 79:14
**enforce** [1] - 33:9
**enforced** [1] - 142:1
**enforcement** [2] - 32:3, 32:17
**engaged** [3] - 89:23, 129:16, 228:4
**engages** [1] - 128:5
**engaging** [2] - 91:15, 128:1
**engine** [15] - 98:18, 98:20, 99:2, 99:3, 100:11, 100:20, 101:2, 101:21, 102:14, 102:17, 103:4, 103:6, 105:4, 161:17, 190:5
**engines** [1] - 100:16
**enjoin** [1] - 4:5
**enjoy** [1] - 117:9
**Enos** [14] - 124:19, 124:20, 127:23, 129:22, 130:2, 136:7, 186:1, 186:14, 186:18, 188:2, 188:5, 188:10, 188:12, 200:19
**enter** [1] - 166:3
**entered** [7] - 7:8, 121:12, 121:14, 131:8, 148:9, 166:22, 182:10
**entering** [1] - 5:15
**entertain** [1] - 108:6
**entire** [4] - 147:24, 165:6, 169:22, 178:7
**entirety** [1] - 29:15
**entities** [1] - 161:18
**entitled** [5] - 30:18, 32:2, 33:7, 226:18, 240:13
**entity** [3] - 88:5, 130:23, 161:17
**entry** [1] - 122:1
**Entry** [1] - 122:3
**equation** [1] - 9:7
**equipment** [34] - 14:3, 15:22, 15:23, 26:1, 40:9, 43:15, 43:17, 43:18, 43:19, 44:3, 44:5, 49:2, 49:4, 85:2, 94:11, 95:13, 95:15, 97:8, 99:15, 100:22, 179:4, 179:17, 179:19, 179:25, 180:1, 180:2, 180:4, 180:6, 180:8, 180:10, 220:24, 223:18, 228:9, 228:13
**Equipment** [3] - 179:10, 179:12, 179:21
**Equipmentfacts** [189] - 13:23, 14:12, 14:16, 14:17, 14:22, 15:9, 15:13, 15:16, 15:17, 15:22, 16:1, 16:2, 16:5, 16:25, 18:5, 19:25, 22:14, 22:25, 23:12, 23:18, 30:7, 34:20, 35:7, 35:10,

36:6, 41:24, 42:15, 44:18, 45:24, 46:17, 49:5, 49:8, 51:15, 51:23, 52:15, 53:25, 54:21, 55:9, 55:12, 56:20, 58:5, 61:15, 62:23, 63:3, 63:22, 63:23, 63:25, 64:17, 66:4, 66:22, 67:16, 68:16, 68:19, 69:5, 69:18, 70:4, 72:11, 72:13, 72:15, 72:19, 72:22, 72:23, 73:4, 75:9, 75:12, 76:22, 81:5, 82:17, 83:2, 85:24, 86:8, 88:1, 91:8, 94:15, 95:19, 97:13, 97:24, 98:15, 98:17, 100:5, 100:20, 101:3, 101:4, 101:7, 101:10, 101:15, 101:19, 101:23, 102:12, 103:6, 103:13, 104:24, 111:13, 112:8, 115:18, 123:15, 123:25, 126:13, 128:6, 128:8, 129:7, 130:4, 130:8, 133:5, 133:9, 133:13, 133:19, 138:15, 138:17, 138:21, 139:1, 140:1, 140:5, 140:6, 140:10, 140:11, 148:22, 149:20, 149:24, 150:24, 156:10, 158:20, 159:18, 159:20, 160:14, 160:18, 161:12, 161:16, 161:17, 161:19, 161:20, 162:1, 162:2, 162:3, 162:5, 163:24, 163:25, 164:5, 169:4, 169:12, 169:13, 169:21, 170:4, 170:6, 175:24, 179:4, 179:18, 179:19, 190:2, 190:3, 190:6, 190:8, 192:2, 192:7, 192:14, 192:20, 192:22, 193:3, 201:13, 201:17, 201:18, 211:24, 215:1, 216:16, 216:18, 217:12, 217:16, 217:22, 217:24, 218:2, 218:5, 218:11, 219:10, 219:25, 221:13, 221:24, 223:15, 226:7, 226:9, 226:15, 226:18, 226:20, 227:1, 227:4, 228:4, 236:7

**Equipmentfacts'** [6] - 34:14, 53:1, 84:3, 122:15, 137:15, 140:18

**Equipmentfacts's** [6] - 123:9, 123:12, 123:13, 127:16, 127:17, 129:6

**equipmentfacts.com** [3] - 115:21, 149:8, 150:7

**ESQUIRE** [2] - 1:15, 1:17

**Essay** [8] - 3:12, 54:9, 54:10, 68:6, 75:16, 80:1, 86:24,

143:11

**essence** [1] - 239:17

**essentially** [12] - 46:20, 60:22, 69:17, 73:4, 75:5, 76:15, 79:18, 88:1, 102:11, 151:17, 182:14, 182:24

**established** [1] - 187:8

**estimation** [1] - 137:24

**Evaluator** [2] - 173:21, 173:25

**EVAN** [2] - 2:6, 11:4

**Evan** [2] - 3:12, 11:1

**event** [1] - 175:21

**events** [1] - 72:5

**eventually** [4] - 161:3, 190:2, 190:5, 190:20

**evidence** [24] - 4:17, 7:12, 8:9, 60:25, 85:12, 85:13, 146:14, 147:6, 155:11, 187:24, 196:24, 203:14, 205:2, 205:5, 211:16, 213:19, 214:10, 226:2, 226:15, 230:8, 237:9, 237:14, 237:17, 238:3

**evident** [1] - 141:10

**exact** [2] - 171:11, 175:20

**exactly** [11] - 42:10, 105:11, 117:4, 117:19, 128:24, 178:9, 179:12, 179:22, 179:24, 198:20, 213:10

**EXAMINATION** [4] - 2:7, 2:8, 12:9, 142:9

**examination** [4] - 7:1, 85:16, 108:5, 132:12

**examine** [3] - 7:25, 10:5, 107:15

**examined** [3] - 8:11, 8:22, 237:19

**example** [8] - 23:23, 94:22, 97:1, 101:6, 101:11, 185:6, 199:12, 207:24

**examples** [2] - 23:23, 24:6

**exceeded** [1] - 152:18

**Excel** [2] - 59:20, 60:1

**excel** [1] - 60:3

**exception** [2] - 97:25, 157:14

**exchange** [23] - 45:1, 48:9, 50:23, 51:5, 52:17, 54:6, 67:11, 69:6, 73:17, 74:3, 74:19, 75:15, 77:14, 82:11, 83:4, 83:17, 96:10, 106:8, 113:5, 119:15, 127:20, 127:23

**exchanged** [2] - 71:15, 82:7

**exchanges** [5] - 45:21, 53:23, 58:12, 97:12, 99:8

**exchanging** [1] - 83:14

**excuse** [4] - 54:22, 114:25, 157:19, 227:18

**execute** [1] - 27:16

**executed** [5] - 27:15, 28:8, 28:11, 31:24, 93:18

**execution** [1] - 24:9

**exercise** [1] - 90:20

**Exhibit** [4] - 2:12, 2:13, 238:12, 238:13

**exhibit** [4] - 24:16, 37:13, 122:1, 132:19

**exhibits** [2] - 25:5, 237:13

**existed** [4] - 47:5, 49:24, 88:17, 137:2

**existence** [2] - 91:21, 138:14

**existing** [2] - 138:23, 140:21

**exodus** [1] - 202:20

**expand** [2] - 94:14, 95:19

**expanded** [1] - 134:16

**expected** [2] - 86:20, 128:21

**expend** [1] - 55:20

**expense** [2] - 101:1, 163:3

**experience** [10] - 16:13, 16:16, 23:7, 23:9, 23:14, 35:21, 65:15, 114:8, 133:18, 136:1

**expertise** [1] - 201:22

**expire** [1] - 28:23

**explain** [3] - 107:1, 121:22, 141:5

**explained** [1] - 9:4

**exported** [2] - 84:14, 205:12

**express** [1] - 110:2

**expressed** [1] - 114:10

**expressing** [1] - 111:23

**expressly** [1] - 103:24

**extend** [1] - 134:14

**extensive** [1] - 23:6

**extent** [7] - 4:18, 8:7, 10:13, 16:19, 26:11, 108:4, 118:21

**externally** [1] - 206:21

**extra** [3] - 164:9, 164:11, 180:24

**extrapolate** [1] - 56:24

**eye** [1] - 124:7

# F

**face** [1] - 17:2

**FaceTime** [1] - 8:20

**facilitating** [2] - 40:9, 228:8

**facility** [2] - 177:12, 177:14

**fact** [28] - 4:24, 5:5, 21:17, 23:17, 23:20, 45:19, 49:24, 85:12, 95:23, 116:7, 138:10, 144:11, 149:1, 154:11, 163:14, 170:8, 175:2, 175:3, 183:19, 186:14, 186:18, 188:4, 203:9, 212:14, 216:25, 217:19, 218:4, 226:3

**FACTS** [1] - 1:7

**Facts** [62] - 3:20, 4:5, 4:9, 88:6, 88:7, 88:11, 88:14, 88:17, 88:22, 88:25, 89:1, 89:4, 89:10, 90:13, 90:16, 90:24, 91:6, 91:20, 91:23, 92:18, 92:23, 94:19, 94:22, 95:13, 99:23, 101:25, 102:8, 103:16, 103:19, 104:3, 105:17, 106:5, 111:17, 112:24, 115:12, 115:17, 117:6, 121:2, 121:7, 126:8, 126:9, 130:4, 130:23, 131:2, 131:4, 131:7, 131:9, 131:14, 131:22, 131:24, 132:24, 133:4, 133:23, 133:24, 134:21, 135:11, 135:17, 137:22, 140:23, 182:9, 224:6, 234:4

**factstechnology.com** [1] - 119:20

**failed** [1] - 57:10

**fair** [6] - 8:23, 23:13, 136:6, 226:11, 237:21, 237:22

**familiar** [14] - 33:24, 47:12, 48:22, 76:7, 80:19, 95:16, 104:21, 105:2, 106:13, 106:15, 124:4, 126:13, 140:3, 152:19

**familiarity** [1] - 38:18

**family** [2] - 126:13, 154:20

**family-owned** [1] - 154:20

**far** [4] - 61:1, 99:6, 189:19, 195:7, 202:14

**farm** [4] - 15:22, 160:15, 171:6, 171:18

**Farms** [1] - 55:11

**Farsiou** [12] - 3:14, 3:15, 6:3, 6:17, 9:4, 9:6, 10:1, 10:4, 142:7, 197:25, 198:10, 237:15

**FARSIOU** [50] - 1:17, 1:17, 2:8, 3:5, 3:14, 6:4, 6:9, 6:18, 8:5, 10:23, 31:14, 37:24, 47:19, 53:14, 60:21, 85:11, 90:5, 107:14, 118:14, 142:8, 142:9, 164:8, 164:13, 178:7, 180:12, 180:18, 181:2, 181:6, 181:9, 181:16, 181:20, 198:4, 198:11, 198:12, 209:14, 209:18, 211:11, 211:14, 222:16, 237:5, 237:16, 238:1, 239:12, 239:19, 239:22, 240:1, 240:3

**fashion** [1] - 10:12

**fast** [2] - 23:10, 133:23

**fast-track** [1] - 23:10

**fault** [2] - 41:1, 126:10
**FBI** [2] - 113:19, 113:21
**fear** [1] - 151:18
**February** [3] - 1:10, 146:13, 240:20
**FEDERAL** [1] - 240:8
**fee** [6] - 100:21, 134:5, 153:1, 173:20, 175:21, 175:22
**feedback** [3] - 195:23, 215:19, 215:20
**feelings** [1] - 111:23
**fees** [3] - 4:6, 4:10, 134:11
**felt** [4] - 6:23, 68:9, 100:25, 190:20
**few** [4] - 11:9, 89:7, 110:10, 202:8
**field** [4] - 49:2, 49:4, 147:5, 228:21
**fielding** [1] - 191:8
**figure** [3] - 56:20, 155:16, 155:17
**file** [10] - 6:12, 59:20, 60:1, 78:23, 78:24, 78:25, 79:1
**filed** [8] - 3:21, 122:3, 147:11, 151:18, 152:1, 177:5, 185:24
**files** [3] - 79:2, 86:25, 232:19
**filings** [1] - 106:13
**filter** [6] - 184:16, 186:8, 188:16, 189:1, 189:7, 189:20
**filtering** [2] - 185:11, 186:4
**filters** [2] - 125:5, 184:19
**final** [1] - 238:8
**finalized** [1] - 46:4
**finally** [3] - 31:8, 31:9
**financially** [2] - 130:9, 130:14
**financials** [1] - 151:24
**findings** [3] - 4:24, 43:25, 44:2
**fine** [6] - 37:17, 84:16, 144:15, 193:15, 193:17, 204:5
**fine-tuned** [2] - 193:15, 193:17
**finish** [1] - 239:7
**fired** [4] - 209:19, 230:11, 230:16, 230:18
**firing** [1] - 208:20
**firm** [1] - 3:15
**First** [1] - 48:20
**first** [35] - 7:6, 16:3, 17:16, 19:16, 25:9, 25:11, 28:7, 28:14, 45:9, 50:22, 52:17, 53:22, 57:25, 67:11, 73:15, 74:7, 81:21, 81:25, 96:10, 97:3, 97:10, 100:18, 109:1, 112:2, 114:5, 119:14,

129:21, 138:13, 147:11, 148:8, 168:18, 195:17, 195:20, 232:23, 237:8
**Fisher** [1] - 1:9
**fit** [5] - 15:24, 15:25, 128:22, 160:15, 176:11
**five** [3] - 32:7, 52:21, 55:8
**flat** [1] - 100:21
**Fleet** [1] - 173:21
**fleet** [1] - 173:25
**Flex** [1] - 68:19
**flight** [1] - 46:2
**flip** [2] - 18:25, 36:2
**flurry** [1] - 84:1
**focus** [8] - 30:20, 32:5, 40:16, 95:2, 112:8, 126:25, 128:1, 202:22
**focused** [4] - 48:14, 50:8, 107:2, 128:8
**focuses** [1] - 91:7
**folder** [1] - 232:21
**folks** [2] - 10:10, 70:19
**follow** [1] - 209:10
**following** [6] - 39:18, 72:11, 176:15, 180:9, 219:9, 234:24
**follows** [1] - 54:22
**font** [1] - 48:3
**FOR** [1] - 1:1
**FORD** [1] - 240:20
**Ford** [1] - 1:20
**foregoing** [1] - 240:12
**forensic** [1] - 232:8
**forensics** [1] - 43:24
**form** [7] - 37:7, 60:4, 60:5, 63:6, 111:22, 133:19, 215:18
**formality** [1] - 70:20
**formation** [1] - 179:18
**formed** [1] - 203:21
**former** [2] - 42:15, 88:8
**forming** [1] - 179:3
**formula** [1] - 56:15
**forth** [3] - 4:24, 58:10, 166:7
**forward** [5] - 18:9, 124:18, 133:23, 140:18, 142:2
**forwarded** [4] - 57:16, 106:6, 150:3, 210:6
**forwarding** [3] - 54:7, 113:3, 205:23
**foundation** [1] - 73:4
**founded** [1] - 217:13
**founder** [1] - 133:4
**four** [3] - 32:6, 238:20
**fourth** [1] - 238:18
**frame** [2] - 31:20, 55:13
**framed** [1] - 127:19
**frankly** [2] - 195:3, 208:7
**Friday** [1] - 182:7

**front** [8] - 11:11, 71:10, 83:13, 111:19, 170:2, 205:3, 222:23, 223:3
**full** [1] - 5:23
**fully** [2] - 11:19, 157:21
**function** [2] - 161:11, 161:12
**functionality** [1] - 125:9
**functions** [3] - 14:23, 47:8, 49:9
**Functions** [1] - 64:14
**funny** [2] - 208:6, 208:9
**furthered** [1] - 69:21
**furthermore** [1] - 114:9
**future** [2] - 141:18, 142:2

## G

**G-O-M-B-I-S-K-I** [1] - 115:3
**gallery** [1] - 126:19
**Garafola** [254] - 3:7, 3:16, 3:20, 3:24, 4:3, 4:8, 13:23, 16:2, 16:14, 17:6, 17:7, 21:1, 21:15, 22:2, 22:10, 22:24, 23:3, 23:4, 23:17, 23:20, 27:3, 27:8, 27:15, 29:23, 30:9, 30:16, 31:16, 32:19, 34:3, 34:15, 34:22, 35:16, 36:6, 36:12, 38:9, 39:9, 41:23, 43:13, 44:15, 46:11, 46:15, 46:20, 48:8, 50:11, 50:24, 51:2, 52:1, 53:7, 55:17, 56:19, 56:23, 57:7, 58:22, 60:12, 60:24, 61:10, 63:1, 63:5, 64:23, 65:11, 66:13, 66:17, 69:7, 70:7, 71:16, 71:25, 72:25, 73:3, 74:22, 80:1, 82:7, 83:5, 83:23, 84:22, 87:16, 88:3, 91:14, 96:4, 97:18, 98:14, 99:7, 109:19, 110:19, 111:21, 112:3, 112:7, 114:6, 114:7, 114:9, 115:20, 115:24, 116:3, 116:5, 117:7, 119:19, 119:20, 119:24, 120:17, 121:7, 122:14, 123:8, 123:22, 124:16, 125:10, 125:13, 126:12, 126:22, 127:23, 128:17, 128:24, 130:3, 130:10, 130:24, 131:2, 131:6, 131:8, 131:16, 131:19, 131:24, 133:4, 133:8, 133:12, 133:18, 133:20, 134:10, 134:13, 134:16, 134:21, 137:7, 140:6, 143:21, 145:4, 145:6, 146:17, 147:12, 147:15, 148:21, 155:23, 156:21, 157:5, 157:25, 158:9, 159:5,

