# Exhibit B

1    **UNITED STATES DISTRICT COURT**
     **FOR THE DISTRICT OF NEW JERSEY**
2

3   _____

    SANDHILLS GLOBAL, INC.,
4
              Plaintiff,              CIVIL ACTION NUMBER:
5
              -vs-
6                                     3:19-cv-20669-MAS-TJB
    LAWRENCE GARAFOLA, SR., and
7   FACTS TECHNOLOGY LLC              Preliminary Injunction
                                               Hearing
8             Defendants.
    _____
9         Clarkson S. Fisher United States Courthouse
          402 East State Street
10        Trenton, New Jersey  08608
          February 21, 2020
11
12   **B E F O R E**:       HONORABLE MICHAEL A. SHIPP
                            UNITED STATES DISTRICT JUDGE
13

14   **A P P E A R A N C E S**:

15   BRESSLER, AMERY & ROSS, P.C.
     BY:  JOHN D. MILLER, III, ESQUIRE
16   On behalf of the Plaintiff.

17   TRINITY & FARSIOU
     BY:  STEVEN D. FARSIOU, ESQUIRE
18   On behalf of the Defendants.

19

20        Cathy J. Ford, Official Court Reporter
                 cfordccr@gmail.com
21               609.367.2777

22   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.
23

24

25

1

# I N D E X

2

WITNESS                                                    PAGE

3

 EVAN WELCH
4  CROSS-EXAMINATION BY MR. FARSIOU:                          5

5  LAWRENCE GARAFOLA,                                        106
   DIRECT EXAMINATION BY MR. FARSIOU:                        107
6  CROSS EXAMINATION BY MR. MILLER:                          165

7               E X H I B I T S

8  NUMBER                                              IDEN. EVID.
                                                        5
9   Defendant's Exhibit D-5 for Identification.
    Defendant's Exhibit D-8 for Identification.        17
10  Defendant's Exhibit D-12 for Identification.       37
    Defendant's Exhibit D-13 for Identification.       63
11  Defendant's Exhibit D-15 for Identification.       85
    Defendant's Exhibit D-16 and D-17 for             95
12  Identification.
    Defendant's Exhibit D-18 for Identification.      122
13  Defendant's Exhibit D-19, D-20, and D-21 for      150
    Identification.
14  Plaintiff's Exhibit P-25 for Identification.      187
    Plaintiff's Exhibit P-26 for Identification.      192
15  Plaintiff's Exhibit P-25 and P-26 in evidence.         210
    Defendant's Exhibit D-5 through D-21 in evidence.      210

16

17

18

19

20

21

22

23

24

25

1           THE DEPUTY COURT CLERK:  All rise.

2           (PROCEEDINGS held in open court before The Honorable

3   Michael A. Shipp, United States District Judge, at 9:28 a.m.)

4           THE COURT:  Please be seated.  Good morning.

5           MR. MILLER:  Good morning.

6           MR. FARSIOU:  Good morning, Judge.

7           THE COURT:  We are here and we are back on the record

8   in the preliminary injunction hearing in the matter of

9   Sandhills versus Garafola, et al., Docket Number 19-20669.

10          Although this is a continuation, let me still have

11  appearances of counsel, please.

12          MR. MILLER:  John Miller from Bressler, Amery and

13  Ross for the plaintiff.  Along with me is Alexander Essay,

14  in-house counsel.  And on the witness stand is Evan Welch,

15  employee of Sandhills.

16          THE COURT:  Good morning.

17          MR. FARSIOU:  Good morning, Judge.  Steven Farsiou

18  for the law firm of Trinity & Farsiou on behalf of the

19  defendants.

20          THE COURT:  And good morning to you as well.

21          MR. FARSIOU:  And Mr. Garafola to my left.

22          THE COURT:  Good morning.

23          So we left off with the cross-examination of Mr. Evan

24  Welch, who is still on the stand, who has already been sworn.

25          We're going to continue with you still being under

1    oath, Mr. Welch, and Mr. Farsiou it was your opportunity to

2    cross-examine the witness.  So at this time, I'm going to

3    invite you to continue your cross-examination.

4         MR. FARSIOU:  Judge, if I may first, I did send your

5    office -- they had asked for the exhibit list, and I had

6    indicated that there was one declaration that was missing that

7    I was going to have marked as D-5.  So this way that there's

8    not -- I don't want to move the numbers off.

9         So I just want to make sure the record is clear that

10   D-5 is supposed to be the declaration of Evan Welch that was

11   filed on 12/4/19.  And I can provide that copy as well.

12        THE COURT:  If you can pass that up so that we have a

13   copy of it.

14        It's a declaration -- wait -- dated when?

15        MR. FARSIOU:  I had it filed 12/4/19.

16        THE COURT:  Okay.

17        MR. MILLER:  Just one moment.  Can I just see real

18   quick?

19        MR. FARSIOU:  Yeah, sure.  I don't think this one

20   was --

21        MR. MILLER:  No, no, no.  I understand.

22        So Judge, I have no problem with the declaration.

23   There are exhibits that were attached to it as part of the

24   filing, but I just want to make that clear.

25        MR. FARSIOU:  Yeah, that's fine.

WELCH - CROSS - FARSIOU

1          MR. MILLER:  Okay.

2          MR. FARSIOU:  There were exhibits to it.  But I think

3  they're already in the record.

4          MR. MILLER:  Correct.

5  (Defendant's Exhibit D-5 for Identification.)

6          THE COURT:  Okay, thank you.

7          And there was no opposition to this, correct,

8  Counsel.

9          MR. MILLER:  No opposition other than when all we're

10  done with this, if we can get the exhibits that were attached

11  to the declaration as part of the filing, submitted as part of

12  the record.  Other than that, no opposition.

13          THE COURT:  Okay.  Mr. Farsiou?

14          MR. FARSIOU:  Okay.  So Judge, does he have the

15  marked version?  Does the witness --

16          THE WITNESS:  I don't have anything.

17          THE COURT:  He doesn't have anything right now.

18          MR. FARSIOU:  Okay.  I just want to confirm that

19  that's his declaration so that it's in the record and marked

20  as D-5.

21  CONT'D CROSS-EXAMINATION BY MR. FARSIOU:

22  Q.  Mr. Welch, as your attorney had indicated, there were

23  attachments to this document, I believe, but I just want to

24  make sure that that document, if you go to the last page,

25  that's your signature?

—WELCH - CROSS - FARSIOU—

1  A.   Yes.

2  Q.   Okay.  And this was a declaration that you had signed --

3  we didn't talk about it last time.  I just want to make sure

4  that I'm correct that this would be another declaration that

5  you made in this case.

6  A.   Yes.

7  Q.   Okay.  Now, when we were here last time, I had asked you

8  about the evidence that you had that established the lawsuit

9  that you initially filed, and I believe what you said was --

10  and do you have the plaintiff documents in front of you?

11  A.   I have nothing but this.  Sorry.

12        MR. FARSIOU:  I would like the witness to have the

13  marked plaintiff exhibits.  It probably would be easier to do

14  it this way, that it's in front of him, so that we can just

15  move quickly.

16        THE COURT:  Do you have them?  Do you --

17        MR. FARSIOU:  Well, doesn't the Court have the marked

18  ones?

19        THE COURT:  Yeah, but he can't have the Court's copy.

20  Do you want --

21        MR. FARSIOU:  No.  Okay.  Well, okay.  I thought the

22  Court -- I thought the witness would looked at the marked

23  versions of it.

24        MR. MILLER:  And I would tell you, Judge, that was

25  our understanding when we left with the --

WELCH - CROSS - FARSIOU

```
 1              THE COURT:  You want to see --

 2              MR. MILLER:  The ones with the tags on the side, the

 3    red?

 4              THE COURT:  So that you can refer to them as the

 5    exhibits here?

 6              MR. FARSIOU:  Yeah.  These were the ones that were

 7    marked on February 6th.

 8              THE COURT:  All right, Counsel.  I'll let you use my

 9    copies, which means I won't have a copy.

10              (Discussion amongst counsel.)

11              MR. MILLER:  So Judge, what we're going to do, I have

12    a binder of plaintiff's exhibits, my copy, but for expediency,

13    the witness can look at those.  I haven't written on them.

14              THE COURT:  Thank you.

15              MR. FARSIOU:  Just so it's easier.

16              MR. MILLER:  Yup.

17              MR. FARSIOU:  Thanks.

18    BY MR. FARSIOU:

19    Q.   I just want to confirm that when we spoke last time -- if

20    you look at P-5, sir?

21    A.   Is that the Permian email to Colton Rush?

22    Q.   Yes.

23    A.   Yes.

24    Q.   P-5 is what initiated the trip to New Jersey on

25    August 1st, correct?
```

WELCH - CROSS - FARSIOU

1   A.   Correct.

2   Q.   Okay.  And then what happened was you went through -- you

3   went through Mr. Garafola's emails to see -- and Ms. Marlene

4   Greene's -- to see what was going on in the email system,

5   right?

6   A.   Yes.

7   Q.   Okay.  And again, the email addresses for Mr. Garafola,

8   Ms. Greene and the other 13 to 14 New Jersey employees,

9   they're all active accounts, aren't they?

10  A.   Currently today?

11  Q.   Yes.

12  A.   I'm not sure on all of them.  I know Larry and Marlene

13  would be.

14  Q.   Okay.  So again, as I indicated last time, if I send an

15  email to larry@equipmentfacts.com, Sandhills would receive

16  that email.

17  A.   Yes.

18  Q.   I had asked you if you had gone through your emails that

19  you were reviewing for any and all emails that related to any

20  of the exhibits that were marked on February 6th.

21       Do you remember that?

22  A.   Yes.

23  Q.   And you said yes.  You said that, We looked for emails to

24  and from Larry throughout the time period.

25       Do you remember saying that?

WELCH - CROSS - FARSIOU

1    A.   To and from Larry's personal, is that what we're talking
2    about?
3    Q.   No, we're talking about Larry's Equipmentfacts' email
4    account.
5    A.   Yes.
6    Q.   Because that's what you had access to, right?
7    A.   That, and anything -- yeah.  Yes.
8    Q.   Just talking about in the time frame --
9    A.   Sure.
10   Q.   -- of July and August at this point.
11   A.   Okay.  Yes.
12   Q.   You would be able to look back at Larry's emails,
13   correct?
14   A.   Yes.
15   Q.   Okay.  And I had asked you, and you said, yeah, we
16   reviewed that time period to see if there were any other
17   emails that corroborated what we thought was going on, right?
18   A.   Right.
19   Q.   And that resulted in you finding P-6, right, or someone
20   finding P-6.  I believe you said Mr. -- was it Bolton or
21   Rolton?
22   A.   I don't remember who found it, but yes, that resulted in
23   finding that email.
24   Q.   Okay.  And then as part of your search, you saw, or
25   someone at Sandhills -- right? -- found P-7 through P-17?

WELCH - CROSS - FARSIOU

1  Right?

2  A.   Yes.

3  Q.   Okay.  And that's what triggered the lawsuit, the initial

4  lawsuit against Mr. Garafola, his son, and Bidpath and

5  Bidfacts, and Ms. Marlene Greene, correct?

6  A.   Yes.

7  Q.   Okay.  Now, again, these were the emails that you found

8  that you found were pertinent to what you believed

9  Mr. Garafola was starting a competing business, right?

10 A.   Yes.

11 Q.   Okay.  Now, with respect to P-7 -- and before I get to

12 P-7, I just want to, again, reiterate that you testified when

13 Equipmentfacts went to the new BidCaller system in late April

14 of 2019, you agreed that in the first couple of months there

15 was some issues with the software and people complained,

16 right?

17 A.   I would say tweaks needed to be made.

18 Q.   Okay.  You testified that there were complaints that you

19 received.

20      Do you remember that?

21 A.   There's always issues with a roll, so I'm sure there was

22 complaints of some kind.

23 Q.   Now -- and your testimony is that these were just

24 standard issues that always come up, it wasn't any major

25 issues that were going on, right?

WELCH - CROSS - FARSIOU

1   A.   Yes, correct.

2   Q.   Now with respect to P-7.  P-7 is the email, Tuesday

3   June 11, 2019, Mr. Garafola's personal account to his work

4   account.

5   A.   Yes.

6   Q.   Do you see that?

7   A.   Uh-huh.

8   Q.   And it's -- the attachment is "OilField Bidders."

9   A.   Yes.

10  Q.   And this document in and of itself was something that you

11  guys or Sandhills found through their third-party consultant,

12  or was it something that Sandhills found in-house?

13  A.   I think we found it in-house.

14  Q.   Okay.  Did you look at the document when they found it?

15  A.   Yes.

16  Q.   Am I correct that you had never seen a document as it

17  looks like it does on P-7 before the time they showed it to

18  you?

19  A.   I'm not sure if I had or hadn't.

20  Q.   My next question is with respect to, if you go to -- and

21  by the way, I'm correct that the testimony that you had with

22  the bidders was that it's your livelihood or bloodline,

23  something to that effect, for Sandhills?

24  A.   Yes.

25  Q.   That's what concerned you?

WELCH - CROSS - FARSIOU

1    A.   It's one of many things that concerned me, but yes.

2    Q.   Your testimony is what it is.  I'm not going to go rehash

3    it.

4         Now with respect to P-11, P-11 is a -- I believe it's

5    Larry Garafola email, July 18, 2019, from his -- I guess it's

6    a work account to his Gmail account?

7    A.   Correct.

8    Q.   This document has a welcome page and it talks about

9    manuals, manage bidders, things like that right.

10        Take a look at it.

11   A.   Yes.

12   Q.   My question for you with respect to P-11 through P-17,

13   these documents are not documents that you had ever seen

14   before prior to someone saying, hey, we saw these emails with

15   these attachments in August?

16   A.   I don't know whether I have seen them or not.

17   Q.   Well, you didn't prepare them, right?

18   A.   I didn't make them, is that what you're asking?

19   Q.   Correct.

20   A.   No, I didn't prepare them, no.

21   Q.   Okay.  Now with respect to -- if you go back to P-7.  P-7

22   was a document -- again, it's June 11, 2019.

23        Now, that's from Larry Garafola's personal email to his

24   work email, correct?

25   A.   Yes.

WELCH - CROSS - FARSIOU

1   Q.   Now, with respect to that, do you remember why this

2   document was so concerning to you?

3   A.   It's our bidder list.

4   Q.   Okay.

5   A.   Or part of our bidder list.

6   Q.   Okay.  Now, with respect to your bidder list, do you

7   remember -- and I know you testified earlier that, you know,

8   there's some hiccups, do you remember Mr. Garafola telling you

9   guys in May of 2019 that there were a lot of issues with this

10  software, the new software?

11  A.   I don't remember him saying specific issues, but I

12  remember him saying that it wasn't working.

13  Q.   Okay.  And by the way, when you went live with the new

14  software, Mr. Garafola, do you remember Mr. Garafola asking if

15  he could see it before it went live?

16  A.   Yes, and he did.

17  Q.   And Mr. Garafola testified that he was told he couldn't

18  look at it.  You don't think that would be accurate?

19  A.   No, I have seen email contrary to that.

20  Q.   What are those?

21  A.   If you like us to provide them, we certainly could.

22          MR. FARSIOU:  That would have been nice, but not now.

23          Judge, I'd like to have two documents marked D-6 and

24  D-7.

25          THE COURT:  What are they?

—————WELCH - CROSS - FARSIOU—————

1    BY MR. FARSIOU:

2    Q.   Sir, if you look at -- Mr. Welch, D-6 is the top of the

3    email, is just one page, and it says "Forward.  I promised

4    myself."

5         Do you see that?

6    A.   Yes.

7    Q.   And D-7 is another email -- and just for the record to be

8    clear, D-6 is an email that is dated May 18, 2019, from Larry

9    Garafola to Carson Schott and Evan Welch.  D-7 is an email

10   dated May 24, 2019, from Mr. Garafola to yourself and

11   Mr. Schott.

12        Do you see that?

13   A.   Yes.

14   Q.   Okay.  These documents were not provided in February,

15   correct?

16   A.   No.

17   Q.   Now, you would agree with me that on D-6, Mr. Garafola is

18   saying that, he promised himself that he would not send any

19   bitching emails but this one had to be sent.

20        Do you see that?

21   A.   Yes.

22   Q.   And he talks about the problems that were going on with

23   respect to the software and the fact that Proxibid is

24   basically taking some sales away.

25        Do you see that?

─────────────── WELCH - CROSS - FARSIOU ───────────────

1   A.   Can I have a second to read through this?

2   Q.   Sure.

3   A.   Okay.  Okay.

4   Q.   So you see the last line where it says, "It's time for a

5   change or we get used to say negative numbers"?

6   A.   Yes.

7   Q.   Mr. Garafola is expressing his frustration with the new

8   software, correct?

9   A.   Yes.

10   Q.   Now -- and you may have not seen it in a while, but you

11   remember getting this?

12   A.   Vaguely, yes.

13   Q.   Okay.  Now, D-7 is another email, May 24th -- these dates

14   are important.  May 24th, Mr. Garafola is -- you'd agree with

15   me that this email is -- well, he states:  "This picture

16   clearly represents when you have people making changes to

17   Equipmentfacts that have no experience in the business."

18        Is that you, Evan, with Carson next to you, and then

19   there's a picture attached to it?  Right?

20   A.   Yes.

21   Q.   It says, "Common sense.  You can't buy it."  Right?

22   A.   Yes.

23   Q.   So obviously you'd agree with me that Mr. Garafola was

24   extremely frustrated with respect to the issues with the new

25   software, right?

────WELCH - CROSS - FARSIOU────

1   A.   Yes.

2   Q.   Okay.  And did you respond to this?

3   A.   I don't know if I did or didn't.

4   Q.   Clearly in May, though, there are some problems with the

5   software, right?

6   A.   I don't see specific problems listed.  I just see him

7   being upset with whatever it is he's upset with.

8   Q.   Okay.  The documents will speak for themselves.

9        And, again, those documents that I just provided you,

10  they were not provided by Sandhills in discovery in this case,

11  correct?

12  A.   No.

13  Q.   Did you think that Mr. Garafola, in May of 2019, do you

14  think he was a loyal employee to Sandhills during that time

15  period?

16  A.   Did I think at that time, or do I think now that --

17  Q.   Yes, yes.

18  A.   At that time?

19  Q.   Yes.

20  A.   Yes.

21  Q.   And the same would go for June of 2019, right?

22  A.   Hum, yes.

23  Q.   I'm going to have four documents marked.

24       MR. FARSIOU:  Have these marked D-8 --

25       Judge, you want me to mark on these what the number

WELCH - CROSS - FARSIOU

1  is?

2  (Defendant's Exhibit D-8 for Identification.)

3  BY MR. FARSIOU:

4  Q.   Mr. Welch, you have those documents in front of you?

5  A.   Yes.

6  Q.   Okay.  Can you just -- for purposes of the record, am I

7  correct that D-8 is a two-page document from Larry Garafola's

8  Equipmentfacts' email to Eric Dyess and Ryan Jacobi?

9  A.   Yes.

10  Q.   And the "re" is "Login to website"?

11  A.   Oh, yes.

12  Q.   And with respect to D-8, this was a document that you

13  guys could have retrieved as well, right?

14  A.   Yes.

15  Q.   It's on Equipmentfacts' email so you could have gotten

16  that, right?

17  A.   I said yes.  Yup.

18  Q.   Now, if you look at the second page, because you have to

19  read the emails from the bottom up, do you know who Cali

20  Claybrook is?

21  A.   No.

22  Q.   If I told you caller Cali is someone from Permian, you

23  don't have anything to dispute that, right?

24  A.   No.

25  Q.   In fact, her email says permianint.com, right?

—WELCH - CROSS - FARSIOU—

1    A.   Yes.

2    Q.   You recognize that as a Permian email address.

3    A.   Yes.

4    Q.   Now, do you see what she says -- that email is May 29,

5    2019, at 10:17 a.m.  Do you see that she's saying, "I noticed

6    y'all's website has changed"?

7    A.   Yes.

8    Q.   And she's having problems logging in.

9         Do you see that?

10   A.   Yes.

11   Q.   And the next email is from Ryan Jacobi.  Who's Ryan

12   Jacobi?

13   A.   A New Jersey employee of Equipmentfacts.

14   Q.   Okay.  And by the way, you remember that Permian was

15   having an auction in June 2019?

16   A.   Yes.

17   Q.   Okay.  Well, you know that because Proxibid was going to

18   be at that auction, right?

19   A.   Yes.

20   Q.   In fact, Proxibid and Equipmentfacts were going to be two

21   providers, software providers -- or not software providers,

22   databases that were going to be there.  Platforms, right?

23   A.   Yes.

24   Q.   Meaning, Permian bidders were going to be able to use

25   either platform.  They could choose which one they wanted to

WELCH - CROSS - FARSIOU

 1    bid off of.

 2    A.    Either bidding software, yes.

 3    Q.    Okay.  Well, it's not a software, but we'll get there.

 4          With respect to -- you see where Mr. Jacobi says that the

 5    old system is no longer active?

 6    A.    Yes.

 7    Q.    And now she's -- basically you see Mr. Dyess, then, gets

 8    involved?

 9    A.    Yes.

10    Q.    Okay.  And he says, "Larry, Ryan has referred us back to

11    Sidney."  Who's Sidney?

12    A.    A sales rep for Sandhills.

13    Q.    How old is Sidney?

14    A.    How old is Sidney?

15    Q.    Yeah?

16    A.    I'm not sure of her exact age.

17    Q.    Do you think she's in her 20s?

18    A.    Probably late 20s, yeah.

19    Q.    Okay.  And he says, "Is that right?  I noticed on

20    Equipmentfacts' homepage there are no oil field categories or

21    subcategories for OilField.  I am concerned about how

22    difficult it is to find the new user registration form from

23    the home page.  We used to" -- it says "used to could link

24    directly to it but now" -- right?  I read that right, right?

25    A.    You're asking if you read that?

WELCH - CROSS - FARSIOU

1   Q.   Absolutely.

2   A.   You read it, yes.

3   Q.   Okay.  Now, not only did I read it, sir, but that's what

4   he said, right?

5   A.   Yeah.  Yes, that's what he wrote, yeah.

6   Q.   Mr. Dyess is having major problems with the new software.

7   Would you agree with that?

8   A.   I wouldn't agree with major problems, no.

9   Q.   Okay.  That's fine.

10       Now, you see that Larry gets involved here and he tells

11  Ryan to walk Cali through the process?

12  A.   Yes.

13  Q.   Okay.  Now, if you go to D-9.

14       D-9 is the same email string except there's a couple

15  added to it.

16       Do you see that?

17  A.   Yes.

18  Q.   Okay.  Now, after -- on the first page, D-9 discusses an

19  email after the one I just read from Mr. Dyess, and Larry

20  writes to Eric, right, Mr. Dyess?

21  A.   Yes.

22  Q.   And he says, "I have Ryan getting you set up.  Your old

23  logins will not work on this new system."

24       Do you see that?

25  A.   Yes.

───WELCH - CROSS - FARSIOU───

 1   Q.   And he's trying to say, hey, this is going to be okay.

 2   We're going to work through it.  We're going to get you

 3   through the process, right?

 4   A.   Can I read that -- just give me one second so I can read

 5   it?

 6   Q.   Sure.

 7   A.   Okay.  Yeah, he's talking about the access to the back

 8   end, yes.  Got it.

 9   Q.   Okay.  And Mr. Dyess responds, the second email on the

10   first page that says, "In Sidney's mass upload spreadsheet,

11   she say that a stock number is a mandatory field.  What is

12   this referring to because we don't use stock numbers and we

13   don't put lot numbers on until a little later.  We were just

14   trying to get some items out there to preview like we have

15   done in the past and plan on uploading the lot catalog number

16   later."

17        Right?

18   A.   Yes.

19   Q.   He's having concerns, again, about what's going on with

20   the software, right?

21   A.   It's a change from the software used previously.

22   Q.   The platform that' he's using, he can't upload his items,

23   right?

24   A.   Because it's changed slightly from what he's used to.

25   Q.   And Larry -- the last email is that Larry talking to --

WELCH - CROSS - FARSIOU

1    or emailing Mr. Dyess.  Again, all from his Equipmentfacts'

2    email, right?

3    A.   Yes.

4    Q.   And he says in the third sentence, "I think it will be

5    much easier for Ryan to explain things than Sidney since he's

6    familiar with what you all did in the past.  I will stay on

7    top of this today."  Right?

8    A.   Yes.

9    Q.   Okay.  You go to D-10, sir.

10   A.   I have a D-11.  Okay, D-10.  Got it.

11   Q.   D-11 is just the one page.  And this is, again, a

12   continuation of this discussion with Mr. Garafola now and

13   Mr. Dyess, right?

14   A.   Yes.

15   Q.   And now we're in June.  It's June 7th, and Mr. Dyess is

16   emailing Mr. Garafola.

17        And if you look at the last paragraph, okay, it says,

18   "Just to give you a heads up, Gary Bergman and I have talked

19   and I know they share the same concerns about the future of

20   Equipmentfacts" -- and it says "were Sandhills is taking it,"

21   meant to say "and where Sandhills is taking that."

22        Do you see that?

23   A.   Yes.

24   Q.   Who is Gary Bergman?

25   A.   I don't know.

WELCH - CROSS - FARSIOU

1   Q.   You don't know who Gary Bergman is?

2   A.   No.

3   Q.   Okay.  If I told you that he's the top guy at Superior

4   Auctions, one of the customers that you claim you lost, do you

5   have anything to dispute that?

6   A.   No.

7   Q.   Okay.  And if you look at top, you see where Mr. Dyess

8   says, "I just got your text.  Not sure what all is transpiring

9   at Sandhills, but our issues are not necessarily with Sidney

10  as much as they are with all," it says "they" -- "the

11  surprises and changes," right?

12  A.   Yes.

13  Q.   "The biggest complaint is that we signed up for

14  Equipmentfacts because it was a platform that fit our needs,

15  was easy to use and quite honestly you made it easy for us,"

16  right?

17  A.   Yes.

18  Q.   Okay.  Now, when I -- this email will speak for itself,

19  but do you agree with me now that Mr. Dyess from Permian is

20  having major issues with the now software?

21  A.   No.

22  Q.   Okay.  D-11.  D-11 is the one page, and you see at the

23  bottom -- now we're at June 9th.  Okay?  June 9, 2019.  And if

24  you go back to D-10, up top after Larry gets this email from

25  Mr. Dyess, he says, "Can I call you in about 30 minutes?"

WELCH - CROSS - FARSIOU

1   Right?

2   A.   Yes.

3   Q.   Okay.  Now, if you go to D-11, the bottom email,

4   June 9th, 2019, at 5:17 p.m. from Mr. Garafola's work email to

5   Mr. Dyess' work email, he says, "Hi Eric.  I just want to

6   mention that I apologize for saying 'I won't be there if

7   Proxibid is,'" right?

8   A.   Yes.

9   Q.   And, again, you test- -- Proxibid is a direct competitor

10  to Sandhills, correct?

11  A.   Yes.

12  Q.   And Equipmentfacts that Mr. Garafola was running for

13  Sandhills was competing with Proxibid, right?

14  A.   Yes.

15  Q.   And you see that Mr. Garafola is saying -- or he told

16  Mr. Dyess at least, "I'm not going to show up to the auction

17  if Proxibid is there," right?

18  A.   Yes.

19  Q.   Do you think he's trying to stick up for Sandhills at

20  that time?

21  A.   I'm not sure.

22  Q.   Okay.  He says, "It was wrong and I will be there

23  regardless of your decision," right?

24  A.   Yes.

25  Q.   Do you remember what that decision was that Mr. Dyess had

————WELCH - CROSS - FARSIOU————

1   made?

2   A.   No.

3   Q.   Okay.  We're at June 9th, and you already read these

4   other emails.  Mr. Dyess had issues with your software and

5   invited Proxibid to be one of the platforms at the auction in

6   June.

7        You don't remember that?

8   A.   No, I remember that.  Yeah.

9   Q.   Okay.  So he says, "I will suck it up like a man.  It's

10  like he's selling a rig and Kruse/RBA is selling to it."

11       Do you know what he meant by that?

12  A.   No.  I'm not going to speculate on what he meant by that.

13  Q.   You don't know who Kruse/RBA is?

14  A.   Yeah, I know what they are.

15  Q.   What are they?

16  A.   They're competing auction companies to Permian.

17  Q.   So what he's saying is, Mr. Garafola is saying is that,

18  it's like you having a competitor selling a rig like these

19  guys selling it next to them, something to that effect, right?

20  A.   Sure.

21  Q.   He's comparing competitors, isn't he?

22  A.   Yeah, I guess.

23  Q.   Okay.  I don't want you to guess.

24       Now, if you go up, this is important, June 10, 2019,

25  Mr. Dyess sends an email to Mr. Garafola, and he says, "No

WELCH - CROSS - FARSIOU

1   apology needed," right?

2   A.   Yes.

3   Q.   And he says, "However, Steve and I did talk and we are

4   still going to allow Proxibid to attend," right?

5        Do you see that?

6   A.   Yes.

7   Q.   Were you aware that Mr. Garafola was trying to get him

8   not to have Proxibid at the auction in June?

9   A.   I'm sure he -- yeah, I mean, it doesn't surprise me.

10  Q.   Mr. Welch, you're -- you testified, this guy, Mr.

11  Garafola, sitting to my left, was your direct report, right?

12  A.   Yeah.

13  Q.   And he told you about the issues with Permian, didn't he?

14  A.   He didn't say any issues specifically.  He just said the

15  system's not working.  Never any feedback on what needed to be

16  improved, never any feedback on what portions of it didn't

17  work or things that needed to change.

18  Q.   Well, we don't know that because we don't have the

19  emails, right?

20       That's your testimony, right?

21  A.   I'm not sure what emails you're referring to there.

22  Q.   Well, the emails that I'm showing you right now are

23  emails on your system that you did not provide, and they

24  provided --

25  A.   Yup.

WELCH - CROSS - FARSIOU

1   Q.   -- a lot of support for the judge to make a decision

2   here.  Okay?

3   A.   There's thousands of emails on our system.

4   Q.   By the way, D-11, did you provide that?

5   A.   No.

6   Q.   Now, do you see in the second email on that page he says,

7   midway through, "I hope you understand and know this is not

8   meant to be a punitive measure at all.  It was us being

9   proactive rather than reactive to some unpredictable forced

10  changes that Sandhills brought on."

11       Do you see that?

12  A.   Yes.

13  Q.   Okay.  "And at the end of it all, we are only concerned

14  about what's best for our consigners and being the best in our

15  industry given the competition that we are all now facing."

16  Right?

17  A.   Yes.

18  Q.   And Larry -- Mr. Garafola writes an email back and says,

19  "Thanks for the email and I totally understand," right?

20  A.   Yes.

21  Q.   Okay.  And he says, "I will make sure we do everything

22  possible to make sure this auction is a success for both of

23  us," right?

24  A.   Yes.

25  Q.   And he is representing Sandhills at that point, correct?

WELCH - CROSS - FARSIOU

1   A.   I mean, yes, but I have questions about what was

2   happening outside of these emails.

3   Q.   Sir, he's talking about the auction in June, isn't he?

4   A.   In these emails, yes.

5   Q.   Okay.  So he's saying, "I will make sure we do everything

6   possible to make this auction a success for both of us,"

7   right?

8   A.   Yes.

9   Q.   Okay.  You don't have any concerns with that email that

10  he's working for someone else, right?

11  A.   The only concern I have is where they talk about text

12  messages and phone calls as to -- because of my concerns on

13  what's going on in that time period leading up to his

14  termination.

15  Q.   Okay.  Well, do you think these emails say anything

16  different than he's going to try to do his best on behalf of

17  Sandhills to make the auction a success for him?

18  A.   These emails, no.

19  Q.   Okay.  Now, I want you to go to P-7.

20  A.   Is that the OilField bidders --

21  Q.   Yes.

22  A.   Okay.

23  Q.   What's the date of that email?

24  A.   June 11th.

25  Q.   Okay.  June 11th is the day after D-11, right?

WELCH - CROSS - FARSIOU

1  A.   Yes.

2  Q.   Okay.  Now, Larry sends this, P-7, from his personal

3  email to his work email, right?

4  A.   Yes.

5  Q.   And if you remember, by looking at the documents that

6  were before you, when we talk about D-8, D-9, D-10, -11,

7  Mr. Dyess from Permian is talking about, hey, I have concerns

8  because I don't see any categories for OilField.

9       Do you see that?

10      You remember that, right?

11  A.   Him saying that?  Yes, but I disagree with it.

12  Q.   Permian is a customer, right?

13  A.   Yup.

14  Q.   Okay.  That's what's your customer is saying.

15      So when Mr. Garafola sends this to him -- his email, his

16  work email, on June 11th, the day after, you have a concern

17  that he did something improper with this?

18  A.   Absolutely.  The fact that that -- that list is on a

19  personal -- coming from a personal email address just proves

20  that he had that at home and it's now being used against us.

21  Q.   Sir, are you aware as to whether or not Mr. Garafola,

22  who's been in the business 20 years prior to coming to

23  Sandhills, had a list of his bidders?

24  A.   Am I aware if he had a list of his bidders?

25  Q.   This is not your document, D-7, is it?  Right?  No.

─────────────── WELCH - CROSS - FARSIOU ───────────────

1   A.   What?

2   Q.   This is not your document, P-7, right?

3   A.   This is not my document.

4   Q.   Let me clarify it for you.  Okay.

5        P-7 was not created by Sandhills.

6   A.   It was Equipmentfacts, which we purchased.

7   Q.   I understand that.  You did not -- Sandhills did not

8   prepare this list, right?

9   A.   I don't know whether we did or didn't.

10  Q.   Well, sir --

11  A.   But the fact that it's on his home email address is a

12  major problem.

13  Q.   Okay.  Well, it's a major problem because he's sending it

14  to his work email that you guys can monitor, and he's trying

15  to help the Permian customer and not -- not hurt Sandhills in

16  the OilField category, I guess.

17  A.   The issue is that it's on his personal email account.

18  Q.   Do you know whether or not this bidder list was used to

19  send out Christmas cards?

20  A.   I have no idea.

21  Q.   Now, this bidder list, obviously, you still have concerns

22  because it was sent from a personal email to his work email.

23  A.   Absolutely.

24  Q.   Okay.  Right.

25       Now -- and you don't think that has anything to do with

1  Mr. Dyess's emails?

2  A.   I don't -- I'm not saying whether it did or didn't.  But

3  the fact that it's on that personal email account is my issue.

4  Q.   Sir, you are aware that Mr. Garafola worked a lot at

5  home, right?

6  A.   He has access to his work email at home as well.

7  Q.   Well, he'd have to get on -- he'd have to use your

8  computer, correct?

9  A.   Not necessarily.

10 Q.   He'd have to get on a secured services, VPN or something?

11 A.   He'd have to log in -- yeah.

12 Q.   Okay.  And if I told you that Mr. Garafola did not --

13 didn't know how to use that system, and he did not use that

14 system for the whole year, do you have anything to dispute

15 that?  When he was at home.

16 A.   I have no idea.

17 Q.   Because remember, when you went to -- when you went to

18 Sandhills on August 1st to retrieve Mr. Garafola's and

19 Ms. Greene's computers, his computer was there, right?

20 A.   Yes.

21 Q.   Okay.  And, again, this email is what you provided,

22 Sandhills provided, in the discovery for this preliminary

23 hearing, right?

24 A.   Yes.

25 Q.   Okay.  Now, I want you to look at -- let's go to P-8.

WELCH - CROSS - FARSIOU

1      Do you remember what P-8 was?

2   A.   Top customer list.

3   Q.   And when was that email sent?

4   A.   June -- well, May 23rd original.

5   Q.   Right.  Well, that's the date of the email, May 23, 2019,

6   right?

7   A.   Yes.

8   Q.   And that was an email between Mr. Garafola and

9   Ms. Greene, right?

10  A.   Correct.

11  Q.   And they were talking about biggest auctioneers, right?

12  A.   Yes.

13  Q.   And in May -- that email in May, knowing what we know

14  from Mr. Garafola's two complaints in D-8 -- sorry, D-6 and

15  D-7 about the system -- right? -- and the emails from

16  Mr. Dyess, you believe that the May 23, 2009, email was a

17  concern?

18  A.   The fact that it was sent out to his personal email

19  address on June 14th is the concern.

20  Q.   Okay.  June 14th?  Okay.

21      Now, with respect to -- with respect to that email, okay,

22  you don't know what Ms. Greene or why Ms. Greene was sending

23  that to Mr. Garafola, correct?

24  A.   No.  Like I said, I'm not taking issue with the email

25  between Marlene and Larry.  My issue is with Larry sending it

WELCH - CROSS - FARSIOU

1   to his personal email account.

2   Q.   Oh, okay.  So you have no problem with that email.

3   A.   If it's being sent to a personal email account,

4   absolutely I do.

5   Q.   Let me ask you this.  Do you have any problems with an

6   email -- the email, the substance of the email?

7   A.   Yes, if it's being sent to a personal email, just

8   absolutely.

9   Q.   I'm -- okay.  So you have an issue with the email in

10  total.

11  A.   That -- yes, it's being sent to -- I don't know how else

12  to answer it.

13  Q.   All right.  You don't believe that the May 23, 2019,

14  email is demonstrating Mr. Garafola working for Sandhills?

15  A.   I don't know.

16  Q.   Okay.  Now, you have all of these emails that you had

17  were concerning to you, and I believe P-9 and P-10 -- do you

18  have those?

19  A.   Yes.

20  Q.   Now, P-9, you'd agree with me, is an email from -- it

21  looks like from Mr. Garafola's personal email -- I'm sorry,

22  from his work email to his Gmail account, right?

23  A.   Yes.

24  Q.   And it says, "Top Bidders," right?

25  A.   Yes.

WELCH - CROSS - FARSIOU

1   Q.   And then it goes on to list the bidders, right?

2   A.   Yes.

3   Q.   And you said, "I have a real problem.  It has rank and

4   bidders number sales," right?

5   A.   Yes.

6   Q.   And P-10 -- and I'm sorry.  I don't know if I said the

7   time, but it was 3:18 p.m. on July 16th, right?

8   A.   Yes.

9   Q.   Then if you go to P-10, there are actually three emails

10  on it.  And you've got to read from the bottom up.  Roselle

11  Denina from Equipmentfacts is sending to Marlene Greene, on

12  April 26, 2019, top bidders, right?

13  A.   Yes.

14  Q.   And the next email is a May 22, 2019, email from

15  Roselle -- I'm sorry, Roselle Denina, D-E-N-I-N-A, to

16  Mr. Garafola's Equipmentfacts' email with a forward of top

17  bidders.

18  A.   Yes.

19  Q.   Okay.  Then the next email is a July 16th email from

20  Roselle Denina, Equipmentfacts' email, July 16, 2019, at

21  9:35 a.m. to Larry Garafola's Equipmentfacts; again, with a

22  forward of top bidders.

23  A.   Yes.

24  Q.   And then you have the email that you're concerned with

25  that's dated July 16, 2019.  And am I correct that the time is

WELCH - CROSS - FARSIOU

1    4:16 p.m.?

2    A.    Yes.

3    Q.    And this is going -- you say you had a concern because

4    this is going to -- I believe you said it was Mr. Garafola's

5    wife's email, personal.

6    A.    Correct.

7    Q.    And that was a concern for you, right?

8    A.    Absolutely.

9    Q.    And I asked you, weren't there emails in between or

10   somewhere in July where someone from Sandhills was requesting

11   Mr. Garafola to provide certain information on top bidders?

12   And you said no, right?

13   A.    I don't remember if I said no.

14   Q.    Well, sir, the concern here is that you think he's taking

15   top bidders for some type of personal use, right?

16   A.    Yes.

17   Q.    Okay.  And my question to you is, and I questioned you

18   before, are you aware of any emails that were in between that

19   indicated someone from Sandhills was requesting this specific

20   information?

21        Your testimony was, "We looked for all the emails

22   throughout the time period and we didn't see them," right?

23   A.    Like I said, I don't know if there was or wasn't, but the

24   issue is is that it's being sent to an outside personal email

25   account.

WELCH - CROSS - FARSIOU

1   Q.   Sir, if Mr. Garafola is working and he's doing work for

2   Sandhills, what does it matter if he's working on a personal

3   email?

4   A.   Because that's going outside of our network.  Major

5   issue.  Huge security breach.

6   Q.   Okay.  And did you have any security issues when Mr. --

7   from Mr. Garafola having his email -- these emails sent home?

8   A.   Can you repeat that question?

9   Q.   Did you have any security problems based off of

10  Mr. Garafola sending these types of emails home?

11  A.   I'm not following -- do we think that's a problem?  Yes,

12  absolutely.

13  Q.   Okay.  Sir, you'd agree with me that there are emails on

14  the Sandhills system where Mr. Garafola is communicating with

15  people from Sandhills on his personal email?

16  A.   I don't know whether there is or isn't.

17  Q.   Did anyone say to Mr. Garafola, hey, don't do that, don't

18  do that, that's a security breach?

19  A.   I have no idea.

20  Q.   Let's just cut to the chase.

21       You guys produced D-9 and D-10 because you want the judge

22  to believe that Mr. Garafola was using this list for his own

23  personal interest to start another business, right?

24  A.   He was, yes.

25  Q.   Well, that's your testimony, sir, right?

WELCH - CROSS - FARSIOU

1   A.   Yes.

2   Q.   Okay.  And I asked you if you had emails in between where

3   someone from Sandhills requested this information, and you

4   said no, right?

5   A.   I don't know whether we did or didn't.

6   Q.   Well, sir, don't you think that would be relevant?

7   A.   No, because the fact that these are being sent to an

8   outside email address is the issue, not whether they were

9   requested within our work space.

10  Q.   Well --

11  (Defendant's Exhibit D-12 for Identification.)

12  BY MR. FARSIOU:

13  Q.   Sir, do you have D-12?

14  A.   Yes.

15  Q.   Now, we just talked about D-11.  I'm sorry.  We just

16  talked about P-9 and 10.

17       You would agree with me that on P-10 the email that

18  you're worried about is the one to his wife on July 16, 2019,

19  at 4:16 p.m.?

20  A.   Yes.

21  Q.   Okay.  And D-12 was not provided by Sandhills, but do you

22  see that this email is from Larry Garafola's Equipmentfacts

23  email?

24  A.   Yes.

25  Q.   To Carson Schott?

*38*

WELCH - CROSS - FARSIOU

1    A.   Yes.

2    Q.   What's the subject line?

3    A.   "Top Bidders Highlighted."

4    Q.   Okay.  The same list that he's been requesting, right?

5    A.   Yes.

6    Q.   When I mean "him," Mr. Garafola requesting the top bidder

7    list.

8    A.   Yes.

9    Q.   And if you look, that's at what time in the afternoon?

10   A.   4:27 p.m.

11   Q.   Okay.  Now, you didn't have this email.  You didn't see

12   this email, or you chose not to see it, before you filed the

13   first lawsuit against Mr. Garafola; isn't that correct?

14   A.   Right.  Like I said, we monitored the emails going to

15   Mr. Garafola's Gmail account.  And, again, the issue is that

16   it's going to his Gmail account.

17   Q.   That's not the issue, sir.

18   A.   Absolutely it is.

19   Q.   The issue, sir, that you testified to and you told this

20   Court in your papers and in your complaint was that these

21   documents were being used by Mr. Garafola to start a competing

22   business.

23   A.   Yup.

24   Q.   That's what you did.

25   A.   Yes.

┌─────────────────────────────────────────────
WELCH - CROSS - FARSIOU

1   Q.   Okay.  And you based it off of P-5, which was an email

2   from Marlene Greene, from a Permian advertisement that did not

3   have Mr. Garafola's name on it at all, correct?

4   A.   Correct.

5   Q.   And P-6 was the email where Mr. Garafola has a

6   conversation saying, hey, I may be able to do this, let's

7   meet, right?

8   A.   Yes.

9   Q.   And you have no idea whether or not he met, you have no

10  other emails between Mr. Garafola and anybody from Bidpath on

11  your system, right?

12  A.   No other emails, no.

13  Q.   No other emails.

14       And you don't know -- you can't testify, because you

15  can't speculate, but Mr. Garafola never worked for Bidpath,

16  never worked for Bidfacts?

17  A.   I don't believe that to be true.

18  Q.   Okay.  Well, it's interesting that he's not doing that

19  but on July 16th, when he's getting these bidders list all in

20  the same day, he then sends a bidder list to Mr. Schott from

21  Sandhills.  And do you see what he did on the document that

22  are attached?  There are highlights to it.

23       Do you see that?

24  A.   Yes.

25  Q.   And those highlights are telling Mr. Carson about the top

WELCH - CROSS - FARSIOU

1   bidders, right?

2   A.   Yes.

3   Q.   Mr. Schott.  I'm sorry, Mr. Schott.  And that's

4   S-C-H-O-T-T, right?

5   A.   Yeah, I don't know what they're telling him but...

6   Q.   Let me ask you a question.  Did you ever ask Mr. Schott

7   about this email?

8   A.   No, I have no problem with the email to Carson.  My

9   problem is to the email to his Gmail and it going outside of

10  our system and it being used against us.

11  Q.   Sir, I want to remind you that you are under oath.  Okay?

12  A.   I'm aware.

13  Q.   Okay.  I take that very seriously.  Okay?

14  A.   As do I.

15  Q.   You should.

16       These documents, if you had D-12, if you had D-12, which

17  you did, it's on your system, you didn't produce it, and you

18  certainly filed these documents to make it look like

19  Mr. Garafola was using this improperly.

20  A.   He was.

21  Q.   It's your testimony.

22  A.   He was.

23  Q.   Okay.  Except the documents don't add up.  They don't add

24  up because he's sending this document to Mr. Schott.  A

25  document that he had created previously that you may have

WELCH - CROSS - FARSIOU

1    purchased.  Okay?  But this is not a document that he was

2    using improperly.  He sent it to Mr. Schott.

3    A.   He sent it to his Gmail.  Improper.

4    Q.   No doubt about it.  Yes, he did.

5         But you don't have any idea if he's working from home,

6    right?

7    A.   Like I said, he can work from home on his Equipmentfacts'

8    email address.

9    Q.   So let me tell just -- so for the Judge's edification,

10   are we here today because you have a concern with Mr. Garafola

11   having use of his personal email for work?

12   A.   I have a concern with our information being sent to his

13   personal email.

14   Q.   Okay.  That's the issue, right?  Now that's the issue for

15   this case?

16   A.   It's one among many.

17   Q.   Okay.  If you go to P-11, sir.

18        Do you have that?

19   A.   Yes.

20   Q.   P-11 is -- if you -- you talked about it.  It's July 18,

21   2019.

22   A.   Correct.

23   Q.   7:38 p.m., right?

24   A.   Yes.

25   Q.   And Garafola sent it from his work email to his personal

—————WELCH - CROSS - FARSIOU—————

1   email, right?

2   A.   Yes.

3   Q.   Okay.  Now this "welcome" document is a packet, right?

4   A.   Yes.

5   Q.   You're not claiming that this is proprietary information,

6   are you?

7   A.   Yes.

8   Q.   Okay.  So this document -- by the way, you'd never seen

9   this document prior to August.

10  A.   I don't know whether I have or hadn't.

11  Q.   You don't know what your proprietary information looks

12  like?

13  A.   All of it?  No.

14  Q.   Okay.  Well, would you agree with me that this document

15  is something that's provided to auctioneers and sales reps to

16  understand how to work the system?

17  A.   Yes.

18  Q.   Okay.  And you'd agree with me it's a how-to manual,

19  basically.  How to do certain things, how to log on to the

20  system.  How to use the Bidpath software, right?

21  A.   It's not directly just Bidpath.  The engine can be

22  changed out and the materials around it would still be the

23  same.  There may be differences, but...

24  Q.   Sir, when you look at this document, can you tell what

25  software is being used?

1      And when I say "used" in this document meaning, what

2  software is this "Welcome" email pertaining to?  What

3  platform?

4  A.   On the first few pages, I haven't seen anything

5  referencing what software is being used.

6  Q.   Okay.  And it talks about -- if you go to the bottom,

7  114, is the Bates stamp number on the bottom right?

8  A.   Okay.

9  Q.   Do you see where it says "Go to the auctioneer login page

10  at www.equipmentfacts.com"?

11  A.   Yes.

12  Q.   This -- and, again, I want to make sure I'm right, this

13  document is provided to auctioneers, right?

14  A.   I don't know whether it's been provided to auctioneers or

15  not.

16  Q.   Well, the auctioneers are the customers that utilize the

17  platform, right?

18  A.   Aspects of it, yes.

19  Q.   What aspects do they not use?

20  A.   Well, a lot of times our sales rep will upload the

21  inventory for them or they may manage certain aspects of the

22  auctions for them, so they're not interacting with all parts

23  of the auction.

24  Q.   Okay.  This manual, though, is what we're talking about.

25  Okay?

WELCH - CROSS - FARSIOU

1    A.   Okay.

2    Q.   You would agree with me -- if you want to look through

3    it, look through it -- this manual is a how-to, how to work

4    the platform with Equipmentfacts and Bidpath.

5    A.   Like I said, I don't see any references to Bidpath in

6    these first few pages.

7    Q.   Okay.  You have no idea.  You have no idea.

8         But my question to you is, since you're the --

9    Mr. Garafola's direct report, is after an auction, do you

10   require -- does Sandhills require that auctioneers provide

11   this information back?

12   A.   Like I said, I don't know whether they have it or not.

13   Q.   Sir, do you see where it says "Go to the auctioneer login

14   page"?

15   A.   Yes.  Yeah.

16   Q.   The platform that you, Sandhills, provided when it was --

17   and Equipmentfacts even now is, hey, this is how to use the

18   platform to upload invoices.  This is how you use the system.

19   This is how you login.  This is how you upload inventory,

20   right?

21   A.   Yes.

22   Q.   This is the manual that we're talking about.  "Welcome to

23   Equipmentfacts."

24   A.   Again, auctioneers aren't always going to do every aspect

25   of that.  The sales rep, a lot of times, will do that for

WELCH - CROSS - FARSIOU

1  them.  So whether or not this has been used with a customer, I

2  don't know.

3  Q.   Well, sir, you've got to know.  We're here for a

4  preliminary injunction.  You claim that this document is

5  proprietary information.  If it's going out to auctioneers and

6  they're using this to use your system, how is that

7  proprietary?

8  A.   It has our copyright on the bottom.

9  Q.   You mean it says copyright on it, right?

10  A.   It has our copyright.

11  Q.   Okay.  So do you ask for it back?

12  A.   Like I said, I don't know that it ever went out.

13  Q.   By the way -- okay.

14      So this is for auctioneers but we say, hey, we may not

15  send it out, right?

16  A.   Again, this is as much for sales rep as it for anyone.

17  Q.   Who are the customers of Equipmentfacts?

18  A.   Auctioneers.

19  Q.   Okay.  Go to P-12, sir.

20      You already testified about this document.

21      Do you see where it says -- well, let's be clear for the

22  record.  Ryan Jacobi, July 25th, 2019, email at 7:47 a.m., to

23  Mr. Garafola's personal email.  And it says "Manuals" -- it

24  says "/12."  I think it meant to say 1/2, but that's what the

25  document says, right?

WELCH - CROSS - FARSIOU

1   A.   Yes.

2   Q.   Now, what is your understanding as to what this document

3   is?

4   A.   It's just more manuals on how to conduct an auction.

5   Q.   Okay.  How to conduct an auction through the Bidpath

6   platform, right?

7   A.   It has references to Bidpath, yes.

8   Q.   Okay.  Now you would agree with me that if P-11 and P-12

9   pertain to the Bidpath software or platform, that platform

10  would be outdated and not applicable to Sandhills in July of

11  2019?

12  A.   No, there's a lot of aspects that are still applicable to

13  Sandhills.  All you're doing is changing out the engine and

14  how these manuals, how you would interact with it.

15  Q.   So your testimony is that a manual that has software or a

16  platform that Sandhills is no longer using would still be very

17  relevant, right?

18  A.   Yes, because it's still about setting up the auction.

19  You can change out the engine, but it's still about the nuts

20  and bolts of setting up an auction.

21  Q.   But it wouldn't say what the new system is, right?

22  A.   What?  I'm not following you.  What's the question?

23  Q.   If you kept the manual the same, it wouldn't have the new

24  system on it, right?

25  A.   You could interchange out the new system and it would

WELCH - CROSS - FARSIOU

1   be -- yeah.

2   Q.   So your testimony isn't that Bidpath and BidCaller are

3   the same exact program, are you?

4   A.   They're the engine that's running the auctions, the

5   software.

6   Q.   The software that runs the auction.

7   A.   The software.

8   Q.   Okay.  So the platforms that run the auction, are you

9   saying that Bidpath's platform and BidCaller's platform are

10  the same?  You don't need to tweak it at all?

11  A.   The nuts and bolts of the software, they're very similar,

12  yes.

13  Q.   Sir, are they the same?

14  A.   Are they exactly the same?

15  Q.   Can you answer that question?

16  A.   They're both online auction software.

17  Q.   Sir, the nuts and bolts of the platforms, Bidpath,

18  BidCaller, are they the same exact nuts and bolts?

19  A.   The same exact?  No, they're not exactly the same, no.

20  Q.   Okay.  You would agree with me that Sandhills wouldn't

21  want manuals that they provide to their customers, these

22  auctioneers, that had the wrong platform on it, right?

23  A.   We wouldn't them?  Absolutely, we want them.  They're our

24  proprietary information.

25  Q.   It's very important -- if you don't understand my

WELCH - CROSS - FARSIOU

1    question, I need you to tell me.  Okay?

2    A.    Okay.

3    Q.    The question is very specific.  Okay?  And I'll -- you

4    know what?  Maybe I'm doing a bad job so I'll try to be more

5    specific for you.

6         With respect to the manuals that we're talking about,

7    P-11 and P-12 so far, you would agree with me that if the

8    manuals discuss and provide information to auctioneers, or

9    even sales reps, of how to operate and upload the system, the

10   platform under Bidpath, that's not something that you want.

11   You want it changed to the proper system that you're using

12   now.

13   A.    Everything that's around that, yes, it's still -- it's

14   still important to us because it's how you interact with

15   whatever software you're using, whether it be Bidpath or

16   BidCaller.

17   Q.    You would want your manuals to be tailored to the system

18   that you're using, right?

19   A.    I mean, you want to make the changes on what software

20   you're using?  Sure.

21   Q.    Okay.  Well, one of the things that Mr. Garafola was

22   tasked with was running -- well, not one thing.  He was tasked

23   with running Equipmentfacts.  That's what you testified to on

24   February 6th, right?

25   A.    Yes.

WELCH - CROSS - FARSIOU

1   Q.   Okay.  And part of that is to make sure that the

2   documents are updated, right?

3   A.   Yeah.

4   Q.   Isn't that what Mr. Jacobi and even Lawrence Garafola,

5   Junior, weren't they doing that in New Jersey?

6   A.   Again, my issue is it's being sent to a Gmail account.

7   Q.   Sir, answer the question.

8   A.   I don't know.

9   Q.   You have no know what they were doing?

10  A.   No.

11  Q.   Okay.  So with respect to the emails, you would agree,

12  then, that they needed to be changed to correspond with the

13  correct system that Sandhills was using at the time.

14  A.   Sure.

15  Q.   Okay.  And you wanted to do that after the system got the

16  kinks out, as you called them, right?

17  A.   Like I said, I don't -- nobody ever -- I didn't

18  personally tell anybody to update these.

19  Q.   So he was being a good employee, then.  He was up dating

20  them on his own, right?

21  A.   I'm not going to speculate on what --

22  Q.   I don't want you to speculate.  I don't want you to

23  speculate.  Okay.

24      Let's go to P-13.  P-13 is an email, July 25th, 2019,

25  7:50 a.m., from Ryan Jacobi to Mr. Garafola's personal email,

WELCH - CROSS - FARSIOU

1   and it says, the re line or subject line is:  "Manuals 2/2,"

2   right?

3   A.   Yes.

4   Q.   He says, "Here's the link to downloaded our video

5   tutorials," right?

6   A.   Yes.

7   Q.   Now, this Dropbox -- and I think there's another -- we'll

8   get to it, but would you agree with me that this Dropbox was

9   the equipmentfacts.com Dropbox?

10  A.   Yes.

11  Q.   Okay.  And that was something that you knew about, right?

12  A.   Yes.

13  Q.   And with respect to the tutorials, the tutorials are for

14  who?

15  A.   For, again, it's probably going to be very similar to the

16  manuals.  For sales reps, it may be used with customers as

17  well.

18  Q.   Well, it would definitely be used for the auctioneers,

19  right?

20  A.   I don't know.  Like I said, I don't know if we've used

21  the tutorials for the auctioneers.

22  Q.   Well, let's be fair, let's be fair and let's -- you have

23  never run an auction, right?

24  A.   Oh, yes, I have.

25  Q.   Oh, you have?

WELCH - CROSS - FARSIOU

```
1    A.    Yes.

2    Q.    So you don't know whether or not a tutorial would go to

3    the auctioneers?

4    A.    I didn't use the tutorial when I ran them, the auction I

5    ran, no.

6    Q.    Are you an auctioneer?

7    A.    No, I ran the software.  I clerked it.

8    Q.    Well, I'm asking you whether or not you're an auctioneer.

9    A.    Oh, no.

10   Q.    Okay.  And you would agree with me that, again, it talks

11   about "Go to the auctioneers login page at

12   equipmentfacts.com."

13         Just take a look at it.

14   A.    It's very similar to the manuals we reviewed, yes.

15   Q.    Right.  And the tutorial -- now, by the way, this is

16   proprietary, right?

17   A.    Yes.

18   Q.    You wouldn't -- you would not load tutorials up on a

19   YouTube page, right?

20   A.    It depends on what it was.  I don't know.  It would

21   depend on what the content was.

22   Q.    Let's talk about it.

23         These tutorials that you have for customers and sales

24   reps, would you put that up on a YouTube page?

25   A.    Like I said, it would depend on the content of them.
```

WELCH - CROSS - FARSIOU

1    There's probably some that we would.

2    Q.   Is P-13 -- so I don't know what "some" is.

3         Is P-13 proprietary?

4    A.   Yeah.

5    Q.   Okay.  And P-13, you don't know whether or not P-13 was

6    updated for the Bidpath -- I'm sorry, for the BidCaller

7    platform?

8    A.   I don't know.

9    Q.   Okay.  When you guys -- when I say "you guys," and,

10   again, just so the record is clear, P-12 and P-13 were

11   forwarded by you to Alex Essay on August 6th of 2019, right?

12   A.   Yes.

13   Q.   And, again, I have one question for you, if you go back

14   to P-11.

15        Can we assume that P-11, since we don't have the email up

16   top, was provided on the same day, August 6th of 2019?

17   A.   I don't know whether it was or wasn't.

18   Q.   Okay.  So P-13, you don't know if these needed to be

19   updated either, right?

20   A.   I don't know, without reviewing.

21   Q.   Now, P-13 -- P-13 is different because it's for timed

22   auctions, right?

23   A.   I don't think it's just for timed auctions, from what I'm

24   seeing.  It looks like it's a little bit of everything.

25   Q.   If you go to P-14.

WELCH - CROSS - FARSIOU

1    A.   Okay.

2    Q.   P-14 is the -- another email on the same date, July 25th,

3    2019, from Mr. Jacobi, 7:52 a.m., to Mr. Garafola's personal

4    email.  It says "Subject:  PowerPoints 1/2," right?

5    A.   Yes.

6    Q.   Now, you also provided this for the Judge to consider

7    that Mr. Garafola was absconding and doing -- using this

8    information, this proprietary information, for improper

9    purposes, right?

10   A.   Yeah, I believe he was using this to set up

11   Equipmentfacts 2.0.

12   Q.   And with respect to this PowerPoint, do you know whether

13   or not this PowerPoint pertains to the Bidpath platform or the

14   BidCaller platform?

15   A.   I don't know without reviewing it.

16   Q.   So if I told you that -- if you look at pages -- well,

17   let's go to 302?

18   A.   You said 302.

19   Q.   Yes, sir.  Wait a second.  I'm sorry.

20        I'm sorry.  Go to 280.

21   A.   Okay.

22   Q.   And just looking at that, you can't tell what platform is

23   being used, right?

24   A.   No.

25   Q.   What about if you go to 301, 302, and 303.

WELCH - CROSS - FARSIOU

```
 1  A.   Okay.

 2  Q.   Do you know what platform is being used?

 3  A.   I don't know.

 4  Q.   And do you know where this -- you see this 301 has a

 5  plant there?

 6  A.   Yes.

 7  Q.   You don't know where that plant came from, do you?

 8  A.   No.

 9  Q.   And, again, these would have been manuals -- or I'm

10  sorry, tutorials that teaches people visually how to use

11  Equipmentfacts on a certain platform, right?

12  A.   Yes.

13  Q.   Okay.  And you don't know whether or not it's Bidpath.

14  A.   No.

15  Q.   And you don't whether or not Mr. Garafola wanted them so

16  that he could change them to the new software, right?

17  A.   Like I said, the fact is these are going to a personal

18  email address, that's the issue.

19  Q.   Well, see, sir, that can't be the issue because what you

20  have told this Court is that it's not that he's sending it to

21  a personal email, it's that he's sending it to a personal

22  email and using it improperly, right?

23  A.   Yes.

24  Q.   Okay.  Now, you have no idea whether or not he was

25  revising them for the new system, right?
```

WELCH - CROSS - FARSIOU

1    A.   I have a pretty good idea of why he was using them.

2    Q.   That's speculation, though, right?

3    A.   I'm not speculating.

4    Q.   Tell me what evidence you have.

5    A.   I have the email of him setting up the new business on

6    July 6th or 7th or whatever.

7    Q.   Okay.

8    A.   I have all this interaction with these customers.  I have

9    these customers ultimately going to Facts Technology and using

10   that platform.

11   Q.   Okay.  Let's stop right there.  Who went to Facts

12   Technology?

13   A.   Permian.

14   Q.   Okay.  Let's be very clear.  Okay?  Your testimony is

15   what it is, and this Judge needs to understand that, right?

16   You're not changing your testimony.  Okay.  Permian, right --

17   you talked about Permian?

18   A.   Yes.

19   Q.   You saw Mr. Dyess's certifications, right?

20   A.   Yes.

21   Q.   And you testified that Permian left Sandhills to go to

22   who?

23   A.   They did go to Proxibid for a time, but they ultimately

24   ended up on Facts Technology.

25   Q.   Did they leave Sandhills for Facts Technology?

WELCH - CROSS - FARSIOU

```
 1   A.   Yes.

 2   Q.   Sir, I'm going to remind you one more time that you're

 3   under oath.

 4   A.   Just because they stopped -- they used Proxibid in

 5   between using Facts Technology does not change the fact that

 6   ultimately they went to Facts Technology.

 7   Q.   That's not the question, sir.  It's a very specific

 8   question.

 9        Did Permian leave Sandhills and go directly to Facts

10   Technology?

11   A.   I believe they did.

12   Q.   How?  What evidence do you have?

13   A.   I think that they had the deal set up and they used

14   Proxibid for a time and then went to Facts Technology in order

15   to create some sort of barrier.

16   Q.   Well, that's not what you think.

17   A.   Oh, yes, it is.

18   Q.   That's not what your first complaint says.  Your first

19   complaint says that my guy right here, he's working for

20   Bidpath, that's your --

21   A.   Bidfacts.

22   Q.   Bidpath which owns Bidfacts, right?

23   A.   That was originally, yes.

24   Q.   Which -- well, no, no, no.  That's what you based the

25   complaint on, right?
```

WELCH - CROSS - FARSIOU

*1*  A.   Yeah --

*2*  Q.   So hear me out.

*3*  A.   Okay.

*4*  Q.   Under your theory here, which is pure speculation,

*5*  Mr. Garafola said, hey, to Mr. Dyess in June of 2019, hey,

*6*  leave Sandhills, I'm going to go to -- I'm going to Facts

*7*  Technology, I'm going to create Facts Technology.  But before

*8*  that, I'm going to pretend I'm going to Bidpath but I'm not

*9*  really going to go there, right?

*10*  A.   It's pretty clear what happened.  They go to Bidfacts, we

*11*  file a suit.  Then all of a sudden Larry goes to

*12*  Equipmentfacts -- or to Facts Technology.  We file a suit,

*13*  then all of a sudden, it's whack-a-mole.  It's moving from one

*14*  thing to another trying to find a way to work with our

*15*  customers.

*16*  Q.   Sir, what you just said not only does not make -- doesn't

*17*  make any sense, but you don't have any evidence to prove that.

*18*  A.   I have plenty of evidence.

*19*  Q.   And the bottom line is -- and I asked you this last time,

*20*  when you had this genius thing of going down to New Jersey

*21*  with Mr. Essay on August 5th, getting everybody's computer,

*22*  after you already got my guy's computer on August 1st, you

*23*  guys, I believe, you said you sent it to a -- you sent it to a

*24*  third-party expert?

*25*  A.   Uh-huh.

—————————WELCH - CROSS - FARSIOU—————————

1   Q.   Okay.  And your testimony was that the computers were

2   wiped, right?

3   A.   Larry Garafola's, Junior, computer was wiped completely.

4   Larry Senior's was mass deletion of documents.

5   Q.   Now, just to go back, before I get to the issue you just

6   brought up, because that's an important issue too, the answer

7   to my question is that Permian did not go directly from

8   Sandhills to Facts Technology; isn't that correct?

9   A.   I believe that they went from --

10  Q.   Sir, just answer the question.

11  A.   I believe they did.

12  Q.   Okay.  So you're changing your testimony from

13  February 6th?

14  A.   No.

15  Q.   Okay.  Well, let's look at your testimony.  Because I

16  don't want you to take this -- and I understand your oath that

17  you took here today and that you took on February 6th.

18          MR. MILLER:  Steve, what page?

19          MR. FARSIOU:  Hold on.  I didn't realize he was going

20  to do this.  So hang on a second.

21          If you go to page 211.  I don't have an extra copy,

22  but I'll show it to you.

23          THE WITNESS:  Okay.

24  BY MR. FARSIOU:

25  Q.   And on line 19 my question is:  "And Mr. Dyess hopefully

1   will be providing testimony, but your position is that you

2   lost Permian because of him, right?"

3        And I meant Mr. Garafola, right?

4   A.   Yes.

5   Q.   "Answer:  Yes.

6        "Question:  Now, is it your testimony that Permian left

7   Equipmentfacts and went directly to Mr. Garafola?

8        "Answer:  No."

9        So do you want to stick to this, or do you want to stick

10  to the one you just testified to?

11  A.   Look, did he use Proxibid?  Yes.  Do I believe that there

12  was a deal in place prior to him moving to Proxibid in order

13  to work with Larry directly?  Yes.

14  Q.   That's your theory, right?

15  A.   No.

16  Q.   Your burden, my friend.  It's your burden in this

17  hearing.

18       You've provided no evidence for Judge Shipp to make a

19  decision based on what you just said.

20  A.   The fact is Larry is doing business with Permian today,

21  which is a direct violation of the covenant.

22  Q.   Okay.  Well, that's actually not correct, but with

23  respect to my question, you want to stick to your answer from

24  February 6th?

25  A.   I just explained my answer.

WELCH - CROSS - FARSIOU

1   Q.   No.   Your answer is that no, he didn't go directly to

2   Equipmentfacts -- I'm sorry, he didn't go directly to

3   Mr. Garafola.  In fact --

4        "Question:   Okay.  You're aware they went somewhere else,

5   right?

6        "Answer:  Yeah.

7        "Question:  Where did they go?

8        "Answer:  Proxibid as well."

9        Right?

10  A.   Right, they were on Proxibid.

11  Q.   That's where they went right, sir, right?

12  A.   They're with Facts Technology today.

13  Q.   Now, you also testified -- you just did again, and I

14  think it's very important that we discuss this because what

15  you -- the testimony is that my client and his son -- anybody

16  else who you claim wiped their computers?

17  A.   I can't recall if anyone else did.

18  Q.   Well, I think this is very important because the judge

19  needs to know what kind of conduct we're talking about here.

20       So I just want to look at your testimony regarding the

21  equipment being wiped.  If you go -- I have page 43, it starts

22  there, and Mr. Miller asked you a question and it says -- if

23  I'm going to start here it goes to -- and your attorney will

24  tell me if I'm reading it wrong.

25       Question on line 21:  "And after that confiscation,"

WELCH - CROSS - FARSIOU

1   talking about the computers, "did you do anything relative to

2   it?

3       "Answer:  Yes, we bought it home and implored a

4   third-party, 12 Points, to do a forensics IT analysis of the

5   devices."

6       Right?

7   A.   Yes.

8   Q.   That's correct.

9       "Question:  And did you receive findings from that

10  analysis?

11      "Answer:  Yes.

12      "Question:  And generally speaking, what were those

13  findings?

14      "Answer:  That the equipment had been wiped."

15      That was your testimony.

16  A.   Yeah.

17  Q.   And you're going to stick to that, right?

18  A.   Yes, I'm referring to Larry and Larry Junior's, yes.

19  Q.   All right.  Well, let's just say it's Larry and Larry

20  Junior's.

21      By the way, when you sent it to 12 Points, you told them

22  to look at all of the computers.

23  A.   Yes.

24  Q.   And what you're saying is what the guy came back with is

25  that Mr. Garafola, Senior, and Junior's computers had been

WELCH - CROSS - FARSIOU

1   wiped.

2   A.   That Larry Garafola, Junior's, had been wiped completely,

3   that there was mass deletions on Larry Senior's.

4   Q.   And he provided those -- he provided those findings to

5   you and some people else at Sandhills?

6   A.   Sure, yes.

7   Q.   So on page 197, I had asked you, the question was, on

8   line 12.

9        "Okay.  Mr. Garafola's computer wasn't wiped, was it?

10       "Answer:  I don't know a terminology wiped.  He deleted

11  many documents on the computer, yes.

12       "Question:  There were other computers that you had that

13  were completely wiped; is that what you're saying.

14       "Answer:  Yes."

15       So when you said other computers, you just meant Larry,

16  Junior?

17  A.   Larry, Junior is the one I was talking about

18  specifically.

19  Q.   "Question:  Was Mr. Garafola's computer completely wiped?

20       "Answer:  I don't know what you'd say was completely

21  wiped, but they were -- all documents were deleted off of it."

22  A.   Yup.

23  Q.   All documents were deleted?

24  A.   Mass deletion of documents.

25  Q.   Okay.  Now, you further testified on this issue, on page

─────WELCH - CROSS - FARSIOU─────

1    231, line 15.  I'm sorry, line 13.

2        "Question:  And then you provided these laptops and cell

3    phones to who?

4        "Answer:  To 12 Points.

5        "Question:  Is that a third-party company?

6        "Answer:  Yes.

7        "Question:  And did they -- did you get an investigation

8    report?

9        "Answer:  We didn't get a report.  We got a summary of

10   what they found.

11       "Question:  Was it a written summary?

12       "Answer:  I'm not sure if it was written or not."

13       Is that still correct you didn't --

14   A.   Yeah.

15   Q.   Now, do you remember in the first lawsuit, you filed a

16   certification?

17   A.   Yes.

18   Q.   And you also -- well let's look at that real quick.

19           MR. FARSIOU:  D-13.

20   (Defendant's Exhibit D-13 for Identification.)

21   Q.   The document in front of you has been labeled D-13, and

22   it is a declaration of Evan Welch that was filed on August 27,

23   2019; am I correct?

24   A.   Yes.

25   Q.   This was the document or the declaration that you filed

WELCH - CROSS - FARSIOU

1    in the first lawsuit based on the documents that you guys had

2    retrieved and found in your investigation of Mr. Garafola,

3    Senior, correct?

4    A.   Yes.

5    Q.   Now, do you see, if you look on the first page, Number 4,

6    this talks about the August 1st, 2009, trip to Flemington,

7    right?

8    A.   Yes.

9    Q.   And this was based off of P-5 -- I'm sorry.  Yeah, P-5,

10   which was the email that Marlene Greene was on from Permian,

11   correct?

12   A.   Yes.

13   Q.   And again, Mr. Garafola wasn't on that advertisement,

14   correct?

15   A.   Correct.

16   Q.   And you then go to 5.  The purpose of this trip was to

17   secure the Sandhills' issued cellular phone and laptop from

18   Larry Garafola, Senior and Marlene Greene for further

19   investigation, right, that's what you did?

20   A.   Yes.

21   Q.   Number 6 says on August 2nd, 2019, you submitted it to

22   your IT department for further examination, right?

23   A.   Yes.

24   Q.   And then, it looks like number 7 talks about the email

25   that you found, which is P-6?

WELCH - CROSS - FARSIOU

1  A.   Yes.

2  Q.   Now, you say that the discovery of this email in July,

3  which has been labeled P-6 in this hearing, the discovery of

4  this information prompted the need for a second visit to the

5  Flemington, New Jersey office the next business day, on

6  August 5th, 2019, right?

7  A.   Correct.

8  Q.   That's when you went on August 15th, 2019, with Mr. Essay

9  and you informed the employees in the New Jersey office that

10  they were immediately suspended?

11  A.   Correct.

12  Q.   And you then collected all of their laptops and cell

13  phones?

14  A.   Yes.

15  Q.   So at that point in time on August 5th -- now, I know you

16  got to fly back but on August 5th you had everybody's

17  computer, right?

18  A.   Correct.

19  Q.   And Number 9, you say that "Upon returning to our

20  corporate office in Nebraska, a computer forensic imaging

21  consultant determined that there had been a mass deletion or

22  removal of information from Mr. Larry Garafola, Junior

23  Sandhills' issued computer on or about July 31st, 2019,"

24  right?

25  A.   Yes.

WELCH - CROSS - FARSIOU

1   Q.   Now, what's really important here is that all of the

2   computers had been analyzed and this is what the forensic

3   expert came up with, right?

4   A.   This is the one they said was wiped.

5   Q.   Sir, he says that -- you say, I'm sorry.  You say that

6   the computer forensic imaging consultant determined that there

7   had been a mass deletion or removal of information from Larry

8   Garafola, Junior's Sandhills issued computer on or about

9   July 31st, 2019, right?

10  A.   Yeah, but that's not the complete report.

11  Q.   Well, the report wasn't written, right?

12  A.   Correct.

13  Q.   But you're saying that the report provided more

14  information to Sandhills that other people had deleted stuff

15  off of computers?

16  A.   It contained other information.

17  Q.   So why didn't you put it in your certification?

18  A.   I don't know.

19  Q.   You say "Upon review of other employees' computers, we

20  discovered communications between Sandhills Flemington, New

21  Jersey's employees and Bidpath," right?

22  A.   Correct.

23  Q.   Now, as of -- let's say, July 16th, 2018, to the end of

24  April of 2019, Equipmentfacts, under the Sandhills' empire was

25  using the database of Bidpath?

─────WELCH - CROSS - FARSIOU─────

1   A.   Was using the database, the software?

2   Q.   The platform?

3   A.   The software.

4   Q.   Yeah, the platform?

5   A.   Yes.

6   Q.   Okay.  So when you say "We discovered communications

7   between Sandhills Flemington, New Jersey employees of

8   Bidpath..." which, by the way, you don't say "Bidfacts," you

9   say "Bidpath," right?

10  A.   Yeah.

11  Q.   So when were they, who were they with and what were they

12  about?

13  A.   The email with David Brindley of Bidpath.

14  Q.   Sir, you already discussed that in your certification?

15  A.   Yeah.

16  Q.   At the end is Number 10, that's the comment that you

17  made?

18  A.   Yeah.  And it's referring to the email between Marlene

19  Greene, a Sandhills' Flemington, New Jersey employee, Larry

20  Garafola, a Sandhills' Flemington, New Jersey employee and

21  Bidpath, David Brindley.

22  Q.   So that's the -- when you say "other communications," you

23  mean --

24  A.   It doesn't say "other communications."  It says

25  "discovered communications."

WELCH - CROSS - FARSIOU

1   Q.   Okay.  Just so we're all clear.  Number 10 simply refers

2   to P-6?

3   A.   Off the top of my head, yes.  There may be more.  But

4   that clearly is conversation between -- communications between

5   Sandhills' Flemington New Jersey employees and Bidpath.

6   Q.   You don't say Larry Garafola, Senior, you don't say Larry

7   Garafola, Junior, and you don't say Marlene Greene.  So this

8   insinuates that there were other people in the office

9   communicating with Bidpath.  That's what it says?

10  A.   I don't read it that way.

11  Q.   Just so we're clear, so the judge knows, Number 10 simply

12  pertains to P-6.

13  A.   It definitely pertains to P-6.  It may pertain to more.

14  I don't know.

15  Q.   Okay.  Well, the problem with that statement is we're

16  here for a preliminary injunction where you have the burden of

17  proof for the Court to enter extraordinary relief of a

18  preliminary injunction.  You have not provided anything else

19  other than P-6.  Am I correct?

20  A.   Anything -- we provided plenty of other --

21  Q.   Sir.  Sir.  Focus on the question.  Talking about

22  communications, okay.

23  A.   Okay.

24  Q.   Communications with Bidpath.  The only communication that

25  you have provided to this Court is P-6?

WELCH - CROSS - FARSIOU

1   A.   Between Bidpath and Sandhills' Flemington, New Jersey

2   employees, is that the question?

3   Q.   Yeah.

4   A.   Yes.

5   Q.   No other emails have been provided?

6   A.   No.

7   Q.   Now, based off of that certification, in the first

8   lawsuit, Sandhills had a certification from a person by the

9   name of Shawn Kasal, right?

10  A.   Kasal, yes.

11  Q.   Who's that?

12  A.   That's a third-party at 12 Points -- third-party forensic

13  IT analyst.

14  Q.   And his declaration was for what purpose?

15  A.   What purpose was his declaration for?

16  Q.   Yeah?

17  A.   The forensic analysis of the computers, of the hardware.

18  Q.   To say to the Court, to Judge Shipp, this is what I

19  found, right?

20  A.   Yes.

21       THE COURT:  Counsel, before you start, we're going to

22  take a morning break.  It's 11 o'clock.  We've been going for

23  an hour and a half.  We'll take a 15-minute break, and we'll

24  resume at 11:15.

25       THE DEPUTY COURT CLERK:  All rise.

WELCH - CROSS - FARSIOU

1          (Recess at 11:03 a.m.)

2          THE DEPUTY COURT CLERK:  All rise.

3          (Open court begins at 11:18 a.m.)

4          THE COURT:  Please be seated.

5          Okay.  Mr. Farsiou.

6          MR. FARSIOU:  Okay.

7     Q.   Mr. Welch, I just provided you D-14.  Do you have that in

8     front of you or no?

9     A.   Yes.

10    Q.   D-14 is a declaration of Shawn Kasal.  And it's not dated

11    but it was filed on August 27, 2019.

12         Do you see that?

13    A.   Is this for the first case?

14    Q.   Well, you didn't file one of these in the second case?

15    A.   I'm not sure.

16    Q.   This is the person that did the forsenic analysis and

17    investigation of all the computers, correct?

18    A.   Yes.

19    Q.   And he says, on August 23, 2019, I ran a forensic imaging

20    report on Larry Garafola, Junior's Sandhills issued computer.

21         Do you see that?

22    A.   Yes.

23    Q.   But he also reviewed the other computers, right?

24    A.   I assume so.

25    Q.   Okay.  He didn't provide a certifications with respect to

WELCH - CROSS - FARSIOU

1    any other computer that he saw that he thought had been

2    manipulated in any way, correct?

3    A.   For the first case?

4    Q.   First case, yup?

5    A.   I -- nope, it doesn't look like it.

6    Q.   What about the second case?

7    A.   I'm not sure.

8    Q.   Okay.  And he says "Upon my inspection, it's clear that a

9    mass deletion or removal of information occurred on Larry

10   Garafola, Junior's computer on or about July 31st, 2019,"

11   right?

12   A.   Yes.

13   Q.   Now, he didn't say that his computer was wiped, does he?

14   A.   I don't know.  It sounds like wiped to me, mass deletion

15   of -- yeah.

16   Q.   You think that says wiped?

17   A.   I think -- I think -- you're splitting hairs.  I think

18   it's the same thing.

19   Q.   Okay.  And he says that "Based on my determination that

20   information had been deleted, I have concluded that a

21   reasonable investigator could find that a user had reinstalled

22   the windows operating system and application on July 31st,

23   2019.  One of the reasons why this could have been done was as

24   a malicious action to destroying data," right?

25   A.   Yes.

WELCH - CROSS - FARSIOU

1    Q.   Now, the only person that Mr. Kasal found to be

2    suspicious was Larry Garafola, Junior, right?

3    A.   The only one he put a declaration in for the first case

4    was Larry Garafola, Junior.

5    Q.   Let's just cut to the chase.  There is no other evidence

6    provided by Sandhills from a forensic expert other than what

7    Mr. Kasal has provided in this certification that's in front

8    of you, D-14, correct?

9    A.   I don't agree with that, no.

10   Q.   Who's the other forensic expert that you have?

11   A.   We don't have any other forensic expert.

12   Q.   Did you hear the question, sir?

13   A.   Yes, I answered it.

14   Q.   Let me rephrase it.  What other forensic expert did

15   Sandhills hire for this case?

16   A.   No other forensic expert.

17   Q.   What other forensic expert did Sandhills hire for the

18   second case?

19   A.   No other forensic expert.

20   Q.   And what other forensic expert or report or

21   declaration -- I should say declaration, there is no report --

22   has Mr. Kasal provided?

23   A.   No other declaration.

24   Q.   Okay.  So, this is the evidence that's in the record that

25   has to do with Larry Garafola, Junior's computer, correct?

WELCH - CROSS - FARSIOU

1   A.   The record of the first case.

2   Q.   Sir, do you have a forensic expert for the second case?

3   A.   We have a forensic expert, yes.

4   Q.   Has that forensic expert provided a report or a

5   declaration in this case?

6   A.   Report?  Yes, we did hear reports, yes.  A declaration,

7   no.

8   Q.   Are you saying that you have a forensic expert report for

9   the second case?

10  A.   I'm saying that the forensic expert provided us feedback

11  on everybody's computers.

12       MR. FARSIOU:  Judge, I can't -- I can't -- I know what

13  your Honor gave me on a time limit, but this is deliberate.

14          THE COURT:  Counsel, you're asking two different

15  questions.

16          MR. FARSIOU:  No, I'm not.

17          THE COURT:  Ask a different question.

18  BY MR. FARSIOU:

19  Q.   Is the same forensic expert, Mr. Kasal, being retained

20  for this case today?

21  A.   He was retained to review all the -- all the computers.

22  Not necessarily the one case or the other.

23  Q.   Sir, is Mr. Kasal the only forensic expert that Sandhills

24  has retained?

25  A.   Yes.

WELCH - CROSS - FARSIOU

1   Q.   Okay.  Now, I asked you a very specific question.  Let's

2   try it again.

3        Did Mr. Kasal provide any other declaration in the first

4   case or the second case?

5   A.   Declaration, no.

6   Q.   Okay.  Did Mr. Kasal provide a written report in either

7   case?

8   A.   I'm not sure if it was written or verbal, but we got a

9   report of everything -- the findings, yes.

10  Q.   You never provided a written report to our side, did you?

11  A.   No.

12  Q.   Okay.  And with respect to the evidence that's before

13  Judge Shipp, with respect to a declaration or any type of

14  expert analysis, it's D-14, correct?

15  A.   Declaration for case one, yes.

16  Q.   Because you have no declaration in case two, right?

17  A.   We have no declaration in case two.

18  Q.   And this declaration was based on what his findings were?

19  Mr. Kasal's findings were, right?

20  A.   Yes.

21  Q.   Okay.  And I think your testimony was he found other

22  stuff too, right?

23  A.   Yeah.

24  Q.   Okay.  But he didn't provide a declaration on that,

25  right?

WELCH - CROSS - FARSIOU

1    A.   No, he did not.

2    Q.   That wasn't important, right?

3    A.   I didn't say that.

4    Q.   Well, you didn't provide it to the Judge, right?

5    A.   I didn't provide a declaration on it, no.

6    Q.   So, did you ever ask Mr. Garafola, Junior what he

7    deleted?

8    A.   No.

9    Q.   And to this day, you don't know what he deleted, right?

10   A.   No.

11   Q.   Okay.  And with respect to Mr. Garafola, Junior, if I

12   told you that he utilized his computer, his Sandhills'

13   computer to store pictures with respect to videography and

14   pictures that he does with a GoPro camera, do you have any

15   reason to dispute that?

16   A.   I don't know what -- do I have any reason to dispute

17   that?

18   Q.   Yeah.

19   A.   No.

20   Q.   Do you have any evidence to dispute it?

21   A.   No.

22   Q.   Okay.  If I told you that Larry Garafola, Junior has won

23   awards and has a very active hobby of working with GoPro and

24   doing these professional type videos or photos, do you have

25   any reason or any evidence to dispute that?

———WELCH - CROSS - FARSIOU———

1    A.   No, but I don't see how it's relevant.

2    Q.   Well, that's what was deleted, sir.

3         If you remember, Mr. Garafola, Junior filed an

4    unemployment application, didn't he?

5    A.   Yes.

6    Q.   And Sandhills objected to it, right?

7    A.   Yes.

8    Q.   And what happened to that application?

9    A.   I don't know.

10   Q.   Okay.  You have no idea?

11   A.   No.

12   Q.   If I told you that Mr. Garafola explained to the

13   unemployment board that the photos that were deleted were

14   GoPro photos and there's files of them and they awarded him

15   benefits, you don't have any reason to dispute that, do you?

16   A.   I don't have any reason to dispute that.  Again, this is

17   all pertaining to case one, so I'm not really sure of the

18   relevance.

19   Q.   Okay.  As long as you don't know, that's fine.

20        If you go to -- so the other evidence that we discussed,

21   briefly, the first time, is that you believe was manipulated

22   in some way, was all the way up to -- I believe we said in the

23   beginning it was P-7 through P-17, right?  And that's all in

24   front you have, right?

25   A.   P-7, the email between Brindley, Marlene, and Larry?

WELCH - CROSS - FARSIOU

1    Yes.

2    Q.   And then P-8 through P-17, right?

3    A.   Yes.

4    Q.   And with respect to that, you don't have any evidence in

5    this case as to whether or not Larry was utilizing that for

6    Sandhills' purposes.  You already testified to that, right?

7    A.   Actually, there's been some things that have come to

8    light since the last time I was in court so I became aware of

9    some more evidence of Larry actually in attendance at the

10   National Auctioneer Association soliciting business from other

11   auctioneers for Equipmentfacts 2.0 telling them that he was

12   going to go out on his own.

13   Q.   Well, sir, who told you that?

14   A.   Jeff Martin.

15   Q.   Okay.  Jeff Martin -- do you have a relationship with

16   Jeff Martin?

17   A.   Yes.

18   Q.   If I told you that Jeff Martin said he has never talked

19   to you about Larry Garafola and his split with Sandhills,

20   would he be lying?

21   A.   I talked to Jeff last night, so I'm aware that --

22   Q.   Answer the question, sir.  Would he be lying?

23   A.   He's not lying.  He doesn't -- the conversation we had

24   about Larry is eight months old.

25   Q.   Do you understand the question?

─────────────── WELCH - CROSS - FARSIOU ───────────────

1   A.   Well, he had a conversation with me about it the last

2   two days in addition to the one he had eight months ago.

3   Q.   So you're saying that if that was the case, Jeff Martin

4   would be lying?

5   A.   I'm not speculating whether he's a liar or not.

6   Q.   It's a very simple question.

7   A.   He and I had a conversation about it --

8   Q.   Sir, let me ask the question again.  And I want you to

9   answer the question, not what you want to answer.

10       The question is very specific.  If Jeff Martin said "I

11  didn't talk to Evan Welch about Larry Garafola and his split

12  with Sandhills," would he be lying?

13  A.   He did talk to me about it and he knows he talked to me

14  about it, and we had a conversation about that as recent as

15  last night.

16  Q.   Sir, did you understand the question?

17  A.   Yes.

18  Q.   So, is the answer to my question:  Yes, he would be

19  lying?

20  A.   What he told Larry is between he and Larry.  And he may

21  have not wanted to have the conversation with Larry, but he

22  absolutely remembers the conversation.

23  Q.   That's not the question I asked you, sir.

24       If Jeff Martin said, in court here, I didn't speak to

25  Evan Welch about Mr. Garafola and his split with Sandhills,

WELCH - CROSS - FARSIOU

 1  would he be lying?

 2  A.   If he said in court here, would he be lying?  Yes.

 3  Q.   Okay.  Now, by the way, are you friends with Jeff Martin?

 4  A.   Yup.

 5  Q.   Do you recall a time where Jeff Martin told Mr. Garafola

 6  to tell you to go F yourself?

 7  A.   Not me, but I know what the conversation you're referring

 8  to.

 9  Q.   Okay.  Now, you just testified that this new evidence was

10  found because I'm assuming that -- did Jeff Martin tell you

11  that Mr. Garafola had solicited business at the convention in

12  New Orleans?

13  A.   Yes.

14  Q.   And if I told you that Mr. Garafola told Mr. Brindley, in

15  New Orleans, that he could not work with him.  You have no

16  evidence to dispute that other than what you're saying Jeff

17  Martin said, right?

18  A.   And this email.

19  Q.   How come Jeff Martin didn't provide a certification?

20  A.   We didn't ask him for one yet.

21  Q.   So that evidence, what you just said, is pure hearsay and

22  pure speculation on your part, right?

23  A.   No.

24  Q.   Okay.  Now -- and you don't remember Mr. Garafola,

25  Junior, his unemployment action being -- you're not aware that

WELCH - CROSS - FARSIOU

1 he was awarded benefits and that the unemployment board did

2 not believe Sandhills reason, right?

3 A.   I'm not aware either way.

4 Q.   Now, if you go to P-8, sir.

5      P-8 is an email that is dated -- there's emails dated

6 May 23, 2019.  Then, the top email is an email from Larry

7 Garafola's work email being forwarded to his Gmail on

8 June 14th, 2019, right?

9 A.   Yes.

10 Q.   And this was a concern for you why?

11 A.   Because it's our top seller list being sent to his

12 personal email address.

13 Q.   Okay.  And again, you said your issue is that it was

14 going to a personal email address and it was a security issue,

15 right?

16 A.   It's -- yeah, it's out there in his personal email

17 address, yes.

18 Q.   And do you recall whether or not this email, this

19 May 23rd, 2019 email was requested by yourself and Mr. Schott

20 with respect to how to retain clients and potentially offering

21 discounts because there was a belief that Proxibid was

22 offering discounts?

23 A.   Like I said, my issue isn't the email being sent.  My

24 issue is the email going out to Larry's personal Gmail account

25 which I testified to earlier.

WELCH - CROSS - FARSIOU

1   Q.   So this case, now, has turned into your issue, Sandhills'

2   issue, being simply that the emails were sent to a personal

3   email account?

4   A.   One of the issues.

5   Q.   What's the other issue?

6   A.   He started a competing business and is doing business

7   with our customers which is in direct violation of the

8   covenants of our agreement.

9   Q.   Okay.  And we're going to talk about that because you

10  have a tortious interference claim, right?

11  A.   Yes.

12  Q.   And you're not an attorney.  You already testified to

13  that, but let's talk about that.

14       You testified that you lost two clients, right?

15  A.   There's two clients that I've testified to.  There's

16  more, but, yes.

17  Q.   Sir, you understand you have to provide proof to the

18  judge so that he can grant a preliminary injunction.  You

19  can't just say, hey, we lost more clients but you don't know

20  who they are.  You testified -- your attorney asked you the

21  question and you said "We lost two clients: Permian and

22  Superior."  That's what you said?

23  A.   That's two of them, yes.  There's more.

24  Q.   Who are they?

25  A.   Berryhill Auctions for one.  There's been others that

─────WELCH - CROSS - FARSIOU─────

1    have done business with him at some point or another that we

2    lost a portion of the business, not the whole thing, which is

3    just as much damage as losing the customer completely.  Those

4    would be Adesa, Wolfe Industrial, Shetron.  At one point,

5    Vicari.  There's several.

6    Q.   Are you changing your testimony from February 6th?

7    A.   I'm not changing my testimony.  I gave two examples and

8    here I gave more.

9    Q.   Two examples --

10   A.   Previously.

11   Q.   Sir, what evidence do you have to support any of the

12   other people that you already just talked about?

13   A.   They were on the competing platform that Larry was

14   working with.

15   Q.   And they left -- you have evidence that they left

16   Sandhills to go to Mr. Garafola?

17   A.   The simple fact that they were using it is competitive

18   with us.

19        MR. FARSIOU:  Judge, I want this evidence and this

20   testimony stricken from the record.  There is no evidence in

21   this record whatsoever.  Mr. Welch's testimony has now

22   changed, and it's becoming a joke.  His testimony has changed.

23   And this is not fair -- this is not even close to being fair

24   to Mr. Garafola.

25        THE COURT:  Counsel, as you're aware, this is only an

─────WELCH - CROSS - FARSIOU─────

1   evidentiary hearing so you don't need to strike testimony.

2   You can just move to have it disregarded, but you don't need

3   to strike it.  There is no jury that's going to evaluate it.

4   It is what it is.  And at this point, I'm not entertaining any

5   motion to strike any evidence from the record.

6   BY MR. FARSIOU:

7   Q.   Mr. Welch, I asked you the last time -- and this is on

8   page 143.  I asked you a very specific question.

9        "Question:  Now, with respect to what you just testified

10  because this is what we're really here for, a preliminary

11  injunction, and it details what type of losses that you have,

12  damages.  Now, I just want to make sure that I'm correct.  You

13  had testified that Permian is a customer that you lost,

14  correct?

15       "Answer:  Yes, we talked about this already."

16       You -- you -- I don't want to repeat it because -- well,

17  I have to repeat it.

18       "Question:  And you believe that you directly lost

19  Permian because of Mr. Garafola, correct?

20       "Answer:  Yes.

21       "Question:  And by the way, you testified that you saw

22  Mr. Dyess's certification in this case, right?

23       "Answer:  Yes.

24       "Question:  Okay.  He didn't -- do you know what

25  technology he uses for his company?

WELCH - CROSS - FARSIOU

1      "Answer:  If you got a copy of the document with that,

2   I'd like to see the headings.

3      "Question:  It's not in the document.  If I told you that

4   he uses Proxibid, would that surprise you?

5      "Answer:  No."

6      And you testified that's he's -- that's what he used when

7   he left Sandhills, right?

8   A.   He's using Proxibid and Facts Technology.

9   Q.   Sir, answer the question, okay.  When Mr. Dyess and

10  Permian left Sandhills, they directly went to Proxibid,

11  correct?

12  A.   I've answered the question several times.  I don't know

13  how else to answer.  Or just because --

14  Q.   You did answer it, and your answer was yes?

15  A.   Okay.

16  Q.   Now, you say question -- on page 144, okay.

17     "Question:  Okay.  With respect to Permian, you lost that

18  client and I believe you said you believed that it would be

19  around $147,000.  Is that what you're saying?

20     "Answer:  Yes.

21     "Question:  And Superior..."  And I called it wrong.  Is

22  it Superior Options?  You said, Auctions.

23     I said, "You're claiming that your lost their business;

24  is that right?

25     "Answer:  Yes.

─────WELCH - CROSS - FARSIOU─────

1    "And you believe that Superior is doing business with Mr.

2    Garafola?

3    "Answer:  At one time, yes.

4    "Question:  They're not doing business with Mr. Garafola

5    currently, are they?

6    "Answer:  I'm not sure on that."

7    Is it your testimony that Superior did work with Mr.

8    Garafola at all?

9    A.   My testimony is I believe there is a working relationship

10   and they will -- if they -- they are doing business in some

11   way, shape, or form today.

12        MR. FARSIOU:  I'd like to have marked as D-15.

13   (Defendant's Exhibit D-15 for Identification.)

14   Q.   Before you look at that, sir, your testimony with respect

15   to Superior doing work with Mr. Garafola, that is pure

16   speculation?  You have no evidence to support that, right?

17   A.   I'm not speculating.  It's the same playbook that we saw

18   with Permian, so I feel like I do have ample evidence showing

19   what's going to happen here.

20   Q.   What's going to happen where?

21   A.   With this relationship with Superior?

22   Q.   Okay.  Well, the question was:  You have no evidence and

23   you've provided no evidence to this Court other than your

24   thoughts that Superior is doing work or did work with Mr.

25   Garafola?

WELCH - CROSS - FARSIOU

1    A.   It's the exact same playbook that we saw with Permian

2    where the sales rep, Sidney Scott, was boxed out of the

3    relationship four weeks prior to him being terminated.  They

4    leave us, go to Proxibid, and then, boom, show up on one of

5    the platforms that Larry comes up with.

6    Q.   Sir, I don't know if you're having a hard time hearing

7    me, but the question was really simple.  You can shake your

8    head all you want, okay, but you can't get up there and just

9    answer however you feel like.

10        The question is very simple.  I want to know what

11   evidence, other than your subjective thoughts, that you have

12   provided to this Court that proves, proves, you have the

13   burden, proves, that Mr. Garafola did work with Superior

14   Auctions?

15   A.   He took over the account, he went out and visited the

16   customer, four weeks later, he's terminated, the customer

17   leaves right out the door with him.

18   Q.   Okay.  Did you understand the question?

19   A.   Yes.

20   Q.   That's your evidence?

21   A.   That's the playbook.

22   Q.   Is that your evidence?

23   A.   Yes.

24   Q.   You have any documents, any emails, anything to show

25   that?

WELCH - CROSS - FARSIOU

```
 1  A.   Not here with me, no.

 2  Q.   Anybody tell you that?  Any third person say, hey, by the

 3  way, Evan?

 4  A.   I reviewed his travel records.  I know he went out and

 5  saw Superior four weeks prior to termination.  I know he took

 6  over that account.  I know he boxed out the sales rep.

 7  Q.   How do you know that?

 8  A.   Because I went and looked.

 9  Q.   So he took over the account.  How much money did Mr.

10  Garafola make from Superior?

11  A.   I have no idea what he's made from Superior.

12  Q.   Sir, I called Mr. Jim Ritchie, okay.  And Mr. Ritchie was

13  more than willing to provide a certification.  I'm assuming

14  that you and Mr. Richie don't have a good relationship -- do

15  not have a good relationship?

16  A.   I don't have a bad relationship.  I don't even know him.

17  Q.   You don't even know what he looks like, right?

18  A.   No.

19  Q.   So I want you to look at his certification that he

20  signed.

21  A.   Okay.

22  Q.   You see what he says?

23  A.   Yes.

24  Q.   Number 3, I've been advised that Evan Welch from

25  Sandhills testified on February 6, 2020, that Superior stopped
```

WELCH - CROSS - FARSIOU

1  doing business with Sandhills and opened an account with Facts

2  Technology.  That was your testimony?

3  A.  Yes.

4  Q.  No evidence to support that, just you're assuming

5  playbook, right?

6      He says, Mr. Welch's testimony is false.  To date,

7  Superior has never done business with Facts Technology or

8  Larry Garafola since Superior terminated its relationship with

9  Sandhills in or around August 2019.  In fact, Mr. Welch and

10  the others at Sandhills are well aware that Superior has never

11  done business with Facts Technology.

12      You don't believe that, right?

13  A.  What?

14  Q.  You don't believe what he said, right?

15  A.  No.  I fully believe that they're doing business in some

16  capacity.

17  Q.  I don't know what the disconnect is, sir.  You heard the

18  question or no?

19  A.  Yes.

20  Q.  So the answer to my question is you don't believe Mr.

21  Ritchie?

22  A.  No.

23  Q.  And do you see what Number 5 says?  Superior stopped

24  doing business with Sandhills because our sales representative

25  was not knowledgeable and the new online bidding software that

WELCH - CROSS - FARSIOU

1   Sandhills began using was confusing and not effective for the

2   auction services we needed?

3   A.   Yeah, I see it.

4   Q.   Okay.  You don't believe that either?

5   A.   No.

6   Q.   In addition, Sandhills' inventory upload process with its

7   new online bidding software was not suitable for all auctions,

8   right?

9   A.   Yes.

10  Q.   You don't believe that either?

11  A.   Uh-uh.

12  Q.   And it says, Sandhills was well aware that we were very

13  unhappy with their new online bidding software.  You don't

14  believe that either, right?

15  A.   I don't know.

16  Q.   Okay.  You don't know.

17       All right.  Then it says, Number 8, when Superior

18  terminated its relationship with Sandhills, we hired Proxibid

19  which is a direct competitor of Sandhills.

20       Do you have any evidence to prove that that statement is

21  not correct?

22  A.   It's the same playbook that we saw with Permian.  Go to

23  Proxibid for a sale and then ultimately end up on one of

24  Larry's platforms.

25  Q.   Sir, do you have any evidence to support your statement?

WELCH - CROSS - FARSIOU

1   A.   I went through all the evidence that I have.

2   Q.   What evidence did you provide that has a document that

3   says that Superior is doing work with Mr. Garafola?

4   A.   I don't have a document with me.

5   Q.   You have what he said, right?

6   A.   Yes.

7   Q.   Okay.  And you didn't get that from anywhere, did you?

8   A.   Yes, I went and reviewed the records.

9   Q.   Oh, you reviewed the records, but you didn't call Mr.

10   Ritchie, right?

11   A.   No.

12   Q.   You didn't say, Mr. Ritchie, hey Jim, you working with

13   Larry, right?

14   A.   That relationship left with Larry.

15   Q.   How do you know you didn't call him?  Yeah, it's funny,

16   right?  Like last time?

17   A.   I'm not laughing.

18   Q.   Number 9, Sandhills was well aware that we hired Proxibid

19   as our new online bidding software provider and that we had

20   nothing to do with Facts Technology.

21        Do you have any evidence to dispute that?  Other than

22   what you just testified to?

23   A.   Do you have any evidence to support that?

24   Q.   Well, this is his certification, sir.  He reviewed it and

25   signed it?

─────── WELCH - CROSS - FARSIOU ───────

1  A.   Sure.

2  Q.   So that's my evidence.  You don't have a certification of

3  Mr. Ritchie, do you?

4  A.   No.

5  Q.   You don't have anything in writing or from anybody to

6  come up here and say, hey, I know Superior did business other

7  than your subjective thoughts?

8  A.   Again, I feel like I've seen this playbook before.  I

9  have seen this playbook before.  I know what's going to

10  happen.

11  Q.   The answer is yes?

12  A.   No.

13  Q.   Okay.  Tell the judge.  Tell him what you have?

14  A.   I think I -- I went through it several times.  I don't

15  know how you want me to answer it.

16  Q.   Well, you haven't provided anything.  You haven't

17  provided any evidence.  You haven't provided a certification.

18  You've provided nothing.  Your subjective thought --

19  A.   Is there a question --

20  Q.   -- your subjective thought as to Superior doing work with

21  Facts Technology is speculation?

22  A.   I believe I've answered the question.  I don't know how

23  else you want me to answer it.

24  Q.   The answer is you have no proof, other than your

25  subjective thoughts.  That's what you testified to.

WELCH - CROSS - FARSIOU

1        If you have something, let's hear it, or let's see it.

2        Am I correct, that Sandhills does not enter into a

3   licensing software agreement with its customers?

4   A.   We do offer licensing agreements.  We do offer licenses.

5   Q.   You have an agreement for a software license?

6   A.   Oh, it depends on what it is, but, yes, we do have some

7   agreements with licenses.

8   Q.   You would provide that to the Court if you have it,

9   right?

10  A.   Oh, I wouldn't -- I mean, I wouldn't even know like of

11  what.  What would be my reason to provide that to the Court?

12  Q.   See, that's the problem.  You don't even know why we're

13  here, do you, sir.  You have no idea what we're here for?

14       As you sit here today, Sandhills does not have a

15  licensing software agreement with auction companies, does it?

16  A.   We're talking about auction services; is that what you're

17  asking?

18  Q.   Can you answer the question?

19  A.   You have to be more clear.

20  Q.   I'll ask it again.  Obviously, you don't understand it,

21  so I'll ask it again.

22       Does Sandhills execute a licensing software agreement

23  with auction companies?

24  A.   A licensing software agreement?  Like, a written

25  licensing software agreement; is that what you're asking?

WELCH - CROSS - FARSIOU

1    Q.   Yeah.

2    A.   No.

3    Q.   Okay.  Now, with respect to -- I think you said Machinery

4    Trader, you had that little PowerPoint presentation.

5         Do you remember that?

6    A.   Yes.

7    Q.   Machinery Trader is a publication, isn't it?

8    A.   Website, publication.  It's all inclusive.

9    Q.   Okay.  It's a publication that would -- if I wanted to

10   advertise a piece of equipment or something, I can put it into

11   Machinery Trader, right?

12   A.   Online, as well as in print.

13   Q.   Okay.  I'm just talking about, if, like, for example,

14   Machinery Trader is not a platform, Machinery Trader is a

15   publication, right?

16   A.   It's a platform.  There's a website.  It's a website and

17   a publication.

18   Q.   Does Machinery Trader do auctions?

19   A.   Yes.

20   Q.   Through what?

21   A.   Through Equipmentfacts and through AuctionTime.

22   Q.   Does Machinery Facts (ph.) have its own platform besides

23   Equipmentfacts?

24   A.   I don't know.

25   Q.   And that would be for the rest of the items that you had

WELCH - CROSS - FARSIOU

```
 1   up on the screen, those are publications that you're saying, I
 2   guess, use the Equipmentfacts platform; is that what you're
 3   saying?
 4   A.   Again, websites and publications.
 5   Q.   You think that's important.
 6        And we talked about before that you had signed several
 7   certifications where you said or declarations, as they're
 8   called, that you had become aware of, right?  Become of aware
 9   of solicitations, things like that, right?
10   A.   Yes.
11   Q.   And that was -- you testified to that because Sandhills
12   was monitoring emails through an email hosting system for its
13   customer and you put a filter on it for Sandhills' purposes of
14   looking for Larry Garafola emails?
15   A.   That was one of several channels that I was aware of
16   solicitations from.
17   Q.   But you used your customers' email system to do that,
18   right?
19   A.   We host the email, so we used our email system.
20   Q.   Your testimony is very clear on that from the first day,
21   so I'm not going to go outside of that.
22        I had talked to you, though, about what Sandhills'
23   privacy policy was.  And I didn't have it on me at the time.
24   You didn't seem to be sure about it.  But I asked you whether
25   or not the privacy policy permits Sandhills to monitor emails
```

—WELCH - CROSS - FARSIOU—

1   of their customers for their own benefit and purpose.

2       And I asked you whether or not the clients knew what you

3   were doing?  And you said, I don't know if they know what

4   we're doing.  That's the same testimony, right?  You're not

5   changing that, are you?

6   A.   Yeah, I'm not changing that, no.

7   Q.   And you didn't know -- your testimony was: I don't know

8   if it's legal, but I don't know if it's illegal either, right?

9   A.   If my attorney said that it's not legal, then, to me,

10  it's not legal.

11  Q.   I didn't ask that question.  And I didn't ask that

12  question on February 6th.

13      You said, I haven't been told it's illegal either, right?

14  A.   Right.

15  Q.   Now, I want to show you two documents that I pulled off

16  of your website.

17          MR. FARSIOU:  D-16 and D-17.

18  (Defendant's Exhibit D-16 and D-17 for Identification.)

19          MR. FARSIOU:  Judge, the only one I have is a

20  highlighted version.  There that's why.  I knew I had it.

21  Thank you.  There you go.

22          So the record is clear, the witness has been handed

23  D-16, which states it's Sandhills Global privacy policy.  And

24  then, D-17, it says Sandhills Global privacy policy.  And then

25  up top it says auctiontime.com.  It looks like a bracket and

—— WELCH - CROSS - FARSIOU ——

```
 1   then a privacy policy.

 2   Q.   Looking at D-16, does that look familiar to you?

 3   A.   16, no.

 4   Q.   Okay.  Does D-17 look familiar to you?

 5   A.   17, it looks like AuctionTime's -- I believe it's

 6   AuctionTime's How to Guide, but I'm not sure.

 7   Q.   How to Guide?

 8   A.   Yes.

 9   Q.   You see where it says privacy policy?

10   A.   Yes.

11   Q.   So, this is what's on your website, do you know that,

12   sir?

13   A.   I don't know whether it is or isn't.

14   Q.   Okay.  And this is what Sandhills states with respect to

15   their privacy policy.  And I'm assuming this privacy policy

16   talks about the customers that it has when they're using their

17   platforms and hosting their emails and hosting their websites,

18   right?

19   A.   I don't know what it's referring to.

20   Q.   All right.  Well, let's talk about it.

21        It says "Sandhills Global understands the concerns" --

22   this is D-16 -- "people have about privacy and safety while

23   using the internet.  This privacy policy explains what

24   information we gather from visitors, how we use that

25   information, and the steps we take to protect your privacy,"
```

WELCH - CROSS - FARSIOU

1   right?

2   A.   Yes.

3   Q.   And if you look at the first bullet point, the last

4   sentence, "Sandhills Global will not collect information from

5   you if you do not want us to collect it."

6   A.   This is visitors of the site, not people we host email

7   for that have opted into a service.

8   Q.   Yeah, but you said you don't have any agreements though,

9   right?

10  A.   Not on email, no.

11  Q.   So, this is just -- what is the policy for then?

12  A.   I assume this is for visitors to the site.  Visitors

13  through the site registration.

14  Q.   Do you know whether or not this is on the website that

15  you host and the emails that you host?

16  A.   Again, I don't know if it is or isn't.  I wouldn't have

17  anything to dispute that it is.

18  Q.   This is your policy.  I'm assuming that it's pretty

19  straightforward, across the board, right?

20  A.   I don't know.

21  Q.   Well, you have an agreement that says Sandhills Global

22  will collect information from you that you don't want us to

23  collect?

24  A.   This is pertaining to visitors to the site.  It has

25  nothing to do with email hosting whatsoever.

WELCH - CROSS - FARSIOU

1   Q.   Sir, do you know if you have a policy that would

2   contradict this statement?

3   A.   I don't know.

4   Q.   Okay.  You don't know.  And then you see in the second

5   bullet point in the middle, it says "Sandhills Global does not

6   perform any individual analysis of this data and are not

7   interested in individual information," right?

8        Do you see that?

9   A.   Pertaining to visitors to the site, yes.

10  Q.   Where does it say that on this policy?

11  A.   It says Sandhills collects information from visitors to

12  the site registration; that's what it's pertaining to.

13  Q.   And that's site registration is through what?  The

14  website hosting?

15  A.   No, not through the website hosting.  Through visitors to

16  our website.

17  Q.   Is this policy any different then what you would tell

18  people if you wanted us to host your email or host your

19  website?

20  A.   We don't provide anything to them when we host their

21  email or website.

22  Q.   You don't say anything to them?

23  A.   About the privacy policy?  No.

24  Q.   And then, the last sentence of bullet 2.  "We also find

25  out how people are using our site (what parts of the site get

1  viewed more than others), which helps us make better content
2  and layout decisions."
3  A.   Yeah.  Again, all pertaining to visitors to the website.
4  Nothing to do with email hosting or website hosting
5  whatsoever.
6  Q.   Okay.  Well, this seems like -- is this the general
7  approach that Sandhills will take with anything that they do
8  for customers?
9  A.   Again, I never used this.  I've never seen this before.
10  It may be on websites, but that's extent that I've seen it
11  ever used.
12  Q.   Okay.  You see where it says, page 2, "When people
13  purchase issues or subscriptions at our site, it's important
14  that the information they enter is secure," right?
15  A.   That's regarding the purchase of publications, yes.
16  Q.   And it talks about, the second bullet point, "Sandhills
17  Global uses a secure firewall to keep out unauthorized users
18  and ensure the integrity of our systems"?
19  A.   That's to block bots and things from calling our sites,
20  yes.
21  Q.   Okay.  "We are vigilant about protecting our site from
22  unwanted intrusions," right?
23  A.   Correct.
24  Q.   Is this policy or this statement, is that anything
25  different that you would tell a customer who wants to email --

—————WELCH - CROSS - FARSIOU—————

1    have you guys email host or website host?

2    A.   Again, this is for visitors to the site.  It has nothing

3    to do with -- anything to do with hosting email or websites or

4    anything like that.  We wouldn't provide this to anybody other

5    than what's listed on the site and visitors coming to the

6    site.

7    Q.   So the question was, this sentence that I just read, is

8    that any different approach that Sandhills would take when

9    they email host or website host for a customer?

10   A.   Well, yeah, I guess it is because we wouldn't provide

11   anything to them, no.

12   Q.   Yeah.  So your position is that if you email host or

13   website host for a client, we can do whatever we want, right?

14   A.   It's an opt-in service.  They're free to leave whenever

15   they want.  They can choose to partake in it, if they want.

16   If they do --

17   Q.   And based on that, you can do whatever you want with

18   their system, right?

19   A.   I didn't say that.  But based on that, my attorneys have

20   deemed that it's perfectly legal for me to review what's

21   coming from that.

22   Q.   Your attorney told you that it would be legal for you to

23   put a filter on an email system for customers to get alerts --

24   Sandhills' get alerted --

25            THE COURT:  Let's not ask that question.

WELCH - CROSS - FARSIOU

1          MR. MILLER:  I was going to object.

2          THE COURT:  It's an improper question to ask what the

3    attorney told him.  Let's just move on to the next question.

4          MR. FARSIOU:  He brought it up.

5          THE COURT:  Doesn't matter who brought it up.  You're

6    the counsel.  You can't ask about attorney/client privilege.

7    You know that.

8    BY MR. FARSIOU:

9    Q.   You see P-17?

10   A.   Yes.

11   Q.   Is this a different privacy policy?

12   A.   It looks slightly different.

13   Q.   Do you know by reading it, if it makes any different --

14   does it make any different policy changes to the one we just

15   talked about?  About securing information?

16   A.   It would -- you want me to compare the two documents?  It

17   would take me a long time to compare the differences between

18   the two documents.

19   Q.   This is your policy; you just haven't seen it?

20   A.   I haven't reviewed it in -- no.  Not in great detail.  I

21   don't know if I've seen it in the last few years.

22   Q.   Okay.  So let's go to page 2.

23   A.   Okay.

24   Q.   It says "Information you submit to us," and then there's

25   bullet points.  And if you look the last bullet point, it says

WELCH - CROSS - FARSIOU

1    "By registering accounts on the websites or any mobile phone

2    applications including setting up passwords and preferred user

3    names, contact details, account details, your preferences, and

4    interests."

5         Do you see that?

6    A.   You said at the bottom of page 2?

7    Q.   No.  The last bullet point at the top.

8    A.   Oh.  Of page 2, though, right?

9    Q.   Yes.

10   A.   Yes.

11   Q.   It says just below that, "If you do not provide us with

12   your personal data, we may not be able to provide you with our

13   services, products, or respond to any questions or requests

14   you submit to us via our website," right?

15   A.   Yeah.  Again, pertaining to visitors to the

16   auctiontime.com website.

17   Q.   I just want to go to page 3.

18        Do you see that Number 2, How do we use your information?

19   A.   Yes.

20   Q.   It says "We will only use your personal data for the

21   purposes and legal basis set out in the table below," right?

22   A.   Yes.

23   Q.   And you're saying this doesn't apply to email hosting or

24   websites?

25   A.   Not at all.

─────────── WELCH - CROSS - FARSIOU ───────────

1    Q.   You believe that there would be a different set of

2    circumstances or policies that Sandhills would follow?

3    A.   Again, we don't provide anything.  If they choose to have

4    us host their email, there's no -- there's no agreement, so it

5    would be -- yeah, it would be different because we don't

6    provide anything.

7    Q.   So, by the way, Durable Undercarriage, right?

8    A.   Yes.

9    Q.   They're still a client, still a customer?

10   A.   Yes.

11   Q.   So you didn't lose them, right?

12   A.   Well, did we lose them?  No.

13   Q.   Okay.  Do you host their website?

14   A.   Yes.

15   Q.   Do you host their email?

16   A.   Yes.

17   Q.   And you testifying that's how you found the email by the

18   filter that you put on for Mr. Garafola, right?

19   A.   Yes.

20   Q.   And by the way, do you know that if you go to Mr. Enos'

21   website and if you click on the policy, the privacy policy

22   comes up that we had just been talking about?

23   A.   It doesn't surprise me because it would be for visitors

24   of that website, so it would be right in line with everything

25   we put on all the websites we host.

WELCH - CROSS - FARSIOU

1  Q.   Okay.  So the policy wouldn't be different, right?

2  A.   For visitors to the site, it's the same.  It's the same

3  use cases.  Everything you just presented to me.

4  Q.   And again, your testimony was that Mr. Enos did not

5  request that you put a filter on his email system so that you

6  could track Mr. Garafola, right?

7  A.   We didn't put a filter on just Enos, we put it on all the

8  email we host.

9  Q.   Thank you.  My next question was, you did that for

10 everybody -- all your clients that you host their email

11 systems, you put that filter on, right?

12 A.   We looked for emails coming from Mr. Garafola's personal

13 Gmail account, yes.

14 Q.   You utilized your customers' accounts for Sandhills'

15 purposes, right?

16 A.   We monitor the emails coming from that email address,

17 which is perfectly legal to do.

18 Q.   Sir, that's your opinion.  I would beg to differ on that,

19 but --

20 A.   If my attorney --

21 Q.   Sir, the question I have is:  None of your clients that

22 you host the email system for know that you were doing that?

23 A.   I don't know whether they know or not.

24 Q.   Because you never got consent and you never asked, right?

25 A.   I -- no.

————WELCH - CROSS - FARSIOU————

1    Q.   Okay.   Just one last question because I know the judge

2    wants to stop here.

3         Just so I am perfectly clear, you did not ever go to Mr.

4    Garafola to find out whether or not he was actually working

5    for Bidpath or Bidfacts, correct?

6    A.   No.   Once we saw the information leaving, we knew we had

7    to make a timely decision so that more information wouldn't

8    leave the company.

9    Q.   And, to this day, you never had a conversation with Mr.

10   Garafola as to what actually happened in July, right?

11   A.   No.

12            MR. FARSIOU:  That's all.

13            THE COURT:  Okay.  Thank you.  At this time, Mr.

14   Welch, you can step down.

15            For the record the Court has ended the testimony of

16   Mr. Welch having found that direct testimony was provided for

17   3 hours and 30 minutes and the cross-examination for 4 hours

18   and 17 minutes.  I feel that's all the assistance that this

19   Court needs with regard to the testimony from Mr. Welch.

20            At this time, we're going to take a half an hour

21   lunch break, after which we're going to proceed with Mr.

22   Garafola's testimony.  When I come back, I'd like to see Mr.

23   Garafola in the witness box.  We will swear him in, and we'll

24   proceed with the direct exam of Mr. Garafola followed by the

25   cross-exam.

──────WELCH - CROSS - FARSIOU──────

 1              Counsel, it is my intention to finish Mr. Garafola

 2     today.  I'd like to go no later than 4 hours with his

 3     testimony.  I'm going to divide that testimony in even should

 4     the parties need it.  But we're not going beyond today.  So

 5     today will be the last day for the testimony.  So when I come

 6     back, I want Mr. Garafola in the witness box.

 7              That's all we have.  We're adjourned until 12:34.

 8              THE DEPUTY COURT CLERK:  All rise.

 9              (Lunch break at 12:04 p.m.)

10              THE DEPUTY COURT CLERK:  All rise.

11              (Open court begins at 12:35 p.m.)

12              THE COURT:  Please be seated.

13              Mr. Farsiou, call your witness.  He's already seated.

14              MR. FARSIOU:  He's already seated, Judge.

15              THE COURT:  Why don't we administer the oath.

16     LAWRENCE GARAFOLA, DEFENDANT, SWORN.

17              THE DEPUTY COURT CLERK:  Please state and spell your

18     name for the record.

19              THE WITNESS:  Lawrence Garafola, G-A-R-A-F-O-L-A.

20              THE COURT:  You can be seated, Mr. Garafola.

21              Mr. Garafola, you've been here in the courtroom so

22     you already have been made aware of some of the basic rules.

23     The court reporter is taking down everything that's said here

24     so keep your voice up.  Please, adjust the microphone if you

25     need to.

─GARAFOLA -DIRECT - FARSIOU─

1      She can only take down one person speaking at a time

2 so please wait before the question is fully posed.  She can't

3 take down nonverbal responses like a nod of the head or a

4 shrug of the shoulders, so you have to give a verbal response.

5      I also understand that you have medication that you

6 need to take so if you need a break at any time, you let me

7 know.

8      THE WITNESS:  Thanks.

9      THE COURT:  Mr. Farsiou, it's your witness.

10      MR. FARSIOU:  Thank you, Judge.

11 (DIRECT EXAMINATION BY MR. FARSIOU:)

12 Q.   Mr. Garafola, I'm going to try to cut the chase here on a

13 lot of the stuff.  But with respect to Equipmentfacts,

14 Equipmentfacts was a company that you started, correct?

15 A.   Yes.

16 Q.   And Equipmentfacts became, at some point, became the

17 leader, as Mr. Welch testified, the pioneer of the online

18 auction services, correct?

19 A.   Yes.

20 Q.   With respect to Equipmentfacts, what type of industry

21 were you working in?

22 A.   Heavy equipment and farm construction auctions.

23 Q.   Okay.  That's what Equipmentfacts was for 19, 20 years,

24 correct?

25 A.   Correct.

---

GARAFOLA -DIRECT - FARSIOU

1   Q.   And at some point you decided that you were going to

2   enter into an agreement with Sandhills, correct?

3   A.   Yes.

4   Q.   Okay.  And you heard Mr. Welch testify on February 6th

5   that their initial offer was somewhere around 1.2, 3 million

6   or something like that.

7        Do you remember that?

8   A.   I recall that.

9   Q.   What's your recollection as to how the negotiations went

10  with respect to the purchase?

11  A.   It started higher than that.  It started at five times

12  the EBITDA.  We went back and forth --

13  Q.   You said EBITDA, what is that?

14  A.   Earnings before income tax -- it was basically the

15  profit.

16  Q.   Go ahead.  I'm sorry.

17  A.   And then, it negotiated back and forth where we started

18  evaluating what EBITDA was or the income of it.  And then

19  looking at adding in what owner perks were and so forth to

20  come up with a number.

21       My original number in my negotiations and emails was

22  anywhere between 2.5 and 2.8.

23  Q.   Okay.  And what was your understanding as to what

24  Sandhills' online system consisted of?

25  A.   BidCaller.

─────GARAFOLA -DIRECT - FARSIOU─────

1   Q.   Well, BidCaller is what?  That was the platform that they

2   were using?

3   A.   That was the platform that was similar to Equipmentfacts,

4   yes.

5   Q.   And when I say -- you heard Mr. Welch go back and forth

6   on platform versus software.  Can you just explain to the

7   Court what the difference is?

8   A.   BidCaller and Equipmentfacts is really known as a

9   marketplace in the industry.  There's different marketplaces.

10  And that's where a company like Equipmentfacts or Proxibid or

11  BidCaller will engage the services of an equipment auctioneer

12  where they will then take their auction and introduce it to

13  bidders that could not attend in person and they bid online.

14  And these bidders are part of the marketplace.  And that's

15  really the term that has not been used in this courtroom,

16  which is really what Equipmentfacts and BidCaller and

17  Proxibid, it's a marketplace.  And that's what everyone talks

18  about.

19  Q.   Okay.  With respect to this marketplace, what was your

20  understanding as to whether or not the Sandhills BidCaller

21  system was effective or not effective?

22  A.   When they first started, they didn't pose a threat at all

23  to me.  But I knew the company behind them was a very big

24  company.  They never did -- they never took business away from

25  us.  I think they've done one or two auctions alongside us.

─────GARAFOLA -DIRECT - FARSIOU─────

1    And that was in the late 2015, '16 area, that was becoming a

2    common thing, where two providers, two marketplaces would

3    attend the same auction.  And they've done that a few times

4    with us but with no success.

5    Q.   When you say "marketplace," you're talking about, for

6    example, Equipmentfacts prior to -- well, prior to and

7    post-purchase, the marketplace was, here's our platform,

8    here's the way the software works, here's what we do for you,

9    right?

10   A.   Correct.

11   Q.   So with respect for purposes of the Court, for the

12   marketplace, what are the activities that are done when you

13   have a platform such as Equipmentfacts?

14   A.   One part of it is -- the biggest part is advertising and

15   marketing.  A marketplace has two clients.  It has a -- it has

16   bidders and auctioneers.

17        Auctioneers bring the product to the marketplace.  They

18   bring the auction voice or that chant, and then they also

19   bring the bidders, the marketplace brings their own bidders

20   that each bidder has to have a unique bidder number and a

21   unique password to enter that marketplace.

22        And I'm going to just say a little bit here.  I

23   understand -- I am the first one in the industry to do this,

24   to provide this online bidding service.  And there is a lot of

25   different twists about what a platform is and a software is.

─GARAFOLA -DIRECT - FARSIOU─

1   Understand, this is a marketplace that we're talking about

2   where you have bidders.  You have auctioneers.  You have

3   products that you're selling.  And then that same marketplace

4   advertises those auctions.  They'll put print ads.

5       I used to -- when Equipmentfacts used to run full-page

6   ads in Machinery Trader magazines and Truck Paper and Track

7   House and in other publications.  We would send out email

8   blast to our own database of bidders, okay.  That's what a

9   marketplace does.

10      And then on auction day, you go there, in the beginning,

11  we would go there, take pictures of all the items, take the

12  catalog, upload that into the marketplace or our software, and

13  then on auction day, stand right next to that auctioneer, just

14  like I'm standing next to the judge and I'd run that software

15  on my computer with an audio device and live video if they had

16  it, and I would just follow that auctioneer's chant like --

17  and I called it a reverse calculator.  And if an internet

18  bidder placed the bid, they'd push a bid button and I'd raise

19  my hand or yell to the auctioneer that I have a bid.  That's

20  what Equipmentfacts is.

21  Q.   Okay.  At some point you decided that you were going to

22  enter into this Purchase Agreement, right?

23  A.   Yes.

24  Q.   And the eventual price was this $1.5 million, right?

25  A.   Correct.

─────GARAFOLA -DIRECT - FARSIOU─────

1    Q.    Now, you also had an Employment Agreement, right?

2    A.    Yes.

3    Q.    Now, whose idea was the Employment Agreement?

4    A.    Mine.

5    Q.    Did you tell anyone at Sandhills that -- without an

6    Employment Agreement and me working, I'm not going to do the

7    purchase?

8    A.    Correct.

9    Q.    And why was that?

10   A.    I was -- because there's not only the sale price of the

11   item, but the salary and staying on.  My original thing, I

12   wanted a 5-year agreement to stay on there so I could support

13   my family, watch the business grow, and earn additional money

14   based on the way my Employment Agreement was outlined.

15   Q.    Now, was the $1.5 million, in your eyes, was obviously

16   lower than what you had requested, right?

17   A.    Yes.

18   Q.    And was it lower because you were going to come on as an

19   employee?

20   A.    Correct.

21   Q.    That's why you were willing to agree to the $1.5 million?

22   A.    Yes.

23   Q.    Now, with respect to that, at some point, you guys enter

24   into these discussions.  It's $1.5 million and you're going to

25   become an employee, correct?

GARAFOLA -DIRECT - FARSIOU

1   A.   Correct.

2   Q.   What did they tell you as to what was going to happen to

3   Equipmentfacts and you specifically?

4   A.   Everything was going to stay the same.  I would run

5   Equipmentfacts with my same staff.  At that point, we needed

6   extra staff.  Prior to me selling -- and they were aware of

7   that -- I actually had an employee pass away that we needed to

8   replace that individual, and we expected things to grow.  And

9   that I have the support and the marketing and the advertising

10  of a thousand plus employees in Lincoln, Nebraska.

11  Q.   And, by the way, you stayed in New Jersey?

12  A.   Yes.

13  Q.   Same office?

14  A.   Yes.

15  Q.   Same employees?

16  A.   Yes.

17  Q.   And Equipmentfacts, when you sold it, was doing the same

18  work that it had done prior, right?

19  A.   Correct.

20  Q.   Which was what?

21  A.   Selling, offering the marketplace or the online auction

22  services, the heavy equipment and agricultural auctioneers.

23  Q.   Okay.  And that's what you were told was going to be your

24  job?

25  A.   Correct.

─GARAFOLA -DIRECT - FARSIOU─

1   Q.   And you remember me asking Mr. Welch about this

2   Employment Agreement, right?

3   A.   Yes.

4   Q.   And you heard him talk about -- he didn't know what

5   happened to Schedule A.

6        Do you remember that?

7   A.   Yes.

8   Q.   Why was Schedule A so important to you?

9   A.   It was outlining my responsibilities, my compensation,

10  and what I was doing as a Sandhills' employee.

11  Q.   Well, the Schedule A -- now, you had a -- your base

12  salary is in the Employment Agreement, right?

13  A.   Yes.

14  Q.   Now, you heard that Mr. Welch testified that there was no

15  agreement as to bonuses or commissions.

16       Do you remember hearing him say that?

17  A.   Yes.

18  Q.   Was that supposed to be something that was going to be

19  put into the Schedule A?

20  A.   Yes.  In fact, during the due diligence period, one of

21  their due diligence records were what is your bonus and

22  commission plan, and I provided that with them.

23  Q.   And you had discussions with them as to not only your

24  employees but you being able to earn a commission and bonus?

25  A.   Yes.  One of the commissions, which was a lot of money,

─GARAFOLA -DIRECT - FARSIOU─

1   was each auction clerk, Equipmentfacts made two percent

2   commission over everything that's sold over the internet.  So

3   if they sold $100,000, Equipmentfacts would get $2,000 of it.

4   Every auction clerk got a bonus of 10 percent of that 2,000 or

5   they would get an extra $200.

6   Q.   The stuff that you just testified to, these are things

7   that you discussed and negotiated with Mr. Welch?

8   A.   Absolutely.

9   Q.   And Mr. Welch told you that Schedule A will have all the

10   information it?

11   A.   Correct.

12   Q.   And Schedule A, did you ever get that?

13   A.   Never.

14   Q.   And with respect to Schedule A, did you ask him

15   throughout the year whether or not Schedule A was going to be

16   prepared?

17   A.   I first started with HR, head of HR, where is it?  It

18   actually started with Carson Schott about that.  Then I was

19   referred to a Stephanie in HR, then I was referred to Nancy at

20   HR.  I kept asking, where's my commission?  The problem at

21   that point for the first four to five or six months, my

22   employees who earned commission, they really didn't know what

23   they were making.  They were just getting a lump price.  And I

24   kept telling HR and their payroll department, take care of my

25   employees first, outline what they're making first and what

─────GARAFOLA -DIRECT - FARSIOU─────

1   commissions they're earning and what reimbursement of travel

2   expenses they're going to get, take care of them first, then

3   deal with me.

4        And then I kept bringing it up to Mr. Schott, Evan Welch.

5   And I actually even brought it up to Shawn Peed, the CEO, or

6   owner of the company, okay.  He referred me back to Evan

7   Welch, and Evan Welch said to me, don't you ever go to Shawn

8   Peed with something like that again.

9   Q.   So, did you ever get Schedule A?

10  A.   No.

11  Q.   And with respect to your employees, were they making less

12  on the commissions?

13  A.   Yes.

14  Q.   And at some point, did you get some type of bonus?

15  A.   On Christmas, I got a bonus.

16  Q.   Okay.  But you never got a bonus or commission for any of

17  the work that you were performing?

18  A.   Never.

19  Q.   And you were the guy that they wanted because their

20  online auction system wasn't very good, right?

21  A.   Correct.

22  Q.   Now, on July 16th of 2018, these agreements get executed,

23  right?

24  A.   Yes.

25  Q.   And that includes the Employment Agreement, right?

GARAFOLA -DIRECT - FARSIOU

1    A.    Yes.

2    Q.    And there were non-competitions, you've heard us talk

3    about these non-competition agreements, right?

4    A.    Yes.

5    Q.    And what was your understanding as to what the

6    non-competition was supposed to apply to?

7    A.    Narrow it down to whatever Equipmentfacts did.

8    Q.    And Equipmentfacts -- what Equipmentfacts did as to how

9    you were operating it?

10   A.    Correct.

11   Q.    And with respect to that, was that one of the reasons why

12   you wanted Schedule A so badly?

13   A.    Yes.

14   Q.    Schedule A, again, was going to lay out what your duties

15   were, right?

16   A.    Correct.

17   Q.    And your agreement was that your duties weren't going to

18   change.  Equipmentfacts is going to be the same?

19   A.    Yes.

20   Q.    Now, as you go through the year -- when I say "go through

21   the year," from July 16th through -- let's just call it

22   April 1st of 2019, okay.

23   A.    Yes.

24   Q.    During that time period, are you helping Sandhills

25   develop their online auction system and business?

GARAFOLA -DIRECT - FARSIOU

1   A.   Yes.

2   Q.   And are you also -- there was discussions about possibly

3   getting rid of Bidpath?

4   A.   Yes.

5   Q.   And they wanted their own software to be used, correct?

6   A.   Yes.

7   Q.   And when I say "software" with the Bidpath, you talked

8   about a marketplace, right?

9   A.   Yes.

10  Q.   So the marketplace was going to be from Bidpath and it

11  was going to go to this BidCaller?

12  A.   Yes.

13  Q.   Okay.  And the BidCaller was what they used to have,

14  right?

15  A.   Yes.

16  Q.   And that was their old system that didn't work very well?

17  A.   Correct.

18  Q.   So during this time period, you're helping them trying to

19  redevelop the BidCaller program?

20  A.   Yeah.  My understanding is a lot of the BidCaller

21  software came from their AuctionTime software, which was a

22  timed auction to -- it was developed to be a realtime live

23  webcasting.  And it was just a lot of issues in the

24  performance of the software.

25  Q.   So they wanted to use this -- the BidCaller, which was

─GARAFOLA -DIRECT - FARSIOU─

1   being used for their timed auctions, to move it over to the

2   online auction services?

3   A.   That's what my understanding where that software came

4   from.

5   Q.   And throughout this time, are you helping them understand

6   this online market?

7   A.   Yes.

8   Q.   And you also indicated that you were trying to help them

9   prepare this software package or whatever was going to be that

10  was going to run Equipmentfacts?

11  A.   Yes, the engine that was behind the Equipmentfacts.

12  Q.   And at some point you become aware that Sandhills is

13  getting rid of Bidpath?

14  A.   Yeah, they were looking for a date.  And I continued to

15  say, it wasn't ready.  There was missing features.  I was

16  involved intimately.  Not with the programming, just trying to

17  let the programmers know what was required.

18  Q.   And you heard all this testimony about -- you have them

19  up in front of you, but you heard all this testimony about all

20  these manuals, tutorials.  And were those documents things

21  that needed to be revised if you guys, Sandhills, was going to

22  go to a new -- I guess you want to call it a platform, right?

23  A.   New software.

24  Q.   Software, okay.

25  A.   Yeah.

─GARAFOLA -DIRECT - FARSIOU─

1  Q.    Platform is Equipmentfacts?

2  A.    Yeah.

3  Q.    So the -- the software package of BidCaller, the new

4  BidCaller, these tutorials and manuals that we discussed,

5  those would have to be changed, correct?

6  A.    Yes.

7  Q.    Okay.  And as this is going on, did you ever find out --

8  or did you ever request from anyone from Equipmentfacts that

9  were working for you as to whether or not these changes had

10 been made?

11 A.    Yes.

12 Q.    Who did you reach out to?

13 A.    My son, Ryan Jacobi and Daniel Fabricator (ph.).

14 Q.    What did you want from them?

15 A.    I wanted to take the manuals, convert them into video

16 tutorials so auctioneers knew how to use the system.

17 Q.    Now, the ones we spoke about here and on February 6th --

18 and I don't want to get into the time frame yet.  I want to

19 kind of walk you through it, but those manuals -- those were

20 manuals that Equipmentfacts prepurchased, prepared?

21 A.    What do you mean prepurchased?

22 Q.    Prepurchased from Sandhills?

23 A.    Oh, they were prepared in 2017.

24 Q.    Okay.  And the manuals you saw them as you were sitting

25 here at table, right?

—————GARAFOLA -DIRECT - FARSIOU—————

1    A.    Yes.

2    Q.    Were those going to be manuals that could be used for the

3    BidCaller system?

4    A.    No.

5    Q.    Why not?

6    A.    The software is completely different.  The process of

7    actually just logging into the website or the admin. site was

8    completely different.  But it was an outline that we wanted to

9    use for video script -- I wanted to get away from sending out

10   these big PowerPoints and these manuals and convert them into

11   videos.  Which the ones that had been present for this case,

12   this evidence, were converted into videos.

13   Q.    Okay.  But, when you say "they were converted into

14   videos," were they provided to people at Sandhills?

15   A.    Yeah, they had access to them.

16   Q.    And with respect to -- when you reached out to -- I

17   believe you said it was your son and another person.  Was

18   it --

19   A.    Danielle Fabricator (ph.) and also Ryan.

20   Q.    Ryan?

21   A.    Ryan Jacobi.

22   Q.    What did they tell you?

23   A.    They're not ready yet.

24   Q.    I want to -- Go ahead.  I'm sorry.

25   A.    Primarily, my son and Carson Schott had some

─────GARAFOLA -DIRECT - FARSIOU─────

1   conversations about that too.  And they were involved with

2   Carson pretty much on a regular basis as far as developing

3   banner ads for the trade publications for a lot of the

4   upcoming auctions.

5   Q.   I'm going to -- I believe we are up to D-18.

6   (Defendant's Exhibit D-18 for Identification.)

7   Q.   Mr. Garafola, I want to show you what's been marked or

8   have in front of you what's been marked D-18.  And my

9   understanding is that this is an email from your

10  Equipmentfacts email account on May 21st, 2019, to L. Garafola

11  at lgarafola@equipmentfacts.com and daniel@equipmentfacts.com;

12  is that correct?

13  A.   Correct.

14  Q.   What's the subject?

15  A.   Video tutorials.

16  Q.   And those video tutorials, were they the ones that were

17  mentioned in one of these exhibits that Sandhills used?

18  A.   Yes.

19  Q.   What are you asking for?

20  A.   How we doing with these videos.  Here are the videos we

21  need.  I list seven types of videos.  The last one, Number 7,

22  I will explain this because this was somewhat of a new video

23  because of the different type of software we had with the

24  BidCaller system.  And then I say, I really like to get these

25  done ASAP so we can make auctioneers more comfortable.

GARAFOLA -DIRECT - FARSIOU

1   Q.   So these videos that you're talking about, these videos

2   were being done for the benefit of the auctioneers?

3   A.   Correct.

4   Q.   And the issue on May 21st, 2019, in that area, was that

5   the BidCaller software was causing chaos; am I right?

6   A.   Correct.

7   Q.   And you saw the emails that we had -- I had shown Mr.

8   Welch with respect to your emails, which I believe they're up

9   there for you -- hang on.  I believe it is D-6 and D-7.

10       Do you see that?

11  A.   Yes.

12  Q.   These are the emails we discussed earlier.  I'm sorry --

13  that I discussed earlier with Mr. Welch about you having

14  concerns about the software because people were complaining?

15  A.   Yes.

16  Q.   And this email, D-18, is in that time period; isn't it?

17  A.   Correct.

18  Q.   And you wanted to know if we had the updated tutorials

19  and manuals for the auctioneers because you wanted them to

20  know how to use this new software, right?

21  A.   Yes.

22  Q.   Now, what did -- did you talk to anybody about this

23  email?  Did your son or Daniel come to you and say -- or talk

24  to you or email or say anything about this?

25  A.   About the May 18th?

GARAFOLA -DIRECT - FARSIOU

1    Q.   About your D-18 email.  When you say "how you doing on

2    these videos"?

3    A.   Yes.

4    Q.   What did they say?

5    A.   We're not ready yet.  They're making changes constantly

6    to the process of using the new BidCaller system.

7    Q.   Well, you heard Mr. Welch testify there's some -- he

8    called them tweaks that needed to be worked out, right?

9    A.   Yes.

10   Q.   Would you call them tweaks?

11   A.   No.

12   Q.   You had -- you saw the emails from Mr. Dyess, right?

13   A.   Yes.

14   Q.   You had emails and you had discussions with him, right?

15   A.   Yes.

16   Q.   Was Mr. Dyess happy with what was going on?

17   A.   No.

18   Q.   And during one of the conversations, did Mr. Dyess tell

19   you that we're going to invite Proxibid to be one of the

20   platforms?

21   A.   Yes.

22   Q.   And with respect to that, do you know if Permian had ever

23   used Proxibid to -- as a platform for their auctions at that

24   time period?

25   A.   No, they never did.  And just to add, this email came

GARAFOLA -DIRECT - FARSIOU

1  right after a longtime client of mine, who is the largest

2  northeast auctioneer, decided to do the same thing and bring

3  Proxibid in.

4  Q.   When you say "this email," you're talking about D-18?

5  A.   D-18.  Two days before this email came out, another

6  auctioneer, North Country Auctions, a longtime client of mine,

7  just sent me a text message and said, "I'm sick of this..."

8  and he used a bad word.  We're bringing Proxibid in.

9  Q.   Okay.  And with respect to -- well, I want to go back to

10 D-18 real quick.  D-18, those manuals and tutorials and those

11 videos, they couldn't be revised yet because the system wasn't

12 perfected yet, correct?

13 A.   Correct.

14 Q.   Because if you revised it at this point in May -- or

15 April of 2019, would you have to revise it again?

16 A.   Yes.

17 Q.   And that's going to be published to your auctioneers,

18 right?

19 A.   Yes.

20 Q.   And with respect to the manuals and tutorials that were

21 provided in this case, those are not -- in your opinion, is

22 that proprietary information?

23 A.   No.

24 Q.   Those are provided to your auctioneers, right?

25 A.   Yes.

GARAFOLA -DIRECT - FARSIOU

1    Q.   And that's always provided to your auctioneers?

2    A.   Yes.  And we've revised these manuals three and four,

3    five times as technology developed and we made changes.

4    Q.   Why was it so important that the auctioneers have these

5    manuals and tutorials?

6    A.   So they knew how to use it.

7    Q.   It was set up for them to use the system, right?

8    A.   Exactly.

9    Q.   So the manuals could not be revised in May of 2019?

10   A.   No.

11   Q.   And we know that -- we know that you had the issues with

12   Permian and you had -- there was an email, if you recall,

13   where -- and I believe, if you look at the sequence of the

14   emails, it's D-8 to D-11.

15   A.   Yes, I'm aware of them.

16   Q.   If you look at D-11, at the bottom is June 9, 2019.

17        Do you see that?

18   A.   Yes.

19   Q.   You said, you're apologizing.  Why are you apologizing?

20   A.   I must have -- I've spoken to Eric beforehand.  And if

21   you look back it says, I'll call you in 30 minutes.  I don't

22   know if I called him in 30 minutes or the following day, but

23   it was a weekend and I tried to use the tactic that I'm not

24   going to be there.  Marlene and I aren't going to be there.

25   I'm just going to send someone who's qualified, but I just

───GARAFOLA -DIRECT - FARSIOU───

 1 | don't -- I never liked to be at an auction where there was a
 2 | competitor there, especially, Proxibid.
 3 | Q.   When you say "competitor," you're talking about Proxibid
 4 | being one of the platforms?
 5 | A.   Another marketplace sitting next to me at an auction.
 6 | Q.   And, by the way, just so that the Court understands, when
 7 | you do an online auction and you're sitting at a computer,
 8 | there's a screen that pops up, correct?
 9 | A.   Yes.
10 | Q.   And the screen says, you can click on one of the
11 | platforms to utilize for the auctioneers, right?
12 | A.   On Permian's website, when he decided to bring in
13 | Proxibid, when you click on the online bidding, there was a
14 | logo, Equipmentfacts, click here; Proxibid, click here.
15 | Q.   So he was using -- he was going to use both platforms?
16 | A.   Yes.
17 | Q.   And he, obviously, as you saw, was very upset with what
18 | was going on?
19 | A.   Yes.
20 | Q.   Were you trying to mend fences with him?
21 | A.   Absolutely.
22 | Q.   Were you trying to mend fences for Bidfacts?
23 | A.   No.
24 | Q.   Were you trying to mend fences for your own selfish
25 | purposes?

─GARAFOLA -DIRECT - FARSIOU─

1   A.   I had no selfish purposes other than Equipmentfacts.

2   Q.   Well, you were working.  You were doing Equipmentfacts,

3   and you were working for Sandhills, right?

4   A.   Yes.

5   Q.   And that -- you didn't want to go -- you didn't want to

6   be at an auction with Proxibid because that was a direct

7   competitor of who?

8   A.   Sandhills and Equipmentfacts.

9   Q.   And you heard Mr. Welch on February 6th talk about that

10   he thought his relationship -- Sandhills' relationship with

11   Proxibid was fine.

12      Did you hear that testimony?

13   A.   Yes.

14   Q.   What's your understanding of the relationship?

15   A.   They were in a legal battle with the Attorney General in

16   Nebraska with some unfair -- I know Proxibid brought up

17   against Sandhills.  And I knew of an employee, a Sandhills'

18   employee that left Sandhills to work for Proxibid and they

19   were in a lawsuit or going to sue them, the employee and

20   Proxibid.

21   Q.   Now, Permian had an auction in June of 2019, right?

22   A.   Yes.

23   Q.   This was the auction that you guys were discussing

24   through the emails?

25   A.   Yes.

1   Q.   And did you end up going?

2   A.   Yes.

3   Q.   And with respect to that auction, did Permian use

4   Sandhills after that or Equipmentfacts after that?

5   A.   No.

6   Q.   Do you know who they used?

7   A.   Yes.

8   Q.   Who did they use?

9   A.   Bidfacts and Proxibid.

10   Q.   And Proxibid.

11        And with respect to that, okay, let's discuss this -- the

12   email that -- well, the only email that exists with respect to

13   some type of deal with Bidpath and this new company Bidfacts.

14   If you have P-6 in front of you.

15   A.   I will.  But I'm familiar with it.

16   Q.   Okay.  Well, with respect to P-6, these are emails in the

17   beginning of July 2019, specifically, July 5th through -- it

18   looks like July 5th and July 7th, right?

19   A.   Yes.

20   Q.   Now, at some point you were looking at your options,

21   right?

22   A.   Yes, I was contacted by the owner of Bidpath because he

23   was getting a lot of phone calls from our clients looking to

24   leave Sandhills and utilize their software because they knew

25   that Equipmentfacts was using the Bidpath software.  And he

───GARAFOLA -DIRECT - FARSIOU───

1    called me up and said, Larry, what's going on?

2    Q.   And at some point you thought about possibly seeing

3    whether or not you could work with them?

4    A.   He -- and Bidpath, what they do is they license software

5    in a white label or self-branded format.  And he says maybe I

6    should get into the marketplace.  Maybe I should create a

7    company.  And that's prompted very limited conversations.

8    Q.   Well, let's look at the second page of the email.  The

9    email says what it says.

10       You see it?

11   A.   Yes.

12   Q.   And you talk about it, "met with my attorney and it looks

13   like she feels confident that I can start a competing business

14   with AuctionTime," right?

15   A.   Correct.

16   Q.   Now, AuctionTime was what?

17   A.   A timed auction by Sandhills.

18   Q.   That's not what you were doing?

19   A.   Equipmentfacts did not do that.

20   Q.   Okay.  And you thought at that time you may be able to do

21   timed auctions, right?

22   A.   Correct.

23   Q.   Okay.  Now, you indicate that you're going to -- it looks

24   like there may be some opportunity to meet with Mr. Brindley,

25   right?

─GARAFOLA -DIRECT - FARSIOU─

1   A.   Correct.

2   Q.   And did you ever meet with Mr. Brindley?

3   A.   Yes.

4   Q.   Where did you meet him?

5   A.   New Orleans.

6   Q.   That was the National Convention?

7   A.   The 70th National Auctioneers Convention, yeah.

8   Q.   You were there, right?

9   A.   Yes.

10  Q.   And you were there on behalf of Sandhills?

11  A.   I was representing Sandhills and Equipmentfacts.

12  Q.   Okay.  And you were going to have a conversation with Mr.

13  Brindley?

14  A.   Correct.

15  Q.   And with respect to the time that you had this

16  conversation with Mr. Brindley, what did you say to him?

17  A.   I said, I can't get -- first thing I said is you really

18  got a lot of -- excuse my words -- balls calling it Bidfacts.

19  And I said but I can't get involved in it.

20  Q.   And that was -- was that the last conversation you had

21  with --

22  A.   The last conversation.

23  Q.   Okay.  And at any point in time, did you work for

24  Bidfacts?

25  A.   No.

1   Q.   At any point in time, did you work for Bidpath?

2   A.   No.

3   Q.   And at that time, obviously, you had some issues with

4   Sandhills, correct?

5   A.   Yes.

6   Q.   Tell the Court what your mindset was after you told

7   Mr. Brindley, "I can't get involved" at the National

8   Convention?

9   A.   It's time to focus on my baby, Equipmentfacts, the

10  company that I built on my kitchen table that put my kids in

11  school, okay, to make it work.

12  Q.   You needed to make it work with Sandhills, right?

13  A.   Yes.

14  Q.   And you saw that there's this P-5, this email, from

15  Permian with an auction announcement that has Marlene

16  mentioned in the -- well, it says it's from Marlene.

17       Do you see that?

18  A.   Yes.

19  Q.   Did you have anything to do with P-5?

20  A.   No.

21  Q.   And with respect to -- with respect to the time in July,

22  when these emails are going down, P-7, I think it's P-7

23  through P-17.  They're like July 18th, July 25th, and they're

24  right after one another, right?

25       Do you remember seeing them?

─────GARAFOLA -DIRECT - FARSIOU─────

1   A.   Yeah, in the morning, yeah.

2   Q.   What were you doing with those emails?  What was the

3   purpose of you getting those emails?

4   A.   First, I was home on vacation.  At some point in that

5   time frame, I did take a short trip to Florida to see my

6   parents.  That object was to grab my son and write scripts to

7   make those videos, tutorials.

8   Q.   Well, you heard Mr. Welch testify that in July, middle or

9   end of July -- or even in the beginning of July, I don't

10  remember what he testified to as the exact point, but the

11  kinks had been, as he called them, the kinks had been worked

12  out, right?

13  A.   Sufficient enough to let's start getting these videos in

14  place and posted.

15  Q.   Okay.  And you had motivation at that point because you

16  knew you couldn't go work for another company like that,

17  right?

18  A.   Yes, I took the advice of two attorneys that I had hired

19  for advice to see what I could do.  And they reviewed my --

20  all my paperwork and told me what I could do and what I can't

21  do.

22  Q.   And your focus in July after speaking to Mr. Brindley

23  was, "I'm going to focus on Equipmentfacts and the situation

24  I'm in with Sandhills"?

25  A.   Correct.

GARAFOLA -DIRECT - FARSIOU

1  Q.   Now, I want to go back.  I want to go back to -- do you

2  have P-7 in front of you?

3  A.   Yes.

4  Q.   P-7, June 11th, 2019, right?

5  A.   Yes.

6  Q.   This is right after you had conversations with Mr. Dyess,

7  right?

8  A.   Correct.

9  Q.   What was the point of asking -- I'm sorry.

10      What was the point of you sending this email from your

11  personal email to your work email?

12  A.   Because that night, if you look on the P-6, I tell Eric

13  Dyess, I'm going to do whatever I can to make this auction a

14  success.  So I took this bidder list, I copied all the emails

15  down, email addresses out of the column, it's a spreadsheet so

16  I could send every one of these bidders a personal invitation

17  to attend with Equipmentfacts versus Proxibid at the June 20th

18  Permian auction.

19  Q.   So that was the purpose of this email to yourself?

20  A.   Correct.

21  Q.   By the way, your conversation with Mr. Dyess also

22  included Superior, didn't it?

23  A.   Yes.  Mr. Welch testified that he didn't know who G.

24  Bergman or Gary Bergman was.  He's the chairman of Superior

25  Auctioneers.

GARAFOLA -DIRECT - FARSIOU

1  Q.  So you now had Permian and you had Superior saying that

2  we don't like what's going on at Sandhills, and we're going to

3  start using Proxibid?

4  A.  The two highest revenue-generating auctioneers for

5  Equipmentfacts.

6  Q.  Now, the emails -- so, this June 11th email coincides

7  with that conversation with Mr. Dyess?

8  A.  Pretty much.

9  Q.  Now, let's go to -- well, let's go to -- do you have P-8

10  up there?

11  A.  Yes, I do.

12  Q.  All right.  P-8 was another document that the plaintiffs

13  believe demonstrate you trying to compete against them or form

14  another company.

15      Do you see that the emails are really -- they're in May,

16  right?

17  A.  Yes.

18  Q.  And then, you send the email from your work account to

19  your personal account on June 14th, 2019, right?

20  A.  Yes.

21  Q.  This is three days after the email P --  I'm sorry, not

22  P.  No.  P-7, right?

23  A.  Yes.

24  Q.  It's three days after that?

25  A.  Yes.

*136*

1    Q.   What was the purpose of this?

2    A.   We were trying to retain clients and do what we can, and

3    I had extensive conversations with Carson Schott about what

4    could we do to keep these auctioneers from going to Proxibid.

5    Q.   Okay.  What was the purpose of getting this information

6    out?

7    A.   Just so I could see who they are, let Carson know, hey

8    listen, can we get free full-page ads in the trade

9    publications, banner ads, whatever we can to make this --

10   these auctioneers stay with us.

11   Q.   Did you have any information as to whether or not

12   Proxibid was offering discounts or anything like that?

13   A.   Oh, they were to auctioneers and to bidders.

14   Q.   Is that how Proxibid was trying to get the Sandhills'

15   work, the Equipmentfacts?

16   A.   Absolutely.  And they did that before I sold to

17   Sandhills.  And they did it a lot more now.

18   Q.   Now, if you go to -- you see P-9 and P-10?

19   A.   Yes.

20   Q.   Now, P-9 and P-10, these are that Top Bidder list.

21        Do you see that?

22   A.   Yes.

23   Q.   And the dates are on both of them July 16, 2019, right?

24   A.   Yes.

25   Q.   And the times are P-9 is 11:53 a.m., P-10 is 4:16 p.m.

─GARAFOLA -DIRECT - FARSIOU─

1    And then we provided a document that is D-12?

2    A.   Yes.

3    Q.   What was -- what were you doing prior to D-12, what were

4    you doing in D-9 and D-10?

5    A.   Sent them to my home computer, to my personal email.

6    Again, I don't even recall if I was home, traveling, at an

7    airport because I traveled every week, okay, but I sent them

8    to my personal email account address, then I sent them to my

9    wife's email address because her computer, which is in the

10   kitchen, is connected to a printer so I could print that out

11   and highlight auction bidders that I thought Proxibid was

12   giving a discount to.

13        And we've spoken to -- I've spoken to Evan Welch and I've

14   spoken to Carson Schott many times, that I think this is what

15   they're doing.  And I've gotten this information, not only

16   from my own experience being at auctions, but all of my

17   long-term auction clerks that were at auctions that kept

18   telling me, this guy's bidding with Proxibid, not with us,

19   they've got to be giving him a discount.

20        And so, the purpose for all these emails and me sending

21   them to my wife's email address is so I could print it, and I

22   could check off who, either my auction clerks were telling me,

23   or I had knowledge that were bidding with Proxibid and not

24   Equipmentfacts.  And then I went back to that computer, I

25   put -- I highlighted every cell after I checked them off.  And

─GARAFOLA -DIRECT - FARSIOU─

1   this is, again, after hours, something I've been doing for 18

2   years, always working at home.  And then I took that list, and

3   I emailed it to Carson Schott who asked for it.

4   Q.   And that's the email in D-12, right?

5   A.   Correct.

6   Q.   Now, this bidder -- by the way, let's back up.

7        There is a lot of discussion about you using your

8   personal email?

9   A.   Yes.

10  Q.   Is that -- I want the Court to understand you're not

11  sitting at a desk all the time, right?

12  A.   No.

13  Q.   You're traveling all the over the country, right?

14  A.   Correct.

15  Q.   Is there a reason why you prefer to use your personal

16  email?

17  A.   Because my work email -- my work email was in my laptop

18  at the office.  There were times I took it or took it away to

19  auctions, but I never accessed -- I had a hard time connecting

20  to the VPN.  So a lot of times if I'm -- and this is something

21  I've done for years, okay.  I'm sure that Sandhills could see

22  in my email accounts how many times I sent emails to my wife

23  on receipts from hotels, because I had to do an expense

24  report.  So I would just forward it to my wife's email, or if

25  I'm at an airport and buying myself lunch and they ask you if

───GARAFOLA -DIRECT - FARSIOU───

1   you want that emailed, I would just send it to my wife's email

2   so when I got home I could print it out and produce my expense

3   report.

4   Q.   D-12 is what Mr. Schott wanted, right?

5   A.   Yes.

6   Q.   And you provided it to him, right?

7   A.   I did from my Equipmentfacts' email.

8   Q.   And it looks like you sent it from your Equipmentfacts'

9   email?

10       Did you -- when you're done with the documents, do you

11  send it back to your work email?

12  A.   Yes.

13  Q.   Okay.  And then, what do you do with the one on your

14  personal?

15  A.   Delete it.

16  Q.   Now, this bidder list --

17  A.   I want to add something.  And I apologize for talking

18  loud, Judge.

19           THE COURT:  It's okay.

20           THE WITNESS:  I've had several months waiting for

21  this period.  But I was never told that I couldn't use my

22  personal email address.  There's nothing in any security thing

23  that Sandhills gave me that said that I couldn't use my

24  personal email address.  I operated my business 18, 19 years,

25  sending stuff to my wife, to my kids, passing through thumb

─────GARAFOLA -DIRECT - FARSIOU─────

1   drives.  I didn't have anything to hide.  If I was putting it

2   in my personal email address, it just was a convenience.

3   Q.   With respect to the other documents, P-11, P-12, P-13,

4   P-14, -16 -- or -15 -16 -17.  Those are the manuals, the

5   tutorials, and things like that, right?

6   A.   Correct.

7   Q.   These were the ones that you needed to revise, right?

8   A.   Correct.

9   Q.   That's why you wanted them?

10  A.   Yup.

11  Q.   Did you want them for any illicit purpose?

12  A.   They were useless.

13  Q.   Do you remember -- let me ask you this.

14       Do you remember August 1st of 2019?

15  A.   Yes, I was on vacation.  Oh, no.  Yes, I was.

16  Q.   What happened on August 1st of 2019?

17  A.   I wasn't on vacation.  August 1st -- the day before

18  August, my office received a phone call from Evan Welch saying

19  Larry better be in the office, we have an electrician coming

20  to look at all the light bulbs that need to be replaced.

21  Because I was having conversations with Alexa Essay a week

22  before that, according to the lease -- and my office was

23  complaining that the light bulbs needed to be replaced.

24       He said, go ahead, you get them and just send him the

25  bill.  I didn't want to do that because it took me months to

─GARAFOLA -DIRECT - FARSIOU─

1   get payment from Sandhills.  So I said, I'm going to have an

2   electrician come and he's going to give you an estimate.  You

3   deal with him.

4        The following day Mr. Welch says to me -- says to Sally,

5   who is the office manager, make sure Larry is there at 11

6   o'clock.  We have an electrician coming.

7   Q.   Okay.  What happened?

8   A.   I wasn't there.  Actually, I was out for lunch.

9        And Mr. Welch walked in, confiscated Marlene's computer.

10  Now she left already, sitting on her desk, her phone.  We

11  weren't looking to hide anything.  My cell phone was with me.

12  I am in Flemington, New Jersey, not in my office.  And my

13  laptop was turned up, open with my emails, all my work

14  information.  My son walked him into there, closed it, took

15  the laptop and left.

16       And then, my son called me and said, Evan's here.

17  There's been a security breach.  We need your phone.  I got on

18  the phone with Evan and I said, I'll meet you at a Wawa in

19  Flemington, and I handed him my phone.

20  Q.   Then after that, there was another meeting, correct?

21  A.   There was no meeting.

22  Q.   There was another visit, I should say?

23  A.   During my day off, yes.

24  Q.   What happened?

25  A.   Mr. Welch, Mr. Essay walked in unannounced in my office,

GARAFOLA -DIRECT - FARSIOU

1  which it's their office too, they can do that.  Ordered

2  everyone on unpaid leave, get out of the office.  Meanwhile,

3  you understand, this office building is mine and I have a

4  tenant downstairs, okay, so I'm extremely concerned and I made

5  sure my son was watching what was going on, put all your

6  laptops on this desk and your phones.

7  Q.  And they took everything, right?

8  A.  Yes.  Fortunate enough, I was away and I did have -- on

9  vacation.  I have no proof of it because it's all on my

10  laptop.  But thank goodness, I have security cameras inside

11  and outside my office so I could see what was going on.

12  Q.  Okay.  Now, after that, the day after this second visit,

13  everybody was fired, right?

14  A.  They were on unpaid leave on the 5th.  They were fired on

15  the 7th, including myself.

16  Q.  And with respect to that, at that point in time, no one

17  came to talk to you, did they?

18  A.  No.

19  Q.  Mr. Welch, Mr. Essay, Mr. Peed, no one came to you and

20  said, hey, we have this email, what's going on?

21  A.  No.

22  Q.  And if they -- if Mr. Welch had come to you and said,

23  hey, I have this email on July 7th that says you're going to

24  compete or you're going to go out and try to start a competing

25  business, what would you have said to him?

GARAFOLA -DIRECT - FARSIOU

1  A.   I talked -- I looked into it.  I'd be lying if I said I

2  wouldn't.  He's got -- I mean, there's proof of it, okay.

3  Q.   Right.

4  A.   But I knew I couldn't.  And I said, if you don't believe

5  me, here's the names of the two attorneys I went to speak to.

6  Q.   Okay.  And you could have shown and proven that you were

7  working for Sandhills, right?

8  A.   Correct.

9  Q.   Now, with respect to Facts Technology, Facts Technology

10 was created previously, correct?

11 A.   Yes, in 2004 or '5.

12 Q.   Was it active for how long?

13 A.   Two years, maybe.

14 Q.   Okay.  And with respect to Facts Technology, you -- you

15 resurrected it, right?

16 A.   Correct.

17 Q.   And you did that in 2019, right?

18 A.   Towards the end of 2019, yes.

19 Q.   At that point, you didn't have a job, did you?

20 A.   No.

21 Q.   And, with respect to Facts Technology, what is it that

22 you thought that Facts Technology could do at that point in

23 time when you first opened it?

24 A.   The first thing I thought was I could do -- I could

25 provide a marketplace outside of what Equipmentfacts did.

GARAFOLA -DIRECT - FARSIOU

1   Q.   And when you say "outside of what Equipmentfacts did,"

2   what do you mean by that?

3   A.   I couldn't do any online auctions in the equipment or

4   agricultural auction industry.  That was spelled out.  I went

5   to my attorneys to get advice on what I could do.

6   Q.   And obviously, you got sued, right?

7   A.   Twice.

8   Q.   And with respect to Facts Technology and providing a

9   marketplace to these other areas, are you -- did there come a

10  time when you just stopped doing that?

11  A.   Yeah, I didn't want to get involved in it.

12  Q.   Is that because you kept on getting sued?

13  A.   The first lawsuit, I said, that's not worth it.  I can't

14  afford to match the legal fees that that table can.

15  Q.   Now, the second lawsuit was based off of Facts

16  Technology, right?

17  A.   Correct.

18  Q.   And with respect to Facts Technology, which was, you

19  said, you're going to provide a platform that was outside of

20  what Equipmentfacts was doing, right?

21  A.   Correct.

22  Q.   And that -- how long did that last?

23  A.   I sent out one email blast on November 15th.  And shortly

24  after that, I got slapped with a lawsuit and a restraining

25  order.

──────GARAFOLA -DIRECT - FARSIOU──────

1    Q.   Now, with respect to the emails that went out, did you

2    have a Sandhills' document that you were looking at and

3    putting in email addresses?

4    A.   No.

5    Q.   Where did you get the email addresses from?

6    A.   When I started Facts Technology, I entered into a

7    distributorship agreement with Vortex Solutions out of

8    Montreal, Canada who was my technology provider from 2005 to

9    2016.

10   Q.   Does Vortex perform auctions?

11   A.   No.

12   Q.   And with respect to that, that's how you got the emails?

13   A.   They gave me 15,017 emails across the United States

14   across the -- all around the world.  That that was their

15   marketing email list that they gave to me.  That was part of

16   our negotiations.

17   Q.   And with respect to Facts Technology and getting out of

18   this platform business --

19   A.   Marketplace.

20   Q.   Marketplace?

21   A.   Is what I prefer to call it.

22   Q.   You're not doing that now, right?

23   A.   No.

24   Q.   And you haven't been doing that, right?

25   A.   No.

─────GARAFOLA -DIRECT - FARSIOU─────

1    Q.   How long have you been out of that?

2    A.   I haven't done anything since the action that brought me

3    here.

4    Q.   Okay.  You did do --

5    A.   I did do a Collector Car Auction.

6    Q.   Collector Car Auction for Permian, right?

7    A.   No, I did a Collector Car Auction for Vicari under

8    collectorcarfacts.com, which was a domain that I own, and I

9    did not sell it to Sandhills.

10   Q.   Okay.  Did Equipmentfacts do that when you were at

11   Equipmentfacts under Sandhills?

12   A.   No.

13   Q.   In fact, you saw the email that was provided in this

14   case?

15   A.   One of the P documents.

16   Q.   And what the plaintiffs had brought up -- if you go to

17   P-19, sir.

18   A.   Yes, I'm here.

19   Q.   P-19 is the document that discusses CollectorCarFacts,

20   right?

21   A.   Correct.

22   Q.   And you say it's no different than Equipmentfacts, right?

23   A.   Yup.

24   Q.   That wasn't a brand that Equipmentfacts was involved in?

25   A.   No.

─────GARAFOLA -DIRECT - FARSIOU─────

1    Q.   In fact, you're trying to get them involved in it, right?

2    A.   When I -- I had CollectorCarFacts and I had MachineFacts,

3    separate companies, separate entities.  And I was bringing

4    this to Sandhills to say, let's get involved in this.

5    Q.   So that was not a part of Equipmentfacts that you sold?

6    A.   No.

7    Q.   And with respect to the CollectorCarFacts email here in

8    P-19, what was the reaction you got as to whether or not you

9    were --

10   A.   Do it on HiBid under their -- under some terminology --

11   under some division.  And I said, no, this has to act like a

12   marketplace.

13   Q.   What's your understanding as to during the time frame

14   that we're talking about as to whether or not HiBid was a

15   Sandhills' company?

16   A.   They advertised -- at this time I thought it was a

17   Sandhills' company and owned by Sandhills.  But I knew and I

18   had -- the conversation came straight out from Evan Welch

19   where they were very creative in their press release calling

20   it a strategic partnership, but he did tell me that we

21   actually bought them out and we own them.

22   Q.   Okay.  But you didn't know that?

23   A.   No, I didn't know -- I was assuming Sandhills owned them.

24   Q.   Well, do you know whether or not the documents support

25   whether or not they own them?

GARAFOLA -DIRECT - FARSIOU

1    A.   No.

2    Q.   So before I get there, let me just -- with respect to

3    that Collector Car email that they brought up, the reaction to

4    wanting to do this from Carson Schott and Evan wasn't very

5    good, was it?

6    A.   No, I got shot down.

7    Q.   So CollectorCarFacts was something that you thought you

8    could do, right?

9    A.   Yes.

10   Q.   And you still think you can do that if you wanted to,

11   right?

12   A.   Correct.

13   Q.   But you're not doing that?

14   A.   No.

15   Q.   And with respect to going into -- after this is all done,

16   you're not going to do this marketplace business anymore.  You

17   decided to go and do something else, right?

18   A.   Yes.

19   Q.   And what was that?

20   A.   License software.

21   Q.   And when you say "license software," you heard -- again,

22   you heard Mr. Welch going back and forth with me over what

23   software was, what platform was.  You say marketplace.

24        Is a marketplace or a platform software?

25   A.   It uses software, but it's not -- it does not license

GARAFOLA -DIRECT - FARSIOU

1   software.  Equipmentfacts never had a licensing software

2   agreement with an auctioneer in the 18 or 19 years I owned it.

3   All we had was an online auction service agreement.

4   Q.   So, as far as you know -- and you heard Mr. Welch testify

5   the first time that they don't provide a software license to a

6   third-party and then not perform their own -- perform that

7   auction, right?

8   A.   Under the Equipmentfacts or the auction industries

9   they're in, no.

10  Q.   And that is something that you want to do, right?

11  A.   Correct.

12  Q.   So you don't want to get into the auction business,

13  right?

14  A.   Too old for it.

15  Q.   And now, you want to do is to license software to

16  third-parties?

17  A.   To auction companies or to dealers.  Two different

18  products.

19  Q.   Okay.  And the software that you would be licensing to

20  them, would you do anything else with that software?

21  A.   Give them a user name and a password and walk away.

22  Q.   Okay.  And with respect to the software that Sandhills

23  would use, whether it's Equipmentfacts/BidCaller, they don't

24  do that, right?

25  A.   No.

GARAFOLA -DIRECT - FARSIOU

1    Q.   They provide a software plus all the other things that

2    they do, right?

3    A.   Marketing, advertising, bidder management, assistance in

4    collecting funds and posting all those auctions on their

5    websites, as well as auction results.

6    Q.   Okay.  And the licensing of the software, doesn't

7    necessarily have to go to an auction company, does it?

8    A.   No.

9    Q.   Who else can get a license?

10   A.   Dealers, fleet managers, fleet owners.  Anybody with --

11   and it doesn't have to be in a specific auction industry.

12   Anyone that has a product that they want to manage or

13   liquidate.

14   Q.   And that is something that -- and you have a licensing

15   software agreement?

16   A.   Yes, I do.

17   Q.   And that is not something that Sandhills provides?

18   A.   Not under Equipmentfacts or any of their auction things,

19   other than their HiBid system.

20   Q.   Now, I want to get into that a little bit.

21   A.   And understand, I don't -- I wasn't involved in HiBid at

22   all, so I don't know the workings of it.

23           MR. FARSIOU:  D-19, D-20, and D-21.

24   (Defendant's Exhibit D-19, D-20, and D-21 for Identification.)

25   BY MR. FARSIOU:

─────GARAFOLA -DIRECT - FARSIOU─────

1   Q.   By the way, Mr. Garafola, you've seen the documents that

2   have been filed in this case by Sandhills?

3   A.   Yes.

4   Q.   Have you ever seen HiBid or AuctionFlex used?

5   A.   Never, except in their comparison presentation that they

6   put on that screen on February 6th.

7   Q.   That was the first time you saw it, right?

8   A.   Yes.

9   Q.   And with respect to that, D-19 is a document that says

10  "HiBid and AuctionFlex Service Agreement," right?

11  A.   Yes.

12  Q.   Is there anything on this document that says Sandhills?

13  A.   No.

14  Q.   In fact, if you go all the way to the bottom, it says,

15  "Company" shall mean 5 Palms (doing business as HiBid and

16  AuctionFlex) business address at 1308 SE 25th Loop, Ocala,

17  Florida, 34471, right?

18  A.   Yes.

19  Q.   There's nothing on this document that says that HiBid is

20  owned by Sandhills?

21  A.   Correct.

22  Q.   If you go to D-20.  D-20 is a one-page document.  5

23  Palms, LLC, it's a corporate and business search.

24       Do you see that?

25  A.   Yes.

—GARAFOLA -DIRECT - FARSIOU—

 1   Q.   Who does it say the registered agent and --

 2   A.   Shawn Peed.

 3   Q.   You got to let me finish the question.

 4   A.   Okay.  I'm sorry.

 5   Q.   Registered agent and office address is who?

 6   A.   Shawn Peed, 120 West Harvest Drive, Lincoln, Nebraska,

 7   68521.

 8   Q.   Now, Shawn Peed also is the owner of Sandhills, right?

 9   A.   Yes.

10   Q.   Okay.  Is there anything on this document, this corporate

11   research -- or search document that says "Sandhills"?

12   A.   No.

13   Q.   And in fact, it says "Certificate of Organization,

14   January 17, 2017."

15        Do you see that?

16   A.   Yes.

17   Q.   It says "Proof of Publication, February 21, 2017"?

18   A.   Yes.

19   Q.   "Biennial Report, February 27, 2019"?

20   A.   Yes.

21   Q.   And then, it says "Statement of Dissolution"?

22   A.   "December 19, 2019."

23   Q.   If you go to D-21.  This is a Certificate of Withdrawal

24   of Authority to Transact Business in Florida.

25        Do you see that?

GARAFOLA -DIRECT - FARSIOU

1    A.    Yes.

2    Q.    What date was it filed?

3    A.    June 3rd, 2020.

4    Q.    Read the date again.

5    A.    January 3rd, 2020.

6    Q.    And it says the name of the limited liability company as

7    currently filed with the Florida Department of State, 5 Palms,

8    LLC, right?

9    A.    Yes.

10   Q.    And the signature is of who?

11   A.    Shawn Peed.

12   Q.    Anything on here that says Sandhills?

13   A.    Nothing.

14   Q.    And in fact, you never had any discussions about whether

15   or not or at some point -- strike that.

16        You said that Mr. Welch told you at some point that HiBid

17   was bought by Sandhills?

18   A.    Yes.

19   Q.    That's not what these documents say, do they?

20   A.    No.

21   Q.    Now, with respect to Equipmentfacts that you were dealing

22   with -- the Equipmentfacts that you were dealing with

23   obviously did not -- it did not do any licensing of software.

24   You called it white label, right?

25   A.    White label, self-branded, yes.

GARAFOLA -DIRECT - FARSIOU

1    Q.   What does that mean?

2    A.   White label means you take software, you give it to a

3    person, an individual, corporation, whatever you want to do.

4    They brand it themselves.  They put their own names on it and

5    they do what they wish with it.

6    Q.   Okay.  Now --

7    A.   Very similar to when you want to download Microsoft Word

8    to your laptop.  You go in, you download it, it becomes yours.

9    Q.   By the way, when Sandhills came in and took all the

10   computers, did -- would those computers have the beginning or

11   somewhat finished product of a revised manual or tutorial?

12   A.   Yes.  My son's laptop and Daniel's laptop, both of their

13   Dell and their Mac that they recently received from Sandhills,

14   would have that information on there.

15   Q.   Did you purposely delete anything off of your computer,

16   your work computer that would have pertained to Sandhills?

17   A.   No.  And if I did, it was just normal documents that I

18   would just delete whatever they were, receipts from hotels or

19   anything, nothing malicious.

20   Q.   That was something that you would normally do?

21   A.   Absolutely.

22   Q.   Now, with respect to making a living.  Currently, what

23   are you doing?

24   A.   Nothing.

25   Q.   Now, you want the Court to know that you want to make a

GARAFOLA -DIRECT - FARSIOU

1    living doing what?

2    A.    Licensing software.

3    Q.    Under Facts Technology?

4    A.    Yes.

5    Q.    Okay.  You're not going to do auctions?

6    A.    I have no desire to do any marketplace environment

7    auctions.

8    Q.    And with respect to selling of the software, that is

9    something that you believe you can do based off of what you've

10   been told, right?

11   A.    Correct.

12   Q.    And with respect to the selling of the software, when you

13   sell the --

14   A.    I license the software.

15   Q.    When you license the software, could that person who buys

16   the software, if they're an auctioneer, could they technically

17   go to Sandhills and say "This is the software I want to use"?

18   A.    If they want Sandhills to market and advertise their

19   auction and introduce it to their bidders, they could.

20   Q.    Now, what's really important is that -- a couple of key

21   differences between licensing software and what Sandhills

22   provides.  Sandhills provides, as part of their package,

23   right, advertising?

24   A.    Yes.

25   Q.    And the biggest thing is they provide their bidders to

───────GARAFOLA -DIRECT - FARSIOU───────

1    the auction, right?

2    A.   That's, in my opinion, the Number 1 reason why

3    auctioneers would engage -- have engaged in the services of

4    Equipmentfacts in the past and Equipmentfacts now and what

5    makes us unique.

6         What made Equipmentfacts unique -- and absolutely

7    BidCaller, back then, is that we were specific in an equipment

8    and agricultural auction industry.  Every other marketplace

9    that's out there does all kinds of auctions.

10        Proxibid does real estate, does industrial, estate

11   auctions, coin auctions.  I never did any of that.  If I had

12   an auctioneer that came to me and said, Larry, I have an

13   industrial auction or if I have a coin auction, I would tell

14   them, don't come to me.  I don't have the bidders.  Go

15   somewhere else.

16   Q.   You do understand Sandhills is taking a position you

17   can't do anything on online auctions?

18   A.   I can't even sell beef.

19   Q.   Okay.  Correct.

20        Now, with respect to that, what you just testified to,

21   that is, when you say they -- this is why auctioneers would

22   hire a company like Equipmentfacts, right?

23   A.   Correct.

24   Q.   And you don't do any of that, do you?

25   A.   No.

GARAFOLA -DIRECT - FARSIOU

1  Q.  You don't provide advertisements, do you?

2  A.  No advertising, no bidders.  I do not list auctions.  I

3  do not list who my clients are or even if they are auction

4  companies.  All of this is listed on Equipmentfacts.

5  Q.  And that's one of the things that they try to get people

6  to use their software because they do all of that for them,

7  correct?

8  A.  Correct.

9  Q.  Now, you sold the company for $1.5 million, and you had a

10 salary of -- I guess, the base salary was 170, right?

11 A.  Yes.

12 Q.  Now, with respect to that, you heard Mr. Welch testify

13 that, you know, we paid good money for everything, okay.

14     With respect to you personally, are you able to sit back

15 and not work?

16 A.  No.

17 Q.  And right now, you have no income coming in, do you?

18 A.  Zero.

19 Q.  And do you need to work?

20 A.  Yes.

21 Q.  Why is that?

22 A.  Four children and a wife.

23 Q.  Now, you heard Mr. Welch testify that they lost Permian

24 and they lost Superior, right?

25 A.  Correct.

─────GARAFOLA -DIRECT - FARSIOU─────

1    Q.   And I just want to make sure that I'm clear and the

2    record is clear.

3         You never did any work with Superior Auctioneers, did

4    you?

5    A.   Never.

6    Q.   And you didn't steer them in any direction, did you?

7    A.   No.

8    Q.   You didn't do -- Permian didn't come to you immediately

9    when they left Sandhills, right?

10   A.   No.

11   Q.   You did do an auction for them, right?

12   A.   After they used another -- two other providers, yes.

13   Q.   They came to you and they wanted you to do an Oil Field

14   Auction, correct?

15   A.   Correct.

16   Q.   And that was the one auction that you did?

17   A.   I think I did two to be honest with you.

18   Q.   So you did two auctions?  Did you do anything else?

19   A.   No.

20   Q.   And you haven't done anything since, right?

21   A.   No.

22   Q.   Okay.  And you're not here to say that you didn't do any

23   of that stuff because you did it and you thought you could do

24   it, right?

25   A.   I thought it was outside -- I mean, you have Sandhills

GARAFOLA -DIRECT - FARSIOU

1    with a publication for equipment, a publication for trucks, a

2    publication for oil field or a digital publication.

3         In my -- in my conversations with attorneys, in my

4    observations, I felt that I could do Collector Car Auctions.

5    I could do Collectible Auctions.  I could do Oil Field

6    Auctions.  These are all different auction industries.  And

7    I've been in this auction industry for over 25 years.  I

8    pretty much know what the industries are.

9    Q.   And you heard that -- you just said that you can't even

10   sell beef.

11        Do you remember you said that?

12   A.   Yes.

13   Q.   Do you think that Sandhills is trying to prevent you from

14   working in areas that they don't do auctions in?

15   A.   Absolutely.

16   Q.   And with respect to that -- not that you want to go sell

17   meat, but...

18        Did you ever -- you heard Mr. Welch testify they don't

19   even do auctions for selling of meat, right?

20   A.   No.

21   Q.   But he testified that you'd be prevented from doing that,

22   right?

23   A.   Yes.

24   Q.   And do you think that's been basically the focus of what

25   Sandhills really wants to do is prevent you from doing

─────GARAFOLA -DIRECT - FARSIOU─────

1   anything in the auction industry?

2   A.   Absolutely.  And I think to add on top of that is they

3   want to protect AuctionFlex and HiBid.

4   Q.   Which they don't own or didn't own at least?

5   A.   Up until -- who knows what took place the last 30 last

6   days.  I don't know.

7   Q.   Now, with respect to your time at Sandhills, would you

8   agree with me that they courted you pretty heavily?

9   A.   Yes.

10  Q.   And they wanted to get -- they wanted to have a great

11  product on the online auction, right?

12  A.   Yes.

13  Q.   In your industry and the Equipmentfacts industry, right?

14  A.   Correct.

15  Q.   And throughout that year or 10 months, is it safe to say

16  that you were teaching them how to do things?

17  A.   Absolutely.

18  Q.   And did it come -- did you come to have a feeling in --

19  when this all went down in August, did you have a feeling as

20  to what you felt happened to you?

21  A.   Yes.

22  Q.   What is that?

23  A.   It started May 3rd when I got a phone call from Evan

24  Welch saying that all auction clerks of yours, their

25  commissions are getting cut in half.  We're giving it to the

—GARAFOLA -DIRECT - FARSIOU—

1    sales reps.

2        May 3rd -- I don't know if it was May 3rd.  And we're

3    giving all responsibilities to the sales reps.  That was the

4    first time I felt compromised and that they had an agenda.

5    Q.   And that was right after they wanted -- that's after they

6    implemented their BidCaller system?

7    A.   The new software, correct.

8    Q.   Now, Mr. Welch testified that you were the one that said,

9    hey, it's ready to go.

10       Do you remember that?

11   A.   Yeah, I remember.

12   Q.   Did that happen?

13   A.   No.

14   Q.   Do you remember -- I believe you testified that you told

15   him that you didn't think it was ready?

16   A.   I wanted to see it, and I was told you really can't see

17   the finished product until it goes live.  And my entire office

18   was in shock to hear that I couldn't see it.  I saw parts of

19   it, and I worked on parts of it.  I said, yeah, this looks

20   good.  This doesn't look good.  This has to be changed.  But

21   they -- the words out of Evan Welch was "We're tired of paying

22   $15,000 a month to Bidpath.  We got to use our own."

23       And I said, "You want to pick the 29th, go right ahead.

24   You're paying the bill.  It's your company."

25   Q.   You didn't bless the new software, did you?  You're

GARAFOLA -DIRECT - FARSIOU

1   saying you didn't give it your blessings?

2   A.   I still don't.

3   Q.   Let me ask you this question.  At that point, you said

4   you felt compromised, right?

5   A.   Yes.

6   Q.   And when you say "compromised," what do you mean by that?

7   A.   That it looked -- I was seeing the picture on the wall.

8   It started with conversations with Alex Essay about extending

9   my lease to 3 to 5 years rather than the 6-month renewal.

10  Because everything was supposed to stay the same, okay.  And

11  after hounding him for a couple of weeks, the response was,

12  Sandhills doesn't have an appetite to renew your lease in a

13  longer term.

14       And then it was brought to my attention by several staff

15  members of mine in New Jersey that the job postings or the

16  career postings on Indeed were removed from the Flemington

17  office and were now in Lincoln, Nebraska.

18  Q.   Okay.  And at that point, when you get into May of 2019,

19  you have shared a lot of information -- readily shared it

20  because you wanted this thing to work, right?

21  A.   Oh, yeah.  And I shared my dislikes of the software, the

22  dislikes of losing clients.  They often called me crying wolf.

23  And at one point I actually stepped back and I let my auction

24  clerks, who have been with me 10, 12, 15 years speak up.  And

25  finally, some of the people in Sandhills started listening to

GARAFOLA -DIRECT - FARSIOU

1    my auction clerks.  And they said, why don't you videotape the

2    errors that are happening in this software.

3        And the icing on the cake was when I was at an auction

4    with Marlene Greene and the software was working backwards,

5    the auctioneer had big monitors up at the auction and there

6    were six Equipmentfacts' auctioneer clients working that

7    auction as a staff member for this one particular auctioneer,

8    they were laughing at the way this technology was going.  And

9    Marlene was clerking.  And she's worked -- I've known her for

10   19 years, 20 years.  It's the first time I saw a tear come out

11   of her eye because how embarrassed she was of what

12   Equipmentfacts turned into and how the software stunk.

13   Q.   Well, at that point, later on that month is when you had

14   the issues with Permian, right?

15   A.   Yes.

16   Q.   And even though you had this feeling, you wanted to make

17   this work somehow?

18   A.   I had no choice.  I needed to work.  I had a son that was

19   working for me, a nephew that was working for me, and I was

20   trying to get my youngest son, who just graduated college, who

21   was a subcontractor clerking auctions for Sandhills, to try to

22   get him a full-time job as a salesperson, or a sales rep, and

23   I had numerous conversations with Carson Schott about that,

24   but he never had the chance.

25   Q.   Well, on top of all the other issues that you were

GARAFOLA -DIRECT - FARSIOU

1   having, you also -- how many employees were in New Jersey?

2   A.   13.

3   Q.   And these 13 people, you told them, Everything's going to

4   stay the same.  We're going to stay in New Jersey.  We're

5   going to work, right?

6   A.   Yup.

7   Q.   And they all got fired?

8   A.   All but two that didn't work in the office.  One lived in

9   South Carolina, another one lived in Jersey City, New Jersey.

10  He was a traveling, remote employee.

11  Q.   Everyone else got fired?

12  A.   Yup.  And they lost 50 percent of their comission, which

13  really aggravates the hell out of me.

14  Q.   So these were the issues that you were having and

15  eventually this is part of the reason why you were willing to

16  listen to Mr. Brindley, right?

17  A.   Yes.

18  Q.   And then you -- you told him you couldn't do it?

19  A.   Absolutely.

20       MR. FARSIOU:  Judge, I don't think I have any further

21  questions.

22       THE COURT:  It is 1:53.  We're going to go ahead and

23  take a short afternoon break, and we'll resume in about

24  15 minutes and at that time I'm going to invite plaintiff's

25  counsel to cross-examine.

──────GARAFOLA - CROSS - MILLER──────

1          MR. MILLER:  Thank you, Judge.

2          THE DEPUTY COURT CLERK:  All rise.

3          (Recess at 1:54 p.m.)

4          THE DEPUTY COURT CLERK:  All rise.

5          (Open court begins at 2:08 p.m.)

6          THE COURT:  Please be seated.  Mr. Miller.

7          MR. MILLER:  Thank you, your Honor.

8  (CROSS EXAMINATION BY MR. MILLER:)

9  Q.   Good afternoon, Mr. Garafola.  I know we've seen each

10 other.  Obviously, my name is John Miller.  I represent

11 Sandhills.  Despite the circumstances, it's nice to meet you.

12 A.   Same here.

13 Q.   Mr. Garafola, in this action, the Court entered a

14 temporary restraining order.

15      Are you aware of that?

16 A.   Yes.

17 Q.   Did you have an opportunity to review what the Judge

18 ordered?

19 A.   Yes.

20 Q.   And when's the last time you reviewed the temporary

21 restraining order the judge issued?

22 A.   Probably right before the February 6th hearing.

23 Q.   If you can, in the defendants' documents, the

24 D-documents, go to D-12, please.

25 A.   12?

—GARAFOLA - CROSS - MILLER—

1  Q.   D-12.  One, two.

2  A.   Yes.

3  Q.   Are you there?

4  A.   Yes, I am.

5  Q.   I just want to understand this document.  In particular,

6  there's a date on there.  Top right corner.  This is D-12.

7      It's an email -- Gmail/email with an attachment.  There's

8  a printout date or I think it's a printout date.

9      Do you see Sunday February 9, 2020?

10 A.   Yes.

11 Q.   Did you print this document out?

12 A.   Yes.

13 Q.   And did you also print out the attachment?

14 A.   Yes.

15 Q.   And, for the record, can you read what the attachment --

16 the title of that attachment is?

17 A.   "Equipmentfacts, LLC.  Top Bidders."

18 Q.   And to date, you haven't returned any of Equipmentfacts'

19 documents, correct?

20 A.   Correct.  Say that again?

21 Q.   To date, as of today, you've not returned any of

22 Equipmentfacts' documents?

23 A.   I returned everything that Sandhills requested me of

24 which was on my laptop that was confiscated.  You're going to

25 ask me where this came from next I'm sure, but I'll wait for

GARAFOLA - CROSS - MILLER

1    you to ask that.

2    Q.   And this document came from your Gmail account, right?

3    A.   No.

4    Q.   Where did it come from?

5    A.   From an old phone.  After sitting here listening to Evan

6    Welch testify on February 6 about this information and hearing

7    my attorney hold up 500-something pages that were given at

8    6:29 p.m. the night before of evidence, I had a chance to look

9    at it, I said to myself, there's a whole lot more emails.  And

10   I remembered there was an old personal phone of mine that was

11   deactivated that had an Equipmentfacts on the application of

12   that phone.

13       And I turned it on, and there were about -- there was a

14   ton of emails.  I probably could have produced a lot of them,

15   but they were deleted and said removed from the server.

16   There were just a few that I knew that would change the look

17   of this case, and, so, I sent it to my attorney and I

18   forwarded them -- first, I tried to print them.  I'm not an

19   iPhone expert, from my iPhone, and they became real big and

20   ugly.

21       And I said to Steve, I can't -- I don't know how to

22   do this -- the way to do this, but you can send them -- that

23   was the email program built into the iPhone.  On that same

24   iPhone I have a Gmail app, and I'm able to send it from that

25   Gmail app to Steve and that's what I did.

GARAFOLA - CROSS - MILLER

1   Q.   And I don't want any discussions between you and your

2   attorney.

3   A.   Okay.

4   Q.   He'll follow-up with that.

5        Other than this email that you forwarded on to your

6   attorney to print out, were there any other emails related to

7   your employment at Equipmentfacts?

8   A.   Nothing other than -- most of it was my correspondence

9   with Lynn McDougall during the negotiations.  That was 98, 99

10  percent of it was on that phone.

11  Q.   And that one percent that you weren't testifying to

12  related to Ms. McDougall, did that have anything to do with

13  Equipmentfacts?

14  A.   Repeat that.

15  Q.   Did it have anything to do, the correspondence, the

16  Gmail, that one percent, did that have anything to do with

17  your employment at Equipmentfacts as --

18  A.   No.  No.

19  Q.   I'd ask you to preserve that phone.

20  A.   Absolutely.

21  Q.   And when -- and you've had this phone in your possession

22  for how long?

23  A.   Three, four, five years.

24  Q.   Any other electronic devices that might contain either

25  emails, documents, old phones, Think pads, any kind of

GARAFOLA - CROSS - MILLER

1  electronic devices?

2  A.   None.

3  Q.   Do you have -- it sounded like with your testimony before

4  that you prefer to print things out to review them in hard

5  copy; is that correct?

6  A.   Correct.

7  Q.   Have you printed out any Equipmentfacts' documents to

8  review hard copy that haven't otherwise been produced to us in

9  this litigation?

10  A.   None.

11  Q.   And you destroyed them?

12  A.   Yes.

13  Q.   About when?

14  A.   Sitting with Mr. -- in his office, going over testimony,

15  I handed them all out, ripped them up, and that was it.  But

16  anything that you show on August 6th that was sent from Evan

17  Welch to Alex Essay, I don't have any printed copies, hard

18  copies.  I have no need for it.

19  Q.   Okay.  And again, I don't want any part of discussion

20  with your counsel.

21  A.   No, I'm sorry.

22  Q.   No.  No.  You haven't done so, and I appreciate that.

23  But I just want to get some clarity around them, and then I'll

24  move on.

25  A.   Okay.

─────GARAFOLA - CROSS - MILLER─────

1   Q.   You were sitting in an office and you ripped up

2   documents?

3   A.   Yes.

4   Q.   Is that your testimony?

5   A.   Yes.  Threw them away.

6   Q.   And did that have anything to do with the acquisition of

7   Equipmentfacts by Sandhills?

8   A.   I still have all the due diligence documents --

9   Q.   I'm talking about the ones you ripped up.  And I

10  apologize for interrupting you.

11  A.   No.  No.

12  Q.   So, what did they have to do with?

13  A.   The one attachment that -- it was the second attachment,

14  which wasn't included on -- to my wife's email.  That was it.

15  A duplicate of what was other evidence, that's all.

16  Q.   And when you ripped it up, do you know whether it was

17  thrown out in the garbage?  Did you see it thrown out in the

18  garbage?

19  A.   I put it in my kitchen garbage.

20  Q.   I ask you again -- and I know your attorney will do it

21  and probably already did it -- I need for you to go home, look

22  at emails, look in your car, wherever you might have documents

23  related to this case, the acquisition of Equipmentfacts, your

24  termination and everything going on, I need you to turn that

25  over to your counsel because we'll be asking for all that.

GARAFOLA - CROSS - MILLER

1   A.   Okay.

2   Q.   Your sons with whom -- I mean, I've seen them.  I haven't

3   met them.

4        They're starting their own company, correct?

5   A.   They tried to, yeah.  They're attempting to, but they

6   actually stopped and one is starting a new job on Monday.

7   Q.   Congratulations to your son.

8   A.   Thank you.

9   Q.   The one you're saying that they stopped, is it officially

10  stopped, no longer operable?

11  A.   They were looking at -- this was this Equipment

12  Auctioneer that you're talking about.  They had an auction

13  planned.  They stopped it.

14  Q.   Okay.  Relative to that business, are you an investor in

15  it?

16  A.   No.

17  Q.   Are you going to receive any proceeds to the extent they

18  actually --

19  A.   Zero.

20  Q.   Just wait for me to finish.  The court reporter can't

21  take both of our conversations.  Thank you.

22       So you've given to them no monies relative to that?

23  A.   None.

24  Q.   Ms. Marlene Greene, the email exchange that we've been

25  talking about that had Mr. Brindley on it, do you recall that

GARAFOLA - CROSS - MILLER

1    email?

2    A.   Yes.

3    Q.   I can point it to you if --

4    A.   I'm clear.

5    Q.   That email exchange was while Ms. Greene was employed by

6    Equipmentfacts at that time, correct?

7    A.   Correct.

8    Q.   And you -- I think I got your testimony correct that at

9    some point you were considering your options because you were

10   frustrated with how things were going in Equipmentfacts?

11   A.   Correct.

12   Q.   And one of those options you were considering but didn't,

13   according to your testimony to exercise, was with Mr.

14   Brindley's company?

15   A.   Yes.

16   Q.   Did you suggest to Ms. Greene that she should join Mr.

17   Brindley's company?

18   A.   No.

19   Q.   You had no discussions with Ms. Greene about joining

20   Bidpath or Bidfacts?

21   A.   No, because just prior to that, her -- she told me she

22   put her résumé out on Indeed.  And what struck me was two

23   weeks prior to that, I had a phone conversation with Carson

24   Schott, and he said, do you know that Shane -- and I don't

25   know his last name but he's a Sandhills' employee that worked

GARAFOLA - CROSS - MILLER

1   with Equipmentfacts based in Lincoln, HR found his résumé on

2   Indeed.  Do you know if he's unhappy or not?  I said, I don't

3   know but Tom's going away with him on an auction, maybe I can

4   have Tom feel him out.  I don't know if Shane still works

5   there.  I've had no contact with them, but I just said to

6   Marlene, I said, just be very careful because HR looks at

7   Indeed for employees looking to leave.

8   Q.   Going back to the meeting you had with Mr. Brindley at

9   the NAA, did both you and Marlene meet with him?

10  A.   Marlene didn't attend the convention, no.

11  Q.   Facts Technology.

12  A.   Yes.

13  Q.   Facts Technology is an entity that currently exists

14  today, correct?

15  A.   Yes.

16  Q.   And I just want to understand sort of the construct, so

17  I'm going to ask questions that might seem obvious to you,

18  they're not to me, so just bear with me.

19       You testified that it was re-created or resurrected in

20  the later part of 2019, correct?

21  A.   Yes.

22  Q.   September 2019 sound about right?

23  A.   Unless I have the formation in front of me, I don't know

24  the exact but --

25  Q.   That's fair.

─GARAFOLA - CROSS - MILLER─

1   A.   Okay.

2   Q.   You're the registered agent for Facts Technology?

3   A.   I believe so, yes.

4   Q.   It might sound obvious, but you're the Founder of Facts

5   Technology?

6   A.   Yes.

7   Q.   You're also -- are there any shareholders?

8   A.   No.

9   Q.   You're the CEO?

10   A.   CEO member because I'm a LLC.

11   Q.   Any other members?

12   A.   None.

13   Q.   Business address, 699 U.S. Highway 202, Flemington, New

14   Jersey, 08 -- what's the rest of that zip?

15   A.   822.

16   Q.   08822?

17   A.   Yes.

18   Q.   That's the current address for Facts Technology?

19   A.   Correct.

20   Q.   That's the same address that Equipmentfacts is at,

21   correct?

22   A.   Yes, I own the building.

23   Q.   That was my next question.

24        And so you do still own that building?

25   A.   I do.

GARAFOLA - CROSS - MILLER

1    Q.    Does Facts Technology pay rent to you?

2    A.    No.

3    Q.    Is that because it's not making any money or because

4    there's no agreement for the rent?

5    A.    They don't make any money.

6    Q.    So if they did make money, there'd be a rental agreement

7    between the two, that is, Facts Technology would pay to you as

8    the owner, rent, in some way?

9    A.    In some format, yes.

10   Q.    Bank accounts.  Does Facts Technology have any bank

11   accounts currently in existence?

12   A.    One.

13   Q.    And with what bank?

14   A.    TD Bank.

15   Q.    TD Bank?

16   A.    Yes.

17   Q.    Is that the same bank that you had for Equipmentfacts?

18   A.    Yes.

19   Q.    Same bank account?

20   A.    No.

21   Q.    Entirely different account number?

22   A.    Correct.

23   Q.    And are you the person who has authorization to access

24   that account?

25   A.    Yes.

—GARAFOLA - CROSS - MILLER—

1    Q.   Does anybody else have authorization to access that

2    account?

3    A.   No one.

4    Q.   Not even your wife?

5    A.   No.

6    Q.   Credit cards.  Any credit cards that are issued on behalf

7    of Facts Technology and given to you as a member?

8    A.   None.

9    Q.   Now, I understand that, based on the rental testimony,

10   currently there is no money being made by Facts Technology and

11   we'll revisit that.

12        However, does Facts Technology provide to you any

13   remuneration i.e. money, say, for any kind of sale or any sale

14   in the future?

15   A.   At some point it could, yes.

16   Q.   Okay.  And would it be in the form of a salary?

17   A.   Or dividend.  I haven't had the luxury to get there yet.

18   Q.   That's fair.  Are you provided health insurance through

19   Facts Technology?

20   A.   No, I'm still current on the COBRA with Sandhills.

21   Q.   Okay.  Does Facts Technology provide to you either a

22   physical car or a car allowance?

23   A.   None.

24   Q.   I recognize that you described it as potentially getting

25   a dividend.  Do you have any 401K benefits through Facts

GARAFOLA - CROSS - MILLER

1    Technology?

2    A.    None.

3    Q.    Other than what I've just asked you about some of the

4    benefits, monetary or otherwise, is there anything that you

5    get from Facts Technology that I haven't talked about that

6    could be considered compensation or a benefit?

7    A.    None.

8    Q.    Facts Technology.  You're the sole member, correct?

9    A.    Yes.

10   Q.    Any employees?

11   A.    None.

12   Q.    So Facts Technology is you?

13   A.    Yes.

14   Q.    You testified earlier about certain of the companies with

15   whom you've done business with after your employment with

16   Sandhills.  I'm going to frame -- and the questions are all

17   going to stay within this time frame.  It's the termination of

18   your employment with Sandhills, which is, August of 2019 to

19   the date until today.

20        And the question to you -- and we're go to go through a

21   list.  It's very simple: Have you done any kind of business

22   with these entities?

23   A.    Okay.

24   Q.    First, I want to ask about Wolfe Industrial Auctions?

25   A.    Yes.

GARAFOLA - CROSS - MILLER

1    Q.   And in what capacity did you do business with them?

2    A.   They license software through Facts Technology.

3    Q.   Worldnet Auctions?

4    A.   None.

5    Q.   I'm going to butcher this.  Shetron, S-H-E-T-R-O-N,

6    Auction and Equipment?

7    A.   None.

8    Q.   Adesa, A-D-E-S-A?

9    A.   None.

10   Q.   Permian?

11   A.   Yes.

12   Q.   And what entity?  What entity provided services to

13   Permian?

14   A.   Facts Technology.

15   Q.   Now, on Permian, what service did you provide?

16   A.   I provided the marketplace under OilfieldFacts.

17   Q.   Okay.  And was that auction successful?  Did they

18   actually sell something, any of their inventory?

19   A.   Very, very, very small amount.

20   Q.   Okay.  Next one, Superior?

21   A.   No.

22   Q.   Have you tried to sell them a license?

23   A.   No.

24   Q.   Vicari?

25   A.   I've done one collector car auction with them under

GARAFOLA - CROSS - MILLER

1    CollectorCarFacts as a marketplace.

2    Q.    And for the Court's benefit, V-I-C-A-R-I.

3    A.    Correct.

4    Q.    Didn't you also do an auction for Vicari while still

5    employed with Sandhills and Equipmentfacts?

6    A.    Through HiBid, correct.

7    Q.    Okay.  Vicari, so that's -- in total, how many business

8    dealings have you had, irrespective if it's with

9    Equipmentfacts or with Facts Technology, have you had with

10   Vicari?  Just two?

11   A.    Yes.  Actually, I found out when I was at that Vicari

12   Auction administering the software, that we did them in 2005

13   or '6, I don't even -- I didn't even recall doing that.

14   Q.    Got it.  Iron Auction Group?

15   A.    They just licensed -- they did license software with

16   Facts Technology.

17   Q.    No other types of business with Facts Technology?

18   A.    None.

19   Q.    McGrew M-C-G-R-E-W Equipment?

20   A.    No.

21   Q.    Berryhill B-E-R-R-Y-H-I-L-L?

22   A.    No.

23   Q.    I've gone through this list.  So the question, then, is

24   going to get rolled back to you.

25        Other than those we've just spoken about in the time

─────GARAFOLA - CROSS - MILLER─────

1  frame post-termination with Sandhills until today, have you

2  done business in any capacity with any other of Sandhills'

3  customers?

4  A.   None.

5  Q.   Now, almost would seem obvious, but I'll ask you another

6  set of questions.  I'm going to be going through that same

7  list of clients, but the question is changed insofar as it's:

8  Have you had any contact with them for business purposes?

9  A.   Okay.

10 Q.   So, have you had contact with, for business purposes,

11 August 2019 to present, with any of the following: Wolfe

12 Industrial Auctions?

13 A.   Yes.

14 Q.   Worldnet Auctions?

15 A.   I can't recall.  I could say yes and I could say no.

16      Just, as I testified, when Steve was asking me questions,

17 I was given, in my distributor agreement with Vortex Solution,

18 I was given 15,017 email address auctioneer contacts.  He

19 could be in there.

20 Q.   That's fair.  And again, I'm just looking for your best

21 recollection.

22 A.   Okay.

23 Q.   But I do appreciate that explanation because 15,000 names

24 probably one drops in there, so I wouldn't --

25 A.   Yup.

GARAFOLA - CROSS - MILLER

1   Q.   Shetron Auction and Equipment?

2   A.   He would fall under that 15,000.  In fact, every one of

3   them would.

4   Q.   I'm just going to go through them.

5   A.   That's fine.

6   Q.   Adesa?

7   A.   No.

8   Q.   Permian?

9   A.   Yes.

10  Q.   Superior?

11  A.   No.

12  Q.   Vicari?

13  A.   I'll take that back.  Superior, I believe, was included

14  in that 15,000 email.

15  Q.   Got it.  Thanks for the clarification.

16       Iron -- we'll stay with Vicari?

17  A.   Yes.

18  Q.   Iron Auction Group?

19  A.   Yes.

20  Q.   McGrew Equipment?

21  A.   Yes, they were part of the 15,000.

22  Q.   Berryhill?

23  A.   Yes.

24  Q.   Jeff Martin Auctioneers?

25  A.   Yes.

————GARAFOLA - CROSS - MILLER————

1   Q.   Other than those that I've just listed, any others that

2   you can think of?  This is, again, for business purposes just

3   simply having contact with a former Equipmentfacts' client?

4   A.   Again, I've got 15,000 emails in my constant contact

5   database.  I couldn't pull out every name.

6   Q.   That's fair.

7   A.   Okay.

8   Q.   That list that was part of the arrangement you were

9   describing for 15,000 some odd, do you still have that

10   document?

11   A.   It's -- yes.

12   Q.   Actually, I missed one.  Ryan Auctions?

13   A.   No.

14   Q.   Now, you and I --

15   A.   I've been in -- I've seen him, but I didn't solicit his

16   business.

17   Q.   And when was it you saw him?

18   A.   Last week in Florida.

19   Q.   What were you doing -- what were both you and Mr. Ryan

20   doing in Florida at that time?

21   A.   He was selling.  I went to go to this big auction, Jeff

22   Martin's Auction, and then visit family members.

23   Q.   Got it.  And so, Jeff Martin is an Equipmentfacts'

24   client, correct?

25   A.   No.  Not Equipmentfacts, no.

GARAFOLA - CROSS - MILLER

1  Q.   Jeff Martin -- how about a Sandhills' customer?

2  A.   I don't know.  I believe they advertise with Sandhills.

3  Q.   Okay.  So, the differentiation you just made was between

4  Equipmentfacts and Sandhills?

5  A.   Sandhills is a broad name when you bring it up, but I

6  believe they advertise in some of their trade papers.  I don't

7  know if they sell on AuctionTime, but I know that their name

8  is not listed as of a few days ago on equipmentfacts.com.

9  Q.   There's a chance Jeff Martin Auctions utilizes

10 AuctionTime, correct?

11 A.   I think so.  I don't know.  There was a big -- there was

12 a legal issue.

13 Q.   Okay.

14 A.   So I don't know if he still does.

15 Q.   Fair.  Let's get back to your attendance at the Jeff

16 Martin Auction?

17 A.   Yes.

18 Q.   Were you invited there?

19 A.   No.

20 Q.   So how did you know it was taking place -- and, real

21 quick, back up.

22      What day was that auction?  How about the day of the

23 week?

24 A.   It was a Monday through -- a Thursday of last week.

25 Q.   And did you attend every day?

GARAFOLA - CROSS - MILLER

1    A.   No, just one day for about three hours.  And then I went

2    out to dinner with Joseph Polias (ph.), who was a 15-year

3    employee of mine.  And that was the majority -- the main

4    reason why I wanted to go there.  And him and I went out to

5    dinner.

6    Q.   Okay.  And you attended one day and that one day was on a

7    Monday, correct?

8    A.   No, it was actually on a Tuesday.  I flew Monday night.

9    Q.   And your attendance and time-wise, we had a hearing last

10   time on February 6th, do you remember that?

11   A.   Yes.

12   Q.   And it was the Tuesday following that hearing, correct?

13   A.   I believe, yes.

14   Q.   And when you -- did you introduce yourself to Mr. Martin

15   while there?

16   A.   He saw me.

17   Q.   Did you go up to him and say any words?

18   A.   He came up to me.  His wife gave me a kiss on the cheek.

19   He hugged me, you know, the man hug, and he went on his way.

20   Q.   Did you guys talk about any auction business?

21   A.   Nothing.

22   Q.   Did you guys talk about this litigation at all?

23   A.   No.

24   Q.   Subsequent to the time that you saw Mr. Martin at that

25   auction, have you spoken to him since?

GARAFOLA - CROSS - MILLER

1   A.   At the NAA Convention in July.

2   Q.   Okay.  And you hadn't spoken to him this week?

3   A.   No.  I texted him.

4   Q.   What did you text?

5   A.   If he spoke to Evan Welch about me.

6   Q.   What specifically did you ask him?

7   A.   Did you speak to Evan Welch about my case?  You know,

8   what's going on?  And he went huh with a question mark.  I did

9   speak to him, but I said nothing about you.

10  Q.   And that's a text message?

11  A.   Yes.

12  Q.   I'd ask you to preserve that.

13       Anything going on with your phone right now relative to

14  this case, your business, Facts Technology, I ask you to

15  preserve it.

16  A.   Okay.

17  Q.   There's no printing out and ripping up.  Promise you're

18  not going to do that?

19  A.   I may have deleted the email.  I mean, the text message.

20  Q.   Okay.  Do you have a practice of deleting text messages?

21  A.   Instantly.

22  Q.   So if I got your phone out now, other than today, there

23  wouldn't be text messages from anybody going back?

24  A.   There's a text message from my dentist, a text message

25  from my son, and I think my wife asking how's it going.

─────── GARAFOLA - CROSS - MILLER ───────

1   Q.   Very nice of your wife.

2        What service provider do you use?  Verizon?

3   A.   Verizon.

4   Q.   Okay.  And do you have any equipment at home, say, for

5   example, an iPad, an iPhone that you're not talking -- well,

6   are you using an iPhone, the one that you just talked about

7   texting?

8   A.   Yes.

9   Q.   Any other devices that are currently active utilizing any

10  kind of service including Verizon?

11          THE COURT:  One second.  Mr. Farsiou.

12          MR. FARSIOU:  I thought you said this wasn't going to

13  be a discovery.  This is a discovery.  This is what he's

14  prying in his discovery.  The point of this is a preliminary

15  injunction not to find out --

16          THE COURT:  I actually think, you're right, Mr.

17  Farsiou.

18          MR. FARSIOU:  Thank you.

19          MR. MILLER:  I'll move on.  The only reason this got

20  triggered was the ripping up of the piece of paper.  So let me

21  finish it out.

22  BY MR. MILLER:

23  Q.   Any other devices you used to communicate: email, text,

24  or otherwise, other than your iPhone that you delete texts

25  from?

GARAFOLA - CROSS - MILLER

1    A.    Nothing.

2    Q.    Okay.   Thank you.   If for some reason you find one, just

3    let your counsel now.

4         Now, Facts Technology's website is currently active,

5    correct?

6    A.    Yes.

7    Q.    Facts Technology is a currently operating business?

8    A.    Yes.

9    Q.    And it has a publicly available website; isn't that true?

10   A.    Correct.

11         MR. MILLER:   Judge, may I approach?

12         THE COURT:   Yes.

13         MR. MILLER:   I'm giving the witness P-25.

14   (Plaintiff's Exhibit P-25 for Identification.)

15   Q.    Mr. Garafola, just take a minute and review that

16   document.   Let me know when you're done.

17   A.    I'm done.

18   Q.    You'll notice on this document -- well, actually, let me

19   ask you, what does this document represent?

20   A.    The homepage of factstech.com.

21   Q.    Okay.   And can you tell as of when this was printed out?

22   A.    February 21st.

23   Q.    And I'll represent to you that earlier this morning I

24   printed this out, so that date is accurate.

25         What I want you to do -- and I know you said you looked

GARAFOLA - CROSS - MILLER

1    at it -- but please do.  There's three pages.  I couldn't get

2    it all on one page.  I apologize about that.

3         And is this what's currently available to the public if

4    they go to the Facts Technology website?

5    A.   Correct.

6    Q.   And I'm going to ask a couple of questions, and then I'm

7    going to ask it more broadly does it apply to the rest.

8         So start first with the description of Facts Technology.

9    Can you read that slowly into the record.  That's the Facts

10   Technology providing?

11   A.   "Facts Technology providing Auctioneers with cutting edge

12   technology, support and services for decades."

13   Q.   Please continue.

14   A.   "We know the auction industry and we talk the language.

15   Give us a call or send us an email to learn more."

16   Q.   And that's an accurate reflection of what you believe as

17   the creator of Facts Technology, what that company provides?

18   A.   At the time that I built this website, yes.

19   Q.   And that website's still live, correct?

20   A.   Yes.

21   Q.   I want to -- and again, this is where I apologize.  You

22   see the -- we go next down and there is a thing called

23   "brands"?

24   A.   Yes.

25   Q.   Are brands what you're equating to marketplace?

GARAFOLA - CROSS - MILLER

1    A.   Yes.

2    Q.   OilfieldFacts, right-hand side of that document.

3         Do you see that?

4    A.   Yes.

5    Q.   I'm going to ask you to read the description.  You're

6    going to have to continue on to the second page, the lines

7    continue from there.

8         But please tell me what your description of what

9    OilfieldFacts provides to customers?

10   A.   "Empowering Oil Field Auctioneers with the most advanced

11   online (sic) technology and customer support services."  And

12   then there's a space, then it says "learn more."

13   Q.   And I don't mean to be a stickler, but can you read it

14   again and make sure you get all the words in there because you

15   left one out.

16   A.   "Empowering Oil Field Auctioneers with the most advanced

17   online bidding technology and customer support services."

18   Space, plus, and then it says "learn more."

19   Q.   Perfect.  You had just left out the bidding component.  I

20   just wanted to make sure it was accurate.

21        Now, you'll see that that same language is utilized

22   throughout each of the brands or marketplaces.

23        Do you see that?

24   A.   It's not.

25   Q.   Where does it differ?

GARAFOLA - CROSS - MILLER

1   A.   Dealer-Facts and AuctioneerFacts.

2   Q.   So tell me this, where Dealer-Facts once existed, wasn't

3   there something else?

4   A.   Yes, it was called Bidderfacts.

5   Q.   Why did you change that?

6   A.   To make room for Dealer-Facts.

7   Q.   Where did Bidderfacts go?

8   A.   In 2004 to 2008 I had a website, an alternate page on

9   Equipmentfacts' website called "Bidderfacts."  And Bidderfacts

10  was a domain name.  And the reason why I created Bidderfacts

11  was, in my thoughts, back then, and understand the online

12  bidding and marketplace was real new, Bidderfacts was to help

13  auctioneers, bidders with transportation for export, for

14  financing.  And we had a few paying customers on that website

15  that had banner ads and that's where Bidderfacts comes in.

16       And I -- when I was looking to start a business and make

17  money for my family, I said, let me just throw -- if you

18  notice, it's a grid here.  And I put Bidderfacts in there

19  thinking that maybe I could create a website or a division and

20  bring back some revenue by getting these logistic companies in

21  there to -- and finance companies and anything related to

22  bidders and what their needs were.

23  Q.   And you took it off why?

24  A.   To make room for Dealer-Facts.

25  Q.   Are you providing anything that Bidderfacts -- the

GARAFOLA - CROSS - MILLER

1   services that Bidderfacts was contemplated to provide, are you

2   still providing those today?

3   A.   No.

4   Q.   Now, I'd like you to go down to AuctioneerFacts.

5   A.   In fact, I don't -- someone bought the domain name.

6   Q.   Okay.  Is that why you took it down because someone

7   bought it or because --

8   A.   I couldn't get it.

9   Q.   Got it.  Did you get a cease and desist letter from

10   someone?

11   A.   No.

12   Q.   The bottom of this page, the second page.

13   A.   Yes.

14   Q.   Under Dealer-Facts, do you see AuctioneerFacts?

15   A.   Yes.

16   Q.   Slowly, for the court reporter's benefit, can you read

17   the description for AuctioneerFacts?

18   A.   Yes.

19        "Empowering the Auctioneer with a complete, powerful and

20   flexible online auction solution.  Fully integrated White

21   Label solution, seamless integration to your corporate look

22   and feel, Goggle friendly, SEO-driven (Search Engine

23   Optimization) catalog.  Requires only the most minimal

24   integration and requires minimal investment to get started."

25   Q.   Is that description you've just read accurate as of

GARAFOLA - CROSS - MILLER

1  today?

2  A.   Yes.

3  Q.   Now, I had you read earlier the description for

4  OilfieldFacts.

5       Do you remember that?

6  A.   Yes.

7  Q.   When I corrected you asking you to put bidding back in?

8  A.   Yes.

9  Q.   And other than Dealer-Facts that description contained

10  with OilfieldFacts appears on the other marketplaces or

11  brands, correct?

12  A.   Correct.

13       MR. MILLER:   I'm handing the witness P-26.

14  (Plaintiff's Exhibit P-26 for Identification.)

15  Q.   Mr. Garafola, take a minute to review that two-page

16  document, and let me know when you're ready.

17  A.   The second page is pretty much empty.

18  Q.   That's, again, my printing error.

19  A.   No, problem.  I'm familiar with it.

20  Q.   And what I'd like you to do -- and I know it's going to

21  seem laborious but this hasn't yet been done.  I'm going to be

22  asking you to read the description into the record.

23       We're going to start, first, with the first paragraph.

24  If I have questions, I'll interrupt you.

25       So, let's start with the first paragraph?  Will you read

GARAFOLA - CROSS - MILLER

1  where it begins OilfieldFacts?

2  A.   "About us.  OilfieldFacts is the brainchild of Larry

3  Garafola, Founder of Equipmentfacts, the Online Marketplace

4  for Equipment and Trucks.  With his extensive experience in

5  Oil Field Auctions, he has decided to expand into the Oil

6  Field Auction industry."

7  Q.   Keep reading, please.

8  A.   "OilfieldFacts provides online auction solutions for the

9  oil field and drilling auction industry.  We have set up an

10  easy to use, industry specific online bidding system that

11  broadcasts auctions from locations around the world and

12  streams directly to a bidder's computer or mobile device.

13  When bidders can't make it to the auction site, they simply

14  log on to the oilfieldfacts.com to attend the auction

15  virtually.  Our online auction service benefits both sellers

16  and buyers because our system makes it very simple for high

17  numbers of bidders around the world to attend auctions,

18  resulting in an increase of participants per sale."

19  Q.   Thank you.  Keep going.

20  A.   "Our bidding technology is fast, reliable, secure, and

21  surpasses the limitations of on-site auctions.  We've compiled

22  a large database of registered bidders from countries across

23  the globe.  As part of our approval process, we rigorously

24  screen each bidder before granting access to our auctions in

25  order to ensure that all participants are reliable buyers.

GARAFOLA - CROSS - MILLER

1    Our services are currently used by numerous auctioneers

2    located around the country."

3         "Other features..."

4    Q.   Please go on.

5    A.   "Other features that OilfieldFacts prides itself on

6    include excellent customer service, responsive technical

7    support team and support staff, custom social media initiative

8    and promotional video marketing service."

9    Q.   That's perfect.  Now, you can stop there.  Thank you.

10        The text that you've just read into the record, is that

11   an accurate reflection of what you as the creator of

12   OilfieldFacts believes that company or that brand does?

13   A.   Yes.

14   Q.   Do you -- OilfieldFacts and Facts Technology, do you

15   provide customer support relative to any of the online auction

16   solutions provided by your brands or your marketplaces?

17   A.   For OilfieldFacts?

18   Q.   Correct.

19   A.   But you slipped in Facts Technology.  But OilfieldFacts,

20   if it was still in business and operating, it would perform

21   that service.

22   Q.   And that differentiation you just brought up, would

23   OilfieldFacts operate -- be able to provide the online auction

24   solutions without the existence of Facts Technology?

25   A.   Yes.

GARAFOLA - CROSS - MILLER

1   Q.   But it never has?  It's always been under Facts

2   Technology, correct?

3   A.   That's -- when I became unemployed, that's how I

4   envisioned to create a business that way, yes.

5   Q.   And let me help understand it.

6        So the vision, as I'm hearing it, would be Facts

7   Technology would otherwise have different marketplaces within

8   its corporate structure?

9   A.   That's what I was trying to get at, yes.

10  Q.   And then each of the marketplaces or the brands,

11  according to the website, provided online auction solutions as

12  is described --

13  A.   As outlined in that one.

14  Q.   -- to the various industry specific areas.  For example,

15  oil fields?

16  A.   Yes.

17  Q.   Collector cars?

18  A.   Yes.

19  Q.   And I won't read them over, but on P-25 it outlines what

20  your envision was?

21  A.   Correct.

22  Q.   And are all these operable, that is, all the brands or

23  marketplaces that exist on the website right now?

24  A.   No, none of them are.

25  Q.   And you have deactivated them?

GARAFOLA - CROSS - MILLER

1    A.    I just -- ever since we're here today, I haven't done

2    anything with them, no.

3    Q.    That's fair.

4         Of those brands that appear on P-25, this is the printout

5    of Facts Technology webpage, I'm talking at any time which

6    brands actually conducted online auctions or provided online

7    auction solutions?

8    A.    OilfieldFacts and CollectorCarFacts.

9    Q.    Now, do you have any plans in the future to make live or

10   active any of the other brands or marketplaces?

11   A.    Not right now, no.

12   Q.    And what's holding you back?

13   A.    The people to your right.

14   Q.    And is that because you believe that, in fact, the online

15   auction solutions provided by each of these brands is actually

16   something you can't do?

17   A.    No.

18   Q.    So then, why are you doing it?

19        Why -- why -- excuse me.  If it's not a violation of your

20   restraints, why not engage in a business that you believe is

21   awful?

22   A.    I just don't -- I don't want to get involved in what I

23   used to do with the staff that I used to have, people

24   traveling, myself traveling.  I just -- I -- I don't want

25   that.

GARAFOLA - CROSS - MILLER

1    Q.   That's fair.  Thank you.

2         Just going back to the OilfieldFacts and

3    CollectorCarFacts.

4    A.   Yes.

5    Q.   You said those two at one point did online auctions for

6    customers, correct?

7    A.   A total of three.

8    Q.   Okay.  And can you identify the customers for whom you

9    did the online auctions for?

10   A.   Vicari under CollectorCarFacts.

11   Q.   Hold there.  That's a Sandhills' customer, correct?

12   A.   No.

13   Q.   Equipmentfacts' customer?

14   A.   No.

15   Q.   You're saying Vicari does not have any kind of business

16   with Sandhills or Equipmentfacts?

17   A.   Correct.

18   Q.   And relative to OilfieldFacts?

19   A.   Permian.

20   Q.   Is that the only one that you've done business for with

21   Permian?

22   A.   Yes.

23   Q.   And Permian was an Equipmentfacts' or Sandhills'

24   customer, correct?

25   A.   Was, yes.

GARAFOLA - CROSS - MILLER

1    Q.   Yes.  Let's go to AuctioneerFacts.

2         How many -- if you can be specific, that'd be great.  If

3    you need to generalize, we can get it later down the line.

4         How many software licenses have you issued using

5    AuctioneerFacts?

6    A.   Three.

7    Q.   And to whom have you issued them?

8    A.   Permian Auction Group or Permian International, Wolfe

9    Auctions, and Iron Auction Group.

10   Q.   And Permian, as you've just testified, is a former

11   customer of Equipmentfacts.

12   A.   Correct.

13   Q.   And Wolfe Auctions was a former customer of

14   Equipmentfacts, correct?

15   A.   I think they're current as well.

16   Q.   Okay.  And then, what was the third, I'm sorry?

17   A.   Iron Auction Group.

18   Q.   And Iron Auction Group, a former customer of

19   Equipmentfacts?

20   A.   Current, I believe.

21   Q.   Okay.  Now, a description you gave before -- and I just

22   want to make sure I understood.  And I work visually, as you

23   can tell by my Italian hands.

24        I hear that AuctioneerFacts and Equipmentfacts both

25   provide online auction software.  The benefit to

GARAFOLA - CROSS - MILLER

1   Equipmentfacts is it has added layers.  For example,

2   advertising, brings its own bidders to the auction.  Is my

3   description -- or my understanding of what you testified to

4   accurate?

5   A.   No.

6   Q.   What's not accurate?

7   A.   Well, you're -- you bring up the word "Equipmentfacts"

8   and "Facts Technology" and you say they both provide online

9   auctions, okay.  They don't.  They both have online software.

10       And just so you understand -- and I guess the judge and

11  everyone else here, I know what Equipmentfacts does because I

12  gave birth to it, okay.  And I know exactly what components

13  bring it together.  And it's working the same way today with

14  some added features, okay.  So you can't put Facts Technology

15  and Equipmentfacts in the same category.  You could probably

16  put Facts Technology and HiBid in the same category, but we

17  don't -- for some reason HiBid's never been involved in

18  anything here in this lawsuit or any documents or the first

19  one.  So, you really can't compare the difference.

20       What's similar is, you use a mouse and a computer to buy

21  a product over the internet.

22  Q.   And, am I correct, I want to start where the premise

23  begins and then get to where you just ended.

24       It's a software.  That's -- when I said auction, you had

25  a problem with it.  It's a software?

GARAFOLA - CROSS - MILLER

1   A.   It's a technology.  Yes, software.

2   Q.   And they both have it?

3   A.   Yes.

4   Q.   HiBid?

5   A.   Yes.

6   Q.   Now, I heard all the testimony about whether and what

7   HiBid is, whether it currently exists or otherwise.  But you

8   did just say that Facts Technology would be a competitor to

9   HiBid, correct?

10  A.   It performs the same -- HiBid has two portions of it.

11  And it's -- if you look at every press release, which I'm sure

12  you have on Sandhills, when it says about AuctionTime and

13  HiBid, they provide a portal site, which is Equipmentfacts,

14  and a white label service, okay.  Both of those two -- right

15  in their own submission, in my opinion, okay, somebody who's

16  hired as the pioneer in online bidding, that website,

17  Sandhills' website clearly identifies two different types of

18  service, a portal site, which I call a marketplace and a white

19  label.  And Facts Technology is a white label solution.

20  Something that Equipmentfacts never did since its birth.

21  Q.   Are you familiar with a company called Polk Equipment?

22  A.   Yes.

23  Q.   Are you also familiar with the fact that Equipmentfacts

24  is providing white label services to Polk Equipment?

25  A.   I don't believe they are because when I look on the

GARAFOLA - CROSS - MILLER

1    Sandhills' website and the Equipmentfacts' website and the

2    upcoming auctions' websites, they're advertised on there as

3    Polk Equipment as one of their auctions.

4         And Equipmentfacts, when I owned the company, never even

5    worked with Polk or never white labelled or licensed the

6    software.

7    Q.   That's fair.  But at some point you became an employee of

8    Sandhills, correct?

9    A.   I did.

10   Q.   And Polk was a customer of Sandhills while you were

11   employed, correct?

12   A.   Not with Equipmentfacts but with Sandhills in some former

13   capacity, yes.

14   Q.   And you were an employee of Sandhills for a period of

15   time, correct?

16   A.   Correct.

17   Q.   And going back to that, the Asset Purchase Agreement, I

18   heard discussions about the negotiations in price.

19        Do you recall that?

20   A.   I do.

21   Q.   Asset Purchase Agreement, you signed it?

22   A.   I did.

23   Q.   As I look at it, there weren't any changes on the

24   document.

25        Do you recall asking for any changes to that document

GARAFOLA - CROSS - MILLER

1    that weren't made before you signed it?

2    A.   No.   When -- I was satisfied with the -- well, I was

3    satisfied with the Asset Purchase Agreement and then there was

4    other subsequent documents that needed to come together to

5    complete this transaction.

6    Q.   Sure.   And we'll talk about those.

7         The -- I call it -- and you've been in here, and you've

8    seen the documents.   I call it the APA Restrictive Covenant

9    Agreement.   Are you familiar -- if I use that term, you know

10   what I'm talking about?

11   A.   Yes.

12   Q.   Was there a document that you asked any changes to before

13   you signed it?

14   A.   Yes.

15   Q.   And were the changes made?

16   A.   Most of them were.   Some I wanted a little bit more

17   detail, but I didn't get them all.

18   Q.   So yet, you signed the document as accepting what you can

19   get from that Restrictive Covenant Agreement?

20   A.   Correct.

21   Q.   What I'm calling the Employee Restrictive Covenant

22   Agreement.   This is the one that I think you -- there was

23   testimony about you narrowed down what the restricted business

24   was.

25        Do you know what I'm talking about?

GARAFOLA - CROSS - MILLER

1   A.   Yes, sir.

2   Q.   Did you negotiate that one as well?

3   A.   Oh, yeah.

4   Q.   Did you negotiate both the restrictive, the non-compete

5   portion as well as the non-solicit portion?

6   A.   Yes.

7   Q.   And so that what existed in that document was acceptable

8   to you because you signed it?

9   A.   Yes.

10  Q.   And I just want to confirm -- there's been some

11  assumptions made and this is not to go any deeper with it.

12      Your wife's email address is mobridge@earthlink.net,

13  correct?

14  A.   Yes.

15  Q.   And is the one email that you've seen in this case, is

16  that the only email that you've ever sent to your wife's

17  account?  I'm sorry, I should be clear.  I apologize.

18      Is that the only email either from Equipmentfacts or

19  containing Equipmentfacts' documents that you've sent to your

20  wife's email?

21  A.   Yes.  If she has another email address, I have no clue.

22  Q.   That's fair.

23          MR. MILLER:  Just give me one second.

24  Q.   Mr. Garafola, I think you have all the Ds, that is,

25  Mr. Farsiou's exhibits up there.

1        The one in particular I'm looking for is D-5.

2        In the beginning of it, it's a declaration of Mr. Evan

3   Welch.  It's dated at the very top of the, file December 4,

4   2019.

5   A.   Actually, that's the only document I don't have.  My

6   documents -- and I put them in order --

7   Q.   That's fair.

8   A.   D-6 is the only one I don't --  I don't know if this

9   is -- it's not marked.  It is a declaration of Evan Welch.

10           MR. FARSIOU:  Does it say D-6?

11           THE WITNESS:  It has no D.

12           MR. MILLER:  If I may ask, the document that was

13   given up was just the declaration.  I mentioned that there was

14   an exhibit attached.  If I may, I have one copy.  If I could

15   stand next to the witness and we'll go through it.

16           MR. FARSIOU:  No objection, your Honor.

17           THE COURT:  That's fine.

18   Q.   Mr. Garafola, I'm going to intrude on your personal

19   space.

20   A.   That's okay.

21   Q.   Sorry.  I'm showing Mr. Garafola what's been marked, I

22   think, D-5, the declaration of Evan Welch dated 12/4/19.

23        What's different about this and what was provided to you

24   by Mr. Farsiou is that this one has the attachments to it.

25           MR. MILLER:  Judge, I can get copies for you.

GARAFOLA - CROSS - MILLER

1            THE COURT:  That's fine.

2   Q.   Now, Mr. Garafola, this is the declaration that Mr. Welch

3   provided.  I think you had a chance to talk about earlier,

4   correct?

5   A.   Yes.  I don't think I talked about it, but I've seen it.

6   Q.   Would you like a minute to review it before I do --

7   A.   I'll let you know.

8   Q.   And I'll tell you that it's one of the exhibits that

9   comes from your website.  I think you're very familiar with

10  it.

11  A.   Okay.

12  Q.   In particular, I am turning to what is Exhibit B to

13  Mr. Welch's 12/4/19 declaration.

14       And again, Mr. Garafola, are you familiar with this

15  document.  Take a minute to look at it.

16            THE COURT:  Mr. Farsiou, you're onboard with where he

17  is?

18            MR. MILLER:  You're welcome to come up too.

19            MR. FARSIOU:  I'll come up there.  I know what the

20  document says.  We'll have a little party.

21            THE WITNESS:  But I am familiar with it.

22  December 4th, right?

23            MR. MILLER:  Correct.

24  BY MR. MILLER:

25  Q.   Now, in particular, Mr. Garafola, I would like you to go

──GARAFOLA - CROSS - MILLER──

1  to what is included in the Exhibit B as AuctioneerFacts.

2      Now, I'll represent, for the record, AuctioneerFacts is

3  cut off on the top but does that look like what it says?

4  A.   Yes.

5  Q.   And in particular, I'd like for you, if you would, as you

6  did before with Facts Technology, the brands or the

7  marketplaces, can you read into the record what appears on

8  this page.

9      And before doing so, please look at it and when you're

10  comfortable begin reading.

11  A.   "Our Experienced Team.

12      Auctioneer Facts: decades of auction experience in online

13  bidding led by Larry Garafola, Founder of Equipmentfacts.

14  Team of auction professionals and programmers..."

15          THE COURT:  I'll ask you to slow down for the court

16  reporter.

17          THE WITNESS:  "Over 18 years of experience.

18  Excellent reputation in the market.  Over 100,000 auctions

19  conducted with flying colors.  State-of-the-art mobile

20  technology.  Far-reaching SEO expertise.  Tried and renowned

21  Technology.  Proactive solutions and competitive strategies.

22  24/7 technology support."

23  Q.   There's an acronym that you read, SEO.  Do you know what

24  that stands for?

25  A.   Search engine optimization.

GARAFOLA - CROSS - MILLER

1   Q.   It's a tough word.  I get tongue-tied as well.

2        And that relates to AuctioneerFacts' capabilities,

3   correct?

4   A.   Not necessarily.

5   Q.   It appears on the website for AuctioneerFacts?

6   A.   It does.

7   Q.   Okay.  The next page, similar to what you just did, if

8   you can read slowly what appears on that page.

9   A.   "A Complete Solution.

10       Auctioneer branded solution.  Full administrative tools.

11  Platform fully integrated to your website.  Live Webcast

12  auction system.  Timed auction system.  Pre-bidding available.

13  Payment solution.  PCI-compliant.  SEO-driven catalog.

14  Google-driven catalog."

15  Q.   Is that an accurate statement of at least what appears on

16  Equipment Auctioneer -- AuctioneerFacts' website?

17  A.   Yes.

18       MR. MILLER:  Judge, if I can have two minutes.  If we

19  can take maybe a short break, I think I'm done.

20       THE COURT:  Do you want two minutes so I'm standing

21  here.

22       MR. MILLER:  No, if we can have --

23       THE COURT:  We'll take a restroom break.  We'll take

24  a five-minute break.

25       THE DEPUTY COURT CLERK:  All rise.

```
 1              (Recess at 3:01 p.m.)

 2              THE DEPUTY COURT CLERK:  All rise.

 3              (Open court begins at 3:08 p.m.)

 4              THE COURT:  Please be seated.

 5              Mr. Miller.

 6              MR. MILLER:  Judge, I have no further questions for

 7    the witness at this time.  Obviously, to the extent the

 8    litigation goes forward we'll have other ones, but for today

 9    I'm done.

10              THE COURT:  With that being said, Mr. Garafola, you

11    can step down.  You're excused.

12              THE WITNESS:  Thank you.

13              THE COURT:  So folks, that brings us to the end of

14    our preliminary injunction hearing in aid of the Court in its

15    resolution of the current motion that's before the Court.

16              The Court will allow for post-trial finding of facts

17    and conclusions of law to be submitted.  Today is

18    February 20th --

19              MR. FARSIOU:  21st.

20              THE COURT:  21st.  So the post-trial finding of facts

21    and conclusions of law should be submitted by February 28th

22    and opposition by March 6th.

23              If for some reason those dates are problematic, you

24    folks should meet and confer and submit to the Court a

25    proposed alternative briefing schedule.
```

```
 1              So, with that, that's all that I have on the record.
 2   I want to go off the record for a moment.
 3              Off the record.
 4              (Short recess is taken.)
 5              THE DEPUTY COURT CLERK:  All rise.
 6              (Court concludes at 3:01 p.m.)
 7              THE DEPUTY COURT CLERK:  All rise.
 8              (Open court begins at 3:19 p.m.)
 9              THE COURT:  Please be seated.
10              So it's come to my attention, we never got the
11   documents formally received by the Court.
12              Let me hear from counsel.
13              MR. FARSIOU:  Judge, I would like to move exhibits
14   D-5 through I believe it's D-21 into evidence.
15              THE COURT:  Mr. Miller?
16              MR. MILLER:  Judge, I don't have an objection.  But
17   what I would like, if permitted, D-5 is the declaration on the
18   stand with Mr. Garafola.  If I may just take my exhibits,
19   attach it to what your Honor already has, then it's a complete
20   document, and I have no issue.  Otherwise, I'd supplement it
21   later.
22              THE COURT:  Mr. Farsiou?
23              MR. FARSIOU:  He doesn't need to do that, Judge.
24   That's fine.  I just wanted the certification for a certain
25   reason.  If he wants to have the full attachments to it,
```

1    that's fine.

2            THE COURT:  Okay.  Then, the Court so moves all the

3    exhibits D-5 through D-21 along with the accompanying

4    certification exhibits to D-5.  And I think that --

5            MR. MILLER:  We've got two, Judge.

6            THE COURT:  Okay.

7            MR. MILLER:  Plaintiff seeks to move into evidence

8    P-25 and P-26.

9            THE COURT:  Mr. Farsiou.

10           MR. FARSIOU:  Hold on, Judge.

11           The only objection I would state, Judge, is that --

12   although, it's on the website, as he testified, that's not

13   what he's doing now.  But --

14           THE COURT:  We're talking about just the exhibits

15   right now.

16           MR. FARSIOU:  Sure.

17           THE COURT:  Moving them in.

18           Do you have any opposition to moving the exhibits

19   into evidence?

20           MR. FARSIOU:  No.

21           THE COURT:  Then, the Court receives them and so

22   moves and allows them.

23   (Plaintiff's Exhibit P-25 and P-26 in evidence.)

24   (Defendant's Exhibit D-5 through D-21 in evidence.)

25           THE COURT:  Anything else?

```
1         MR. MILLER:  Not as of yet.  Thank you, Judge.

2         MR. FARSIOU:  Thank you, your Honor.

3         THE DEPUTY COURT CLERK:  All rise.

4         (Court concludes at 3:20 p.m.)

5

6       FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

7    - - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9

10     I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.

12

13

14

15

16

17

18  /S/ CATHY J. FORD, CCR, CRR, RPR          February 25, 2020

19     Court Reporter                         Date

20

21

22

23

24

25
```

## $

**$100,000** [1] - 115:3
**$147,000** [1] - 84:19
**$15,000** [1] - 161:22
**$2,000** [1] - 115:3
**$200** [1] - 115:5

## '

**'16** [1] - 110:1
**'5** [1] - 143:11

## /

**/12** [1] - 45:24
**/S** [1] - 211:18

## 0

**08** [1] - 174:14
**08608** [1] - 1:10
**08822** [1] - 174:16

## 1

**1** [1] - 156:2
**1.2** [1] - 108:5
**1.5** [5] - 111:24, 112:15, 112:21, 112:24, 157:9
**1/2** [2] - 45:24, 53:4
**10** [8] - 25:24, 37:16, 67:16, 68:1, 68:11, 115:4, 160:15, 162:24
**100,000** [1] - 206:18
**106** [1] - 2:5
**107** [1] - 2:5
**10:17** [1] - 18:5
**11** [5] - 11:3, 12:22, 29:6, 69:22, 141:5
**114** [1] - 43:7
**11:03** [1] - 70:1
**11:15** [1] - 69:24
**11:18** [1] - 70:3
**11:53** [1] - 136:25
**11th** [5] - 28:24, 28:25, 29:16, 134:4, 135:6
**12** [7] - 61:4, 61:21, 62:8, 63:4, 69:12, 162:24, 165:25
**12/4/19** [4] - 4:11, 4:15, 204:22, 205:13
**120** [1] - 152:6
**122** [1] - 2:12
**12:04** [1] - 106:9
**12:34** [1] - 106:7
**12:35** [1] - 106:11
**13** [4] - 8:8, 63:1, 164:2, 164:3
**1308** [1] - 151:16

**14** [1] - 8:8
**143** [1] - 83:8
**144** [1] - 84:16
**14th** [4] - 32:19, 32:20, 80:8, 135:19
**15** [4] - 63:1, 140:4, 162:24, 164:24
**15,000** [6] - 180:23, 181:2, 181:14, 181:21, 182:4, 182:9
**15,017** [2] - 145:13, 180:18
**15-minute** [1] - 69:23
**15-year** [1] - 184:2
**150** [1] - 2:13
**15th** [2] - 65:8, 144:23
**16** [7] - 34:20, 34:25, 37:18, 96:3, 136:23, 140:4
**165** [1] - 2:6
**16th** [6] - 34:7, 34:19, 39:19, 66:23, 116:22, 117:21
**17** [5] - 2:9, 96:5, 105:18, 140:4, 152:14
**170** [1] - 157:10
**18** [7] - 12:5, 14:8, 41:20, 138:1, 139:24, 149:2, 206:17
**187** [1] - 2:14
**18th** [2] - 123:25, 132:23
**19** [6] - 58:25, 107:23, 139:24, 149:2, 152:22, 163:10
**19-20669** [1] - 3:9
**192** [1] - 2:14
**197** [1] - 62:7
**1:53** [1] - 164:22
**1:54** [1] - 165:3
**1st** [8] - 7:25, 31:18, 57:22, 64:6, 117:22, 140:14, 140:16, 140:17

## 2

**2** [6] - 98:24, 99:12, 101:22, 102:6, 102:8, 102:18
**2,000** [1] - 115:4
**2.0** [2] - 53:11, 77:11
**2.5** [1] - 108:22
**2.8** [1] - 108:22
**2/2** [1] - 50:1
**20** [3] - 29:22, 107:23, 163:10
**2004** [2] - 143:11, 190:8
**2005** [2] - 145:8, 179:12
**2008** [1] - 190:8
**2009** [2] - 32:16, 64:6
**2015** [1] - 110:1
**2016** [1] - 145:9
**2017** [3] - 120:23, 152:14, 152:17
**2018** [2] - 66:23, 116:22
**2019** [67] - 10:14, 11:3, 12:5,

**12:22, 13:9, 14:8, 14:10, 16:13, 16:21, 18:5, 18:15, 23:23, 24:4, 25:24, 32:5, 33:13, 34:12, 34:14, 34:20, 34:25, 37:18, 41:21, 45:22, 46:11, 49:24, 52:11, 52:16, 53:3, 57:5, 63:23, 64:21, 65:6, 65:8, 65:23, 66:9, 66:24, 70:11, 70:19, 71:10, 71:23, 80:6, 80:8, 80:19, 88:9, 117:22, 122:10, 123:4, 125:15, 126:9, 126:16, 128:21, 129:17, 134:4, 135:19, 136:23, 140:14, 140:16, 143:17, 143:18, 152:19, 152:22, 162:18, 173:20, 173:22, 177:18, 180:11, 204:4**
**202** [1] - 174:13
**2020** [6] - 1:10, 87:25, 153:3, 153:5, 166:9, 211:18
**20s** [2] - 19:17, 19:18
**20th** [2] - 134:17, 208:18
**21** [3] - 1:10, 60:25, 152:17
**210** [2] - 2:15, 2:15
**211** [1] - 58:21
**21st** [5] - 122:10, 123:4, 187:22, 208:19, 208:20
**22** [1] - 34:14
**23** [5] - 32:5, 32:16, 33:13, 70:19, 80:6
**231** [1] - 63:1
**23rd** [2] - 32:4, 80:19
**24** [1] - 14:10
**24/7** [1] - 206:22
**24th** [2] - 15:13, 15:14
**25** [2] - 159:7, 211:18
**25th** [5] - 45:22, 49:24, 53:2, 132:23, 151:16
**26** [1] - 34:12
**27** [3] - 63:22, 70:11, 152:19
**280** [1] - 53:20
**28th** [1] - 208:21
**29** [1] - 18:4
**29th** [1] - 161:23
**2:08** [1] - 165:5
**2nd** [1] - 64:21

## 3

**3** [5] - 87:24, 102:17, 105:17, 108:5, 162:9
**30** [5] - 23:25, 105:17, 126:21, 126:22, 160:5
**301** [2] - 53:25, 54:4
**302** [3] - 53:17, 53:18, 53:25
**303** [1] - 53:25
**31st** [4] - 65:23, 66:9, 71:10, 71:22
**34471** [1] - 151:17

**37** [1] - 2:10
**3:01** [2] - 208:1, 209:6
**3:08** [1] - 208:3
**3:18** [1] - 34:7
**3:19** [1] - 209:8
**3:19-cv-20669-MAS-TJB** [1] - 1:6
**3:20** [1] - 211:4
**3rd** [5] - 153:3, 153:5, 160:23, 161:2

## 4

**4** [4] - 64:5, 105:17, 106:2, 204:3
**401K** [1] - 176:25
**402** [1] - 1:9
**43** [1] - 60:21
**4:16** [3] - 35:1, 37:19, 136:25
**4:27** [1] - 38:10
**4th** [1] - 205:22

## 5

**5** [8] - 2:4, 2:8, 64:16, 88:23, 151:15, 151:22, 153:7, 162:9
**5-year** [1] - 112:12
**50** [1] - 164:12
**500-something** [1] - 167:7
**5:17** [1] - 24:4
**5th** [7] - 57:21, 65:6, 65:15, 65:16, 129:17, 129:18, 142:14

## 6

**6** [4] - 64:21, 87:25, 167:6, 179:13
**6-month** [1] - 162:9
**609.367.2777** [1] - 1:21
**63** [1] - 2:10
**68521** [1] - 152:7
**699** [1] - 174:13
**6:29** [1] - 167:8
**6th** [19] - 7:7, 8:20, 48:24, 52:11, 52:16, 55:6, 58:13, 58:17, 59:24, 82:6, 95:12, 108:4, 120:17, 128:9, 151:6, 165:22, 169:16, 184:10, 208:22

## 7

**7** [2] - 64:24, 122:21
**70th** [1] - 131:7
**7:38** [1] - 41:23
**7:47** [1] - 45:22
**7:50** [1] - 49:25
**7:52** [1] - 53:3

**7th** [5] - 22:15, 55:6, 129:18, 142:15, 142:23

## 8

**8** [1] - 89:17
**822** [1] - 174:15
**85** [1] - 2:11

## 9

**9** [5] - 23:23, 65:19, 90:18, 126:16, 166:9
**95** [1] - 2:11
**98** [1] - 168:9
**99** [1] - 168:9
**9:28** [1] - 3:3
**9:35** [1] - 34:21
**9th** [3] - 23:23, 24:4, 25:3

## A

**a.m** [9] - 3:3, 18:5, 34:21, 45:22, 49:25, 53:3, 70:1, 70:3, 136:25
**able** [9] - 9:12, 18:24, 39:6, 102:12, 114:24, 130:20, 157:14, 167:24, 194:23
**above-entitled** [1] - 211:11
**absconding** [20] - 53:7
**absolutely** [20] - 20:1, 29:18, 30:23, 33:4, 33:8, 35:8, 36:12, 38:18, 47:23, 78:22, 115:8, 127:21, 136:16, 154:21, 156:6, 159:15, 160:2, 160:17, 164:19, 168:20
**acceptable** [1] - 203:7
**accepting** [1] - 202:18
**access** [7] - 9:6, 21:7, 31:6, 121:15, 175:23, 176:1, 193:24
**accessed** [1] - 138:19
**accompanying** [1] - 210:3
**according** [3] - 140:22, 172:13, 195:11
**account** [32] - 9:4, 11:3, 11:4, 12:6, 30:17, 31:3, 33:1, 33:3, 33:22, 35:25, 38:15, 38:16, 49:6, 80:24, 81:3, 86:15, 87:6, 87:9, 88:1, 102:3, 104:13, 122:10, 135:18, 135:19, 137:8, 167:2, 175:19, 175:21, 175:24, 176:2, 203:17
**accounts** [6] - 8:9, 102:1, 104:14, 138:22, 175:10, 175:11
**accurate** [9] - 13:18, 187:24,

188:16, 189:20, 191:25, 194:11, 199:4, 199:6, 207:15
**acquisition** [2] - 170:6, 170:23
**acronym** [1] - 206:23
**act** [1] - 147:11
**ACTION** [1] - 1:4
**action** [4] - 71:24, 79:25, 146:2, 165:13
**active** [7] - 8:9, 19:5, 75:23, 143:12, 186:9, 187:4, 196:10
**activities** [1] - 110:12
**add** [5] - 40:23, 124:25, 139:17, 160:2
**added** [2] - 20:15, 199:1, 199:14
**adding** [1] - 108:19
**addition** [2] - 78:2, 89:6
**additional** [1] - 112:13
**address** [25] - 18:2, 29:19, 30:11, 32:19, 37:8, 41:8, 54:18, 80:12, 80:14, 80:17, 104:16, 137:8, 137:9, 137:21, 139:22, 139:24, 140:2, 151:16, 152:5, 174:13, 174:18, 174:20, 180:18, 203:12, 203:21
**addresses** [4] - 8:7, 134:15, 145:3, 145:5
**ADESA** [1] - 178:8
**Adesa** [3] - 82:4, 178:8, 181:6
**adjourned** [1] - 106:7
**adjust** [1] - 106:24
**admin** [1] - 121:7
**administer** [1] - 106:15
**administering** [1] - 179:12
**administrative** [1] - 207:10
**ads** [6] - 111:4, 111:6, 122:3, 136:8, 136:9, 190:15
**advanced** [2] - 189:10, 189:16
**advertise** [4] - 93:10, 155:18, 183:2, 183:6
**advertised** [2] - 147:16, 201:2
**advertisement** [2] - 39:2, 64:13
**advertisements** [1] - 157:1
**advertises** [1] - 111:4
**advertising** [10] - 114:4, 113:9, 150:3, 155:23, 157:2, 199:2
**advice** [3] - 133:18, 133:19, 144:5
**advised** [1] - 87:24
**afford** [1] - 144:14
**afternoon** [3] - 38:9, 164:23,

165:9
**age** [1] - 19:16
**agenda** [1] - 161:4
**agent** [3] - 152:1, 152:5, 174:2
**aggravates** [1] - 164:13
**ago** [2] - 78:2, 183:8
**agree** [21] - 14:17, 15:14, 15:23, 20:7, 20:8, 23:19, 33:20, 36:13, 37:17, 42:14, 42:18, 44:2, 46:8, 47:20, 48:7, 49:11, 50:8, 51:10, 72:9, 112:21, 160:8
**agreed** [1] - 10:14
**Agreement** [15] - 111:22, 112:1, 112:3, 112:6, 112:14, 114:2, 114:12, 116:25, 151:10, 201:17, 201:21, 202:3, 202:9, 202:19, 202:22
**agreement** [20] - 81:8, 92:3, 92:5, 92:15, 92:22, 92:24, 92:25, 97:21, 103:4, 108:2, 112:12, 114:15, 117:17, 145:7, 149:2, 149:3, 150:15, 175:4, 175:6, 180:17
**agreements** [5] - 92:4, 92:7, 97:8, 116:22, 117:3
**agricultural** [1] - 113:22, 144:4, 156:8
**ahead** [5] - 108:16, 121:24, 140:24, 161:23, 164:22
**aid** [1] - 208:14
**aided** [1] - 1:22
**airport** [2] - 137:7, 138:25
**al** [1] - 3:9
**alerted** [1] - 100:24
**alerts** [1] - 100:23
**Alex** [3] - 52:11, 162:8, 169:17
**Alexa** [1] - 140:21
**Alexander** [1] - 3:13
**allow** [2] - 26:4, 208:16
**allowance** [1] - 176:22
**allows** [1] - 210:22
**almost** [1] - 180:5
**alongside** [1] - 109:25
**alternate** [1] - 190:8
**alternative** [1] - 208:25
**Amery** [1] - 3:12
**AMERY** [1] - 1:15
**amount** [1] - 178:19
**ample** [1] - 85:18
**analysis** [6] - 61:4, 61:10, 69:17, 70:16, 74:14, 98:6
**analyst** [1] - 69:13
**analyzed** [1] - 66:2
**announcement** [1] - 132:15
**answer** [30] - 33:12, 47:15,

49:7, 58:6, 58:10, 59:5, 59:8, 59:23, 59:25, 60:1, 60:6, 60:8, 61:3, 61:11, 61:14, 77:22, 78:9, 78:18, 84:9, 84:13, 84:14, 86:9, 88:20, 91:11, 91:15, 91:23, 91:24, 92:18
**Answer** [16] - 62:10, 62:14, 62:20, 63:4, 63:6, 63:9, 63:12, 83:15, 83:20, 83:23, 84:1, 84:5, 84:20, 84:25, 85:3, 85:6
**answered** [3] - 72:13, 84:12, 91:22
**APA** [1] - 202:8
**apologize** [6] - 24:6, 139:17, 170:10, 188:2, 188:21, 203:17
**apologizing** [2] - 126:19
**apology** [1] - 26:1
**app** [2] - 167:24, 167:25
**appear** [1] - 196:4
**appearances** [1] - 3:11
**appetite** [1] - 162:12
**applicable** [2] - 46:10, 46:12
**application** [4] - 71:22, 76:4, 76:8, 167:11
**applications** [1] - 102:2
**apply** [3] - 102:23, 117:6, 188:7
**appreciate** [2] - 169:22, 180:23
**approach** [3] - 99:7, 100:8, 187:11
**approval** [1] - 193:23
**April** [5] - 10:13, 34:12, 66:24, 117:22, 125:15
**area** [2] - 110:1, 123:4
**areas** [3] - 144:9, 159:14, 195:14
**arrangement** [1] - 182:8
**art** [1] - 206:19
**ASAP** [1] - 122:25
**aspect** [1] - 44:24
**aspects** [4] - 43:18, 43:19, 43:21, 46:12
**Asset** [3] - 201:17, 201:21, 202:3
**assistance** [2] - 105:18, 150:3
**Association** [1] - 77:10
**assume** [3] - 52:15, 70:24, 97:12
**assuming** [6] - 79:10, 87:13, 88:4, 96:15, 97:18, 147:23
**assumptions** [1] - 203:11
**attach** [1] - 209:19
**attached** [5] - 4:23, 5:10, 15:19, 39:22, 204:14
**attachment** [7] - 11:8, 166:7,

166:13, 166:15, 166:16, 170:13
**attachments** [4] - 5:23, 12:15, 204:24, 209:25
**attempting** [1] - 171:5
**attend** [8] - 26:4, 109:13, 110:3, 134:17, 173:10, 183:25, 193:14, 193:17
**attendance** [3] - 77:9, 183:15, 184:9
**attended** [1] - 184:6
**attention** [2] - 162:14, 209:10
**Attorney** [1] - 128:15
**attorney** [14] - 5:22, 60:23, 81:12, 81:20, 95:9, 100:22, 101:3, 104:20, 130:12, 167:7, 167:17, 168:2, 168:6, 170:20
**attorney/client** [1] - 101:6
**attorneys** [5] - 100:19, 133:18, 143:5, 144:5, 159:3
**Auction** [16] - 146:5, 146:6, 146:7, 158:14, 178:6, 179:12, 179:14, 181:1, 181:18, 182:22, 183:16, 193:6, 198:8, 198:9, 198:17, 198:18
**auction** [108] - 18:15, 18:18, 24:16, 25:5, 25:16, 26:8, 27:22, 28:3, 28:6, 28:17, 43:23, 44:9, 46:4, 46:5, 46:18, 46:20, 47:6, 47:8, 47:16, 50:23, 51:4, 89:2, 92:15, 92:16, 92:23, 107:18, 109:12, 110:3, 110:18, 111:10, 111:13, 113:21, 115:1, 115:4, 116:20, 117:25, 118:22, 119:2, 127:1, 127:5, 127:7, 128:6, 128:21, 128:23, 129:3, 130:17, 132:15, 134:13, 134:18, 137:11, 137:17, 137:22, 144:4, 149:3, 149:7, 149:8, 149:12, 149:17, 150:5, 150:7, 150:11, 150:18, 155:19, 156:1, 156:8, 156:13, 157:3, 158:11, 158:16, 159:6, 159:7, 160:1, 160:11, 160:24, 162:23, 163:1, 163:3, 163:5, 163:7, 171:12, 173:3, 178:17, 178:25, 179:4, 182:21, 183:22, 184:20, 184:25, 188:14, 191:20, 193:8, 193:9, 193:13, 193:14, 193:15, 194:15, 194:23, 195:11,

196:7, 196:15, 198:25, 199:2, 199:24, 206:12, 206:14, 207:12
**Auctioneer** [5] - 77:10, 171:12, 191:19, 206:12, 207:16
**auctioneer** [17] - 43:9, 44:13, 51:6, 51:8, 109:11, 111:13, 111:19, 125:2, 125:6, 149:2, 155:16, 156:12, 163:5, 163:6, 163:7, 180:18, 207:10
**auctioneer's** [1] - 111:16
**AuctioneerFacts** [10] - 190:1, 191:4, 191:14, 191:17, 198:1, 198:5, 198:24, 206:1, 206:2, 207:5
**AuctioneerFacts'** [2] - 207:2, 207:16
**auctioneers** [38] - 32:11, 42:15, 43:13, 43:14, 43:16, 44:10, 44:24, 45:5, 45:14, 45:18, 47:22, 48:8, 50:18, 50:21, 51:3, 51:11, 77:11, 110:16, 110:17, 111:2, 113:22, 120:16, 122:25, 123:2, 123:19, 125:17, 125:24, 126:1, 126:4, 127:11, 135:4, 136:4, 136:10, 136:13, 156:3, 156:21, 190:13, 194:1
**Auctioneers** [7] - 131:7, 134:25, 158:3, 181:24, 188:11, 189:10, 189:16
**AuctionFlex** [4] - 151:4, 151:10, 151:16, 160:3
**Auctions** [17] - 23:4, 81:25, 84:22, 86:14, 125:6, 159:4, 159:5, 159:6, 177:24, 178:3, 180:12, 180:14, 182:12, 183:9, 193:5, 198:9, 198:13
**auctions** [40] - 43:22, 47:4, 52:22, 52:23, 89:7, 93:18, 107:22, 109:25, 111:4, 119:1, 122:4, 124:23, 130:21, 137:16, 137:17, 138:19, 144:3, 145:10, 150:4, 155:5, 155:7, 156:9, 156:11, 156:17, 157:2, 158:18, 159:14, 159:19, 163:21, 193:11, 193:17, 193:21, 193:24, 196:6, 197:5, 197:9, 199:9, 201:3, 206:18
**auctions'** [1] - 201:2
**AuctionTime** [7] - 93:21, 118:21, 130:14, 130:16, 183:7, 183:10, 200:12

**AuctionTime's** [2] - 96:5, 96:6
**auctiontime.com** [2] - 95:25, 102:16
**audio** [1] - 111:15
**August** [27] - 7:25, 9:10, 12:15, 31:18, 42:9, 52:11, 52:16, 57:21, 57:22, 63:22, 64:6, 64:21, 65:6, 65:8, 65:15, 65:16, 70:11, 70:19, 88:9, 140:14, 140:16, 140:17, 140:18, 160:19, 169:16, 177:18, 180:11
**Authority** [1] - 152:24
**authorization** [2] - 175:23, 176:1
**available** [3] - 187:9, 188:3, 207:12
**awarded** [2] - 76:14, 80:1
**awards** [1] - 75:23
**aware** [23] - 26:7, 29:21, 29:24, 31:4, 35:18, 40:12, 60:4, 77:8, 77:21, 79:25, 80:3, 82:25, 88:10, 89:12, 90:18, 94:8, 94:15, 106:22, 113:6, 119:12, 126:15, 165:15
**awful** [1] - 196:21

**B**

**baby** [1] - 132:9
**backwards** [1] - 163:4
**bad** [3] - 48:4, 87:16, 125:8
**badly** [1] - 117:12
**balls** [1] - 131:18
**bank** [5] - 175:10, 175:13, 175:17, 175:19
**Bank** [2] - 175:14, 175:15
**banner** [3] - 122:3, 136:9, 190:15
**barrier** [1] - 56:15
**base** [2] - 114:11, 157:10
**based** [15] - 36:9, 39:1, 56:24, 59:19, 64:1, 64:9, 69:7, 74:18, 100:17, 100:19, 112:14, 144:15, 155:9, 173:1, 176:9
**Based** [1] - 71:19
**basic** [1] - 106:22
**basis** [2] - 102:21, 122:2
**Bates** [1] - 43:7
**battle** [1] - 128:15
**bear** [1] - 173:18
**became** [6] - 77:8, 107:16, 167:19, 195:3, 201:7
**become** [4] - 94:8, 112:25, 119:12
**becomes** [1] - 154:8
**becoming** [2] - 82:22, 110:1

**beef** [2] - 156:18, 159:10
**beforehand** [1] - 126:20
**beg** [1] - 104:18
**began** [1] - 89:1
**begin** [1] - 206:10
**beginning** [6] - 76:23, 111:10, 129:17, 133:9, 154:10, 204:2
**begins** [7] - 70:3, 106:11, 165:5, 193:1, 199:23, 208:3, 209:8
**behalf** [6] - 1:16, 1:18, 3:18, 28:16, 131:10, 176:6
**behind** [2] - 109:23, 119:11
**belief** [1] - 80:21
**believes** [1] - 194:12
**below** [2] - 102:11, 102:21
**benefit** [6] - 95:1, 123:2, 177:6, 179:2, 191:16, 198:25
**benefits** [5] - 76:15, 80:1, 176:25, 177:4, 193:15
**Bergman** [5] - 22:18, 22:24, 23:1, 134:24
**berryhill** [2] - 179:21, 181:22
**Berryhill** [1] - 81:25
**BERRYHILL** [1] - 179:21
**best** [4] - 27:14, 28:16, 180:20
**better** [2] - 99:1, 140:19
**between** [21] - 32:8, 32:25, 35:9, 35:18, 37:2, 39:10, 56:5, 66:20, 67:7, 67:18, 68:4, 69:1, 76:25, 78:20, 101:17, 108:22, 155:21, 168:1, 175:7, 183:3
**beyond** [1] - 106:4
**bid** [5] - 19:1, 109:13, 111:18, 111:19
**BidCaller** [25] - 10:13, 47:2, 47:18, 48:16, 52:6, 53:14, 108:25, 109:1, 109:8, 109:11, 109:16, 109:20, 118:11, 118:13, 118:19, 118:20, 118:25, 120:3, 120:4, 121:3, 122:24, 123:5, 124:6, 156:7, 161:6
**BidCaller's** [1] - 47:9
**Bidder** [1] - 136:20
**bidder** [15] - 13:3, 13:5, 13:6, 30:18, 30:21, 38:6, 39:20, 110:20, 111:18, 134:14, 138:6, 139:16, 150:3, 193:24
**bidder's** [1] - 193:12
**Bidderfacts** [10] - 190:4, 190:7, 190:9, 190:10, 190:12, 190:15, 190:18, 190:25, 191:1
**Bidders** [4] - 11:8, 33:24,

38:3, 166:17
**bidders** [35] - 11:22, 12:9, 18:24, 28:20, 29:23, 29:24, 34:1, 34:4, 34:12, 34:17, 34:22, 35:11, 35:15, 39:19, 40:1, 109:13, 109:14, 110:16, 110:19, 111:2, 111:8, 134:16, 136:13, 137:11, 155:19, 155:25, 156:14, 157:2, 190:13, 190:22, 193:13, 193:17, 193:22, 199:2
**bidding** [18] - 19:2, 88:25, 89:7, 89:13, 90:19, 110:24, 127:13, 137:18, 137:23, 189:17, 189:19, 190:12, 192:7, 193:10, 193:20, 200:16, 206:13, 207:12
**Bidfacts** [13] - 10:5, 39:16, 56:21, 56:22, 57:10, 67:8, 105:5, 127:22, 129:9, 129:13, 131:18, 131:24, 172:20
**Bidpath** [41] - 10:4, 39:10, 39:15, 42:20, 42:21, 44:4, 44:5, 46:5, 46:7, 46:9, 47:2, 47:17, 48:10, 48:15, 52:6, 53:13, 54:13, 56:20, 56:22, 57:8, 66:21, 66:25, 67:9, 67:13, 67:21, 68:5, 68:9, 68:24, 69:1, 105:5, 118:3, 118:7, 118:10, 119:13, 129:13, 129:22, 129:25, 130:4, 132:1, 161:22, 172:20
**Bidpath's** [1] - 47:9
**Bidpath..** [1] - 67:8
**Biennial** [1] - 152:19
**big** [6] - 109:23, 121:10, 163:5, 167:19, 182:21, 183:11
**biggest** [4] - 23:13, 32:11, 110:14, 155:25
**bill** [2] - 140:25, 161:24
**binder** [1] - 7:12
**birth** [2] - 199:12, 200:20
**bit** [4] - 52:24, 110:22, 150:20, 202:16
**bitching** [1] - 14:19
**blast** [2] - 111:8, 144:23
**bless** [1] - 161:25
**blessings** [1] - 162:1
**block** [1] - 99:19
**bloodline** [1] - 11:22
**board** [3] - 76:13, 80:1, 97:19
**Bolton** [1] - 9:20
**bolts** [4] - 46:20, 47:11, 47:17, 47:18
**bonus** [3] - 114:21, 114:24, 115:4, 116:14, 116:15,

116:16
**bonuses** [1] - 114:15
**boom** [1] - 86:4
**bots** [1] - 99:19
**bottom** [12] - 17:19, 23:23, 24:3, 34:10, 43:6, 43:7, 45:8, 57:19, 102:6, 126:16, 151:14, 191:12
**bought** [5] - 61:3, 147:21, 153:17, 191:5, 191:7
**box** [2] - 105:23, 106:6
**boxed** [2] - 86:2, 87:6
**bracket** [1] - 95:25
**brainchild** [1] - 193:2
**brand** [3] - 146:24, 154:4, 194:12
**branded** [3] - 130:5, 153:25, 207:10
**brands** [12] - 188:23, 188:25, 189:22, 192:11, 194:16, 195:10, 195:22, 196:4, 196:6, 196:10, 196:15, 206:6
**breach** [3] - 36:5, 36:18, 141:17
**break** [9] - 69:22, 69:23, 105:21, 106:9, 107:6, 164:23, 207:19, 207:23, 207:24
**BRESSLER** [1] - 1:15
**Bressler** [1] - 3:12
**briefing** [1] - 208:25
**briefly** [1] - 76:21
**Brindley** [13] - 67:13, 67:21, 76:25, 79:14, 130:24, 131:2, 131:13, 131:16, 132:7, 133:22, 164:16, 171:25, 173:8
**Brindley's** [2] - 172:14, 172:17
**bring** [9] - 110:17, 110:18, 110:19, 125:2, 127:12, 183:5, 190:20, 199:7, 199:13
**bringing** [3] - 116:4, 125:8, 147:3
**brings** [3] - 110:19, 199:2, 208:13
**broad** [1] - 183:5
**broadcasts** [1] - 193:11
**broadly** [1] - 188:7
**brought** [11] - 27:10, 58:6, 101:4, 101:5, 116:5, 128:16, 146:2, 146:16, 148:3, 162:14, 194:22
**building** [3] - 142:3, 174:22, 174:24
**built** [3] - 132:10, 167:23, 188:18
**bulbs** [2] - 140:20, 140:23

**bullet** [7] - 97:3, 98:5, 98:24, 99:16, 101:25, 102:7
**burden** [4] - 59:16, 68:16, 86:13
**business** [58] - 10:9, 15:17, 29:22, 36:23, 38:22, 55:5, 59:20, 65:5, 77:10, 79:11, 81:6, 82:1, 82:2, 84:23, 85:1, 85:4, 85:10, 88:1, 88:7, 88:11, 88:15, 88:24, 91:6, 109:24, 112:13, 117:25, 130:13, 139:24, 142:25, 145:18, 148:16, 149:12, 151:15, 151:16, 151:23, 171:14, 174:13, 177:15, 177:21, 178:1, 179:7, 179:17, 180:2, 180:8, 180:10, 182:2, 182:16, 184:20, 185:14, 187:7, 190:16, 194:20, 195:4, 196:20, 197:15, 197:20, 202:23
**Business** [1] - 152:24
**but..** [3] - 40:5, 42:23, 159:17
**butcher** [1] - 178:5
**button** [1] - 111:18
**buy** [2] - 15:21, 199:20
**buyers** [2] - 193:16, 193:25
**buying** [1] - 138:25
**buys** [1] - 155:15
**BY** [19] - 1:15, 1:17, 2:4, 2:5, 2:6, 5:21, 7:18, 14:1, 17:3, 37:12, 58:24, 73:18, 83:6, 101:8, 107:11, 150:25, 165:8, 186:22, 205:24

## C

**cake** [1] - 163:3
**calculator** [1] - 111:17
**Cali** [3] - 17:19, 17:22, 20:11
**caller** [1] - 17:22
**camera** [1] - 75:14
**cameras** [1] - 142:10
**Canada** [1] - 145:8
**capabilities** [1] - 207:2
**capacity** [4] - 88:16, 178:1, 180:2, 201:13
**car** [4] - 170:22, 176:22, 178:25
**Car** [5] - 146:5, 146:6, 146:7, 148:3, 159:4
**cards** [3] - 30:19, 176:6
**care** [2] - 115:24, 116:2
**career** [1] - 162:16
**careful** [1] - 173:6
**Carolina** [1] - 164:9
**cars** [1] - 195:17
**Carson** [15] - 14:9, 15:18, 37:25, 39:25, 40:8, 115:18,

121:25, 122:2, 136:3, 136:7, 137:14, 138:3, 148:4, 163:23, 172:23
**case** [37] - 6:5, 16:10, 41:15, 70:13, 70:14, 71:3, 71:4, 71:6, 72:3, 72:15, 72:18, 73:1, 73:2, 73:5, 73:9, 73:20, 73:22, 74:4, 74:7, 74:15, 74:16, 74:17, 76:17, 77:5, 78:3, 81:1, 83:22, 121:11, 125:21, 146:14, 151:2, 167:17, 170:23, 185:7, 185:14, 203:15
**cases** [1] - 104:3
**catalog** [5] - 21:15, 111:12, 191:23, 207:13, 207:14
**categories** [2] - 19:20, 29:8
**category** [3] - 30:16, 199:15, 199:16
**CATHY** [1] - 211:18
**Cathy** [1] - 1:20
**causing** [1] - 123:5
**CCR** [1] - 211:18
**cease** [1] - 191:9
**cell** [4] - 63:2, 65:12, 137:25, 141:11
**cellular** [1] - 64:17
**CEO** [3] - 116:5, 174:9, 174:10
**certain** [6] - 35:11, 42:19, 43:21, 54:11, 177:14, 209:24
**certainly** [2] - 13:21, 40:18
**CERTIFICATE** [1] - 211:6
**Certificate** [2] - 152:13, 152:23
**certification** [15] - 63:16, 66:17, 67:14, 69:7, 69:8, 72:7, 79:19, 83:22, 87:13, 87:19, 90:24, 91:2, 91:17, 209:24, 210:4
**certifications** [3] - 55:19, 70:25, 94:7
**certify** [1] - 211:10
**cfordccr@gmail.com** [1] - 1:20
**chairman** [1] - 134:24
**chance** [4] - 163:24, 167:8, 183:9, 205:3
**change** [9] - 15:5, 21:21, 26:17, 46:19, 54:16, 56:5, 117:18, 167:16, 190:5
**changed** [10] - 18:6, 21:24, 42:22, 48:11, 49:12, 82:22, 120:5, 161:20, 180:7
**changes** [12] - 15:16, 23:11, 27:10, 48:19, 101:14, 120:9, 124:5, 126:3, 201:23, 201:25, 202:12, 202:15

**changing** [7] - 46:13, 55:16, 58:12, 82:6, 82:7, 95:5, 95:6
**channels** [1] - 94:15
**chant** [2] - 110:18, 111:16
**chaos** [1] - 123:5
**chase** [3] - 36:20, 72:5, 107:12
**check** [1] - 137:22
**checked** [1] - 137:25
**cheek** [1] - 184:18
**children** [1] - 157:22
**choice** [1] - 163:18
**choose** [3] - 18:25, 100:15, 103:3
**chose** [1] - 38:12
**Christmas** [2] - 30:19, 116:15
**circumstances** [2] - 103:2, 165:11
**City** [1] - 164:9
**CIVIL** [1] - 1:4
**claim** [4] - 23:4, 45:4, 60:16, 81:10
**claiming** [2] - 42:5, 84:23
**clarification** [1] - 181:15
**clarify** [1] - 30:4
**clarity** [1] - 169:23
**Clarkson** [1] - 1:9
**Claybrook** [1] - 17:20
**clear** [18] - 4:9, 4:24, 14:8, 45:21, 52:10, 55:14, 57:10, 68:1, 68:11, 71:8, 92:19, 94:20, 95:22, 105:3, 158:1, 158:2, 172:4, 203:17
**clearly** [4] - 15:16, 16:4, 68:4, 200:17
**clerk** [2] - 115:1, 115:4
**CLERK** [13] - 3:1, 69:25, 70:2, 106:8, 106:10, 106:17, 165:2, 165:4, 207:25, 208:2, 209:5, 209:7, 211:3
**clerked** [1] - 51:7
**clerking** [2] - 163:9, 163:21
**clerks** [5] - 137:17, 137:22, 160:24, 162:24, 163:1
**click** [5] - 103:21, 127:10, 127:13, 127:14
**client** [8] - 60:15, 84:18, 100:13, 103:9, 125:1, 125:6, 182:3, 182:24
**clients** [15] - 80:20, 81:14, 81:15, 81:19, 81:21, 95:2, 104:10, 104:21, 110:15, 129:23, 136:2, 157:3, 162:22, 163:6, 180:7
**close** [1] - 82:23
**closed** [1] - 141:14
**clue** [1] - 203:21

**COBRA** [1] - 176:20
**coin** [2] - 156:11, 156:13
**coincides** [1] - 135:6
**collect** [4] - 97:4, 97:5, 97:22, 97:23
**collected** [1] - 65:12
**Collectible** [1] - 159:5
**collecting** [1] - 150:4
**Collector** [5] - 146:5, 146:6, 146:7, 148:3, 159:4
**collector** [2] - 178:25, 195:17
**CollectorCarFacts** [8] - 146:19, 147:2, 147:7, 148:7, 179:1, 196:8, 197:3, 197:10
**collectorcarfacts.com** [1] - 146:8
**collects** [1] - 98:11
**college** [1] - 163:20
**colors** [1] - 206:19
**Colton** [1] - 7:21
**column** [1] - 134:15
**comfortable** [2] - 122:25, 206:10
**coming** [9] - 29:19, 29:22, 100:5, 100:21, 104:12, 104:16, 140:19, 141:6, 157:17
**comission** [1] - 164:12
**comment** [1] - 67:16
**commission** [6] - 114:22, 114:24, 115:2, 115:20, 115:22, 116:16
**commissions** [5] - 114:15, 114:25, 116:1, 116:12, 160:25
**Common** [1] - 15:21
**common** [1] - 110:2
**communicate** [1] - 186:23
**communicating** [2] - 36:14, 68:9
**communication** [1] - 68:24
**communications** [16] - 66:20, 67:6, 67:22, 67:24, 67:25, 68:4, 68:22, 68:24
**companies** [5] - 92:15, 92:23, 147:3, 149:17, 157:4, 177:14, 190:20, 190:21
**Company** [1] - 151:15
**company** [27] - 63:5, 83:25, 105:8, 107:14, 109:10, 109:23, 109:24, 116:6, 129:13, 130:7, 132:10, 133:16, 135:14, 147:15, 147:17, 150:7, 153:6, 156:22, 157:9, 161:24, 171:4, 172:14, 172:17, 188:17, 194:12, 200:21, 201:4

**compare** [3] - 101:16, 101:17, 199:19
**comparing** [1] - 25:21
**comparison** [1] - 151:5
**compensation** [2] - 114:9, 177:6
**compete** [3] - 135:13, 142:24, 203:4
**competing** [8] - 10:9, 24:13, 25:16, 38:21, 81:6, 82:13, 130:13, 142:24
**competition** [3] - 27:15, 117:3, 117:6
**competitions** [1] - 117:2
**competitive** [2] - 82:17, 206:21
**competitor** [7] - 24:9, 25:18, 89:19, 127:2, 127:3, 128:7, 200:8
**competitors** [1] - 25:21
**compiled** [1] - 193:21
**complained** [1] - 10:15
**complaining** [2] - 123:14, 140:23
**complaint** [5] - 23:13, 38:20, 56:18, 56:19, 56:25
**complaints** [3] - 10:18, 10:22, 32:14
**complete** [4] - 66:10, 191:19, 202:5, 209:19
**Complete** [1] - 207:9
**completely** [8] - 58:3, 62:2, 62:13, 62:19, 62:20, 82:3, 121:6, 121:8
**compliant** [1] - 207:13
**component** [1] - 189:19
**components** [1] - 199:12
**compromised** [3] - 161:4, 162:4, 162:6
**computer** [31] - 1:22, 31:8, 31:19, 57:21, 57:22, 58:3, 62:9, 62:11, 62:19, 65:17, 65:20, 65:23, 66:6, 66:8, 70:20, 71:1, 71:10, 71:13, 72:25, 75:12, 75:13, 111:15, 127:7, 137:5, 137:9, 137:24, 141:9, 154:15, 154:16, 193:12, 199:20
**computer-aided** [1] - 1:22
**computers** [18] - 31:19, 58:1, 60:16, 61:1, 61:22, 61:25, 62:12, 62:15, 66:2, 66:15, 66:19, 69:17, 70:17, 70:23, 73:11, 73:21, 154:10
**concern** [10] - 28:11, 29:16, 32:17, 32:19, 35:3, 35:7, 35:14, 41:10, 41:12, 80:10
**concerned** [6] - 11:25, 12:1, 19:21, 27:13, 34:24, 142:4

**concerning** [2] - 13:2, 33:17
**concerns** [8] - 21:19, 22:19, 28:9, 28:12, 29:7, 30:21, 96:21, 123:14
**concluded** [1] - 71:20
**concludes** [2] - 209:6, 211:4
**conclusions** [2] - 208:17, 208:21
**conduct** [3] - 46:4, 46:5, 60:19
**conducted** [2] - 196:6, 206:19
**confer** [1] - 208:24
**confident** [1] - 130:13
**confirm** [3] - 5:18, 7:19, 203:10
**confiscated** [2] - 141:9, 166:24
**confiscation** [1] - 60:25
**confusing** [1] - 89:1
**congratulations** [1] - 171:7
**connected** [1] - 137:10
**connecting** [1] - 138:19
**consent** [1] - 104:24
**consider** [1] - 53:6
**considered** [1] - 177:6
**considering** [2] - 172:9, 172:12
**consigners** [1] - 27:14
**consisted** [1] - 108:24
**constant** [1] - 182:4
**constantly** [1] - 124:5
**construct** [1] - 173:16
**construction** [1] - 107:22
**consultant** [3] - 11:11, 65:21, 66:6
**CONT'D** [1] - 5:21
**contact** [6] - 102:3, 173:5, 180:8, 180:10, 182:3, 182:4
**contacted** [1] - 129:22
**contacts** [1] - 180:18
**contain** [1] - 168:24
**contained** [2] - 66:16, 192:9
**containing** [1] - 203:19
**contemplated** [1] - 191:1
**content** [3] - 51:21, 51:25, 99:1
**continuation** [2] - 3:10, 22:12
**continue** [5] - 3:25, 4:3, 188:13, 189:6, 189:7
**continued** [1] - 119:14
**contradict** [1] - 98:2
**contrary** [1] - 13:19
**convenience** [1] - 140:2
**convention** [2] - 79:11, 173:10
**Convention** [4] - 131:6,

131:7, 132:8, 185:1
**conversation** [18] - 39:6, 68:4, 77:23, 78:1, 78:7, 78:14, 78:21, 78:22, 79:7, 105:9, 131:12, 131:16, 131:20, 131:22, 134:21, 135:7, 147:18, 172:23
**conversations** [10] - 122:1, 124:18, 130:7, 134:6, 136:3, 140:21, 159:3, 162:8, 163:23, 171:21
**convert** [2] - 120:15, 121:10
**converted** [2] - 121:12, 121:13
**copied** [1] - 134:14
**copies** [4] - 7:9, 169:17, 169:18, 204:25
**copy** [10] - 4:11, 4:13, 6:19, 7:9, 7:12, 58:21, 84:1, 169:5, 169:8, 204:14
**copyright** [3] - 45:8, 45:9, 45:10
**corner** [1] - 166:6
**corporate** [5] - 65:20, 151:23, 152:10, 191:21, 195:8
**corporation** [1] - 154:3
**correct** [165] - 5:4, 5:7, 6:4, 7:25, 8:1, 9:13, 10:5, 11:1, 11:16, 11:21, 12:7, 12:19, 12:24, 14:15, 15:8, 16:11, 17:7, 24:10, 27:25, 31:8, 32:10, 32:23, 34:25, 35:6, 38:13, 39:3, 39:4, 41:22, 49:13, 58:8, 59:22, 61:8, 63:13, 63:23, 64:3, 64:11, 64:14, 64:15, 65:7, 65:11, 65:18, 66:12, 66:22, 68:19, 70:17, 71:2, 72:8, 72:25, 74:14, 83:12, 83:14, 83:19, 84:11, 89:21, 92:2, 99:23, 105:5, 107:14, 107:18, 107:24, 107:25, 108:2, 110:10, 111:25, 112:8, 112:20, 112:25, 113:1, 113:19, 113:25, 115:11, 116:21, 117:10, 117:16, 118:5, 118:17, 120:5, 122:12, 122:13, 123:3, 123:6, 123:17, 125:12, 125:13, 127:8, 130:15, 130:22, 131:1, 131:14, 132:4, 133:25, 134:8, 134:20, 138:5, 138:14, 140:6, 140:8, 141:20, 143:8, 143:10, 143:16, 144:17, 144:21, 146:21, 148:12, 149:11, 151:21, 155:11, 156:19, 156:23, 157:7, 157:8, 157:25,

158:14, 158:15, 160:14, 161:7, 166:19, 166:20, 169:5, 169:6, 171:4, 172:6, 172:7, 172:8, 172:11, 173:14, 173:20, 174:19, 174:21, 175:22, 177:8, 179:3, 179:6, 182:24, 183:10, 184:7, 184:12, 187:5, 187:10, 188:5, 188:19, 192:11, 192:12, 194:18, 195:2, 195:21, 197:6, 197:11, 197:17, 197:24, 198:12, 198:14, 199:22, 200:9, 201:8, 201:11, 201:15, 201:16, 202:20, 203:13, 205:4, 205:23, 207:3, 211:10
**corrected** [1] - 192:7
**correspond** [1] - 49:12
**correspondence** [2] - 168:8, 168:15
**corroborated** [1] - 9:17
**counsel** [11] - 3:11, 3:14, 7:10, 69:21, 82:25, 101:6, 164:25, 169:20, 170:25, 187:3, 209:12
**Counsel** [4] - 5:8, 7:8, 73:14, 106:1
**countries** [1] - 193:22
**Country** [1] - 125:6
**country** [2] - 138:13, 194:2
**couple** [5] - 10:14, 20:14, 155:20, 162:11, 188:6
**COURT** [71] - 1:1, 3:1, 3:4, 3:7, 3:16, 3:20, 3:22, 4:12, 4:16, 5:6, 5:13, 5:17, 6:16, 6:19, 7:1, 7:4, 7:8, 7:14, 13:25, 69:21, 69:25, 70:2, 70:4, 73:14, 73:17, 82:25, 100:25, 101:2, 101:5, 105:13, 106:8, 106:10, 106:12, 106:15, 106:17, 106:20, 107:9, 139:19, 164:22, 165:2, 165:4, 165:6, 186:11, 186:16, 187:12, 204:17, 205:1, 205:16, 206:15, 207:20, 207:23, 207:25, 208:2, 208:4, 208:10, 208:13, 208:20, 209:5, 209:7, 209:9, 209:15, 209:22, 210:2, 210:6, 210:9, 210:14, 210:17, 210:21, 210:25, 211:3, 211:6
**Court** [31] - 1:20, 6:17, 6:22, 38:20, 54:20, 68:17, 68:25, 69:18, 85:23, 86:12, 92:8, 92:11, 105:15, 105:19, 109:7, 110:11, 127:6, 132:6, 138:10, 154:25,

165:13, 208:14, 208:15, 208:16, 208:24, 209:6, 209:11, 210:2, 210:21, 211:4, 211:19
**court** [13] - 3:2, 70:3, 77:8, 78:24, 79:2, 106:11, 106:23, 165:5, 171:20, 191:16, 206:15, 208:3, 209:8
**Court's** [2] - 6:19, 179:2
**courted** [1] - 160:8
**Courthouse** [1] - 1:9
**courtroom** [2] - 106:21, 109:15
**covenant** [1] - 59:21
**Covenant** [2] - 202:8, 202:19, 202:21
**covenants** [1] - 81:8
**create** [5] - 56:15, 57:7, 130:6, 190:19, 195:4
**created** [5] - 30:5, 40:25, 143:10, 173:19, 190:10
**creative** [1] - 147:19
**creator** [2] - 188:17, 194:11
**credit** [2] - 176:6
**CROSS** [4] - 2:4, 2:6, 5:21, 165:8
**cross** [6] - 3:23, 4:2, 4:3, 105:17, 105:25, 164:25
**cross-exam** [1] - 105:25
**cross-examination** [3] - 3:23, 4:3, 105:17
**CROSS-EXAMINATION** [2] - 2:4, 5:21
**cross-examine** [2] - 4:2, 164:25
**CRR** [1] - 211:18
**crying** [1] - 162:22
**current** [5] - 174:18, 176:20, 198:15, 198:20, 208:15
**custom** [1] - 194:7
**customer** [25] - 29:12, 29:14, 30:15, 32:2, 45:1, 82:3, 83:13, 86:16, 94:13, 99:25, 100:9, 103:9, 183:1, 189:11, 189:17, 194:6, 194:15, 197:11, 197:13, 197:24, 198:11, 198:13, 198:18, 201:10
**customers** [20] - 23:4, 43:16, 45:17, 47:21, 50:16, 51:23, 55:8, 55:9, 57:15, 81:7, 92:3, 95:1, 96:16, 99:8, 100:23, 180:3, 189:9, 190:14, 197:6, 197:8
**customers'** [2] - 94:17, 104:14
**cut** [5] - 36:20, 72:5, 107:12, 160:25, 206:3
**cutting** [1] - 188:11

**D**

**D-10** [6] - 22:9, 22:10, 23:24, 29:6, 36:21, 137:4
**D-11** [10] - 22:10, 22:11, 23:22, 24:3, 27:4, 28:25, 37:15, 126:14, 126:16
**D-12** [13] - 2:10, 37:11, 37:13, 37:21, 40:16, 137:1, 137:3, 138:4, 139:4, 165:24, 166:1, 166:6
**D-13** [4] - 2:10, 63:19, 63:20, 63:21
**D-14** [4] - 70:7, 70:10, 72:8, 74:14
**D-15** [3] - 2:11, 85:12, 85:13
**D-16** [6] - 2:11, 95:17, 95:18, 95:23, 96:2, 96:22
**D-17** [5] - 2:11, 95:17, 95:18, 95:24, 96:4
**D-18** [10] - 2:12, 122:5, 122:6, 122:8, 123:16, 124:1, 125:4, 125:5, 125:10
**D-19** [4] - 2:13, 150:23, 150:24, 151:9
**D-20** [5] - 2:13, 150:23, 150:24, 151:22
**D-21** [8] - 2:13, 2:15, 150:23, 150:24, 152:23, 209:14, 210:3, 210:24
**D-5** [13] - 2:9, 2:15, 4:7, 4:10, 5:5, 5:20, 204:1, 204:22, 209:14, 209:17, 210:3, 210:4, 210:24
**D-6** [8] - 13:23, 14:2, 14:8, 14:17, 32:14, 123:9, 204:8, 204:10
**D-7** [7] - 13:24, 14:7, 14:9, 15:13, 29:25, 32:15, 123:9
**D-8** [8] - 2:9, 16:24, 17:2, 17:7, 17:12, 29:6, 32:14, 126:14
**D-9** [6] - 20:13, 20:14, 20:18, 29:6, 36:21, 137:4
**D-documents** [1] - 165:24
**damage** [1] - 82:3
**damages** [1] - 83:12
**Daniel** [2] - 120:13, 123:23
**Daniel's** [1] - 154:12
**daniel@equipmentfacts. com** [1] - 122:11
**Danielle** [1] - 121:19
**data** [4] - 71:24, 98:6, 102:12, 102:20
**database** [5] - 66:25, 67:1, 111:8, 182:5, 193:22
**databases** [1] - 18:22
**date** [14] - 28:23, 32:5, 53:2, 88:6, 119:14, 153:2, 153:4,

166:6, 166:8, 166:18, 166:21, 177:19, 187:24
**Date** [1] - 211:19
**dated** [9] - 4:14, 14:8, 14:10, 34:25, 70:10, 80:5, 204:3, 204:22
**dates** [3] - 15:13, 136:23, 208:23
**dating** [1] - 49:19
**David** [2] - 67:13, 67:21
**days** [6] - 78:2, 125:5, 135:21, 135:24, 160:6, 183:8
**deactivated** [2] - 167:11, 195:25
**deal** [5] - 56:13, 59:12, 116:3, 129:13, 141:3
**Dealer** [6] - 190:1, 190:2, 190:6, 190:24, 191:14, 192:9
**Dealer-Facts** [6] - 190:1, 190:2, 190:6, 190:24, 191:14, 192:9
**dealers** [2] - 149:17, 150:10
**dealing** [2] - 153:21, 153:22
**dealings** [1] - 179:8
**decades** [2] - 188:12, 206:12
**December** [3] - 152:22, 204:3, 205:22
**decided** [6] - 108:1, 111:21, 125:2, 127:12, 148:17, 193:5
**decision** [5] - 24:23, 24:25, 27:1, 59:19, 105:7
**decisions** [1] - 99:2
**declaration** [35] - 4:6, 4:10, 4:14, 4:22, 5:11, 5:19, 6:2, 6:4, 63:22, 63:25, 69:14, 69:15, 70:10, 72:3, 72:21, 72:23, 73:5, 73:6, 74:3, 74:5, 74:13, 74:15, 74:16, 74:17, 74:18, 74:24, 75:5, 204:2, 204:9, 204:13, 204:22, 205:2, 205:13, 209:17
**declarations** [1] - 94:7
**deemed** [1] - 100:20
**deeper** [1] - 203:11
**DEFENDANT** [1] - 106:16
**Defendant's** [18] - 2:9, 2:9, 2:10, 2:10, 2:11, 2:11, 2:12, 2:13, 2:15, 5:5, 17:2, 37:11, 63:20, 85:13, 95:18, 122:6, 150:24, 210:24
**defendants** [1] - 3:19
**Defendants** [2] - 1:8, 1:18
**defendants'** [1] - 165:23
**definitely** [2] - 50:18, 68:13
**delete** [4] - 139:15, 154:15, 154:18, 186:24

**deleted** [11] - 62:10, 62:21, 62:23, 66:14, 71:20, 75:7, 75:9, 76:2, 76:13, 167:15, 185:19
**deleting** [1] - 185:20
**deletion** [6] - 58:4, 62:24, 65:21, 66:7, 71:9, 71:14
**deletions** [1] - 62:3
**deliberate** [1] - 73:13
**Dell** [1] - 154:13
**demonstrate** [1] - 135:13
**demonstrating** [1] - 33:14
**Denina** [3] - 34:11, 34:15, 34:20
**DENINA** [1] - 34:15
**dentist** [1] - 185:24
**Department** [1] - 153:7
**department** [2] - 64:22, 115:24
**DEPUTY** [13] - 3:1, 69:25, 70:2, 106:8, 106:10, 106:17, 165:2, 165:4, 207:25, 208:2, 209:5, 209:7, 211:3
**described** [2] - 176:24, 195:12
**describing** [1] - 182:9
**description** [10] - 188:8, 189:5, 189:8, 191:17, 191:25, 192:3, 192:9, 192:22, 198:21, 199:3
**desire** [1] - 155:6
**desist** [1] - 191:9
**desk** [3] - 138:11, 141:10, 142:6
**despite** [1] - 165:11
**destroyed** [1] - 169:11
**destroying** [1] - 71:24
**detail** [2] - 101:20, 202:17
**details** [3] - 83:11, 102:3
**determination** [1] - 71:19
**determined** [2] - 65:21, 66:6
**develop** [1] - 117:25
**developed** [2] - 118:22, 126:3
**developing** [1] - 122:2
**device** [2] - 111:15, 193:12
**devices** [5] - 61:5, 168:24, 169:1, 186:9, 186:23
**differ** [2] - 104:18, 189:25
**difference** [2] - 109:7, 199:19
**differences** [3] - 42:23, 101:17, 155:21
**different** [26] - 28:16, 52:21, 73:14, 73:17, 98:17, 99:25, 100:8, 101:11, 101:12, 101:13, 101:14, 103:1, 103:5, 104:1, 109:9, 110:25, 121:6, 121:8,

122:23, 146:22, 149:17, 159:6, 175:21, 195:7, 200:17, 204:23
**differentiation** [2] - 183:3, 194:22
**difficult** [1] - 19:22
**digital** [1] - 159:2
**diligence** [3] - 114:20, 114:21, 170:8
**dinner** [2] - 184:2, 184:5
**DIRECT** [2] - 2:5, 107:11
**direct** [9] - 24:9, 26:11, 44:9, 59:21, 81:7, 89:19, 105:16, 105:24, 128:6
**direction** [1] - 158:6
**directly** [11] - 19:24, 42:21, 56:9, 58:7, 59:7, 59:13, 60:1, 60:2, 83:18, 84:10, 193:12
**disagree** [1] - 29:11
**disconnect** [1] - 88:17
**discount** [2] - 137:12, 137:19
**discounts** [3] - 80:21, 80:22, 136:12
**discovered** [3] - 66:20, 67:6, 67:25
**discovery** [7] - 16:10, 31:22, 65:2, 65:3, 186:13, 186:14
**discuss** [3] - 48:8, 60:14, 129:11
**discussed** [6] - 67:14, 76:20, 115:7, 120:4, 123:12, 123:13
**discusses** [2] - 20:18, 146:19
**discussing** [1] - 128:23
**discussion** [3] - 22:12, 138:7, 169:19
**Discussion** [1] - 7:10
**discussions** [8] - 112:24, 114:23, 118:2, 124:14, 153:14, 168:1, 172:19, 201:18
**dislikes** [2] - 162:21, 162:22
**dispute** [12] - 17:23, 23:5, 31:14, 75:15, 75:16, 75:20, 75:25, 76:15, 76:16, 79:16, 90:21, 97:17
**disregarded** [1] - 83:2
**Dissolution** [1] - 152:21
**distributor** [1] - 180:17
**distributorship** [1] - 145:7
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [1] - 3:3
**divide** [1] - 106:3
**dividend** [2] - 176:17, 176:25
**division** [2] - 147:11, 190:19
**Docket** [1] - 3:9
**document** [63] - 5:23, 5:24, 11:10, 11:14, 11:16, 12:8,

12:22, 13:2, 17:7, 17:12, 29:25, 30:2, 30:3, 39:21, 40:24, 40:25, 41:1, 42:3, 42:8, 42:9, 42:14, 42:24, 43:1, 43:13, 45:4, 45:20, 45:25, 46:2, 63:21, 63:25, 84:1, 84:3, 90:2, 90:4, 135:12, 137:1, 145:2, 146:19, 151:9, 151:12, 151:19, 151:22, 152:10, 152:11, 166:5, 166:11, 167:2, 182:10, 187:16, 187:18, 187:19, 189:2, 192:16, 201:24, 201:25, 202:12, 202:18, 203:7, 204:5, 204:12, 205:15, 205:20, 209:20
**documents** [48] - 6:10, 12:13, 13:23, 14:14, 16:8, 16:9, 16:23, 17:4, 29:5, 38:21, 40:16, 40:18, 40:23, 49:2, 58:4, 62:11, 62:21, 62:23, 62:24, 64:1, 86:24, 95:15, 101:16, 101:18, 119:20, 139:10, 140:3, 146:15, 147:24, 151:1, 153:19, 154:17, 165:23, 165:24, 166:19, 166:22, 168:25, 169:7, 170:2, 170:8, 170:22, 199:18, 202:4, 202:8, 203:19, 204:6, 209:11
**domain** [3] - 146:8, 190:10, 191:5
**done** [29] - 5:10, 21:15, 71:23, 82:1, 88:7, 88:11, 109:25, 110:3, 110:12, 113:18, 122:25, 123:2, 138:21, 139:10, 146:2, 148:15, 158:20, 169:22, 177:15, 177:21, 178:25, 180:2, 187:16, 187:17, 192:21, 196:1, 197:20, 207:19, 208:9
**door** [1] - 86:17
**doubt** [1] - 41:4
**down** [17] - 57:20, 105:14, 106:23, 107:1, 107:3, 117:7, 132:22, 134:15, 148:6, 160:19, 188:22, 191:4, 191:6, 198:3, 202:23, 206:15, 208:11
**download** [2] - 154:7, 154:8
**downloaded** [1] - 50:4
**downstairs** [1] - 142:4
**drilling** [1] - 193:9
**Drive** [1] - 152:6
**driven** [3] - 191:22, 207:13, 207:14
**drives** [1] - 140:1

**Dropbox** [3] - 50:7, 50:8, 50:9
**drops** [1] - 180:24
**Ds** [1] - 203:24
**due** [3] - 114:20, 114:21, 170:8
**duplicate** [1] - 170:15
**Durable** [1] - 103:7
**during** [8] - 16:14, 114:20, 117:24, 118:18, 124:18, 141:23, 147:13, 168:9
**duties** [2] - 117:14, 117:17
**Dyess** [28] - 17:8, 19:7, 20:6, 20:19, 20:20, 21:9, 22:1, 22:13, 22:15, 23:7, 23:19, 23:25, 24:16, 24:25, 25:4, 25:25, 29:7, 32:16, 57:5, 58:25, 84:9, 124:12, 124:16, 124:18, 134:6, 134:13, 134:21, 135:7
**Dyess'** [1] - 24:5
**Dyess's** [3] - 31:1, 55:19, 83:22

### E

**earn** [2] - 112:13, 114:24
**earned** [1] - 115:22
**earning** [1] - 116:1
**earnings** [1] - 108:14
**easier** [3] - 6:13, 7:15, 22:5
**East** [1] - 1:9
**easy** [2] - 23:15, 193:10
**EBITDA** [3] - 108:12, 108:13, 108:18
**edge** [1] - 188:11
**edification** [1] - 41:9
**effect** [2] - 11:23, 25:19
**effective** [3] - 89:1, 109:21
**eight** [2] - 77:24, 78:2
**either** [14] - 18:25, 19:2, 52:19, 74:6, 80:3, 89:4, 89:10, 89:14, 95:8, 95:13, 137:22, 168:24, 176:21, 203:18
**electrician** [3] - 140:19, 141:2, 141:6
**electronic** [2] - 168:24, 169:1
**email** [226] - 7:21, 8:4, 8:7, 8:15, 8:16, 9:3, 9:23, 11:2, 12:5, 12:23, 12:24, 13:19, 14:3, 14:7, 14:8, 14:9, 15:13, 15:15, 17:8, 17:15, 17:25, 18:2, 18:4, 18:11, 20:14, 20:19, 21:9, 21:25, 22:2, 23:18, 23:24, 24:3, 24:4, 24:5, 25:25, 27:6, 27:18, 27:19, 28:9, 28:23, 29:3, 29:15, 29:16, 29:19, 30:11, 30:14, 30:17, 30:22,

31:3, 31:6, 31:21, 32:3, 32:5, 32:8, 32:13, 32:16, 32:18, 32:21, 32:24, 33:1, 33:2, 33:3, 33:6, 33:7, 33:9, 33:14, 33:20, 33:21, 33:22, 34:14, 34:16, 34:19, 34:20, 34:24, 35:5, 35:24, 36:3, 36:7, 36:15, 37:8, 37:17, 37:22, 37:23, 38:11, 38:12, 39:1, 39:5, 40:7, 40:8, 40:9, 41:8, 41:11, 41:13, 41:25, 42:1, 43:2, 45:22, 45:23, 49:24, 49:25, 52:15, 53:2, 53:4, 54:18, 54:21, 54:22, 55:5, 64:10, 64:24, 65:2, 67:13, 67:18, 76:25, 79:18, 80:5, 80:6, 80:7, 80:12, 80:14, 80:16, 80:18, 80:19, 80:23, 80:24, 81:3, 94:12, 94:17, 94:19, 97:6, 97:10, 97:25, 98:18, 98:21, 99:4, 99:25, 100:1, 100:3, 100:9, 100:12, 100:23, 102:23, 103:4, 103:15, 103:17, 104:5, 104:8, 104:10, 104:16, 104:22, 111:7, 122:9, 122:10, 123:16, 123:23, 123:24, 124:1, 124:25, 125:4, 125:5, 126:12, 129:12, 130:8, 130:9, 132:14, 134:10, 134:11, 134:15, 134:19, 135:6, 135:18, 135:21, 137:5, 137:8, 137:9, 137:21, 138:4, 138:8, 138:16, 138:17, 138:22, 138:24, 139:1, 139:7, 139:9, 139:11, 139:22, 139:24, 140:2, 142:20, 142:23, 144:23, 145:3, 145:5, 145:15, 146:13, 147:7, 148:3, 166:7, 167:23, 168:5, 170:14, 171:24, 172:1, 172:5, 180:18, 181:14, 185:19, 186:23, 188:15, 203:12, 203:15, 203:16, 203:18, 203:20, 203:21
**emailed** [2] - 138:3, 139:1
**emailing** [2] - 22:1, 22:16
**emails** [74] - 8:3, 8:18, 8:19, 8:23, 9:12, 9:17, 10:7, 12:14, 14:19, 17:19, 25:4, 26:19, 26:21, 26:22, 26:23, 27:3, 28:2, 28:4, 28:15, 28:18, 31:1, 32:15, 33:16, 34:9, 35:9, 35:18, 35:21, 36:7, 36:10, 36:13, 37:2, 38:14, 39:10, 39:12, 39:13, 49:11, 69:5, 80:5, 81:2,

86:24, 94:12, 94:14, 94:25, 96:17, 97:15, 104:12, 104:16, 108:21, 123:7, 123:8, 123:12, 124:12, 124:14, 126:14, 128:24, 129:16, 132:22, 133:2, 133:3, 134:14, 135:6, 135:15, 137:20, 138:22, 141:13, 145:1, 145:12, 145:13, 167:9, 167:14, 168:6, 168:25, 170:22, 182:4
**embarrassed** [1] - 163:11
**empire** [1] - 66:24
**employed** [3] - 172:5, 179:5, 201:11
**employee** [18] - 3:15, 16:14, 18:13, 49:19, 67:19, 67:20, 112:19, 112:25, 113:7, 114:10, 128:17, 128:18, 128:19, 164:10, 172:25, 184:3, 201:7, 201:14
**Employee** [1] - 202:21
**employees** [15] - 8:8, 65:9, 66:21, 67:7, 68:5, 69:2, 113:10, 113:15, 114:24, 115:22, 115:25, 116:11, 164:1, 173:7, 177:10
**employees'** [1] - 66:19
**employment** [4] - 168:7, 168:17, 177:15, 177:18
**Employment** [7] - 112:1, 112:3, 112:6, 112:14, 114:2, 114:12, 116:25
**empowering** [3] - 189:10, 189:16, 191:19
**empty** [1] - 192:17
**end** [9] - 21:8, 27:13, 66:23, 67:16, 89:23, 129:1, 133:9, 143:18, 208:13
**ended** [3] - 55:24, 105:15, 199:23
**engage** [3] - 109:11, 156:3, 196:20
**engaged** [1] - 156:3
**engine** [6] - 42:21, 46:13, 46:19, 47:4, 119:11, 206:25
**Engine** [1] - 191:22
**Enos** [2] - 104:4, 104:7
**Enos'** [1] - 103:20
**ensure** [2] - 99:18, 193:25
**enter** [7] - 68:17, 92:2, 99:14, 108:2, 110:21, 111:22, 112:23
**entered** [2] - 145:6, 165:13
**entertaining** [1] - 83:4
**entire** [1] - 161:17
**entirely** [1] - 175:21
**entities** [2] - 147:3, 177:22

**entitled** [1] - 211:11
**entity** [3] - 173:13, 178:12
**environment** [1] - 155:6
**envision** [1] - 195:20
**envisioned** [1] - 195:4
**equating** [1] - 188:25
**equipment** [10] - 60:21, 61:14, 93:10, 107:22, 109:11, 113:22, 144:3, 156:7, 159:1, 186:4
**Equipment** [10] - 171:11, 178:6, 179:19, 181:1, 181:20, 193:4, 200:21, 200:24, 201:3, 207:16
**Equipmentfacts** [121] - 10:13, 15:17, 18:13, 18:20, 22:20, 23:14, 24:12, 30:6, 34:11, 34:21, 37:22, 44:4, 44:17, 44:23, 45:17, 48:23, 53:11, 54:11, 57:12, 59:7, 60:2, 66:24, 77:11, 93:21, 93:23, 94:2, 107:13, 107:14, 107:16, 107:20, 107:23, 109:3, 109:8, 109:10, 109:16, 110:6, 110:13, 111:5, 111:20, 113:3, 113:5, 113:17, 115:1, 115:3, 117:7, 117:8, 117:18, 119:10, 119:11, 120:1, 120:8, 120:20, 122:10, 127:14, 128:1, 128:2, 128:8, 129:4, 129:25, 130:19, 131:11, 132:9, 133:23, 134:17, 135:5, 136:15, 137:24, 143:25, 144:1, 144:20, 146:10, 146:11, 146:22, 146:24, 147:5, 149:1, 149:8, 150:18, 153:21, 153:22, 156:4, 156:6, 156:22, 157:4, 160:13, 163:12, 166:17, 167:11, 168:7, 168:13, 168:17, 170:7, 170:23, 172:6, 172:10, 173:1, 174:20, 175:17, 179:5, 179:9, 182:25, 183:4, 193:3, 197:16, 198:11, 198:14, 198:19, 198:24, 199:1, 199:7, 199:11, 199:15, 200:13, 200:20, 200:23, 201:4, 201:12, 203:18, 206:13
**Equipmentfacts'** [21] - 9:3, 17:8, 17:15, 19:20, 22:1, 34:16, 34:20, 41:7, 139:7, 139:8, 163:6, 166:18, 166:22, 169:7, 182:3, 182:23, 190:9, 197:13, 197:23, 201:1, 203:19

equipmentfacts.com [3] - 50:9, 51:12, 183:8
Equipmentfacts/BidCaller [1] - 149:23
Eric [5] - 17:8, 20:20, 24:5, 126:20, 134:12
error [1] - 192:18
errors [1] - 163:2
especially [1] - 127:2
ESQUIRE [2] - 1:15, 1:17
Essay [3] - 3:13, 52:11, 57:21, 65:8, 140:21, 141:25, 142:19, 162:8, 169:17
established [1] - 6:8
estate [2] - 156:10
estimate [1] - 141:2
et [1] - 3:9
evaluate [1] - 83:3
evaluating [1] - 108:18
EVAN [1] - 2:3
Evan [27] - 3:14, 3:23, 4:10, 14:9, 15:18, 63:22, 78:11, 78:25, 87:3, 87:24, 116:4, 116:6, 116:7, 137:13, 140:18, 141:18, 147:18, 148:4, 160:23, 161:21, 167:5, 169:16, 185:5, 185:7, 204:2, 204:9, 204:22
Evan's [1] - 141:16
eventual [1] - 111:24
eventually [1] - 164:15
EVID [1] - 2:8
evidence [48] - 2:15, 2:15, 6:8, 55:4, 56:12, 57:17, 57:18, 59:18, 72:5, 72:24, 74:12, 75:20, 75:25, 76:20, 77:4, 77:9, 79:9, 79:16, 79:21, 82:11, 82:15, 82:19, 82:20, 83:5, 85:16, 85:18, 85:22, 85:23, 86:11, 86:20, 86:22, 88:4, 89:20, 89:25, 90:1, 90:2, 90:21, 90:23, 91:2, 91:17, 121:12, 167:8, 170:15, 209:14, 210:7, 210:19, 210:23, 210:24
evidentiary [1] - 83:1
exact [7] - 19:16, 47:3, 47:18, 47:19, 86:1, 133:10, 173:24
exactly [4] - 47:14, 47:19, 126:8, 199:12
exam [2] - 105:24, 105:25
examination [4] - 3:23, 4:3, 64:22, 105:17
EXAMINATION [6] - 2:4, 2:5, 2:6, 5:21, 107:11, 165:8
examine [2] - 4:2, 164:25
example [5] - 93:13, 110:6,

186:5, 195:14, 199:1
examples [2] - 82:7, 82:9
excellent [2] - 194:6, 206:18
except [3] - 20:14, 40:23, 151:5
exchange [2] - 171:24, 172:5
excuse [2] - 131:18, 196:19
excused [1] - 208:11
execute [1] - 92:22
executed [1] - 116:22
exercise [1] - 149:17
Exhibit [26] - 2:9, 2:9, 2:10, 2:10, 2:11, 2:11, 2:12, 2:13, 2:14, 2:14, 2:15, 2:15, 5:5, 17:2, 37:11, 63:20, 85:13, 95:18, 122:6, 150:24, 187:14, 192:14, 205:12, 206:1, 210:23, 210:24
exhibit [2] - 4:5, 204:14
exhibits [16] - 4:23, 5:2, 5:10, 6:13, 7:5, 7:12, 8:20, 122:17, 203:25, 205:8, 209:13, 209:18, 210:3, 210:4, 210:14, 210:18
exist [1] - 195:23
existed [2] - 190:2, 203:7
existence [2] - 175:11, 194:24
exists [3] - 129:12, 173:13, 200:7
expand [1] - 193:5
expected [1] - 113:8
expediency [1] - 7:12
expense [2] - 138:23, 139:2
expenses [1] - 116:2
experience [5] - 15:17, 137:16, 193:4, 206:12, 206:17
Experienced [1] - 206:11
expert [19] - 57:24, 66:3, 72:6, 72:10, 72:11, 72:14, 72:16, 72:17, 72:19, 72:20, 73:2, 73:3, 73:4, 73:8, 73:10, 73:19, 73:23, 74:14, 167:19
expertise [1] - 206:20
explain [3] - 22:5, 109:6, 122:22
explained [2] - 59:25, 76:12
explains [1] - 96:23
explanation [1] - 180:23
export [1] - 190:13
expressing [1] - 15:7
extending [1] - 162:8
extensive [2] - 136:3, 193:4
extent [3] - 99:10, 171:17, 208:7
extra [3] - 58:21, 113:6, 115:5

extraordinary [1] - 68:17
extremely [2] - 15:24, 142:4
eye [1] - 163:11
eyes [1] - 112:15

F

Fabricator [2] - 120:13, 121:19
facing [1] - 27:15
fact [24] - 14:23, 17:25, 18:20, 29:18, 30:11, 31:3, 32:18, 37:7, 54:17, 56:5, 59:20, 60:3, 82:17, 88:9, 114:20, 146:13, 147:1, 151:14, 152:13, 153:14, 181:2, 191:5, 196:14, 200:23
Facts [80] - 55:9, 55:11, 55:24, 55:25, 56:5, 56:6, 56:9, 56:14, 57:6, 57:7, 57:12, 58:8, 60:12, 84:8, 88:1, 88:7, 88:11, 90:20, 91:21, 93:22, 143:9, 143:14, 143:21, 143:22, 144:8, 144:15, 144:18, 145:6, 145:17, 155:3, 173:11, 173:13, 174:2, 174:4, 174:18, 175:1, 175:7, 175:10, 176:7, 176:10, 176:12, 176:19, 176:21, 176:25, 177:5, 177:8, 177:12, 178:2, 178:14, 179:9, 179:16, 179:17, 185:14, 187:4, 187:7, 188:4, 188:8, 188:9, 188:11, 188:17, 190:1, 190:2, 190:6, 190:24, 191:14, 192:9, 194:14, 194:19, 194:24, 195:1, 195:6, 196:5, 199:8, 199:14, 199:16, 200:8, 200:19, 206:6, 206:12
FACTS [1] - 1:7
facts [2] - 208:16, 208:20
factstech.com [1] - 187:20
fair [14] - 50:22, 82:23, 173:25, 176:18, 180:20, 182:6, 183:15, 196:3, 197:1, 201:7, 203:22, 204:7
fall [1] - 181:2
false [1] - 88:6
familiar [11] - 22:6, 96:2, 96:4, 129:15, 192:19, 200:21, 200:23, 202:9, 205:9, 205:14, 205:21
family [2] - 112:13, 182:22, 190:17
far [4] - 48:7, 122:2, 149:4,

206:20
far-reaching [1] - 206:20
farm [1] - 107:22
Farsiou [12] - 3:17, 3:18, 4:1, 70:5, 106:13, 107:9, 186:11, 186:17, 204:24, 205:16, 209:22, 210:9
farsiou [1] - 5:13
FARSIOU [60] - 1:17, 1:17, 2:4, 2:5, 3:6, 3:17, 3:21, 4:4, 4:15, 4:19, 4:25, 5:2, 5:14, 5:18, 5:21, 6:12, 6:17, 6:21, 7:6, 7:15, 7:17, 7:18, 13:22, 14:1, 16:24, 17:3, 37:12, 58:19, 58:24, 63:19, 70:6, 73:12, 73:16, 73:18, 82:19, 83:6, 85:12, 95:17, 95:19, 101:4, 101:8, 105:12, 106:14, 107:10, 107:11, 150:25, 150:25, 164:20, 186:12, 186:18, 204:10, 204:16, 205:19, 208:19, 209:13, 209:23, 210:10, 210:16, 210:20, 211:2
Farsiou's [1] - 203:25
fast [1] - 193:20
features [3] - 119:15, 194:5, 199:14
features.. [1] - 194:3
february [1] - 1:10
February [24] - 7:7, 8:20, 14:14, 48:24, 58:13, 58:17, 59:24, 82:6, 87:25, 95:12, 108:4, 120:17, 128:9, 151:6, 152:17, 152:19, 165:22, 166:9, 167:6, 184:10, 187:22, 208:18, 208:21, 211:18
FEDERAL [1] - 211:6
feedback [3] - 26:15, 26:16, 73:10
fees [1] - 144:14
felt [4] - 159:4, 160:20, 161:4, 162:4
fences [3] - 127:20, 127:22, 127:24
few [7] - 43:4, 44:6, 101:21, 110:3, 167:16, 183:8, 190:14
Field [6] - 158:13, 159:5, 189:10, 189:16, 193:5, 193:6
field [4] - 19:20, 21:11, 159:2, 193:9
fields [1] - 195:15
file [4] - 57:11, 57:12, 70:14, 204:3
filed [13] - 4:11, 4:15, 6:9, 38:12, 40:18, 63:15, 63:22,

63:25, 70:11, 76:3, 151:2, 153:2, 153:7
**files** [1] - 76:14
**filing** [2] - 4:24, 5:11
**filter** [6] - 94:13, 100:23, 103:18, 104:5, 104:7, 104:11
**finally** [1] - 162:25
**finance** [1] - 190:21
**financing** [1] - 190:14
**findings** [6] - 61:9, 61:13, 62:4, 74:9, 74:18, 74:19
**fine** [9] - 4:25, 20:9, 76:19, 128:11, 181:5, 204:17, 205:1, 209:24, 210:1
**finish** [4] - 106:1, 152:3, 171:20, 186:21
**finished** [2] - 154:11, 161:17
**fired** [4] - 142:13, 142:14, 164:7, 164:11
**firewall** [1] - 99:17
**firm** [1] - 3:18
**first** [45] - 4:4, 10:14, 20:18, 21:10, 38:13, 43:4, 44:6, 56:18, 63:15, 64:1, 64:5, 69:7, 70:13, 71:3, 71:4, 72:3, 73:1, 74:3, 76:21, 94:20, 97:3, 109:22, 110:23, 115:17, 115:21, 115:25, 116:2, 131:17, 133:4, 143:23, 143:24, 144:13, 149:5, 151:7, 161:4, 163:10, 167:18, 177:24, 188:8, 192:23, 192:25, 199:18
**Fisher** [1] - 1:9
**fit** [1] - 23:14
**five** [5] - 108:11, 115:21, 126:3, 168:23, 207:24
**five-minute** [1] - 207:24
**fleet** [2] - 150:10
**Flemington** [12] - 64:6, 65:5, 66:20, 67:7, 67:19, 67:20, 68:5, 69:1, 141:12, 141:19, 162:16, 174:13
**flew** [1] - 184:8
**flexible** [1] - 191:20
**Florida** [6] - 133:5, 151:17, 152:24, 153:7, 182:18, 182:20
**fly** [1] - 65:16
**flying** [1] - 206:19
**focus** [5] - 68:21, 132:9, 133:22, 133:23, 159:24
**folks** [2] - 208:13, 208:24
**follow** [3] - 103:2, 111:16, 168:4
**follow-up** [1] - 168:4
**followed** [1] - 105:24
**following** [6] - 36:11, 46:22,

126:22, 141:4, 180:11, 184:12
**FOR** [1] - 1:1
**forced** [1] - 27:9
**FORD** [1] - 211:18
**Ford** [1] - 1:20
**foregoing** [1] - 211:10
**forensic** [21] - 65:20, 66:2, 66:6, 69:12, 69:17, 70:19, 72:6, 72:10, 72:11, 72:14, 72:16, 72:17, 72:19, 72:20, 73:2, 73:3, 73:4, 73:8, 73:10, 73:19, 73:23
**forensics** [1] - 61:4
**form** [4] - 19:22, 85:11, 135:13, 176:16
**formally** [1] - 209:11
**format** [2] - 130:5, 175:9
**formation** [1] - 173:23
**former** [5] - 182:3, 198:10, 198:13, 198:18, 201:12
**forsenic** [1] - 70:16
**forth** [5] - 108:12, 108:17, 108:19, 109:5, 148:22
**fortunate** [1] - 142:8
**forward** [4] - 34:16, 34:22, 138:24, 208:8
**Forward** [1] - 14:3
**forwarded** [4] - 52:11, 80:7, 167:18, 168:5
**Founder** [2] - 174:4, 193:3, 206:13
**four** [8] - 16:23, 86:3, 86:16, 87:5, 115:21, 126:2, 157:22, 168:23
**frame** [7] - 9:8, 120:18, 133:5, 147:13, 177:16, 177:17, 180:1
**free** [2] - 100:14, 136:8
**friend** [1] - 59:16
**friendly** [1] - 191:22
**friends** [1] - 79:3
**front** [12] - 6:10, 6:14, 17:4, 63:21, 70:8, 72:7, 76:24, 119:19, 122:8, 129:14, 134:2, 173:23
**frustrated** [2] - 15:24, 172:10
**frustration** [1] - 15:7
**full** [5] - 111:5, 136:8, 163:22, 207:10, 209:25
**full-page** [2] - 111:5, 136:8
**full-time** [1] - 163:22
**fully** [4] - 88:15, 107:2, 191:20, 207:11
**funds** [1] - 150:4
**funny** [1] - 90:15
**future** [3] - 22:19, 176:14, 196:9

## G

**G-A-R-A-F-O-L-A** [1] - 106:19
**GARAFOLA** [3] - 1:6, 2:5, 106:16
**Garafola** [126] - 3:9, 3:21, 8:7, 10:4, 10:9, 12:5, 13:8, 13:14, 13:17, 14:9, 14:10, 14:17, 15:7, 15:14, 15:23, 16:13, 22:12, 22:16, 24:12, 24:15, 25:17, 25:25, 26:7, 26:11, 27:18, 29:15, 29:21, 31:4, 31:12, 32:8, 32:23, 33:14, 35:11, 36:1, 36:7, 36:10, 36:14, 36:17, 36:22, 38:6, 38:13, 38:21, 39:5, 39:10, 39:15, 40:19, 41:10, 41:25, 48:21, 49:4, 53:7, 54:15, 57:5, 59:3, 59:7, 60:3, 61:25, 62:2, 64:2, 64:13, 64:18, 65:22, 66:8, 67:20, 68:6, 68:7, 70:20, 71:10, 72:2, 72:4, 72:25, 75:6, 75:11, 75:22, 76:3, 76:12, 77:19, 78:11, 78:25, 79:5, 79:11, 79:14, 79:24, 82:16, 82:24, 83:19, 85:2, 85:4, 85:8, 85:15, 85:25, 86:13, 87:10, 88:8, 90:3, 94:14, 103:18, 104:6, 105:4, 105:10, 105:23, 105:24, 106:1, 106:6, 106:19, 106:20, 106:21, 107:12, 122:7, 122:10, 151:1, 165:9, 165:13, 187:15, 192:15, 193:3, 203:24, 204:18, 204:21, 205:2, 205:14, 205:25, 206:13, 208:10, 209:18
**Garafola's** [24] - 8:3, 11:3, 12:23, 17:7, 24:4, 31:18, 32:14, 33:21, 34:16, 34:21, 35:4, 37:22, 38:15, 39:3, 44:9, 45:23, 49:25, 53:3, 58:3, 62:9, 62:19, 80:7, 104:12, 105:22
**garbage** [3] - 170:17, 170:18, 170:19
**Gary** [4] - 22:18, 22:24, 23:1, 134:24
**gather** [1] - 96:24
**general** [1] - 99:6
**General** [1] - 128:15
**generalize** [1] - 198:3
**generally** [1] - 61:12
**generating** [1] - 135:4
**genius** [1] - 57:20
**given** [7] - 27:15, 167:7, 171:22, 176:7, 180:17,

180:18, 204:13
**Global** [7] - 95:23, 95:24, 96:21, 97:4, 97:21, 98:5, 99:17
**GLOBAL** [1] - 1:3
**globe** [1] - 193:23
**Gmail** [14] - 12:6, 33:22, 38:15, 38:16, 40:9, 41:3, 49:6, 80:7, 80:24, 104:13, 167:2, 167:24, 167:25, 168:16
**Gmail/email** [1] - 166:7
**Goggle** [1] - 191:22
**goodness** [1] - 142:10
**Google** [1] - 207:14
**Google-driven** [1] - 207:14
**GoPro** [3] - 75:14, 75:23, 76:14
**grab** [1] - 133:6
**graduated** [1] - 163:20
**grant** [1] - 81:18
**granting** [1] - 193:24
**great** [3] - 101:20, 160:10, 198:2
**Greene** [16] - 8:8, 10:5, 32:9, 32:22, 34:11, 39:2, 64:10, 64:18, 67:19, 68:7, 163:4, 171:24, 172:5, 172:16, 172:19
**Greene's** [2] - 8:4, 31:19
**grid** [1] - 190:18
**Group** [6] - 179:14, 181:18, 198:8, 198:9, 198:17, 198:18
**grow** [2] - 112:13, 113:8
**guess** [9] - 12:5, 25:22, 25:23, 30:16, 94:2, 100:10, 119:22, 157:10, 199:10
**Guide** [2] - 96:6, 96:7
**guy** [5] - 23:3, 26:10, 56:19, 61:24, 116:19
**guys** [16] - 11:11, 13:9, 17:13, 25:19, 30:14, 36:21, 52:9, 57:23, 64:1, 100:1, 112:23, 119:21, 128:23, 184:20, 184:22

## H

**hairs** [1] - 71:17
**half** [3] - 69:23, 105:20, 160:25
**hand** [2] - 111:19, 189:2
**handed** [3] - 95:22, 141:19, 169:15
**handing** [1] - 192:13
**hands** [1] - 198:23
**hang** [2] - 58:20, 123:9
**happy** [1] - 124:16
**hard** [5] - 86:6, 138:19,

169:4, 169:8, 169:17
**hardware** [1] - 69:17
**Harvest** [1] - 152:6
**head** [4] - 68:3, 86:8, 107:3, 115:17
**headings** [1] - 84:2
**heads** [1] - 22:18
**health** [1] - 176:18
**hear** [8] - 57:2, 72:12, 73:6, 92:1, 128:12, 161:18, 198:24, 209:12
**heard** [20] - 88:17, 108:4, 109:5, 114:4, 114:14, 117:2, 119:18, 119:19, 124:7, 128:9, 133:8, 148:21, 148:22, 149:4, 157:12, 157:23, 159:9, 159:18, 200:6, 201:18
**Hearing** [1] - 1:7
**hearing** [13] - 3:8, 31:23, 59:17, 65:3, 83:1, 86:6, 114:16, 165:22, 167:6, 184:9, 184:12, 195:6, 208:14
**hearsay** [1] - 79:21
**heavily** [1] - 160:8
**heavy** [2] - 107:22, 113:22
**held** [1] - 3:2
**hell** [1] - 164:13
**help** [4] - 30:15, 119:8, 190:12, 195:5
**helping** [3] - 117:24, 118:18, 119:5
**helps** [1] - 99:1
**Hi** [1] - 24:5
**HiBid** [17] - 147:10, 147:14, 150:19, 150:21, 151:4, 151:10, 151:15, 151:19, 153:16, 160:3, 179:6, 199:16, 200:4, 200:7, 200:9, 200:10, 200:13
**HiBid's** [1] - 199:17
**hiccups** [1] - 13:8
**hide** [2] - 140:1, 141:11
**high** [1] - 193:16
**higher** [1] - 108:11
**highest** [1] - 135:4
**highlight** [1] - 137:11
**Highlighted** [1] - 38:3
**highlighted** [2] - 95:20, 137:25
**highlights** [2] - 39:22, 39:25
**Highway** [1] - 174:13
**himself** [1] - 14:18
**hire** [3] - 72:15, 72:17, 156:22
**hired** [4] - 89:18, 90:18, 133:18, 200:16
**hobby** [1] - 75:23
**hold** [4] - 58:19, 167:7,

197:11, 210:10
**holding** [1] - 196:12
**home** [18] - 19:23, 29:20, 30:11, 31:5, 31:6, 31:15, 36:7, 36:10, 41:5, 41:7, 61:3, 133:4, 137:5, 137:6, 138:2, 139:2, 170:21, 186:4
**homepage** [2] - 19:20, 187:20
**honest** [1] - 158:17
**honestly** [1] - 23:15
**Honor** [5] - 73:13, 165:7, 204:16, 209:19, 211:2
**Honorable** [1] - 3:2
**HONORABLE** [1] - 1:11
**hope** [1] - 27:7
**hopefully** [1] - 58:25
**host** [20] - 94:19, 97:6, 97:15, 98:18, 98:20, 100:1, 100:9, 100:12, 100:13, 103:4, 103:13, 103:15, 103:25, 104:8, 104:10, 104:22
**hosting** [10] - 94:12, 96:17, 97:25, 98:14, 98:15, 99:4, 100:3, 102:23
**hotels** [2] - 138:23, 154:18
**hounding** [1] - 162:11
**hour** [2] - 69:23, 105:20
**hours** [5] - 105:17, 106:2, 138:1, 184:1
**House** [1] - 111:7
**house** [3] - 3:14, 11:12, 11:13
**how-to** [2] - 42:18, 44:3
**HR** [7] - 115:17, 115:19, 115:20, 115:24, 173:1, 173:6
**hug** [1] - 184:19
**huge** [1] - 36:5
**hugged** [1] - 184:19
**hum** [1] - 16:22
**hurt** [1] - 30:15

---

**I**

**i.e** [1] - 176:13
**icing** [1] - 163:3
**idea** [13] - 30:20, 31:16, 36:19, 39:9, 41:5, 44:7, 54:24, 55:1, 76:10, 87:11, 92:13, 112:3
**IDEN** [1] - 2:8
**Identification** [20] - 2:9, 2:9, 2:10, 2:10, 2:11, 2:12, 2:12, 2:13, 2:14, 2:14, 5:5, 17:2, 37:11, 63:20, 85:13, 95:18, 122:6, 150:24, 187:14, 192:14
**identifies** [1] - 200:17

**identify** [1] - 197:8
**III** [1] - 1:15
**illegal** [2] - 95:8, 95:13
**illicit** [1] - 140:11
**imaging** [3] - 65:20, 66:6, 70:19
**immediately** [2] - 65:10, 158:8
**implemented** [1] - 161:6
**implored** [1] - 61:3
**important** [14] - 15:14, 25:24, 47:25, 48:14, 58:6, 60:14, 60:18, 66:1, 75:2, 94:5, 99:13, 114:8, 126:4, 155:20
**improper** [4] - 29:17, 41:3, 53:8, 101:2
**improperly** [3] - 40:19, 41:2, 54:22
**improved** [1] - 26:16
**in-house** [3] - 3:14, 11:12, 11:13
**INC** [1] - 1:3
**include** [1] - 194:6
**included** [4] - 134:22, 170:14, 181:13, 206:1
**includes** [1] - 116:25
**including** [3] - 102:2, 142:15, 186:10
**inclusive** [1] - 93:8
**income** [3] - 108:14, 108:18, 157:17
**increase** [1] - 193:18
**Indeed** [4] - 162:16, 172:22, 173:2, 173:7
**indicate** [1] - 130:23
**indicated** [5] - 4:6, 5:22, 8:14, 35:19, 119:8
**individual** [4] - 98:6, 98:7, 113:8, 154:3
**industrial** [2] - 156:10, 156:13
**Industrial** [3] - 82:4, 177:24, 180:12
**industries** [3] - 149:8, 159:6, 159:8
**industry** [16] - 27:15, 107:20, 109:9, 110:23, 144:4, 150:11, 156:8, 159:7, 160:1, 160:13, 188:14, 193:6, 193:9, 193:10, 195:14
**information** [39] - 35:11, 35:20, 37:3, 41:12, 42:5, 42:11, 44:11, 45:5, 47:24, 48:8, 53:8, 65:22, 66:7, 66:14, 66:16, 71:9, 71:20, 96:24, 96:25, 97:4, 97:22, 98:7, 98:11, 99:14, 101:15, 102:18, 105:6,

105:7, 115:10, 125:22, 136:5, 136:11, 137:15, 141:14, 154:14, 162:19, 167:6
**Information** [1] - 101:24
**informed** [1] - 65:9
**initial** [2] - 10:3, 108:5
**initiated** [1] - 7:24
**initiative** [1] - 194:7
**injunction** [8] - 3:8, 45:4, 68:16, 68:18, 81:18, 83:11, 186:15, 208:14
**Injunction** [1] - 1:7
**inside** [1] - 142:10
**insinuates** [1] - 68:8
**insofar** [1] - 180:7
**inspection** [1] - 71:8
**instantly** [1] - 185:21
**insurance** [1] - 176:18
**integrated** [2] - 191:20, 207:11
**integration** [2] - 191:21, 191:24
**integrity** [1] - 99:18
**intention** [1] - 106:1
**interact** [2] - 46:14, 48:14
**interacting** [1] - 43:22
**interaction** [1] - 55:8
**interchange** [1] - 46:25
**interest** [1] - 36:23
**interested** [1] - 98:7
**interesting** [1] - 39:18
**interests** [1] - 102:4
**interference** [1] - 81:10
**International** [1] - 198:8
**internet** [4] - 96:23, 111:17, 115:2, 199:21
**interrupt** [1] - 192:24
**interrupting** [1] - 170:10
**intimately** [1] - 119:16
**introduce** [3] - 109:12, 155:19, 184:14
**intrude** [1] - 204:18
**intrusions** [1] - 99:22
**inventory** [4] - 43:21, 44:19, 89:6, 178:18
**investigation** [4] - 63:7, 64:2, 64:19, 70:17
**investigator** [1] - 71:21
**investment** [1] - 191:24
**investor** [1] - 171:14
**invitation** [1] - 134:16
**invite** [3] - 4:3, 124:19, 164:24
**invited** [2] - 25:5, 183:18
**invoices** [1] - 44:18
**involved** [13] - 19:8, 20:10, 119:16, 122:1, 131:19, 132:7, 144:11, 146:24,

147:1, 147:4, 150:21, 196:22, 199:17
**iPad** [1] - 186:5
**iPhone** [7] - 167:19, 167:23, 167:24, 186:5, 186:6, 186:24
**Iron** [6] - 179:14, 181:16, 181:18, 198:9, 198:17, 198:18
**irrespective** [1] - 179:8
**issue** [29] - 30:17, 31:3, 32:24, 32:25, 33:9, 35:24, 36:5, 37:8, 38:15, 38:17, 38:19, 41:14, 49:6, 54:18, 54:19, 58:5, 58:6, 62:25, 80:13, 80:14, 80:23, 80:24, 81:1, 81:2, 81:5, 123:4, 183:12, 209:20
**issued** [8] - 64:17, 65:23, 66:8, 70:20, 165:21, 176:6, 198:4, 198:7
**issues** [21] - 10:15, 10:21, 10:24, 10:25, 13:9, 13:11, 15:24, 23:9, 23:20, 25:4, 26:13, 26:14, 36:6, 81:4, 99:13, 118:23, 126:11, 132:3, 163:14, 163:25, 164:14
**IT** [3] - 61:4, 64:22, 69:13
**Italian** [1] - 198:23
**item** [1] - 112:11
**items** [4] - 21:14, 21:22, 93:25, 111:11
**itself** [3] - 11:10, 23:18, 194:5

**J**

**Jacobi** [10] - 17:8, 18:11, 18:12, 19:4, 45:22, 49:4, 49:25, 53:3, 120:13, 121:21
**January** [2] - 152:14, 153:5
**Jeff** [19] - 77:14, 77:15, 77:16, 77:18, 77:21, 78:3, 78:10, 78:24, 79:3, 79:5, 79:10, 79:16, 79:19, 181:24, 182:21, 182:23, 183:1, 183:9, 183:15
**JERSEY** [1] - 1:1
**Jersey** [21] - 1:10, 7:24, 8:8, 18:13, 49:5, 57:20, 65:5, 65:9, 67:7, 67:19, 67:20, 68:5, 69:1, 113:11, 141:12, 162:15, 164:1, 164:4, 164:9, 174:14
**Jersey's** [1] - 66:21
**Jim** [2] - 87:12, 90:12
**job** [6] - 48:4, 113:24, 143:19, 162:15, 163:22,

171:6
**John** [2] - 3:12, 165:10
**JOHN** [1] - 1:15
**join** [1] - 172:16
**joining** [1] - 172:19
**joke** [1] - 82:22
**Joseph** [1] - 184:2
**JUDGE** [1] - 1:12
**judge** [10] - 27:1, 36:21, 60:18, 68:11, 81:18, 91:13, 105:1, 111:14, 165:21, 199:10
**Judge** [36] - 3:3, 3:6, 3:17, 4:4, 4:22, 5:14, 6:24, 7:11, 13:23, 16:25, 53:6, 55:15, 59:18, 69:18, 73:12, 74:13, 75:4, 82:19, 95:19, 106:14, 107:10, 139:18, 164:20, 165:1, 165:17, 187:11, 204:25, 207:18, 208:6, 209:13, 209:16, 209:23, 210:5, 210:10, 210:11, 211:1
**Judge's** [1] - 41:9
**July** [38] - 9:10, 12:5, 34:7, 34:19, 34:20, 34:25, 35:10, 37:18, 39:19, 41:20, 45:22, 46:10, 49:24, 53:2, 55:6, 65:2, 65:23, 66:9, 66:23, 71:10, 71:22, 105:10, 116:22, 117:21, 129:17, 129:18, 132:21, 132:23, 133:8, 133:9, 133:22, 136:23, 142:23, 185:1
**june** [1] - 32:4
**June** [28] - 11:3, 12:22, 16:21, 18:15, 22:15, 23:23, 24:4, 25:3, 25:6, 25:24, 26:8, 28:3, 28:24, 28:25, 29:16, 32:19, 32:20, 57:5, 80:8, 126:16, 128:21, 134:4, 134:17, 135:6, 135:19, 153:3
**Junior** [13] - 49:5, 58:3, 62:16, 62:17, 65:22, 68:7, 72:2, 72:4, 75:6, 75:11, 75:22, 76:3, 79:25
**Junior's** [8] - 61:18, 61:20, 61:25, 62:2, 66:8, 70:20, 71:10, 72:25
**jury** [1] - 83:3

**K**

**Kasal** [10] - 69:9, 69:10, 70:10, 72:1, 72:7, 72:22, 73:19, 73:23, 74:3, 74:6
**Kasal's** [1] - 74:19
**keep** [5] - 99:17, 106:24, 136:4, 193:7, 193:19

**kept** [6] - 46:23, 115:20, 115:24, 116:4, 137:17, 144:12
**key** [1] - 155:20
**kids** [2] - 132:10, 139:25
**kind** [6] - 10:22, 60:19, 120:19, 168:25, 176:13, 177:21, 186:10, 197:15
**kinds** [1] - 156:9
**kinks** [3] - 49:16, 133:11
**kiss** [1] - 184:18
**kitchen** [3] - 132:10, 137:10, 170:19
**knowing** [1] - 32:13
**knowledge** [1] - 137:23
**knowledgeable** [1] - 88:25
**known** [2] - 109:8, 163:9
**knows** [3] - 68:11, 78:13, 160:5
**Kruse/RBA** [2] - 25:10, 25:13

**L**

**label** [8] - 130:5, 153:24, 153:25, 154:2, 200:14, 200:19, 200:24
**Label** [1] - 191:21
**labeled** [2] - 63:21, 65:3
**labelled** [1] - 201:5
**laborious** [1] - 192:21
**language** [2] - 188:14, 189:21
**laptop** [9] - 64:17, 138:17, 141:13, 141:15, 142:10, 154:8, 154:12, 166:24
**laptops** [3] - 63:2, 65:12, 142:6
**large** [1] - 193:22
**largest** [1] - 125:1
**Larry** [65] - 8:12, 8:24, 12:5, 12:23, 14:8, 17:7, 19:10, 20:10, 20:19, 21:25, 23:24, 27:18, 29:2, 32:25, 34:21, 37:22, 57:11, 58:3, 58:4, 59:13, 59:20, 61:18, 61:19, 62:2, 62:3, 62:15, 62:17, 64:18, 65:22, 66:7, 67:19, 68:6, 70:20, 71:9, 72:2, 72:4, 72:25, 75:22, 76:25, 77:5, 77:9, 77:19, 77:24, 78:11, 78:20, 78:21, 80:6, 82:13, 86:5, 88:8, 90:13, 90:14, 94:14, 130:1, 140:19, 141:5, 156:12, 193:2, 206:13
**Larry's** [5] - 9:1, 9:3, 9:12, 80:24, 89:24
**larry@equipmentfacts. com** [1] - 8:15
**last** [33] - 5:24, 6:3, 6:7, 7:19,

8:14, 15:4, 21:25, 22:17, 57:19, 77:8, 77:21, 78:1, 78:15, 83:7, 90:16, 97:3, 98:24, 101:21, 101:25, 102:7, 105:1, 106:5, 122:21, 131:20, 131:22, 144:22, 160:5, 165:20, 172:25, 182:18, 183:24, 184:9
**late** [3] - 10:13, 19:18, 110:1
**laughing** [2] - 90:17, 163:8
**law** [3] - 3:18, 208:17, 208:21
**Lawrence** [2] - 49:4, 106:19
**LAWRENCE** [3] - 1:6, 2:5, 106:16
**lawsuit** [12] - 6:8, 10:3, 10:4, 38:13, 63:15, 64:1, 69:8, 128:19, 144:13, 144:15, 144:24, 199:18
**lay** [1] - 117:14
**layers** [1] - 199:1
**layout** [1] - 99:2
**leader** [1] - 107:17
**leading** [1] - 28:13
**learn** [3] - 188:15, 189:12, 189:18
**lease** [3] - 140:22, 162:9, 162:12
**least** [3] - 24:16, 160:4, 207:15
**leave** [10] - 55:25, 56:9, 57:6, 86:4, 100:14, 105:8, 129:24, 142:2, 142:14, 173:7
**leaves** [1] - 86:17
**leaving** [1] - 105:6
**led** [1] - 206:13
**left** [17] - 3:21, 3:23, 6:25, 26:11, 55:21, 59:6, 82:15, 84:7, 84:10, 90:14, 128:18, 141:10, 141:15, 158:9, 189:15, 189:19
**legal** [10] - 95:8, 95:9, 95:10, 100:20, 100:22, 102:21, 104:17, 128:15, 144:14, 183:12
**less** [1] - 116:11
**letter** [1] - 191:9
**lgarafola@equipmentfacts .com** [1] - 122:11
**liability** [1] - 153:6
**liar** [1] - 78:5
**license** [13] - 92:5, 130:4, 148:20, 148:21, 148:25, 149:5, 149:15, 150:9, 155:14, 155:15, 178:2, 178:22, 179:15
**licensed** [2] - 179:15, 201:5
**licenses** [2] - 92:4, 92:7, 198:4

**licensing** [13] - 92:3, 92:4, 92:15, 92:22, 92:24, 92:25, 149:1, 149:19, 150:6, 150:14, 153:23, 155:2, 155:21

**light** [3] - 77:8, 140:20, 140:23

**limit** [1] - 73:13

**limitations** [1] - 193:21

**limited** [2] - 130:7, 153:6

**Lincoln** [4] - 113:10, 152:6, 162:17, 173:1

**line** [12] - 15:4, 38:2, 50:1, 57:19, 58:25, 60:25, 62:8, 63:1, 103:24, 198:3

**lines** [1] - 189:6

**link** [2] - 19:23, 50:4

**liquidate** [1] - 150:13

**list** [30] - 4:5, 13:3, 13:5, 13:6, 29:18, 29:23, 29:24, 30:8, 30:18, 30:21, 32:2, 34:1, 36:22, 38:4, 38:7, 39:19, 39:20, 80:11, 122:21, 134:14, 136:20, 138:2, 139:16, 145:15, 157:2, 157:3, 177:21, 179:23, 180:7, 182:8

**listed** [5] - 16:6, 100:5, 157:4, 182:1, 183:8

**listen** [2] - 136:8, 164:16

**listening** [2] - 162:25, 167:5

**litigation** [3] - 169:9, 184:22, 208:8

**live** [8] - 13:13, 13:15, 111:15, 118:22, 161:17, 188:19, 196:9, 207:11

**lived** [2] - 164:8, 164:9

**livelihood** [1] - 11:22

**living** [2] - 154:22, 155:1

**LLC** [5] - 1:7, 151:23, 153:8, 166:17, 174:10

**load** [1] - 51:18

**located** [1] - 194:2

**locations** [1] - 193:11

**log** [3] - 31:11, 42:19, 193:14

**logging** [2] - 18:8, 121:7

**Login** [1] - 17:10

**login** [4] - 43:9, 44:13, 44:19, 51:11

**logins** [1] - 20:23

**logistic** [1] - 190:20

**logo** [1] - 127:14

**long-term** [1] - 137:17

**longtime** [2] - 125:1, 125:6

**look** [49] - 7:13, 7:20, 9:12, 11:14, 12:10, 13:18, 14:2, 17:18, 22:17, 23:7, 31:25, 38:9, 40:18, 42:24, 44:2, 44:3, 51:13, 53:16, 58:15, 59:11, 60:20, 61:22, 63:18,

64:5, 71:5, 85:14, 87:19, 96:2, 96:4, 97:3, 101:25, 126:13, 126:16, 126:21, 130:8, 134:12, 140:20, 161:20, 167:8, 167:16, 170:21, 170:22, 191:21, 200:11, 200:25, 201:23, 205:15, 206:3, 206:9

**looked** [8] - 6:22, 8:23, 35:21, 87:8, 104:12, 143:1, 162:7, 187:25

**looking** [15] - 29:5, 53:22, 94:14, 96:2, 108:19, 119:14, 129:20, 129:23, 141:11, 145:2, 171:11, 173:7, 180:20, 190:16, 204:1

**looks** [15] - 11:17, 33:21, 42:11, 52:24, 64:24, 87:17, 95:25, 96:5, 101:12, 129:18, 130:12, 130:23, 139:8, 161:19, 173:6

**Loop** [1] - 151:16

**lose** [2] - 103:11, 103:12

**losing** [2] - 82:3, 162:22

**losses** [1] - 83:11

**lost** [13] - 23:4, 59:2, 81:14, 81:19, 81:21, 82:2, 83:13, 83:18, 84:17, 84:23, 157:23, 157:24, 164:12

**loud** [1] - 139:18

**lower** [2] - 112:16, 112:18

**loyal** [1] - 16:14

**lump** [1] - 115:23

**lunch** [4] - 105:21, 106:9, 138:25, 141:8

**luxury** [1] - 176:17

**lying** [9] - 77:20, 77:22, 77:23, 78:4, 78:12, 78:19, 79:1, 79:2, 143:1

**Lynn** [1] - 168:9

**M**

**Mac** [1] - 154:13

**MachineFacts** [1] - 147:2

**Machinery** [8] - 93:3, 93:7, 93:11, 93:14, 93:18, 93:22, 111:6

**magazines** [1] - 111:6

**main** [1] - 184:3

**major** [7] - 10:24, 20:6, 20:8, 23:20, 30:12, 30:13, 36:4

**majority** [1] - 184:3

**malicious** [2] - 71:24, 154:19

**man** [2] - 25:9, 184:19

**manage** [3] - 12:9, 43:21, 150:12

**management** [1] - 150:3

**manager** [1] - 141:5

**managers** [1] - 150:10

**mandatory** [1] - 21:11

**manipulated** [2] - 71:2, 76:21

**manual** [7] - 42:18, 43:24, 44:3, 44:22, 46:15, 46:23, 154:11

**Manuals** [1] - 45:23

**manuals** [26] - 12:9, 46:4, 46:14, 47:21, 48:6, 48:8, 48:17, 50:1, 50:16, 51:14, 54:9, 119:20, 120:4, 120:15, 120:19, 120:20, 120:24, 121:2, 121:10, 123:19, 125:10, 125:20, 126:2, 126:5, 126:9, 140:4

**March** [1] - 208:22

**mark** [2] - 16:25, 185:8

**marked** [16] - 4:7, 5:15, 5:19, 6:13, 6:17, 6:22, 7:7, 8:20, 13:23, 16:23, 16:24, 85:12, 122:7, 122:8, 204:9, 204:21

**market** [3] - 119:6, 155:18, 206:18

**marketing** [5] - 110:15, 113:9, 145:15, 150:3, 194:8

**Marketplace** [1] - 193:3

**marketplace** [35] - 109:9, 109:14, 109:17, 109:19, 110:5, 110:7, 110:12, 110:15, 110:17, 110:19, 110:21, 111:1, 111:3, 111:9, 111:12, 113:21, 118:8, 118:10, 127:5, 130:6, 143:25, 144:9, 145:19, 145:20, 147:12, 148:16, 148:23, 148:24, 155:6, 156:8, 178:16, 179:1, 188:25, 190:12, 200:18

**marketplaces** [10] - 109:9, 110:2, 189:22, 192:10, 194:16, 195:7, 195:10, 195:23, 196:10, 206:7

**Marlene** [20] - 8:3, 8:12, 10:5, 32:25, 34:11, 39:2, 64:10, 64:18, 67:18, 68:7, 76:25, 126:24, 132:15, 132:16, 163:4, 163:9, 171:24, 173:6, 173:9, 173:10

**Marlene's** [1] - 141:9

**Martin** [19] - 77:14, 77:15, 77:16, 77:18, 78:3, 78:10, 78:24, 79:3, 79:5, 79:10, 79:17, 79:19, 181:24, 182:23, 183:1, 183:9, 183:16, 184:14, 184:24

**Martin's** [1] - 182:22

**mass** [8] - 21:10, 58:4, 62:3, 62:24, 65:21, 66:7, 71:9, 71:14

**match** [1] - 144:14

**materials** [1] - 42:22

**matter** [4] - 3:8, 36:2, 101:5, 211:11

**McDougall** [2] - 168:9, 168:12

**McGrew** [2] - 179:19, 181:20

**MCGREW** [1] - 179:19

**mean** [17] - 26:9, 28:1, 38:6, 45:9, 48:19, 67:23, 92:10, 120:21, 143:2, 144:2, 151:15, 154:1, 158:25, 162:6, 171:2, 185:19, 189:13

**meaning** [2] - 18:24, 43:1

**means** [2] - 7:9, 154:2

**meant** [7] - 22:21, 25:11, 25:12, 27:8, 45:24, 59:3, 62:15

**meanwhile** [1] - 142:2

**measure** [1] - 27:8

**meat** [2] - 159:17, 159:19

**mechanical** [1] - 1:22

**media** [1] - 194:7

**medication** [1] - 107:5

**meet** [8] - 39:7, 130:24, 131:2, 131:4, 141:18, 165:11, 173:9, 208:24

**meeting** [3] - 141:20, 141:21, 173:8

**member** [4] - 163:7, 174:10, 176:7, 177:8

**members** [3] - 162:15, 174:11, 182:22

**mend** [3] - 127:20, 127:22, 127:24

**mention** [1] - 24:6

**mentioned** [3] - 122:17, 132:16, 204:13

**message** [5] - 125:7, 185:10, 185:19, 185:24

**messages** [3] - 28:12, 185:20, 185:23

**met** [3] - 39:9, 130:12, 171:3

**MICHAEL** [1] - 1:11

**Michael** [1] - 3:3

**microphone** [1] - 106:24

**Microsoft** [1] - 154:7

**middle** [2] - 98:5, 133:8

**midway** [1] - 27:7

**might** [4] - 168:24, 170:22, 173:17, 174:4

**MILLER** [36] - 1:15, 2:6, 3:5, 3:12, 4:17, 4:21, 5:1, 5:4, 5:9, 6:24, 7:2, 7:11, 7:16, 58:18, 101:1, 165:1, 165:7, 165:8, 186:19, 186:22,

187:11, 187:13, 192:13,
203:23, 204:12, 204:25,
205:18, 205:23, 205:24,
207:18, 207:22, 208:6,
209:16, 210:5, 210:7,
211:1
**Miller** [6] - 3:12, 60:22,
165:6, 165:10, 208:5,
209:15
**million** [6] - 108:5, 111:24,
112:15, 112:21, 112:24,
157:9
**mindset** [1] - 132:6
**mine** [7] - 112:4, 125:1,
125:6, 142:3, 162:15,
167:10, 184:3
**minimal** [2] - 191:23, 191:24
**minute** [5] - 187:15, 192:15,
205:6, 205:15, 207:24
**minutes** [8] - 23:25, 105:17,
105:18, 126:21, 126:22,
164:24, 207:18, 207:20
**missed** [1] - 182:12
**missing** [2] - 4:6, 119:15
**mobile** [3] - 102:1, 193:12,
206:19
**mobridge@earthlink.net** [1]
- 203:12
**mole** [1] - 57:13
**moment** [2] - 4:17, 209:2
**Monday** [4] - 171:6, 183:24,
184:7, 184:8
**monetary** [1] - 177:4
**money** [10] - 87:9, 112:13,
114:25, 157:13, 175:3,
175:5, 175:6, 176:10,
176:13, 190:17
**monies** [1] - 171:22
**monitor** [3] - 30:14, 94:25,
104:16
**monitored** [1] - 38:14
**monitoring** [1] - 94:12
**monitors** [1] - 163:5
**month** [2] - 161:22, 163:13
**months** [7] - 10:14, 77:24,
78:2, 115:21, 139:20,
140:25, 160:15
**Montreal** [1] - 145:8
**morning** [10] - 3:4, 3:5, 3:6,
3:16, 3:17, 3:20, 3:22,
69:22, 133:1, 187:23
**most** [5] - 168:8, 189:10,
189:16, 191:23, 202:16
**motion** [2] - 83:5, 208:15
**motivation** [1] - 133:15
**mouse** [1] - 199:20
**move** [9] - 4:8, 6:15, 83:2,
101:3, 119:1, 169:24,
186:19, 209:13, 210:7
**moves** [2] - 210:2, 210:22

**moving** [4] - 57:13, 59:12,
210:17, 210:18
**MR** [93] - 2:4, 2:5, 2:6, 3:5,
3:6, 3:12, 3:17, 3:21, 4:4,
4:15, 4:17, 4:19, 4:21,
4:25, 5:1, 5:2, 5:4, 5:9,
5:14, 5:18, 5:21, 6:12,
6:17, 6:21, 6:24, 7:2, 7:6,
7:11, 7:15, 7:16, 7:17,
7:18, 13:22, 14:1, 16:24,
17:3, 37:12, 58:18, 58:19,
58:24, 63:19, 70:6, 73:12,
73:16, 73:18, 82:19, 83:6,
85:12, 95:17, 95:19, 101:1,
101:4, 101:8, 105:12,
106:14, 107:10, 107:11,
150:23, 150:25, 164:20,
165:1, 165:7, 165:8,
186:12, 186:18, 186:19,
186:22, 187:11, 187:13,
192:13, 203:23, 204:10,
204:12, 204:16, 204:25,
205:18, 205:19, 205:23,
205:24, 207:18, 207:22,
208:6, 208:19, 209:13,
209:16, 209:23, 210:5,
210:7, 210:10, 210:16,
210:20, 211:1, 211:2
**must** [1] - 126:20

---

# N

**NAA** [2] - 173:9, 185:1
**name** [12] - 39:3, 69:9,
106:18, 149:21, 153:6,
165:10, 172:25, 182:5,
183:5, 183:7, 190:10,
191:5
**names** [4] - 102:3, 143:5,
154:4, 180:23
**Nancy** [1] - 115:19
**narrow** [1] - 117:7
**narrowed** [1] - 202:23
**National** [4] - 77:10, 131:6,
131:7, 132:7
**Nebraska** [5] - 65:20, 113:10,
128:16, 152:6, 162:17
**necessarily** [5] - 23:9, 31:9,
73:22, 150:7, 207:4
**need** [18] - 47:10, 48:1, 65:4,
83:1, 83:2, 106:4, 106:25,
107:6, 122:21, 140:20,
141:17, 157:19, 169:18,
170:21, 170:24, 198:3,
209:23
**needed** [16] - 10:17, 26:1,
26:15, 26:17, 49:12, 52:18,
89:2, 113:5, 113:7, 119:21,
124:8, 132:12, 140:7,
140:23, 163:18, 202:4

**needs** [5] - 23:14, 55:15,
60:19, 105:19, 190:22
**negative** [1] - 15:5
**negotiate** [2] - 203:2, 203:4
**negotiated** [2] - 108:17,
115:7
**negotiations** [5] - 108:9,
108:21, 145:16, 168:9,
201:18
**nephew** [1] - 163:19
**network** [1] - 36:4
**never** [38] - 11:16, 26:15,
26:16, 39:15, 39:16, 42:8,
50:23, 74:10, 77:18, 88:7,
88:10, 99:9, 104:24, 105:9,
109:24, 115:13, 116:16,
116:18, 124:25, 127:1,
138:19, 139:21, 149:1,
151:5, 153:14, 156:11,
158:3, 158:5, 163:24,
195:1, 199:17, 200:20,
201:4, 201:5, 209:10
**NEW** [1] - 1:1
**new** [30] - 10:13, 13:10,
13:13, 15:7, 15:24, 19:22,
20:6, 20:23, 46:21, 46:23,
46:25, 54:16, 54:25, 55:5,
79:9, 88:25, 89:7, 89:13,
90:19, 119:22, 119:23,
120:3, 122:22, 123:20,
124:6, 129:13, 161:7,
161:25, 171:6, 190:12
**New** [24] - 1:10, 7:24, 8:8,
18:13, 49:5, 57:20, 65:5,
65:9, 66:20, 67:7, 67:19,
67:20, 68:5, 69:1, 79:12,
79:15, 113:11, 131:5,
141:12, 162:15, 164:1,
164:4, 164:9, 174:13
**next** [18] - 11:20, 15:18,
18:11, 25:19, 34:14, 34:19,
65:5, 101:3, 104:9, 111:13,
111:14, 127:5, 166:25,
174:23, 178:20, 188:22,
204:15, 207:7
**nice** [3] - 13:22, 165:11,
186:1
**night** [5] - 77:21, 78:15,
134:12, 167:8, 184:8
**nobody** [1] - 49:17
**non** [5] - 117:2, 117:3, 117:6,
203:4, 203:5
**non-compete** [1] - 203:4
**non-competition** [2] - 117:3,
117:6
**non-competitions** [1] -
117:2
**non-solicit** [1] - 203:5
**none** [16] - 104:21, 169:2,
169:10, 171:23, 174:12,

176:8, 176:23, 177:2,
177:7, 177:11, 178:4,
178:7, 178:9, 179:18,
180:4, 195:24
**nonverbal** [1] - 107:3
**normal** [1] - 154:17
**normally** [1] - 154:20
**North** [1] - 125:6
**northeast** [1] - 125:2
**nothing** [15] - 6:11, 90:20,
91:18, 97:25, 99:4, 100:2,
139:22, 151:19, 153:13,
154:19, 154:24, 168:8,
184:21, 185:9, 187:1
**notice** [2] - 187:18, 190:18
**noticed** [2] - 18:5, 19:19
**November** [1] - 144:23
**Number** [13] - 3:9, 64:5,
65:19, 67:16, 68:1, 68:11,
87:24, 88:23, 89:17, 90:18,
102:18, 122:21, 156:2
**NUMBER** [2] - 1:4, 2:8
**number** [11] - 16:25, 21:11,
21:15, 34:4, 43:7, 64:21,
64:24, 108:20, 108:21,
110:20, 175:21
**numbers** [5] - 4:8, 15:5,
21:12, 21:13, 193:17
**numerous** [2] - 163:23,
194:1
**nuts** [4] - 46:19, 47:11,
47:17, 47:18

---

# O

**o'clock** [2] - 69:22, 141:6
**oath** [5] - 4:1, 40:11, 56:3,
58:16, 106:15
**object** [2] - 101:1, 133:6
**objected** [1] - 76:6
**objection** [3] - 204:16,
209:16, 210:11
**observations** [1] - 159:4
**obvious** [3] - 173:17, 174:4,
180:5
**obviously** [10] - 15:23,
30:21, 92:20, 112:15,
127:17, 132:3, 144:6,
153:23, 165:10, 208:7
**Ocala** [1] - 151:16
**occurred** [1] - 71:9
**odd** [1] - 182:9
**OF** [1] - 1:1
**offer** [3] - 92:4, 108:5
**offering** [4] - 80:20, 80:22,
113:21, 136:12
**office** [23] - 4:5, 65:5, 65:9,
65:20, 68:8, 113:13,
138:18, 140:18, 140:19,
140:22, 141:5, 141:12,

141:25, 142:1, 142:2, 142:3, 142:11, 152:5, 161:17, 162:17, 164:8, 169:14, 170:1
**Official** [1] - 1:20
**OFFICIAL** [1] - 211:6
**officially** [1] - 171:9
**often** [1] - 162:22
**oil** [4] - 19:20, 159:2, 193:9, 195:15
**Oil** [6] - 158:13, 159:5, 189:10, 189:16, 193:5
**OilField** [5] - 11:8, 19:21, 28:20, 29:8, 30:16
**OilfieldFacts** [17] - 178:16, 189:2, 189:9, 192:4, 192:10, 193:1, 193:2, 193:8, 194:5, 194:12, 194:14, 194:17, 194:19, 194:23, 196:8, 197:2, 197:18
**oilfieldfacts.com** [1] - 193:14
**old** [10] - 19:5, 19:13, 19:14, 20:22, 77:24, 118:16, 149:14, 167:5, 167:10, 168:25
**on-site** [1] - 193:21
**onboard** [1] - 205:16
**once** [2] - 105:6, 190:2
**one** [105] - 4:6, 4:17, 4:19, 12:1, 14:3, 14:19, 18:25, 20:19, 21:4, 22:11, 23:4, 23:22, 25:5, 37:18, 41:16, 48:21, 48:22, 52:13, 56:2, 57:13, 59:10, 62:17, 66:4, 70:14, 71:23, 72:3, 73:22, 74:15, 76:17, 78:2, 79:20, 81:4, 81:25, 82:4, 85:3, 86:4, 89:23, 94:15, 95:19, 101:14, 105:1, 107:1, 109:25, 110:14, 110:23, 114:20, 114:25, 117:11, 122:17, 122:21, 124:18, 124:19, 127:4, 127:10, 132:24, 134:16, 139:13, 142:16, 142:19, 144:23, 146:15, 151:22, 157:5, 158:16, 161:8, 162:23, 163:7, 164:8, 164:9, 166:1, 168:11, 168:16, 170:13, 171:6, 171:9, 172:12, 175:12, 176:3, 178:20, 178:25, 180:24, 181:2, 182:12, 184:1, 184:6, 186:6, 186:11, 187:2, 188:2, 189:15, 195:13, 197:5, 197:20, 199:19, 201:3, 202:22, 203:2, 203:15, 203:23, 204:1,

204:8, 204:14, 204:24, 205:8
**one-page** [1] - 151:22
**ones** [9] - 6:18, 7:2, 7:6, 120:17, 121:11, 122:16, 140:7, 170:9, 208:8
**Online** [1] - 193:3
**online** [41] - 47:16, 88:25, 89:7, 89:13, 90:19, 93:12, 107:17, 108:24, 109:13, 110:24, 113:21, 116:20, 117:25, 119:2, 119:6, 127:7, 127:13, 144:3, 149:3, 156:17, 160:11, 189:11, 189:17, 190:11, 191:20, 193:8, 193:10, 193:15, 194:15, 194:23, 195:11, 196:6, 196:14, 197:5, 197:9, 198:25, 199:8, 199:9, 200:16, 206:12
**open** [2] - 3:2, 141:13
**Open** [5] - 70:3, 106:11, 165:5, 208:3, 209:8
**opened** [2] - 88:1, 143:23
**operable** [2] - 171:10, 195:22
**operate** [2] - 48:9, 194:23
**operated** [1] - 139:24
**operating** [4] - 71:22, 117:9, 187:7, 194:20
**opinion** [4] - 104:18, 125:21, 156:2, 200:15
**opportunity** [3] - 4:1, 130:24, 165:17
**opposition** [5] - 5:7, 5:9, 5:12, 208:22, 210:18
**opt** [1] - 100:14
**opt-in** [1] - 100:14
**opted** [1] - 97:7
**Optimization** [1] - 191:23
**optimization** [1] - 206:25
**options** [3] - 129:20, 172:9, 172:12
**Options** [1] - 84:22
**order** [7] - 56:14, 59:12, 144:25, 165:14, 165:21, 193:25, 204:6
**ordered** [2] - 142:1, 165:18
**Organization** [1] - 152:13
**original** [3] - 32:4, 108:21, 112:11
**originally** [1] - 56:23
**Orleans** [3] - 79:12, 79:15, 131:5
**otherwise** [6] - 169:8, 177:4, 186:24, 195:7, 200:7, 209:20
**outdated** [1] - 46:10
**outline** [2] - 115:25, 121:8
**outlined** [2] - 112:14, 195:13

**outlines** [1] - 195:19
**outlining** [1] - 114:9
**outside** [11] - 28:2, 35:24, 36:4, 37:8, 40:9, 94:21, 142:11, 143:25, 144:1, 144:19, 158:25
**own** [23] - 36:22, 49:20, 77:12, 93:22, 95:1, 110:19, 111:8, 118:5, 127:24, 137:16, 146:8, 147:21, 147:25, 149:6, 154:4, 160:4, 161:22, 171:4, 174:22, 174:24, 199:2, 200:15
**owned** [5] - 147:17, 147:23, 149:2, 151:20, 201:4
**owner** [5] - 108:19, 116:6, 129:22, 152:8, 175:8
**owners** [1] - 150:10
**owns** [1] - 56:22

## P

**P-10** [7] - 33:17, 34:6, 34:9, 37:17, 136:18, 136:20, 136:25
**P-11** [10] - 12:4, 12:12, 41:17, 41:20, 46:8, 48:7, 52:14, 52:15, 140:3
**P-12** [5] - 45:19, 46:8, 48:7, 52:10, 140:3
**P-13** [11] - 49:24, 52:2, 52:3, 52:5, 52:10, 52:18, 52:21, 140:3
**P-14** [3] - 52:25, 53:2, 140:4
**P-17** [6] - 9:25, 12:12, 76:23, 77:2, 101:9, 132:23
**P-19** [3] - 146:17, 146:19, 147:8
**P-25** [8] - 2:14, 2:15, 187:13, 187:14, 195:19, 196:4, 210:8, 210:23
**P-26** [6] - 2:14, 2:15, 192:13, 192:14, 210:8, 210:23
**P-5** [7] - 7:20, 7:24, 39:1, 64:9, 132:14, 132:19
**P-6** [13] - 9:19, 9:20, 39:5, 64:25, 65:3, 68:2, 68:12, 68:13, 68:19, 68:25, 129:14, 129:16, 134:12
**P-7** [19] - 9:25, 10:11, 10:12, 11:2, 11:17, 12:21, 28:19, 29:2, 30:2, 30:5, 76:23, 76:25, 132:22, 134:2, 134:4, 135:22
**P-8** [7] - 31:25, 32:1, 77:2, 80:4, 80:5, 135:9, 135:12
**P-9** [6] - 33:17, 33:20, 37:16, 136:18, 136:20, 136:25
**P.C** [1] - 1:15

**p.m** [17] - 24:4, 34:7, 35:1, 37:19, 38:10, 41:23, 106:9, 106:11, 136:25, 165:3, 165:5, 167:8, 208:1, 208:3, 209:6, 209:8, 211:4
**package** [3] - 119:9, 120:3, 155:22
**packet** [1] - 42:3
**pads** [1] - 168:25
**PAGE** [1] - 2:2
**page** [43] - 5:24, 12:8, 14:3, 17:7, 17:18, 19:23, 20:18, 21:10, 22:11, 23:22, 27:6, 43:9, 44:14, 51:11, 51:19, 51:24, 58:18, 58:21, 60:21, 62:7, 62:25, 64:5, 83:8, 84:16, 99:12, 101:22, 102:6, 102:8, 102:17, 111:5, 130:8, 136:8, 151:22, 188:2, 189:6, 190:8, 191:12, 192:15, 192:17, 206:8, 207:7, 207:8
**pages** [5] - 43:4, 44:6, 53:16, 167:7, 188:1
**paid** [1] - 157:13
**Palms** [3] - 151:15, 151:23, 153:7
**Paper** [1] - 111:6
**paper** [1] - 186:20
**papers** [2] - 38:20, 183:6
**paperwork** [1] - 133:20
**paragraph** [3] - 22:17, 192:23, 192:25
**parents** [1] - 133:6
**part** [19] - 4:23, 5:11, 9:24, 13:5, 49:1, 79:22, 109:14, 110:14, 145:15, 147:5, 155:22, 164:15, 169:19, 173:20, 181:21, 182:8, 193:23
**partake** [1] - 100:15
**participants** [2] - 193:18, 193:25
**particular** [6] - 163:7, 166:5, 204:1, 205:12, 205:25, 206:5
**parties** [2] - 106:4, 149:16
**partnership** [1] - 147:20
**parts** [4] - 43:22, 98:25, 161:18, 161:19
**party** [8] - 11:11, 57:24, 61:4, 63:5, 69:12, 149:6, 205:20
**pass** [2] - 4:12, 113:7
**passing** [1] - 139:25
**password** [2] - 110:21, 149:21
**passwords** [1] - 102:2
**past** [3] - 21:15, 22:6, 156:4
**pay** [2] - 175:1, 175:7

**paying** [3] - 161:21, 161:24, 190:14
**payment** [2] - 141:1, 207:13
**payroll** [1] - 115:24
**PCI** [1] - 207:13
**PCI-compliant** [1] - 207:13
**Peed** [7] - 116:5, 116:8, 142:19, 152:2, 152:6, 152:8, 153:11
**people** [20] - 10:15, 15:16, 36:15, 54:10, 62:5, 66:14, 68:8, 82:12, 96:22, 97:6, 98:18, 98:25, 99:12, 121:14, 123:14, 157:5, 162:25, 164:3, 196:13, 196:23
**per** [1] - 193:18
**percent** [6] - 115:1, 115:4, 164:12, 168:10, 168:11, 168:16
**perfect** [2] - 189:19, 194:9
**perfected** [1] - 125:12
**perfectly** [3] - 100:20, 104:17, 105:3
**perform** [5] - 98:6, 145:10, 149:6, 194:20
**performance** [1] - 118:24
**performing** [1] - 116:17
**performs** [1] - 200:10
**period** [12] - 8:24, 9:16, 16:15, 28:13, 35:22, 114:20, 117:24, 118:18, 123:16, 124:24, 139:21, 201:14
**perks** [1] - 108:19
**permian** [1] - 197:19
**Permian** [50] - 7:21, 17:22, 18:2, 18:14, 18:24, 23:19, 25:16, 26:13, 29:7, 29:12, 30:15, 39:2, 55:13, 55:16, 55:17, 55:21, 56:9, 58:7, 59:2, 59:6, 59:20, 64:10, 81:21, 83:13, 83:19, 84:10, 84:17, 85:18, 86:1, 89:22, 124:22, 126:12, 128:21, 129:3, 132:15, 134:18, 135:1, 146:6, 157:23, 158:8, 163:14, 178:10, 178:13, 178:15, 181:8, 197:21, 197:23, 198:8, 198:10
**Permian's** [1] - 127:12
**permianint.com** [1] - 17:25
**permits** [1] - 94:25
**permitted** [1] - 209:17
**person** [10] - 69:8, 70:16, 72:1, 87:2, 107:1, 109:13, 121:17, 154:3, 155:15, 175:23
**personal** [50] - 9:1, 11:3,

12:23, 29:2, 29:19, 30:17, 30:22, 31:3, 32:18, 33:1, 33:3, 33:7, 33:21, 35:5, 35:15, 35:24, 36:2, 36:15, 36:23, 41:11, 41:13, 41:25, 45:23, 49:25, 53:3, 54:17, 54:21, 80:12, 80:14, 80:16, 80:24, 81:2, 102:12, 102:20, 104:12, 134:11, 134:16, 135:19, 137:5, 137:8, 138:8, 138:15, 139:14, 139:22, 139:24, 140:2, 167:10, 204:18
**personally** [2] - 49:18, 157:14
**pertain** [2] - 46:9, 68:13
**pertained** [1] - 154:16
**pertaining** [7] - 43:2, 76:17, 97:24, 98:9, 98:12, 99:3, 102:15
**pertains** [3] - 53:13, 68:12, 68:13
**pertinent** [1] - 10:8
**ph** [3] - 93:22, 121:19, 184:2
**ph.)** [1] - 120:13
**phone** [20] - 28:12, 64:17, 102:1, 129:23, 140:18, 141:10, 141:11, 141:17, 141:18, 141:19, 160:23, 167:5, 167:10, 167:12, 168:10, 168:19, 168:21, 172:23, 185:13, 185:22
**phones** [4] - 63:3, 65:13, 142:6, 168:25
**photos** [3] - 75:24, 76:13, 76:14
**physical** [1] - 176:22
**pick** [1] - 161:23
**picture** [3] - 15:15, 15:19, 162:7
**pictures** [3] - 75:13, 75:14, 111:11
**piece** [2] - 93:10, 186:20
**pioneer** [2] - 107:17, 200:16
**place** [4] - 59:12, 133:14, 160:5, 183:20
**placed** [1] - 111:18
**Plaintiff** [2] - 1:4, 1:16
**plaintiff** [4] - 3:13, 6:10, 6:13, 210:7
**Plaintiff's** [6] - 2:14, 2:14, 2:15, 187:14, 192:14, 210:23
**plaintiff's** [2] - 7:12, 164:24
**plaintiffs** [2] - 135:12, 146:16
**plan** [2] - 21:15, 114:22
**planned** [1] - 171:13
**plans** [1] - 196:9
**plant** [2] - 54:5, 54:7
**platform** [44] - 18:25, 21:22,

23:14, 43:3, 43:17, 44:4, 44:16, 44:18, 46:6, 46:9, 46:16, 47:9, 47:22, 48:10, 52:7, 53:13, 53:14, 53:22, 54:2, 54:11, 55:10, 67:2, 67:4, 82:13, 93:14, 93:16, 93:22, 94:2, 109:1, 109:3, 109:6, 110:7, 110:13, 110:25, 119:22, 120:1, 124:23, 144:19, 145:18, 148:23, 148:24, 207:11
**platforms** [11] - 18:22, 25:5, 47:8, 47:17, 86:5, 89:24, 96:17, 124:20, 127:4, 127:11, 127:15
**playbook** [7] - 85:17, 86:1, 86:21, 88:5, 89:22, 91:8, 91:9
**plenty** [2] - 57:18, 68:20
**plus** [3] - 113:10, 150:1, 189:18
**point** [44] - 9:10, 27:25, 65:15, 82:1, 82:4, 83:4, 97:3, 98:5, 99:16, 101:25, 102:7, 107:16, 108:1, 111:21, 112:23, 113:5, 115:21, 116:14, 119:12, 125:14, 129:20, 130:2, 131:23, 132:1, 133:4, 133:10, 133:15, 134:9, 134:10, 142:16, 143:19, 143:22, 153:15, 153:16, 162:3, 162:18, 162:23, 163:13, 172:3, 172:9, 176:15, 186:14, 197:5, 201:7
**points** [1] - 101:25
**Points** [6] - 61:4, 61:21, 63:4, 69:12
**Polias** [1] - 184:2
**policies** [1] - 103:2
**policy** [22] - 94:23, 94:25, 95:23, 95:24, 96:1, 96:9, 96:15, 96:23, 97:11, 97:18, 98:1, 98:10, 98:17, 98:23, 99:24, 101:11, 101:14, 101:19, 103:21, 104:1
**Polk** [5] - 200:21, 200:24, 201:3, 201:5, 201:10
**pops** [1] - 127:8
**portal** [2] - 200:13, 200:18
**portion** [3] - 82:2, 203:5
**portions** [2] - 26:16, 200:10
**pose** [1] - 109:22
**posed** [1] - 107:2
**position** [3] - 59:1, 100:12, 156:16
**possession** [1] - 168:21
**possible** [2] - 27:22, 28:6
**possibly** [2] - 118:2, 130:2

**post** [4] - 110:7, 180:1, 208:16, 208:20
**post-purchase** [1] - 110:7
**post-termination** [1] - 180:1
**post-trial** [2] - 208:16, 208:20
**posted** [1] - 133:14
**posting** [1] - 150:4
**postings** [2] - 162:15, 162:16
**potentially** [2] - 80:20, 176:24
**powerful** [1] - 191:19
**PowerPoint** [3] - 53:12, 53:13, 93:4
**PowerPoints** [1] - 121:10
**powerPoints** [1] - 53:4
**practice** [1] - 185:20
**pre** [1] - 207:12
**pre-bidding** [1] - 207:12
**prefer** [3] - 138:15, 145:21, 169:4
**preferences** [1] - 102:3
**preferred** [1] - 102:2
**Preliminary** [1] - 1:7
**preliminary** [9] - 3:8, 31:22, 45:4, 68:16, 68:18, 81:18, 83:10, 186:14, 208:14
**premise** [1] - 199:22
**prepare** [4] - 12:17, 12:20, 30:8, 119:9
**prepared** [3] - 115:16, 120:20, 120:23
**prepurchased** [3] - 120:20, 120:21, 120:22
**present** [2] - 121:11, 180:11
**presentation** [2] - 93:4, 151:5
**presented** [1] - 104:3
**preserve** [3] - 168:19, 185:12, 185:15
**press** [2] - 147:19, 200:11
**pretend** [1] - 57:8
**pretty** [8] - 55:1, 57:10, 97:18, 122:2, 135:8, 159:8, 160:8, 192:17
**prevent** [2] - 159:13, 159:25
**prevented** [1] - 159:21
**preview** [1] - 21:14
**previously** [4] - 21:21, 40:25, 82:10, 143:10
**price** [4] - 111:24, 112:10, 115:23, 201:18
**prides** [1] - 194:5
**primarily** [1] - 121:25
**print** [10] - 93:12, 111:4, 137:10, 137:21, 139:2, 166:11, 166:13, 167:18, 168:6, 169:4
**printed** [4] - 169:7, 169:17, 187:21, 187:24

**printer** [1] - 137:10
**printing** [2] - 185:17, 192:18
**printout** [3] - 166:8, 196:4
**privacy** [14] - 94:23, 94:25, 95:23, 95:24, 96:1, 96:9, 96:15, 96:22, 96:23, 96:25, 98:23, 101:11, 103:21
**privilege** [1] - 101:6
**proactive** [2] - 27:9, 206:21
**problem** [13] - 4:22, 30:12, 30:13, 33:2, 34:3, 36:11, 40:8, 40:9, 68:15, 92:12, 115:20, 192:19, 199:25
**problematic** [1] - 208:23
**problems** [8] - 14:22, 16:4, 16:6, 18:8, 20:6, 20:8, 33:5, 36:9
**proceed** [2] - 105:21, 105:24
**Proceedings** [1] - 1:22
**proceedings** [1] - 211:11
**PROCEEDINGS** [1] - 3:2
**proceeds** [1] - 171:17
**process** [6] - 20:11, 21:3, 89:6, 121:6, 124:6, 193:23
**produce** [2] - 40:17, 139:2
**produced** [4] - 1:22, 36:21, 167:14, 169:8
**product** [6] - 110:17, 150:12, 154:11, 160:11, 161:17, 199:21
**products** [3] - 102:13, 111:3, 149:18
**professional** [1] - 75:24
**professionals** [1] - 206:14
**profit** [1] - 108:15
**program** [3] - 47:3, 118:19, 167:23
**programmers** [1] - 119:17
**programmers..** [1] - 206:14
**programming** [1] - 119:16
**promise** [1] - 185:17
**promised** [2] - 14:3, 14:18
**promotional** [1] - 194:8
**prompted** [2] - 65:4, 130:7
**Proof** [1] - 152:17
**proof** [5] - 68:17, 81:17, 91:24, 142:9, 143:2
**proper** [1] - 48:11
**proposed** [1] - 208:25
**proprietary** [9] - 42:5, 42:11, 45:5, 45:7, 47:24, 51:16, 52:3, 53:8, 125:22
**protect** [2] - 96:25, 160:3
**protecting** [1] - 99:21
**prove** [2] - 57:17, 89:20
**proven** [1] - 143:6
**proves** [4] - 29:19, 86:12, 86:13
**provide** [43] - 4:11, 13:21,

26:23, 27:4, 35:11, 44:10, 47:21, 48:8, 70:25, 74:3, 74:6, 74:24, 75:4, 75:5, 79:19, 81:17, 87:13, 90:2, 92:8, 92:11, 98:20, 100:4, 100:10, 102:11, 102:12, 103:3, 103:6, 110:24, 143:25, 144:19, 149:5, 150:1, 155:25, 157:1, 176:12, 176:21, 178:15, 191:1, 194:15, 194:23, 198:25, 199:8, 200:13
**provided** [53] - 14:14, 16:9, 16:10, 26:24, 31:21, 31:22, 37:21, 42:15, 43:13, 43:14, 44:16, 52:16, 53:6, 59:18, 62:4, 63:2, 66:13, 68:18, 68:20, 68:25, 69:5, 70:7, 72:6, 72:7, 72:22, 73:4, 73:10, 74:10, 85:23, 86:12, 91:16, 91:17, 91:18, 105:16, 114:22, 121:14, 125:21, 125:24, 126:1, 137:1, 139:6, 146:13, 176:18, 178:12, 178:16, 194:16, 195:11, 196:6, 196:15, 204:23, 205:3
**provider** [3] - 90:19, 145:8, 186:2
**providers** [5] - 18:21, 110:2, 158:12
**provides** [6] - 150:17, 155:22, 188:17, 189:9, 193:8
**providing** [7] - 59:1, 144:8, 188:10, 188:11, 190:25, 191:2, 200:24
**Proxibid** [51] - 14:23, 18:17, 18:20, 24:7, 24:9, 24:13, 24:17, 25:5, 26:4, 26:8, 55:23, 56:4, 56:14, 59:11, 59:12, 60:8, 60:10, 80:21, 84:4, 84:8, 84:10, 86:4, 89:18, 89:23, 90:18, 109:10, 109:17, 124:19, 124:23, 125:3, 125:8, 127:2, 127:3, 127:13, 127:14, 128:6, 128:11, 128:16, 128:18, 128:20, 129:9, 129:10, 134:17, 135:3, 136:4, 136:12, 136:14, 137:11, 137:18, 137:23, 156:10
**prying** [1] - 186:14
**public** [1] - 188:3
**publication** [6] - 93:7, 93:8, 93:9, 93:15, 93:17, 159:1, 159:2
**Publication** [1] - 152:17
**publications** [6] - 94:1, 94:4,

99:15, 111:7, 122:3, 136:9
**publicly** [1] - 187:9
**published** [1] - 125:17
**pull** [1] - 182:5
**pulled** [1] - 95:15
**punitive** [1] - 27:8
**Purchase** [4] - 111:22, 201:17, 201:21, 202:3
**purchase** [5] - 99:13, 99:15, 108:10, 110:7, 112:7
**purchased** [2] - 30:6, 41:1
**pure** [4] - 57:4, 79:21, 79:22, 85:15
**purpose** [10] - 64:16, 69:14, 69:15, 95:1, 133:3, 134:19, 136:1, 136:5, 137:20, 140:11
**purposely** [1] - 154:15
**purposes** [12] - 17:6, 53:9, 77:6, 94:13, 102:21, 104:15, 110:11, 127:25, 128:1, 180:8, 180:10, 182:2
**push** [1] - 111:18
**put** [27] - 21:13, 51:24, 66:17, 72:3, 93:10, 94:13, 100:23, 103:18, 103:25, 104:5, 104:7, 104:11, 111:4, 114:19, 132:10, 137:25, 142:5, 151:6, 154:4, 170:19, 172:22, 190:18, 192:7, 199:14, 199:16, 204:6
**putting** [2] - 140:1, 145:3

## Q

**qualified** [1] - 126:25
**questioned** [1] - 35:17
**questions** [11] - 28:1, 73:15, 102:13, 164:21, 173:17, 177:16, 180:6, 180:16, 188:6, 192:24, 208:6
**quick** [4] - 4:18, 63:18, 125:10, 183:21
**quickly** [1] - 6:15
**quite** [1] - 23:15

## R

**raise** [1] - 111:18
**ran** [4] - 51:4, 51:5, 51:7, 70:19
**rank** [1] - 34:3
**rather** [2] - 27:9, 162:9
**re** [3] - 17:10, 50:1, 173:19
**re-created** [1] - 173:19
**reach** [1] - 120:12
**reached** [1] - 121:16
**reaching** [1] - 206:20

**reaction** [2] - 147:8, 148:3
**reactive** [1] - 27:9
**read** [28] - 15:1, 17:19, 19:24, 19:25, 20:2, 20:3, 20:19, 21:4, 25:3, 34:10, 68:10, 100:7, 153:4, 166:15, 188:9, 189:5, 189:13, 191:16, 191:25, 192:3, 192:22, 192:25, 194:10, 195:19, 206:7, 206:23, 207:8
**readily** [1] - 162:19
**reading** [4] - 60:24, 101:13, 193:7, 206:10
**ready** [6] - 119:15, 121:23, 124:5, 161:9, 161:15, 192:16
**real** [4] - 4:17, 34:3, 63:18, 125:10, 156:10, 167:19, 183:20, 190:12
**realize** [1] - 58:19
**really** [17] - 57:9, 66:1, 76:17, 83:10, 86:7, 109:8, 109:15, 109:16, 115:22, 122:24, 131:17, 135:15, 155:20, 159:25, 161:16, 164:13, 199:19
**realtime** [1] - 118:22
**reason** [17] - 75:15, 75:16, 75:25, 76:15, 76:16, 80:2, 92:11, 138:15, 156:2, 164:15, 184:4, 186:19, 187:2, 190:10, 199:17, 208:23, 209:25
**reasonable** [1] - 71:21
**reasons** [2] - 71:23, 117:11
**receipts** [2] - 138:23, 154:18
**receive** [3] - 8:15, 61:9, 171:17
**received** [4] - 10:19, 140:18, 154:13, 209:11
**receives** [1] - 210:21
**recent** [1] - 78:14
**recently** [1] - 154:13
**recess** [4] - 70:1, 165:3, 208:1, 209:4
**recognize** [2] - 18:2, 176:24
**recollection** [2] - 108:9, 180:21
**record** [28] - 3:7, 4:9, 5:3, 5:12, 5:19, 14:7, 17:6, 45:22, 52:10, 72:24, 73:1, 82:20, 82:21, 83:5, 95:22, 105:15, 106:18, 158:2, 166:15, 188:9, 192:22, 194:10, 206:2, 206:7, 209:1, 209:2, 209:3, 211:11
**recorded** [1] - 1:22
**records** [4] - 87:4, 90:8,

90:9, 114:21
**red** [1] - 7:3
**redevelop** [1] - 118:19
**refer** [1] - 7:4
**references** [2] - 44:5, 46:7
**referencing** [1] - 43:5
**referred** [4] - 19:10, 115:19, 116:6
**referring** [6] - 21:12, 26:21, 61:18, 67:18, 79:7, 96:19
**refers** [1] - 68:1
**reflection** [2] - 188:16, 194:11
**regard** [1] - 105:19
**regarding** [2] - 60:20, 99:15
**regardless** [1] - 24:23
**registered** [4] - 152:1, 152:5, 174:2, 193:22
**registering** [1] - 102:1
**registration** [4] - 19:22, 97:13, 98:12, 98:13
**regular** [1] - 122:2
**rehash** [1] - 12:2
**reimbursement** [1] - 116:1
**reinstalled** [1] - 71:21
**reiterate** [1] - 10:12
**related** [5] - 8:19, 168:6, 168:12, 170:23, 190:21
**relates** [1] - 207:2
**relationship** [13] - 77:15, 85:9, 85:21, 86:3, 87:14, 87:15, 87:16, 88:8, 89:18, 90:14, 128:10, 128:14
**relative** [6] - 61:1, 171:14, 171:22, 185:13, 194:15, 197:18
**release** [2] - 147:19, 200:11
**relevance** [1] - 76:18
**relevant** [3] - 37:6, 46:17, 76:1
**reliable** [2] - 193:20, 193:25
**relief** [1] - 68:17
**remember** [38] - 8:21, 8:25, 9:22, 10:20, 13:1, 13:7, 13:8, 13:11, 13:12, 13:14, 15:11, 18:14, 24:25, 25:7, 25:8, 29:5, 29:10, 31:17, 32:1, 35:13, 63:15, 76:3, 79:24, 93:5, 108:7, 114:1, 114:6, 114:16, 132:25, 133:10, 140:13, 140:14, 159:11, 161:10, 161:11, 161:14, 184:10, 192:5
**remembered** [1] - 167:10
**remembers** [1] - 78:22
**remind** [2] - 40:11, 56:2
**remote** [1] - 164:10
**removal** [3] - 65:22, 66:7, 71:9
**removed** [2] - 162:16, 167:15

**remuneration** [1] - 176:13
**renew** [1] - 162:12
**renewal** [1] - 162:9
**renowned** [1] - 206:20
**rent** [3] - 175:1, 175:4, 175:8
**rental** [2] - 175:6, 176:9
**rep** [7] - 19:12, 43:20, 44:25, 45:16, 86:2, 87:6, 163:22
**repeat** [4] - 36:8, 83:16, 83:17, 168:14
**rephrase** [1] - 72:14
**replace** [1] - 113:8
**replaced** [2] - 140:20, 140:23
**report** [18] - 26:11, 44:9, 63:8, 63:9, 66:10, 66:11, 66:13, 70:20, 72:20, 72:21, 73:4, 73:6, 73:8, 74:6, 74:9, 74:10, 138:24, 139:3
**Report** [1] - 152:19
**Reporter** [2] - 1:20, 211:19
**reporter** [3] - 106:23, 171:20, 206:16
**reporter's** [1] - 191:16
**REPORTER'S** [1] - 211:6
**reports** [1] - 73:6
**represent** [4] - 165:10, 187:19, 187:23, 206:2
**representative** [1] - 88:24
**representing** [2] - 27:25, 131:11
**represents** [1] - 15:16
**reps** [6] - 42:15, 48:9, 50:16, 51:24, 161:1, 161:3
**reputation** [1] - 206:18
**request** [2] - 104:5, 120:8
**requested** [5] - 37:3, 37:9, 80:19, 112:16, 166:23
**requesting** [4] - 35:10, 35:19, 38:4, 38:6
**requests** [1] - 102:13
**require** [1] - 44:10
**required** [1] - 119:17
**requires** [2] - 191:23, 191:24
**research** [1] - 152:11
**resolution** [1] - 208:15
**respect** [76] - 10:11, 11:2, 11:20, 12:4, 12:12, 12:21, 13:1, 13:6, 14:23, 15:24, 17:12, 19:4, 32:21, 48:6, 49:11, 50:13, 53:12, 59:23, 70:25, 74:12, 74:13, 75:11, 75:13, 77:4, 80:20, 83:9, 84:17, 85:14, 93:3, 96:14, 107:13, 107:20, 108:10, 109:19, 110:11, 112:23, 115:14, 116:11, 117:11, 121:16, 123:8, 124:22, 125:9, 125:20, 129:3, 129:11, 129:12, 129:16, 131:15, 132:21, 140:3,

142:16, 143:9, 143:14, 143:21, 144:8, 144:18, 145:1, 145:12, 145:17, 147:7, 148:2, 148:15, 149:22, 151:9, 153:21, 154:22, 155:8, 155:12, 156:20, 157:12, 157:14, 159:16, 160:7
**respond** [2] - 16:2, 102:13
**responds** [1] - 21:9
**response** [2] - 107:4, 162:11
**responses** [1] - 107:3
**responsibilities** [2] - 114:9, 161:3
**responsive** [1] - 194:6
**rest** [3] - 93:25, 174:14, 188:7
**restraining** [3] - 144:24, 165:14, 165:21
**restraints** [1] - 196:20
**restricted** [1] - 202:23
**Restrictive** [3] - 202:8, 202:19, 202:21
**restrictive** [1] - 203:4
**restroom** [1] - 207:23
**resulted** [2] - 9:19, 9:22
**resulting** [1] - 193:18
**results** [1] - 150:5
**resume** [2] - 69:24, 164:23
**resurrected** [2] - 143:15, 173:19
**retain** [2] - 80:20, 136:2
**retained** [3] - 73:19, 73:21, 73:24
**retrieve** [1] - 31:18
**retrieved** [2] - 17:13, 64:2
**returned** [3] - 166:18, 166:21, 166:23
**returning** [1] - 65:19
**revenue** [2] - 135:4, 190:20
**revenue-generating** [1] - 135:4
**reverse** [1] - 111:17
**review** [9] - 66:19, 73:21, 100:20, 165:17, 169:4, 169:8, 187:15, 192:15, 205:6
**reviewed** [10] - 9:16, 51:14, 70:23, 87:4, 90:8, 90:9, 90:24, 101:20, 133:19, 165:20
**reviewing** [3] - 8:19, 52:20, 53:15
**revise** [2] - 125:15, 140:7
**revised** [6] - 119:21, 125:11, 125:14, 126:2, 126:9, 154:11
**revising** [1] - 54:25
**revisit** [1] - 176:11
**Richie** [1] - 87:14

**rid** [2] - 118:3, 119:13
**rig** [2] - 25:10, 25:18
**right-hand** [1] - 189:2
**rigorously** [1] - 193:23
**ripped** [4] - 169:15, 170:1, 170:9, 170:16
**ripping** [2] - 185:17, 186:20
**rise** [12] - 3:1, 69:25, 70:2, 106:8, 106:10, 165:2, 165:4, 207:25, 208:2, 209:5, 209:7, 211:3
**Ritchie** [6] - 87:12, 88:21, 90:10, 90:12, 91:3
**roll** [1] - 10:21
**rolled** [1] - 179:24
**Rolton** [1] - 9:21
**room** [2] - 190:6, 190:24
**Roselle** [4] - 34:10, 34:15, 34:20
**Ross** [1] - 3:13
**ROSS** [1] - 1:15
**RPR** [1] - 211:18
**rules** [1] - 106:22
**run** [6] - 47:8, 50:23, 111:5, 111:14, 113:4, 119:10
**running** [4] - 24:12, 47:4, 48:22, 48:23
**runs** [1] - 47:6
**Rush** [1] - 7:21
**Ryan** [15] - 17:8, 18:11, 19:10, 20:11, 20:22, 22:5, 45:22, 49:25, 120:13, 121:19, 121:20, 121:21, 182:12, 182:19
**résumé** [2] - 172:22, 173:1

---

**S**

**safe** [1] - 160:15
**safety** [1] - 96:22
**salary** [5] - 112:11, 114:12, 157:10, 176:16
**sale** [5] - 89:23, 112:10, 176:13, 193:18
**sales** [16] - 14:24, 19:12, 34:4, 42:15, 43:20, 44:25, 45:16, 48:9, 50:16, 51:23, 86:2, 87:6, 88:24, 161:1, 161:3, 163:22
**salesperson** [1] - 163:22
**Sally** [1] - 141:4
**SANDHILLS** [1] - 1:3
**Sandhills** [166] - 3:9, 3:15, 8:15, 9:25, 11:11, 11:12, 11:23, 16:10, 16:14, 19:12, 22:20, 22:21, 23:9, 24:10, 24:13, 24:19, 27:10, 27:25, 28:17, 29:23, 30:5, 30:7, 30:15, 31:18, 31:22, 33:14, 35:10, 35:19, 36:2, 36:14,

36:15, 37:3, 37:21, 39:21, 44:10, 44:16, 46:10, 46:13, 46:16, 47:20, 49:13, 55:21, 55:25, 56:9, 57:6, 58:8, 62:5, 66:8, 66:14, 66:20, 67:7, 69:8, 70:20, 72:6, 72:15, 72:17, 73:23, 76:6, 77:19, 78:12, 78:25, 80:2, 82:16, 84:7, 84:10, 87:25, 88:1, 88:9, 88:10, 88:24, 89:1, 89:12, 89:18, 89:19, 90:18, 92:2, 92:14, 92:22, 94:11, 94:25, 95:23, 95:24, 96:14, 96:21, 97:4, 97:21, 98:5, 98:11, 99:7, 99:16, 100:8, 103:2, 108:2, 109:20, 112:5, 117:24, 119:12, 119:21, 120:22, 121:14, 122:17, 128:3, 128:8, 128:17, 128:18, 129:4, 129:24, 130:17, 131:10, 131:11, 132:4, 132:12, 133:24, 135:2, 136:17, 138:21, 139:23, 141:1, 143:7, 146:9, 146:11, 147:4, 147:17, 147:23, 149:22, 150:17, 151:2, 151:12, 151:20, 152:8, 152:11, 153:12, 153:17, 154:9, 154:13, 154:16, 155:17, 155:18, 155:21, 155:22, 156:16, 158:9, 158:25, 159:13, 159:25, 160:7, 162:12, 162:25, 163:21, 165:11, 166:23, 170:7, 176:20, 177:16, 177:18, 179:5, 180:1, 183:2, 183:4, 183:5, 197:16, 200:12, 201:8, 201:10, 201:12, 201:14
**Sandhills'** [30] - 64:17, 65:23, 66:24, 67:19, 67:20, 68:5, 69:1, 75:12, 77:6, 81:1, 89:6, 94:13, 94:22, 100:24, 104:14, 108:24, 114:10, 128:10, 128:17, 136:14, 145:2, 147:15, 147:17, 172:25, 180:2, 183:1, 197:11, 197:23, 200:17, 201:1
**satisfied** [2] - 202:2, 202:3
**saw** [22] - 9:24, 12:14, 55:19, 71:1, 83:21, 85:17, 86:1, 87:5, 89:22, 105:6, 120:24, 123:7, 124:12, 127:17, 132:14, 146:13, 151:7, 161:18, 163:10, 182:17, 184:16, 184:24
**schedule** [1] - 208:25
**Schedule** [11] - 114:5, 114:8, 114:11, 114:19, 115:9, 115:12, 115:14, 115:15, 116:9, 117:12, 117:14
**school** [1] - 132:11
**SCHOTT** [1] - 40:4
**Schott** [20] - 14:9, 14:11, 37:25, 39:20, 40:3, 40:6, 40:24, 41:2, 80:19, 115:18, 116:4, 121:25, 136:3, 137:14, 138:3, 139:4, 148:4, 163:23, 172:24
**Scott** [1] - 86:2
**screen** [5] - 94:1, 127:8, 127:10, 151:6, 193:24
**script** [1] - 121:9
**scripts** [1] - 133:6
**SE** [1] - 151:16
**seamless** [1] - 191:21
**search** [4] - 9:24, 151:23, 152:11, 206:25
**Search** [1] - 191:22
**seated** [9] - 3:4, 70:4, 106:12, 106:13, 106:14, 106:20, 165:6, 208:4, 209:9
**second** [25] - 15:1, 17:18, 21:4, 21:9, 27:6, 53:19, 58:20, 65:4, 70:14, 71:6, 72:18, 73:2, 73:9, 74:4, 98:4, 99:16, 130:8, 142:12, 144:15, 170:13, 186:11, 189:6, 191:12, 192:17, 203:23
**secure** [4] - 64:17, 99:14, 99:17, 193:20
**secured** [1] - 31:10
**securing** [1] - 101:15
**security** [8] - 36:5, 36:6, 36:9, 36:18, 80:14, 139:22, 141:17, 142:10
**see** [86] - 4:17, 7:1, 8:3, 8:4, 9:16, 11:6, 13:15, 14:5, 14:12, 14:20, 14:25, 15:4, 16:6, 18:4, 18:5, 18:9, 19:4, 19:7, 20:10, 20:16, 20:24, 22:22, 23:7, 23:22, 24:15, 26:5, 27:6, 27:11, 29:8, 29:9, 35:22, 37:22, 38:11, 38:12, 39:21, 39:23, 43:9, 44:5, 44:13, 45:21, 54:4, 54:19, 64:5, 70:12, 70:21, 76:1, 84:2, 87:22, 88:23, 89:3, 92:1, 92:12, 96:9, 98:4, 98:8, 99:12, 101:9, 102:5, 102:18, 105:22, 123:10, 126:17, 130:10, 132:17, 133:5, 133:19, 135:15, 136:7, 136:18, 136:21, 138:21, 142:11, 151:24, 152:15, 152:25, 161:16, 161:18, 166:9, 170:17, 188:22, 189:3, 189:21, 189:23, 191:14
**seeing** [4] - 52:24, 130:2, 132:25, 162:7
**seeks** [1] - 210:7
**seem** [4] - 94:24, 173:17, 180:5, 192:21
**self** [2] - 130:5, 153:25
**self-branded** [2] - 130:5, 153:25
**selfish** [2] - 127:24, 128:1
**sell** [8] - 146:9, 155:13, 156:18, 159:10, 159:16, 178:18, 178:22, 183:7
**seller** [1] - 80:11
**sellers** [1] - 193:15
**selling** [11] - 25:10, 25:18, 25:19, 111:3, 113:6, 113:21, 155:8, 155:12, 159:19, 182:21
**send** [15] - 4:4, 8:14, 14:18, 30:19, 45:15, 111:7, 126:25, 134:16, 135:18, 139:1, 139:11, 140:24, 167:22, 167:24, 188:15
**sending** [12] - 30:13, 32:22, 32:25, 34:11, 36:10, 40:24, 54:20, 54:21, 121:9, 134:10, 137:20, 139:25
**sends** [4] - 25:25, 29:2, 29:15, 39:20
**Senior** [4] - 61:25, 64:3, 64:18, 68:6
**Senior's** [2] - 58:4, 62:3
**sense** [2] - 15:21, 57:17
**sent** [32] - 14:19, 30:22, 32:3, 32:18, 33:3, 33:7, 33:11, 35:24, 36:7, 37:7, 41:2, 41:3, 41:12, 41:25, 49:6, 57:23, 61:21, 80:11, 80:23, 81:2, 125:7, 137:5, 137:7, 137:8, 138:22, 139:8, 144:23, 167:17, 169:16, 203:16, 203:19
**sentence** [4] - 22:4, 97:4, 98:24, 100:7
**SEO** [4] - 191:22, 206:20, 206:23, 207:13
**SEO-driven** [2] - 191:22, 207:13
**separate** [2] - 147:3
**September** [1] - 173:22
**sequence** [1] - 126:13
**seriously** [1] - 40:13
**server** [1] - 167:15
**Service** [1] - 151:10
**service** [13] - 97:7, 100:14, 110:24, 149:3, 178:15, 186:2, 186:10, 193:15, 194:6, 194:8, 194:21, 200:14, 200:18
**services** [16] - 31:10, 89:2, 92:16, 102:13, 107:18, 109:11, 113:22, 119:2, 156:3, 178:12, 188:12, 189:11, 189:17, 191:1, 194:1, 200:24
**set** [8] - 20:22, 53:10, 56:13, 102:21, 103:1, 126:7, 180:6, 193:9
**setting** [4] - 46:18, 46:20, 55:5, 102:2
**seven** [1] - 122:21
**several** [7] - 82:5, 84:12, 91:14, 94:6, 94:15, 139:20, 162:14
**shake** [1] - 86:7
**shall** [1] - 151:15
**Shane** [2] - 172:24, 173:4
**shape** [1] - 85:11
**share** [1] - 22:19
**shared** [3] - 162:19, 162:21
**shareholders** [1] - 174:7
**Shawn** [8] - 69:9, 70:10, 116:5, 116:7, 152:2, 152:6, 152:8, 153:11
**SHETRON** [1] - 178:5
**Shetron** [3] - 82:4, 178:5, 181:1
**Shipp** [4] - 3:3, 59:18, 69:18, 74:13
**SHIPP** [1] - 1:11
**shock** [1] - 161:18
**short** [4] - 133:5, 164:23, 207:19, 209:4
**shortly** [1] - 144:23
**shot** [1] - 148:6
**shoulders** [1] - 107:4
**show** [7] - 24:16, 58:22, 86:4, 86:24, 95:15, 122:7, 169:16
**showed** [1] - 11:17
**showing** [3] - 26:22, 85:18, 204:21
**shown** [2] - 123:7, 143:6
**shrug** [1] - 107:4
**sic** [1] - 189:11
**sick** [1] - 125:7
**side** [3] - 7:2, 74:10, 189:2
**Sidney** [7] - 19:11, 19:13, 19:14, 22:5, 23:9, 86:2
**Sidney's** [1] - 21:10
**signature** [2] - 5:25, 153:10
**signed** [10] - 6:2, 23:13, 87:20, 90:25, 94:6, 201:21, 202:1, 202:13, 202:18, 203:8
**similar** [7] - 47:11, 50:15,

51:14, 109:3, 154:7, 199:20, 207:7
**simple** [6] - 78:6, 82:17, 86:7, 86:10, 177:21, 193:16
**simply** [5] - 68:1, 68:11, 81:2, 182:3, 193:13
**sit** [2] - 92:14, 157:14
**site** [20] - 97:6, 97:12, 97:13, 97:24, 98:9, 98:12, 98:13, 98:25, 99:13, 99:21, 100:2, 100:5, 100:6, 104:2, 121:7, 193:13, 193:21, 200:13, 200:18
**sites** [1] - 99:19
**sitting** [9] - 26:11, 120:24, 127:5, 127:7, 138:11, 141:10, 167:5, 169:14, 170:1
**situation** [1] - 133:23
**six** [2] - 115:21, 163:6
**slapped** [1] - 144:24
**slightly** [2] - 21:24, 101:12
**slipped** [1] - 194:19
**slow** [1] - 206:15
**slowly** [3] - 188:9, 191:16, 207:8
**small** [1] - 178:19
**social** [1] - 194:7
**software** [109] - 10:15, 13:10, 13:14, 14:23, 15:8, 15:25, 16:5, 18:21, 19:2, 19:3, 20:6, 21:20, 21:21, 23:20, 25:4, 42:20, 42:25, 43:2, 43:5, 46:9, 46:15, 47:5, 47:6, 47:7, 47:11, 47:16, 48:15, 48:19, 51:7, 54:16, 67:1, 67:3, 88:25, 89:7, 89:13, 90:19, 92:3, 92:5, 92:15, 92:22, 92:24, 92:25, 109:6, 110:8, 110:25, 111:12, 111:14, 118:5, 118:7, 118:21, 118:24, 119:3, 119:9, 119:23, 119:24, 120:3, 121:6, 122:23, 123:5, 123:14, 123:20, 129:24, 129:25, 130:4, 148:20, 148:21, 148:23, 148:24, 148:25, 149:1, 149:5, 149:15, 149:19, 149:20, 149:22, 150:1, 150:6, 150:15, 153:23, 154:2, 155:2, 155:8, 155:12, 155:14, 155:15, 155:16, 155:17, 155:21, 157:6, 161:7, 161:25, 162:21, 163:2, 163:4, 163:12, 178:2, 179:12, 179:15, 198:4, 198:25, 199:9, 199:24,

199:25, 200:1, 201:6
**sold** [6] - 113:17, 115:2, 115:3, 136:16, 147:5, 157:9
**sole** [1] - 177:8
**solicit** [2] - 182:15, 203:5
**solicitations** [2] - 94:9, 94:16
**solicited** [1] - 79:11
**soliciting** [1] - 77:10
**solution** [5] - 191:20, 191:21, 200:19, 207:10, 207:13
**Solution** [2] - 180:17, 207:9
**Solutions** [1] - 145:7
**solutions** [7] - 193:8, 194:16, 194:24, 195:11, 196:7, 196:15, 206:21
**someone** [12] - 9:19, 9:25, 12:14, 17:22, 28:10, 35:10, 35:19, 37:3, 126:25, 191:5, 191:6, 191:10
**somewhat** [2] - 122:22, 154:11
**somewhere** [4] - 35:10, 60:4, 108:5, 156:15
**son** [14] - 10:4, 60:15, 120:13, 121:17, 121:25, 123:23, 133:6, 141:14, 141:16, 142:5, 163:18, 163:20, 171:7, 185:25
**son's** [1] - 154:12
**sons** [1] - 171:2
**sorry** [25] - 6:11, 32:14, 33:21, 34:6, 34:15, 37:15, 40:3, 52:6, 53:19, 53:20, 54:10, 60:2, 63:1, 64:9, 66:5, 108:16, 121:24, 123:12, 134:9, 135:21, 152:4, 169:21, 198:16, 203:17, 204:21
**sort** [2] - 56:15, 173:16
**sound** [2] - 173:22, 174:4
**sounded** [1] - 169:3
**sounds** [1] - 71:14
**South** [1] - 164:9
**space** [4] - 37:9, 189:12, 189:18, 204:19
**speaking** [3] - 61:12, 107:1, 133:22
**specific** [14] - 13:11, 16:6, 35:19, 48:3, 48:5, 56:7, 74:1, 78:10, 83:8, 150:11, 156:7, 193:10, 195:14, 198:2
**specifically** [5] - 26:14, 62:18, 113:3, 129:17, 185:6
**speculate** [5] - 25:12, 39:15, 49:21, 49:22, 49:23
**speculating** [3] - 55:3, 78:5, 85:17

**speculation** [5] - 55:2, 57:4, 79:22, 85:16, 91:21
**spell** [1] - 106:17
**spelled** [1] - 144:4
**split** [3] - 77:19, 78:11, 78:25
**splitting** [1] - 71:17
**spoken** [7] - 126:20, 137:13, 137:14, 179:25, 184:25, 185:2
**spreadsheet** [2] - 21:10, 134:15
**SR** [1] - 1:6
**staff** [6] - 113:5, 113:6, 162:14, 163:7, 194:7, 196:23
**stamp** [1] - 43:7
**stand** [5] - 3:14, 3:24, 111:13, 204:15, 209:18
**standard** [1] - 10:24
**standing** [2] - 111:14, 207:20
**stands** [1] - 206:24
**start** [13] - 36:23, 38:21, 60:23, 69:21, 130:13, 133:13, 135:3, 142:24, 188:8, 190:16, 192:23, 192:25, 199:22
**started** [13] - 81:6, 107:14, 108:11, 108:17, 109:22, 115:17, 115:18, 145:6, 160:23, 162:8, 162:25, 191:24
**starting** [3] - 10:9, 171:4, 171:6
**starts** [1] - 60:21
**State** [2] - 1:9, 153:7
**state** [3] - 106:17, 206:19, 210:11
**state-of-the-art** [1] - 206:19
**Statement** [1] - 152:21
**statement** [6] - 68:15, 89:20, 89:25, 98:2, 99:24, 207:15
**states** [3] - 15:15, 95:23, 96:14
**STATES** [2] - 1:1, 1:12
**States** [3] - 1:9, 3:3, 145:13
**stay** [9] - 22:6, 112:12, 113:4, 136:10, 162:10, 164:4, 177:17, 181:16
**stayed** [1] - 113:11
**staying** [1] - 112:11
**steer** [1] - 158:6
**stenography** [1] - 1:22
**step** [2] - 105:14, 208:11
**Stephanie** [1] - 115:19
**stepped** [1] - 162:23
**steps** [1] - 96:25
**Steve** [5] - 26:3, 58:18, 167:21, 167:25, 180:16
**Steven** [1] - 3:17
**STEVEN** [1] - 1:17

**stick** [5] - 24:19, 59:9, 59:23, 61:17
**stickler** [1] - 189:13
**still** [27] - 3:10, 3:24, 3:25, 26:4, 30:21, 42:22, 46:12, 46:16, 46:18, 46:19, 48:13, 48:14, 63:13, 103:9, 148:10, 162:2, 170:8, 173:4, 174:24, 176:20, 179:4, 182:9, 183:14, 188:19, 191:2, 194:20
**stock** [2] - 21:11, 21:12
**stop** [3] - 55:11, 105:2, 194:9
**stopped** [8] - 56:4, 87:25, 88:23, 144:10, 171:6, 171:9, 171:10, 171:13
**store** [1] - 75:13
**straight** [1] - 147:18
**straightforward** [1] - 97:19
**strategic** [1] - 147:20
**strategies** [1] - 206:21
**streams** [1] - 193:12
**Street** [1] - 1:9
**stricken** [1] - 82:20
**strike** [4] - 83:1, 83:3, 83:5, 153:15
**string** [1] - 20:14
**struck** [1] - 172:22
**structure** [1] - 195:8
**stuff** [6] - 66:14, 74:22, 107:13, 115:6, 139:25, 158:23
**stunk** [1] - 163:12
**subcategories** [1] - 19:21
**subcontractor** [1] - 163:21
**Subject** [1] - 53:4
**subject** [3] - 38:2, 50:1, 122:14
**subjective** [5] - 86:11, 91:7, 91:18, 91:20, 91:25
**submission** [1] - 200:15
**submit** [3] - 101:24, 102:14, 208:24
**submitted** [4] - 5:11, 64:21, 208:17, 208:21
**subscriptions** [1] - 99:13
**subsequent** [2] - 184:24, 202:4
**substance** [1] - 33:6
**success** [5] - 27:22, 28:6, 28:17, 110:4, 134:14
**successful** [1] - 178:17
**suck** [1] - 25:9
**sudden** [2] - 57:11, 57:13
**sue** [1] - 128:19
**sued** [2] - 144:6, 144:12
**sufficient** [1] - 133:13
**suggest** [1] - 172:16
**suit** [2] - 57:11, 57:12

**suitable** [1] - 89:7
**summary** [2] - 63:9, 63:11
**Sunday** [1] - 166:9
**Superior** [29] - 23:3, 81:22, 84:22, 85:1, 85:7, 85:15, 85:21, 85:24, 86:13, 87:5, 87:10, 87:11, 87:25, 88:7, 88:8, 88:10, 88:23, 89:17, 90:3, 91:6, 91:20, 134:22, 134:24, 135:1, 157:24, 158:3, 178:20, 181:10, 181:13
**Superior..** [1] - 84:21
**supplement** [1] - 209:20
**support** [16] - 27:1, 82:11, 85:16, 88:4, 89:25, 90:23, 112:12, 113:9, 147:24, 188:12, 189:11, 189:17, 194:7, 194:15, 206:22
**supposed** [4] - 4:10, 114:18, 117:6, 162:10
**surpasses** [1] - 193:21
**surprise** [3] - 26:9, 84:4, 103:23
**surprises** [1] - 23:11
**suspended** [1] - 65:10
**suspicious** [1] - 72:2
**swear** [1] - 105:23
**sworn** [1] - 3:24
**SWORN** [1] - 106:16
**system** [51] - 8:4, 10:13, 19:5, 20:23, 26:23, 27:3, 31:13, 31:14, 32:15, 36:14, 39:11, 40:10, 40:17, 42:16, 42:20, 44:18, 45:6, 46:21, 46:24, 46:25, 48:9, 48:11, 48:17, 49:13, 49:15, 54:25, 71:22, 94:12, 94:17, 94:19, 100:18, 100:23, 104:5, 104:22, 108:24, 109:21, 116:20, 117:25, 118:16, 120:16, 121:3, 122:24, 124:6, 125:11, 126:7, 150:19, 161:6, 193:10, 193:16, 207:12
**system's** [1] - 26:15
**systems** [2] - 99:18, 104:11

**T**

**table** [4] - 102:21, 120:25, 132:10, 144:14
**tactic** [1] - 126:23
**tags** [1] - 7:2
**tailored** [1] - 48:17
**talks** [9] - 12:8, 14:22, 43:6, 51:10, 64:6, 64:24, 96:16, 99:16, 109:17
**tasked** [2] - 48:22
**tax** [1] - 108:14

**TD** [2] - 175:14, 175:15
**teaches** [1] - 54:10
**teaching** [1] - 160:16
**Team** [1] - 206:11
**team** [2] - 194:7, 206:14
**tear** [1] - 163:10
**technical** [1] - 194:6
**technically** [1] - 155:16
**TECHNOLOGY** [1] - 1:7
**Technology** [72] - 55:9, 55:12, 55:24, 55:25, 56:5, 56:6, 56:10, 56:14, 57:7, 57:12, 58:8, 60:12, 84:8, 88:2, 88:7, 88:11, 90:20, 91:21, 143:9, 143:14, 143:21, 143:22, 144:8, 144:16, 144:18, 145:6, 145:17, 155:3, 173:11, 173:13, 174:2, 174:5, 174:18, 175:1, 175:7, 175:10, 176:7, 176:10, 176:12, 176:19, 176:21, 177:1, 177:5, 177:8, 177:12, 178:2, 178:14, 179:9, 179:16, 179:17, 185:14, 187:7, 188:4, 188:8, 188:10, 188:11, 188:17, 194:14, 194:19, 194:24, 195:2, 195:7, 196:5, 199:8, 199:14, 199:16, 200:8, 200:19, 206:6, 206:21
**technology** [11] - 83:25, 126:3, 145:8, 163:8, 188:12, 189:11, 189:17, 193:20, 200:1, 206:20, 206:22
**Technology's** [1] - 187:4
**temporary** [2] - 165:14, 165:20
**tenant** [1] - 142:4
**term** [4] - 109:15, 137:17, 162:13, 202:9
**terminated** [4] - 86:3, 86:16, 88:8, 89:18
**termination** [5] - 28:14, 87:5, 170:24, 177:17, 180:1
**terminology** [2] - 62:10, 147:10
**test** [1] - 24:9
**testified** [42] - 10:12, 10:18, 13:7, 13:17, 26:10, 38:19, 45:20, 48:23, 55:21, 59:10, 60:13, 62:25, 77:6, 79:9, 80:25, 81:12, 81:14, 81:15, 81:20, 83:9, 83:13, 83:21, 84:6, 87:25, 90:22, 91:25, 94:11, 107:17, 114:14, 115:6, 133:10, 134:23, 156:20, 159:21, 161:8,

161:14, 173:19, 177:14, 180:16, 198:10, 199:3, 210:12
**testify** [9] - 39:14, 108:4, 124:7, 133:8, 149:4, 157:12, 157:23, 159:18, 167:6
**testifying** [2] - 103:17, 168:11
**testimony** [53] - 10:23, 11:21, 12:2, 26:20, 35:21, 36:25, 40:21, 46:15, 47:2, 55:14, 55:16, 58:1, 58:12, 58:15, 59:1, 59:6, 60:15, 60:20, 61:15, 74:21, 82:6, 82:7, 82:20, 82:21, 82:22, 83:1, 85:7, 85:9, 85:14, 88:2, 88:6, 94:20, 95:4, 95:7, 104:4, 105:15, 105:16, 105:19, 105:22, 106:3, 106:5, 119:18, 119:19, 128:12, 169:3, 169:14, 170:4, 172:8, 172:13, 176:9, 200:6, 202:23
**text** [12] - 23:8, 28:11, 125:7, 185:4, 185:10, 185:19, 185:20, 185:23, 185:24, 186:23, 194:10
**texted** [1] - 185:3
**texting** [1] - 186:7
**texts** [1] - 186:24
**that'** [1] - 21:22
**that'd** [1] - 198:2
**THE** [79] - 1:1, 3:1, 3:4, 3:7, 3:16, 3:20, 3:22, 4:12, 4:16, 5:6, 5:13, 5:16, 5:17, 6:16, 6:19, 7:1, 7:4, 7:8, 7:14, 13:25, 58:23, 69:21, 69:25, 70:2, 70:4, 73:14, 73:17, 82:25, 100:25, 101:2, 101:5, 105:13, 106:8, 106:10, 106:12, 106:15, 106:17, 106:19, 106:20, 107:8, 107:9, 139:19, 139:20, 164:22, 165:2, 165:4, 165:6, 186:11, 186:16, 187:12, 204:11, 204:17, 205:1, 205:16, 205:21, 206:15, 206:17, 207:20, 207:23, 207:25, 208:2, 208:4, 208:10, 208:12, 208:13, 208:20, 209:5, 209:7, 209:9, 209:15, 209:22, 210:2, 210:6, 210:9, 210:14, 210:17, 210:21, 210:25, 211:3
**themselves** [2] - 16:8, 154:4
**theory** [2] - 57:4, 59:14

**there'd** [1] - 175:6
**they've** [3] - 109:25, 110:3, 137:19
**thinking** [1] - 190:19
**third** [11] - 11:11, 22:4, 57:24, 61:4, 63:5, 69:12, 87:2, 149:6, 149:16, 198:16
**third-parties** [1] - 149:16
**third-party** [7] - 11:11, 57:24, 61:4, 63:5, 69:12, 149:6
**this..** [1] - 125:7
**thoughts** [5] - 85:24, 86:11, 91:7, 91:25, 190:11
**thousand** [1] - 113:10
**thousands** [1] - 27:3
**threat** [1] - 109:22
**three** [9] - 34:9, 126:2, 135:21, 135:24, 168:23, 184:1, 188:1, 197:7, 198:6
**threw** [1] - 170:5
**throughout** [6] - 8:24, 35:22, 115:15, 119:5, 160:15, 189:22
**throw** [1] - 190:17
**thrown** [2] - 170:17
**thumb** [1] - 139:25
**Thursday** [1] - 183:24
**tied** [1] - 207:1
**time-wise** [1] - 184:9
**timed** [7] - 52:21, 52:23, 118:22, 119:1, 130:17, 130:21, 207:12
**timely** [1] - 105:7
**tired** [1] - 161:21
**title** [1] - 166:16
**today** [23] - 8:10, 22:7, 41:10, 58:17, 59:20, 60:12, 73:20, 85:11, 92:14, 106:2, 106:4, 106:5, 166:21, 173:14, 177:19, 180:1, 185:22, 191:2, 192:1, 196:1, 199:13, 208:8, 208:17
**together** [2] - 199:13, 202:4
**Tom** [1] - 173:4
**Tom's** [1] - 173:3
**ton** [1] - 167:14
**tongue** [1] - 207:1
**tongue-tied** [1] - 207:1
**took** [18] - 58:17, 86:15, 87:5, 87:9, 109:24, 133:18, 134:14, 138:2, 138:18, 140:25, 141:14, 142:7, 154:9, 160:5, 190:23, 191:6
**tools** [1] - 207:10
**top** [25] - 14:2, 22:7, 23:3, 23:7, 23:24, 32:2, 34:12, 34:16, 34:22, 35:11, 35:15, 38:3, 38:6, 39:25, 52:16,

68:3, 80:6, 80:11, 95:25, 102:7, 160:2, 163:25, 166:6, 204:3, 206:3
**Top** [3] - 33:24, 136:20, 166:17
**tortious** [1] - 81:10
**total** [3] - 33:10, 179:7, 197:7
**totally** [1] - 27:19
**tough** [1] - 207:1
**towards** [1] - 143:18
**track** [1] - 104:6
**Track** [1] - 111:6
**trade** [3] - 122:3, 136:8, 183:6
**Trader** [7] - 93:4, 93:7, 93:11, 93:14, 93:18, 111:6
**Transact** [1] - 152:24
**transaction** [1] - 202:5
**transcript** [2] - 1:22, 211:10
**transcription** [1] - 1:22
**transpiring** [1] - 23:8
**transportation** [1] - 190:13
**travel** [2] - 87:4, 116:1
**traveled** [1] - 137:7
**traveling** [5] - 137:6, 138:13, 164:10, 196:24
**Trenton** [1] - 1:10
**trial** [2] - 208:16, 208:20
**tried** [5] - 126:23, 167:18, 171:5, 178:22, 206:20
**triggered** [2] - 10:3, 186:20
**Trinity** [1] - 3:18
**TRINITY** [1] - 1:17
**trip** [4] - 7:24, 64:6, 64:16, 133:5
**Truck** [1] - 111:6
**Trucks** [1] - 193:4
**trucks** [1] - 159:1
**true** [2] - 39:17, 187:9
**try** [7] - 28:16, 48:4, 74:2, 107:12, 142:24, 157:5, 163:21
**trying** [19] - 21:1, 21:14, 24:19, 26:7, 30:14, 57:14, 118:18, 119:8, 119:16, 127:20, 127:22, 127:24, 135:13, 136:2, 136:14, 147:1, 159:13, 163:20, 195:9
**Tuesday** [3] - 11:2, 184:8, 184:12
**turn** [1] - 170:24
**turned** [4] - 81:1, 141:13, 163:12, 167:13
**turning** [1] - 205:12
**tutorial** [4] - 51:2, 51:4, 51:15, 154:11
**tutorials** [18] - 50:5, 50:13, 50:21, 51:18, 51:23, 54:10, 119:20, 120:4, 120:16,

122:15, 122:16, 123:18, 125:10, 125:20, 126:5, 133:7, 140:5
**tweak** [1] - 47:10
**tweaks** [3] - 10:17, 124:8, 124:10
**twice** [1] - 144:7
**twists** [1] - 110:25
**two** [44] - 13:23, 17:7, 18:20, 32:14, 73:14, 74:16, 74:17, 78:2, 81:14, 81:15, 81:21, 81:23, 82:7, 82:9, 95:15, 101:16, 101:18, 109:25, 110:2, 110:15, 115:1, 125:5, 133:18, 135:4, 143:5, 143:13, 149:17, 158:12, 158:17, 158:18, 164:8, 166:1, 172:22, 175:7, 179:10, 192:15, 197:5, 200:10, 200:14, 200:17, 207:18, 207:20, 210:5
**two-page** [2] - 17:7, 192:15
**type** [8] - 35:15, 74:13, 75:24, 83:11, 107:20, 116:14, 122:23, 129:13
**types** [4] - 36:10, 122:21, 179:17, 200:17

# U

**U.S** [1] - 174:13
**ugly** [1] - 167:20
**ultimately** [4] - 55:9, 55:23, 56:6, 89:23
**unannounced** [1] - 141:25
**unauthorized** [1] - 99:17
**under** [20] - 3:25, 40:11, 48:10, 56:3, 57:4, 66:24, 146:7, 146:11, 147:10, 147:11, 149:8, 150:18, 155:3, 178:16, 178:25, 181:2, 191:14, 195:1, 197:10
**Undercarriage** [1] - 103:7
**understood** [1] - 198:22
**unemployed** [1] - 195:3
**unemployment** [4] - 76:4, 76:13, 79:25, 80:1
**unfair** [1] - 128:16
**unhappy** [2] - 89:13, 173:2
**unique** [4] - 110:20, 110:21, 156:5, 156:6
**UNITED** [2] - 1:1, 1:12
**United** [3] - 1:9, 3:3, 145:13
**unless** [1] - 173:23
**unpaid** [2] - 142:2, 142:14
**unpredictable** [1] - 27:9
**unwanted** [1] - 99:22
**up** [78] - 4:12, 10:24, 17:19,

20:22, 22:18, 23:13, 23:24, 24:16, 24:19, 25:9, 25:24, 28:13, 34:10, 40:23, 40:24, 46:18, 46:20, 49:19, 51:18, 51:24, 52:15, 53:10, 55:5, 55:24, 56:13, 58:6, 66:3, 76:22, 86:4, 86:5, 86:8, 89:23, 91:6, 94:1, 95:25, 101:4, 101:5, 102:2, 103:22, 106:24, 108:20, 116:4, 116:5, 119:19, 122:5, 123:8, 126:7, 127:8, 128:16, 129:1, 130:1, 135:10, 138:6, 141:13, 146:16, 148:3, 160:5, 162:24, 163:5, 167:7, 168:4, 169:15, 170:1, 170:9, 170:16, 180:5, 183:21, 184:17, 184:18, 185:17, 186:20, 193:9, 194:22, 199:7, 203:25, 204:13, 205:18, 205:19
**upcoming** [2] - 122:4, 201:2
**update** [1] - 49:18
**updated** [4] - 49:2, 52:6, 52:19, 123:18
**upload** [8] - 21:10, 21:22, 43:20, 44:18, 44:19, 48:9, 89:6, 111:12
**uploading** [1] - 21:15
**upset** [3] - 16:7, 127:17
**useless** [1] - 140:12
**user** [4] - 19:22, 71:21, 102:2, 149:21
**users** [1] - 99:17
**uses** [4] - 83:25, 84:4, 99:17, 148:25
**utilize** [3] - 43:16, 127:11, 129:24
**utilized** [3] - 75:12, 104:14, 189:21
**utilizes** [1] - 183:9
**utilizing** [1] - 77:5, 186:9

# V

**V-I-C-A-R-I** [1] - 179:2
**vacation** [4] - 133:4, 140:15, 140:17, 142:9
**vaguely** [1] - 15:12
**various** [1] - 195:14
**verbal** [2] - 74:8, 107:4
**Verizon** [3] - 186:2, 186:3, 186:10
**version** [2] - 5:15, 95:20
**versions** [1] - 6:23
**versus** [3] - 3:9, 109:6, 134:17
**via** [1] - 102:14
**Vicari** [11] - 82:5, 146:7,

178:24, 179:4, 179:7, 179:10, 179:11, 181:12, 181:16, 197:10, 197:15
**video** [8] - 50:4, 111:15, 120:15, 121:9, 122:15, 122:16, 122:22, 194:8
**videography** [1] - 75:13
**videos** [13] - 75:24, 121:11, 121:12, 121:14, 122:20, 122:21, 123:1, 124:2, 125:11, 133:7, 133:13
**videotape** [1] - 163:1
**viewed** [1] - 99:1
**vigilant** [1] - 99:21
**violation** [3] - 59:21, 81:7, 196:19
**virtually** [1] - 193:15
**vision** [1] - 195:6
**visit** [4] - 65:4, 141:22, 142:12, 182:22
**visited** [1] - 86:15
**visitors** [14] - 96:24, 97:6, 97:12, 97:24, 98:9, 98:11, 98:15, 99:3, 100:2, 100:5, 102:15, 103:23, 104:2
**visually** [2] - 54:10, 198:22
**voice** [2] - 106:24, 110:18
**Vortex** [3] - 145:7, 145:10, 180:17
**VPN** [2] - 31:10, 138:20
**vs** [1] - 1:5

# W

**wait** [5] - 4:14, 53:19, 107:2, 166:25, 171:20
**waiting** [1] - 139:20
**walk** [3] - 20:11, 120:19, 149:21
**walked** [3] - 141:9, 141:14, 141:25
**wall** [1] - 162:7
**wants** [4] - 99:25, 105:2, 159:25, 209:25
**watch** [1] - 112:13
**watching** [1] - 142:5
**Wawa** [1] - 141:18
**Webcast** [1] - 207:11
**webcasting** [1] - 118:23
**webpage** [1] - 196:5
**website** [44] - 17:10, 18:6, 93:8, 93:16, 95:16, 96:11, 97:14, 98:14, 98:15, 98:16, 98:19, 98:21, 99:3, 99:4, 100:1, 100:9, 100:13, 102:14, 102:16, 103:13, 103:21, 103:24, 121:7, 127:12, 187:4, 187:9, 188:4, 188:18, 190:8, 190:9, 190:14, 190:19,

195:11, 195:23, 200:16, 200:17, 201:1, 205:9, 207:5, 207:11, 207:16, 210:12

**website's** [1] - 188:19

**websites** [9] - 94:4, 96:17, 99:10, 100:3, 102:1, 102:24, 103:25, 150:5, 201:2

**week** [6] - 137:7, 140:21, 182:18, 183:23, 183:24, 185:2

**weekend** [1] - 126:23

**weeks** [5] - 86:3, 86:16, 87:5, 162:11, 172:23

**Welch** [60] - 3:14, 3:24, 4:1, 4:10, 5:22, 14:2, 14:9, 17:4, 26:10, 63:22, 70:7, 78:11, 78:25, 83:7, 87:24, 88:9, 105:14, 105:16, 105:19, 107:17, 108:4, 109:5, 114:1, 114:14, 115:7, 115:9, 116:4, 116:7, 123:8, 123:13, 124:7, 128:9, 133:8, 134:23, 137:13, 140:18, 141:4, 141:9, 141:25, 142:19, 142:22, 147:18, 148:22, 149:4, 153:16, 157:12, 157:23, 159:18, 160:24, 161:8, 161:21, 167:6, 169:17, 185:5, 185:7, 204:3, 204:9, 204:22, 205:2

**WELCH** [1] - 2:3

**Welch's** [3] - 82:21, 88:6, 205:13

**Welcome** [1] - 43:2

**welcome** [4] - 12:8, 42:3, 44:22, 205:18

**West** [1] - 152:6

**whack** [1] - 57:13

**whack-a-mole** [1] - 57:13

**whatsoever** [3] - 82:21, 97:25, 99:5

**white** [9] - 130:5, 153:24, 153:25, 154:2, 200:14, 200:18, 200:19, 200:24, 201:5

**White** [1] - 191:20

**whole** [3] - 31:14, 82:2, 167:9

**wife** [8] - 37:18, 138:22, 139:25, 157:22, 176:4, 184:18, 185:25, 186:1

**wife's** [9] - 35:5, 137:9, 137:21, 138:24, 139:1, 170:14, 203:12, 203:16, 203:20

**willing** [3] - 87:13, 112:21,

164:15

**windows** [1] - 71:22

**wiped** [16] - 58:2, 58:3, 60:16, 60:21, 61:14, 62:1, 62:2, 62:9, 62:10, 62:13, 62:19, 62:21, 66:4, 71:13, 71:14, 71:16

**wise** [1] - 184:9

**wish** [1] - 154:5

**Withdrawal** [1] - 152:23

**WITNESS** [10] - 2:2, 5:16, 58:23, 106:19, 107:8, 139:20, 204:11, 205:21, 206:17, 208:12

**witness** [15] - 3:14, 4:2, 5:15, 6:12, 6:22, 7:13, 95:22, 105:23, 106:6, 106:13, 107:9, 187:13, 192:13, 204:15, 208:7

**wolf** [1] - 162:22

**wolfe** [1] - 180:11

**Wolfe** [4] - 82:4, 177:24, 198:8, 198:13

**won** [1] - 75:22

**word** [3] - 125:8, 199:7, 207:1

**Word** [1] - 154:7

**words** [4] - 131:18, 161:21, 184:17, 189:14

**workings** [1] - 150:22

**works** [2] - 110:8, 173:4

**world** [3] - 145:14, 193:11, 193:17

**Worldnet** [2] - 178:3, 180:14

**worried** [1] - 37:18

**worth** [1] - 144:13

**write** [1] - 133:6

**writes** [2] - 20:20, 27:18

**writing** [1] - 91:5

**written** [8] - 7:13, 63:11, 63:12, 66:11, 74:6, 74:8, 74:10, 92:24

**wrote** [1] - 20:5

**www.equipmentfacts.com** [1] - 43:10

## Y

**y'all's** [1] - 18:6

**year** [5] - 31:14, 115:15, 117:20, 117:21, 160:15

**years** [15] - 29:22, 101:21, 107:23, 138:2, 138:21, 139:24, 143:13, 149:2, 159:7, 162:9, 162:24, 163:10, 168:23, 206:17

**yell** [1] - 111:19

**youngest** [1] - 163:20

**yourself** [5] - 14:10, 79:6, 80:19, 134:19, 184:14

**YouTube** [2] - 51:19, 51:24

**yup** [13] - 7:16, 17:17, 26:25, 29:13, 38:23, 62:22, 71:4, 79:4, 140:10, 146:23, 164:6, 164:12, 180:25

## Z

**zero** [2] - 157:18, 171:19

**zip** [1] - 174:14