# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SANDHILLS GLOBAL, INC., <br><br> Plaintiffs, <br><br> v. <br><br> LAWRENCE GARAFOLA, individual, and FACTS TECHNOLOGY, LLC, a New Jersey limited liability company, <br><br> Defendants. | Civil Action No.: 3:19-cv-20669 |

---

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

**TRINITY & FARSIOU, LLC**
Steven D. Farsiou, Esq. (026442000)
47 Maple Ave., Suite 7
Flemington, NJ 08822
P: (908) 824-7265
F: (908) 968-3891
*Attorneys for Defendants, Lawrence Garafola and Facts Technology, LLC*

## PRELIMINARY STATEMENT

Plaintiff, Sandhills Global ("Sandhills"), has taken great liberties with the record evidence and even submits yet another Declaration of Evan Welch, which should be disregarded by the Court. A review of Sandhills' submission begs the question of what hearing did Sandhills' representative, Evan Welch, and its counsel attend? It certainly was not the two hearing dates of February 6 and 21, 2020. Sandhills' failure to acknowledge pertinent facts and its complete manipulation of the record evidence is alarming. Sandhills' entire case is purely smoke and mirrors based on the unsupported speculation of Mr. Welch. Sandhills has failed miserably to satisfy the requirements of Kos Pharms, Inc. v. Andrx Corp., 369 F.3d. 700, 708 (3d. Cir. 2004). If the Court entered a preliminary injunction on this record, the entire legal landscape regarding preliminary injunctions would be changed.

Sandhills' submission demonstrates the lengths it will go to financially ruin Defendant, Larry Garafola, and his business, Defendant, Facts Technology. Amazingly, Sandhills continues to argue that it lost customers, Permian International ("Permian") and Superior Auctioneers ("Superior). This is pure fiction and negated by not only Mr. Welch's own testimony but by the evidence – more specifically, the documents marked as D8, D9, D10, D11, the Certification of Eric Dyess of Permian and the Certification of Jim Richie of Superior. Sandhills cannot contest these crucial facts. These documents confirm that Permian and Superior both terminated their relationship with Sandhills because Sandhills' new platform, BidCaller, was terrible. In addition, both Mr. Dyess and Mr. Richie certify that Mr. Garafola did not cause them to terminate their relationship with Sandhills. No evidence was provided to prove that Sandhills lost **any** customers.

Moreover, Sandhills continues to argue that "goodwill" and its "reputation" have been damaged – with zero evidence to support this subjective and self-serving testimony of Mr. Welch.

Sandhills even continues to argue that Mr. Garafola misappropriated confidential information as "supported" by the cherry-picked emails in P7 through P17. Sandhills completely ignores the documents submitted by Defendants (D8 through D12 and D18) that completely contradict this position. These documents demonstrate Mr. Garafola was actively working on behalf of Sandhills. The top bidder information was specifically requested by Carson Schott, a Sandhills' manager, as supported by the July 16, 2019 (4:27 p.m.) email from Mr. Garafola to Mr. Schott highlighting the top bidders in the list that was at issue. In this regard, the self-serving allegation that Mr. Garafola intentionally destroyed proprietary evidence is both false and anti-climactic. The testimony states that the email with the bidder list was submitted to the Court and a "copy" of this document was discarded. As such, the information was provided after a review of an old phone based on the false testimony of Mr. Welch from February 6, 2020. Once Mr. Garafola found it, he provided it to counsel, and it was submitted to the Court. There is no evidence whatsoever that supports any destruction of evidence. Although it should be noted that destroying alleged "proprietary and confidential" information would satisfy the requirement of not having that information.

Sandhills' desperation is even more alarming in the self-serving manipulation of the evidence regarding its claim that the manuals, tutorials and other reference materials are confidential or proprietary. This demonstrates the complete lack of knowledge of Mr. Welch and Sandhills. These documents were initially provided by Bidpath since it was their software that auctioneers needed to learn how to use. Not only did Bidpath have these documents but so did auctioneers – a fact conceded by Mr. Welch. These documents are for the auctioneers and sales representatives to learn how to use the system. The tutorials are on the Equipmentfacts YouTube page. Why did Sandhills not reference D8, D9, D10, D11, D12 and D18 or attempt to explain them

away in their submission? The simple answer is that it makes their arguments not only meritless but transparently frivolous.

