## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SANDHILLS GLOBAL, INC.,

        *Plaintiff,*

        v.

LAWRENCE GARAFOLA, et al.,

        *Defendants.*

Civil Action No. 19-20669 (MAS) (TJB)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

      This matter comes before the Court upon Plaintiff Sandhills Global, Inc.'s ("Plaintiff" or "Sandhills") Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction, seeking to restrain Defendants Lawrence Garafola ("Garafola") and Facts Technology, LLC ("Facts Technology") (collectively, "Defendants"). (ECF No. 3.) On December 16, 2019, the Court issued temporary restraints against Garafola, pending a preliminary injunction hearing. (ECF No. 23.) Plaintiff filed a pre-hearing brief (ECF No. 33); Defendants filed opposition (ECF No. 35); and Plaintiff replied (ECF No. 39). On February 6, 2020 and February 21, 2020, the Court held an evidentiary hearing. The Court received documentary exhibits and heard live testimony from two witnesses: Evan Welch, Sandhills's Director of New Product Sales, and Garafola. Both witnesses were cross-examined. Following the hearing, the parties submitted proposed findings of fact and conclusions of law (ECF Nos. 53, 54), oppositions (ECF Nos. 58, 59), and additional witness certifications (ECF Nos. 54-1, 59-1). The Motion was fully briefed on March 12, 2020. After careful consideration and for the reasons set forth below, the Court finds that Sandhills has

met its burden of showing that injunctive relief is warranted, although not to the extent requested. Subject to the Court's "blue pencil" modifications to the parties' agreements, Sandhills's Motion for a Preliminary Injunction will be granted.

## I.   FINDINGS OF FACT[1]

The following facts are supported by the record.

### A.   Sandhills's Acquisition of Equipmentfacts

1.   Sandhills is a Nevada corporation with a diverse range of products and services. (APA 2; Ex. D-5 ¶ 3.)

---

[1] The Court's Findings of Fact refers to various record items, abbreviated as follows:

> APA = Asset Purchase Agreement dated July 16, 2018, Ex. P-2; *see also* Ex. A to Farsiou Cert., ECF No. 35-1 at *5–35.
> APARC = Noncompetition, Noninterference and Confidentiality Agreement dated July 16, 2018, Ex. P-3; *see also* Ex. B to Farsiou Cert., ECF No. 35-1 at *37–44.
> Compl. = Verified Compl., ECF No. 1.
> Defs.' Opp'n Br. = Defendants' Pre-hearing Brief, ECF No. 35.
> DFF = Defendants' Proposed Findings of Fact and Conclusions of Law, ECF No. 53.
> DRPFF = Defendants' Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF No. 59.
> EA = Employment Agreement dated July 16, 2018, Ex. D-1; *see also* Ex. C to Farsiou Cert., ECF No. 35-1 at *46–54.
> EARC = Employee Proprietary Information, Inventions and Non[-]solicitation Agreement dated July 13, 2018, Ex. P-4; *see also* Ex. D to Farsiou Cert., ECF No. 35-1 at *56–62.
> Ex. D - __ = Defendants' Exhibit entered into evidence at the preliminary injunction hearing held February 6, 2020 and February 21, 2020.
> Ex. P - __ = Plaintiff's Exhibit entered into evidence at the preliminary injunction hearing held February 6, 2020 and February 21, 2020.
> Garafola Cert. = Certification of Larry Garafola dated March 12, 2020 submitted in support of DRPFF, Ex. A to Farsiou Cert., ECF No. 59-1 at *4–13.
> PFF = Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF No. 54.
> Pl.'s Moving Br. = Plaintiff's Pre-hearing Brief, ECF No. 33.
> PRDFF = Plaintiff's Response to Defendants' Proposed Findings of Fact and Conclusions of Law, ECF No. 58.

2.      Sandhills operated a simulcast auction webcast service called Bidcaller (Exs. P-20 ¶¶ 4–5; P-21 ¶ 3; Tr. I 15:20–21) and a timed auction service called AuctionTime (Tr. I 13:19–21).

3.      Beginning in and around 2001, Garafola was the sole owner and the Chief Executive Officer ("CEO") of Equipmentfacts LLC ("Equipmentfacts"), a New Jersey limited liability company. (EA 1.)

4.      In July 2017, Evan Welch ("Welch"), Sandhills's Director of New Product Sales, began negotiating the purchase of Equipmentfacts from Garafola. (Tr. I 17:1–20.)

5.      Sandhills's initial purchase offer was approximately $1.23 million. (Tr. I 18:8.)

6.      On April 25, 2018, the parties executed a Letter of Intent setting forth the preliminary terms and conditions for Sandhills's purchase of Equipmentfacts. (Tr. I 17:15–21:22; *see also* APA § 6.7.)

7.      On July 16, 2018, Sandhills purchased Equipmentfacts for $1.5 million (the "Acquisition"), and Sandhills and Garafola entered into an Asset Purchase Agreement (the "APA"). (APA §§ 1.6, 2.)

8.      Sandhills and Garafola contemporaneously entered into: (1) a Noncompetition, Noninterference and Confidentiality Agreement (the "APA Restrictive Covenant"); (2) an Employment Agreement (the "EA"); and (3) an Employee Proprietary Information, Inventions and Non[-]solicitation Agreement (the "EA Restrictive Covenant"). (APARC; EA; EARC.)

---

Tr. I = Transcript of February 6, 2020 Preliminary Injunction Hearing, ECF No. 56.
Tr. II = Transcript of February 21, 2020 Preliminary Injunction Hearing, ECF No. 57.
TRO = Dec. 16, 2019 Letter Opinion and Order, ECF No. 23.
TRO Hr'g Tr = Transcript of December 11, 2019 Oral Argument on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 55.
Welch Decl. = Declaration of Evan Welch dated March 3, 2020 submitted in support of PFF, Ex. A to Miller Cert., ECF No. 54-1 at *4–6.

9.    Both parties were represented by counsel in their negotiations of the APA and the APA

Restrictive Covenant. (APA 24–25; APARC 4–5.)

