**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SANDHILLS GLOBAL, INC.,

        Plaintiff,

        v.

LAWRENCE GARAFOLA, et al.,

        Defendants.

Civil Action No. 19-20669 (MAS) (TJB)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

      This matter comes before the Court upon Plaintiff Sandhills Global, Inc.'s ("Sandhills") Proposed Supplemental Findings of Fact and Conclusions of Law Regarding White Label Online Auction Bidding Systems. (ECF No. 70.) Through that submission, Sandhills requests that the Court extend its April 10, 2020 Preliminary Injunction Order (ECF No. 64) against Lawrence Garafola ("Garafola") and Facts Technology, LLC (collectively, "Defendants") and enjoin them from providing certain "white label" online bidding systems.[1] Defendants opposed. (ECF No. 73.) For their part, Defendants have moved for reconsideration of the same April 10, 2020 Preliminary Injunction Order. (ECF No. 67.) Sandhills opposed reconsideration. (ECF No. 69.) For the reasons set forth below, Defendants' Motion for Reconsideration is denied and Sandhills's request for a Preliminary Injunction is granted.

---

[1] The Court has previously found "Garafola has admitted that, for all intents and purposes, he is Facts Technology—that they are one in the same." (Apr. 10, 2020 Op. 25, ECF No. 63.)

1

I.      **BACKGROUND**

The parties are familiar with the factual and procedural history of this matter, and therefore the Court only recites those facts necessary to resolve the instant motions.  In July 2018, Garafola sold his online truck auctioning company, Equipmentfacts, LLC ("Equipmentfacts") to Sandhills for $1.5 million.  (Asset Purchase Agreement ("APA") §§ 1.6, 2, Ex. A to Farsiou Certif., ECF No. 35-1.)  Under the APA, Equipmentfacts's "Business" is defined as "the business of providing online auction solutions for the heavy equipment, truck, agriculture[,] and related auction industries, including providing industry-specific online bidding systems, websites for virtual attendance at auctions, the 'Auction Facts Monthly' publication, third-party advertisement services[,] and podcast content[.]"  (APA 2; *see also* APA § 7.1(f).)  At the time of the transaction, Sandhills and Garafola "agree[d] that the goodwill of [Equipmentfacts was] an integral component of the assets being acquired pursuant to the [APA] and without such goodwill the value of the assets of [Equipmentfacts would] be greatly diminished and [Sandhills's] reasons for entering into the [APA] and completing the Acquisition [would] be extinguished."   (Noncompetition, Noninterference and Confidentiality Agreement ("APARC") 1, Ex. B to Farsiou Certif., ECF No. 35-1.)

In order to protect Equipmentfacts's goodwill and assets, and as a condition for completing the transaction, Sandhills and Garafola entered into certain restrictive covenants.  The APA's Restrictive Covenant contains noncompetition, non-solicitation, and noninterference provisions which are effective for a period of five consecutive years beginning July 16, 2018.  (APARC §§ 1-5.)  The APA Restrictive Covenant's noncompetition clause provides that during the restrictive period

> [Garafola] shall not . . . directly or indirectly . . . provide or perform
> services for the benefit of, manage, operate, or in any way

2

> participate in a business that competes with the Business (as
> conducted by [Sandhills] or its Affiliates), either on [Garafola's]
> own behalf or on behalf of any other Person; or acquire a financial
> interest in, own or control any business that competes with the
> Business . . . .

(APARC § 2.)  The APA Restrictive Covenant's nonsolicitation clause provides that during the

restrictive period

> [Garafola] shall not . . . directly or indirectly solicit . . . business
> which is competitive with the Business from any customers, clients
> or accounts of the Business as conducted by [Sandhills] or its
> Affiliates . . .

(*Id.* § 3.)  The APA Restrictive Covenant's noninterference clause provides that during the

restrictive period

> [Garafola] shall not . . . directly or indirectly:
>      a.       encourage in any way or for any reason, any
> customer, client[,] or account of [Sandhills] or its Affiliates, to sever
> or alter the relationship of such customer, client[,] or account with
> [Sandhills] or its Affiliates;
>      b.       discourage . . . any prospective customers, clients[,]
> or accounts of [Sandhills] or its Affiliates from becoming a
> customer, client[,] or account of [Sandhills] or its Affiliates;
>      c       aid any other person attempting to take customers,
> clients[,] or accounts in relation to the Business from [Sandhills] or
> its Affiliates.

(*Id.* § 5.)  Additionally, although the APA Restrictive Covenant does not define the "Business" of

"Sandhills and its Affiliates," it adopts the APA's definition of the "Business" given above.  (*Id.*

§ 1(d) (providing that "all other capitalized terms used in the [APARC], but not otherwise defined

in the [APARC] shall have the meanings ascribed to them in the [APA].").)