160:14, 161:13, 162:7, 162:13, 163:16, 164:23, 165:9, 166:3, 166:12, 167:7, 167:10, 167:13, 170:18, 170:23, 171:5, 171:17, 173:3, 174:6, 174:11, 175:11, 176:21, 177:10, 178:5, 178:10, 178:13, 179:1, 180:11, 182:9, 184:14, 184:17, 184:20, 185:8, 185:13, 186:9, 186:23, 189:3, 190:10, 190:12, 190:15, 191:9, 196:19, 197:1, 197:21, 198:16, 203:22, 203:24, 204:10, 204:14, 204:16, 204:20, 204:23, 205:16, 205:25, 206:18, 206:23, 207:16, 207:23, 208:10, 209:5, 209:20, 210:21, 210:24, 211:8, 211:9, 211:17, 211:24, 212:6, 212:25, 213:14, 214:2, 214:7, 214:12, 214:19, 214:23, 214:25, 216:15, 217:1, 217:13, 218:14, 218:15, 220:12, 220:19, 221:15, 222:1, 222:17, 223:10, 223:14, 224:11, 224:15, 224:23, 225:1, 225:15, 226:1, 226:12, 228:20, 228:23, 229:6, 229:14, 229:18, 230:9, 231:7, 231:8, 232:3, 232:4, 232:5, 232:8, 233:21, 234:1, 234:11, 237:21, 239:15
**GARAFOLA** [1] - 1:6
**Garafola's** [57] - 9:6, 19:3, 23:14, 26:19, 27:1, 33:14, 33:20, 33:24, 36:3, 41:19, 45:9, 47:12, 49:25, 50:24, 51:23, 53:25, 54:1, 57:10, 58:5, 58:7, 59:15, 60:16, 61:20, 67:15, 69:22, 72:7, 73:20, 74:20, 77:2, 77:19, 81:23, 82:16, 82:20, 83:17, 84:2, 85:20, 87:11, 87:25, 113:1, 113:21, 124:13, 125:18, 125:24, 126:4, 129:13, 129:23, 138:20, 150:6, 188:19, 189:14, 194:19, 197:12, 197:18, 200:14, 222:18, 225:17, 232:17
**garafola.lawrence@gmail.com** [1] - 26:23
**general** [4] - 38:21, 161:24, 164:2, 189:5
**generally** [13] - 17:15, 20:10,

21:10, 24:21, 25:22, 38:18,
44:2, 47:1, 65:10, 76:10,
99:23, 117:24, 217:20
**Generate** [3] - 64:4, 68:25,
75:25
**generate** [1] - 55:21
**generated** [1] - 138:6
**generates** [1] - 52:19
**generating** [1] - 162:9
**gentleman** [1] - 119:5
**gentlemen** [1] - 238:15
**Gina** [2] - 37:22, 239:1
**given** [8] - 7:2, 26:12, 35:20,
37:19, 86:18, 110:10,
195:13, 238:19
**Global** [11] - 3:7, 12:17, 13:4,
15:8, 43:2, 90:24, 153:3,
153:5, 153:8, 153:9,
153:12
**GLOBAL** [1] - 1:3
**Global's** [1] - 3:19
**Glombiski** [3] - 114:17,
114:19, 115:3
**Glombiski's** [1] - 114:23
**Gmail** [21] - 9:7, 33:22,
33:24, 58:23, 64:24, 66:18,
71:16, 72:1, 72:7, 73:21,
77:20, 81:23, 82:16, 84:2,
87:11, 87:14, 87:25,
122:20, 124:8, 124:9,
126:8
**God** [2] - 180:12, 200:24
**Gombiski** [7] - 89:6, 114:16,
115:9, 116:1, 116:7, 119:4,
121:5
**Gombiski's** [2] - 115:2,
115:4
**goodwill** [3] - 36:7, 72:17,
140:3
**granted** [1] - 6:10
**Great** [1] - 45:16
**great** [4] - 24:7, 76:6, 109:9,
187:13
**Greene** [29] - 42:2, 42:15,
42:19, 43:12, 44:15, 51:2,
51:7, 71:8, 72:1, 72:22,
83:8, 83:9, 83:10, 83:14,
84:8, 84:25, 85:5, 99:8,
147:15, 153:18, 159:8,
163:11, 163:13, 163:17,
163:23, 186:23, 196:21,
209:23
**Greene's** [2] - 44:8, 45:10
**Greene-David** [1] - 72:1
**grid** [1] - 146:24
**gross** [5] - 135:6, 135:23,
136:2, 138:2, 152:18
**grossed** [1] - 152:6
**ground** [1] - 11:9
**group** [1] - 13:17

**guess** [10] - 8:21, 90:6, 90:7,
164:12, 195:21, 215:3,
217:20, 225:20, 233:24,
234:24
**guide** [3] - 66:21, 76:12,
79:11
**guy** [1] - 28:22
**guys** [25] - 81:16, 117:14,
141:5, 152:13, 153:20,
162:7, 162:13, 162:18,
162:23, 163:17, 164:23,
169:23, 171:22, 190:13,
207:11, 208:20, 209:19,
210:5, 214:3, 217:17,
218:4, 224:11, 230:13,
230:16
**gymnastics** [1] - 130:21

### H

**half** [2] - 62:10, 132:2
**hand** [4] - 14:12, 92:12,
104:9, 230:7
**handed** [1] - 92:9
**handle** [1] - 157:14
**handling** [6] - 172:11, 173:4,
173:5, 173:9, 173:10
**hands** [1] - 226:16
**hang** [1] - 159:11
**happy** [3] - 120:13, 212:23
**hard** [9] - 18:17, 90:2, 138:7,
146:11, 146:14, 148:15,
151:16, 166:10, 210:16
**hardware** [3] - 43:12, 43:13,
230:25
**harm** [4] - 32:20, 138:4,
145:19, 146:11, 151:7,
213:18, 213:20, 213:22
**harmed** [1] - 139:20
**harmful** [1] - 86:21
**head** [4] - 11:16, 60:16,
96:16, 209:10
**header** [2] - 54:17, 54:20
**headers** [2] - 48:14, 48:16
**headings** [1] - 144:4
**hear** [6] - 8:18, 10:11, 11:13,
107:6, 178:10, 178:13
**heard** [8] - 12:1, 30:9, 107:5,
117:15, 118:18, 121:8,
121:11, 193:13
**Hearing** [1] - 1:7
**hearing** [19] - 4:1, 4:12, 4:14,
4:17, 4:23, 4:25, 5:17, 6:2,
7:11, 10:4, 12:13, 89:3,
98:22, 123:7, 170:21,
205:4, 232:23, 238:7,
239:7
**hearsay** [1] - 118:13
**heavy** [4] - 26:1, 94:11,
95:12, 95:14, 160:19,

220:23, 223:18, 223:24
**held** [3] - 3:1, 4:12, 154:20
**help** [6] - 5:9, 42:10, 90:11,
120:13, 220:21
**helped** [1] - 94:6
**helping** [2] - 17:8, 163:23
**hereof** [1] - 167:22
**hereto** [1] - 167:22
**HiBid** [9] - 14:2, 14:21, 15:9,
94:24, 94:25, 95:3, 96:25,
97:3, 97:4, 97:5, 97:7,
97:25, 98:20, 99:2, 103:8,
174:2, 174:7, 174:9,
174:24
**highest** [1] - 52:22
**Hilpipre** [17] - 89:6, 111:1,
111:2, 111:3, 111:9,
111:23, 112:10, 112:11,
112:14, 113:3, 113:7,
113:15, 114:14, 119:4,
121:5, 132:16, 132:24
**Hilpipre's** [2] - 111:20,
113:13
**himself** [7] - 55:17, 57:8,
57:17, 60:12, 61:10,
123:11, 127:15
**hire** [1] - 220:19
**hired** [3] - 220:18, 220:21,
220:23
**historic** [1] - 136:1
**history** [1] - 121:11
**hit** [1] - 105:19
**hold** [3] - 156:15, 163:13,
229:12
**holdup** [2] - 148:2, 148:3
**home** [3] - 43:23, 65:12,
66:15
**Honor** [20] - 3:4, 5:15, 6:15,
6:19, 6:23, 6:25, 7:2, 7:20,
8:8, 8:14, 9:2, 9:4, 9:9,
9:12, 9:17, 11:1, 12:8,
18:16, 18:18, 239:10
**HONORABLE** [1] - 1:11
**Honorable** [1] - 3:1
**hope** [1] - 238:20
**hoped** [1] - 130:8
**hopefully** [1] - 211:19
**host** [9] - 44:11, 125:2,
183:7, 183:16, 187:12,
189:11, 189:21, 199:23,
200:1
**hosted** [1] - 200:3
**hosting** [21] - 125:1, 182:21,
182:23, 182:24, 183:3,
183:10, 183:12, 184:3,
184:6, 185:1, 185:18,
187:14, 189:2, 189:9,
189:15, 198:14, 198:24,
199:2, 199:12, 199:13,
199:21

**hounding** [1] - 212:15
**hour** [4] - 59:10, 60:14,
62:11, 132:2
**house** [5] - 3:12, 68:7, 68:9,
75:16, 142:21
**housekeeping** [1] - 5:13
**huge** [1] - 112:4
**hundred** [1] - 14:14
**hundreds** [1] - 47:3
**hybrid** [1] - 14:3
**hyena** [3] - 111:21, 112:3,
113:17

### I

**idea** [13] - 146:14, 153:18,
154:18, 154:23, 157:25,
163:19, 175:8, 187:20,
205:15, 206:11, 208:17,
226:17, 226:20
**IDEN** [1] - 2:11
**identification** [5] - 2:13,
2:14, 237:13, 238:12,
238:13
**identified** [3] - 101:5, 102:21,
103:21
**ii** [1] - 40:16
**iii** [1] - 1:15
**III** [1] - 1:15
**illegal** [2] - 187:10, 187:17
**immediately** [2] - 115:18,
122:14
**impact** [1] - 118:17
**impacting** [1] - 141:17
**implored** [1] - 43:23
**imploring** [1] - 120:5
**import** [4] - 25:18, 60:6,
91:4, 103:2
**important** [12] - 8:13, 11:13,
68:9, 68:14, 169:24, 170:2,
170:17, 201:15, 219:19,
219:23, 219:24, 238:23
**impossible** [1] - 155:16
**impression** [5] - 76:11,
109:4, 111:22, 130:2,
130:6
**improper** [3] - 203:5, 208:12,
231:25
**improperly** [1] - 7:13
**improve** [1] - 217:15
**in-house** [5] - 3:12, 68:7,
68:9, 75:16, 142:21
**in-person** [1] - 17:16
**inaccurate** [1] - 11:22
**INC** [1] - 1:3
**Inc** [1] - 12:17
**Inc.'s** [2] - 13:4, 15:8
**include** [8] - 13:4, 15:9, 16:7,
16:10, 168:22, 168:23,
198:16, 236:17
**included** [5] - 20:6, 20:9,

24:12, 84:18, 87:14
**includes** [1] - 127:21
**including** [5] - 47:8, 49:20, 86:1, 110:11, 122:16
**increase** [2] - 20:24, 21:1
**increased** [2] - 35:10, 169:4
**increases** [1] - 169:5
**incredibly** [1] - 48:3
**incurred** [1] - 151:19
**independent** [1] - 110:5
**indicate** [2] - 8:5, 162:16
**indicated** [11] - 6:22, 6:25, 7:11, 8:15, 151:8, 151:9, 152:4, 155:13, 180:23, 194:5, 209:2
**indicia** [1] - 133:21
**indirectly** [7] - 30:17, 31:7, 123:9, 123:11, 123:14, 127:15, 129:5
**individual** [4] - 22:1, 50:7, 75:6, 88:24
**individuals** [5] - 43:14, 107:16, 110:10, 110:21, 126:18
**individuals'** [1] - 61:21
**industrial** [3] - 95:12, 95:20, 99:15
**industries** [17] - 14:23, 26:2, 30:11, 40:10, 91:15, 92:14, 94:4, 97:9, 220:25, 221:2, 221:4, 221:8, 221:10, 223:25, 228:10, 228:14
**industry** [28] - 14:25, 15:22, 15:24, 16:3, 23:6, 24:5, 29:7, 36:6, 46:9, 46:10, 88:21, 91:19, 93:12, 99:25, 100:9, 109:11, 109:18, 133:6, 140:11, 152:25, 154:6, 160:19, 161:22, 179:2, 217:11, 217:17, 223:20, 228:21
**industry-specific** [3] - 14:25, 24:5, 93:12
**infancy** [1] - 15:21
**info@equipmentfacts.com** [3] - 82:22, 82:24, 83:3
**informal** [1] - 5:2
**Information** [1] - 38:6
**information** [44] - 26:11, 33:18, 33:20, 35:17, 51:14, 52:2, 52:10, 55:24, 56:2, 56:24, 59:11, 61:9, 66:9, 66:11, 84:3, 84:14, 84:18, 84:20, 84:23, 85:7, 85:22, 85:25, 86:9, 87:24, 90:8, 90:16, 105:3, 109:17, 110:18, 116:5, 116:9, 141:10, 185:22, 186:19, 186:20, 207:17, 207:23, 208:6, 208:12, 208:16,

222:4, 232:6
**informed** [2] - 4:2, 4:7
**initial** [8] - 18:4, 18:8, 45:1, 45:9, 63:5, 73:16, 96:10, 239:8
**initiation** [1] - 7:6
**Injunction** [1] - 1:7
**injunction** [18] - 3:20, 4:1, 4:14, 4:17, 5:17, 6:2, 33:3, 33:7, 123:7, 143:15, 145:14, 145:16, 146:1, 146:2, 205:4, 213:17, 238:7, 239:7
**injunction's** [1] - 145:18
**insinuated** [1] - 204:18
**insinuation** [1] - 209:13
**instrumental** [5] - 24:4, 94:14, 156:12, 161:14, 163:2
**Intellectual** [1] - 31:9
**intellectual** [22] - 5:14, 5:19, 5:25, 16:10, 16:12, 31:17, 36:5, 36:11, 41:15, 72:12, 72:13, 72:17, 116:13, 122:15, 122:19, 131:5, 202:5, 202:7, 202:20, 205:6, 205:8, 227:9
**intent** [8] - 17:23, 18:1, 18:9, 18:13, 18:23, 22:8, 27:11, 47:16
**interact** [1] - 192:20
**intercept** [1] - 75:3
**interest** [2] - 115:23, 120:11
**interested** [2] - 97:17, 184:11
**interesting** [2] - 98:14, 146:18
**interfere** [3] - 31:17, 38:23, 39:22
**Interference** [2] - 21:8, 28:5
**interference** [9] - 21:13, 27:13, 27:18, 30:19, 30:22, 34:9, 37:2, 215:24, 216:3
**interfering** [1] - 123:14
**internal** [4] - 54:7, 54:8, 68:6, 156:10
**internally** [1] - 206:19
**internationally** [1] - 153:15
**internet** [1] - 79:5
**interns** [2] - 5:6, 93:6
**interplay** [1] - 98:15
**introduced** [1] - 6:24
**Inventions** [1] - 38:6
**inventory** [9] - 89:10, 95:3, 101:6, 101:12, 101:19, 102:4, 103:8, 129:1, 173:9
**investigate** [4] - 44:5, 89:9, 113:19, 113:21
**investigation** [26] - 46:24, 47:2, 47:4, 47:8, 48:1,

50:20, 53:18, 57:23, 58:9, 62:17, 67:9, 71:4, 71:16, 73:13, 77:12, 79:23, 81:11, 81:19, 84:7, 88:11, 184:19, 208:21, 208:22, 230:19, 230:24, 231:18
**Invoice** [1] - 64:1
**invoices** [1] - 76:13
**Invoices** [4] - 63:24, 65:25, 68:25, 75:25
**invoicing** [1] - 164:1
**involved** [17] - 13:10, 16:21, 17:6, 17:12, 22:7, 24:9, 25:17, 35:14, 48:4, 106:11, 128:19, 141:11, 141:14, 143:7, 156:8, 171:12, 203:23
**involvement** [8] - 16:24, 18:12, 24:8, 25:2, 25:21, 61:25, 148:5, 215:11
**IP** [4] - 198:17, 198:21, 198:25, 199:8
**irreparable** [5] - 32:20, 145:18, 146:10, 213:20, 213:21
**issue** [17] - 5:14, 8:6, 9:3, 9:20, 106:4, 107:9, 116:21, 119:9, 124:3, 125:19, 136:14, 155:14, 183:22, 230:4, 230:6, 230:7
**issued** [4] - 3:24, 43:19, 121:18, 232:10
**issues** [16] - 5:2, 10:8, 59:9, 89:1, 111:20, 139:12, 155:1, 163:23, 164:3, 164:5, 183:25, 191:3, 193:18, 205:14, 217:19, 239:4
**IT** [2] - 43:24, 188:8
**item** [4] - 37:12, 50:5, 101:10, 102:6
**items** [5] - 14:4, 14:10, 14:15, 20:10, 230:9
**itself** [4] - 54:16, 97:15, 109:23, 113:23

## J

**J.B** [4] - 89:6, 105:23, 107:5, 109:2
**Jackson** [1] - 96:17
**Jacobi** [13] - 62:21, 62:22, 69:22, 73:20, 75:11, 77:19, 78:14, 80:1, 81:23, 82:8, 82:21, 82:23, 83:6
**Jacobi's** [1] - 82:17
**James** [1] - 114:18
**January** [4] - 4:7, 4:12, 127:2, 127:20, 129:10, 181:9, 182:4, 182:14,

201:2
**Jeff** [8] - 89:7, 116:18, 116:20, 117:23, 119:6, 119:7, 131:18, 131:19
**Jenga** [1] - 25:5
**JERSEY** [1] - 1:1
**Jersey** [13] - 1:10, 12:12, 14:13, 14:20, 43:11, 61:15, 62:23, 149:5, 149:11, 197:5, 197:22, 216:21, 230:11
**Jim** [2] - 106:6, 109:2
**job** [16] - 13:2, 16:20, 112:8, 167:21, 168:16, 168:22, 169:8, 169:11, 169:14, 169:18, 169:20, 170:1, 170:3, 170:4, 202:22, 218:1
**John** [2] - 3:10, 209:14
**JOHN** [1] - 1:15
**Jr** [2] - 126:22, 232:3, 232:4, 232:5, 232:8
**judge** [9] - 5:12, 121:11, 121:22, 123:3, 145:23, 155:11, 221:2, 236:22, 237:12
**Judge** [57] - 3:2, 3:5, 3:14, 6:4, 6:18, 8:5, 10:23, 18:15, 24:15, 27:21, 37:10, 37:24, 42:4, 44:19, 47:17, 47:19, 50:16, 53:12, 53:14, 57:19, 62:13, 67:7, 71:2, 73:9, 77:4, 85:11, 89:25, 107:14, 118:7, 118:15, 121:18, 121:25, 132:5, 132:13, 142:6, 142:8, 146:23, 164:8, 178:7, 180:12, 180:14, 180:18, 180:25, 181:17, 181:19, 185:25, 187:24, 198:11, 209:12, 211:11, 237:6, 237:16, 238:1, 239:12, 240:1, 240:3
**JUDGE** [1] - 1:12
**July** [40] - 17:16, 18:2, 21:24, 26:25, 28:24, 42:18, 46:3, 55:17, 57:8, 58:24, 59:5, 65:1, 65:6, 67:19, 67:22, 71:13, 71:20, 72:2, 73:23, 74:20, 77:15, 77:21, 78:1, 80:2, 80:7, 82:11, 147:20, 162:17, 169:5, 174:25, 194:14, 196:16, 201:2, 202:15, 203:19, 210:1, 210:4, 226:2, 226:3
**jump** [1] - 70:23
**June** [4] - 42:25, 48:10, 51:20, 214:16
**junk** [1] - 185:4
**jury** [2] - 5:6