Furthermore, the new Declaration is a desperate attempt by Mr. Welch to try and rehabilitate his prior testimony that confirms Sandhills does not perform a true white label service. As will be described below, a white-label product is "a product or service produced by one company (the producer) that other companies (the marketers) rebrand to make it appear as if they had made it." See https://en.wikipedia.org/wiki/White-label_product. Sandhills does not and never has performed or permitted such a service. Sandhills may provide software but the customer is not permitted to brand it and all auctions must be run by Sandhills. Facts Technology is the complete opposite. Interestingly, for the very first time, Sandhills now starts to input "HiBid and AuctionFlex" except these two entities were not owned by Sandhills as proven by the record evidence. See D19, D20 and D21. The record evidence cannot rectify or rehabilitate Mr. Welch. He was not only not credible but the evidence did not support his testimony. He not only failed to answer questions but lied under oath several times. The Court must recognize the lack of credibility of Mr. Welch.

As has been demonstrated by the actual evidence, Sandhills has failed to prove any of the elements for a preliminary injunction. Its attempt to disguise its meritless money claims as an injunction should not be permitted by this Court.

3

## RESPONSE TO SANDHILLS PROPOSED FINDINGS OF FACT

With respect to Sandhills Proposed Findings of Fact, Defendants respond to the same below.

1.      The citation to this fact does not support what is contained in this paragraph. Mr. Welch testified as follows:

> Q:      And without going through it in entirety, what's **your understanding** of what that non-competition paragraph (Asset Purchase Agreement) paragraph is providing?
>
> A:      That Larry cannot compete with the business **that was being sold to Sandhills**.

(T1 29:10-19). (Emphasis Added). This testimony is significant as it demonstrates Mr. Welch's knowledge that the non-competition provision only pertained to the Equipmentfacts that was being sold to Sandhills. Sandhills' convenient position that their "brands" compete with Facts Technology is not supported by the evidence.

2.      Sandhills "brands" are not auction platforms. They are publications. Sandhills is taking the position that publications are equivalent to the platforms for auctions. In addition, Sandhills provided no testimony or evidence to demonstrate that these publications were separate platforms. In fact, Mr. Welch testified to the opposite.

> Q.      Okay. Now, with respect to -- I think you said Machinery Trader, you had that little PowerPoint presentation. Do you remember that?
>
> A.      Yes.
>
> Q.      Machinery Trader is a publication, isn't it?
>
> A.      Website, publication. It's all inclusive.
>
> Q.      Okay. It's a publication that would -- if I wanted to advertise a piece of equipment or something, I can put it into Machinery Trader, right?

A:      Online, as well as in print.

Q:      Okay. I'm just talking about, if, like, for example, Machinery Trader is not a platform, Machinery Trader is a publication, right?

A:      It's a platform. There's a website. It's a website and a publication.

Q:      Does Machinery Trader do auctions?

A:      Yes.

Q:      Through what?

A:      Through Equipmentfacts and through AuctionTime.

Q:      Does Machinery Facts (ph.) have its own platform besides Equipmentfacts?

A:      I don't know.

Q:      And that would be for the rest of the items that you had up on the screen, those are publications that you're saying, I guess, use the Equipmentfacts platform; is that what you're saying?

A:      Again, websites and publications.

(T2 93:1 to 94:4). This testimony confirms that the alleged brands in competition are not auction platforms. They are simply publications. Although Facts Technology stopped performing auctions altogether, it is clear that Facts Technology could perform auctions for the various platforms it has but not has not been utilizing. Furthermore, Sandhills has not provided any evidence as to when these "brands" were actually up and running on their website. Up until Mr. Garafola was terminated, these "brands" were not listed on Sandhills site.

3 -5.    The language in the agreements speak for themselves. However, the meaning and the conversations leading up to these agreements are disputed. Defendants have always contended that the non-competition clauses only pertained to the Equipmentfacts that was being purchased by

Sandhills. The Equipmentfacts that was sold pertained to an online auction platform for purposes of facilitating the sale of heavy construction equipment and trucks used in the agricultural industry.

In addition, the facts regarding the discussions leading up to the sale of Equipmentfacts is contested as the initial purchase price was not 1.24 million. No evidence other than Mr. Welch's self-serving testimony was provided to make this claim. As such, this is very much disputed.

Moreover, the claim that Mr. Garafola is a "sophisticated business owner" is self-serving. However, this would support the fact that the non-competition provisions apply only to the Equipmentfacts that was being sold, not the one now being manipulated by Sandhills.

6.     This fact confirms that Mr. Garafola understood the restrictions to only pertain to the Equipmentfacts business he sold.

7.     It is agreed that the final sale price was $1.5 million.

8.     As part of the lower sales price, Mr. Garafola was to be employed with Sandhills running Equipmentfacts with his employees in New Jersey like nothing changed. (T2 111:21 to 113:25).

9.     As stated in Defendants' response to No. 8, this is admitted based on the testimony contained in T2 111:21 to 113:25.