10.    At the time of the Acquisition, Equipmentfacts used Bidpath software. (Tr. I 217:24-25.)

11.    Sandhills purchased Equipmentfacts for the purpose of replacing Sandhills's Bidcaller.

(*See* Exs. P-20 ¶¶ 4–5; P-21 ¶ 3; Tr. I 218:4–7.)

### B.    The Asset Purchase Agreement and the Ancillary Restrictive Covenant

12.    Under the APA, Sandhills acquired substantially all assets of Equipmentfacts, including:

> (b) All Intellectual Property of [Equipmentfacts], . . .
> (c) All rights to and under all customer contracts and purchase orders
> . . .
> . . .
>
> (i) *All books, records, and other documents*, including fixed asset records, sales and advertising materials (including all price lists, customer lists, bidder lists, auctioneer lists, and any related lists and records), copies of . . . technical research and data, books of account and records, ledgers, files, correspondence, specifications, creative materials, studies, reports and other items only to the extent they relate to the Business or the Included Assets . . .
> . . .
>
> (j) All goodwill of [Equipmentfacts], including the names "Equipmentfacts", "Relaybid", "Auction Facts Monthly" and any other trade names and any derivations or combinations thereof[,]
> . . .
>
> (l) To the extent not otherwise included in this Section . . ., all other assets of [Equipmentfacts] of every kind, character, nature and description, whether tangible or intangible, choate or inchoate, corporeal or incorporeal, matured or unmatured, known or unknown, contingent or fixed, required for, used in, held for use in or otherwise constituting the Business.

(APA § 1.1.)

13.    Under the APA, Equipmentfacts's "Business" is defined as "the business of providing

online auction solutions for the heavy equipment, truck, agriculture[,] and related auction

industries, including providing industry-specific online bidding systems, websites for virtual

attendance at auctions, the 'Auction Facts Monthly' publication, third-party advertisement services and podcast content[.]" (APA 2; *see also* APA § 7.1(f).)

14.    The APA and the APA Restrictive Covenant are separate documents and together constitute the Acquisition agreement. (*See* APA; APARC.)

15.    The parties contemplated the APA Restrictive Covenant as a condition of the APA. (APARC 1; *see also* Tr. I 36:14–37:3; Tr. II 202:2-20.)

16.    At the time of the Acquisition, Sandhills and Garafola "agree[d] that the goodwill of [Equipmentfacts] [was] an integral component of the assets being acquired pursuant to the [APA] and without such goodwill the value of the assets of [Equipmentfacts] [would] be greatly diminished and [Sandhills's] reasons for entering into the [APA] and completing the Acquisition [would] be extinguished." (APARC 1; *see also* Tr. I 140:1–8.)

17.    The APA Restrictive Covenant contains noncompetition, non-solicitation, and noninterference provisions which are effective for a period of five consecutive years from July 16, 2018. (*See* APARC §§ 1–5.)

18.    The APA Restrictive Covenant restrains Garafola's conduct within the United States of America. (APARC § 1.)

19.    The APA Restrictive Covenant defines "Restrictive Period," "Party" or "Parties," and "Territory." (APARC § 1.)

20.    "[A]ll other capitalized terms used in [the APA Restrictive Covenant], but not otherwise defined in [the] Agreement, shall have the meanings ascribed to them in the [APA]." (APARC § 1.)

21.    The "Business" of "Sandhills and its Affiliates" is not defined in the APA Restrictive Covenant. (*See supra* Findings of Fact ¶¶ 18–20.)

22.     The APA Restrictive Covenant's noncompetition clause provides that

>       [Garafola] shall not . . . directly or indirectly . . . provide or perform services for the benefit of, manage, operate, or in any way participate in, a business that competes with the Business (as conducted by [Sandhills] or its Affiliates), either on [Garafola's] own behalf or on behalf of any other Person; or acquire a financial interest in, own or control any business that competes with the Business . . . .

(APARC § 2.)

23.     The APA Restrictive Covenant's non-solicitation clause provides that "Garafola shall not . . . directly or indirectly solicit for [Garafola] or any other Person, business which is competitive with the Business from any customers, clients[,] or accounts of the Business as conducted by [Sandhills] or its Affiliates." (APARC § 3.)

24.     The APA Restrictive Covenant's noninterference clause provides that:

>       [Garafola] shall not . . . directly or indirectly:
>               a. encourage, in any way or for any reason, any customer, client[,] or account of [Sandhills] or its Affiliates, to sever or alter the relationship of such customer, client[,] or account with [Sandhills] or its Affiliates;
>               b. discourage . . . any prospective customers, clients[,] or accounts of [Sandhills] or its Affiliates from becoming a customer, client[,] or account of [Sandhills] or its Affiliates;
>               c. aid any other Person attempting to take customers, clients[,] or accounts in relation to the Business from [Sandhills] or its Affiliates.
>               . . . .

(APARC § 5.)

### C.      The Employment Agreement and Corresponding Restrictive Covenant

25.     Garafola and Sandhills also agreed that Garafola would join Sandhills as an employee. The parties entered into the EA. (EA 1; TI 156:24-157:1; *see also* DRPFF ¶ 15.)

26.     Under the EA, Garafola was to work for Sandhills as the full-time Manager of Auction Services and report to Sandhills's Director of New Products. (EA §§ 3–4.)

27. The EA states that "[a] job description of [Garafola's position] is attached hereto as Schedule A and made a part hereof." (EA § 3.)

28. Garafola's annual base salary was $170,000. (EA § 5.)

29. The EA was to "continue uninterrupted for a period of two (2) years." (EA § 2.)

30. The EA and the EA Restrictive Covenant are separate documents and together constitute the agreement on Garafola's employment with Sandhills. (*See* EA; EARC.)

31. Only if the EA was terminated due to "[t]he cessation of [Sandhills's] business, [Sandhills's] BidCaller division, or any business transferred pursuant to the Transaction" would Garafola be released from the EA Restrictive Covenant. (EA § 2.c.)

32. The EA Restrictive Covenant's nondisclosure clause provides, "[a]t all times during [his] employment and thereafter, [Garafola] . . . will not discuss, disclose, use[,] or publish any of [Sandhills's] Proprietary Information (defined [in § 1.2]), except as such discuss[ion], disclosure, use[,] or publication may be required in connection with [his] work for [Sandhills]." (EARC § 1.1.)