Garafola and Sandhills also agreed that as a part of Sandhills's July 2018 purchase of

Equipmentfacts, Garafola would join Sandhills as an employee.[2]  (Employment Agreement ("EA")

---

[2] In connection with this employment, Garafola and Sandhills entered into a restrictive covenant
in which Garafola agreed not to be involved in the "restricted business" for eighteen months

1, Ex. C to Farsiou Certif., ECF No. 35-1.) As a Sandhills employee, Garafola ran Equipmentfacts and managed Sandhills's New Jersey office. (Feb. 6, 2020 Hr'g Tr. 216:14-24, ECF No. 56.) As the Court has previously found, following an internal investigation conducted by Sandhills during the summer of 2019, the company became aware of internal email correspondence between Garafola and other Sandhills employees forwarding sensitive Sandhills materials to private email accounts controlled by Garafola. (Apr. 10, 2020 Op. ¶¶ 39-59.) These materials included lists of auctioneers, sales, and commissions; lists of "Equipmentfacts, LLC TOP BIDDERS 2017 to present"; and various Equipmentfacts manuals and reference materials relating to conducting live online auctions. (*Id.* ¶¶ 44, 50, 54-56.) Other emails uncovered by Sandhills's investigation suggest that Garafola and former Sandhills employees were planning to "start a competing business" to certain Sandhills services. (*Id.* ¶ 54.) After discovering these emails, Sandhills terminated Garafola and other employees in its New Jersey office. (*Id.* ¶ 59.)

Following Garafola's termination, in August of 2019, Sandhills commenced two litigations against Garafola, including the present action now before the Court.[3] In the present action, Sandhills alleges that "Garafola, while an employee of Sandhills, misappropriated Sandhills's trade secrets and proprietary technology, and used such trade secrets and proprietary technology to launch a competing online auction company, Facts Technology, shortly after his termination

---

following his termination to the extent such involvement "would involve [his] provision of products or performance of services of the type [Garafola] conducted, authorized, offered, or provided while working on behalf of [Sandhills] during the twenty-four (24) month period prior" to his termination date. (Employment Agreement Restrictive Covenant § 5, Ex. D to Farsiou Certif., ECF No. 35-1.) The "restricted business" is defined as "the business of providing online auction platform or online auction services for the purpose of facilitating the sale of equipment or machinery that is used in the agriculture or construction industries in a manner that competes with [Sandhills]." (*Id.*)

[3] *See also Sandhills Global, Inc. v. Garafola*, No. 19-17225.

from Sandhills and only weeks after Sandhills filed its companion litigation against Garafola."
(Compl. ¶ 43, ECF No. 1.)  Indeed, Sandhills alleges that Garafola and Facts Technology sent
solicitations to Sandhills customers for his and Facts Technology's benefit in "direct[] violat[ion
of] his agreements with Sandhills, which prevent him from competing in the Equipmentfacts
Business space." (*Id.* ¶¶ 45, 48.)

On December 16, 2019, the Court issued temporary restraints against Garafola, pending a
preliminary injunction hearing.  (ECF No. 23.)  On February 6, 2020 and February 21, 2020, the
Court held an evidentiary hearing.  (ECF Nos. 48, 49.)  Following that hearing, the Court granted
Sandhills a Preliminary Injunction restraining Garafola "from violating the provisions of the
Noncompetition, Noninterference, and Confidentiality Agreement between Sandhills and
Garafola, such relief being limited to competition with Equipmentfacts's Business." (Prelim. Inj.
Order ("PI Order") 2, ECF No. 64.)  The Court found that "Equipmentfacts's Business is the
business of providing online auction solutions for the heavy equipment, truck, agriculture, and
related auction industries, including providing industry-specific online bidding systems, website
for virtual attendance at auctions, the Auction Facts Monthly publication, third-party
advertisement services, and podcast content."  (*Id.* 2 n.1.)  In one of the motions currently before
the Court, Defendants move for reconsideration of this Order. (ECF No. 67.)

The second motion now before the Court seeks to extend the April 10, 2020 Preliminary
Injunction to forbid Defendants from offering certain "white label" services.  As the Court noted
in an earlier opinion, "[t]o avoid violating the Restrictive Covenants, Garafola wishes to 'conduct
business as Facts Technology, Auctioneer Facts, and Dealer Facts by selling software licenses as
a true white label service' without providing any other services."  (Apr. 10, 2020 Op. 24 (quoting
Garafola Certif. ¶¶ 15, 17, Ex. A to Farsiou Certif., ECF No. 59-1); *see also* Feb. 21, 2020 Hr'g

Tr. 155:6-7, ECF No. 57.)  Although the parties disagreed about the definition of white label services, Sandhills argued that it provided white label services to customers as a part of its business and that Garafola should be enjoined from providing these services.  (*Id.* at 24-25.)  While issuing the April 10, 2020 Preliminary Injunction, the Court found that the "parties have not provided appropriate briefing and substantiating documentation to support their positions.  For these reasons, the issue is not properly before the Court."  (*Id.* at 25.)  The parties have since provided supplemental briefing on the white label issue and the Court will consider these submissions at this time.