## K

**keep** [18] - 6:11, 11:10, 11:14, 70:19, 77:6, 77:8, 81:16, 97:6, 98:19, 98:22, 115:22, 124:7, 127:19, 154:21, 180:16, 185:4, 195:23, 216:17
**keeping** [1] - 239:14
**keeps** [1] - 209:9
**kept** [3] - 161:10, 217:3, 221:19
**key** [1] - 50:6
**kids** [1] - 179:22
**killed** [1] - 159:10
**kind** [15] - 9:24, 14:3, 14:23, 15:20, 16:3, 23:9, 35:18, 55:25, 60:5, 60:9, 66:2, 103:24, 115:19, 140:13, 239:17
**kinds** [1] - 139:25
**kingdom** [2] - 113:17, 114:12
**Knisley** [1] - 119:25
**Knisley's** [1] - 120:1
**knowing** [3] - 16:15, 171:9, 171:16
**knowledge** [20] - 16:5, 16:7, 16:14, 22:4, 22:7, 36:5, 36:11, 100:23, 105:21, 116:6, 121:3, 121:4, 123:24, 130:23, 131:5, 131:6, 131:7, 147:10, 161:25, 191:18
**knowledgeable** [1] - 23:6
**known** [3] - 26:25, 170:15, 170:16
**knows** [6] - 8:14, 85:13, 123:3, 131:9, 178:9, 178:12

## L

**label** [4] - 176:2, 176:12, 176:18, 176:24
**labeled** [2] - 216:2, 227:8
**lack** [1] - 130:3
**laid** [2] - 221:8, 221:10
**language** [2] - 142:24, 229:23
**laptop** [1] - 232:17
**laptops** [2] - 231:2, 231:13
**large** [1] - 96:18
**larger** [4] - 34:21, 48:4, 79:2, 154:10
**Larry** [92] - 3:20, 29:18, 42:16, 45:11, 45:18, 45:19, 50:24, 51:18, 53:25, 54:1, 58:5, 58:10, 61:16, 63:1, 67:15, 69:7, 73:20, 77:19, 81:23, 82:16, 94:14, 95:19,

96:15, 96:22, 97:18, 97:22, 98:5, 100:23, 105:2, 112:7, 114:6, 114:7, 114:9, 116:25, 119:19, 124:16, 126:5, 126:22, 127:24, 131:2, 131:6, 133:4, 141:25, 149:23, 150:16, 150:25, 151:20, 155:17, 157:11, 159:7, 162:20, 163:1, 163:2, 163:7, 163:8, 163:20, 165:3, 165:12, 166:16, 168:8, 169:1, 169:3, 169:15, 169:23, 171:5, 179:19, 184:20, 194:19, 194:22, 196:1, 196:4, 197:1, 200:19, 201:9, 201:12, 201:15, 201:21, 202:2, 202:6, 202:8, 202:14, 202:21, 203:11, 207:18, 221:15, 232:3, 232:5, 233:20, 235:22
**Larry's** [9] - 52:19, 124:9, 124:16, 150:23, 150:25, 162:22, 168:22, 200:25
**larry@equipmentfacts** [1] - 194:20
**Larry@equipmentfacts. com** [1] - 148:25
**larry@factstech.com** [1] - 119:19
**last** [17] - 6:20, 7:5, 7:17, 11:6, 18:25, 24:22, 27:3, 33:13, 50:22, 114:7, 120:4, 120:7, 146:19, 147:3, 147:9, 147:24, 225:25
**Last** [1] - 48:21
**late** [1] - 42:25
**lately** [1] - 155:6
**latitude** [1] - 211:13
**laundry** [2] - 117:18, 141:8
**law** [4] - 3:15, 4:24, 125:8, 142:16
**LAWRENCE** [1] - 1:6
**Lawrence** [4] - 48:8, 122:14, 123:7, 182:8
**lawsuit** [7] - 104:4, 145:21, 147:12, 147:14, 147:18, 148:8
**lawsuits** [1] - 148:6
**lawyer** [2] - 142:18, 142:22
**lawyers** [1] - 40:24
**lead** [1] - 19:10
**leading** [1] - 163:14
**learn** [5] - 88:25, 120:5, 162:8, 162:11, 222:1
**learned** [4] - 105:16, 190:15, 222:4, 232:5
**learning** [2] - 162:13, 191:8
**least** [18] - 5:21, 15:12,

16:13, 17:2, 18:12, 51:7, 52:25, 55:16, 56:14, 71:15, 88:18, 92:5, 94:18, 113:3, 119:23, 124:21, 133:25, 237:10
**leave** [7] - 135:15, 170:22, 196:6, 236:24, 238:10, 238:14, 239:1
**leaving** [2] - 194:23, 194:25
**led** [2] - 17:20, 229:23
**left** [19] - 3:16, 43:17, 43:18, 48:19, 54:10, 92:12, 92:19, 158:8, 158:9, 158:13, 158:15, 158:17, 211:23, 212:24, 213:14, 214:7, 214:14, 214:23, 232:20
**left-hand** [1] - 92:12
**legal** [3] - 187:6, 187:9, 187:21
**length** [1] - 136:15
**lengthy** [1] - 136:21
**less** [1] - 155:20
**letter** [12] - 17:23, 18:1, 18:9, 18:13, 18:23, 22:8, 27:11, 47:15, 121:19, 122:6, 127:8, 134:14
**letting** [1] - 238:18
**leverage** [2] - 23:14, 138:11
**liaison** [1] - 149:20
**license** [27] - 173:17, 173:19, 173:22, 175:14, 175:21, 175:22, 186:19, 218:19, 220:9, 220:15, 220:19, 228:20, 228:24, 234:5, 234:9, 235:18, 235:23, 235:24, 236:4, 236:9, 236:18, 237:2, 239:14, 239:20
**licensed** [1] - 234:12
**licenses** [5] - 175:11, 218:15, 236:5, 236:8, 239:23
**licensing** [2] - 176:10, 235:15
**life** [1] - 137:1
**lifeblood** [4] - 50:3, 60:20, 68:15, 146:17
**likely** [1] - 74:18
**limit** [1] - 229:15
**limited** [5] - 23:17, 61:5, 94:11, 122:16, 233:20
**limits** [1] - 228:13
**Lincoln** [3] - 149:13, 149:19, 183:5
**line** [5] - 63:8, 63:20, 75:18, 75:23, 80:16, 219:9
**lined** [1] - 102:23
**lines** [2] - 32:7, 32:14
**link** [1] - 74:23
**list** [18] - 15:8, 34:14, 36:7,

49:1, 50:7, 52:6, 52:7, 52:20, 55:8, 56:6, 60:6, 146:16, 179:16, 196:25, 206:14, 206:18, 206:23, 226:4
**List** [1] - 54:15
**listed** [2] - 102:4, 153:1
**listen** [1] - 216:15
**lists** [6] - 122:17, 122:18
**literally** [1] - 238:21
**litigation** [5] - 76:7, 90:11, 106:11, 141:12, 141:17
**Live** [7] - 63:22, 63:23, 63:24, 63:25, 64:17, 68:23, 76:3
**live** [23] - 13:21, 13:25, 14:1, 14:13, 23:9, 118:23, 120:6, 120:11, 120:16, 150:4, 156:2, 159:21, 160:3, 160:8, 162:9, 164:3, 172:22, 190:16, 214:25, 217:11, 217:17, 222:2
**living** [3] - 113:18, 134:17, 134:23
**LLC** [16] - 1:7, 3:21, 46:3, 46:19, 54:21, 66:4, 76:22, 81:5, 88:6, 88:12, 174:16, 202:19, 203:19, 203:20, 204:7, 204:9
**location** [2] - 198:22, 216:17
**logged** [1] - 49:3
**login** [1] - 49:9
**logo** [2] - 120:10, 120:19
**LOI** [2] - 17:20, 17:21
**longstanding** [1] - 140:5
**look** [32] - 10:15, 19:19, 20:7, 21:10, 28:7, 40:1, 57:25, 59:15, 76:5, 80:18, 93:6, 96:12, 102:11, 108:2, 120:3, 145:20, 151:25, 159:9, 159:13, 171:9, 191:14, 195:17, 205:22, 206:25, 207:14, 207:22, 208:1, 209:1, 215:4, 218:5, 230:1, 230:3
**lookback** [3] - 135:5, 135:6, 135:23
**lookbacks** [1] - 136:1
**looked** [5] - 95:6, 191:13, 207:18, 210:12, 232:6
**looking** [12] - 20:1, 23:13, 24:22, 32:4, 58:14, 65:19, 78:4, 92:25, 111:4, 111:15, 136:4, 141:23
**Looks** [1] - 64:14
**looks** [9] - 80:23, 101:25, 120:19, 120:22, 168:17, 195:18, 196:1, 203:20, 204:10
**loses** [1] - 5:24

**losing** [1] - 139:9
**loss** [1] - 138:1
**losses** [1] - 143:15
**lost** [21] - 134:25, 135:3, 138:2, 138:5, 138:7, 139:6, 139:8, 139:17, 143:18, 143:20, 144:18, 144:25, 145:9, 151:9, 155:8, 155:12, 210:17, 211:5, 211:8, 211:20
**loud** [4] - 116:1, 120:7, 122:12, 127:14
**loyalty** [2] - 37:9, 209:6
**Loyalty** [1] - 38:17
**lunch** [2] - 62:11, 132:2
**luncheon** [1] - 132:7
**Lynn** [3] - 17:10, 22:2, 26:16

**M**

**machine** [3] - 95:20, 99:25, 232:9
**Machinefacts** [18] - 95:11, 95:16, 95:24, 95:25, 96:4, 98:21, 99:1, 99:11, 102:12, 103:8, 224:7, 224:10, 224:16, 224:20, 224:21, 225:4, 225:10
**machineFacts** [1] - 95:12
**Machinefacts.com** [3] - 98:2, 98:5, 98:9
**machinery** [7] - 40:9, 160:19, 220:23, 223:19, 223:25, 228:9, 228:13
**Machinery** [7] - 95:11, 95:13, 99:12, 101:8, 224:6, 224:9, 224:10
**mail** [2] - 60:9, 185:5
**main** [1] - 95:2
**majority** [3] - 6:21, 9:3, 160:6
**Manage** [3] - 64:7, 69:1, 75:25
**manager** [6] - 72:14, 167:11, 167:16, 167:18, 194:3, 223:11
**managers** [1] - 13:8
**manipulate** [2] - 60:3, 60:5
**manner** [3] - 5:2, 40:10, 228:10
**Manual** [22] - 64:1, 64:4, 64:7, 64:10, 64:12, 68:19, 68:22, 68:23, 68:24, 68:25, 69:1, 75:24, 75:25, 76:1, 76:2, 76:3, 82:5
**manual** [1] - 76:15
**manuals** [34] - 67:1, 146:25, 191:12, 191:14, 191:15, 191:17, 191:20, 191:21, 191:25, 192:5, 192:8, 192:12, 192:13, 192:22,

193:2, 193:6, 193:20, 194:5, 194:8, 194:12, 197:7, 205:8, 205:9, 205:11, 210:6, 226:3, 226:11, 226:18, 226:22, 226:24, 226:25
**Manuals** [1] - 64:18
**mark** [1] - 122:1
**marked** [9] - 37:12, 38:2, 71:7, 96:7, 164:12, 164:18, 181:22, 237:10, 237:13
**market** [9] - 22:23, 56:7, 107:3, 112:6, 134:1, 154:8, 160:16, 160:17
**marketing** [5] - 60:6, 173:10, 206:19, 217:7, 220:2
**marking** [2] - 37:20, 164:16
**Marlene** [32] - 42:2, 42:13, 42:14, 42:15, 42:19, 43:12, 43:17, 44:15, 45:18, 51:2, 52:19, 52:23, 69:7, 71:8, 72:1, 72:22, 83:8, 83:9, 83:14, 84:8, 84:25, 124:16, 147:15, 153:18, 159:8, 163:20, 186:23, 195:6, 195:22, 204:5
**Marlene's** [3] - 45:15, 124:8, 196:25
**Martin** [14] - 89:7, 116:18, 116:19, 116:20, 116:23, 117:1, 117:5, 117:23, 117:24, 119:6, 119:7, 121:6, 131:18, 131:19
**Martin's** [1] - 116:21
**mass** [4] - 84:14, 107:3, 202:19
**material** [2] - 183:15, 206:20
**materials** [2] - 226:6
**math** [1] - 28:22
**matter** [10] - 3:7, 3:18, 5:13, 10:11, 70:20, 114:20, 118:16, 137:10, 236:1, 240:13
**matters** [1] - 10:18
**Maureen** [1] - 124:16
**maureenmodridge@ earthlink.net's** [1] - 58:6
**McDougall** [4] - 17:11, 22:2, 22:4, 26:16
**McGrew** [5] - 89:7, 119:8, 120:24, 121:5
**McGrew's** [1] - 120:19
**mean** [30] - 23:8, 30:1, 43:19, 55:4, 60:21, 60:22, 61:12, 66:24, 69:14, 90:5, 91:3, 96:24, 102:5, 111:24, 136:10, 139:24, 173:3, 176:4, 187:7, 198:19, 200:2, 203:20, 207:9, 207:13, 208:7, 216:20,

228:24, 230:6, 230:8, 239:15
**meaning** [7] - 13:20, 13:24, 94:8, 102:6, 149:1, 173:9, 232:9
**means** [10] - 172:11, 174:10, 176:2, 176:5, 198:21, 221:5, 221:7, 228:3, 228:6
**meant** [1] - 92:22
**measures** [1] - 85:24
**meat** [5] - 171:3, 171:6, 171:11, 171:19, 172:6
**mechanical** [1] - 1:22
**Mecum** [1] - 96:17
**media** [1] - 8:21
**meet** [6] - 24:1, 46:1, 46:16, 126:16, 204:23, 205:1
**meeting** [4] - 17:16, 46:1, 46:5, 196:1
**meld** [1] - 164:6
**member** [2] - 32:8, 32:9
**member's** [1] - 33:11
**members** [1] - 126:14
**memorialized** [1] - 18:10
**mental** [1] - 130:21
**mention** [2] - 121:11, 174:7
**mentioned** [5] - 69:2, 78:13, 105:19, 157:3, 177:7
**merchandise** [1] - 152:18
**merge** [2] - 60:8, 60:9
**met** [2] - 16:17, 142:10
**method** [1] - 86:3
**MICHAEL** [1] - 1:11
**Michael** [1] - 3:2
**Michaela** [3] - 111:12, 113:8, 113:16
**mid** [1] - 42:25
**might** [6] - 15:24, 15:25, 60:18, 75:4, 93:15, 215:5
**Mike** [1] - 200:19
**Miller** [21] - 3:10, 5:11, 6:20, 7:11, 8:3, 8:7, 9:1, 10:25, 12:7, 37:12, 62:6, 70:25, 85:13, 107:21, 119:1, 132:12, 142:20, 181:11, 230:2, 233:8, 238:4
**MILLER** [76] - 1:15, 2:7, 3:4, 3:10, 5:12, 6:15, 9:2, 10:22, 11:1, 12:8, 12:9, 18:15, 24:15, 24:18, 27:21, 27:23, 31:15, 31:19, 37:10, 37:15, 37:19, 38:1, 42:4, 42:6, 44:19, 44:21, 47:17, 47:24, 50:16, 50:18, 53:12, 53:16, 57:19, 57:21, 61:7, 62:7, 62:12, 62:15, 67:7, 71:2, 73:9, 73:11, 77:4, 77:7, 77:10, 85:17, 89:25, 90:10, 93:6, 107:17, 107:24, 108:10, 118:15,

119:2, 119:3, 121:25, 122:3, 122:5, 132:5, 132:13, 132:14, 142:6, 178:1, 178:3, 180:14, 181:12, 181:14, 207:2, 207:4, 209:12, 211:10, 222:14, 237:12, 238:5, 239:10, 239:25
**Miller's** [2] - 195:17, 226:25
**million** [14] - 18:8, 20:20, 20:22, 34:16, 35:13, 65:17, 70:5, 72:15, 72:20, 81:8, 87:19, 139:4, 158:1, 201:12
**mind** [4] - 89:5, 118:17, 119:7, 121:6
**mindful** [1] - 198:3
**mine** [1] - 223:3
**minute** [9] - 18:19, 20:7, 21:10, 31:10, 62:10, 70:12, 96:12, 113:24, 119:12
**minutes** [1] - 80:9
**mirror** [1] - 123:17
**missing** [1] - 204:15
**model** [1] - 100:18
**moment** [1] - 27:24
**Monday** [2] - 182:14, 230:23
**monetarily** [4] - 139:15, 146:6, 146:8, 146:9
**monetary** [11] - 35:12, 138:1, 138:4, 143:9, 145:12, 145:20, 145:24, 146:15, 148:15, 151:10, 154:25
**money** [13] - 33:10, 36:2, 36:3, 50:4, 55:8, 55:20, 87:16, 87:18, 133:21, 133:22, 142:3, 213:18, 213:23
**money-motivated** [1] - 133:22
**monitor** [9] - 44:9, 125:5, 125:6, 125:8, 186:10, 188:19, 188:22, 188:23, 200:5
**monitored** [1] - 124:9
**monitoring** [16] - 124:11, 124:12, 125:9, 150:14, 185:7, 185:15, 185:17, 186:6, 186:22, 189:8, 189:20, 198:23, 200:8, 200:9, 200:11, 200:13
**month** [1] - 99:6
**months** [11] - 7:19, 21:24, 39:4, 39:14, 39:18, 136:25, 162:13, 163:22, 190:15, 213:9, 213:12
**morning** [10] - 3:3, 3:4, 3:5, 3:13, 3:14, 3:17, 5:16, 12:10, 62:10, 70:11
**most** [11] - 48:14, 55:8, 56:7,