10.     This is a convoluted statement that provides no clarity or any evidence to support what is actually being deemed "sensitive" information. There is no evidence that Mr. Garafola accessed anything that was considered to be sensitive. The only documents presented or discussed by Sandhills were documents that were prepared by Mr. Garafola prior to the purchase, including manuals and tutorials which were initially created by Bidpath. (See P7 through P17). The Court is already aware of the documents that completely contradict Sandhills' position. (See D8 through D12). There was no testimony presented as to the other items listed in this proposed finding of

fact. In fact, Mr. Welch's testimony, as inconsistent as it was, confirms that the at least P11 through P17 were not proprietary and certainly not confidential. (See T2 41:1 to 55:6).

More importantly, the statement that Mr. Garafola "received the benefit of Sandhills' industry reputation and name with which he could and did expand Equipmentfacts' existing business and obtain new business" is just another self-serving conclusory statement with no evidence to support it. The real truth is that Sandhills used Mr. Garafola's reputation and experience to try and become a player in the online auction venue with respect to the sale of heavy construction equipment and trucks used in the agricultural industry. The citation to Mr. Garafola's testimony, T2 117:20 to 118:1, does not support any of the facts in this section.

11.    Once again, Sandhills simply makes a statement and does not provide any evidence to support it. There is no evidence before this Court that Mr. Garafola did anything improper with any alleged confidential information.

12- 15. This just simply regurgitates language in the documents. However, it does not provide the information from the employment agreement which was breached by Sandhills as noted in Defendants' Proposed Findings of Fact and Conclusions of Law.

16.    Mr. Welch's testimony was not remotely credible and contradicted the actual evidence. In addition, the negotiated employment agreement was essential and critical components to Mr. Garafola for the fear that he would be put in the exact position he is now. Sandhills has twisted the non-competition agreements to include auction services that Sandhills does not even perform in but more importantly, that are outside of what Equipmentfacts did.

17.    This fact is not supported by any evidence. In fact, Mr. Welch's testified as follows:

Q:    Okay. Sir, do you see the difference between just providing a
       software license and walking away?

A:    No. I see one as -- one, what they're doing is just providing a component of what we do. It's no different.

Q:    Mr. Garafola never did that when he was at Sandhills; isn't that correct?

A:    Never did what?

Q:    He never just provided a software license and walked away, right?

A:    **No, we chose not to charge that way**.

Q:    That's not what you hired him to do, right? You didn't hire Mr. Garafola to license software and then walk away? You wanted him to run the auctions?

A:    We hired him to help sell online auction services. No different than what he's doing today.

Q:    Well, no, you hired him for the heavy truck and machinery equipment, right?

A:    And related industries.

Q:    So I just want to make sure that I'm clear so that the judge understands too. The related industries is anything to do with online auctions?

A:    It's online auction services and related industries.

Q:    **Sir, do you know what that means?**

A:    **Yes.**

Q:    **Okay. What tell me what it means?**

A.    **It's industries related to the industries laid out in the agreement.**
Q:    **What's laid out in the agreement, what industries?**

A:    **The construction and truck.**

Q:    Well, if construction and truck -- well, that's what Equipmentfacts did, right?

A:    Part of, yes.

> Q:    Well, no. When Larry, Mr. Garafola, was purchased, that's what they did?
>
> A:    They'd also done other types of auctions as well.
>
> Q:    How do you know that?
>
> A:    I kept track of him. I've been in the business for 15 years. I've seen what he's done.
>
> Q:    Okay. You testified earlier that Sandhills wanted to get better in that area, right?
>
> A:    Yes.
>
> Q:    Okay. That's why you purchased Equipmentfacts, right?
>
> A:    One of the reasons, yes.

This confirms that the non-competition provisions pertained to the Equipmentfacts' business Sandhills purchased. It also confirms that Sandhills did not engage in white labeling services. Notwithstanding this, because of Sandhills' litigation for sport against Mr. Garafola, Mr. Garafola has not performed any auction platforms or services for months. He now wants to simply sell software licenses which is something that Sandhills does not do. (See T1 237:1-4; T2 92:22 to p. 93:2).

18.    The Employee Restrictive Covenant language speaks for itself. However, because Sandhills clearly breached the employment agreement, this provision would be of no force or effect based on Sandhills' unclean hands. (See P2).

19.    See response to No. 18. In addition, Sandhills has not lost one client because of Mr. Garafola.

20.    This is a very convenient fact since it now inputs "white labeling solutions," something that has never been mentioned by Sandhills during this entire injunction process. It is not even mentioned on its website. It was only brought up when Mr. Welch was cross-examined

by counsel. Mr. Welch's testimony confirms that Sandhills does not perform such a service. (See T1 237:1-4; T2 92:22 to p. 93:2). Mr. Welch confirmed it was never brought up. (See T1 177:4-9); (See also, Certification of Larry Garafola).