33. The EA Restrictive Covenant defines "Proprietary Information" as:

> any and all confidential and/or proprietary knowledge, data or nonpublic information of [Sandhills], its affiliates and subsidiaries . . . [and] includes
> (a) trade secrets, . . . data, databases, programs, other works of authorship, know-how, improvements, discoveries, developments, designs[,] and techniques (hereinafter[,] collectively[,] referred to as "Inventions"); and
> (b) information regarding . . . marketing and selling, business plans, . . . prices and costs, suppliers, customers, customer sales information, customer representatives[,] and customer contact information. Notwithstanding the foregoing, it is understood that, at all such times, [Garafola is] free to use information which is generally known in the trade or industry, which is not gained as a result of a breach of this Agreement or any other contractual obligations [Garafola] may have, and [his] own, skill, knowledge, know-how and experience to whatever extent and in whichever way [he] wish[es].

(EARC § 1.2.)

34.     Upon leaving the employ of Sandhills, Garafola was required to "immediately deliver to [Sandhills] any and all . . . material containing or disclosing any [Sandhills] Inventions . . . or Proprietary Information of [Sandhills], its affiliates or subsidiaries." (EARC § 8.)

35.     Under the EA Restrictive Covenant's noncompetition clause, Garafola agreed that

> during [his] employment by [Sandhills] and for eighteen (18) months after the date [his] employment with [Sandhills] ends for any or no reason . . . (the "Termination Date"), [Garafola] will not, except in the course of performing [his] duties on behalf of [Sandhills], directly or through others, be involved as an owner, partner, . . . agent . . . of any business engaged in the Restricted Business within the Restricted Area to the extent such involvement would involve [his] provision of products or performance of services of the type [Garafola] conducted, authorized, offered, or provided while working on behalf of [Sandhills] during the twenty-four (24) month period prior to the Termination Date.

(EARC § 5.)

36.     Under the EA Restrictive Covenant. "Restricted Business" is defined as "the business of providing an online auction platform or online auction services for the purpose of facilitating the sale of equipment or machinery that is used in the agriculture or construction industries in a manner that competes with [Sandhills]." (EARC § 5.)

37.     Under the EA Restrictive Covenant, "Restrictive Area" is defined as "each State, within the United States, in which [Sandhills] or Equipmentfacts has engaged in the Restrictive Business during the twenty-four (24) month period prior to the Termination Date." (EARC § 5.)

38.     Under the EA Restrictive Covenant's non-solicitation clause, Garafola agreed that

> during [his] employment by [Sandhills] and for eighteen (18)
> months after the Termination Date, [he] will not solicit, do business
> with, or accept or aid in the provision of products or services to any
> customers of [Sandhills], its affiliates and subsidiaries with whom
> [he] had personal contact and actually did business with in the
> course of [his] employment with [Sandhills] (or in [his] performance
> of work for any affiliate or subsidiary of [Sandhills]) during [his]
> employment with [Sandhills] at any time during the four (4) years
> period immediately preceding the Termination Date.

(EARC § 6.)

### D.     Garafola's Employment with Sandhills and Subsequent Termination

39.     Following the Acquisition, on July 16, 2018, Garafola became a Sandhills employee, responsible for running Equipmentfacts and managing Sandhills's New Jersey office. (Tr. I 216:14–24; *see also* EA 1.)

40.     Garafola also managed former Equipmentfacts employees who joined Sandhills with him, including Marlene Greene ("Greene") and Ryan Jacobi ("Jacobi"). (Tr. I 42:15–21, 62:21–24, 216:17–18.)

41.     As a part of his employment with Sandhills, Garafola was given access to Sandhills's confidential and proprietary information such as Sandhills's pricing schedules, business strategies, customer lists, bidder lists, and auctioneer lists. (Tr. I 35:15–19; *see also* EA ¶ 7.)

42.     At some point during Garafola's employment, Sandhills decided to stop using Bidpath and instead start using Bidcaller to run Equipmentfacts. (Tr. I 100:23–101:3.)

43.     On May 18, 2019, Garafola complained to Welch and another Sandhills Manager, Carson Schott ("Schott"), about a customer's auction and how it should have been conducted remotely. (Ex. D-6; Tr. I 193:25–194:3.)

44.     On May 23, 2019, Garafola requested from Greene a list of the "top five auctioneers that had the highest revenue[ since July.]" (Ex. P-8.) That same day, Greene provided Garafola with a list of auctioneers, sales, and commissions from July 15, 2018. (*Id.*)

45.     On May 24, 2019, Garafola complained to Welch and Schott that they made changes to Equipmentfacts without experience in the business. (Ex. D-7.)

46.     On several instances between May and June 2019, Permian International Energy Services, LLC ("Permian") complained to Garafola about Sandhills's move to the Bidcaller platform. (Exs. D-8 to D-11.)

47.     On June 11, 2019, Garafola forwarded to his personal e-mail account a spreadsheet entitled "Oilbidders", which listed company names, bidder numbers, passwords, e-mail addresses, contacts' first and last names, phone numbers, states, and zip codes. (Ex. P-7.)

48.     At some point in June 2019, Greene voluntarily resigned from her position at Sandhills. (Tr. I 42:19–25.)

49.     On June 14, 2019, Garafola forwarded to his personal e-mail account Greene's May 23 message, which contained the list of auctioneers, sales, and commissions from July 15, 2018. (Ex. P-8; *see supra* Findings of Fact ¶ 44.)

50.     On June 16, 2019, Garafola forwarded to his and his wife's personal e-mail accounts a spreadsheet entitled "Equipmentfacts, LLC TOP BIDDERS 2017 to present." (Exs. P-9, P-10; Tr. II 203:12–14.) The spreadsheet ranked 500 bidders and provided their bidder numbers, names, and sales. (Exs. P-9, P-10.)