In its supplemental briefing, Sandhills argues that it provides its customers "with white label online bidding systems that give them the opportunity to integrate the Equipmentfacts online bidding system into their websites.  Customers choose whether or not they want to include Equipmentfacts branding on their website and to use Equipmentfacts's website to auction their inventory."  (Sandhills Suppl. White Label Findings of Fact ("SWLFF") ¶ 2, ECF No. 70.)  According to Sandhills, it "has approximately 186 white label customers."  (*Id.*)  As Sandhills further explains, it "will integrate the Equipmentfacts online bidding functionality (BidCaller) directly into the customer's website with their own branding and logo."  (*Id.* ¶ 3.)  Sandhills maintains that "[t]his enables bidders to go directly onto the customer's website and bid directly on the customer's online auction inventory without ever leaving the customer's website.  Colloquially speaking, this is a 'brand-less' white label bidding system."  (*Id.*)  Sandhills maintains that "Defendants' white label system, e.g., Auctioneerfacts, competes against Equipmentfacts'[s] white label system."  (*Id.* ¶ 11 (emphasis omitted).)  Sandhills represents to the Court that the following statement appears on Defendants' Auctioneerfacts's website: "AuctioneerFacts, a Facts Technology Company[,] is an online auction solution designed with efficiency and performance

in mind. Our 100% web-powered auction platform boasts a variety of features . . . ." (*Id.* (emphasis omitted).)

Sandhills provides James G. Murphy & Co. ("Murphy") as an example of "an auction company that utilizes Sandhills'[s] 'brand-less' white label bidding system." (*Id.* ¶ 4.) Sandhills maintains that Murphy "has been using the Equipmentfacts['s] 'brand-less' white label system since October 2018 and continues to do so through the present. Garafola was employed by Sandhills when [Murphy] started using this 'brand-less' white label system." (*Id.* ¶ 5.)

In response to Sandhills's arguments regarding Murphy, Defendants argue that "this is yet another example of perjury" by Sandhills and its representatives. (Defs.' Opp'n to Pl.'s Suppl. Findings of Fact ¶ 4, ECF No. 73.) Defendants maintain that "Equipmentfacts does not offer a white label solution for Murphy," but rather, "it provides a marketplace[,] which is what Equipmentfacts's business is and what Plaintiff purchased." (*Id.* at 8.) In their opposition, Defendants go on to describe and reproduce images taken from webpages with Murphy branding. (*See generally id.* at 7-22.) According to Defendants, however, notwithstanding Murphy's branding, it is clear from these webpages "that Murphy's online bidding provider is Equipmentfacts and not a white label solution provided by Sandhills or Equipmentfacts." (*Id.* at 9.) Because these webpages tend to "show the connection" between Murphy and Sandhills, Defendants maintain that Sandhills is not offering a true white label bidding service to Murphy. (*Id.* at 12; *see also id.* at 14-21.) Defendants also maintain that Sandhills is not offering a white label service because it "charge[s] a two (2) percent commission fee for having their auction platform utilized[,]" (*id.* at 4), and because Sandhills, according to Defendants, shares auction information on behalf of Murphy using Sandhills's social media accounts (*id.* at ¶ 4-5).

Compared with Sandhills, Defendants maintain that its "white label service provides the customer with independence to use the software as it sees fit.  This includes a public website, bidder management system, an inventory management system[,] and a full accounting system with reports.  This is all done with the customer's branding."  (*Id.* ¶ 13.)  Defendants further explain that its "inventory management system . . . allows customers . . . to list their inventory on [the customer's] website."  (*Id.* ¶ 14.)