74:18, 93:11, 169:24,
206:7, 216:20, 219:19,
219:23, 232:3
**motion** [3] - 3:19, 185:24,
237:8
**motivated** [1] - 133:22
**mouth** [1] - 138:9
**move** [4] - 158:20, 195:8,
237:9, 238:21
**moved** [4] - 158:17, 237:13,
237:17, 238:2
**moving** [3] - 37:13, 70:20,
163:21
**MR** [123] - 2:7, 2:8, 3:4, 3:5,
3:10, 3:14, 5:12, 6:4, 6:9,
6:15, 6:18, 8:5, 9:2, 10:22,
10:23, 11:1, 12:8, 12:9,
18:15, 24:15, 24:18, 27:21,
27:23, 31:14, 31:15, 31:19,
37:10, 37:15, 37:19, 37:24,
38:1, 42:4, 42:6, 44:19,
44:21, 47:17, 47:19, 47:24,
50:16, 50:18, 53:12, 53:14,
53:16, 57:19, 57:21, 60:21,
61:7, 62:7, 62:12, 62:15,
67:7, 71:2, 73:9, 73:11,
77:4, 77:7, 77:10, 85:11,
85:17, 89:25, 90:5, 90:10,
93:6, 107:14, 107:17,
107:21, 107:24, 108:9,
108:10, 118:7, 118:14,
118:15, 119:2, 119:3,
121:25, 122:3, 122:5,
132:5, 132:13, 132:14,
142:6, 142:8, 142:9, 164:8,
164:13, 178:1, 178:3,
178:7, 180:12, 180:14,
180:18, 181:2, 181:6,
181:9, 181:12, 181:14,
181:16, 181:20, 198:4,
198:11, 198:12, 207:2,
207:4, 209:12, 209:14,
209:18, 211:10, 211:11,
211:14, 222:14, 222:16,
237:5, 237:12, 237:16,
238:1, 238:5, 239:10,
239:12, 239:19, 239:22,
239:25, 240:1, 240:3
**multimillion** [2] - 153:23,
153:25
**multimillion-dollar** [2] -
153:23, 153:25
**multiple** [4] - 30:4, 63:8,
71:24, 85:19
**Murphy** [2] - 114:18, 116:6
**must** [2] - 170:15, 170:16
**mutually** [2] - 167:12, 225:14

## N

**NAA** [3] - 46:6, 46:7, 46:8
**name** [15] - 11:5, 11:6, 17:10,
26:16, 26:19, 49:11, 54:14,
58:15, 58:20, 78:21,
117:22, 153:6, 153:13,
173:24, 196:20
**Name** [3] - 48:20, 48:21
**names** [7] - 63:21, 68:18,
75:22, 80:15, 86:4, 98:22,
105:19
**narrative** [1] - 90:25
**narrowly** [1] - 180:16
**National** [1] - 46:8
**natural** [1] - 160:15
**naturally** [1] - 170:10
**nature** [1] - 183:8
**navigated** [1] - 103:16
**Nebraska** [3] - 12:12, 183:5,
231:11
**necessarily** [7] - 40:19,
58:18, 99:22, 160:7,
172:18, 175:5, 193:8
**necessity** [1] - 229:15
**need** [20] - 4:22, 5:2, 5:7, 6:4,
6:12, 76:13, 96:23, 99:23,
108:6, 125:5, 170:21,
183:20, 183:24, 199:8,
200:19, 202:22, 218:20,
238:15, 239:4
**needed** [8] - 160:24, 164:5,
193:5, 193:15, 193:16,
217:10, 232:12, 235:3
**needs** [1] - 12:1
**negative** [2] - 140:16, 140:17
**negotiate** [6] - 21:1, 35:5,
39:9, 94:6, 102:7, 157:22
**negotiated** [11] - 35:6, 39:14,
105:12, 133:12, 143:3,
143:8, 165:4, 166:13,
166:18, 169:3, 178:12
**negotiating** [1] - 17:2
**negotiation** [2] - 142:24,
148:1
**negotiations** [12] - 17:12,
17:15, 17:17, 19:10, 22:7,
23:4, 24:8, 25:2, 25:21,
39:5, 142:25, 143:6
**networks** [1] - 86:8
**never** [33] - 6:21, 7:9, 7:14,
7:15, 9:23, 116:3, 116:4,
118:5, 118:10, 130:15,
142:10, 168:2, 168:12,
169:8, 169:9, 169:14,
169:25, 196:13, 196:14,
204:19, 206:20, 208:15,
208:16, 208:25, 210:11,
210:23, 214:22, 216:19,
220:12, 220:14, 220:15

**NEW** [1] - 1:1
**new** [24] - 12:19, 12:23,
13:11, 13:13, 44:17, 46:5,
69:14, 72:10, 83:20, 88:10,
90:7, 110:12, 117:20,
117:24, 141:2, 154:3,
171:8, 189:24, 193:10,
196:8, 196:10, 202:19,
209:23, 226:1
**New** [13] - 1:10, 12:12, 14:13,
14:20, 43:11, 61:15, 62:23,
149:5, 149:11, 197:5,
197:22, 216:21, 230:11
**newer** [1] - 13:3
**news** [2] - 7:14, 45:16
**Newswire** [1] - 152:16
**next** [8] - 8:18, 14:17, 20:5,
40:12, 120:15, 225:13,
230:1
**nice** [1] - 23:11
**night** [8] - 6:20, 7:5, 7:17,
9:24, 146:19, 147:3, 147:9,
147:25
**ninth** [1] - 127:9
**NMI** [3] - 68:20, 69:3, 69:12
**nobody** [3] - 156:5, 187:10,
214:8
**Nolan** [1] - 55:11
**Non** [3] - 21:8, 28:5, 38:7
**non** [57] - 14:3, 21:8, 21:13,
27:12, 27:13, 27:18, 28:5,
29:14, 29:16, 29:23, 30:14,
30:19, 30:22, 34:8, 34:9,
36:17, 36:24, 37:1, 37:2,
37:9, 39:1, 39:13, 39:15,
91:13, 103:25, 123:18,
123:19, 137:17, 137:18,
138:4, 139:15, 143:2,
146:15, 148:15, 154:25,
156:17, 171:7, 171:13,
171:25, 172:7, 173:1,
175:15, 177:13, 179:2,
215:24, 216:1, 216:2,
216:3, 227:18, 229:19,
234:1
**non-compete** [20] - 27:12,
27:18, 29:23, 36:17, 36:24,
37:9, 39:15, 103:25,
123:18, 123:19, 171:7,
171:13, 171:25, 172:7,
173:1, 177:13, 179:2,
216:1, 229:19, 234:1
**non-competes** [2] - 156:17,
175:15
**non-competition** [11] - 21:8,
21:13, 28:5, 29:14, 29:16,
34:8, 39:1, 39:13, 215:24,
216:2, 227:18
**non-equipment-related** [1] -
14:3

**Non-Interference** [2] - 21:8,
28:5
**non-interference** [9] - 21:13,
27:13, 27:18, 30:19, 30:22,
34:9, 37:2, 215:24, 216:3
**non-monetarily** [1] - 139:15
**non-monetary** [4] - 138:4,
146:15, 148:15, 154:25
**non-restrictive** [1] - 143:2
**non-solicitation** [7] - 27:13,
30:14, 37:1, 37:9, 123:19,
137:17, 137:18
**Non-Solicitation** [1] - 38:7
**none** [2] - 177:4, 177:7
**nonverbal** [1] - 11:15
**notation** [1] - 34:2
**notations** [2] - 22:11, 27:8
**note** [9] - 7:4, 8:10, 8:13,
8:23, 47:19, 107:14,
107:21, 118:7, 118:11
**noted** [3] - 61:2, 61:6, 100:4
**notes** [1] - 9:23
**nothing** [8] - 10:22, 97:24,
143:11, 151:12, 184:2,
196:3, 218:4, 239:10
**Notice** [1] - 33:17
**notice** [3] - 37:12, 211:13,
238:23
**noticed** [3] - 37:17, 88:8,
174:1
**Notices** [1] - 26:7
**notices** [1] - 26:11
**notification** [1] - 130:16
**notifying** [1] - 84:25
**notwithstanding** [1] - 5:5
**November** [5] - 107:19,
119:15, 181:3, 181:8,
181:9
**Number** [22] - 3:8, 20:1, 20:5,
20:10, 25:11, 38:12, 38:13,
48:20, 48:21, 107:19,
167:4, 182:7, 182:14,
182:18, 182:19, 223:8,
230:1, 230:3, 232:24,
233:5, 233:6, 233:11
**number** [6] - 21:3, 32:1,
33:16, 40:16, 65:20,
155:16
**NUMBER** [2] - 1:4, 2:11
**numbered** [4] - 20:13, 21:3,
25:10, 54:24
**numbers** [1] - 195:17
**numerette** [1] - 40:16
**nuts** [2] - 79:20, 173:8

## O

**o'clock** [3] - 62:11, 198:3,
236:22
**oath** [5] - 70:22, 186:7,

195:14, 200:13
**object** [4] - 60:21, 85:11, 209:12, 237:16
**objected** [1] - 22:11
**objection** [25] - 8:10, 11:23, 11:25, 53:15, 61:2, 61:6, 90:4, 107:14, 108:7, 118:7, 118:12, 118:13, 118:20, 125:19, 134:14, 178:1, 178:2, 180:14, 180:17, 207:2, 207:3, 211:10, 222:14, 237:23
**objections** [2] - 4:18, 90:5
**obligations** [1] - 166:25
**obtained** [1] - 110:17
**obviously** [9] - 7:20, 7:21, 20:24, 44:25, 91:4, 146:18, 162:16, 201:12, 232:13
**occur** [1] - 151:21
**occurred** [3] - 21:24, 71:20, 106:13
**occurring** [2] - 53:23, 127:20
**OF** [1] - 1:1
**offer** [7] - 5:18, 9:16, 18:4, 18:7, 18:8, 18:16, 170:9
**offered** [3] - 14:15, 101:8, 102:6
**offering** [2] - 134:4, 175:20
**offers** [2] - 95:3, 99:15
**office** [4] - 61:15, 62:24, 149:5, 149:11
**OFFICIAL** [1] - 240:8
**Official** [1] - 1:20
**officially** [1] - 4:16
**oil** [4] - 49:1, 49:4, 147:5, 228:20
**OilfieldFacts** [5] - 88:10, 88:11, 158:21, 158:23, 159:1
**onboard** [2] - 196:4, 201:21
**once** [2] - 25:6, 168:10
**one** [96] - 8:5, 11:21, 16:3, 19:3, 24:5, 26:6, 27:18, 32:6, 42:1, 47:19, 47:25, 48:4, 53:24, 55:11, 59:14, 60:2, 61:23, 62:19, 64:2, 64:5, 71:6, 73:8, 74:10, 81:17, 84:9, 84:21, 88:8, 93:8, 93:13, 99:20, 99:21, 99:23, 100:7, 105:1, 106:6, 107:12, 107:22, 108:1, 112:21, 113:18, 117:16, 119:10, 125:22, 128:10, 134:5, 134:11, 135:4, 136:5, 142:8, 145:5, 145:19, 148:11, 148:13, 152:9, 155:19, 161:17, 161:23, 165:24, 167:2, 172:20, 174:23, 175:24, 178:9, 178:12, 181:10,

181:16, 181:17, 181:18, 183:19, 185:1, 190:4, 190:19, 194:7, 195:20, 205:11, 210:17, 211:1, 211:7, 213:25, 214:3, 214:6, 219:3, 219:5, 220:10, 221:25, 224:8, 225:25, 232:3, 232:12, 236:6, 238:17, 238:20
**one's** [1] - 59:20
**one-sided** [1] - 167:2
**one-stop** [2] - 190:4, 219:3
**one-time** [2] - 134:5, 134:11
**ones** [6] - 7:16, 100:4, 102:21, 154:10, 181:4, 193:3
**ongoing** [2] - 36:12, 184:19
**online** [106] - 13:5, 13:20, 13:24, 14:5, 14:16, 14:18, 14:19, 15:13, 16:4, 16:14, 22:15, 23:8, 25:25, 29:7, 29:22, 29:24, 30:6, 30:10, 40:4, 40:5, 40:7, 40:8, 49:6, 49:8, 50:5, 69:4, 76:14, 79:12, 79:19, 89:22, 91:7, 91:11, 91:15, 93:2, 93:9, 93:11, 93:13, 93:25, 94:25, 95:4, 95:8, 97:7, 98:10, 99:18, 99:20, 99:21, 99:24, 100:3, 100:7, 100:8, 101:13, 101:18, 101:22, 102:3, 102:8, 102:14, 103:18, 103:20, 109:11, 109:18, 120:10, 127:24, 128:2, 129:1, 129:2, 133:5, 139:16, 140:14, 155:18, 155:24, 156:2, 170:23, 170:25, 171:14, 171:21, 172:2, 172:4, 172:8, 172:10, 172:13, 172:19, 172:22, 173:3, 173:4, 177:16, 190:16, 201:19, 218:8, 218:10, 218:17, 219:1, 219:2, 219:6, 219:8, 219:10, 219:19, 219:23, 220:21, 221:3, 221:4, 228:7, 234:6, 235:21, 236:20
**Open** [3] - 70:17, 132:9, 198:8
**open** [3] - 3:1, 135:17, 177:11
**opening** [2] - 18:4, 20:21
**operate** [2] - 29:8, 101:4
**operated** [2] - 88:18, 91:16
**operates** [7] - 13:15, 29:21, 30:11, 92:3, 92:6, 92:15, 111:2
**operating** [1] - 139:16
**opinion** [17] - 23:2, 91:3,

105:12, 111:22, 114:10, 115:23, 121:19, 121:22, 122:6, 123:22, 127:9, 139:15, 150:22, 151:1, 171:17, 209:7
**opinions** [1] - 133:19
**opportunity** [4] - 6:25, 10:1, 10:5, 107:15
**opposed** [1] - 141:1
**opposition** [4] - 3:21, 6:3, 238:4, 238:5
**Options** [2] - 144:22, 144:24
**orchestrating** [1] - 83:20
**order** [15] - 5:16, 7:8, 96:19, 98:3, 121:19, 121:20, 121:22, 122:6, 122:11, 122:23, 127:9, 148:8, 151:18, 182:11, 239:8
**otherwise** [29] - 5:22, 9:15, 13:13, 13:14, 35:21, 39:23, 49:24, 55:20, 55:24, 60:18, 72:25, 76:23, 82:23, 85:9, 89:17, 90:1, 95:7, 98:9, 101:4, 101:14, 101:18, 105:9, 120:17, 124:14, 128:1, 133:9, 140:6, 178:5, 205:4
**outright** [1] - 235:18
**outside** [6] - 38:23, 85:8, 149:5, 149:11, 229:19, 239:15
**outstanding** [1] - 239:4
**overall** [1] - 51:13
**overarching** [1] - 103:13
**overlap** [1] - 170:7
**overly** [1] - 229:19
**overruled** [1] - 211:12
**overruling** [1] - 108:7
**oversee** [3] - 13:6, 13:8, 154:3
**own** [16] - 86:15, 90:19, 179:19, 180:10, 185:22, 186:4, 186:24, 187:15, 224:20, 224:21, 224:22, 235:2, 235:16, 235:17, 236:19
**owned** [5] - 154:20, 174:11, 174:12, 217:1, 225:8
**owner** [5] - 19:12, 69:7, 96:15, 116:20, 136:12
**ownership** [2] - 43:10, 204:17
**owns** [1] - 180:8

**P**

**P-1** [3] - 2:12, 47:20, 238:12
**P-10** [4] - 59:4, 59:14, 61:8, 65:6
**P-11** [1] - 67:22

**P-12** [2] - 78:1, 78:11
**P-13** [2] - 77:25, 78:7
**P-14** [1] - 80:5
**P-15** [2] - 80:11, 81:15
**P-16** [1] - 81:15
**P-18** [2] - 96:7, 107:22
**P-19** [2] - 107:22, 107:23
**P-2** [2] - 215:4, 215:6
**P-20** [1] - 107:23
**P-24** [2] - 2:12, 238:12
**P-3** [5] - 215:5, 216:2, 216:5, 222:25
**P-4** [7] - 38:3, 215:5, 227:8, 227:13, 227:16, 232:24
**P-6** [9] - 71:7, 72:24, 159:13, 159:16, 194:15, 194:18, 196:19, 200:22, 200:23
**P-7** [2] - 47:21, 49:23
**P-9** [1] - 58:18
**P.C** [1] - 1:15
**p.m** [10] - 6:20, 59:3, 59:7, 65:5, 97:18, 132:7, 132:9, 198:6, 198:8, 240:5
**package** [6] - 147:24, 205:10, 229:2, 234:9, 234:12, 234:17
**packages** [2] - 175:12, 218:19
**PAGE** [1] - 2:5
**page** [44] - 18:25, 19:16, 20:14, 25:9, 25:10, 26:3, 26:6, 26:7, 26:14, 27:3, 27:25, 28:14, 29:10, 31:9, 32:1, 33:13, 33:16, 33:18, 40:12, 45:1, 48:6, 52:18, 73:15, 81:24, 82:1, 96:11, 96:22, 97:10, 109:1, 109:7, 115:25, 119:14, 120:2, 120:15, 122:9, 127:1, 127:9, 129:21, 167:4, 195:17, 223:5, 227:17, 227:24, 230:1
**pages** [8] - 7:17, 24:22, 79:8, 79:16, 89:14, 89:15, 120:16, 206:4
**paid** [13] - 34:25, 52:7, 52:13, 70:5, 72:19, 87:16, 87:19, 87:21, 134:7, 139:3, 142:3, 179:20, 201:12
**Palms** [1] - 174:16
**paper** [1] - 58:1
**papers** [3] - 107:18, 152:1, 177:4
**paragraph** [65] - 19:19, 19:23, 20:1, 20:13, 20:17, 21:3, 21:7, 21:11, 25:18, 25:19, 26:7, 26:10, 27:12, 28:7, 28:15, 29:11, 29:13, 29:16, 30:13, 30:15, 30:18, 31:3, 31:4, 31:9, 31:10,