21.     This is a self-serving subjective definition that is made in an attempt to now prevent Mr. Garafola from earning a living by selling software licenses. Mr. Welch testified that Sandhills does not sell a software license to third-parties unless it runs the auction, unlike Facts Technology. Mr. Welch also testified that Sandhills does not utilize licensing software agreements with auction companies. (See T1 237:1-4; T2 92:22 to p. 93:2). Mr. Welch's self-proclaimed definition of white labeling is contradicted by what the actual definition is. (See Certification of Larry Garafola).

As stated above, a white-label product is "a product or service produced by one company (the producer) that other companies (the marketers) **rebrand to make it appear as if they had made it**." See en.wikipedia.org/wiki/White-label_product. (Emphasis Added). Forbes describes white labeling as "a fully supported product or service that's made by one company but sold by another. White label products and services **are purchased by the latter company without branding**. That way, the reseller can customize the product **with their own brand, logo and identity, allowing customers to associate the product with the reseller**. Meanwhile, the manufacturer can focus on finding cost-effective ways to make the product, without concern for the product's marketing." See, www.forbes.com/sites/theyec/2014/06/03/why-a-white-label-solution-is-easier-than-building-your-own/#599f0dbdd9e0. (Emphasis Added). Business.com describes white label as "product may be customized **with the branding of your choice**. So, instead of opening your business software **and seeing the logos and colors of the software company**, you (or your customers) **will see your company's logo and colors emblazoned on the product**." See, www.business.com/articles/white-label-software-app/. (Emphasis Added).

Business.com goes further and states, "some businesses prefer to white label the products their employees use to promote a cohesive and professional experience internally, but other software is white labeled for the benefit of the external client. Systems that process outside requests, e-commerce platforms and customer service apps are all frequently white labeled." Id. None of this applies to Sandhills and it is confirmed by Mr. Welch. Mr. Welch's certification is discussing auction services. White labeling has nothing to do with auction services. It has to do with branding – something completely omitted in the certification.

  As specifically defined, Sandhills does not perform white labeling services. At no point did Sandhills even contend they performed this service. (See T1 177:4-9). More importantly, Mr. Welch's refusal to answer the question as to branding should be telling to the Court. (See T1 176:1-21). Lastly, Sandhills would never provide a product to a third party and permit them to brand it themselves. Everything revolves around Sandhills. To even suggest otherwise is absurd. The inclusion of Hibid is also beyond misleading. Hibid was not owned (and is still not proven to be owned at this time) by Sandhills. (See D19, D20, D21).,

  22. This "proposed fact" has absolutely nothing to do with Mr. Garafola. Mr. Garafola is not even mentioned in this document. Moreover, Permian terminated its relationship with Sandhills in June 2019. This was based on the fact that the new Equipmentfacts platform had a lot of issues due to the Bidcaller software. This is all documented in D8, D9, D10 and D11. In fact, Mr. Dyess from Permian also used Proxibid for its auction in June 2019. (See D10 and D11). After that auction, Permian has been using Proxibid. (See Dyess Certification; see also, T1 211:19 to 212:5). Significantly, Sandhills conveniently did not provide D8 through D11 to the Court.

  23. Sandhills provided testimony as to this but did not provide any evidence of a forensic analysis.

24.     Sandhills provided one email exchange, noted in P6, which confirms a conversation about a potential business that Mr. Garafola was considering joining. No additional emails were provided and no evidence was provided to demonstrate that Mr. Garafola partnered with Bidpath. In fact, the evidence demonstrates that Mr. Garafola was actively working in the best interests of Sandhills. (See D8 through D12 and D18). If you place these documents in context with Sandhills' documents P7 through P17, the evidence is clear that Mr. Garafola was doing his job.

25.     The manipulation of the cherry-picked documents should be alarming to this Court, especially based on the documents provided by Defendants. The evidence confirms that Mr. Garafola did not use these documents for a nefarious purpose. In addition, P11 through P17 are not confidential or proprietary. Sandhills simply changes its position when it is convenient for them. The original argument was that the Mr. Garafola was using his personal email account to help Bidfacts. Now that Sandhills knows that Mr. Garafola never worked for Bidfacts, the new argument is that just by using his personal email, it is improper. No email policy was provided until after the hearing was closed. Now, Sandhills wants to supplement the record with an email policy. Notwithstanding this, a violation of some email policy by utilizing your personal email to perform work is completely different than using your personal email for nefarious reasons. The latter did not occur and no evidence supports any such contention. Furthermore, Sandhills did not submit any documents prior to April 2019 wherein Mr. Garafola utilized his gmail account. This was a known fact and not objected to at any time.