51.     On June 18, 2019, Jacobi forwarded Garafola a sample "Welcome to Equipmentfacts" e-mail message in .docx format and "accompanying attachments." Garafola forwarded to his

personal e-mail account Jacobi's message. The accompanying attachments were various Equipmentfacts templates, manuals, and how-to guides. (Ex. P-11.)

52.     On July 5, 2019, Garafola, through his personal e-mail account, corresponded with Greene and David Brindley ("Brindley") of Bidpath.com. Garafola notified them that his attorney, after reviewing the "non competes and [Acquisition] agreement[,]" "feels confident that [he] can start a competing business like [Sandhills's] AuctionTime." (Ex. P-6.) Greene responded on July 5, "Great news[,] boss." (*Id.*) Brindley responded on July 7 with updates on BidFacts LLC:

> BidFacts LLC is in place as of July 3rd.
> The Bank account should be finalized early this week.
> We will then link Quickbooks Online (as we both use this) to both
> the company/bank account and then we can get shared access when
> the time is right to do so. I will take care of getting us to that point.

(*Id.*)

53.     On July 16, 2019, Garafola forwarded Schott a version of the "Equipmentfacts, LLC TOP BIDDERS 2017 to present" spreadsheet with certain "top bidders" highlighted. (Ex. D-12.)

54.     On July 25, 2019, Jacobi forwarded Garafola additional Equipmentfacts manuals in .docx format and a Dropbox link to download Equipmentfacts's video tutorials. (Exs. P-12, P-13.) The titles of the copyrighted manuals included: "How to create a timed auction"; "How to create invoices"; "How to generate reports"; "How to manage your bidders"; "How to set up for a remote broadcast"; "How to upload your photographs"; "How to upload your sale day catalog"; and "How to create a live auction". (*Id.*)

55.     On July 25, 2019, Jacobi forwarded to Garafola's personal e-mail account a zip file of Equipmentfacts's PowerPoint presentations, which included ones on "Remote broadcast setup" and "How the auctioneer pop up projector functions". (Ex. P-14.)

56.     On July 25, 2019, Jacobi forwarded to Garafola's personal e-mail account "some more reference materials." (Ex. P-15.) The materials included an "Equipmentfacts 3.0 creating and

uploading live auctions" manual and a copyrighted Equipmentfacts manual entitled "How to upload your photographs". (Ex. P-15.)

57.     On July 30, 2019, Greene, on behalf of "BidFacts.com, an online provider company for [h]eavy [e]quipment, [t]rucks, [t]railers, [o]ilfield [e]quipment[,]" distributed an "Auction Announcement" "for Permian International's next sale on August 8th." (Ex. P-5.)

58.     Sandhills became aware of Greene's July 30 e-mail message and started investigating the Equipmentfacts employees in the New Jersey office. (Tr. I 41:18–43:6; Ex. P-5.) The investigation included e-mail message review and forensic analysis of electronic devices issued to the employees. (Tr. I 43:7–44:18.)

59.     From the investigation, Sandhills discovered the aforementioned e-mail messages involving Garafola (Tr. I 46:23–47:3; Exs. P-7 to P-15, P17) and terminated Garafola and other employees in the New Jersey office. (Tr. I 57:10–18, 61:20–62:2, 78:13–17, 209:4–8.)

**E.      _Sandhills I_ Complaint**

60.     In August 2019, Sandhills initiated a lawsuit against Garafola, Greene, Bidpath, Bidfacts and Garafola's son and moved for a TRO and preliminary injunction. The case caption for this action is _Sandhills Global, Inc. v. Garafola_, No. 19-17225 ("_Sandhills I_").

61.     On August 30, 2019, the Court denied Sandhills's motion. The Court stated, in relevant part, "Although loss of goodwill and industry reputation could suffice to demonstrate irreparable harm, here, Plaintiff's Motion and accompanying Complaint fail to explain what goodwill or harm to industry it would suffer in the absence of an injunction." _Sandhills I_, 2019 WL 4143015, at *2 (D.N.J. Aug. 30, 2019). The Court, however, granted expedited discovery. _Id_.

62.     Discovery in _Sandhills I_ is ongoing.

### F.      The Resurrection of Facts Technology

63.      Garafola originally formed Facts Technology in 2003. (TRO Hr'g Tr. 16:23-17:2.)

64.      In September 2019, Garafola "resurrected" Facts Technology as its sole owner and CEO. (Tr. II 173:13–22, 177:8-13.)

65.      Garafola is the founder, registered agent, and sole member of Facts Technology, a limited liability company. (Tr. II 173:13–22, 177:8–13.)

66.      Garafola "is" Facts Technology. (Tr. 177:12–13.)

67.      Facts Technology marketed itself as an "easy to use, industry specific online bidding system that broadcasts auctions from locations around the world and streams directly to a bidder's computer." (Facts Tech. Marketing at *40, Ex. D to Welch Decl., ECF No. 15-2; *see also* TRO 4–5.)

68.      Facts Technology operated online auctions via various brands, including OilFieldFacts, CollectorCarFacts, BigRigFacts, MachineFacts, RecreationFacts, MotorSportsFacts, LandandHomeFacts, ControllerFacts, StockyardFacts, VehicleFacts, CollectibleFacts, and BidderFacts. (Facts Tech. Website *13–14, Ex. B to Welch Decl., ECF No. 15-2; *see also* TRO 5.)

69.      On November 15, 2019, Facts Technology announced the release of AuctioneerFacts via e-mail message. (*See, e.g.*, E-mail Message at *8, Ex. A to Dimick Decl., ECF No. 3-2; *see also* TRO 5.)

70.      Prior to December 16, 2019, Facts Technology marketed AuctioneerFacts as "an online broadcaster of live webcast and timed auctions," having been in business "since 1999," and "led by Larry Garafola, Founder of Equipmentfacts." (Facts Tech. Website *23; *see also* TRO 5.)

71.    Upon receiving the e-mail message announcing the release of Auctioneerfacts, certain Sandhills customers contacted Sandhills. One customer asked, "Is this part of Sand[h]ills?" (*See, e.g.*, E-mail Message at *8, Ex. A to Dimick Decl.)