Sandhills also represents to the Court that following the April 10, 2020 Preliminary Injunction Order, on April 25, 2020, Garafola and Facts Technology participated in a virtual auction put on by Wolfe Industrial Auctions, Inc. ("Wolfe").  (SWLFF ¶ 24.)  Defendants confirm their participation in the Wolfe auction and submit evidence from Joshua Ruby ("Ruby"), the President of Wolfe, confirming that his company "purchased a software license from Garafola through Facts Technology which allowed [Wolfe] to brand the software for Wolfe. It permits [Wolfe] to create a platform that [Wolfe] could use for [Wolfe's] bidder list."  (Ruby Certif. ¶ 10, ECF No. 73-8.)  Notwithstanding their purchase of this online auction solution from Defendants, Ruby avers that Wolfe "has been and is currently a customer of Sandhills for purposes of providing Wolfe with an auction platform for [its] auctions.  [Sandhills] served in this capacity at the April 25, 2020 virtual auction that [Wolfe] held."  (*Id.* ¶ 6.)  According to Ruby, Wolfe used three auction platforms during that auction, including Equipmentfacts and its own "Wolfe Live."  (*Id.* ¶ 7.)  Ruby also confirms that Garafola was involved in "oversee[ing]" the April 25, 2020 auction for purposes of ensuring any software issues were resolved as this was the first virtual auction [Wolfe] had performed."  (*Id.* ¶ 14.)  Additionally, Ruby avers that Garafola "cover[ed] for [a Wolfe] clerk when a break was needed," although he "did not perform specific work for Wolfe, such as placing bids."  (*Id.* ¶ 15.)  Sandhills argues that Garafola's participation in the April 25, 2020 auction

8

violated the Court's April 10, 2020 Preliminary Injunction Order, which restrained Defendants from violating the APA's Restricted Covenant.  (SWLFF ¶ 31 (citing PI Order).)

## II.  LEGAL STANDARD

### A.  Motion for Reconsideration

Reconsideration under Local Civil Rule 7.1 is an extraordinary remedy that is rarely granted. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 215 F. Supp. 2d 482, 507 (D.N.J. 2002). It requires the moving party to set forth the factual matters or controlling legal authorities he believes the Court overlooked when rendering its final decision. *See* L. Civ. R. 7.1(i).

To succeed on a motion for reconsideration, a movant must show: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion [at issue]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).  "A court commits clear error of law 'only if the record cannot support the findings that led to the ruling.'" *Rich v. State*, 294 F. Supp. 3d 266, 272 (D.N.J. 2018) (quoting *ABS Brokerage Servs., LLC v. Penson Fin. Servs., Inc.*, No. 09-4590, 2010 WL 3257992, at *6 (D.N.J. Aug. 16, 2010)).  "Thus, a party must do more than allege that portions of a ruling were erroneous in order to obtain reconsideration of that ruling." *ABS Brokerage Servs.*, 2010 WL 3257992, at *6.  A motion for reconsideration is not an opportunity to raise new matters or arguments that could have been raised before the original decision was made. *See Bowers v. NCAA*, 130 F. Supp. 2d 610, 612-13 (D.N.J. 2001).  Nor is a motion for reconsideration an opportunity to ask the Court to rethink what it has already thought through. *Interfaith Cmty. Org.*, 215 F. Supp. 2d at 507. "Rather, the rule permits a reconsideration only when 'dispositive factual

matters or controlling decisions of law' were presented to the court but were overlooked." *Id.* (quoting *Khair v. Campbell Soup Co.*, 893 F. Supp. 316, 337 (D.N.J. 1995)).

### B.     Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). Failure to establish any element renders the remedy inappropriate. *See Nutrasweet Co. v. Vit-Mar Enters.*, 176 F.3d 151, 153 (3d Cir. 1999).

## III.     DISCUSSION

### A.     Motion for Reconsideration

The Court finds that Defendants have failed to meet the high standard required for a successful motion for reconsideration of the April 10, 2020 Preliminary Injunction Order. Defendants repeat a number of arguments already considered and rejected by the Court. For example, Defendants argue that "at best," Sandhills has only demonstrated "a potential risk of some type of loss." (Defs.' Recons. Moving Br. 8, ECF No. 67-1.) Defendants argue that "Sandhills has not provided any evidence that Sandhills has lost one client or suffered any equitable harm due to Defendants. There was no basis whatsoever to determine that Sandhills has met the irreparable harm standard." (*Id.*) As Sandhills persuasively argues, however, Defendants have made similar arguments in prior briefs. (Sandhills's Recons. Opp'n Br. 3, ECF No. 69 (citing Defs.' Post-Trial Findings of Fact and Conclusions of Law Opp'n Br. 1, 9, ECF No. 59 ("No

evidence was provided to prove that Sandhills lost **any** customers")).)  The Court has already found that whether or not Sandhills demonstrates a loss of customers as a result of Defendants' conduct, "loss of control of reputation and loss of good will are grounds for irreparable harm."  (Apr. 10, 2020 Op. 26 (citing *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)).)  Relatedly, the Court has already found that Sandhills has provided sufficient "evidence of customer confusion—specifically that customers have questioned whether Facts Technology is affiliated with Sandhills" in the wake of Garafola's post-termination conduct.  (*Id.*)  As Plaintiff persuasively argues, many of Defendants' other arguments are similarly repetitive.  (*See generally* Sandhills's Recons. Opp'n Br. 3-4 (listing repetitive arguments previously considered by the Court).)