31:13, 31:14, 31:15, 32:1, 32:4, 33:17, 38:12, 38:16, 38:19, 38:25, 39:2, 39:16, 39:17, 40:12, 40:14, 40:17, 41:8, 41:11, 41:13, 109:23, 109:24, 113:24, 114:2, 115:6, 115:10, 115:25, 116:1, 120:4, 120:7, 122:12, 123:2, 123:5, 127:12, 195:25, 227:18
**paraphrase** [1] - 125:22
**parcel** [1] - 156:25
**parent** [1] - 90:23
**parenthetical** [1] - 25:13
**part** [56] - 5:21, 16:20, 21:12, 21:18, 26:25, 28:20, 38:9, 46:24, 47:7, 48:1, 53:18, 57:23, 62:17, 66:11, 71:4, 71:15, 73:13, 76:7, 77:12, 79:23, 81:10, 81:18, 90:11, 93:17, 93:18, 106:7, 106:22, 107:1, 109:3, 126:11, 139:23, 140:1, 143:6, 156:25, 157:10, 162:20, 166:25, 167:22, 169:10, 169:24, 173:16, 176:23, 177:2, 183:12, 188:8, 204:17, 216:20, 219:18, 221:14, 225:3, 225:13, 226:2, 235:13, 236:17, 237:11, 239:8
**particular** [19] - 14:23, 24:21, 27:25, 29:7, 30:21, 36:17, 39:23, 40:16, 45:5, 48:14, 49:20, 53:23, 72:16, 97:17, 99:25, 100:9, 114:25, 120:3, 134:3
**particularly** [2] - 16:2, 23:3
**parties** [7] - 4:15, 26:12, 123:4, 173:19, 176:10, 237:2, 237:20
**parties'** [2] - 4:11, 166:25
**party** [7] - 43:23, 75:2, 176:6, 231:16, 232:18, 236:4, 237:17
**pass** [1] - 181:15
**password** [1] - 49:13
**Password** [1] - 48:20
**passwords** [4] - 49:15, 49:20, 50:12, 86:4
**past** [2] - 35:21, 114:8
**Pause** [1] - 68:20
**pay** [3] - 46:13, 55:23, 190:18
**paying** [1] - 216:25
**payments@permian** [1] - 42:12
**pays** [2] - 36:2, 36:3
**PDF** [2] - 59:22, 60:1
**Peed** [5] - 19:9, 19:12, 27:5, 96:15, 166:22

**pending** [3] - 3:25, 123:7, 238:7
**people** [30] - 8:8, 11:18, 11:21, 14:14, 14:19, 55:1, 61:13, 86:17, 97:13, 107:13, 139:22, 139:23, 149:2, 149:8, 150:4, 150:11, 150:16, 150:21, 150:23, 162:8, 180:1, 185:8, 191:9, 207:17, 216:18, 226:19, 233:20, 235:17, 236:10
**per** [1] - 169:9
**percent** [3] - 56:17, 56:20
**percentage** [2] - 50:5, 56:15
**perception** [2] - 108:22, 112:6
**perfect** [1] - 62:12
**perform** [3] - 156:4, 170:18, 170:23
**performance** [1] - 35:6
**performed** [1] - 18:3
**performing** [2] - 205:16, 215:1
**performs** [1] - 156:5
**period** [10] - 28:17, 28:19, 31:22, 39:16, 39:18, 52:25, 174:10, 175:6, 207:19, 228:5
**permanently** [1] - 232:22
**Permian** [30] - 8:15, 8:16, 84:23, 85:2, 85:4, 85:9, 88:8, 88:25, 89:9, 135:4, 135:5, 135:11, 136:7, 136:12, 137:22, 138:5, 138:13, 139:9, 143:18, 143:20, 144:18, 158:8, 158:13, 158:15, 159:2, 210:17, 211:1, 211:20, 211:23, 214:14
**Permian's** [5] - 84:18, 84:20, 135:9, 137:8
**permission** [1] - 66:13
**permitted** [4] - 6:24, 8:19, 31:20, 131:16
**person** [11] - 16:18, 17:2, 17:16, 29:21, 52:9, 56:18, 56:23, 68:14, 126:16, 139:15, 143:8
**person's** [1] - 185:19
**personal** [46] - 9:6, 27:1, 33:22, 33:24, 44:8, 45:9, 45:10, 47:12, 49:25, 50:25, 51:24, 52:3, 53:7, 54:1, 64:24, 67:15, 69:22, 70:8, 73:5, 73:20, 74:20, 77:2, 77:19, 81:23, 82:16, 85:20, 87:11, 87:14, 124:8, 124:9, 124:13, 124:15, 125:24, 126:4, 126:6, 186:20,

186:24, 187:15, 188:19, 188:20, 188:23, 188:24, 189:14, 233:2, 233:17
**personally** [2] - 117:7, 121:8
**personnel** [1] - 44:10
**perspective** [1] - 114:7
**pertain** [4] - 145:25, 146:2, 167:7, 192:22
**pertained** [3] - 191:16, 191:17, 207:1
**peruse** [3] - 27:24, 79:7, 93:8
**phone** [3] - 43:19, 43:20, 212:15
**Phone** [1] - 48:21
**phones** [2] - 231:4, 231:13
**Photographs** [3] - 64:10, 68:22, 76:2
**phrase** [6] - 94:4, 95:24, 95:25, 96:4, 129:3, 140:2
**physical** [2] - 41:15, 198:21
**PI** [1] - 25:10
**PI-113** [1] - 65:21
**PI-163** [1] - 70:1
**PI-178** [1] - 73:16
**PI-180** [1] - 76:19
**PI-203** [1] - 79:14
**PI-25** [1] - 26:4
**PI-33** [1] - 28:15
**PI-34** [2] - 29:10, 31:11
**PI-361** [1] - 79:14
**PI-383** [1] - 80:25
**PI-426** [1] - 81:25
**PI-431** [1] - 127:1
**PI-435** [1] - 109:24
**PI-438** [2] - 108:19, 109:20
**PI-446** [1] - 132:21
**PI-466** [1] - 112:17
**PI-508** [1] - 19:18
**PI-517** [1] - 96:11
**PI-52** [1] - 38:13
**PI-53** [1] - 40:13
**PI-70** [1] - 195:18
**PI-72** [1] - 53:20
**pick** [1] - 17:17
**picked** [5] - 197:4, 197:6, 206:2, 207:11, 210:5
**piece** [1] - 58:1
**pioneer** [3] - 16:14, 140:14, 201:18
**pioneers** [1] - 16:3
**place** [22] - 14:20, 17:25, 22:15, 23:24, 46:3, 86:15, 102:9, 115:20, 123:5, 125:5, 125:7, 127:6, 127:21, 131:12, 134:15, 157:6, 166:7, 185:6, 186:8, 199:22, 203:19, 239:6
**Plaintiff** [2] - 1:4, 1:16
**plaintiff** [9] - 3:10, 3:19, 4:2,

4:7, 5:10, 10:22, 237:12, 239:9, 239:25
**plaintiff's** [3] - 3:24, 4:4, 4:5
**Plaintiff's** [2] - 2:12, 238:12
**PLAINTIFF'S** [1] - 11:4
**plaintiffs** [1] - 3:21
**plan** [2] - 46:6, 195:5
**planned** [1] - 60:3
**platform** [15] - 24:6, 40:4, 40:8, 50:4, 56:9, 75:2, 76:14, 88:10, 97:7, 101:7, 156:12, 158:17, 158:22, 180:7, 228:7
**plural** [1] - 79:9
**point** [28] - 17:1, 17:7, 26:6, 32:12, 41:18, 45:12, 84:5, 90:20, 98:8, 100:24, 105:20, 121:10, 136:6, 161:7, 161:14, 163:15, 172:15, 183:9, 191:14, 193:5, 207:6, 213:13, 215:3, 215:21, 217:10, 233:7, 233:10, 238:1
**Points** [2] - 43:24, 231:15
**Pop** [1] - 64:14
**Pop-Up** [1] - 64:14
**portal** [2] - 24:5, 96:23, 97:2
**portals** [1] - 96:25
**portion** [1] - 154:4
**pose** [1] - 185:8
**posed** [1] - 157:21
**poses** [1] - 11:19
**position** [11] - 12:18, 167:11, 167:12, 167:21, 169:23, 178:14, 211:20, 223:11, 225:14, 225:18, 239:13
**positive** [3] - 140:21, 194:22, 194:24
**possession** [2] - 192:5, 226:13
**possible** [2] - 238:16, 238:24
**possibly** [2] - 12:4, 55:11
**post** [3] - 4:22, 124:18
**post-TRO** [1] - 124:18
**posted** [1] - 195:23
**potential** [5] - 22:24, 23:15, 134:11, 139:8, 141:18
**potentially** [1] - 138:12
**powered** [1] - 97:25
**PowerPoint** [7] - 64:15, 79:8, 79:9, 79:13, 79:16, 89:25, 90:12
**powerPoints** [1] - 78:22
**PR** [1] - 152:16
**practice** [1] - 19:13
**pre** [3] - 4:12, 61:16, 224:25
**pre-acquisition** [2] - 61:16, 224:25
**pre-hearing** [1] - 4:12
**Preliminary** [1] - 1:7

**preliminary** [17] - 3:19, 3:25, 4:13, 4:17, 5:17, 6:2, 10:18, 123:7, 143:14, 145:14, 145:16, 145:18, 145:25, 146:2, 205:3, 213:17, 238:7
**preparation** [2] - 215:12, 226:22
**prepare** [2] - 90:12, 215:17
**prepared** [6] - 4:13, 168:2, 168:4, 169:8, 215:9, 215:15
**present** [4] - 9:14, 55:9, 55:15, 90:3
**Present** [1] - 54:21
**presentation** [8] - 18:16, 30:3, 64:15, 79:9, 79:13, 89:25, 90:12
**presentations** [1] - 79:16
**presented** [3] - 102:2, 133:2, 237:18
**preserve** [1] - 85:15
**president** [3] - 69:9, 69:10, 83:15
**press** [2] - 152:15, 152:16
**pretty** [8] - 15:21, 19:21, 97:7, 136:5, 160:12, 203:7, 218:1, 235:10
**prevent** [2] - 33:8, 115:20
**preventing** [1] - 29:22
**previous** [4] - 24:3, 45:23, 155:3, 192:2
**previously** [3] - 6:22, 7:15, 8:6
**price** [7] - 18:5, 20:9, 20:17, 20:19, 102:7, 133:16, 134:1
**pricing** [2] - 52:14, 57:6
**primarily** [1] - 13:19
**printed** [1] - 55:16
**privacy** [4] - 183:13, 183:18, 183:22, 183:25
**privately** [1] - 154:20
**prnnewswire.com/news** [1] - 152:13
**prnnewswire.com/news-releases** [1] - 152:13
**problem** [6] - 106:24, 169:22, 179:5, 179:6, 179:7, 213:8
**problems** [2] - 193:9, 193:12
**proceed** [11] - 4:13, 4:15, 5:1, 7:21, 8:23, 10:7, 10:12, 70:25, 119:1, 132:4, 209:17
**proceeding** [1] - 9:25
**proceedings** [1] - 240:13
**Proceedings** [1] - 1:22
**PROCEEDINGS** [1] - 3:1
**process** [2] - 164:6, 237:22

**processes** [1] - 164:6
**produced** [4] - 1:22, 7:9, 148:11, 175:23
**product** [11] - 12:19, 13:14, 13:20, 13:22, 13:24, 14:2, 24:2, 110:13, 154:3, 173:21, 219:23
**production** [2] - 6:14, 191:18
**products** [16] - 12:23, 13:3, 13:4, 13:18, 34:19, 34:20, 35:19, 40:22, 41:1, 112:9, 170:7, 170:9, 170:11, 173:22, 174:23, 233:15
**program** [2] - 60:9, 163:24
**prohibited** [2] - 91:14, 121:23
**prohibition** [1] - 103:23
**Projector** [1] - 64:14
**promise** [1] - 169:2
**promoted** [1] - 187:14
**promoting** [1] - 89:17
**proof** [4] - 194:22, 194:24, 209:25, 210:3
**property** [25] - 5:14, 5:20, 5:25, 16:10, 16:12, 31:17, 36:5, 36:11, 41:14, 41:15, 72:12, 72:13, 72:17, 116:13, 122:15, 122:20, 131:5, 202:5, 202:7, 202:20, 203:4, 205:7, 205:8, 227:9
**Property** [2] - 31:9, 41:12
**proposed** [1] - 39:13
**proprietary** [9] - 35:17, 49:21, 51:15, 52:2, 55:5, 55:7, 85:22, 85:25, 110:18
**Proprietary** [1] - 38:6
**protect** [1] - 85:25
**protected** [4] - 86:4, 183:13, 183:18
**protecting** [1] - 202:5
**protections** [1] - 86:15
**Protocol** [1] - 68:20
**prove** [2] - 174:20, 205:4
**provide** [35] - 23:20, 30:10, 31:13, 32:23, 48:4, 93:9, 98:10, 102:3, 107:2, 116:8, 124:25, 125:3, 169:16, 170:1, 170:12, 176:7, 183:7, 187:12, 189:2, 198:15, 206:6, 206:18, 206:23, 207:4, 207:12, 207:16, 207:23, 213:19, 217:6, 219:7, 219:8, 219:13, 219:18, 232:12
**provided** [25] - 7:5, 30:7, 52:23, 93:1, 100:3, 101:13, 101:18, 116:4, 147:3, 147:24, 155:4, 156:21, 169:9, 169:25, 176:12,

185:9, 205:21, 206:4, 206:9, 207:1, 207:5, 210:6, 212:14, 220:15, 231:13
**provider** [2] - 45:23, 99:20
**providers** [4] - 16:4, 104:25, 155:19, 155:20
**provides** [8] - 31:4, 38:21, 41:3, 41:13, 99:24, 172:16, 176:9, 182:20
**providing** [25] - 15:12, 26:10, 29:17, 32:18, 40:4, 40:7, 91:11, 93:2, 93:13, 95:7, 155:18, 171:14, 177:16, 177:18, 193:3, 199:6, 211:19, 219:1, 219:2, 220:5, 220:6, 220:9, 220:11, 228:7, 234:9
**Provision** [1] - 33:17
**provision** [7] - 40:20, 40:22, 41:1, 216:11, 228:12, 233:15, 233:20
**provisions** [2] - 33:9, 34:4
**Proxibid** [6] - 144:6, 144:8, 144:13, 154:9, 155:17, 212:5
**public** [5] - 5:22, 5:24, 55:10, 120:10, 133:24
**publicly** [5] - 90:15, 107:13, 109:16, 154:13, 154:16
**publish** [1] - 152:14
**Publishing** [5] - 19:24, 113:19, 114:10, 153:7, 174:17
**pull** [5] - 127:8, 161:25, 215:4, 215:5
**pulled** [2] - 163:4, 170:11
**pulling** [1] - 29:20
**purchase** [27] - 15:16, 17:20, 19:25, 20:9, 20:17, 21:12, 22:20, 28:12, 34:13, 35:13, 36:10, 36:25, 47:15, 50:5, 87:15, 133:13, 133:15, 138:24, 140:9, 157:6, 159:19, 160:14, 162:17, 165:24, 224:23, 227:1, 227:3
**Purchase** [29] - 20:11, 21:18, 21:23, 24:10, 24:13, 25:1, 27:9, 28:9, 91:14, 93:18, 94:2, 94:10, 103:25, 105:13, 123:10, 137:13, 137:16, 143:1, 156:25, 157:1, 157:12, 164:24, 165:14, 166:1, 166:4, 166:5, 166:6, 215:7, 216:8
**purchased** [11] - 72:15, 72:17, 76:24, 81:8, 91:8, 115:21, 138:18, 161:19, 170:4, 221:15, 221:24
**purchaser** [3] - 32:21, 33:7,

33:10
**purchasing** [2] - 66:6, 91:10
**purpose** [4] - 40:8, 83:2, 99:16, 228:8
**purposes** [15] - 5:17, 17:3, 18:17, 19:17, 25:9, 74:6, 128:2, 185:2, 185:22, 188:16, 200:10, 200:11, 203:5, 208:13, 229:3
**pursuant** [1] - 192:24
**put** [28] - 4:21, 6:5, 6:7, 6:8, 10:9, 18:17, 59:25, 71:10, 73:8, 75:4, 75:6, 75:12, 76:14, 82:23, 83:6, 90:3, 137:6, 152:13, 155:16, 156:11, 166:7, 180:17, 184:16, 188:15, 189:1, 225:5, 230:19, 232:21

**Q**

**quantify** [1] - 213:21
**questioning** [1] - 219:9
**questions** [12] - 12:5, 24:24, 39:5, 142:6, 146:20, 180:13, 180:16, 181:5, 181:6, 226:25, 230:2, 230:18
**quick** [8] - 20:7, 37:24, 52:17, 58:18, 97:3, 108:2, 127:8, 223:13
**QuickBooks** [1] - 46:5
**quickly** [4] - 5:13, 58:17, 59:14, 238:16
**quite** [2] - 32:12, 84:17
**quo** [2] - 239:6, 239:13
**quotations** [1] - 227:25
**quote** [1] - 114:5

**R**

**raided** [2] - 84:14, 202:7
**raiding** [2] - 72:12, 205:6
**raise** [1] - 169:4
**raised** [5] - 9:20, 105:21, 110:21, 114:15, 139:12
**raising** [1] - 125:19
**ran** [3] - 24:5, 45:24, 190:5
**ranked** [2] - 55:1, 55:2
**ranking** [1] - 55:13
**rankings** [1] - 54:24
**rather** [7] - 52:12, 98:1, 107:2, 109:19, 112:8, 136:10, 137:7
**Ray** [2] - 89:6, 114:16
**re** [1] - 97:19
**reach** [2] - 188:2, 212:18
**read** [46] - 19:19, 21:7, 32:5, 32:12, 32:13, 33:6, 37:2, 38:5, 40:3, 40:19, 41:2,

48:15, 54:19, 63:4, 63:20, 68:17, 74:21, 75:22, 78:21, 92:8, 96:12, 97:22, 109:1, 112:2, 113:15, 114:5, 115:9, 115:11, 115:16, 116:1, 119:23, 120:7, 122:12, 123:2, 123:5, 125:25, 127:14, 130:1, 133:2, 167:14, 227:22, 227:23, 228:2, 233:8, 233:14, 233:23

**reading** [5] - 32:14, 40:19, 110:5, 128:23, 203:7

**reads** [1] - 44:25

**ready** [2] - 163:9, 198:11

**real** [8] - 20:7, 52:17, 58:17, 58:18, 59:14, 97:3, 127:8, 223:13

**realize** [1] - 205:13

**really** [8] - 11:13, 22:15, 50:3, 97:1, 128:22, 143:14, 166:10, 237:22

**reason** [12] - 30:23, 50:11, 78:16, 133:7, 151:20, 153:16, 161:20, 168:6, 177:8, 186:3, 208:2, 208:4

**reasons** [3] - 161:23, 185:1, 221:25

**receivable** [1] - 164:2

**receive** [6] - 43:25, 61:4, 186:10, 189:6, 237:10, 238:6

**received** [23] - 6:20, 7:17, 10:2, 42:2, 43:7, 105:22, 106:5, 107:9, 109:9, 110:2, 110:14, 116:9, 116:16, 121:6, 122:25, 130:16, 131:19, 139:13, 150:4, 169:5, 191:3, 193:13, 231:23