26.     The purchase price was $1.5 million. With respect to the "voluminous documents," they were so important that Sandhills did not even know they existed. It is undisputed that neither Mr. Garafola nor anyone else associated with Mr. Garafola downloaded any of these documents

from a Sandhills' directory. These were documents created, utilized and dispersed to auctioneers for years.

27.    This "fact" has no relevance to the issues before this Court. However, any contention that the dropbox utilized by Mr. Garafola was improper or not a Sandhills' dropbox, this is an outright false statement. The dropbox, as noted in P17, is the Equipmentfacts dropbox. If Mr. Garafola was using the dropbox for nefarious reasons, why would he use the Equipmentfacts dropbox? This is simply absurd. Mr. Welch testified as follows:

> Q:    Now, this Dropbox -- and I think there's another -- we'll get to it, but would you agree with me that this Dropbox was the equipmentfacts.com Dropbox?
>
> A:    Yes.
>
> Q:    Okay. And that was something that you knew about, right?
>
> A:    Yes.

(See T2 50:7-12).

28.    These contentions are simply a pure abuse of the record evidence. The Court cannot tolerate this type of conduct. The dropbox was an Equipmentfacts dropbox and Mr. Welch knew about it. There is no conduct that demonstrates Mr. Garafola did anything improper. Interestingly, Sandhills states that the dropbox was improperly used for nefarious conduct based on P6, July 5 email string. Why did Sandhills simply ignore the July 16, 2019 email wherein Mr. Garafola sends highlighted top bidders to Carson Schott, a manager at Sandhills? This demonstrates Mr. Garafola was actively working for Sandhills.

29.    This is another blatantly false assertion. There was no evidence provided that indicated that any computer was wiped or had mass deletions of files. In the first lawsuit entitled, Sandhills Global, Inc. v. Garafola, et. al., Docket No.: 3:19-cv-17225 (MAS)(TJB) ("Sandhills

13

1"), Sandhills submitted a declaration from a forensic IT person, Shawn Kasal. (See D14). Nothing in this declaration indicates that any computer was wiped. In fact, Mr. Kasal's declaration is solely about Larry Garafola Jr.'s computer. There is nothing in this declaration that states Mr. Garafola did anything improper.

30.     It is admitted that Sandhills terminated Mr. Garafola on August 7, 2019. This was an improper termination based on subjective thoughts. It is also a violation of the employment agreement.

31.      Mr. Garafola does not currently operate Facts Technology. He has stopped any work based on the current application before the Court. (See T2 154:22-24). In addition, Mr. Garafola has not revised his website to accurately reflect that his intentions are to simply provide a white label service, which is not an area that Sandhills conducts business. (See T2 154:25 to 157:22).

32.     These facts have no effect on the application before the Court.

33.     This fact has no effect on the application before the Court. Moreover, Mr. Garafola was only questioned as to the current composition of Facts Technology. To clarify, Mr. Garafola let employees go once the restraining order was filed. He is the only current person associated with Facts Technology. (See, Certification of Larry Garafola).

34.     This is false. Facts Technology does not provide any auction services based on the pending application. Mr. Garafola never testified that Facts Technology was a marketplace. However, it is clear that he could conduct auction services in the areas that he did not perform while at Sandhills. Facts Technology is simply looking to sell a white label service, something that Sandhills does not do. (See T2 154:25 to 157:22).

35.     The lengths that Sandhills will go to manipulate the true facts is alarming. None of these brands are active. In addition, none of them compete. See response to No. 2 above. (See T2 93:1 to 94:4). It should also be noted that Hibid is not owned by Sandhills. (See D19, D20 and D21). Again, Facts Technology is not performing any auction services.

36.     The testimony states that Facts Technology provides a white label solution.

37.     The record evidence does not support this fact. First, Hibid is not owned by Sandhills. (See D19, D20 and D21). Sandhills coyly states "Sandhills" instead of Hibid. This is done because Hibid is not owned by Sandhills. Second, Mr. Garafola testified that "Facts Technology is a white label solution. Something Equipmentfacts never did since its birth." (See T2 200:6-20).

38.     See response to No. 35. None of the brands are active and there are no intentions to perform auction services. As such, this is irrelevant and used to simply confuse the issues.

39.     This is not a fact. This is based on the beliefs of Mr. Welch. Notwithstanding this, Sandhills has not lost any business from these alleged solicitations.