72.    OilfieldFacts held two auctions for Permian. (Tr. I 158:8–19; Tr. II 178:10–19.)

73.    Garafola, through Facts Technology, solicited J&C Auction Company, Equipment Marketers & Appraisers, James G. Murphy Company, McGrew Auctions, and Jeff Martin Auctions. (Tr. I 89:3–7; Tr. II 180:16–181:3; Exs. P-20 to P-23.)

### G.    *Sandhills II* **and TRO**

*74.*    On November 25, 2019, Sandhills commenced this action against Garafola and Facts Technology and filed the present Motion.

75.    After hearing oral argument on the Motion, on December 16, 2019, the Court granted temporary restraints based on Plaintiff's breach of contract claim. (*See* TRO.)

76.    The TRO states, in relevant part:

> 2. Pending a preliminary injunction hearing, Lawrence Garafola shall be temporarily restrained from (a) directly or indirectly competing with Equipmentfacts's Business, as defined in the APA; (b) directly or indirectly soliciting for himself or another business that is competitive with Equipmentfacts's Business from any customers, clients[,] or accounts of Equipmentfacts's Business; or (c) directly or indirectly interfering with any customer, client or account of Equipmentfacts to sever or alter the relationship of the customer, client or account.
>
> 3. Lawrence Garafola shall immediately return Sandhills's and Equipmentfacts's Proprietary information, as defined in the Employee Restrictive Covenant, including, but not limited to, customer lists and contact lists, bidders lists and contact lists, and auctioneer lists and contact lists.

(*Id.* at 9.)

77.     On December 23, 2019, Sandhills informed the Court that Garafola violated the TRO when Facts Technology sent an e-mail message to one of Plaintiff's customers and, accordingly, sought an amendment to the TRO. (ECF No. 29.)

78.     On January 8, 2020, the Court denied Sandhills's request and informed the parties that the evidence and legal arguments would be fully evaluated at an upcoming preliminary injunction hearing. (ECF No. 34.)

79.     Following the entry of the December 16, 2019 TRO, Garafola ceased operation of Facts Technology and has not generated any income. (Tr. II 154:22–24, 157:17–18.)

80.     Following the entry of the December 16, 2019 TRO, Garafola failed to return Sandhills's proprietary information. (Tr. I 87:3–88:2; Tr. II 166:18–19.)

81.     On February 21, 2020, the Facts Technology website, www.factstech.com, remained live. (Tr. II 188:19–20; *see also* Ex. P-25.)

## II.     <u>ANALYSIS/CONCLUSIONS OF LAW</u>

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). Failure to establish any element renders the remedy inappropriate. *See NutraSweet Co. v. Vit-Mar Enters.*, 176 F.3d 151, 153 (3d Cir. 1999).

### A.        Likelihood of Success on the Merits

To show likelihood of success on the merits, Sandhills "must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017). "[W]hether a party has met this threshold will necessarily vary with the circumstances of each case . . . [and] the elements of the movant's claims." *Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 77 (3d Cir. 2017).

Sandhills's Motion relies upon its claims against Defendants for breach of contract, tortious interference, and trade secret misappropriation.[2] (Pl.'s Moving Br. 4–11.) To demonstrate breach of contract, Sandhills must establish: (1) "that the parties entered into a contract containing certain terms"; (2) "that [Sandhills] did what the contract required [it] to do"; (3) "that [Garafola] did not do what the contract required [him] to do, defined as a breach of the contract"; and (4) "that [Garafola's] breach, or failure to do what the contract required, caused a loss to [Sandhills]." *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016) (internal quotation marks omitted) (citation omitted).

Under New Jersey law,[3] restrictive covenants are enforceable if they are reasonable under the circumstances. *Solari Indus., Inc. v. Malady*, 264 A.2d 53, 61 (N.J. 1970). A covenant is enforceable if it (1) protects the legitimate interests of the employer, (2) does not impose an undue

---

[2] Because the Court restrains Facts Technology based upon Sandhills's breach of contract claim, *see* discussion *infra* Section II.A.5., and Sandhills could not achieve greater injunctive relief by its tortious interference and trade secret misappropriation claims, the Court will not address these claims against Facts Technology.

[3] The parties agree that New Jersey law governs the parties' contract dispute. (*See generally* PFF, DFF.)

hardship on the employee, and (3) is not injurious to the public. *Whitmyer Bros. Inc. v. Doyle*, 274 A.2d 577, 581 (N.J. 1971) (citing *Solari*, 264 A.2d at 56).

Because the Acquisition and Garafola's employment are separate agreements (Findings of Fact ¶ 25), the Court considers the ancillary APA and EA Restrictive Covenants (collectively, "Covenants") in turn so not to conflate their reasonableness analyses.

### 1.     Legitimate Business Interest

"Courts will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee." *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 892 (1988). Rather, employers must have a "patently legitimate" interest in their trade secrets, confidential business information, and customer relationships. *ADP, LLC v. Rafferty*, 923 F.3d 113, 126 (3d Cir. 2019) (citing *Whitmyer*, 274 A.2d at 581; *Ingersoll-Rand*, 542 A.2d at 892–93. When a restrictive covenant is "ancillary to the purchase of a business," it is "accorded far more latitude," *Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 602 A.2d 789, 793 (N.J. Super. Ct. App. Div. 1992), because the sale of a business involves the goodwill of the seller, *Jiffy Lube Int'l. Inc. v. Weiss Bros.*, 834 F. Supp. 683, 691 (D.N.J. 1993).

### a.     APA Restrictive Covenant

The Court finds that the APA Restrictive Covenant, which is ancillary to the Asset Purchase Agreement, protects Sandhills's legitimate business interest in its $1.5 million purchase of Equipmentfacts. Indeed, under the agreement, "the Parties . . . agree[d] that the goodwill of [Equipmentfacts] [was] an integral component of the assets being acquired pursuant to the [APA] and without such goodwill the value of the assets of [Equipmentfacts] [would] be greatly diminished and [Sandhills's] reasons for entering into the [APA] and completing the Acquisition [would] be extinguished." (APARC 1; *see also* Findings of Fact ¶ 15.)

b.    EA Restrictive Covenant

The Court finds that the EA Restrictive Covenant, which is ancillary to Garafola's Employment Agreement, protects Sandhills's legitimate business interests in protecting its customer relationships and its proprietary and confidential information.