Here, Garafola and Facts Technology LLC are merely asking the Court to rethink what it has already thought through.  Having failed to demonstrate either an intervening change in the controlling law, or the availability of new evidence not available when the Court granted the April 10, 2020 Preliminary Injunction, or otherwise demonstrating a need to correct a clear error of law or fact or to prevent manifest injustice, the Court denies Defendants' Motion for Reconsideration.

    **B.**    **Preliminary Injunction for White Label Services**

        **1.**    **Likelihood of Success**

Sandhills is likely to succeed in its action to have the APA's Restricted Covenant enforced against the Defendants' white label business.

The Court has previously found that "Sandhills has a legitimate and protectable interest in Equipmentfacts's Business, namely its goodwill, and the APA Restrictive Covenant could be enforced to reasonably protect that interest."  (Apr. 10, 2020 Op. 19.)  The Court found that Equipmentfacts's Business, in turn, was "the business of providing online auction solutions for the

heavy equipment, truck, agriculture[,] and related auction industries, including providing industry-specific online bidding systems, websites for virtual attendance at auctions, the 'Auction Facts Monthly' publication, third-party advertisement services and podcast content." (PI Order 2 n.1; *see also* APA §§ 2, 7.1(f).) The Court went on to find, however, that "enforcement of the APA Restrictive Covenant is reasonable only insofar as it is limited to restricting Garafola from competing with, soliciting for business in competition with, and interfering with Equipmentfacts's Business as defined under the APA." (Apr. 10, 2020 Op. 19.) The Court's earlier ruling was in accord with New Jersey law providing that "[i]f a restrictive covenant reaches beyond an employer's legitimate interests," courts may "resort[] to blue-penciling to fulfill the contract's lawful ends." (*Id.* (quoting *ADP, LLC v. Rafferty*, 923 F.3d 113, 126 (3d Cir. 2019)).) Accordingly, the Court previously "blue-penciled" the APA Restrictive Covenant so that Garafola would be restricted from operating in industries in which Equipmentfacts operates, rather than the industries in which Sandhills and its other brands operate.

Notwithstanding the broad definition of Equipmentfacts's business as "providing online auction solutions," Defendants appear to argue that the Court should similarly blue-pencil the APA Restrictive Covenant so that Defendants are only restricted from providing the same kinds of online services that Equipmentfacts actually provides. Defendants maintain that Equipmentfacts does not offer white label services. For its part, Sandhills argues that Equipmentfacts does provide white label services to its customers. Sandhills asserts that Murphy and the Burton Auction Company are examples of customers using Equipmentfacts's white label services. (SWLFF ¶¶ 3-5, 10.) Defendants, however, argue that the services Equipmentfacts provides to these customers are not "a legitimate white label service." (Defs.' Opp'n to Pl.'s Suppl. Findings of Fact 3.) Indeed, in support of their arguments, Defendants submit a certification from Ruby of Wolfe, one

12

of Defendants' white label customers.  (*Id.* 3-4.)  According to Ruby, Sandhills does not provide

white label services, but "[i]f Equipmentfacts provided a white label service, Wolfe would have

purchased that from Equipmentfacts." (*Id.* at 25 (citing Ruby Certif., ECF No. 73-8).)  Defendants

further maintain that "white label service is not identified or inserted into either the Asset Purchase

Agreement[,] . . . restrictive covenant[,] nor the employment agreement restrictive covenant."  (*Id.*

at 3.)  Defendants further argue that "when the restrictive covenant was entered, neither [Sandhills]

[n]or Garafola performed white label services."  (*Id.* at 33.)  According to Defendants, "[t]he

restrictive covenant would be overly broad if it pertained to work not performed by either party."

(*Id.*)  Defendants' supplemental submission asserts that "at no point in time did Garafola[,]" during

his time as an employee of Sandhills, "or Equipmentfacts ever provide a white label service."  (*Id.*

at 22.)  Accordingly, Defendants argue that under New Jersey's restrictive covenant doctrine, they

cannot be enjoined from providing white label services.