**receiver** [11] - 42:11, 48:7, 48:8, 50:23, 50:25, 73:21, 77:18, 77:20, 81:22, 82:15, 82:18

**receiving** [5] - 9:24, 44:4, 134:10, 191:8, 238:9

**recess** [2] - 70:15, 132:7

**recipient** [1] - 73:19

**recitation** [1] - 121:11

**reciting** [1] - 114:2

**recognize** [2] - 126:18, 126:21

**recollection** [5] - 95:23, 96:3, 136:20, 137:6, 165:18

**record** [39] - 3:6, 4:16, 5:23, 6:5, 6:7, 6:8, 6:18, 7:22, 8:24, 11:6, 11:10, 11:15, 11:22, 19:17, 28:4, 33:5, 37:25, 54:20, 61:3, 61:6,

63:4, 68:17, 71:23, 75:22, 77:14, 90:4, 97:23, 113:15, 115:9, 120:8, 122:13, 123:4, 132:11, 152:17, 180:17, 227:23, 228:2, 237:11, 240:13

**record-breaking** [1] - 152:17

**recorded** [1] - 1:22

**Recording** [1] - 68:20

**records** [1] - 6:14

**recoup** [1] - 145:21

**recover** [1] - 183:20

**redundant** [1] - 183:6

**refer** [7] - 25:7, 40:13, 102:17, 103:10, 122:1, 122:2, 132:15

**reference** [3] - 26:6, 33:3, 104:20

**referenced** [7] - 21:17, 26:16, 26:19, 54:8, 69:16, 82:5, 96:3

**references** [3] - 45:11, 46:5, 91:20

**referencing** [3] - 45:25, 58:10, 222:22

**referral** [1] - 139:8

**referred** [3] - 24:10, 111:21, 140:2

**referring** [5] - 119:11, 133:9, 152:22, 181:1, 206:3

**refers** [1] - 204:6

**reflect** [2] - 71:23, 75:8

**reflecting** [2] - 19:23, 34:3

**reflects** [1] - 75:18

**regard** [4] - 141:23, 193:24, 215:13, 238:14

**regarding** [2] - 6:13, 13:5

**regards** [9] - 10:5, 23:7, 93:25, 164:1, 199:19, 200:3, 211:3, 228:16, 238:11

**register** [1] - 49:10

**relate** [1] - 206:8

**related** [10] - 14:3, 26:2, 94:4, 97:8, 103:25, 137:16, 220:25, 221:2, 221:4, 221:8

**relationship** [19] - 24:3, 30:24, 58:11, 123:15, 126:12, 128:17, 130:3, 135:17, 135:20, 135:21, 136:16, 136:21, 137:2, 137:22, 139:4, 139:6, 140:7, 140:22, 144:11

**relationships** [8] - 16:8, 16:9, 23:24, 135:1, 135:3, 138:11, 140:5, 140:10

**relative** [11] - 9:9, 14:5, 39:2, 39:15, 43:21, 88:14, 89:1, 89:16, 91:13, 125:1, 131:7

**relaxed** [2] - 4:17, 8:9

**relaxing** [1] - 60:25

**release** [4] - 109:12, 133:6, 152:15, 152:16

**releases** [1] - 152:13

**relevant** [2] - 174:9, 175:6

**reliance** [1] - 9:11

**relief** [2] - 10:14, 33:8

**relies** [1] - 105:4

**rely** [2] - 30:6, 90:15

**remain** [2] - 106:2, 239:6

**remained** [1] - 6:1

**remaining** [1] - 10:8

**remains** [2] - 3:25, 108:4

**remedy** [2] - 32:25, 33:1

**remember** [23] - 66:7, 108:24, 156:18, 157:8, 162:17, 168:6, 168:8, 168:11, 168:13, 180:20, 180:21, 185:3, 191:5, 191:7, 193:10, 195:14, 197:5, 201:4, 206:11, 208:3, 214:14, 224:5, 233:9

**remind** [2] - 4:14, 72:21

**reminding** [1] - 70:22

**Remote** [2] - 68:21, 76:1

**removed** [2] - 104:7, 104:11

**rent** [1] - 216:25

**rental** [2] - 177:12, 177:14

**renting** [1] - 177:19

**rep** [1] - 149:18

**repeat** [2] - 192:21, 222:15

**repeatedly** [2] - 9:10, 85:18

**rephrase** [1] - 178:24

**replace** [1] - 163:3

**replaced** [1] - 101:2

**replacing** [2] - 161:18, 190:21

**reply** [1] - 3:22

**report** [7] - 43:3, 167:19, 231:18, 231:19, 232:11, 232:13, 232:18

**reported** [1] - 152:16

**reporter** [3] - 11:11, 115:15, 123:3

**Reporter** [2] - 1:20, 240:21

**REPORTER'S** [1] - 240:8

**Reports** [3] - 64:4, 68:25, 75:25

**represent** [3] - 77:25, 107:17, 121:14

**representative** [10] - 43:2, 109:2, 110:12, 111:12, 111:13, 113:16, 114:11, 119:8, 149:18, 188:6

**representatives** [12] - 3:11, 9:16, 13:7, 13:8, 13:9, 13:17, 17:8, 55:23, 106:6, 112:4, 119:10, 121:9

**represented** [1] - 79:10

**representing** [4] - 90:22, 94:18, 116:7, 153:10

**reps** [2] - 88:9, 107:1

**reputation** [9] - 139:20, 140:11, 140:13, 140:14, 140:18, 151:7, 151:19, 213:18, 214:11

**reputational** [1] - 210:16

**request** [11] - 4:6, 5:21, 6:1, 6:10, 8:19, 10:14, 52:19, 87:6, 87:7, 134:14, 232:14

**requested** [6] - 4:4, 4:8, 6:22, 7:7, 7:15, 207:23

**requesting** [1] - 7:18

**require** [1] - 166:20

**required** [5] - 8:11, 164:23, 165:24, 166:2, 166:19

**requirement** [4] - 165:20, 165:22, 182:1, 215:23

**requires** [2] - 169:16, 169:18

**reserve** [5] - 4:21, 7:1, 7:25, 90:7, 146:20

**reserved** [2] - 66:4, 70:4

**resides** [1] - 75:5

**resign** [1] - 42:22

**resold** [1] - 179:20

**resolve** [2] - 11:24, 239:5

**resolved** [2] - 9:21, 238:23

**respect** [37] - 6:6, 7:1, 7:21, 12:20, 17:12, 56:14, 92:5, 101:5, 117:13, 119:22, 125:3, 139:21, 143:13, 144:18, 146:10, 147:24, 148:14, 151:7, 156:16, 163:24, 168:15, 175:11, 179:1, 188:18, 191:12, 200:4, 208:10, 209:4, 214:25, 215:20, 215:22, 227:3, 227:16, 229:22, 231:23, 232:24, 237:23

**respond** [5] - 117:3, 117:5, 118:15, 130:10, 130:13

**responded** [1] - 150:13

**responds** [2] - 82:21, 129:22

**response** [7] - 11:16, 11:17, 45:15, 87:8, 116:24, 117:5, 178:4

**responsibilities** [5] - 13:2, 16:21, 167:5, 169:11, 223:7

**restrain** [1] - 4:9

**restrained** [3] - 93:22, 93:24, 123:8

**restraining** [2] - 151:18, 182:11

**restraints** [1] - 123:5

**restricted** [6] - 39:16, 227:21, 228:1, 228:3, 228:5, 228:6

**restricting** [1] - 229:15
**restrictions** [1] - 131:11
**Restrictive** [2] - 122:16, 128:13
**restrictive** [12] - 28:17, 28:19, 31:22, 39:16, 39:21, 40:2, 91:13, 93:17, 105:13, 143:2, 166:4, 166:7
**restroom** [1] - 62:9
**result** [8] - 32:20, 74:15, 122:22, 124:10, 125:6, 134:11, 139:17, 184:19
**resulting** [1] - 33:10
**results** [1] - 47:8
**resume** [3] - 70:13, 132:4, 198:2
**retail** [1] - 102:4
**retain** [1] - 141:3
**retrieved** [3] - 44:4, 75:6, 230:25
**Return** [1] - 41:12
**return** [3] - 36:4, 37:4, 122:14
**returned** [2] - 41:15, 87:3
**revenue** [13] - 52:22, 56:8, 56:16, 135:24, 136:2, 138:2, 138:6, 152:22, 153:1, 153:2, 153:24, 155:20
**revenues** [3] - 35:9, 135:6, 169:3
**reverse** [3] - 44:25, 98:3, 122:11
**review** [15] - 6:25, 10:1, 18:19, 19:20, 24:21, 24:23, 27:7, 31:10, 47:7, 111:6, 113:24, 114:22, 121:19, 124:7, 189:13
**reviewed** [7] - 4:11, 18:20, 19:22, 104:2, 109:13, 112:13, 177:5
**reviewer** [1] - 133:8
**reviewing** [1] - 25:6
**revisit** [1] - 105:20
**rid** [3] - 162:19, 163:5, 163:19
**right-hand** [1] - 104:9
**rights** [2] - 66:4, 70:4
**rigs** [1] - 100:1
**ring** [1] - 214:16
**rise** [7] - 70:14, 70:16, 132:6, 132:8, 198:5, 198:7, 240:4
**Ritchie** [2] - 154:10, 154:11
**role** [5] - 12:23, 12:24, 13:2, 149:22, 163:25
**rolling** [2] - 77:8, 135:5
**rollout** [1] - 191:6
**rolls** [1] - 55:25
**room** [1] - 178:9
**Roselle** [2] - 61:16, 61:23

**Ross** [1] - 3:11
**ROSS** [1] - 1:15
**roughly** [1] - 70:13
**row** [1] - 83:13
**RPR** [1] - 240:20
**rules** [5] - 4:16, 6:13, 8:9, 11:9, 60:25
**ruling** [1] - 7:20
**run** [22] - 67:3, 69:5, 99:3, 161:17, 170:25, 172:16, 172:20, 172:21, 216:16, 216:18, 217:13, 220:20, 234:14, 234:20, 235:11, 235:12, 235:16, 235:17, 236:14, 236:18, 237:3
**running** [19] - 14:18, 23:8, 79:11, 98:18, 98:20, 103:5, 103:6, 148:22, 169:13, 172:21, 173:11, 173:14, 218:11, 219:25, 220:3, 223:14, 224:3, 226:18, 235:6
**runs** [7] - 13:25, 101:2, 159:18, 172:19, 188:8, 224:8, 236:14
**Rush** [4] - 43:1, 43:2, 149:16, 149:17
**Ryan** [18] - 23:25, 62:21, 62:22, 63:4, 67:12, 67:14, 69:22, 73:20, 74:19, 74:22, 77:19, 80:22, 81:23, 82:17, 106:7, 109:2, 110:11, 156:12
**Ryan's** [1] - 67:16

# S

**salary** [6] - 35:1, 35:2, 35:8, 35:9, 157:22, 169:6
**sale** [8] - 14:20, 34:10, 35:13, 40:9, 51:13, 102:6, 228:8, 228:13
**Sale** [5] - 63:22, 63:23, 64:12, 68:23, 76:2
**sales** [30] - 12:19, 12:23, 13:6, 13:8, 13:9, 13:14, 13:17, 53:3, 55:21, 56:10, 56:16, 56:17, 56:24, 88:9, 106:6, 107:1, 109:2, 110:13, 111:12, 111:13, 112:4, 119:10, 121:9, 139:18, 149:18, 154:3, 157:14, 183:14, 188:6
**Sales** [2] - 63:24, 63:25
**sample** [1] - 63:6
**SANDHILLS** [1] - 1:3
**Sandhills** [312] - 3:7, 3:12, 3:19, 5:24, 7:7, 12:17, 12:20, 13:3, 13:11, 13:12, 13:14, 14:22, 15:4, 15:8,

15:12, 15:16, 15:17, 16:21, 17:3, 18:4, 19:18, 19:24, 20:21, 22:25, 23:14, 23:15, 23:21, 24:1, 25:10, 26:3, 27:5, 28:15, 29:4, 29:10, 29:19, 29:22, 30:4, 30:11, 30:17, 30:24, 31:5, 31:11, 31:17, 32:21, 34:12, 34:18, 36:2, 36:12, 36:15, 36:19, 36:22, 37:4, 38:13, 38:22, 39:3, 39:22, 39:25, 40:13, 41:4, 41:5, 41:14, 41:16, 42:19, 43:2, 45:18, 45:19, 46:13, 46:21, 49:19, 51:15, 52:10, 53:1, 53:10, 53:20, 55:20, 55:23, 56:3, 56:14, 56:19, 57:2, 59:9, 61:17, 63:3, 65:20, 65:21, 66:6, 70:1, 70:5, 72:14, 73:16, 75:9, 75:12, 76:18, 76:24, 79:14, 80:25, 81:8, 81:25, 82:17, 83:2, 83:23, 84:15, 85:4, 85:24, 86:20, 86:22, 87:4, 87:25, 88:3, 88:17, 88:22, 88:24, 89:2, 89:23, 90:13, 90:17, 90:23, 91:5, 91:8, 91:16, 92:15, 93:24, 94:19, 95:14, 95:22, 96:1, 96:11, 97:15, 98:7, 100:5, 100:18, 103:9, 103:20, 106:1, 106:2, 106:7, 106:23, 107:2, 107:13, 108:18, 109:3, 109:20, 109:24, 110:12, 110:18, 111:13, 112:1, 112:2, 112:17, 113:19, 114:10, 115:18, 115:21, 115:24, 116:14, 120:25, 122:22, 123:25, 124:25, 127:1, 128:4, 128:18, 128:19, 129:11, 131:6, 132:20, 134:25, 135:9, 135:15, 135:20, 138:15, 138:21, 139:16, 139:23, 142:13, 144:8, 145:19, 146:15, 147:14, 148:22, 149:2, 149:18, 150:12, 151:22, 151:25, 152:5, 152:6, 152:17, 153:3, 153:5, 153:7, 153:8, 153:9, 153:10, 153:12, 153:22, 154:4, 154:5, 154:9, 154:15, 154:18, 155:24, 158:2, 158:9, 158:16, 159:20, 160:5, 162:18, 163:4, 163:18, 163:23, 164:3, 165:10, 166:19, 166:22, 167:8, 169:1, 169:13, 169:16, 170:17, 171:2, 171:12, 171:19, 172:8, 172:15, 173:4,

173:5, 173:15, 173:16, 173:17, 173:19, 174:12, 174:17, 175:14, 176:7, 176:9, 176:23, 182:20, 183:10, 184:9, 184:16, 185:11, 185:13, 185:24, 186:7, 188:14, 188:15, 188:18, 189:1, 189:23, 194:5, 194:18, 195:2, 195:18, 196:10, 198:15, 199:14, 199:20, 200:24, 201:4, 201:15, 202:23, 203:5, 205:16, 206:25, 207:23, 208:18, 209:4, 209:19, 212:15, 212:23, 212:24, 213:2, 213:14, 213:23, 214:1, 214:6, 214:7, 214:14, 214:19, 216:14, 216:16, 216:25, 217:6, 217:10, 218:22, 219:2, 220:12, 221:21, 222:17, 223:15, 224:3, 224:8, 224:13, 225:2, 225:8, 230:13, 231:25, 233:22, 234:13, 234:19, 234:23, 234:25, 235:11, 236:3, 236:14, 237:2
**Sandhills'** [34] - 29:24, 52:2, 72:12, 85:8, 92:13, 92:19, 94:16, 107:18, 112:9, 113:9, 116:15, 122:14, 125:13, 128:10, 129:13, 129:18, 133:10, 135:6, 135:13, 137:15, 142:21, 165:20, 165:22, 166:17, 178:11, 182:10, 187:15, 199:21, 200:9, 200:17, 205:6, 207:17, 230:4, 236:17
**Sandhills's** [1] - 186:24
**satisfactory** [1] - 239:2
**save** [1] - 85:15
**saw** [9] - 58:9, 88:25, 101:12, 124:11, 143:23, 146:16, 158:20, 168:18, 204:12
**Schedule** [12] - 167:22, 167:25, 168:2, 168:4, 168:9, 168:15, 168:21, 169:8, 169:17, 170:13
**schedule** [3] - 238:15, 238:21, 238:22
**Scheduling** [1] - 68:19
**Schott** [2] - 193:25, 194:4
**scope** [2] - 39:15, 61:5
**Scottsdale** [1] - 183:6
**seal** [1] - 6:1
**sealed** [1] - 148:2
**sealing** [2] - 6:13, 6:14
**seated** [5] - 3:3, 11:8, 70:18, 132:10, 198:9

**second** [18] - 45:1, 45:15, 52:18, 81:24, 96:21, 108:1, 115:25, 120:2, 127:1, 142:8, 152:9, 156:15, 159:11, 195:22, 216:5, 229:13, 233:7, 233:10

**secondly** [1] - 11:18

**section** [6] - 28:25, 32:6, 32:18, 33:6, 127:14, 227:24

**Section** [1] - 227:18

**sections** [1] - 45:5

**secure** [3] - 75:2, 117:20

**security** [4] - 86:12, 185:5, 186:19, 187:13

**see** [91] - 8:22, 15:6, 15:8, 19:6, 20:3, 22:10, 25:11, 26:8, 28:15, 28:17, 28:25, 29:11, 33:18, 33:20, 51:1, 51:3, 54:3, 54:12, 54:22, 56:10, 56:12, 59:22, 63:10, 63:13, 64:2, 64:5, 64:8, 64:19, 66:2, 67:11, 68:3, 74:8, 74:11, 77:16, 82:2, 82:13, 92:20, 93:5, 94:4, 97:20, 102:25, 113:5, 119:15, 120:10, 126:3, 127:3, 129:24, 130:7, 144:4, 146:19, 152:4, 152:8, 152:20, 159:10, 164:8, 164:18, 167:4, 167:23, 169:22, 176:6, 176:11, 180:18, 180:24, 181:16, 181:25, 182:7, 188:15, 194:21, 195:16, 195:19, 195:21, 199:8, 200:7, 201:24, 204:15, 205:22, 207:14, 218:23, 218:25, 220:8, 220:10, 222:21, 223:7, 223:10, 232:25, 233:1, 233:4, 236:1, 236:25, 237:1, 238:18