40.     This is yet another manipulation of the record evidence. As stated above, no work is currently being done in any capacity due to this application. Defendants respond as follows:

a.     Mr. Garafola testified that he provided a white label service to Wolfe Industrial Auctions ("Wolfe"). The citation to the record also confirms that Wolfe is still a current client of Sandhills. This is not disputed. This also supports the fact that Facts Technology does not provide auction services.

b.     Mr. Garafola testified that he had conducted two auctions for Permian after being asked to do so. However, this was months ago and no other auctions were done. He testified as follows:

Q:     You didn't do -- Permian didn't come to you immediately when they left Sandhills, right?

A:     No.

Q:     You did do an auction for them, right?

A:     After they used another -- two other providers, yes.

Q:     They came to you and they wanted you to do an Oil Field Auction, correct?

A:     Correct.

Q:     And that was the one auction that you did?

A:     I think I did two to be honest with you.

Q:     So you did two auctions? Did you do anything else?

A:     No.

Q:     And you haven't done anything since, right?

A:     No.

Q:     Okay. And you're not here to say that you didn't do any of that stuff because you did it and you thought you could do it, right?

A:     I thought it was outside -- I mean, you have Sandhills with a publication for equipment, a publication for trucks, a publication for oil field or a digital publication. In my -- in my conversations with attorneys, in my observations, I felt that I could do Collector Car Auctions. I could do Collectible Auctions. I could do Oil Field Auctions. These are all different auction industries. And I've been in this auction industry for over 25 years. I pretty much know what the industries are.

Q:     And you heard that -- you just said that you can't even sell beef. Do you remember you said that?

A:     Yes.

> Q:   Do you think that Sandhills is trying to prevent you from working in areas that they don't do auctions in?
>
> A:   Absolutely.

(See T2 158:8 to 159:15).

      c.   Mr. Garafola testified that he did one auction for Vicari months ago as follows:

> Q:   Collector Car Auction for Permian, right?
>
> A:   No, I did a Collector Car Auction for Vicari under collectorcarfacts.com, which was a domain that I own, and I did not sell it to Sandhills.
>
> Q:   Okay. Did Equipmentfacts do that when you were at Equipmentfacts under Sandhills?
>
> A:   No.

(See T2 146:6-12). Notably, Collectorcarfacts.com was not a part of the purchase of Equipmentfacts.

      d.   Mr. Garafola testified he provided a white label service to Iron Auction Group ("Iron"). There is no evidence that Iron does not still use Sandhills.

    41.   This is another blatant disregard for the truth and record evidence. This is a knowingly false statement. Sandhills cites to the speculative testimony of Mr. Welch which is not supported by any record evidence. The documents produced by Defendants confirm that Sandhills did not lost the Permian and Superior accounts because of Mr. Garafola – far from it. (See D8, D9, D10, D11, Certification of Mr. Dyess and Certification of Richie – D15). D10 negates Sandhills' contention. As previously cited, on June 7, 2019, Mr. Dyess sent an email to Mr. Garafola wherein he advised of the issues with the new platform and his issues with Sandhills. He specifically states, in pertinent part:

My biggest complaint is that we signed up for Equipmentfacts because it was a platform that fit our needs, was easy to use and quite honestly you made it easy for us. I feel like we have been forced into this Bidcaller platform that doesn't fit how we write catalog and its all about making Sandhills' websites more searchable and driving traffic to their websites which I could careless (sp) about. This battle over how we write oilfield and related equipment **started last year when we let Sandhills build us a website which was just really links to bidcaller and auctiontime with the same issues it looks like we are facing now**. We wound up moving our website because we were being forced to call well service rigs drilling rigs . . . I get what their goal is and its sounds good sitting in a computer lab while developing these programs but it isn't reality on a 75% of the stuff we sell.

Last time we talked you told me to continue to go through Ryan at your office. We tried and Ryan routed Cali back to Sydney. **With our sale fast approaching and our confidence shaken we decided to allow Proxibid to also attend this upcoming sale.** Can you tell me the range of bidder numbers you guys use with the new platform so we do not have any overlap?

**Just to give you a heads up, Gary Bergman (Superior) and I have talked and I know they share the same concerns about the future of Equipmentfacts and were (sp) Sandhills is taking it.**

(See D10) (Emphasis Added). Sandhills cannot with a straight face state that they lost Permian or Superior because of Mr. Garafola.

42.     This is yet another blatant manipulation. First, Durable Undercarriage is still a customer of Sandhills. Second, the contact made by Mr. Garafola was not for auction services. It was for the selling of a piece of equipment.