**1.    Undue Burden**

Next, the Court considers whether the covenants impose undue hardship on Garafola. A restrictive covenant is generally enforceable if it is no broader than necessary to protect an employer's legitimate business interests. *See generally* Restatement (Second) of Contracts, §§ 186–188 (Am. Law Inst. 1981). Where a court finds a covenant overbroad, the court tailors the covenant's restrictions through the process of blue penciling rather than holding them to be void per se. *ADP*, 923 F.3d at 125–26 (citing *Solari*, 264 A.2d at 61). That is, a court will consider whether a covenant's duration, geographic limits, and scope of activities must be "narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests." *Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005).

a.    APA Restrictive Covenant

The parties disagree on the scope of activity prohibited under the APA Restrictive Covenant. Sandhills argues that the APA Restrictive Covenant prohibits Garafola from providing "*any* online auction[] related services or solutions within *any* of the industries in which Sandhills's brands offer online auction services or solutions." (PFF 27 (emphasis added).)

Here, although Sandhills has a legitimate business interest in the goodwill of Equipmentfacts's business, Sandhills's interpretation of the APA Restrictive Covenant is unsupported by the terms of the contract. Sandhills does not identify any contract language and merely relies upon Welch's testimony at the hearing. (*See* PFF ¶ 17.) Neither the APA nor the

APA Restrictive Covenant defines Sandhills's business. (*See* Findings of Fact ¶ 21.) Without support in the contract language, Sandhills's interpretation of the APA Restrictive is too nebulous and uncertain to enforce, and Sandhills may not now alter the terms of the covenant in its favor.

Moreover, under Sandhills's interpretation of the APA Restrictive Covenant, Garafola would be precluded from providing online auction related services or solutions within *any* of the industries in which Sandhills's brands offer online auction services or solutions. Sandhills's interpretation could, therefore, include industries in which Equipmentfacts does not operate. Indeed, Equipmentfacts's Business *is* defined in the APA and is limited to online auction solutions for certain industries. (*See* Findings of Fact ¶ 13.)

"If a restrictive covenant reaches beyond an employer's legitimate interests, courts applying New Jersey law have typically resorted to blue penciling to fulfill the contract's lawful ends." *ADP*, 923 F.3d at 126 (vacating district court's denial of a preliminary injunction and remanding for the district court to blue pencil the covenants); *see also*, *Saturn Wireless Consulting, LLC v. Aversa*, No. 17-1637, 2017 WL 1538157, at *11–12 (D.N.J. Apr. 26, 2017) (blue-penciling a restrictive covenant's non-solicitation clause following preliminary injunction hearing).

Accordingly, the Court finds Sandhills has a legitimate and protectable interest in Equipmentfacts's Business, namely its goodwill, and the APA Restrictive Covenant could be enforced to reasonably protect that interest. But enforcement of the APA Restrictive Covenant is reasonable only insofar as it is limited to restricting Garafola from competing with, soliciting for business in competition with, and interfering with Equipmentfacts's Business as defined under the APA.

b.     EA Restrictive Covenant

Next, the Court turns to the provisions of the EA Restrictive Covenant. First, under the EA Restrictive Covenant's non-solicitation clause, Garafola is restricted from soliciting or doing business with *any* customers of Sandhills with whom he had personal contact and actually did business with in the course of his employment with Sandhills or Equipmentfacts at any time during the four years before his termination. (EARC § 6; *see also* Findings of Fact ¶ 38.)

Here, the Court finds that this clause reasonably protects Sandhills's interest in maintaining its customer relationships. *Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028, 1039 (N.J. Super. Ct. Law Div. 1995) (finding non-solicitation clause reasonably protected a plaintiff's existing customer relationships but was overbroad to the extent it covered prospective customers that were only solicited by the plaintiff); *see also ADP*, 923 F.3d at 121. Each client that Sandhills attracted and had purchased through the Acquisition of Equipmentfacts "represents a significant investment of time, effort and money which is worthy of protection." *A.T. Hudson & Co. v. Donovan*, 524 A.2d 412, 416 (N.J. Super. Ct. App. Div. 1987); *see also Solari*, 264 A.2d at 61 (finding an employer's "legitimate interest[] would be adequately protected by a limited restraint against [a former employee's] dealing with any of [its] actual customers or prospective customers in the United States with whom [the former employee] had substantial dealings on [its] behalf while in [its] employ"). Moreover, the covenant is tailored to *customers* with whom Garafola did business in the last four years of his tenure at Equipmentfacts. The non-solicitation clause, therefore, reasonably protects Sandhills's interest.

Second, the EA Restrictive Covenant's non-disclosure clause prohibits Garafola from the unauthorized use of Sandhills's Proprietary Information and requires Garafola to return this Proprietary Information upon leave of its employ. (EARC §§ 1.1, 8; *see also* Findings of Fact

¶ 33.) Proprietary Information is narrowly defined and includes public and non-public materials, some of which Sandhills presented at the hearing, including the company's data, business plans, suppliers, customers, customer sales information, customer representatives, and customer contact information. (*Supra* Findings of Fact ¶ 33.) Employers have legitimate business interests in their trade secrets and confidential business information. *ADP*, 923 F.3d at 121. And "employers may protect themselves contractually from the misappropriation of other company information by former employees." *Ingersoll-Rand Co.*, 542 A.2d at 893. Here, Sandhills has a legitimate business interest in protecting its business information and intellectual property, and the Court finds that this provision reasonably protects that interest.

Last, the EA Restrictive Covenant's non-competition clause expressly prohibits Garafola from conducting "Restricted Business," *i.e.*, "providing an online auction platform or online auction services for the purpose of facilitating the sale of equipment or machinery that is used in the agriculture or construction industries in a manner that competes with [Sandhills]." (EARC § 6; *see also* Findings of Fact ¶ 36.) Here, considering the noncompetition provision of the APA Restrictive Covenant, the Court finds that this definition of Restricted Business sufficiently overlaps with the definition of Equipmentfacts's Business in the APA and reasonably protects Sandhills's interest. For these reasons, the Court finds the EA Restrictive Covenant does not impose undue hardship upon Garafola.