    "While non-compete agreements that accompany employment contracts are subject to a

reasonableness test, New Jersey courts afford more deference to restrictive covenants ancillary to

the sale of a business because the participants in the sale of a business have more equal bargaining

power." *Arch Pers. Care Prods., L.P. v. Malstrom*, 90 F. App'x 17, 21 (3d Cir. 2003).  "The courts

seek to protect the 'good will' established by the seller and transferred to the buyer.  Good will

includes intangibles like company reputation and customer relationships." *Id.*  As New Jersey

courts have explained,

> if a retail store is purchased at a particular location, the seller
> receives payment for the good will generated at that location,
> recognizing that customers would be inclined to continue shopping
> at the facility.  For the seller to thereafter trade on that good will by
> reopening within the competitive area would destroy the essence of
> the transaction.

*Marigold Management, Inc. v. Arumugam*, No. A-5849-17T3, 2020 WL 5033394, at *7 (N.J. Super. Ct. App. Div. Aug. 26, 2020) (citation omitted). Here, the Court finds that the APA Restrictive Covenant between Garafola and Sandhills was executed by participants with similar bargaining power. Accordingly, Garafola's incidental noncompetitive covenant, which is designed to protect Equipmentfacts's goodwill for Sandhills is freely enforceable by the Court. *Jackson Hewitt Inc. v. Childress*, No. 06-0909, 2008 WL 834386, at *6 (D.N.J. Mar. 27, 2008) (citing *Solari Indus., Inc. v. Malady*, 264 A.2d 53, 56 (1970)).

"Notwithstanding the deference given to restrictive covenants made in connection with the sale of a business, there is no indication that New Jersey law denies to the court the right to 'blue-pencil' such a covenant to insure that it is reasonably tailored to meet the *Solari* test." *Marigold*, 2020 WL 5033394, at *7. To pass the *Solari* test, "the covenant must protect a legitimate interest of the [buyer]; it may impose no undue hardship on the [seller]; and it must not impair the public interest." *Coskey's Television & Radio Sales and Serv., Inc. v. Foti*, 602 A.2d 789, 793 (N.J. Super. Ct. App. Div. 1992). The Court will analyze each *Solari* factor to determine whether the restrictive covenant should be blue-penciled to allow Defendants to provide white label services.

        a.    **_Solari_ Factor One: Sandhills Has a Legitimate Interest in Enforcing the Restrictive Covenant**

First, restricting Defendants from providing white label services protects a legitimate interest of Sandhills. The APA Restrictive Covenant expressly enumerates the purchase of Equipmentfacts's "goodwill" as a reason Sandhills sought to purchase the company from Garafola and enter into a restrictive covenant. (APARC 1.) Courts have consistently upheld goodwill and customer relationships as a legitimate business interest satisfying the first prong of the *Solari* test. *See, e.g., Arch Personal Care Prods.*, 90 F. App'x at 22. Defendants deny that Sandhills is protecting Equipmentfacts's goodwill and customer relationships by preventing them from

14

providing white label services because Equipmentfacts has never provided white label services, according to Defendants. The Court need not reach the issue of whether or not Equipmentfacts provides white label services, a hotly disputed question in the parties' submissions. Whether or not Equipmentfacts previously or currently provides those services is beside the point. Even if Equipmentfacts does not provide white label services, the Court finds that preventing Defendants from operating such a business helps Sandhills protect Equipmentfacts's customer relationships and goodwill. *Lawn Doctor, Inc. v. Rizzo*, No. 12-1430, 2012 WL 6156228, at *11 (D.N.J. Dec. 11, 2012).

*Lawn Doctor* is instructive. In that case, the defendants entered into a franchise agreement that included a restrictive covenant controlling their conduct following termination of the agreement. The restrictive covenant broadly prohibited the defendants from operating another "Competitive Business" for the "establishment, care, and conditioning of lawns or other vegetation or any related or ancillary services, including but not limited to trees, shrubbery, and other plant life." *Id.* at *1. Notwithstanding their restrictive covenant, the defendants sought to provide "irrigation services." *Id.* at *2. The plaintiff objected, arguing that "irrigation services" fell within the definition of competitive businesses prohibited by the restrictive covenant. (*Id.* at *3.) Similar to Garafola and Facts Technology's white label arguments, the *Lawn Care* defendants argued that for the ten years they were in business with the plaintiff, "they never performed irrigation services." *Id.* at *5. Moreover, the defendants argued that "nowhere in their 35 page [f]ranchise [a]greement with Lawn Doctor is the word irrigation mentioned, nor are irrigation services discussed on the Lawn Doctor website." *Id.* Furthermore, the defendants argued that "irrigation work was never contemplated as a restricted activity or 'competitive business.'" *Id.* at * 6.