**seeing** [4] - 92:10, 156:18, 203:8, 235:25

**seem** [1] - 130:21

**self** [1] - 102:18

**self-contained** [1] - 102:18

**sell** [13] - 34:20, 129:1, 171:6, 171:19, 180:6, 220:21, 228:20, 228:23, 234:17, 236:5, 236:8, 237:2, 239:23

**seller** [7] - 16:9, 21:14, 21:15, 32:25, 33:1, 36:8, 102:7

**seller's** [3] - 32:7, 32:9, 33:11

**selling** [27] - 29:24, 112:9, 171:21, 172:2, 172:6,

175:11, 175:14, 175:20, 175:25, 176:24, 179:4, 180:1, 218:15, 234:5, 234:6, 235:13, 235:14, 235:18, 235:23, 236:3, 236:9, 236:11, 236:17, 236:20, 239:14, 239:20

**sells** [1] - 218:18

**send** [8] - 66:13, 68:9, 70:7, 77:1, 79:2, 150:6, 150:23, 151:3

**sender** [13] - 42:11, 42:12, 48:7, 48:8, 50:23, 50:24, 73:19, 73:20, 77:18, 77:19, 81:22, 82:15, 82:16

**sending** [12] - 67:14, 73:3, 74:21, 74:22, 84:22, 84:25, 113:7, 119:18, 150:4, 150:24, 182:9, 182:16

**sends** [3] - 58:22, 186:9, 189:3

**senior** [1] - 232:8

**sense** [1] - 130:1

**sent** [51] - 9:5, 44:10, 49:25, 51:23, 59:11, 59:15, 60:11, 60:12, 60:13, 61:10, 64:23, 64:25, 65:6, 65:11, 67:22, 70:8, 71:16, 71:20, 71:25, 72:7, 72:22, 74:16, 77:25, 78:1, 78:9, 79:1, 79:25, 80:5, 80:9, 80:11, 80:22, 80:23, 84:2, 85:20, 97:22, 109:20, 112:21, 119:10, 122:20, 124:21, 127:2, 130:17, 184:20, 186:6, 186:23, 188:22, 189:8, 194:19, 197:7, 206:20, 226:4

**sentence** [6] - 32:7, 32:13, 98:13, 204:15, 225:13

**sentences** [1] - 114:5

**separate** [5] - 80:22, 80:23, 157:1, 157:2, 161:18

**separated** [2] - 128:7, 236:13

**September** [1] - 92:2

**sequence** [1] - 72:5

**serve** [1] - 123:15

**server** [1] - 74:16

**servers** [2] - 44:10, 124:10

**service** [11] - 15:21, 55:24, 99:25, 100:7, 100:8, 124:25, 134:5, 219:18, 225:2, 234:18, 236:5

**services** [61] - 15:13, 23:20, 29:24, 30:6, 30:10, 40:5, 40:8, 40:22, 41:1, 52:8, 89:22, 91:7, 91:11, 91:15, 93:2, 93:12, 93:14, 93:25, 95:8, 98:10, 100:3, 101:13, 101:18, 102:3, 107:3,

109:18, 125:3, 127:24, 155:18, 167:12, 167:16, 170:15, 170:19, 170:24, 170:25, 171:14, 171:21, 172:8, 172:11, 172:15, 177:16, 177:17, 183:7, 184:6, 201:19, 205:16, 218:8, 218:17, 219:1, 219:2, 219:14, 220:21, 221:4, 223:11, 223:14, 228:8, 233:15, 234:6, 235:21, 236:9, 236:20

**set** [12] - 4:24, 10:11, 25:6, 41:17, 65:15, 76:12, 79:19, 120:13, 133:5, 192:12, 204:6, 204:8

**Set** [2] - 68:21, 76:1

**setting** [8] - 46:20, 79:11, 95:21, 159:7, 202:18, 203:8, 203:9, 205:5

**Settings** [3] - 68:20, 68:21, 69:3

**settings** [1] - 69:13

**seven** [1] - 71:24

**several** [17] - 13:18, 23:24, 23:25, 42:25, 45:7, 58:9, 67:25, 71:19, 89:6, 104:25, 121:8, 154:8, 154:10, 173:22, 180:20, 191:3, 211:4

**shaking** [1] - 209:9

**shall** [4] - 122:14, 123:8, 167:11, 223:10

**shape** [1] - 215:17

**share** [2] - 22:23, 238:24

**Shawn** [4] - 19:9, 19:12, 96:15, 96:22

**sheet** [1] - 195:22

**Shipp** [4] - 3:2, 121:18, 185:25, 187:24

**SHIPP** [1] - 1:11

**shop** [2] - 190:4, 219:4

**short** [5] - 31:10, 62:9, 70:15, 197:25, 238:22

**shortly** [3] - 73:5, 84:1, 89:3

**shot** [3] - 205:25, 206:17, 206:22

**shoulders** [1] - 11:16

**show** [5] - 56:15, 164:7, 181:21, 182:3, 210:5

**showed** [1] - 230:14

**shown** [2] - 156:16, 156:20

**shows** [2] - 16:19, 146:4

**shrug** [1] - 11:16

**sic** [3] - 8:16, 114:17, 123:15

**sic)** [1] - 94:22

**side** [14] - 9:7, 17:5, 25:6, 36:2, 88:13, 92:12, 92:17, 92:19, 101:25, 104:9, 117:16, 120:12, 157:15

**side-by-side** [1] - 88:13

**sidebar** [3] - 12:1, 12:2, 37:24

**sided** [1] - 167:2

**sides** [4] - 211:12, 211:13, 237:8, 239:3

**sign** [5] - 19:11, 34:8, 38:9, 164:23, 165:1

**signatory** [1] - 19:14

**signature** [8] - 18:25, 19:3, 19:6, 27:25, 28:21, 33:14, 34:3, 42:12

**signed** [10] - 21:14, 22:10, 27:3, 27:5, 34:6, 36:14, 126:5, 165:6, 165:10, 180:20

**significance** [1] - 55:6

**significant** [2] - 60:17, 138:1

**significantly** [1] - 17:18

**signing** [1] - 181:23

**similar** [3] - 33:8, 82:5, 99:3

**simple** [4] - 130:22, 170:8, 177:1, 235:10

**simply** [7] - 9:21, 101:21, 155:21, 173:20, 199:23, 200:1, 228:24

**simulcast** [7] - 13:24, 14:6, 15:21, 16:4, 101:14, 159:25, 172:13

**simultaneous** [1] - 128:9

**sit** [7] - 146:13, 154:17, 159:4, 186:7, 187:20, 205:3, 205:15

**site** [1] - 152:14

**sites** [1] - 153:2

**sitting** [8] - 3:16, 5:6, 11:11, 14:17, 54:10, 83:13, 126:18, 142:20

**situation** [2] - 33:1, 141:21

**six** [5] - 32:7, 71:24, 141:16, 213:9, 213:12

**size** [1] - 51:13

**slide** [1] - 94:18

**slow** [2] - 40:6, 115:13

**slowly** [2] - 123:2, 227:24

**small** [1] - 48:3

**so..** [1] - 154:11

**social** [2] - 8:21, 186:19

**software** [71] - 45:23, 69:4, 100:22, 100:24, 101:21, 102:14, 103:4, 103:6, 103:10, 103:14, 159:18, 161:14, 163:8, 172:19, 173:11, 173:17, 173:19, 173:23, 175:12, 175:14, 176:9, 189:24, 190:17, 190:20, 191:22, 192:17, 193:6, 193:10, 193:15, 193:18, 194:6, 194:9, 205:10, 218:15, 218:19,

218:21, 219:4, 219:24,
219:25, 220:4, 220:9,
220:15, 220:19, 226:17,
226:19, 227:4, 228:20,
228:23, 228:25, 229:1,
229:2, 234:5, 234:9,
234:12, 234:14, 234:20,
235:1, 235:2, 235:6,
235:12, 235:15, 235:24,
236:3, 236:9, 236:15,
236:18, 237:2, 239:14,
239:23
**sold** [7] - 13:18, 29:19,
130:8, 130:15, 158:1,
170:14, 179:19
**sole** [3] - 32:8, 32:9, 33:11
**solicit** [8] - 4:3, 30:16, 40:21,
40:25, 125:13, 131:16,
137:8, 233:14
**solicitation** [21] - 27:13,
30:14, 37:1, 37:9, 107:10,
110:3, 110:14, 111:17,
111:18, 114:23, 116:9,
116:17, 120:3, 121:7,
123:19, 133:2, 133:9,
137:17, 137:18, 230:3,
232:25
**Solicitation** [2] - 38:7, 40:15
**solicitations** [9] - 89:4,
105:22, 114:15, 134:24,
139:12, 139:17, 140:23,
182:9, 182:16
**solicited** [2] - 117:6, 130:24
**soliciting** [11] - 42:2, 120:1,
123:11, 127:15, 127:24,
129:5, 129:13, 151:20,
179:16, 230:9, 233:13
**solutions** [5] - 16:4, 30:10,
176:12, 176:18, 176:24
**someone** [16] - 59:24, 71:25,
113:4, 117:17, 118:10,
163:4, 166:11, 198:22,
200:14, 207:22, 212:15,
218:18, 218:19, 219:11,
230:13, 234:9
**something's** [1] - 125:7
**somewhat** [1] - 5:1
**somewhere** [2] - 201:24,
212:1
**son** [1] - 188:8
**sons** [6] - 127:25, 128:1,
128:25, 129:14, 129:16,
179:8
**sons'** [1] - 129:2
**soon** [4] - 115:11, 115:16,
204:22, 238:24
**Sorry** [1] - 181:18
**sorry** [21] - 8:4, 20:3, 20:4,
22:18, 31:14, 36:1, 40:7,
97:6, 98:19, 115:2, 115:14,

130:7, 172:1, 179:10,
192:19, 201:2, 210:17,
223:2, 229:12, 233:4
**sort** [5] - 16:15, 71:6, 83:20,
88:13, 103:8
**sound** [3] - 72:3, 121:16,
152:19
**sounds** [1] - 121:17
**soup** [1] - 79:19
**sources** [1] - 139:9
**space** [4] - 13:15, 16:15,
29:22, 95:20
**spam** [2] - 125:4
**speaking** [13] - 11:18, 11:21,
11:24, 17:15, 21:10, 25:22,
38:18, 44:2, 47:1, 65:10,
76:10, 99:23, 134:3
**specific** [14] - 14:25, 24:5,
32:6, 93:12, 96:25, 102:10,
105:14, 105:21, 124:13,
138:4, 161:20, 199:5,
215:21, 218:18
**specifically** [13] - 33:9,
65:20, 89:5, 112:11,
123:24, 125:12, 140:2,
143:8, 158:9, 168:13,
170:1, 217:12, 228:12
**speculate** [23] - 151:2, 151:4,
153:24, 158:3, 158:5,
165:12, 171:8, 178:5,
178:17, 184:23, 185:23,
186:13, 187:4, 202:25,
203:2, 208:11, 213:11,
214:8, 225:22, 229:8,
229:10, 229:11, 235:8
**speculated** [1] - 203:5
**speculating** [9] - 158:15,
158:19, 178:8, 195:11,
203:3, 208:12, 210:20,
212:8
**speculation** [4] - 195:9,
210:12, 222:14, 234:10
**spell** [1] - 11:6
**spend** [1] - 56:9
**spends** [1] - 56:18
**spent** [2] - 55:8, 55:11
**split** [1] - 141:5
**spoken** [3] - 11:12, 110:22,
116:3
**spread** [1] - 14:11
**Spreadsheet** [1] - 76:4
**spreadsheet** [1] - 48:17
**spreadsheets** [1] - 84:18
**Sr** [1] - 69:7
**SR** [1] - 1:6
**staff** [4] - 13:6, 120:8, 120:9,
139:18
**stage** [1] - 137:4
**stamp** [18] - 21:4, 25:10,
26:3, 28:14, 29:10, 31:11,

38:13, 40:13, 65:20, 66:3,
69:25, 79:13, 80:25, 81:25,
96:11, 108:18, 109:24,
132:20
**stamped** [7] - 19:17, 19:18,
20:14, 53:20, 73:16, 76:18,
112:16
**stand** [8] - 8:11, 11:2,
106:20, 111:19, 114:22,
114:25, 118:10, 237:18
**standing** [1] - 17:22
**Staples** [1] - 189:17
**start** [11] - 30:21, 48:6,
48:19, 62:19, 72:18,
105:20, 127:1, 158:25,
180:13, 196:10
**started** [16] - 10:20, 17:17,
42:1, 84:7, 84:8, 89:3,
98:3, 104:4, 137:1, 190:19,
190:23, 194:22, 203:24,
209:22, 222:6
**starting** [10] - 44:17, 53:23,
72:10, 96:10, 99:8, 100:18,
132:20, 194:24, 196:8,
226:1
**starts** [3] - 73:17, 96:11,
227:25
**State** [3] - 1:9, 48:21, 228:3
**state** [3] - 11:5, 118:17,
182:13
**statement** [1] - 92:5
**statements** [1] - 136:14
**states** [3] - 96:16, 130:7,
227:18
**STATES** [2] - 1:1, 1:12
**States** [5] - 1:9, 3:2, 29:3,
29:5, 228:4
**static** [1] - 89:13
**status** [2] - 239:6, 239:13
**stay** [6] - 105:24, 138:4,
138:13, 157:13, 196:10,
216:17
**stayed** [1] - 169:14
**staying** [2] - 28:14, 57:25
**stealing** [1] - 113:18
**stenography** [1] - 1:22
**steps** [3] - 17:25, 44:5, 86:3
**Steve** [1] - 3:14
**STEVEN** [1] - 1:17
**still** [10] - 43:12, 45:19,
46:21, 70:22, 71:1, 150:1,
150:3, 150:16, 193:23,
214:19
**stink** [1] - 214:3
**Stockyard** [1] - 93:14
**stood** [1] - 7:11
**stop** [8] - 11:24, 51:18,
130:20, 190:4, 219:3,
223:13, 236:23, 237:6
**stopped** [1] - 17:24

**story** [2] - 117:15, 117:16
**Street** [1] - 1:9
**strictly** [3] - 14:9, 102:3,
102:8
**strike** [5] - 81:14, 82:10,
83:1, 95:16, 194:17
**strikes** [1] - 98:14
**strip** [1] - 222:6
**strong** [3] - 15:22, 15:23,
22:15
**stronger** [3] - 22:14, 160:15,
160:16
**strongest** [1] - 160:23
**structure** [4] - 168:23, 169:2,
174:23, 175:23
**study** [1] - 76:6
**stuff** [2] - 154:21, 157:23
**subject** [2] - 7:6, 199:11
**submission** [1] - 152:4
**submissions** [1] - 4:11
**submit** [3] - 8:7, 106:18,
111:4
**submitted** [14] - 9:12,
106:16, 107:18, 108:12,
111:6, 112:14, 114:19,
115:10, 125:17, 125:18,
134:13, 136:8, 186:15,
237:9
**subparagraphs** [1] - 30:20
**subpart** [1] - 127:21
**subscription** [1] - 173:20
**subsequent** [4] - 10:4,
74:10, 82:7, 130:11
**subsidiaries** [1] - 233:16
**subsidiary** [3] - 174:17,
174:18, 174:21
**substance** [2] - 68:10,
123:17
**substantive** [1] - 63:15
**successfully** [1] - 133:15
**sue** [1] - 224:15
**suffered** [2] - 138:4, 145:19
**sufficiently** [1] - 18:20
**sum** [1] - 123:17
**summarize** [1] - 85:18
**summarizing** [1] - 25:20
**summary** [4] - 83:19, 231:19,
231:21, 231:23
**Superior** [15] - 135:4,
135:15, 135:21, 135:24,
138:5, 138:23, 139:9,
139:24, 144:22, 145:3,
210:18, 210:20, 210:23,
211:16
**superior** [2] - 135:13, 211:18
**supervisor** [1] - 72:14
**supervisory** [1] - 47:7
**support** [4] - 93:11, 163:21,
214:10, 217:6
**supposed** [4] - 168:15,

168:21, 168:23, 169:25
**surprise** [2] - 144:6, 175:4
**suspension** [2] - 230:19, 230:22
**sustained** [1] - 33:10
**switched** [2] - 140:22, 163:15
**SWORN** [1] - 11:4
**sworn** [1] - 116:8
**system** [27] - 60:7, 120:9, 120:12, 182:21, 182:23, 182:24, 183:4, 183:12, 184:3, 185:1, 185:12, 186:8, 186:21, 187:14, 189:7, 189:15, 189:20, 190:9, 191:10, 191:16, 198:24, 199:2, 199:3, 199:6, 199:12, 199:13, 199:21
**system's** [1] - 161:10
**systems** [7] - 25:25, 44:9, 85:8, 189:2, 189:9, 198:15, 205:12

**T**

**table** [1] - 17:5
**tailored** [1] - 180:16
**talks** [5] - 46:4, 204:4, 204:12, 232:25, 233:13
**target** [3] - 50:8, 56:6, 60:18
**targeted** [1] - 16:1
**targeting** [2] - 22:14, 57:3
**team** [1] - 86:13
**technology** [11] - 93:11, 144:1, 191:4, 191:22, 192:2, 192:14, 192:25, 193:3, 193:22, 213:3, 213:5
**TECHNOLOGY** [1] - 1:7
**Technology** [57] - 3:21, 4:5, 4:9, 88:6, 88:7, 88:11, 88:14, 88:17, 88:22, 89:2, 89:4, 89:10, 90:13, 90:16, 90:24, 91:6, 91:20, 91:23, 92:24, 94:19, 95:13, 99:24, 101:25, 102:8, 103:17, 103:20, 104:3, 105:17, 106:5, 111:17, 112:24, 115:12, 115:17, 117:6, 121:2, 121:7, 126:8, 126:9, 130:4, 130:23, 131:2, 131:4, 131:9, 131:15, 131:22, 131:24, 132:24, 133:4, 133:23, 133:25, 134:21, 135:11, 135:18, 137:22, 140:23, 182:9, 234:4
**Technology's** [3] - 88:25, 92:18, 131:7