43.     Sandhills provided zero evidence of any "irreparable harm." When asked "[h]ave you lost anything other than the revenue that was generated from those accounts," Mr. Welch testified, "[i]t's hard to know what all we lost." (T1 138:4-7). Mr. Welch also testified that he has no evidence to support anybody stating that Sandhills' reputation was damaged because of Mr. Garafola. (T1 213:16 to 214:13). There is also zero evidence that any of the documents submitted by Sandhills (P7 – P17) were provided to any third-party, who would otherwise not already have

them in their possession. It is laughable since the documents incorporated the Bidpath software so (1) Bidpath already had these documents, (2) auctioneers had these documents and (3) none of these documents contain confidential information.

With respect to the absolute false contention that Mr. Garafola misused the "TOP BIDDERS" list, this is negated by Mr. Garafola's email to Mr. Schott on July 16, 2019. (See D12). Moreover, the contention that Mr. Garafola destroyed confidential and proprietary evidence is false and counterproductive. Mr. Garafola submitted D12 after turning on an old phone. This list was submitted to the Court since Sandhills conveniently failed to produce it. Moreover, the citation to Mr. Garafola testimony confirms that he provided the "TOP BIDDERS" email and destroyed a copy of the same document. Additionally, even if proprietary information was destroyed, which it was not, isn't that a good thing for Sandhills?

## LEGAL ARGUMENT

## POINT I

## SANDHILLS HAS FAILED MISERABLY TO SATISFY THE STRICT STANDARD FOR A PRELIMINARY INJUNCTION TO BE ISSUED

As the Court is well aware, preliminary injunctive relief is an extraordinary remedy that should only be granted in limited circumstances. Frank's GMC Truck Ctr., Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988); Genovese Drug Stores, Inc. v. TGC Stores, Inc., 939 F. Supp. 340, 343-44 (D.N.J. 1996). In addition, a preliminary injunction can only be granted when the moving party meets all four of the required elements by clear and convincing evidence: (1) the likelihood that the plaintiff will prevail on the merits at the final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. Kos Pharms, Inc. v. Andrx Corp., 369 F.3d. 700, 708 (3d. Cir. 2004); see also, Duraco

Prods., Inc. v. Joy Plastic Enters., Ltd., 40 F.3d 1431, 1438 (3d. Cir. 1994). Now that the Court has had the opportunity to hear the actual evidence through testimony, it is not only clear that Sandhills fails miserably to satisfy its burden but it is also clear that Sandhills' application is frivolous. This should not be lost on the Court as Mr. Garafola does not have the financial resources as the well-funded Sandhills.

A district court's analysis of each of the above factors must not be perfunctory; each injunction factor requires rigorous analysis. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008). In conducting this analysis, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Id. at 377.

A.      **Likelihood Of Prevailing On The Merits At The Final Hearing**

The evidence at the hearing demonstrated that Sandhills' entire case is based on pure speculation. To be clear, although the cherry-picked documents submitted by Sandhills seemed to paint a picture of someone who was committing nefarious conduct, this was all negated by the documents that Sandhills did not present that put the situation in context. Sandhills spends the majority of its brief discussing conduct that occurred months ago. This conduct did not violate the restrictive covenants but even if the Court believed it did, it is moot. Mr. Garafola is seeking to simply provide a white label service as to software programs, something Sandhills does not do.

1.      **Tortious Interference with Prospective Economic Advantage**

Even more alarming is Sandhills' blatant false contentions that Defendants tortuously interfered with some prospective economic advantage. As cited by Sandhills, such a claim requires Sandhills to provide evidence that demonstrates (1) a reasonable expectation of economic advantage, (2) that was lost as a direct result of Defendants' malicious interference and (3) that

Sandhills suffered losses from this conduct. No evidence was presented that Sandhills lost any clients because of Defendants. Mr. Welch confirmed this crucial fact. He testified:

> Q:  And again, you haven't lost any customers other than what you just testified to (Permian and Superior)?
>
> A:  Not that I'm aware of.

(See T1 155:2-10). This testimony is in direct contradiction to Mr. Dyess' emails marked as D8 through D11 and his Certification. In addition, Mr. Welch testified that Permian did not leave Sandhills and go directly to Facts Technology. He admitted that Permian went to Proxibid as outlined in D8 through D11. (See also, T1 211:19 to 213:22). Moreover, Jim Richie, one of the owners of Superior, submitted a Certification that contradicts Mr. Welch's testimony. (See D15). When asked "[h]ave you lost anything other than the revenue that was generated from those accounts," Mr. Welch testified, "[i]t's hard to know what all we lost." (See T1 138:4-7). He also testified that he has no evidence to support anybody stating that Sandhills' reputation was damaged because Garafola. T1 213:16 to 214:13).

Not only does this actual evidence end the preliminary injunction analysis, it demonstrates the frivolous nature of the application before this Court.