### 2.    Injury to the Public

Lastly, any "enforcement of [a restrictive covenant] should not cause harm to the public." *More*, 869 A.2d at 898. Here, beyond the public's usual interest in matters involving noncompetition, non-solicitation, and nondisclosure agreements, the Court does not identify any possible injury to the public. The Covenants honor the parties' initial agreements and reasonably

protect Sandhills's interests. Enforcement of the Covenants would not, therefore, be injurious to the public.

### 3.     Breach of the Restrictive Covenants

Sandhills initially demonstrated the likelihood of success on the merits on its breach of contract claim against Garafola because Facts Technology's brands offered online auction solutions for the heavy equipment, truck, agriculture, and related industries, in contravention of the APA Restrictive Covenant. (TRO 7–8.) To that end, the Court will not reanalyze whether those actions previously taken by Facts Technology violated the Covenants. Following the TRO and the hearing, new issues have arisen, which the Court addresses in turn.

### a.     Unclean Hands

Defendants argue that Sandhills has unclean hands by breaching Section 3 of the EA and failing to provide him with Schedule A of the EA. (DFF 24.) Schedule A was an attachment to the EA which contained a job description of Garafola's position. (EA § 3; *see also* Findings of Fact ¶ 27.)

"The unclean hands doctrine is not an automatic or absolute bar to relief; [rather,] it is only one of the factors [a] court must consider when deciding whether to exercise its discretion and grant an injunction." *Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147, 150 (3d Cir. 2019) (internal quotation marks and citation omitted) (first alteration in original). To that end, "a court retains the discretion to grant equitable relief even where the elements of the unclean hands doctrine are met." *Id.* (citation omitted); *see also Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944) (explaining that while "a federal court should not, in an ordinary case, lend its judicial power to a plaintiff who seeks to invoke that power for the purpose of consummating a transaction in clear violation of law" the court need not "always permit a

defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law in the transactions involved").

Garafola has not demonstrated that Sandhills has terminated his employment in bad faith. Indeed, the record contains some unfavorable e-mail messages to and from Garafola and Greene that do not indicate Sandhills acted in bad faith. (*E.g.*, Exs. P-5, P-8.) It is also unclear from the record whether "Schedule A" was provided to Garafola. Therefore, on the current record before the Court, the Court cannot find that Sandhills acted with unclean hands.

b. <u>Return of Proprietary Information</u>

Pursuant to the TRO, Garafola was to "immediately return Sandhills's and Equipmentfacts's Proprietary Information, as defined in the Employee Restrictive Covenant, including, but not limited to, customer lists and contact lists, bidders lists and contact lists, and auctioneer lists and contact lists." (TRO 9.) Sandhills argues that, following the TRO, Garafola failed to return any Proprietary Information. Examples of such Proprietary Information were introduced at the hearing, including customer and contacts lists, spreadsheets, and copyrighted how-to presentations attached to e-mail messages either to or from Garafola's personal e-mail address. (PFF 29; *see also* Exs. P-7 to P-17.)

Garafola argues that these materials are not "proprietary." He also argues that even if the materials were proprietary, once these documents were "put into context," it is apparent that Garafola was still working for Sandhills, albeit using his personal e-mail address.

First, the Court finds the term "Proprietary Information" as defined in the EA Restrictive Covenant ably encompasses the materials in Sandhills's exhibits. These are lists of top bidders and customer lists that are not readily accessible by the public. Second, even if Garafola legitimately

used his personal e-mail account to conduct Sandhills's business,[4] this reason does not explain why Garafola did not return the Proprietary Information upon his termination and why Garafola failed to return the Proprietary Information following entry of the TRO. To the extent Garafola destroyed the relevant information in his possession, he shall provide a certification as to the same. (Tr. II 166:18-19; *see also* Findings of Fact ¶ 80.)

### c. White Label Solutions

To avoid violating the Restrictive Covenants, Garafola wishes to "conduct business as Facts Technology, Auctioneer Facts, and Dealer Facts by selling software licenses as a true white label service" without providing any other services. (Garafola Cert. ¶¶ 15, 17; Tr. II 155:6–7.) Sandhills argues that Equipmentfacts provides white label solutions to at least forty-five customers. (Welch Decl. ¶ 9.)

The parties define "white label solutions" in various ways. (*E.g.*, Tr. I 176:1–177:3 (Welch: "[White label] means that if you go to somebody's website, you can't -- you don't see branding for the third-party vendor."); PFF ¶ 21 (Sandhills offers "white labeling" whereby "[it] integrates one or more of its live broadcast and timed auction solutions (Equipmentfacts, AuctionTime, HiBid) into its customer's website. This option allows buyers to go directly to a customer's website and bid directly on the customer's inventory sale. Sandhills works with the customer to create the general layout and design of the website and proofs the website with the customer when the customer is ready . . . for the website to 'go live' to the public. Customers can use their Sandhills login to their inventory management account to upload a new sale, catalog items upcoming for an

---

[4] Garafola testified that out of convenience and habit, he transferred the documents to his personal e-mail address in order to conduct business for Sandhills, including highlighting and checking off bidders so he could invite them to attend auctions with Equipmentfacts. (Tr. II 134:10–140:12; *see e.g.*, Ex. D-12.)  He also explained that he would send documents to his wife's e-mail address because her computer was connected to the printer at home. (Tr. II 137:7–12.)

auction, sort orders, view registered bidders and pre-bids, and run the online bidding software themselves." (citing Welch Decl. ¶¶ 7–8; Tr. I 176:1–177:3)); Garafola Cert. ¶ 17 ("A white label service is when a product, such as a software program, is produced by one company, such as Facts Technology, and sold to a third-party so that [the] third-party can then rebrand the product with its name and/or logo as if the third-party made it. There are no other services being provided.").)

Here, the parties have not provided appropriate briefing and substantiating documentation to support their positions. For these reasons, the issue is not properly before the Court. The parties may, accordingly, submit briefing and supporting documentation on this issue.