15

Notwithstanding these arguments, the court found that "the fact that the parties failed to address whether irrigation services would be prohibited by the restrictive covenant is irrelevant. The parties did not have to account for 'every possible contractual provision to cover every contingency' in order to enter into a binding and enforceable [agreement]." *Id.* at *10 (citations omitted). The "restrictive covenant was not limited to lawn care and conditioning services actually provided by Lawn Doctor. Instead, [the defendants] agreed to refrain from operating 'a business for the establishment, care[,] and conditioning of lawns or other vegetation or any related or ancillary services, including, but not limited to trees, shrubbery, and other plant life.'" *Id.* "While Lawn Doctor has never provided irrigation services in [the defendants'] franchise territory, that does not alter the fact that preventing the [defendants] from operating such a business helps Lawn Doctor protect its customer relationships and its good will." *Id.* As such "Lawn Doctor is not simply trying to enforce a restrictive covenant to stifle competition. Instead, it is attempting to protect its good will and customer relationships, legitimate interests that it is entitled to protect." *Id.* at *11.

Similarly, here, Garafola entered into a restrictive covenant that broadly prohibited him from engaging in Equipmentfacts's business. That business consists of "providing online auction solutions" within "the heavy equipment, truck, agriculture, and related auction industries." (PI Order 2 n.1.) It is of no moment that the APA and the APA Restrictive Covenant fail to expressly define or mention "white label" services. Nor does it matter whether or not Equipmentfacts actually provides "true" white label services to its customers. Sandhills has a legitimate interest in preventing damage to Equipmentfacts's goodwill and customer relationships from Defendants' white label business even if Sandhills does not itself offer white label services.

Defendants themselves submit evidence that their efforts to provide white label services may well interfere with Sandhills's customer relationships. For example, Ruby of Wolfe avers that "Wolfe has been and is currently a customer of Sandhills for purposes of providing Wolfe with an auction platform for our auctions. [Sandhills] served in this capacity at the April 25, 2020 virtual auction that [Wolfe] held." (Ruby Certif. ¶ 6.) Although "Wolfe is still a customer of Equipmentfacts[,]" has "not terminated [its] relationship with Equipmentfacts[,]" and still "uses Equipmentfacts's auction platform and other services," (Ruby Certif. ¶ 17), Ruby acknowledges purchasing certain online auction solutions from Garafola and using that licensed software at an April 25, 2020 virtual auction. (*Id.* ¶¶ 10, 14, 16 ("[w]e purchased a software license from Garafola through Facts Technology which allowed us to brand the software for Wolfe. It permits us to create a platform that we could use for our bidder list" and "at our April 25, 2020 virtual auction, Wolfe utilized three auction platforms," including "Wolfe Live").)

By offering these services to Wolfe and enabling the company to create its own online auction platform, Defendants are plainly interfering with Sandhills's customer relationships. Ruby's certification acknowledges a competitive dynamic between Equipmentfacts and Wolfe's platform: "[i]t should also be noted that Wolfe utilizes a one (1) percent commission fee on all monies generated in our platform" while Equipmentfacts has "commission fees of at least two (2) percent." (*Id.* ¶ 13.) Sandhills confirms a competitive dynamic between itself and its customer during the April 25, 2020 virtual auction: "Wolfe Industrial Auctions, Inc. encouraged bidders to use Wolfe Auction Live which means it was potentially diverting bidders from Equipmentfacts . . . to Wolfe Auction Live." (SWLFF ¶ 27.) The Court finds that this competitive dynamic is enabled by Defendants' white label auction solution. Additionally, the Court notes that Wolfe has now submitted evidence, at Defendants' behest, against Sandhills and

in support of Defendants' white label business. The Court can scarcely imagine an activity more disruptive to a vendor's relationship with a client than this. Whether or not Equipmentfacts provides white label services to companies like Wolfe, Sandhills has a legitimate business interest in protecting Equipmentfacts's customer relationships and goodwill from interference by Defendants. This is especially true where, as here, the record indicates that Defendants' white label business may be facilitating a degree of contention between Sandhills and its customers.

Finally, notwithstanding their failure to expressly name white label services as a part of Equipmentfacts's business, the plain language of the APA and the APA Restrictive Covenant make it clear that Garafola is prohibited from providing these services during the restrictive period. Once again, the Court's consideration of this matter begins with the principle that "a seller's incidental noncompetitive covenant, which is designed to protect the good will of the business for the buyer, is freely enforceable in the courts" and "accorded far more latitude than those ancillary to an employment contract." *Jackson Hewitt, Inc.*, 2008 WL 834386, at *7 (internal quotation marks omitted). As discussed above, under the APA, Equipmentfacts's "Business" is defined as "the business of providing online auction solutions for the heavy equipment, truck, agriculture[,] and related auction industries . . . ." (APA 2; *see also* APA § 7.1(f).) There is no dispute that the white label services Defendants seek to provide are "online auction solutions." (*Cf.* Defs.' Opp'n to Pl.'s Suppl. Findings of Fact ¶ 13 ("Defendants' white label service provides the customer with . . . *a public website*, a *bidder* management system, an inventory management system[,] and full accounting system with reports." (emphasis added).) Nor do Defendants dispute Sandhills's evidence that an April 25, 2020 online auction relied on Defendants' white label online auction solutions and featured "inventory includ[ing] equipment used in the agricultural and construction industries." (SWLFF ¶ 25 (citing Welch Decl. ¶ 26).) Again, Defendants themselves submit

18

evidence that the white label online auction solutions it provides to customers like Wolfe are competitive with Equipmentfacts's services. (Ruby Certif. ¶ 13 ("[i]t should also be noted that Wolfe utilizes a one (1) percent commission fee on all monies generated in our platform" while Equipmentfacts has "commission fees of at least two (2) percent").) Under the APA Restrictive covenant, "[Garafola] shall not . . . directly or indirectly . . . provide or perform services for the benefit of, manage, operate, or *in any way* participate in a business that competes with the Business." (APARC § 2 (emphasis added).) Nor may Garafola "directly or indirectly solicit . . . business which is competitive with the Business from any customers, clients or accounts of the Business as conducted by [Sandhills] or its Affiliates . . ." (*Id.* § 3.) The Court finds that Defendants are violating the APA Restricted Covenant's non-compete clause by offering white label online auction solutions within the same industries in which Equipmentfacts offers online auction solutions. Furthermore, the Court finds that Defendants are violating the APA Restricted Covenant's nonsolicitation clause by offering these services to current Equipmentfacts customers like Wolfe. Moreover, the Court finds that assisting Wolfe in running its white label online auction solution during the April 25, 2020 virtual auction constitutes participation in a business that competes with Equipmentfacts's Business. The Court finds that by doing so, Garafola violated the Court's April 10, 2020 Preliminary Injunction Order. Accordingly, the Court finds that Sandhills has a legitimate business interest in preventing this behavior by Defendants.

### a.    Remaining *Solari* Factors

The Court finds that the two remaining *Solari* factors do not establish a need to "blue-pencil" the agreement in order to permit Defendants to provide white label services. "To be enforceable," restrictive covenants "must also not impose undue hardship on the covenantors." *Marigold*, 2020 WL 5033394, at *9. "For a court to find undue hardship, a particular non-

competition restriction must result in more than mere personal hardship." *Id.* (internal quotation marks omitted). "The inquiry should look to the likelihood of the employee finding work in his or her field or elsewhere." *Id.* "Where the breach results from the covenaters' own conduct, rather than from any wrongdoing by the covenantee, a court should be hesitant to find undue hardship." *Id.* The Court finds that construing the APA Restrictive Covenant as forbidding Defendants from providing white label services will not impose any undue hardship on Defendants. The record before the Court does not suggest that Garafola will be unable to find comparable work in the online auction space or elsewhere. The Court also notes that Garafola received $1.5 million in exchange for Equipmentfacts. That sum itself undercuts any suggestion that enforcing the APA's Restrictive Covenant will impose an undue hardship on him. *Cf. Arch Personal Care*, 90 F. App'x at 5 (affirming a district court order enforcing an "agreement not to compete" because the defendant "received a great deal of money for the sale of his business"). Finally, "where a case presents no major public component, no extended discussion" of this factor "is required." *Marigold*, 2020 WL 5033394, at *9.

## 2.      Remaining Preliminary Injunction Factors

The Court finds that Sandhills has also met its burden of establishing the remaining preliminary injunction factors in its application for an injunction against Defendants' white label business. As discussed above, Defendants' efforts to establish a white label business in the same industries in which Equipmentfacts operates has resulted in loss of goodwill that is grounds for irreparable harm. *Pappan Enters.*, 143 F.3d at 805. For the reasons discussed above, the APA's Restrictive Covenant reasonably protects Sandhills' legitimate business interests and does not result in undue hardship upon Garafola. As such, the balance of harms favors entry of an injunction. Finally, it is within the public's interest to protect Sandhills's legitimate business

interests and enforce the parties' initial agreements.  For these reasons, the Court finds Sandhills

has met its burden of showing that injunctive relief is warranted.

IV.      **CONCLUSION**

      For the reasons set forth above, Defendants' Motion for Reconsideration is denied. The

Court grants Sandhills's application for a Preliminary Injunction restraining Defendants from

offering white label services subject to the limitations stated in this Memorandum Opinion.  The

Court will enter an Order consistent with this Memorandum Opinion.


                                                  **MICHAEL A. SHIPP**
                                                  **UNITED STATES DISTRICT JUDGE**