**Template** [4] - 63:22, 63:23, 63:24, 63:25
**temporarily** [1] - 123:8
**temporary** [2] - 151:18, 182:10
**ten** [3] - 32:14, 62:10, 70:12
**ten-minute** [2] - 62:10, 70:12
**term** [5] - 94:1, 136:21, 140:3, 224:16, 225:4
**terminated** [9] - 41:19, 57:11, 57:14, 61:21, 78:14, 174:10, 202:16, 209:5
**termination** [4] - 39:4, 39:18, 61:25, 228:6
**terminology** [1] - 197:13
**terms** [28] - 13:12, 15:6, 18:4, 19:23, 22:11, 22:13, 24:12, 27:9, 29:20, 29:23, 38:9, 39:9, 75:18, 94:8, 95:10, 102:1, 104:2, 109:10, 114:3, 123:5, 124:12, 125:9, 133:13, 133:15, 133:20, 134:8, 135:23, 136:7
**Territory** [1] - 28:25
**territory** [1] - 29:2
**testified** [59] - 16:20, 18:23, 20:21, 21:23, 22:1, 22:13, 25:2, 27:11, 35:23, 47:11, 60:16, 61:9, 61:20, 66:5, 69:6, 69:17, 71:19, 82:4, 84:6, 85:14, 85:19, 87:23, 105:16, 106:21, 108:11, 108:22, 122:19, 139:11, 141:1, 143:13, 143:18, 143:23, 148:14, 150:20, 151:8, 155:9, 165:23, 182:20, 184:25, 190:12, 192:11, 193:9, 193:13, 194:21, 196:8, 198:14, 203:17, 207:12, 210:15, 211:5, 213:16, 215:22, 221:21, 223:23, 226:24, 227:12, 234:25, 237:20
**testify** [14] - 8:20, 8:21, 18:21, 60:22, 60:24, 61:5, 118:10, 162:22, 162:23, 193:12, 196:5, 196:7, 200:13, 204:14
**testifying** [9] - 24:7, 38:8, 44:22, 71:3, 122:7, 128:4, 211:10, 224:4, 224:5
**testimony** [24] - 10:3, 10:16, 12:3, 61:4, 83:19, 85:12, 103:19, 118:22, 118:24, 119:12, 143:5, 144:16, 151:5, 151:15, 163:16, 172:25, 176:9, 196:9, 210:15, 211:19, 211:23, 215:2, 223:24, 238:17

**Texas** [1] - 8:16
**text** [2] - 74:21, 82:19
**THE** [92] - 1:1, 3:3, 3:6, 3:13, 3:17, 6:3, 6:7, 6:10, 6:16, 8:2, 8:25, 9:19, 10:24, 11:3, 11:5, 11:7, 11:8, 12:6, 12:7, 24:17, 27:22, 31:16, 37:11, 37:17, 37:21, 42:5, 44:20, 47:18, 47:23, 50:17, 53:13, 57:20, 61:2, 62:6, 62:8, 62:14, 70:10, 70:14, 70:16, 70:18, 73:10, 77:5, 77:8, 85:15, 90:4, 90:9, 108:1, 118:13, 118:19, 122:2, 132:1, 132:6, 132:8, 132:10, 142:7, 157:20, 178:2, 178:15, 178:17, 178:19, 178:21, 180:15, 181:1, 181:4, 181:8, 181:11, 181:13, 181:15, 197:25, 198:5, 198:7, 198:9, 207:3, 207:7, 207:9, 209:16, 211:12, 222:15, 222:20, 222:21, 237:7, 237:15, 237:25, 238:4, 238:6, 238:14, 239:11, 239:16, 239:21, 239:24, 240:2, 240:4
**theatrics** [1] - 5:7
**themselves** [1] - 47:9
**thereafter** [4] - 73:6, 84:1, 89:3, 204:22
**thereof** [1] - 130:3
**they've** [1] - 239:19
**thinking** [1] - 112:3
**thinks** [1] - 151:2
**third** [12] - 43:23, 75:2, 173:19, 176:6, 176:10, 231:16, 232:18, 236:4, 237:2, 237:17, 237:20, 238:18
**third-parties** [4] - 173:19, 176:10, 237:2, 237:20
**third-party** [6] - 75:2, 176:6, 231:16, 232:18, 236:4, 237:17
**thirdhand** [1] - 118:9
**thoughts** [2] - 59:24, 60:23
**threatened** [1] - 33:11
**three** [9] - 12:25, 13:8, 13:16, 32:6, 47:11, 65:8, 155:19, 157:18, 181:21
**three-year** [1] - 157:18
**throughout** [6] - 29:4, 88:21, 88:23, 168:8, 169:14, 207:18
**Thursday** [2] - 78:1, 80:2
**tie** [3] - 57:10, 96:23, 178:4
**tied** [1] - 36:25

**timed** [26] - 13:20, 14:6, 14:8, 24:2, 26:1, 45:12, 128:3, 128:5, 128:6, 128:7, 156:3, 156:4, 156:5, 156:7, 156:9, 156:11, 159:21, 159:23, 159:25, 160:2, 160:6, 172:13, 172:21, 172:23, 192:23
**Timed** [3] - 68:24, 75:24, 129:16
**timing** [1] - 84:10
**tiny** [1] - 205:11
**title** [11] - 20:4, 21:7, 28:3, 38:5, 38:16, 40:14, 41:11, 169:14, 222:8, 222:11, 222:18
**titled** [1] - 38:25
**titles** [2] - 68:13, 68:17
**to/from** [1] - 51:18
**today** [36] - 4:13, 7:24, 8:7, 8:9, 8:16, 10:7, 12:3, 12:4, 83:10, 88:3, 104:4, 109:13, 123:21, 126:19, 135:21, 141:24, 146:13, 150:20, 150:22, 154:17, 155:11, 159:4, 159:11, 186:7, 187:20, 198:3, 200:13, 205:3, 205:15, 210:15, 220:22, 232:15, 234:4, 236:24, 238:17, 240:2
**tomorrow** [3] - 171:6, 171:19, 177:10
**took** [12] - 17:25, 72:18, 110:19, 116:14, 136:14, 156:11, 231:2, 231:4, 231:6, 231:7, 231:8
**Top** [3] - 54:15, 54:21, 59:18
**top** [22] - 11:21, 52:6, 52:7, 52:21, 53:1, 54:2, 55:8, 58:16, 58:21, 59:4, 68:2, 75:15, 84:21, 93:17, 113:5, 147:4, 206:12, 206:14, 206:18, 206:23, 207:24
**topic** [1] - 200:12
**total** [3] - 32:14, 96:12, 139:3
**touch** [1] - 124:14
**touched** [2] - 22:22, 124:15
**tough** [1] - 41:2
**towards** [2] - 20:1, 40:1
**track** [4] - 23:10, 55:21, 185:4, 221:19
**tractor** [1] - 101:13
**TractorHouse** [1] - 101:12
**trade** [1] - 16:18
**traded** [1] - 154:16
**trademark** [1] - 36:7
**trademarks** [2] - 16:11, 36:8
**Trader** [6] - 95:11, 95:14, 99:12, 101:8, 224:9, 224:10

**transaction** [2] - 19:24, 165:2
**transcript** [3] - 1:22, 10:3, 240:12
**transcription** [1] - 1:22
**translation** [1] - 59:8
**transmitted** [4] - 69:22, 79:5, 85:8, 87:24
**travel** [1] - 74:13
**traveled** [2] - 10:10, 12:12
**treat** [1] - 103:9
**trees** [1] - 159:10
**Trenton** [1] - 1:10
**trial** [2] - 5:6, 9:25
**trigger** [2] - 111:8, 163:5
**triggered** [1] - 71:6
**Trinity** [1] - 3:15
**TRINITY** [1] - 1:17
**TRO** [24] - 3:24, 4:3, 4:5, 4:6, 4:8, 4:9, 7:10, 121:12, 121:14, 121:18, 121:23, 123:22, 124:18, 125:7, 125:12, 127:5, 127:21, 130:17, 134:14, 134:15, 145:17, 151:21, 185:1, 185:25
**truck** [13] - 15:23, 22:17, 22:18, 26:1, 93:10, 94:11, 160:16, 160:19, 161:21, 220:23, 221:11, 221:12, 223:24
**true** [9] - 80:19, 101:11, 101:17, 102:20, 149:13, 160:20, 160:21, 165:8, 197:24
**truly** [1] - 50:3
**trust** [1] - 114:9
**truth** [2] - 118:16, 182:1
**try** [7] - 12:3, 38:23, 62:10, 100:16, 141:3, 156:13, 239:2
**trying** [8] - 45:25, 70:19, 128:24, 129:1, 172:25, 180:4, 180:24, 200:25
**Tuesday** [1] - 97:18
**tuned** [2] - 193:15, 193:17
**turn** [11] - 17:18, 26:3, 26:14, 44:25, 60:6, 65:19, 80:25, 106:5, 108:18, 182:3, 204:6
**turning** [1] - 5:10
**tutorial** [1] - 104:18
**tutorials** [2] - 74:23, 75:13
**two** [27] - 11:18, 14:3, 30:20, 32:6, 43:14, 55:17, 59:16, 59:24, 60:12, 61:12, 90:1, 90:23, 105:9, 114:5, 120:15, 127:25, 151:8, 154:9, 155:13, 157:17, 161:17, 174:11, 178:9,
211:5, 233:11, 236:11, 236:13
**two-year** [1] - 157:17
**tying** [1] - 46:5
**type** [9] - 8:20, 14:7, 78:23, 89:17, 143:15, 151:19, 163:24, 185:21, 186:8
**types** [3] - 14:22, 15:13, 221:17
**typically** [1] - 79:1

## U

**ultimate** [3] - 4:20, 25:22, 239:17
**ultimately** [32] - 5:23, 9:11, 9:14, 17:18, 17:20, 18:2, 24:1, 30:9, 31:24, 34:6, 34:20, 35:8, 43:11, 51:17, 52:13, 52:23, 55:25, 60:17, 64:22, 72:2, 72:6, 84:6, 86:14, 86:24, 100:25, 125:12, 159:1, 161:13, 161:18, 163:3, 230:20, 232:22
**uncovered** [11] - 47:2, 50:19, 53:17, 57:22, 62:16, 67:8, 71:15, 73:12, 77:11, 79:22, 81:10
**under** [9] - 6:1, 70:22, 186:7, 191:16, 193:22, 195:14, 200:13, 209:22
**Undercarriage** [7] - 124:2, 124:11, 124:19, 125:20, 129:11, 188:15, 199:20
**Undercarriage's** [1] - 124:23
**undercut** [5] - 52:11, 53:10, 57:2, 57:6
**underneath** [2] - 52:14, 149:23
**understood** [1] - 24:12
**unfairness** [1] - 9:22
**unfortunately** [2] - 106:10, 181:12
**unhappy** [1] - 213:2
**unilaterally** [2] - 222:17, 225:18
**unique** [1] - 88:22
**UNITED** [2] - 1:1, 1:12
**United** [5] - 1:9, 3:2, 29:3, 29:4, 228:3
**universally** [1] - 89:20
**unlawful** [2] - 105:14, 187:21
**unless** [5] - 99:23, 165:15, 185:18, 235:11, 237:18
**Up** [3] - 64:14, 68:21, 76:1
**up** [68] - 7:11, 11:14, 14:15, 17:18, 17:19, 18:17, 35:5, 35:10, 36:22, 39:3, 43:11, 45:25, 46:1, 46:20, 52:21,

**55:25, 65:16, 69:2, 74:3, 75:15, 76:12, 79:11, 79:19, 90:3, 93:7, 95:21, 96:21, 98:22, 100:22, 102:23, 114:5, 120:14, 126:3, 133:15, 134:4, 135:17, 141:5, 145:24, 146:18, 153:20, 159:7, 161:19, 163:14, 174:1, 174:10, 177:11, 181:15, 192:12, 195:5, 195:6, 195:25, 197:4, 197:6, 202:16, 202:18, 203:8, 203:9, 204:6, 204:9, 205:6, 215:4, 216:4, 216:6, 224:11, 230:14, 238:15, 239:2
**upload** [1] - 192:15
**Upload** [6] - 64:10, 64:12, 68:22, 68:23, 76:2
**uploading** [1] - 76:13
**Uploading** [1] - 64:17
**upside** [1] - 35:6
**urging** [1] - 204:10
**useful** [1] - 60:18
**user** [5] - 49:11, 76:15, 86:4, 200:3
**user-protected** [1] - 86:4
**uses** [4] - 95:23, 95:25, 144:1, 144:5
**utilize** [1] - 52:10
**utilized** [6] - 49:3, 100:22, 107:12, 190:10, 226:7, 226:9
**utilizing** [1] - 198:14

## V

**v2** [2] - 68:20, 69:3
**value** [1] - 152:18
**various** [7] - 39:6, 86:14, 92:14, 97:13, 101:5, 103:17, 143:1
**vendor** [1] - 176:6
**venue** [1] - 177:18
**verbal** [4] - 11:17, 17:19, 18:8, 120:3
**Version** [1] - 69:3
**version** [1] - 69:13
**versions** [1] - 59:24
**versus** [4] - 60:2, 90:13, 98:21, 161:17
**verticals** [3] - 91:6, 94:15, 94:16
**via** [3] - 8:20, 172:2, 172:6
**Vicari** [2] - 24:4, 96:17
**video** [2] - 74:23, 75:12
**videos** [2] - 82:23, 83:6
**view** [4] - 90:21, 129:3, 136:21, 141:17
**violate** [1] - 179:2

**violated** [4] - 4:3, 4:8, 123:22, 185:25
**violation** [15] - 171:7, 171:12, 171:20, 171:24, 172:6, 175:15, 177:12, 178:6, 186:4, 187:21, 187:25, 222:12, 222:19, 225:18, 225:23
**virtual** [1] - 25:25
**virtue** [4] - 129:22, 140:22, 177:1
**visit** [1] - 89:11
**visited** [1] - 104:2
**visually** [1] - 15:3
**voice** [1] - 11:14
**voluminous** [1] - 84:17
**voluntarily** [1] - 42:22
**Vortex** [6] - 104:20, 104:23, 104:25, 105:4, 105:6, 105:8
**vs** [1] - 1:5

## W

**W-E-L-C-H** [1] - 11:7
**wait** [5] - 11:19, 157:20, 223:22
**waiving** [2] - 54:5, 146:23
**walk** [2] - 96:9, 220:19
**walked** [1] - 220:15
**walking** [1] - 220:9
**Wallace** [3] - 111:12, 113:8, 113:16
**waste** [2] - 10:9, 10:10
**watching** [1] - 209:14
**web** [2] - 89:14, 89:15
**website** [23] - 15:4, 16:10, 36:6, 49:4, 49:5, 89:11, 89:13, 89:18, 93:2, 94:25, 103:16, 104:3, 109:14, 120:5, 120:10, 152:11, 152:21, 154:13, 174:25, 175:9, 176:5
**websites** [5] - 90:2, 91:1, 92:25, 103:5, 104:17
**weeks** [4] - 42:25, 57:16, 72:11, 202:9
**Welch** [67] - 3:12, 7:2, 8:1, 9:14, 10:5, 11:1, 11:3, 11:8, 12:10, 12:16, 13:12, 14:21, 18:19, 24:19, 25:1, 27:11, 27:24, 31:8, 33:13, 38:2, 41:18, 42:7, 44:22, 47:11, 47:25, 48:6, 48:22, 50:19, 53:17, 53:22, 57:22, 61:8, 62:16, 67:8, 71:3, 73:12, 76:5, 77:11, 78:13, 78:18, 79:22, 81:10, 81:18, 90:11, 90:22, 92:10, 93:17, 108:11, 112:13, 115:2,

118:17, 119:11, 121:10,
122:6, 122:19, 126:11,
132:15, 133:12, 142:10,
151:22, 156:14, 169:22,
178:5, 180:20, 181:2,
181:21, 237:19
**WELCH** [2] - 2:6, 11:4
**Welch's** [1] - 10:3
**welcome** [1] - 63:6
**whatnot** [1] - 16:19
**whatsoever** [1] - 13:21
**whereas** [7] - 15:22, 25:11,
28:7, 95:13, 102:4, 102:8,
103:5
**wherein** [2] - 152:17, 207:22
**white** [4] - 176:1, 176:12,
176:18, 176:24
**whole** [10] - 24:20, 32:5,
45:4, 146:16, 165:2, 188:8,
199:3, 209:15, 217:10,
233:25
**wide** [1] - 211:12
**wife** [4] - 58:6, 58:10, 60:13,
124:17
**wife's** [2] - 61:11, 85:21
**wiped** [8] - 44:3, 197:9,
197:12, 197:13, 197:16,
197:18, 197:19, 232:9
**witness** [13] - 12:7, 18:15,
24:15, 27:21, 37:10, 42:4,
60:22, 70:21, 71:1, 85:13,
108:6, 178:11, 178:14
**WITNESS** [9] - 2:5, 11:4,
11:7, 12:6, 31:16, 178:17,
178:21, 207:9, 222:21
**witness's** [1] - 61:5
**witnesses** [3] - 8:10, 9:18,
118:23
**wonder** [1] - 130:20
**wondering** [5] - 81:13,
117:14, 139:22, 139:23,
139:24
**word** [7] - 11:12, 14:23,
88:14, 138:9, 204:15,
213:10
**word-for-word** [1] - 213:10
**words** [10] - 36:21, 40:24,
45:5, 90:20, 91:4, 93:21,
129:4, 134:15, 141:7,
225:4
**works** [6] - 62:12, 95:20,
100:11, 100:14, 100:16,
150:16
**world** [3] - 14:10, 14:11,
14:19
**worth** [4] - 55:18, 154:14,
154:15, 154:22
**worthwhile** [1] - 16:6
**wrap** [1] - 238:15
**writing** [3] - 4:21, 18:10,

169:9
**written** [5] - 129:4, 231:21,
231:22, 232:11, 232:13
**wrote** [1] - 151:16

## X

**XLSX** [1] - 59:20

## Y

**year** [16] - 35:3, 35:9, 48:11,
51:21, 65:2, 67:20, 73:24,
136:2, 136:5, 152:6,
152:17, 157:17, 157:18,
168:9, 192:3
**year-over-year** [1] - 136:2
**years** [13] - 12:22, 12:25,
28:21, 28:22, 31:23, 36:23,
42:16, 93:23, 114:8,
176:20, 183:11, 217:13,
221:20
**years'** [1] - 55:18
**yesterday** [1] - 206:5
**yourself** [2] - 19:20, 32:13
**yup** [5] - 71:11, 115:14,
146:12, 163:18, 195:15

## Z

**Zip** [1] - 48:21
**zip** [2] - 78:24, 78:25
**zone** [1] - 74:6
**zones** [1] - 59:12