## 2.  <u>Misappropriation of Trade Secrets</u>

Sandhills claims that Mr. Garafola misappropriated trade secrets. However, the evidence completely contradicts this. The only evidence submitted in support were documents P7 through P17. Once documents were provided to put these documents into context, it demonstrated that Mr. Garafola was actively working for Sandhills. In addition, none of the documents were trade secrets or proprietary information.

**B.**     <u>**Irreparable Harm - Sandhills**</u>

Defendants will rely on its initial brief and the testimony from Mr. Welch cited above. No such harm has been established and no such harm is even contemplated. Sandhills lost clients because of their own doing as demonstrated in documents D8 through D12, Certification of Dyess and Certification of Richie. Lastly, the desperate argument that the contract states irreparable harm occurred is one-sided. Defendants contest this and the evidence contradicts Sandhills' position.

**C.**     <u>**Irreparable Harm - Defendants**</u>

The irreparable harm is immense and favors Defendants in this balancing test the Court must analyze – it is not even close. If Sandhills obtains the injunctive relief it seeks, Mr. Garafola will not only not be able to provide for his family but he will be submerged with attorneys' fees and costs. Sandhills has deep pockets and can withstand litigation. Mr. Garafola cannot and must be able to make a living. Sandhills has provided zero evidence to this Court to grant its application. Precluding Garafola from participating in his business that does not compete with Sandhills does not serve the public interest, and the balance of harms heavily weigh in his favor. To find to the contrary would infringe on Mr. Garafola's ability to participate in the market, a market in which Plaintiff is not engaged.

**D.**     <u>**Public Interest**</u>

Any decision that enjoins Defendants based on this record would not only harm the public but embolden billion-dollar companies like Sandhills to file litigation for sport to pulverize smaller businesses and individuals. The evidence in this case demonstrates Sandhills deliberately (1) dumped 596 documents on the eve of the February 6, 2020 hearing – documents that were in its possession since August 2019, (2) misled this Court by failing to provide all of the relevant documents because these documents refuted their case, (3) manipulating the 596 documents by

cherry-picking the ones that placed Mr. Garafola in a false light, and (4) misled the Court by providing false testimony as to what actually occurred. These actions cannot be overlooked nor can they be rewarded by this Court.

**E.**     **Injunction Bond and Costs**

Based on the above and based on what the Court witnessed, this Court must order Sandhills to pay Defendants for all attorneys' fees, costs and damages incurred based on its frivolous injunction application. As the Court is aware, an injunction bond was ordered in the amount of $10,000 to award damages to Defendants should the injunction not be granted. Unfortunately, Defendants' attorneys' fees, costs and damages are well more than $10,000.

**POINT II**

**NOTWITHSTANDING THE FACT THAT SANDHILLS HAS NOT MET ITS BURDEN FOR A PRELIMINARY INJUNCTION TO BE ISSUED, IF ANY RESTRICTION IS ISSUED CANNOT BE BROADER THAN NECESSARY**

It is well-established that an injunction must not only meet the specificity requirements set forth in Rule 65(d), it also cannot be broader than necessary to restrain the unlawful conduct." Educ. Testing Servs. v. Katzman, 793 F.2d. 533, 545 (3d. Cir. 1986) (excising words from paragraph of injunction where relief granted was "broader than that to which the party is entitled"); accord Bosworth v. Ehrenreich, 823 F. Supp. 1175, 1183 (D.N.J. 1993); see also, U-Save Auto Rental of Am., Inc. v. Moses, 80 F. App'x 929, 930 (5th Cir. 2003) (vacating injunction that prohibited defendant from "contacting customers expressly excluded from the scope of the non-compete clause," and stating that "[i]njunctions must be narrowly drawn and precise. Injunctive relief should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Califano v. Yamasaki, 442 U.S. 682, 701 (1979); accord Ameron, Inc. v. U.S. Army Corps of Eng'rs, 797 F.2d 875, 887-88 (3d. Cir. 1986).

23

To the extent any injunction is issued, the only area of business should be conducting online auction services as it relates to Equipmentfacts as it was run by Mr. Garafola. The other "brands" claimed by Sandhills are not auction platforms, they are publications. However, Sandhills should not be permitted any injunction as it has not met all of the required elements.

## **CONCLUSION**

Defendants rely on all submissions with respect to the temporary restraining order and the preliminary injunction applications in this case. For the foregoing reasons, the Defendants respectfully request that the Court deny Sandhills' application for a preliminary injunction and require Sandhills to pay Defendants' lost income, attorneys' fees and costs for defending this frivolous injunction application. The testimony overwhelming supports the baselessness of the application.

Respectfully submitted,

*/s/ Steven D. Farsiou*

STEVEN D. FARSIOU