### 4.    Restraints Against Facts Technology

For the foregoing reasons, the Court enforces the terms of the Covenants against Garafola. Moreover, the Court equally applies the terms of the Injunction to Facts Technology because Garafola has admitted that, for all intents and purposes, he is Facts Technology—that they are one in the same. (Findings of Fact ¶ 67.) Under Federal Rule of Civil Procedure 65(d)(2), an injunctive "order binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." As an entity in active participation with Garafola, Facts Technology is, accordingly, bound by the terms of the injunction pursuant to Rule 65(d)(2).

### B.    Immediate, Irreparable Harm

To demonstrate irreparable harm, a movant has the burden of establishing a "clear showing of immediate irreparable injury." *Louis v. Bledsoe*, 438 F. App'x 129, 131 (3d Cir. 2011) (citation omitted). "Establishing a risk of irreparable harm is not enough [to warrant a preliminary injunction]." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987); *see also Laidlaw, Inc.*

*v. Student Transp. of Am.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) ("[T]he claimed injury cannot merely be possible, speculative, or remote." (citation omitted)). Moreover, "the injury created by a failure to issue the requested injunction must be of a peculiar nature, so that compensation in money cannot atone for it." *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) (citation omitted).

Sandhills has established that it will suffer immediate, irreparable harm absent an injunction. It provided evidence that Garafola mentions Equipmentfacts in Facts Technology's marketing materials, thereby employing Equipmentfacts's goodwill. Sandhills further provided evidence of customer confusion—specifically that its customers have questioned whether Facts Technology is affiliated with Sandhills. Furthermore, following the Court's TRO, Facts Technology's website remained live. (Findings of Fact ¶ 82.) Because loss of control of reputation and loss of goodwill are grounds for irreparable harm, *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (citation omitted), the Court finds that Plaintiff will suffer irreparable harm absent preliminary injunctive relief.

### C.    Balance of Harms and Public Interest

Finding that Plaintiff satisfies the first two factors, the Court turns to the remaining two factors. "As a practical matter, if a plaintiff demonstrates a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

Defendants argue the balance of harms weighs in its favor because Sandhills has not provided any evidence to support its Motion. (DFF 27.) Defendants also argue that "if Sandhills obtains the injunctive relief it seeks, Mr. Garafola will not only not be able to provide for his

family[,] but he will be submerged with attorneys' fees and costs." (*Id.*) Moreover, Garafola would be precluded from participating in a business that does not compete with Sandhills. (*Id.*)

First, the Court finds that Sandhills has put forth ample evidence to meet its burden on its breach of contract claim. *See supra* discussion Section II.A.1. Moreover, in balancing the harms between the parties, the Court considers its previous analysis of the Covenants. *See* discussion *supra* Section II.A.1–2. For the same reasons the Covenants reasonably protect Sandhills's legitimate business interests and do not result in undue hardship upon Garafola, the Court finds the balance of harms favors entry of an injunction.

As to the public's interest, the Court similarly relies upon its determination that the Covenants are not injurious to the public. *See* discussion *supra* Section II.A.3. In addition, it would be within the public's interest to protect Sandhills's legitimate business interests and enforce the parties' initial agreements. For these reasons, the Court finds Sandhills has met its burden of showing that injunctive relief is warranted.

## III.   ATTORNEYS' FEES

Sandhills seeks "reasonable attorneys' fees and out-of-pocket expenses incurred in connection with the Temporary Injunction and Preliminary Injunction applications." (PFF 41.)

Under New Jersey law, "[a] prevailing party can recover counsel fees if expressly allowed by statute, court rule, or contract." *Empower Our Neighborhoods v. Guadagno*, 183 A.3d 275, 283 (N.J. Super. Ct. App. Div. 2018). "[A] party can be considered 'prevailing' . . . even though the disposition of the case does not include a final judgment entered in [the] plaintiff's favor, provided plaintiff has won substantially the relief originally sought in [its] complaint." *Id.* (quoting *Singer v. State*, 472 A.2d 138, 142 (N.J. 1984)). Attorneys' fees pursuant to terms of a restrictive covenant are, accordingly, appropriate where a court orders "enforcement of restrictions on [the defendant's]

employment for almost the entire the period [the plaintiff] requested." *Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 344 (3d Cir. 2019) (quoting *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 234 (3d Cir. 2008)); *see also Psaros v. Saropoulos*, No. A-4293-07T3, 2009 WL 1393313, at *4 (N.J. Super. Ct. App. Div. May 20, 2009) (granting attorneys' fees pursuant to a provision of the parties' restrictive covenant where "plaintiff received a judgment substantially in his favor").

The APA Restrictive Covenant provides that "[Sandhills] shall be entitled to recover from [Garafola] its reasonable attorneys' fees and out-of-pocket expenses incurred" in enforcing provisions of the agreement. (APARC § 8.) Here, Sandhills preliminarily achieved the substantive relief it sought. Defendants have not, however, put forth any defense to Sandhills's request. Sandhills's requests is, accordingly, denied without prejudice in order to afford the parties the opportunity to fully brief the issue. Sandhills shall file a motion for attorneys' fees which includes appropriate documentation of fees and expenses for the Court's consideration, and Defendants shall have the opportunity to oppose.

## IV.   PRELIMINARY INJUNCTION BOND

The Federal Rules requires a successful applicant for a preliminary injunction to post a bond, "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[A] bond given pursuant to a [TRO] cannot be carried over to cover possible liability under a preliminary injunction." *Steinberg v. Am. Bantam Car Co.*, 173 F.2d 179, 181 (3d Cir. 1949); *see also Howmedica Osteonics v. Zimmer Inc.*, 461 F. App'x 192, 198 (3d Cir. 2012) (finding district court erred in continuing bond securing TRO rather than establishing new injunction bond). Plaintiff shall, accordingly, post the bond as set forth in the accompanying Order.

## IV.    <u>CONCLUSION</u>

The Court grants Plaintiff's Application for Preliminary Injunction subject to the limitations stated in this Memorandum Opinion. The Court will enter an appropriate Order.


MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE